**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FUBOTV INC. and FUBOTV MEDIA INC., | CIVIL ACTION NO. 23-cv-1363-MMG-JEW |
| *Plaintiffs*, | **COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| THE WALT DISNEY COMPANY, ESPN, INC., ESPN ENTERPRISES, INC., HULU, LLC, FOX CORPORATION, and WARNER BROS. DISCOVERY, INC., | |
| *Defendants*. | |

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

INTRODUCTION ................................................................................................... 1

PARTIES ............................................................................................................... 6

    A.    Plaintiffs ...................................................................................... 6

    B.    Defendants ................................................................................... 6

JURISDICTION AND VENUE ............................................................................... 7

FACTS ................................................................................................................... 9

I.      THE PAY TV ECOSYSTEM ........................................................................ 9

II.     THE UNIQUE IMPORTANCE OF SPORTS TELEVISION CONTENT ............... 12

III.    DEFENDANTS CONTROL SIGNIFICANT SPORTS LICENSING RIGHTS ....... 14

    A.    Defendant Disney ...................................................................... 15

    B.    Defendant Fox ........................................................................... 17

    C.    Defendant Warner Bros. Discovery ............................................. 19

IV.    THE OLD ERA OF CABLE BUNDLING ..................................................... 20

V.     THE CORD-CUTTING RENAISSANCE AND THE CHALLENGE TO
TRADITIONAL SPORTS BUNDLES ........................................................... 22

    A.    Cord Cutting and New OTT Streaming Services Offered A Way to Break
Out of the Old Cable Model ....................................................... 22

    B.    Fubo's History of Innovation ...................................................... 24

VI.    THE EMPIRE STRIKES BACK ................................................................... 26

    A.    Disney/ESPN and Fox Use Their Market Power to Force Fubo To
License, Bundle, and Distribute Virtually All of Their Content, Not Just
Sports ....................................................................................... 28

    B.    Defendants Use Artificial MFN Clauses to Impose Above-Market Prices
and Penetration Rates on Fubo ................................................... 30

    C.    Defendants Deny Fubo Important Content Features, Preventing Fubo from
Innovating and Degrading the Quality of Fubo's Product ............. 38

VII.    DEFENDANTS ANNOUNCE A NEW JOINT VENTURE TO
        CONSOLIDATE CONTROL OVER SPORTS CONTENT ..................................... 39

VIII.   RELEVANT PRODUCT MARKETS AND MARKET POWER ........................... 42

   A.    Sports Program Licensing Market ........................................................ 42

   B.    Market for Streaming Live Sports Content to Customers .................................... 46

        1.    Live Pay TV Market ...................................................... 46

        2.    Streaming Live Pay TV Market ...................................... 47

   C.    Tying and Tied Product Markets .......................................................... 49

        1.    Tying Market:  Commercially Critical Sports Channels ............................. 49

        2.    Tied Market:  Non-Critical Television Channels........................................... 51

IX.     RELEVANT GEOGRAPHIC MARKET .................................................... 53

X.      DEFENDANTS' AND HULU'S VERTICAL RESTRAINTS ARE
        UNLAWFUL PER SE AND UNREASONABLY RESTRAIN TRADE ................. 54

XI.     DEFENDANTS' JOINT VENTURE WILL SUBSTANTIALLY LESSEN
        COMPETITION AND UNREASONABLY RESTRAIN TRADE ......................... 55

XII.    FUBO HAS SUFFERED AND WILL SUFFER ANTITRUST INJURY ................ 57

   A.    Defendants' Anticompetitive Practices Caused Fubo (and Ultimately
        Consumers) to Pay Supra-Competitive Prices and Has Inhibited Fubo's
        Innovations .................................................................................... 57

   B.    Fubo Will Suffer Further Antitrust Injury If Defendants Are Permitted to
        Form The Joint Venture ...................................................................... 59

FIRST CAUSE OF ACTION Violation of Section 7 of the Clayton Act, 15 U.S.C. §
        18 (Against Disney/ESPN, Fox, WBD)....................................................... 59

SECOND CAUSE OF ACTION Unreasonable Restraint of Trade in Violation of the
        Sherman Act, 15 U.S.C. § 1 (Against Disney/ESPN, Fox, and WBD) .................... 61

THIRD CAUSE OF ACTION Per Se Unlawful Tying in Violation of the Sherman
        Act, 15 U.S.C. § 1 (Against Disney/ESPN)................................................. 62

FOURTH CAUSE OF ACTION Per Se Unlawful Tying in Violation of the Sherman
        Act, 15 U.S.C. § 1 (Against Fox)............................................................ 63

FIFTH CAUSE OF ACTION Unlawful Block-Booking in Violation of the Sherman Act, 15 U.S.C. § 1 (Against Disney/ESPN) .................................................. 64

SIXTH CAUSE OF ACTION Unlawful Block-Booking in Violation of the Sherman Act, 15 U.S.C. § 1 (Against Fox) .............................................................. 65

SEVENTH CAUSE OF ACTION Vertical Restraints of Trade in Violation of the Sherman Act, 15 U.S.C. § 1 (Against Disney and ESPN) ........................................ 66

EIGHTH CAUSE OF ACTION Vertical Restraints of Trade in Violation of the Sherman Act, 15 U.S.C. § 1 (Against Fox) ................................................ 67

NINTH CAUSE OF ACTION Vertical Restraints of Trade in Violation of the Sherman Act, 15 U.S.C. § 1 (Against WBD) ............................................ 68

TENTH CAUSE OF ACTION Vertical Restraints of Trade in Violation of the Sherman Act, 15 U.S.C. § 1 (Against Hulu) ................................................ 69

ELEVENTH CAUSE OF ACTION Unreasonable Restraint of Trade in Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340 (Against Disney/ESPN, Fox, WBD) ....... 70

TWELFTH CAUSE OF ACTION Unlawful Tying in Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340 (Against Disney/ESPN and Fox) ................................... 70

THIRTEENTH CAUSE OF ACTION Unlawful Block-Booking in Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340 (Against Disney/ESPN and Fox) ............. 70

FOURTEENTH CAUSE OF ACTION Vertical Restraints of Trade in Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340 (Against All Defendants) .................. 71

PRAYER FOR RELIEF .................................................................. 71

DEMAND FOR JURY TRIAL ......................................................... 72

**INTRODUCTION**

1.      The Defendant television conglomerates have long been engaged in a multifaceted campaign to frustrate Fubo's innovative sports-first streaming business, resulting in the extreme suppression of competition in the U.S. sports-focused streaming market and significant harm to both Fubo and consumers.

2.      This campaign includes, *first*, using their power over commercially critical sports content to force Fubo to broadcast unwanted, expensive content that prevents Fubo from offering the sports-centric package of channels that its customers want; *second*, imposing artificial, above-market prices and other economic terms on Fubo through a web of most-favored-nation ("MFN") clauses in their contracts with Fubo's competitors; and *third*, and most recently, assuring that this campaign would culminate in a total freeze-out by announcing a "Joint Venture" ("JV") that will combine rights to most commercially critical sports content in a single entity, which will only increase the participants' incentives *not* to make the necessary content available to Fubo and others.

3.      Defendants The Walt Disney Company ("Disney"), ESPN, Inc. and ESPN Enterprises, Inc. (collectively, "ESPN"), Fox Corporation ("Fox"), and Warner Brothers Discovery, Inc. ("WBD") control commercially critical sports content.  Together, these Defendants control the television rights to more than half of the most popular U.S. sports content.  And now, these horizontal competitors are colluding to create a JV that will cause substantial harm to competition and consumers.  Defendants' unlawful conduct must be stopped.

4.      For decades, Defendants have leveraged their iron grip on sports content to extract billions of dollars in supra-competitive profits from distributors and consumers. Defendants earned many of these profits by "bundling" their commercially critical sports content with other, less desirable content—forcing sports fans to purchase channels they did not want or

need in order to receive Defendants' sports content.  In 2013, Senator John McCain called this

"bundling" system "an injustice being inflicted on the American people."

5.      Fubo envisioned a different system of live sports streaming.  Founded in 2015,

Fubo is a content distributor whose core business idea is to offer sports fans a slim, sports-first

package of live streaming channels.  To create this consumer-friendly package, Fubo has tried

for years to license sports content from the Defendants on an unbundled basis and on

commercially reasonable terms.

6.      But Fubo's sports-centric streaming package—the first of its kind—threatened to

change the anti-consumer status quo that has been so lucrative for Defendants.  They were happy

to do business with Fubo as a small company—on terms they dictate.  But Defendants were

worried that, if Fubo grew too large, it would begin to threaten their highly profitable businesses

built on cable bundles.  During negotiations with Disney to renew Fubo's carriage agreement,

one senior Disney executive bluntly told Fubo's CEO that Disney did not want Fubo to become

"the next Netflix."

7.      Defendants responded to this threat by exploiting their power over commercially

critical sports content to frustrate Fubo's consumer-friendly sports package and ensure that Fubo

would never grow into a viable threat to their businesses.  These tactics, both individually and in

combination, are unlawful restraints against trade.

8.      *First*, Defendants have leveraged their power over sports content to impose their

"bundling" requirements on Fubo, forcing Fubo to spend hundreds of millions of dollars to

license and broadcast content that its customers do not want or need.  These tactics have

prevented Fubo from executing on its business plan to offer a consumer-friendly package of

sports content.  Indeed, Defendants have imposed bundling requirements on Fubo that are *more*

draconian than those imposed on other distributors in the marketplace, including forcing Fubo to broadcast unwanted content to ▪▪▪▪ of its English-language customers and preventing Fubo from offering different base package options.

9.      *Second*, Defendants have imposed significantly above-market licensing fees and other onerous economic terms on Fubo by colluding with Fubo's two largest competitors—Google-owned YouTube TV and Disney-owned Hulu + Live TV ("Hulu TV")—to set artificially high rates for Fubo.  In their carriage agreements with Defendants, YouTube TV and Hulu TV agree to nominally above-market prices and economic terms for their content.  In exchange, Defendants offer YouTube TV and Hulu TV "most-favored-nation" status, meaning that Defendants cannot offer Fubo better terms than they offer to YouTube TV and Hulu TV.  At the same time, Defendants provide effective "rebates" to both YouTube TV and Hulu TV (or their respective parent companies), so that in reality, neither YouTube TV nor Hulu TV is subject to the artificially high prices or other terms set forth in their carriage agreements.

10.     As a result of this MFN scheme, Fubo is forced to pay above-market rates (and agree to other onerous terms), while both YouTube TV and Hulu TV avoid paying those same above-market rates (and can steal Fubo's market share as a result).  And these MFN clauses come at an enormous cost to competition:  they freeze price competition and place any nascent competitor or potential new entrant at a significant competitive disadvantage relative to the vertically integrated giants.

11.     *Third*, Defendants prohibit Fubo from offering important product features, limiting Fubo's ability to offer consumer-desired innovations and diminishing the attractiveness of Fubo's product to consumers.  For example, Defendants have restricted Fubo's ability to offer customers DVR and video-on-demand features.  There is no pro-competitive rationale for

restricting these features, which improve the users' experience of Defendants' own content. Indeed, Defendants have allowed other distributors to offer similar features. The evident intent of these restrictions is to prevent Fubo from offering a competitive product, and—in particular—to prevent Fubo from fairly competing with Defendants and their newly announced JV.

12.     Defendants' campaign to stymie Fubo's business has resulted in substantial damages to Fubo, including in the form of higher prices and lost business. Defendants' tactics have also caused significant harm to the market, competition, and consumers. Consumers pay more for channels and cannot avoid paying for channels they do not want.

13.     But despite Defendants' efforts, Fubo's subscriber base has grown since its founding—a testament to the high value that consumers place on a compelling and technologically innovative sports-centric package of channels (even a flawed one), and the substantial investment Fubo has made in its product.

14.     Faced with the threat of disruptive competition from Fubo and other upstarts, Defendants have responded by locking arms (and locking others out) to steal Fubo's core business idea—a sports-centric package of channels—while blocking Fubo from offering that same package.

15.     On February 6, 2024, Defendants announced the impending launch of a new streaming JV in the fall of 2024. Disney/ESPN, Fox, and WBD will each own one-third of the new JV and will license their sports content to it without requiring the JV to license or distribute other non-sports content. They will accordingly aggregate, in one service, all or substantially all of the commercially critical sports content that is now separately held, separately and profitably licensed (albeit on unfair terms), and necessary for rivals to compete.

16.     Fubo is not alone in raising alarms about the JV.  Almost immediately after Defendants announced the JV, other market participants and industry groups expressed serious concerns about the JV's negative effects on competition.  And according to media reports, the U.S. Department of Justice has begun to investigate its potential anticompetitive effects.

17.     It is easy to see why.  The JV aligns the interests and incentives of three large horizontal competitors in the sports programming market.  The proposed collusive arrangement will cause even higher prices and even worse terms for third-party video distributors such as Fubo—and the millions of American consumers who rely on those services.

18.     To disguise their predatory intent, Defendants claim they will continue to license their sports content to third-party distributors.  That is false.  In reality, the JV represents the first and only time that Defendants have agreed to license their commercially critical sports content to a streaming platform on an unbundled basis.  Defendants' uniform practice with third-party distributors is to *only* license their commercially critical sports content on the condition that this content is bundled with the excess channels and other limitations that drive up prices and degrade quality.  Indeed, Disney Chief Executive Officer Bob Iger acknowledged that creating an unfair playing field is key to Defendants' strategy, as it will allow Defendants to sell the JV's sports-centric streaming app "at a price point that will be obviously more attractive than the big fat bundle" that Defendants themselves force rival distributors to offer.

19.     And once they have combined forces, Defendants' incentive to exclude Fubo and other rivals will only increase.  If not stopped, Defendants' JV will substantially increase Defendants' incentives—both individually and collectively—to deny access and/or charge higher content prices to third-party distributors that depend on access to Defendants' must-have sports channels, irrevocably reducing competition in the market and harming consumers.

20.     In short, instead of competition, Defendants have chosen collusion—giving their own cartel, and no one else, the ability to market and sell a live-sports-centric package.  They have thus ensured that their combined entity will not face effective competition.  They are now harming, and threaten further harm to, United States competition and consumers.

21.     Defendants' anticompetitive practices, including their bundling practices, anticompetitive terms, collusion through MFN clauses, and contemplated JV, violate multiple provisions of the U.S. antitrust laws, including Sections 1 of the Sherman Act and Section 7 of the Clayton Act, as well as New York's Donnelly Act.

## PARTIES

### A.     Plaintiffs

22.     Plaintiff fuboTV Inc. (collectively with fuboTV Media Inc., "Fubo") is a Florida corporation, with its principal place of business in New York at 1290 Avenue of the Americas, 9th Floor, New York, New York 10104.

23.     Plaintiff fuboTV Media Inc. is a Delaware corporation, with its principal place of business in New York at 1290 Avenue of the Americas, 9th Floor, New York, New York 10104.

### B.     Defendants

24.     Defendant The Walt Disney Company ("Disney") is a public company incorporated in Delaware with its principal place of business in Burbank, California.  Disney has numerous affiliates that are parties to the carriage agreements discussed in this Complaint.

25.     Defendant ESPN, Inc. (collectively with ESPN Enterprises, Inc., "ESPN") is a Disney affiliate, incorporated in Delaware with its principal place of business in Bristol, Connecticut.

26.     Defendant ESPN Enterprises, Inc. is a Disney affiliate, incorporated in Delaware with its principal place of business in Bristol, Connecticut.

27.     Defendant Hulu, LLC ("Hulu") is a Disney affiliate, Delaware limited liability company, with its principal place of business in Santa Monica, California.

28.     Defendant Fox Corporation ("Fox") is a public company, incorporated in Delaware with its principal place of business in New York, New York.  Fox has numerous affiliates that are parties to the carriage agreements discussed in this Complaint.

29.     Defendant Warner Bros. Discovery, Inc. ("WBD") is a public company, incorporated in Delaware with its principal place of business in New York, New York.  WBD has at least one affiliate that was a party to a carriage agreement discussed in this Complaint.

30.     Except where context otherwise requires, references in this Complaint to "Defendants" are to Disney, ESPN, Fox, and WBD.

## JURISDICTION AND VENUE

31.     This action arises, in part, under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and Sections 4 and 7 of the Clayton Act, 15 U.S.C. §§ 15 and 18.

32.     This Court has subject matter jurisdiction over the claims under 28 U.S.C. §§ 1331 and 1337(a), as well as through Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

33.     In addition to pleading violations of federal antitrust law, Fubo alleges violations of state law.  All claims under federal and state law are based upon a common nucleus of operative facts, and the entire action commenced by this Complaint constitutes a single case that ordinarily would be tried in one judicial proceeding.  This Court therefore has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).  Exercising jurisdiction over the state-law claims will avoid unnecessary duplication of actions and supports the interests of judicial economy, convenience, and fairness.

34.     Venue in this District is proper under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. § 1391(b) and (c).  Each Defendant resides, transacts business, is found, or has agents in this District.

35.     This Court has personal jurisdiction over each of the Defendants (including Hulu) under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, because each Defendant resides, transacts business, or may be found in this District.

36.     Disney maintains continuous operations in this District.  Disney has multiple corporate offices and operations in this District, including its New York headquarters and production studios for ABC, ESPN, and Disney Streaming Services.  Disney is registered to conduct business in New York as a foreign corporation and has appointed an agent for the service of process within New York.

37.     ESPN maintains continuous business operations in this District, including corporate offices and studios for TV, radio, and podcasts.  ESPN is registered to conduct business in New York as a foreign corporation and has appointed an agent for the service of process within New York.

38.     In addition, ████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████

39.     Hulu maintains a corporate headquarters in this District.  Hulu is registered to conduct business in New York as a foreign corporation and has appointed an agent for the service of process within New York.

40.     Fox is headquartered in this District.  Fox is registered to conduct business in New York as a foreign corporation and has appointed an agent for the service of process within New York.

41.     WBD is headquartered in this District.  WBD engages in extensive business operations in this District, including production studios for CNN, HBO, Turner, and Warner Bros.  WBD negotiates contracts, makes statements to the press and public, and reports financial statements from this District.

42.     All Defendants' conduct substantially affects interstate trade and commerce by harming competition, increasing prices, and restricting output, to the detriment of Fubo and consumers nationwide.

**FACTS**

**I.      THE PAY TV ECOSYSTEM**

43.     When an American consumer turns on a television service to watch live sports, a web of companies behind the scenes interact to create, package, and distribute that event to the screen.  That process is commonly referred to as the "pay TV ecosystem."  Understanding the pay TV ecosystem is essential to understanding Defendants' anticompetitive actions.

44.     With respect to live sports in particular, the pay TV ecosystem has three basic levels.

45.     <u>Sports leagues</u>:  At the top level, sports leagues such as the NFL and the PGA Tour organize live sporting events and own the copyright to those events.  The sports leagues sell the media rights to their events to programmers, via long-term license agreements.

46.     <u>Programmers</u>:  Programmers are companies that own basic and premium broadcast and cable networks.  Programmers acquire the media rights to popular programming—such as NFL games—and then broadcast those games on their linear channels.  Programmers

9

then license the rights to distribute those linear channels to video distributors, via carriage agreements.

47.    <u>Video Distributors</u>:  Before the advent of streaming, video distributors were primarily multi-channel video programming distributors ("MVPDs"), which include cable television companies such as Comcast and satellite television companies such as DISH and DirecTV.  However, streaming has expanded the market for video distribution to include virtual multi-channel video programming distributors ("virtual MVPDs") like Fubo.  Virtual MVPDs provide multi-channel television service over the internet, without the need for the additional physical infrastructure associated with traditional cable service (e.g., coaxial cable or satellite technology).

48.     Figure 1 below depicts the chain of distribution in the pay TV ecosystem with respect to live sports:

**Figure 1**



49.     The parties in this case operate in overlapping parts of the pay TV ecosystem.

50.     Fubo is a leading virtual MVPD.  Fubo licenses (or has licensed) linear television channels from Defendants Disney/ESPN, Fox, and WBD, and their affiliates.  Fubo distributes its virtual MVPD service to consumers throughout the United States in the downstream market.

51.     Disney is a dominant licensor in the upstream market, owning important linear channels including ESPN and ABC.  Disney holds the rights to a vast number of America's most popular sporting events.  In the downstream market, Disney also owns the majority of Hulu, which operates Hulu TV, the second-largest virtual MVPD (behind Google's YouTube TV) and one of Fubo's chief competitors.

11

52.     Like Disney, Fox is a dominant programmer and owns one of the most popular linear sports television channels—the Fox broadcast network.  Fox holds the rights to many popular sporting events.

53.     WBD is similarly a programmer that owns many linear channels, including TNT and TBS.  Like Disney and Fox, WBD has substantial exclusive rights to broadcast live sports on its channels.

## II.     THE UNIQUE IMPORTANCE OF SPORTS TELEVISION CONTENT

54.     "Sports, more than any other form of entertainment, are . . . the principal driver of TV viewership."[1]  The first televised sporting event in United States history was a 1939 baseball game between Princeton and Columbia.  Since then, live college and professional sports have become the most watched content on television.  Twenty-seven of the thirty most-watched broadcasts of all time have been live sporting events.  And in 2023, "97 of the top 100 most-watched broadcasts were sports events."[2]

55.     While viewers' appetite for live sports is effectively endless, the supply of live sports is not.  Leagues have limited numbers of games, each game occurs only once, and the mystery of a game's outcome lasts only while the game is live.

56.     Therefore, sports programming is "non-replicable" TV for large numbers of consumers, who will pay a premium and sit through advertisements to watch their teams play live.  Accordingly, many live sports are "must-have," commercially critical content for any video distributor seeking to attract and retain such consumers.

---

[1] *TV Timeout:  Understanding Sports Media Rights*, Hearing Before the Subcomm. on Commc'ns and Tech., 118th Cong. at 15:15 (2024) (statement of Rep. Doris Matsui), available at https://energycommerce.house.gov/events/communications-and-technology-subcommittee-hearing-tv-timeout-understanding-sports-media-rights.

[2] *Id.*

57.     Indeed, live sports are the only thing keeping many television networks alive. Networks and channels with no sports are steadily losing viewers.

58.     Several Defendants have publicly acknowledged that live sports is the lifeblood of multi-channel video distribution, in an era when movies and scripted shows are readily available from video-on-demand services such as Netflix.

      a.  WBD has stated that "[p]remium sports programming drives audience and ratings growth, and continues to add value because consumers watch the product live across all screens."

      b.  Bob Iger, CEO of Disney, has stated that "[y]ou cannot launch a new multichannel platform or bundle successfully without ESPN. The numbers would be not even close to what they'd be with ESPN."

      c.  And Eric Shanks, CEO of Fox Sports Media Group, stated in a 2023 interview that "[w]e know in five years that Fox's [NFL] 'America's Game of the Week' is still going to be the No. 1 show on television. We're still going to have the NFC package and the Super Bowl. We're still going to have the World Series. Those are the core properties that drive our business."

59.     Because must-have sports content is the linchpin for live television, it is often the most expensive content for video distributors. Video distributors pay carriage fees to the programmers whose channels they carry. These fees typically take the form of a monthly charge per subscriber.

60.     The most expensive of these channels by far is Disney's ESPN, which commands affiliate fees ▮▮▮▮▮▮▮ higher than the most expensive non-sports channel.

61.     Most video distributors agree to pay these high affiliate fees because they have no other option. Video distributors that fail to carry live sports cannot attract or retain the many customers who demand this programming. Sports fans will pay a premium to watch their favorite teams play live. And they care enough to switch providers if their current television service stops carrying those games.

62.     Video distributors that fail to carry live sports will not only see subscriber numbers plummet, they will also lose substantial advertising revenue.  Unique among categories of television content, 97% of live sports broadcasts are consumed in real time—when viewers cannot skip the commercials.  Accordingly, the most desirable and expensive commercial slots air during live sports broadcasts.  Video distributors (such as Fubo or Charter) typically share such advertising time with the programmers (such as Disney or Fox).

## III.    DEFENDANTS CONTROL SIGNIFICANT SPORTS LICENSING RIGHTS

63.     Defendants exercise significant control over the upstream market for the licensing of television channels featuring sports content (the "Sports Program Licensing Market"). Collectively, they control the television rights to a staggering array of the most popular sports leagues and events in the United States, as illuminated in Figure 2 below.

**Figure 2**



### A.   Defendant Disney

64.     Disney is chief among American media conglomerates.  As described by one industry publication, Disney "is the final boss you must defeat after beating out all other media companies.  Most major things we consume today, from Marvel to *Sportscenter*, have been rooted in the powerhouse that Disney has become."

65.     ESPN is majority-owned by Disney.  ESPN holds all Disney's sports assets.  The ESPN empire has included an array of video programming assets, including ESPN, ESPN International, ESPN2, ESPN3, ESPNews, ESPN PPV, ESPN Films, ESPN Deportes, ESPNU, ESPN+, ESPN Events, Longhorn Network, SEC Network, Big 12 Now, ACC Network, and ABC Sports.

66.     Disney's foray into sports began in 1995, when the company merged with Capital Cities/ABC, Inc. for $19 billion—which came with an 80% ownership stake in ESPN. Reflecting on the transaction, an industry publication wrote: "Most importantly, this merger allowed Disney to soak its hands into the world of sports, and what better way could they have done that other than buying the company who covers it all and your families [sic] go-to TV station."

67.     Today, ESPN's vast empire encompasses every major sport:

  a. NFL:  ESPN owns rights to the NFL's Monday Night Football, Wild Card Playoff game, Divisional Playoff Game, Pro Bowl, and the Super Bowl (self-produced every four years), as well as the NFL Draft.

  b. College Football:  In college football, ESPN owns the rights to Saturday Night Football, the College Football Playoffs (including the National Championship), the SEC Championship Game, the Big 12 Championship Game, the ACC Championship Game, the AAC Championship Game, regular season SEC, Big 12, and ACC games, as well as major bowl games and rivalry games such as Alabama-Auburn, Georgia-Florida, the Peach Bowl, the Rose Bowl, the Sugar Bowl, the Citrus Bowl, the Celebration Bowl, the LA Bowl, and the Music City Bowl.  ESPN also owns rights from a variety of mid-major and smaller conferences.

  c. NBA:  For the NBA, ESPN owns the rights to the Playoffs, the Finals, the Draft, the All-Star Celebrity Game, and all nationally televised Saturday night and Sunday afternoon games in the regular season—roughly half of all nationally televised regular-season games.  Additionally, Disney-owned ABC broadcasts key regular season and playoff games, including the NBA Finals.

  d. Baseball:  ESPN owns the rights to significant regular season MLB games, including exclusive rights to Sunday Night Baseball, and exclusive rights to MLB Opening Night, MLB World Tour, and MLB Mexico Series games.  It also owns the exclusive rights to seven MLB playoff series per year and to Little League World Series games.

  e. Hockey:  In hockey, ESPN covers NHL All-Star Week, including the NHL Draft and All-Star Game, as well as the NHL Stadium Series, ABC Hockey Saturday, and the Stanley Cup Playoffs.  ESPN also has exclusive rights to the Stanley Cup Finals (in even-numbered years), as well as over 100 exclusive regular season games, and over 1,000 regular season games available exclusively on ESPN+ via NHL Power Play.

  f. <u>College Basketball</u>:  ESPN is the largest broadcaster of men's and women's college basketball, including major conferences such as the Big 12, SEC, ACC, and Pac-12, as well as mid-major and smaller conferences.  ESPN airs the vast majority of men's basketball conference tournaments during Championship Week in the run-up to the March Madness tournament.

  g. <u>Golf and Tennis</u>:  With respect to professional golf, ESPN owns exclusive rights to broadcast portions of three of the major events on the PGA Tour.  In tennis, ESPN has broadcast rights to three major championships—Wimbledon, the US Open, and the Australian Open.

  h. <u>College Championships</u>:  ESPN owns the exclusive rights to 40 different NCAA championships across a broad array of sports, including the Women's Basketball NCAA Tournament.

68. And ESPN's sports rights cover more targeted interests as well, including:  UFC Fight Night; 4,000 college baseball games and 3,200 college softball games in the 2024 season alone; annual Pickleball Slam tournaments featuring famed tennis players Andre Agassi, Steffi Graf, and Maria Sharapova; 820 men's and women's college lacrosse games in the 2024 season; the X Games; the World Surf League Championship Tour and U.S. Open of Surfing; and 21 games from the United Football League.

69. Not surprisingly given its vast sports rights empire, ██████████████

████████████████████████████████████

70. Fubo licenses sports content from Disney/ESPN through a carriage agreement between Fubo and Disney's affiliates.  Fubo first signed a carriage agreement with Disney's affiliates ████████████████████████████████████████████

████████████████████████████████.

**B. Defendant Fox**

71. Fox is a massive media conglomerate founded by Rupert Murdoch and now headed by his son Lachlan Murdoch.  Fox's current market capitalization is $13.61 billion, making it one of the largest media companies in the world.

72.     Fox Sports is the division of Fox that comprises all of Fox's United States sports assets.  Today, that includes the sports television arm of the Fox Network, Fox Sports 1, Fox Sports 2, Fox Soccer Plus, Fox Deportes, and the Big Ten Network.  Fox claims that its sports properties are "capable of reaching more than 100 million viewers in a single weekend."

73.     Fox holds the licenses to broadcast a huge number of live sporting events across a wide variety of sports.  In March 2021, Fox announced an 11-year agreement with the NFL to broadcast National Football Conference ("NFC") games on traditional cable and on "future direct-to-consumer" digital platforms.  The deal also gave Fox the right to broadcast all NFC championship games and four Super Bowls, one each in 2023, 2025, 2029, and 2033.  According to Lachlan Murdoch, Executive Chairman of Fox, Fox's ability to broadcast numerous NFL games every year is "the foundation of [Fox's] marquee sports portfolio."

74.     Fox has numerous other highly valuable live-sports licenses including:

a.   <u>MLB</u>:  The exclusive right, each year through 2028, to broadcast the MLB World Series, one League Championship Series, two Division Series, the All-Star Game, and select regular season games.

b.   <u>NASCAR</u>:  The exclusive right to broadcast NASCAR races through 2024.

c.   <u>College Football</u>:  The rights to numerous college football broadcasts for the Big Ten, Big 12, and Mountain West conferences, including the Big Ten and Mountain West conference championship games.

d.   <u>College Basketball</u>:  The right to broadcast men's and women's college basketball games from the Big 12, Pac-12, Big East, and Mountain West conferences, and the right to broadcast men's basketball games from the Big Ten conference.

e.   <u>Soccer</u>:  The right to broadcast numerous international soccer competitions, including the 2026 men's World Cup and the 2024 and 2028 men's European Championships; the right to broadcast Major League Soccer games.

75.     ███████████████████████████████████████████

███████████████████

76.     In June 2018, Fox sold its entertainment properties to Disney for $71.3 billion, including 21st Century Fox (with popular shows like "The Simpsons" and blockbuster movies like "Titanic" and the "Avatar" franchise) and Fox's stable of Regional Sports Networks (RSNs). Fox also sold Disney its stake in the streaming platform Hulu.  The U.S. Department of Justice ("DOJ") cleared the sale—but only after Disney divested the former Fox regional sports networks.  In blocking Disney and Fox from combining their sports assets, the DOJ called Disney and Fox "two of the country's most valuable cable sports properties."

77.     Fubo licenses sports content from Fox through a carriage agreement between Fubo and Fox.  Fubo entered into its first carriage agreement with Fox ██████████████

████████████████████████████████████████████████████████████

████████████████████████

### C.     Defendant Warner Bros. Discovery

78.     WBD is a massive multinational media conglomerate.  In 2022, the corporation collected $33 billion in revenue, making it the third-largest media company in the United States by revenue.  WBD was formed through a spinoff of WarnerMedia from AT&T and then a merger with Discovery, Inc. in 2022.

79.     TNT Sports is the entity within WBD that holds the company's US sports-related licenses and produces sports programming, which airs on TNT, TBS, truTV, and on Max (via the B/R Sports add-on).  It also operates NBA TV.

80.     WBD has licensed the rights to a wide variety of sports entertainment.  Perhaps most prominently, the company owns significant rights for basketball and hockey.  WBD holds the rights to broadcast most games of the NCAA Division I Men's Basketball March Madness tournament as well as the exclusive rights to 65 NBA marquee regular season national games per year, robust exclusive playoff coverage including one conference finals each year, and exclusive

rights to the NBA All-Star Game.  In hockey, WBD owns exclusive rights to 72 regular season NHL games per season, the Thanksgiving Showdown, the Winter Classic, the Heritage Classic, one Conference Finals Series per season, the Stanley Cup playoffs, and the Stanley Cup Finals (in odd years).

81.    WBD's sports holdings continue to expand.  In November 2023, WBD inked a new seven-year deal with NASCAR to show five NASCAR Cup Series races per year.  And WBD's other valuable sports holdings include:  the right to broadcast a Tuesday night MLB game of the week, one MLB League Championship Series, and two of the four MLB Division Series per season; the exclusive right to broadcast the English-language version of 20 Women's and Men's National Team matches for U.S. Soccer as well as the U.S. Open Cup; and the right to broadcast All Elite Wrestling.

82.    Fubo currently licenses non-sports content from WBD.  Fubo has a carriage agreement with Discovery (from before it merged with Warner Media) that expires ███████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████  However, as discussed further below, Fubo had to drop the Turner networks (including TBS and TNT) when it licensed ESPN.  After ████████, Fubo attempted to negotiate a new carriage agreement with WBD but was unsuccessful.

## IV.    THE OLD ERA OF CABLE BUNDLING

83.    For decades, the dominant programmers (including Defendants here) and localized cable monopolies controlled Americans' access to linear television and live sports content.

84.     Even as of 2010, 90% of U.S. households with a television watched through a traditional cord- or satellite-based cable subscription.

85.     Under the old cable model, programmers leveraged their market power over essential content to force video distributors and, ultimately, consumers to purchase large bundles of television channels.

86.     Cable television packages swelled:  An average legacy cable package includes well over 150 channels, even though the typical consumer watches few of them.

87.     Over the years, video distributors complained vociferously about programmers' bundling policies, but to no avail.  The chairman of one distributor noted that the "largest programmers . . . have the muscle to control the way that pay television providers offer programming to consumers," and that "bundling of must-have and other content in a single deal is a well-established problem in the industry."  The American Cable Association (a business association of small cable companies) similarly explained that "wholesale tying and bundling profoundly shape the channel offerings of small and medium-sized cable companies" and "cause substantial public interest harms."

88.     One academic paper from 2013 calculated that television bundling practices cost consumers—and lined the pockets of the dominant programmers—to the tune of $27 billion a year.  A 2006 Federal Communications Commission report likewise concluded that offering television content on an unbundled basis would likely deliver lower costs and substantial benefits to consumers.

V.      **THE CORD-CUTTING RENAISSANCE AND THE CHALLENGE TO TRADITIONAL SPORTS BUNDLES**

A.      **Cord Cutting and New OTT Streaming Services Offered A Way to Break Out of the Old Cable Model**

89.     Over the past decade, that paradigm of television has begun to change, as millions of American consumers have found an escape route away from the old cable regime by cutting the cord—canceling their cable TV subscriptions in favor of internet-based programming.  The trend has become so popular that "cord-cutter" earned its own entry in Merriam-Webster.

90.     The early generation of cord-cutters largely did so primarily by relying on video-on-demand streaming services, such as Netflix.  But for many consumers, video-on-demand streaming services are not a substitute for the traditional cable bundle for a simple reason:  they do not offer live sports.  For example, while Netflix offers a deep catalog of television shows and movies, subscribers still needed a traditional cable package to watch popular sports leagues and events from the NFL to the World Series.

91.     That began to change around 2015, with the advent of a disruptive new entrant in the live television landscape:  streaming live pay TV providers, also known as virtual MVPDs.  Led by Fubo and other entrants (such as Sling, YouTube TV, and Hulu TV), virtual MVPDs promised consumers the benefits of live TV without the consumer-unfriendly tactics of the cable regime.  Unlike the old-school cable companies, virtual MVPDs require no long-term contracts, provide transparent billing, and do not hit consumers with junk fees such as broadcast fees, truck roll fees, and set-top box fees.

92.     Virtual MVPDs deliver live television—including live sports—to consumers over a broadband internet connection.  With streaming live pay TV, consumers need not rent or deal with legacy equipment such as set-top boxes or satellite dishes.  And because streaming live pay

TV is delivered over broadband, consumers of these services can watch television from anywhere they want on their devices of choice (including smartphones and tablets).

93.     Additionally, virtual MVPDs brought consumers the freedom and flexibility to activate and deactivate their subscriptions at will, simply by clicking a button on a website.  To cancel, for example, Fubo consumers do not need to call a customer service line—and confront confusing automated response systems and interminable hold times—or stand in line to return bulky equipment.

94.     Moreover, streaming live pay TV services offered by virtual MVPDs historically were significantly cheaper—and less bloated with little-used channels—than traditional cable (although Defendants' anticompetitive tactics increasingly have undermined efforts to streamline these packages).  For example, in its earlier days, Fubo offered a sports-focused package that featured about 45 channels for $35 per month.

95.     Over the past eight years, MVPDs have steadily lost customers, while virtual MVPDs—starting from scratch—have grown to nearly 20 million subscribers, as shown in Figure 3 below.  (The growth of virtual MVPDs has slowed in the past few years, however, as Defendants' bundling and pricing policies have forced virtual MVPDs to raise prices and offer bloated packages of channels).

**Figure 3**



### B. Fubo's History of Innovation

96.     In the virtual MVPD category, Fubo has been a pioneer and an innovator—taking on entrenched incumbents and vertically integrated tech and media giants.

97.     Fubo launched in January 2015 with a focus on streaming live soccer matches—branding itself the "Netflix of soccer."  Fubo offered a wide variety of global soccer content from two soccer-focused cable channels (GolTV and Benfica TV).  Fubo's initial soccer-centric offering was $7 per month.

98.     By early 2016, Fubo was expanding beyond soccer.  Fubo added new channels—including from the leading Spanish-language programmer, Univision—that included a mix of sports and non-sports content.  Later in 2016, Fubo signed carriage agreements with key general sports programmers, including NBC, Fox, and NBA TV—offering users a sports-first package of about 45 channels for $35 per month.  As co-founder and CEO David Gandler explained, Fubo

was a "sports-first" virtual MVPD—the first of its kind—that sought "to drive sports networks into the most basic of tiers," without requiring subscribers to buy over a hundred other cable channels.  By September 2017, Fubo was catching on with users; it surpassed 100,000 subscribers that month.

99.     As a scrappy upstart, Fubo has consistently led the industry with consumer-focused product developments.  Time and again, Fubo prompted its much larger rivals and industry peers to follow suit.

100.    Fubo's history of innovations—large and small—abounds.  Fubo was the first virtual MVPD to allow users to watch up to four channels simultaneously on a single screen. Fubo was the first virtual MVPD to offer key sports events—such as the 2018 World Cup and the 2019 Super Bowl—in 4K HDR, offering users the clearest and highest-resolution programming possible at the time.  Fubo was the first virtual MVPD to offer international service, when it launched in Spain in 2018.

101.    There are many more examples.  Fubo was first to launch "dynamic discovery," which provides a user-friendly interface for subscribers to browse live content that is in progress and easily select the show they want to watch.  And Fubo introduced a technology called dynamic ad insertion—improving the ad experience for both users and advertisers—before either of its much larger virtual MVPD rivals, Google-owned YouTube TV or Disney-owned Hulu TV. Engineers at Fubo built the ad system internally from the ground up, despite the entire company having fewer than 175 employees.

102.    Fueled by consistent growth and innovation, Fubo's future looked bright.  In July 2019, Forbes named Fubo one of its "Next Billion-Dollar Startups."  On October 8, 2020, Fubo's shares began trading on the New York Stock Exchange.

103.    Fubo continued to roll out first-of-their-kind features with a focus on sports fans. For example, in 2022, Fubo launched dashboard features that allowed users to follow live stats and participate in interactive quizzes while watching live sports, such as World Cup qualifier matches.  Here again, Fubo was the first company to integrate, within the same platform, live sports streaming, free gaming, and live stats.

104.    By early 2022, after having added ESPN to its package, Fubo grew to more than one million subscribers in North America.  Fubo's growth has continued—despite being hampered by Defendants' anticompetitive practices—and the company ended the third quarter of 2023 with 1.477 million North American subscribers.

## VI.    THE EMPIRE STRIKES BACK

105.    Defendants themselves have profited from Fubo's growth and success.  At the same time, Fubo represents a potential threat to the orthodox bundling regimes that large programmers have profited from for decades.  Fubo's very business model—a slimmed-down, sports-centric package of channels—is antithetical to the overstuffed bundles that allowed large programmers to reap billions in supra-competitive profits.

106.    Simply put, if Fubo grew too large, it would threaten to disrupt an anti-consumer status quo that programmers (including Defendants) have profited from for decades.  Defendants have seen what can happen when they dealt fairly with small, independent streaming companies: In the early 2010s, Defendants licensed content to Netflix, which at that time was a relatively new streaming service with 20 million subscribers.  A decade later, Netflix has more than 200 million subscribers and competes fiercely with Disney's and WBD's own streaming-video-on-demand platforms.  In 2022, Disney CEO Bog Iger told the New York Times that Disney's licensing of content to Netflix amounted to "basically selling nuclear weapons technology to a Third World country, and now they're using it against us."

107.    Defendants vowed not to make the same mistake with Fubo.  As a senior Disney executive explained to Fubo's CEO, Disney did not want Fubo to become "the next Netflix."

108.    Thus, while Defendants are happy to deal with Fubo as a small company—and on terms that they dictate—they have taken steps to ensure that Fubo never grows so much that it poses a threat to the anti-consumer status quo.  They have done so in several ways:

109.    *First*, Defendants require Fubo to license and distribute the vast majority of their content to virtually all Fubo subscribers as a condition of receiving *any* of their content. Defendants foist these bundling requirements on Fubo by threatening to withhold their commercially critical sports content if Fubo does not accept them.  As a result, Defendants' bundling requirements prevent Fubo from executing on its core business plan:  to offer consumers a slim, sports-first package of channels at a low cost.

110.    *Second*, Defendants impose significantly above-market prices and other onerous terms on Fubo by leveraging a web of MFN clauses in Defendants' carriage agreements with the two largest virtual MVPDs, YouTube TV and Hulu TV (and potentially other distributors).  In these carriage agreements, YouTube TV and Hulu TV agree to nominally above-market content prices and other terms in exchange for Defendants' agreement to impose those same high prices and terms on Fubo and others via MFN clauses.  YouTube TV and Hulu TV do not actually pay the above-market prices reflected in the MFN clauses, because Defendants provide them "rebates" or similar consideration through ancillary side deals.  These MFN clauses produce anticompetitive results:  they keep consumer prices high, hamstring nascent and smaller competitors like Fubo, and raise barriers to entry.

111.    *Third*, Defendants have blocked Fubo from launching important product features that consumers want.  There is no pro-competitive economic justification for the limits

Defendants place on Fubo's ability to offer these features—they enhance the value of Defendants' own content, and Defendants allow other video distributors to offer them.  The evident intent of these restrictions is to prevent Fubo from offering a competitive streaming package—and in particular to prevent Fubo from competing fairly with Defendants, Fubo's largest competitors (Hulu TV and YouTube TV), and the Defendants' recently announced JV.

112.    As a result of Defendants' and Hulu's anticompetitive conduct, Fubo is forced to agree to above-market prices and other unreasonable terms, while consumers pay supra-competitive prices for content and are deprived of the ability to choose the channels they want to buy.

**A.    Disney/ESPN and Fox Use Their Market Power to Force Fubo To License, Bundle, and Distribute Virtually All of Their Content, Not Just Sports**

113.    Disney/ESPN and Fox have frustrated Fubo's efforts to offer a consumer-friendly package of sports-first content by requiring Fubo to "bundle" their content—that is, to license and distribute virtually all of their channels as a condition of receiving any of their sports content.  Disney/ESPN and Fox have coerced Fubo to accept their bundling requirements by leveraging their ownership of commercially critical sports content.  *See supra* § III.

114.    For example, Fubo's carriage agreement with Disney and its affiliates requires it to ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████.  In total, Fubo is forced to spend more than $██ million per year on content it does not want and that does not fit its core business strategy because of Disney/ESPN's and Fox's anticompetitive bundling practices.

115.    Disney/ESPN and Fox compound their bundling requirements by imposing draconian "penetration" requirements on Fubo in each carriage agreement.  Penetration refers to

the percentage of Fubo customers that must receive a programmer's content.  With a few small exceptions, Disney/ESPN's and Fox's carriage agreements with Fubo include ▇▇ % penetration requirements for every channel subject to each agreement.  As a result, Fubo is required not only to license these channels from Disney/ESPN and Fox, but to distribute them to ▇▇▇▇▇▇▇ and pay for those channels on a per-customer basis.

116.    For the rare channel without a ▇▇ % penetration requirement, Disney/ESPN and Fox will frequently require Fubo to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇ Penetration requirements ▇▇▇▇▇▇▇▇▇▇ make it economically unfeasible for Fubo to offer the skinny bundles that are part of the company's vision for the virtual MVPD space.

117.    These high penetration rates and forced bundling are neither economically nor structurally necessary for Disney/ESPN's and Fox's businesses.  Disney/ESPN and Fox could (and do) unbundle sports from non-sports channels, as they do for some traditional cable providers.  During negotiations over the most recent carriage agreement, for example,

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ .

118.     Disney/ESPN's and Fox's anticompetitive bundling requirements have harmed Fubo—and reduced consumer choice—by preventing Fubo from offering "skinny" sports-centric packages of channels and requiring Fubo to distribute virtually all of their channels (sports or otherwise) to Fubo's English-language consumers.  Importantly, these bundling requirements have also prevented Fubo from licensing other content that Fubo would prefer to distribute.  For example, because of Disney/ESPN's and Fox's bundling practices, Fubo has been unable to license content from Turner (and other networks such as A&E and AMC) that would make its streaming packages more attractive to consumers.

119.     For the same reasons Disney/ESPN's and Fox's bundling practices have harmed Fubo, they also have harmed competition and consumers.  They raise barriers to entry by requiring any new entrant or nascent competitor to license dozens of low-value channels, raising entrants' costs and impeding their ability to offer a differentiated service to consumers.  Forced bundling likewise harms consumers by raising prices and forcing consumers to buy channels they do not want.

**B.     Defendants Use Artificial MFN Clauses to Impose Above-Market Prices and Penetration Rates on Fubo**

120.     In addition to imposing above-market ▮▮▮% penetration requirements on Fubo, Defendants impose prices on Fubo that are worse than any other distributor of their content.  The average prices that Defendants charge Fubo are between ▮▮▮% higher than the prices that Defendants charge other video distributors, as reflected in market data published by Kagan (a media research group at S&P Global).  Comparing the rates charged to Fubo with the rates published by Kagan as the average prices charged to other video distributors reveals dramatic supra-competitive pricing practices by Defendants, as illustrated by Figure 4 below:



121.    Notably, Defendants charge Fubo these premiums while also requiring Fubo to distribute most of their content to ███% of Fubo's subscribers, and requiring Fubo to pay on a per-subscriber basis.  As discussed above, the penetration rates that Defendants impose on Fubo are also significantly above-market.  Thus, the total effective premiums that Defendants charge Fubo are significantly higher than the price premiums reflected in Figure 4.

122.    The above-market prices, penetration rates, and other economic terms that constrain Fubo's ability to compete are the result of MFN clauses in contracts between each of the Defendants and the two largest virtual MVPDs, YouTube TV and Hulu TV.  These MFN clauses are part of a larger collusive scheme between Defendants and these two large virtual MVPDs to inflate the prices that Fubo (and others) must pay for content and price smaller competitors out of the market with artificially high prices.  And because Defendants have imposed these above-market prices, penetration rates, and other economic terms on Fubo, Fubo itself has had to significantly raise the price it charges consumers.

123.     Generally speaking, an MFN clause is a contractual provision in which one party agrees not to give more favorable terms to anyone else without offering that same deal to the counterparty.  The economics literature has long recognized that MFN clauses can be used to anticompetitive ends, particularly when they pervade an industry, by locking in an artificially high floor for a supplier's prices or terms and facilitating coordination among competitors.

124.     As numerous commentators have noted, "the pay-TV industry is rife with [MFN] agreements."  Media companies have long deployed MFN clauses to anticompetitive ends.  In 1994, the DOJ sued to stop a group of cable operators and major programmers from using MFN clauses (and other restraints) to prevent new competitors from entering the distribution market. The DOJ was especially concerned about these restraints "[b]ecause the [parties] own or control a significant amount of popular cable programming," and thus little or no desired content would be left for new market entrants.

125.     Despite the DOJ's efforts, MFN clauses continue to pervade the pay TV industry and are routinely abused by large programmers.  As the Wall Street Journal explained in 2012, large programmers like Disney have "the leverage to write MFNs in such a way that [they] get[] better deals" than their rivals, due in large part to their "dominance of TV sports."

126.     Following this model, Defendants have deployed a web of MFN clauses with YouTube TV and Hulu TV to coerce Fubo into paying above-market prices and agreeing to unreasonable penetration rates and other contractual terms.  ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████

127.     YouTube TV, the virtual MVPD owned by Google, is the largest virtual MVPD by a significant margin.  YouTube TV has approximately 8 million subscribers, representing approximately 41% of all virtual MVPD subscribers.  Hulu TV, a virtual MVPD offered by Disney subsidiary Hulu, is currently the second largest virtual MVPD in the market, with 4.6 million subscribers (representing approximately 28% of all virtual MVPD subscribers).  Both are significant competitors of Fubo.

128.     Defendants have colluded with both Hulu TV and YouTube TV to raise content prices and penetration rates for smaller virtual MVPDs like Fubo through the use of MFN clauses.  This scheme involves three basic steps:

129.     *First*, in their carriage agreements with Defendants, Hulu TV and YouTube TV agree to content prices, penetration requirements, and other economic terms that are significantly more onerous than the terms that Defendants offer to other video distributors, such as Comcast. Defendants know that it will be nearly impossible for Fubo to bear these terms economically.  By contrast, both YouTube TV and Hulu TV are part of large and highly profitable conglomerates and can better afford these premiums and onerous economic terms than Fubo.

130.     *Second*, in exchange for those above-market prices and penetration requirements, Defendants agree to afford YouTube TV and Hulu TV MFN status in the virtual MVPD market. As a result of these MFN clauses, Defendants cannot offer Fubo better terms unless they also agree to offer those same terms to YouTube TV and Hulu TV.  Because YouTube TV and Hulu TV together account for more than two-thirds of all virtual MVPD subscribers, Defendants have no incentive to offer Fubo lower prices or better economic terms, because doing so will require Defendants to offer YouTube TV and Hulu TV those same terms.  Thus, the MFN clauses in

Defendants' carriage agreements with YouTube TV and Hulu TV effectively set a floor on the prices, penetration requirements, and other economic terms that Defendants' offer to Fubo.

131.    *Third*, Defendants enter side deals with YouTube TV and Hulu TV that give these large virtual MVPDs relief from the above-market prices and other terms reflected their carriage agreements with Defendants.  Because of these side deals, neither YouTube TV nor Hulu TV pays the high sticker prices listed in their carriage agreements, because both receive effective "rebates" on those prices.

132.    For example, Defendants allow YouTube TV's parent company (Google) to recoup the above-market premiums that YouTube TV pays for content purchasing cloud, advertising, and other services from Google.  Google's cloud and advertising services are a lucrative and critical business for Google, and Google competes fiercely with Amazon Web Services and Microsoft Azure for cloud services customers.  Thus, obtaining a Defendant's agreement to purchase cloud or advertising services is a financial boon for Google that significantly defrays the premiums that Google subsidiary YouTube TV pays for Disney/ESPN's and Fox's content.

133.    Hulu TV (and its parent Disney) has similar ancillary deals with Fox, WBD, and other programmers.  These deals allow Disney and Hulu TV to recoup the premiums that Hulu TV pays for those programmers' live content.

134.    For example, in its carriage agreement with Hulu TV, WBD predecessor Discovery agreed to give Hulu a discount on its video-on-demand content to offset the high prices that Hulu TV was paying for Discovery's live streaming content.  This discount on video-on-demand content provided Hulu TV relief from the above-market prices for live content reflected in its carriage agreement with Discovery.

135.     Similarly, Fox's deal with Hulu included an "extensive multiplatform strategic marketing alliance" under which Fox agreed to market Hulu "across all Fox-owned and 'external marketing touchpoints,'" meaning that Fox would be providing marketing services for Hulu in exchange for Hulu TV's agreement to pay premiums for Fox content.  This multifaceted carriage agreement "underscore[d] the continuing symbiotic relationship between [Fox] and [Hulu] despite them not being corporately tied anymore."

136.     When Hulu TV agrees to pay above-market prices and penetration rates for Disney/ESPN content, the rebate that Hulu TV receives is even more direct.  Because Disney is Hulu's majority owner, the premiums that Hulu TV pays for Disney/ESPN content are directly offset by Disney/ESPN's receipt of those same premiums.  For Disney, the MFN merely shifts money from one pocket to the other.  But the MFN clauses, while having no effect on Disney's bottom line, exact a substantial toll on competition—setting a floor on the prices that Fubo and other smaller virtual MVPDs are required to pay for Disney/ESPN's content.

137.     These are only a few examples of the myriad ways that Defendants allow YouTube TV and Hulu TV (or their parent companies) to recoup the above-market premiums that YouTube TV and Hulu TV agree to pay for Defendants' live content.  While Defendants' carriage agreements and other contracts with YouTube TV and Hulu TV and their affiliates are confidential, on information and belief, each of these carriage agreements contains MFN clauses whose artificial prices and economic terms are offset by parallel side deals (or similar arrangements) between these two virtual MVPDs and Defendants.

138.     Hulu TV also engages in similar MFN schemes with other programmers (besides Defendants) to induce those programmers to charge Fubo higher prices and penetration requirements.  Programmers such as NBC, Univision, and A&E, have referenced or alluded to

MFN clauses with Hulu TV as a justification for charging Fubo above-market prices and demanding onerous penetration requirements and other economic terms.  On information and belief, Hulu TV also recoups the premiums it pays these programmers for their content through lucrative side deals.

139.    Without the "rebates" that their parent companies receive, YouTube TV and Hulu TV would operate at significant losses.  Assuming that YouTube TV and Hulu TV pay the same MFN prices for content that Fubo pays, the total wholesale cost of the channel packages that YouTube TV and Hulu TV offer exceed the retail prices that YouTube TV and Hulu TV charge for those channels.  YouTube TV and Hulu TV can absorb these nominal losses only because they or their parent companies (Google and Disney, respectively) can recoup those losses through side deals with programmers.

140.    Fubo, as an independent streaming service, cannot take advantage of these side deals. ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████.

141.    The artificial MFN-based high prices and penetration requirements described above allow the biggest players in the virtual MVPD market to keep prices high, thus pricing out smaller competitors and raising barriers to entry.  These MFN-based prices and terms benefit YouTube TV and Defendant Hulu by hamstringing Fubo as a competitor and allow them to capture Fubo's market share.  And they benefit the other Defendants by giving them the pretext (and uniform incentive) to charge Fubo above-market rates and impose other unreasonable

terms:  as the Wall Street Journal reported in 2012, "[s]ome pay-TV executives say that the entertainment companies use MFN's as 'smoke screens' to justify why they can't make their programs available to technology companies."  These MFN clauses make it easier for Defendants to maintain high content prices and onerous economic terms without fearing that their competitors will undercut them.

142.    Defendants' MFN clauses also effectively allow them to control the price that Fubo must charge customers for its streaming packages.  Fubo has consistently charged customers the lowest rates it can afford to charge without making any significant profit margin. But because Defendants, YouTube TV, and Hulu TV have consistently raised the MFN rates applicable to the content Defendants license to Fubo, Fubo itself has had to significantly raise the price it charges consumers, or go out of business.

143.    These price hikes have significantly (and negatively) affected the value proposition of Fubo's channel packages.  In 2017, Fubo charged consumers $35 per month for its basic package of channels.  In 2019, price hikes forced Fubo to raise the price of its basic package to $54 per month.  By 2024, Disney/ESPN's and Fox's price hikes had forced Fubo to raise the price of its basic package to $79.99—more than double the price that Fubo charged customers just six years earlier.  These price hikes also have forced Fubo to drop valuable channels to avoid pricing its product out of the market.

144.    Defendants' MFN clauses also give YouTube TV and Hulu TV the freedom to raise their own prices without fear that customers will switch to Fubo or other smaller virtual MVPDs.  In 2017, YouTube TV charged subscribers $35 per month.  YouTube TV raised its monthly price to $40 in 2018, $50 in 2019, $65 in 2020, and $72.99 in 2023.  Meanwhile, Hulu TV has increased its monthly retail price from $39.99 in 2017, to $44.99 in 2019, to $54.99 in

2020, to $64.99 in 2021, to $76.99 in 2023.  YouTube TV and Hulu TV can safely increase their retail prices without fearing customer attrition because both have MFN clauses with Defendants and other programmers, ensuring that Fubo (and other smaller virtual MVPDs) will never have a better cost structure and thus cannot effectively compete on price.

145.    As a result of Defendants' MFN-enforced price hikes, "[b]y 2023, the savings a viewer could make by switching to a vMVPD had halved" relative to five years earlier.  Or as Sling TV programming chief Warren Schlichting described it, "Programming fees . . . only go in one direction, and that's up!"

146.    Indeed, Defendants' anticompetitive conduct has already forced smaller virtual MVPDs out of the market, demonstrating how their conduct harms competition and consumers. In 2020, PlayStation Vue—one of the earliest entrants in the virtual MVPD space—discontinued its service when faced with increasing content costs.  In 2021, T-Mobile similarly announced the closure of its virtual MVPD TVision, which "offer[ed] a variety of channel bundles starting at just $10 per month," after its "cheap plans drew the ire of several programmers," including Disney.  And in January 2024, the virtual MVPD Duo alerted its customers that it would close at the end of the year due to "extreme price increases from programmers."

### C.    Defendants Deny Fubo Important Content Features, Preventing Fubo from Innovating and Degrading the Quality of Fubo's Product

147.    Defendants have compounded the draconian pricing and economic terms they impose on Fubo by steadfastly refusing to allow Fubo to carry important content features that consumers demand.

148.    Each of the Defendants restricts Fubo's ability to offer valuable interactive features with Defendants' content.  Under Defendants' restrictions, any interactivity must be

customer-initiated, must be uniform across all content, and cannot have overlays or shrink screens.

149.    Defendants also curtail Fubo's ability to offer DVR and video-on-demand features.  Fubo is often allowed to get ███████████████████████████.  And even then, Fubo gets only ███████████████████████████.  Defendants also set arbitrary limits on DVR functionality.  For example, ███████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████

150.    Defendants themselves, however, do not have to play by these rules.  Defendants' own existing streaming services face none of the same restrictions on interactivity, on-demand functionality, or advertising.  Indeed, Disney CEO Bob Iger recently bragged about how ESPN+ would have "many more features and provide a much more immersive experience for the sports fan" than other sports bundles—all the while using their market power and chokehold on sports licenses to prevent smaller virtual MVPDs from offering these improved features.  Perhaps more concerning, Defendants have done nothing to indicate that their newly announced JV will be subject to any of the same restrictions that Fubo faces.  *See infra* § VII.

## VII.   DEFENDANTS ANNOUNCE A NEW JOINT VENTURE TO CONSOLIDATE CONTROL OVER SPORTS CONTENT

151.    Despite Defendants' attempts to saddle Fubo with uncompetitive terms and undermine the threat it poses to their bundling model, Fubo has survived and grown—a testament to the significant consumer demand for a sports-centric streaming package (even a flawed one) and Fubo's own significant investment in its product.

152.     Finally, in 2024, Defendants could no longer ignore the mounting consumer demand for a sports-first streaming package.  Instead of addressing this demand by relaxing their bundling requirements on third-party distributors, however, Defendants have embarked on a coordinated campaign to capture it for themselves and exclude all other distributors.

153.     On February 6, 2024, Defendants announced the launch of a new JV for live sports in the fall of 2024.  Critically, Defendants will license their sports programming to the JV on a standalone (not bundled) basis.  The JV will then offer that content to consumers through a new "app," allowing subscribers to access all of Defendants' sports content (without the dozens of other channels Defendants force Fubo to license and include in its packages) using their phone, tablet, TV, or other internet-enabled device.

154.     According to public news reports, Defendants will each own one-third of the JV and will share revenues (and losses) commensurate with the sports rights that each Defendant licenses to the JV.  A subscription to the streaming service is expected to cost between $30 and $50 per month—significantly lower than the prices that Defendants effectively force Fubo to charge consumers.

155.     The JV streaming service will offer subscribers access to all of Defendants' 14 linear sports networks ESPN, ESPN2, ESPNU, SEC Network, ACC Network, ESPNEWS, and ABC from Disney; FOX, FS1, FS2 and BTN from Fox; and TNT, TBS, and truTV from WBD. The new service will also provide access to Disney's existing sports streaming service, ESPN+.

156.     As the channel lineup indicates, the Defendants own the media rights to a broad swath of the most popular sporting events in America.  They control the television rights for most of the NHL, the NBA, and MLB and have substantial rights to the NFL, NCAA March Madness basketball, the FIFA World Cup, UFC, Formula 1, NASCAR, three of four Grand Slam

tennis events, and two of the four major golf championships, among other high-profile sporting events.

157.    Defendants' content is critical for any third-party, multi-channel video distributor. Without it, no MVPD or virtual MVPD can offer a commercially viable service.

158.    Once the JV launches, Defendants will have far greater incentives to shut out third-party video distributors such as Fubo and try to drive them out of the market.  At a minimum, they will have every incentive to raise content prices and impose even greater anticompetitive conditions on third-party video distributors.  If Defendants make it impossible for Fubo and others to license critical sports content on economically rational terms, that will only benefit their new JV sports app as consumers migrate to their jointly owned platform.

159.    As noted, Defendants have already heavily tilted the playing field in favor of their joint streaming service.  Because of Defendants' bundling practices, the only way Fubo can offer live sports content is to sell it together with less-desirable non-sports content (which it is forced to license).  As a result of the high content costs stemming from these policies, Fubo is forced to charge a price significantly higher than the expected price of the JV's new streaming service (even though Fubo does not turn a profit with those packages).

160.    Indeed, Disney CEO Bob Iger candidly admitted, on an investor call, that by licensing their jointly owned sports content exclusively to the JV on a standalone basis, Defendants are joining forces to give themselves a huge advantage in the marketplace:  They can sell the JV streaming app "at a price point that will be obviously more attractive than the big fat bundle" that Defendants impose on third-party distributors like Fubo.

161.    The anticompetitive effects of the JV are even more nefarious.  Not only will competition be harmed in the short run, as Fubo and other video programming distributors face

higher prices, but Defendants have consolidated control over the licensing and distribution of live sports in the United States and driven out distributors that cannot compete with the JV, Defendants will have the ability and incentive to charge even higher prices for streaming live sports.

## VIII.   RELEVANT PRODUCT MARKETS AND MARKET POWER

162.    There are multiple relevant product markets in the pay television ecosystem. *First*, there is an upstream market for the licensing of television channels featuring sports content—the Sports Program Licensing Market.  In that market, programmers (such as Disney) license the rights to distribute linear television channels featuring live sports to video distributors (such as Fubo).  *Second*, there is a downstream market in which distributors deliver television content to consumers through multi-channel packages—the "Live Pay TV" market and the "Streaming Live Pay TV" submarket.  Finally, with respect to Fubo's tying claims under Section 1 of the Sherman Act, there are relevant markets for "Commercially Critical Sports Channels" (tying market) and "Non-Critical Television Channels" (tied market).

### A.      Sports Program Licensing Market

163.    In the upstream portion of the live television ecosystem, one relevant product market is the market for the licensing of linear television channels featuring live sports, between programmers such as Disney and video distributors such as Fubo (the "Sports Program Licensing Market").

164.    One level up from this market, programmers such as Disney/ESPN, Fox, and WBD negotiate with sports leagues for exclusive rights to distribute live broadcasts of their events through television and cable channels.  For example, Disney/ESPN and Fox have long-term deals with the NFL for the rights to exclusively broadcast many regular-season and playoff NFL games, including six Super Bowls over the next decade.  Similarly, ESPN and WBD have

long-term deals with the NHL for the exclusive media rights to regular season and playoff hockey.  Other examples abound.  *See supra* § III.

165.    After acquiring these lucrative media rights to popular sporting events, programmers produce linear television channels featuring live sports broadcasts and license those channels to third-party video distributors—the licensing transaction at the heart of the Sports Program Licensing Market.  Video distributors of this sports programming include MVPDs (such as Comcast and Charter) and virtual MVPDs (such as Fubo).

166.    Fubo is thus a direct purchaser and a consumer in the Sports Program Licensing Market.

167.    Defendants have substantial market power in the Sports Program Licensing Market.  Together, Defendants control more than half the U.S. sports broadcasting rights, including most rights to the NBA, the NHL, and the MLB, and significant rights to the NFL, college sports, and more.

168.    Figure 5 below shows the value of the sports rights controlled by Defendants in the Sports Program Licensing Market, based on a Citi Research report.  Disney/ESPN, Fox, and WBD control 54% of U.S. sports rights, while the Big Five—Defendants plus CBS and NBC—control 83%.

**Figure 5**



Percentage of Sports Rights in Sports Program Licensing Market

| The Walt Disney Company ESPN | FOX | WARNER BROS. DISCOVERY | CBS | NBC | OTHER |
|---|---|---|---|---|---|
| 26.8% | 17.3% | 9.9% | 12.9% | 13.1% | 17.1% |

169.    Even before the JV, the Sports Program Licensing Market is concentrated under DOJ Merger Guidelines (with a Herfindahl-Hirschman Index, or HHI, of 1,685, based on the Citi Research figures).  The JV would massively increase that concentration—more than doubling the HHI to over 3,400 (far above the 1,800 HHI threshold that the Department of Justice considers "highly concentrated")—as Defendants create a joint entity that aligns their interests and incentives to bid on and license the sports content they control.

170.    The unique value and importance of sports content enhances Defendants' market power and allows them to leverage that power during licensing negotiations.  Many consumers will not subscribe to a MVPD or virtual MVPD package of channels that does not distribute live sports content.  Indeed, access to live sports is the only reason that many consumers continue to subscribe to multi-channel television packages.  Because of the "must-have" status of live sports content, programmers that own the rights to that content can demand high fees and other onerous economic terms from video distributors who license that content.

171.    High barriers to entry protect Defendants' substantial market power in the Sports Program Licensing Market.

172.    *First*, as noted, sports rights are expensive, requiring upwards of billions of dollars in capital for a share of a major sports league's content.  The total value of the NFL's recent rights deals is more than $110 billion over eleven years.  And the costs of the rights to major-league content are only continuing to rise.  The NBA is reportedly seeking a $75 billion rights deal to replace its current $24 billion rights deal, which expires in 2025.  Costs that high preclude all but the largest media giants from entering the market.

173.    *Second*, programmers lock up the exclusive media rights to popular sports properties through long-term deals with the leagues.  The new NFL deal lasts for a decade, meaning that its rights will not be available to any new programmers until 2033.  Other rights deals are lengthy as well:  The NBA's most recent rights package covered a nine-year period, from 2016 through 2025, and the NHL and MLB have completed agreements for seven years. The years-long duration of each of these deals effectively insulates programmers currently in control of the rights from competition by other potential entrants into the market.

174.    *Third*, because the sports leagues seek to maximize distribution of their content, they license that content primarily to programmers with existing large customer bases.  The current NBA deal, for instance, limits the rights to broadcast all NBA content to just two of the large sports programmers, ESPN and Turner Sports (now owned by WBD).  Similarly, in deals reached in 2018 and 2021, the MLB sold the rights to both its regular-season and postseason games to Fox and Disney.  By licensing their rights to ESPN, Turner, and Fox—programmers with huge, established subscriber bases—the leagues ensure their content will be distributed as

widely as possible.  Programmers without similarly large audiences cannot compete with the programmers that currently control the market.

### B.     Market for Streaming Live Sports Content to Customers

#### 1.     Live Pay TV Market

175.    Downstream from the Sports Program Licensing Market, another relevant market is the market for distributing live sports programming to consumers as part of a multi-channel package (the "Live Pay TV" market).  The Live Pay TV market includes both traditional MVPDs (such as Comcast, Charter, Verizon Fios, and DISH) and virtual MVPDs (such as Fubo, YouTube TV, Hulu TV, and Sling).  MVPDs and virtual MVPDs are the primary distributors of live sports in the United States today.  The new JV will seek to compete in this relevant market.

176.    MVPDs and virtual MVPDs compete most closely with each other and are distinct from other forms of video distribution.  Both MVPDs and virtual MVPDs sell multi-channel live television packages, allowing users to watch time-sensitive programming (such as sporting and breaking news events) as it occurs.  And critically, both MVPDs and virtual MVPDs rely on live sports as the key factor differentiating them from video-on-demand streaming services such as Netflix.

177.    For America's many millions of sports fans in particular, Live Pay TV services are not reasonably interchangeable with video-on-demand services such as Netflix, Max, or Disney+.  Consumers can only get a wide variety of the most popular sports—from the NFL, NBA, MLB, and NHL to sports like golf, soccer, tennis, and more—through a Live Pay TV subscription.  Indeed, that is the very reason Fubo exists.

178.    MVPDs and virtual MVPDs charge distinct prices from other video distributors.  For example, MVPDs and virtual MVPDs typically charge $75 or more for their standard, multi-channel package—in large part because of the exorbitant licensing costs demanded by

Defendants and other commercially critical sports programmers.  By contrast, video-on-demand

streaming services are much lower-priced because they do not broadly license live sports.  For

example, Netflix's standard package is $15.49 (or $6.99 with ads), Peacock and Paramount+

charge $5.99 a month, and ad-supported video-on-demand distributors such as Tubi and Pluto

TV are free.  Disney's Hulu demonstrates the stark pricing disparity:  Hulu's video-on-demand

service costs $7.99 a month, whereas Hulu TV—which includes Defendants' live sports

programming—starts at $76.99 a month.

179.    For these reasons, a hypothetical monopolist of the Live Pay TV market could

profitably impose a small but significant, non-transitory price increase or quality reduction.

### 2.    Streaming Live Pay TV Market

180.    Within the Live Pay TV market, virtual MVPDs such as Fubo compete in a

distinct submarket (the "Streaming Live Pay TV" market).  Practical indicia and industry

recognition show that the Streaming Live Pay TV market is a distinct category within the

broader Live Pay TV market.

181.    ***Peculiar characteristics and uses***:  In the Streaming Live Pay TV market, virtual

MVPDs allow consumers to stream live television content from any type of device, anywhere a

broadband connection is possible.  Because virtual MVPDs deliver service over a broadband

internet connection, consumers need not rent or purchase equipment such as set-top boxes or

satellite dishes that are required for traditional cable service.  To subscribe to Fubo, a customer

does not need a single piece of extra equipment—they only need their smartphone, tablet, laptop,

connected TV, or other internet-connected device.

182.    ***Unique delivery infrastructure***:  Unlike traditional cable, virtual MVPDs do not

require proprietary end-to-end physical networks.  Instead, virtual MVPDs depend on

sophisticated computer infrastructure and data centers to deliver content over the public internet

at high speeds.  This difference is important:  traditional cable companies have long enjoyed local monopolies, because they control the physical infrastructure necessary to deliver cable service.  By contrast, because virtual MVPDs deliver television content over the internet, they can and do operate nationwide.

183.  ***Industry and public recognition***:  Industry participants recognize that Streaming Live Pay TV constitutes a distinct market.  Industry participants separately describe and analyze market shares for virtual MVPDs.  Likewise, the public recognizes Streaming Live Pay TV as distinct from traditional cable or satellite-based television, as demonstrated by the rising popularity of "cord-cutting" from traditional cable.

184.  ***Distinct customers***:  Streaming Live Pay TV customers tend to be significantly younger than traditional cable customers.  For example, the median Fubo subscriber is around ██ ███████████████████████████████████████████.  Indeed, many Streaming Live Pay TV customers are "cord nevers," meaning they never subscribed to a traditional cable service.  Streaming Live Pay TV customers also have different viewing habits, as they tend to consume live television from phones, tablets, gaming consoles, and computers, not just from stationary television sets.

185.  A hypothetical monopolist of the Streaming Live Pay TV market could profitably impose a small but significant, non-transitory price increase or quality reduction.  Indeed, the dominant firms in the Streaming Live Pay TV market—Google's YouTube TV and Disney's Hulu TV—in fact have imposed large price increases in recent years (and forced other providers to raise their prices too, through MFN clauses), demonstrating that a hypothetical monopolist could profit from control over this market.

### C.      Tying and Tied Product Markets

186.     Additional relevant markets exist with respect to Fubo's tying claims against Disney and Fox under Section 1 of the Sherman Act.  In particular, (1) the tying product market is the market for licensing commercially critical sports channels; and (2) the tied product market is the market for licensing non-critical television channels.

### 1.      Tying Market:  Commercially Critical Sports Channels

187.     The tying product market is the market for licensing commercially critical sports channels.  Commercially critical sports channels—or "must-have" sports channels—is programming that an MVPD or virtual MVPD *must* license to offer a commercially viable package of channels.  In other words, without commercially critical sports channels, an MVPD or a virtual MVPD cannot offer a commercially viable package of channels that profitably attracts and retains customers.

188.     The commercially critical nature of live sports is based on widespread consumer demand for that programming.  By definition, no programming outside this market is comparable to or reasonably interchangeable with commercially critical television programming.

189.     Live sports is increasingly important to multi-channel video distributors. Although consumers have time-shifted their entertainment viewing habits—so that they increasingly watch scripted shows and movies through video-on-demand services—they continue to watch sports live.  Accordingly, high-quality sports content is more critical than ever to the survival of multi-channel video distributors.

190.     The linear networks ESPN, ABC, and Fox are commercially critical sports channels.  Both Disney and Fox have publicly acknowledged that those channels are must-have content for MVPDs and virtual MVPDs.  For instance, Bob Iger, CEO of Disney, said

unequivocally:  "You cannot launch a new multichannel platform or bundle successfully without ESPN."

191.    Mr. Iger is correct:  ESPN is a commercially critical sports channel.  ESPN holds the exclusive rights to a vast array of the most popular live sports events, *see supra* § III, and is ██████████████████████████████████████████████████████████.  Because of its control over ESPN, Disney has substantial market power over MVPDs and virtual MVPDs.

192.    Disney's market power is further enhanced because it owns ABC, another commercially critical sports channel with exclusive rights to many popular live sports events.





██████████████████████████████.

193.    The Fox network is also a commercially critical channel.  Like ESPN and ABC, Fox also holds extensive exclusive rights to popular live sports events.  *See infra supra* § III.

██████████████████████████████████████████████████████████

██████████████████████████.  As a result, Fox has substantial market power over MVPDs and virtual MVPDs.

194.    The commercially critical nature of Disney's and Fox's sports programming is also evidenced by its cost.  Fubo's affiliate fees for ESPN, for instance, are $████ per subscriber—compared to drastically lower fees for relatively popular non-critical channels in Fubo's lineup such as ████████████████████████████████████████████ ████████████████████.  Disney can demand such high fees for ESPN because they know video distributors have no choice but to pay them.

195.    Further evidencing their control over commercially critical sports programming, Disney and Fox can also demand non-economic terms that Fubo would never accept if they did

not exert market power.  To take just a few examples, Disney and Fox coerce Fubo to:  (1)
license and broadcast non-critical channels Fubo does not want to broadcast; (2) drop other non-
critical television channels (such as TNT, TBS, AMC and A&E) that Fubo would select from
other programmers instead of those offered by Disney and Fox; (3) agree to include most of
Disney's and Fox's channels in every subscriber package that Fubo offers, including channels
that Fubo would not otherwise include in those packages; (4) ███████████████████████
████████████████████████████████; and (5) agree to other one-sided and onerous
contractual terms that Fubo would otherwise never accept.

196.    High barriers to entry protect Disney's and Fox's market power in the tying
market.  Developing a commercially critical sports channel requires obtaining the media rights to
major sports leagues and events.  Acquiring those rights is difficult and expensive.  *See supra*
§ III.  Moreover, creating a commercially critical sports channel requires developing
programming that resonates with Americans and attracts strong live viewership, which is
difficult to predict or achieve even for a deep-pocketed entrant (particularly without an
established brand like Disney/ESPN and Fox).

## 2.    Tied Market:  Non-Critical Television Channels

197.    The tied product market is the market for licensing non-critical television
channels.

198.    Non-critical television programming is programming that an MVPD or virtual
MVPD *might* choose to license for distribution in a given package of channels, but that it does
not *need* to license to support a commercially viable package of channels.

199.    Non-critical television channels are reasonably interchangeable within a package
of channels, because distributors (absent tying and bundling policies) could choose between non-
critical television channels when offering a multi-channel package to consumers.  For example, a

distributor could choose to license A&E but not FX, or vice versa, and still offer a commercially viable service.

200.    However, non-critical television channels are *not* reasonably interchangeable with commercially critical sports channels.  If an MVPD or virtual MVPD attempted to offer a multi-channel package featuring non-critical television channels, in lieu of commercially critical sports channels, the package would not be commercially viable.  For example, if Fubo decided to offer National Geographic instead of ESPN in a package of channels, that package would quickly shed subscribers and would not be commercially viable.

201.    Both Disney and Fox force Fubo to accept many non-critical television channels—and include those channels in every package Fubo offers—as a condition to receiving the commercially critical sports programming offered on ESPN, ABC, and Fox.

202.    Disney, for example, forces Fubo to license and broadcast non-critical television channels such as ████████████████████████████████████, among others.  Each of those channels is offered in every Fubo package, ██████████████, yet they receive relatively little viewership.  ██████████████████████████ ██████

203.    Likewise, Fox licenses—and forces Fubo to carry—non-critical television channels such as ██████████████████.

204.    Disney's and Fox's tying policies have forced Fubo to license and broadcast non-critical television channels from them instead of other suppliers.  For example, when Fubo signed its first licensing agreement with Disney to get access to ESPN, Fubo was forced to drop TNT and TBS to maintain an economical channel package (because Disney's prices are so high).

Fubo—and Fubo's subscribers—would prefer to have TNT and TBS included in their packages, rather than the array of non-critical channels that Disney and Fox force Fubo to include.

## IX.    RELEVANT GEOGRAPHIC MARKET

205.    The relevant geographic market is the United States.

206.    With respect to the upstream Sports Program Licensing Market, sports leagues such as the NFL, NBA, and PGA Tour sell media rights to their events for the United States separately from international media rights.  And those United States media rights are particularly valuable:  in 2023, the top sports leagues sold their United States media rights for a cumulative $27.5 billion—six times more than the next-biggest media rights market (the United Kingdom, at $4.6 billion).

207.    In turn, after programmers such as Defendants acquire the media rights to sporting events, they license the United States distribution rights to their sports programming to video distributors such as Fubo.  These agreements between programmers and distributors generally define the United States as the relevant "Territory" and license the rights to distribute linear television channels within the United States specifically.

208.    With respect to Live Pay TV and Streaming Live Pay TV services, those services are distributed to customers throughout the United States.  Over-the-air networks, which are broadcast on both MVPDs and virtual MVPDs, are regulated under federal law and tailored to the laws of the United States.

209.    Both MVPDs and virtual MVPDs cater to United States customers, providing content predominantly in English and featuring popular sporting events conducted in the United States.  Advertisements on pay television services likewise are tailored to United States consumers.

210.     Virtual MVPDs market their services nationwide.  They provide content over broadband internet connections that are available throughout the United States.  Moreover, virtual MVPDs enforce geo-location restrictions that limit consumers to watching those services within the United States.

211.     Likewise, Defendants' jointly owned sports streaming application, if allowed to launch, will be offered in the United States (and not internationally) and tailored to United States consumers.

## X.     DEFENDANTS' AND HULU'S VERTICAL RESTRAINTS ARE UNLAWFUL PER SE AND UNREASONABLY RESTRAIN TRADE

212.     As described above and in the following paragraphs, Defendants' and Hulu's vertical restraints are unlawful in several respects.

213.     *First*, Disney/ESPN's and Fox's bundling practices prevent Fubo and similarly situated video distributors from offering the "skinny," sports-centric packages of channels that consumers have long desired.  Those tying arrangements are unlawful *per se*.  Even if they are not unlawful *per se*, they unreasonably restrain trade.

214.     By requiring Fubo to broadcast virtually all of Disney/ESPN's and Fox's channels (sports or otherwise) to ███ Fubo's English-language customers, those Defendants have blocked Fubo from composing innovative, consumer-driven offerings that might threaten their market dominance and increase consumer choice.  Defendants have also blocked Fubo from licensing and broadcasting channels from other programmers that Fubo would prefer to license (and Fubo's customers would prefer to watch).

215.     *Second*, Defendants' MFN clauses prevent Fubo from engaging in fair competition on price.  Those MFN agreements unreasonably restrain trade.

216.    The nominal prices and other economic terms that Defendants charge to large virtual MVPDs such as YouTube TV and Hulu TV do not reflect market realities.  Instead, these large virtual MVPDs accept these prices in exchange for lucrative side benefits, such as some Defendants' purchase of Google's cloud services, WBD's discounting of its video-on-demand content, and Fox's agreement to market Hulu TV.  In the case of Disney and Hulu TV, Disney directly recoups the above-market premiums that Hulu TV pays for its content.

217.    The MFN clauses allow Defendants to impose these above-market prices on the entire industry—including smaller virtual MVPDs such as Fubo, which receive no corresponding benefit for accepting the above-market rates.  This curtails any practical ability for Fubo to engage in price competition with Defendants, forcing consumers to continue to purchase content from Defendants at above-market rates not subject to any market check.

218.    Although Defendants' bundling and MFN practices are each anticompetitive in their own right, these interrelated restraints have had cumulative and synergistic effects that have harmed competition and the competitive process.  Both practices—bundling and MFN clauses— harm the competitive process by structurally and severely disadvantaging smaller, disruptive virtual MVPDs (such as Fubo) and raising barriers to entry.  For example, these practices prevent new and nascent competitors from offering a differentiated service at better prices, lowering their ability and incentive to challenge the dominant incumbents YouTube TV and Hulu TV.  This further entrenches Defendants' own market power and deprives consumers of the benefits of innovation.

## XI.    DEFENDANTS' JOINT VENTURE WILL SUBSTANTIALLY LESSEN COMPETITION AND UNREASONABLY RESTRAIN TRADE

219.    As described above and in the following paragraphs, Defendants' JV will substantially lessen competition in multiple respects.

220.    *First*, the JV reflects an anticompetitive agreement between horizontal competitors to exclusively license their must-have sports content on a standalone basis to their jointly owned application, while denying rival distributors the ability to offer those same channels on an unbundled basis (or with all of the content features that Defendants will include on channels broadcast through the JV).

221.    In a similar vein, the JV will substantially lessen and soften competition by facilitating horizontal collusion between Defendants, who collectively control access to most commercially critical sports content in the United States.  With the JV, Defendants have aligned their interests and will have the opportunity and incentive to collude when it comes to licensing must-have sports content to third-party distributors.

222.    *Second*, the JV will increase Defendants' incentives to shut out and/or raise the carriage fees they charge to third-party virtual MVPDs in the Sports Program Licensing Market. Defendants have the power and incentive to undercut now-rival distributors by discontinuing their licensing agreements with them or demanding yet-higher prices (including by using MFN clauses in their licensing deals with their own JV streaming app).  By hobbling rival distributors of streaming sports content, Defendants will ensure their jointly owned streaming app is the only option left and will inevitably charge consumers monopoly prices for streaming live sports.

223.    *Third*, in the downstream distribution markets, the agreement will substantially lessen competition by combining three formidable actual or potential competitors in the direct-to-consumer streaming market.  The JV will jointly price more than half the sports channels available to United States consumers, depriving consumers of all of the benefits of competition. Absent the JV, Defendants would compete against one another—and with other virtual

MVPDs—to offer the best streaming sports package based on price, content, and quality features.  With the JV, collusion replaces that competition.

## XII.   FUBO HAS SUFFERED AND WILL SUFFER ANTITRUST INJURY

224.   Defendants' anticompetitive conduct has harmed not just Fubo, it has harmed competition itself.  Defendants' conduct has raised the prices consumers pay to access live-streamed sports and has degraded the quality of sports live-streaming services.  If Defendants are permitted to go through with their JV, the injury to competition will deepen.  The JV will enable Defendants to exercise their combined market power to exclude competitors in the market for streaming live sports content, including Fubo.

### A.   Defendants' Anticompetitive Practices Caused Fubo (and Ultimately Consumers) to Pay Supra-Competitive Prices and Has Inhibited Fubo's Innovations

225.   As described above and in the following paragraphs, Defendants' conduct has caused competitive injury to Fubo in at least four ways:  (1) by coercing Fubo to license non-critical content in order to access Disney's, ESPN's and Fox's' commercially critical sports content; (2) by coercing Fubo to pay to distribute Defendants' non-critical content to ███% of Fubo's English-language customers; (3) by entering into MFN clauses that artificially raise the price for Defendants' content (and impose other onerous, non-market terms on Fubo); and (4) by preventing Fubo from offering important content features, degrading the quality of Fubo's product.

226.   *First*, Defendants Disney/ESPN and Fox tie their commercially critical sports content to the licensing of non-critical content.  Absent this unlawful tying arrangement, Fubo would license only commercially critical sports content or would license far less non-critical content (by, for instance, placing non-critical content in separate packages available to only consumers who desire that content).  Instead, Fubo is forced to pay high prices for unnecessary

content.  As a result of Disney/ESPN's and Fox's unlawful ties, Fubo must also forego other commercially valuable content that its customers want.  If Fubo were not forced to license Disney/ESPN's and Fox's non-critical content, it could instead license higher-demand content from other content producers.  Disney/ESPN's and Fox's unlawful tying arrangements thus degrade the quality of product Fubo can market to consumers, and cause Fubo to lose potential customers.

227.    *Second*, Defendants Disney/ESPN, and Fox force Fubo to distribute virtually all of their non-critical content to █ % of Fubo's English-language package subscribers.  As a result, Fubo is required to license non-critical content for every subscriber, even though most of its subscribers do not consume that non-critical content.  Without Disney's, ESPN's, and Fox's unlawful requirements, Fubo would be able to offer consumers content packages more tailored to their interests, which would raise the quality of Fubo's product, benefit consumers, and grow Fubo's business (increasing output).  Absent these tying restraints, Fubo would license the content its consumers actually want to watch.  Instead, Fubo (and its customers) pay for unnecessary content.

228.    *Third*, Defendants (including Hulu) have entered contracts with other market participants designed to drive up the price that every virtual MVPD that is in the market—or wishes to enter the market—must pay for content.  By using MFN clauses to set an artificially high price floor, these Defendants (including Hulu) prevent Fubo from competing on price—to the detriment of competition and consumers.

229.    *Fourth*, Defendants' conduct has also impeded Fubo's ability to offer pro-consumer innovations, harming Fubo and consumers alike and frustrating the competitive process.

**B.    Fubo Will Suffer Further Antitrust Injury If Defendants Are Permitted to Form The Joint Venture**

230.    As described above and in the following paragraphs, if the JV is allowed to proceed, Fubo will suffer antitrust injury as a direct purchaser in the Sports Program Licensing Market.

231.    Defendants will collectively and individually have much greater incentives to exercise their market power and raise the content costs they charge to Fubo.  Those higher costs constitute antitrust injury to Fubo, which is a consumer and direct purchaser in the Sports Program Licensing Market.

232.    In turn, Fubo will be forced to either pay the prices demanded by the Defendants or face the prospect of business insolvency, because no virtual MVPD can offer a commercially viable service without Defendants' sports channels.  Either circumstance would severely and irrevocably harm competition and consumers—resulting in higher prices or the elimination of competition and choice.

## FIRST CAUSE OF ACTION
### Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18
### (Against Disney/ESPN, Fox, WBD)

233.    Fubo realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

234.    Defendants are corporations or limited liability companies engaged in interstate trade and commerce throughout the United States.

235.    On February 6, 2024, Defendants announced the launch of the new JV, through which they will consolidate their sports content rights and offer that combined content to consumers through a single, jointly priced app.

236.    Through the formation of the JV, Defendants will acquire, directly or indirectly, shares of a business engaged in interstate trade and commerce throughout the United States.

237.    Defendants jointly control a majority of U.S. sports broadcasting rights and therefore have substantial market power in the Sports Program Licensing Market.  Defendants currently own the media rights to a broad cross-section of commercially critical sports programming, including NFL, the NBA, the MLB, the NHL, the FIFA World Cup, and many others.

238.    The Sports Program Licensing Market is concentrated and barriers to entry and expansion are high.

239.    This acquisition may substantially lessen competition in the Sports Program Licensing Market.

240.    Among other things, the formation of the JV will substantially increase Defendants' incentives to raise prices or withhold commercially critical sports channels in licensing negotiations with third-party distributors including Fubo—causing them to pay supra-competitive carriage rates or driving them out of business altogether and harming the millions of American consumers who rely on those services.

241.    Defendants cannot show that any cognizable efficiencies resulting from the formation of the JV are of a character and magnitude such that the JV is not likely to be anticompetitive.

242.    As a result of the JV, Fubo will suffer injury and damages that flows from Defendants' antitrust violations.

**SECOND CAUSE OF ACTION**
**Unreasonable Restraint of Trade in Violation of the Sherman Act, 15 U.S.C. § 1**
**(Against Disney/ESPN, Fox, and WBD)**

243.    Fubo realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

244.    Defendants are corporations or limited liability companies engaged in interstate trade and commerce throughout the United States.

245.    On February 6, 2024, Defendants announced an agreement to launch the JV, through which they will consolidate their sports content rights and offer that combined content to consumers through a single, jointly priced app.

246.    The JV will substantially affect interstate commerce.

247.    Defendants jointly control a majority of U.S. sports broadcasting rights and therefore have substantial market power in the Sports Program Licensing Market.  Defendants currently own the media rights to a broad cross-section of commercially critical sports programming, including NFL, the NBA, the MLB, the NHL, the FIFA World Cup, and many others.

248.    The Sports Program Licensing Market is concentrated and barriers to entry and expansion are high.

249.     Among other things, the formation of the JV will substantially increase Defendants' incentives to raise prices or withhold commercially critical sports channels in licensing negotiations with third-party distributors including Fubo—causing them to pay supra-competitive carriage rates or driving them out of business altogether and harming the millions of American consumers who use those services.

250.    Defendants cannot show that any pro-competitive benefits resulting from their agreement will outweigh these anticompetitive effects.

251.     As a result of the JV, Fubo will suffer injury and damages that flows from Defendants' antitrust violations.

### THIRD CAUSE OF ACTION
### *Per Se* Unlawful Tying in Violation of the Sherman Act, 15 U.S.C. § 1
### (Against Disney/ESPN)

252.     Fubo realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

253.     In its carriage agreements with Fubo, Disney/ESPN has conditioned the sale of its commercially critical sports content—the linear channels ESPN and ABC—on Fubo's agreement to license its non-critical content as well.  Disney/ESPN also requires Fubo to broadcast this non-critical content to ███████████████ Fubo's English-language subscribers.

254.     Disney/ESPN's commercially critical sports content and non-critical content exist in separate and distinct markets or submarkets.  As the exclusive owner of must-have sports content, Disney/ESPN has appreciable market power in the market for licensing commercially critical sports channels.

255.     Disney/ESPN has coerced Fubo into licensing its non-critical content by expressly conditioning its sale of commercially critical sports content on Fubo's license of non-critical content.  Absent this tying arrangement, Fubo (and its customers) would not license Disney/ESPN's non-critical content.

256.     Disney/ESPN's tying arrangement is unlawful *per se*.

257.     In the alternative, Disney/ESPN's tying arrangement unreasonably restrains trade.  Disney/ESPN's bundling requirements have anticompetitive effects in the market for non-critical content.  Because of those bundling requirements, Disney/ESPN charges higher prices for its non-critical content than it otherwise could.  Absent Disney/ESPN's bundling requirements, Fubo would license and broadcast superior non-critical content from other programmers.

258.     Disney/ESPN's bundling requirements affect a substantial amount of interstate commerce in the market for non-critical content.

259.     Disney/ESPN's bundling requirements have injured Fubo and harmed the competitive process.  Because of the bundling requirements, Fubo pays for non-critical content it does not want and cannot license content from other programmers that it would otherwise license.  Additionally, Fubo cannot offer packages of unbundled sports content that consumers demand from Fubo, and cannot effectively position itself as a sports-centric virtual MVPD.

260.     As a result of the Disney/ESPN's bundling practices, Fubo has suffered injury and damages that flows from Disney/ESPN's antitrust violations.

### FOURTH CAUSE OF ACTION
### *Per Se* Unlawful Tying in Violation of the Sherman Act, 15 U.S.C. § 1
### (Against Fox)

261.     Fubo realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

262.     In its carriage agreements with Fubo, Fox has conditioned the sale of its commercially critical sports content—the linear channel FOX—on Fubo's agreement to license its non-critical content as well.  Fox also requires Fubo to broadcast this non-critical content to ███████████████████ Fubo's English-language subscribers.

263.     Fox's commercially critical sports content and non-critical content exist in separate and distinct markets or submarkets.  As the exclusive owner of must-have sports content, Fox has appreciable market power in the market for licensing commercially critical sports channels.

264.     Fox has coerced Fubo into licensing its non-critical content by expressly conditioning its sale of commercially critical sports content on Fubo's license of non-critical

content.  Absent this tying arrangement, Fubo (and its customers) would not license Fox's non-critical content.

265.    Fox's tying arrangement is unlawful *per se*.

266.    In the alternative, Fox's tying arrangement unreasonably restrains trade.  Fox's bundling requirements have anticompetitive effects in the market for non-critical content. Because of those bundling requirements, Fox can maintain higher prices for their non-critical content than it otherwise could.  Absent Fox's bundling requirements, Fubo would license and broadcast superior non-critical content from other programmers.

267.    Fox's bundling requirements affect a substantial amount of interstate commerce in the market for non-critical content.

268.    Fox's bundling requirements have injured Fubo and harmed the competitive process.  Because of the bundling requirements, Fubo pays for non-critical content it does not want and cannot license content from other programmers that it would otherwise license. Additionally, Fubo cannot offer packages of unbundled sports content that consumers demand from Fubo, and cannot effectively position itself as a sports-centric virtual MVPD.

269.    As a result of the Fox's bundling practices, Fubo has suffered injury and damages that flows from Fox's antitrust violations.

## FIFTH CAUSE OF ACTION
### Unlawful Block-Booking in Violation of the Sherman Act, 15 U.S.C. § 1 (Against Disney/ESPN)

270.    Fubo realleges and reincorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

271.    In its carriage agreements with Fubo, Disney/ESPN has conditioned the licensing of ABC and ESPN on Fubo's agreement to license and broadcast less-desired non-critical

content from Disney/ESPN.  Disney requires Fubo to broadcast virtually all of its non-critical content to all or substantially all of Fubo's English-language subscribers.

272.    Disney/ESPN's above-described conduct constitutes unlawful "block-booking." As relevant here, block-booking is the practice of licensing one set of programming to a distributor on the condition that the distributor also license and distribute other programming from the programmer.

273.    Disney/ESPN has wielded its market power to coerce Fubo into purchasing less-desired non-critical content by expressly conditioning Disney/ESPN's licensing of ABC and ESPN on Fubo's agreement to license and broadcast Disney's less-desired non-live-sports content.  Absent this block-booking arrangement, Fubo (and its customers) would not license all of Disney/ESPN's non-critical content.

274.    Disney/ESPN's unlawful block-booking has injured Fubo.  Because of Disney/ESPN's block-booking, Fubo pays for non-critical content it does not want and cannot license content from other content providers that it would otherwise license.  Its block-booking also harms consumers, who would prefer to receive other programming.

### SIXTH CAUSE OF ACTION
### Unlawful Block-Booking in Violation of the Sherman Act, 15 U.S.C. § 1
### (Against Fox)

275.    Fubo realleges and reincorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

276.    In its carriage agreements with Fubo, Fox has conditioned the sale of Fox on Fubo's agreement to license and broadcast less-desired non-critical content from Fox.  Fox requires Fubo to broadcast virtually all of its non-live-sports content ██████████████ of Fubo's English-language subscribers.

277.     Fox's above-described conduct constitutes unlawful "block-booking."  As relevant here, block-booking is the practice of licensing one set of programming to a distributor on the condition that the distributor also license and distribute other programming from the programmer.

278.     Fox has wielded its market power to coerce Fubo into purchasing less-desired non-critical content by expressly conditioning Fox's licensing of Fox on Fubo's agreements to license and broadcast Fox's less-desired non-critical content.  Absent this block-booking arrangement, Fubo (and its customers) would not license all of Fox's non-critical content.

279.     Fox's unlawful block-booking has injured Fubo.  Because of Fox's block-booking, Fubo pays for non-critical content it does not want and cannot license content from other content providers that it would otherwise license.  Its block-booking also harms consumers, who would prefer to receive other programming.

### SEVENTH CAUSE OF ACTION
### Vertical Restraints of Trade in Violation of the Sherman Act, 15 U.S.C. § 1
### (Against Disney and ESPN)

280.     Fubo realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

281.     Disney and ESPN have entered into agreements with other distributors—most notably, YouTube TV and Hulu TV—that include MFN clauses.

282.     Disney and ESPN's MFN agreements substantially affect interstate commerce.

283.     Disney and ESPN have market power in the Sports Program Licensing Market. Because Disney and ESPN control must-have sports channels, they have substantial market power over virtual MVPDs such as Fubo, which need access to those channels to offer a commercially viable product.

284.    The Sports Program Licensing Market is concentrated and barriers to entry are high.

285.    Disney and ESPN's MFN agreements unreasonably restrain trade under the rule of reason.

286.    Disney and ESPN's MFN agreements have anticompetitive effects.  Among other things, the MFN agreements raise prices for Fubo and consumers alike; set an artificially high price floor that prevents price competition by virtual MVPDs; severely disadvantage new and nascent virtual MVPDs; raise barriers to entry; and facilitate coordination or collusion among horizontal competitors.

287.    Disney and ESPN cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

288.    As a result of the MFN agreements, Fubo has suffered injury and damages that flow from Disney and ESPN's antitrust violations.

### EIGHTH CAUSE OF ACTION
### Vertical Restraints of Trade in Violation of the Sherman Act, 15 U.S.C. § 1
### (Against Fox)

289.    Fubo realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

290.    Fox has entered into agreements with other distributors—most notably, YouTube TV and Hulu TV—that include MFN clauses.

291.    Fox's MFN agreements substantially affect interstate commerce.

292.    Fox has market power in the Sports Program Licensing Market.  Because Fox controls a must-have sports channel, Fox has substantial market power over virtual MVPDs such as Fubo, which need access to that channel to offer a commercially viable product.

293.     The Sports Program Licensing Market is concentrated and barriers to entry are high.

294.     Fox's MFN agreements unreasonably restrain trade under the rule of reason.

295.     Fox's MFN agreements have anticompetitive effects.  Among other things, the MFN agreements raise prices for Fubo and end consumers alike; set an artificially high price floor that prevents price competition by virtual MVPDs; severely disadvantage new and nascent virtual MVPDs; raise barriers to entry; and facilitate coordination or collusion among horizontal competitors.

296.     Fox cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

297.     As a result of the MFN agreements, Fubo has suffered injury and damages that flow from Fox's antitrust violations.

### NINTH CAUSE OF ACTION
### Vertical Restraints of Trade in Violation of the Sherman Act, 15 U.S.C. § 1 (Against WBD)

298.     Fubo realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

299.     WBD has entered into agreements with other distributors—most notably, YouTube TV and Hulu TV—that include MFN clauses.

300.     WBD's MFN agreements substantially affect interstate commerce.

301.     The Sports Program Licensing Market is concentrated and barriers to entry are high.

302.     WBD's MFN agreements unreasonably restrain trade under the rule of reason.

303.     WBD's MFN agreements have anticompetitive effects.  Among other things, the MFN agreements raise prices for Fubo and consumers alike; set an artificially high price floor

that prevents price competition by virtual MVPDs; severely disadvantage new and nascent virtual MVPDs; raise barriers to entry; and facilitate coordination or collusion among horizontal competitors.

304.    WBD cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

305.    As a result of the MFN agreements, Fubo has suffered injury and damages that flow from WBD's antitrust violations.

### TENTH CAUSE OF ACTION
### Vertical Restraints of Trade in Violation of the Sherman Act, 15 U.S.C. § 1
### (Against Hulu)

306.    Fubo realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

307.    Hulu's virtual MVPD, Hulu TV, has entered into carriage agreements with programmers—including Disney, Fox, WBD, NBC, Univision, and A&E—that include MFN clauses.

308.    Hulu TV's MFN agreements substantially affect interstate commerce.

309.    Hulu TV has facilitated and entered into MFN agreements with counterparties that have market power in the Sports Program Licensing Market, including Disney/ESPN and Fox.  Hulu TV's majority owner Disney has market power in the Sports Program Licensing Market, because Disney controls must-have sports channels that virtual MVPDs need to provide a commercially viable service.

310.    Hulu TV's MFN agreements unreasonably restrain trade under the rule of reason.

311.    Hulu TV's MFN agreements have anticompetitive effects.  Among other things, the MFN agreements raise prices for Fubo and consumers alike; set an artificially high price floor that prevents price competition by virtual MVPDs; severely disadvantage new and nascent

virtual MVPDs; raise barriers to entry; and facilitate coordination or collusion among horizontal competitors.

312.    Hulu TV cannot show any cognizable pro-competitive benefits that outweigh the harm to competition and consumers.

313.    As a result of the MFN agreements, Fubo has suffered injury and damages that flow from Hulu TV's antitrust violations.

**ELEVENTH CAUSE OF ACTION**
**Unreasonable Restraint of Trade in Violation of Donnelly Act, N.Y. Gen. Bus. Law § 340**
**(Against Disney/ESPN, Fox, WBD)**

314.    Fubo realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

315.    Defendants' JV, set forth in the Complaint's First and Second Causes of Action, violate New York's Donnelly Act for the same reasons they violate federal antitrust law.

**TWELFTH CAUSE OF ACTION**
**Unlawful Tying in Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340**
**(Against Disney/ESPN and Fox)**

316.    Fubo realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

317.    Disney's, ESPN's and Fox's unlawful tying arrangements, set forth in the Complaint's Third and Fourth Causes of Action, violate New York's Donnelly Act for the same reasons they violate federal antitrust law.

**THIRTEENTH CAUSE OF ACTION**
**Unlawful Block-Booking in Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340**
**(Against Disney/ESPN and Fox)**

318.    Fubo realleges and reincorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

319.   Disney's, ESPN's and Fox's unlawful block-booking arrangements, set forth in the Complaint's Fifth and Sixth Causes of Action, violate New York's Donnelly Act for the same reasons they violate federal antitrust law.

## FOURTEENTH CAUSE OF ACTION
## Vertical Restraints of Trade in Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340
### (Against All Defendants)

320.   Fubo realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

321.   The anticompetitive use of MFN clauses (in combination with other anticompetitive conduct) by Disney/ESPN, Fox, WBD, and Hulu, set forth in the Complaint's Seventh, Eighth, Ninth, and Tenth Causes of Action, violate New York's Donnelly Act for the same reasons they violate federal antitrust law.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray as follows:

a. That Defendants' conduct specified in this Complaint be declared by the Court to violate Section 1 of the Sherman Act, 15 U.S.C. § 1; Section 7 of the Clayton Act, 15 U.S.C. § 18; and the Donnelly Act, N.Y. Gen. Bus. Law § 340.

b. That judgment be entered for Plaintiffs against Defendants for three times the amount of damages sustained by Plaintiffs as allowed by law, together with the costs of this action, including reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

c. That Plaintiffs be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

d. That the Court order such divestitures by Defendants as may be required to unwind the Joint Venture, restore competition, and prevent the recurrence of antitrust violation in future;

e. That the Court issue further equitable relief in the form of a permanent injunction prohibiting Defendants' planned Joint Venture, ongoing and future exclusionary conduct, ongoing and future tying arrangements, ongoing and future block-booking,

and other unreasonable vertical restraints by Defendants (including the use of MFN clauses), either collectively or individually; and

f.  That Plaintiffs receive such other, further, or different relief as the case may require and the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

322.  Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Fubo demands a jury trial of all issues so triable.

Dated:  February 20, 2024

Respectfully submitted,

Mark C. Hansen (*pro hac vice* pending)
Evan T. Leo (*pro hac vice* forthcoming)
Kevin J. Miller (*pro hac vice* forthcoming)
Joseph S. Hall (SDNY Bar No. JH2612)
Thomas G. Schultz (*pro hac vice* forthcoming)
Joshua Hafenbrack (*pro hac vice* forthcoming)
KELLOGG, HANSEN, TODD, FIGEL
 & FREDERICK, P.L.L.C.
1615 M Street NW
Suite 400
Washington, DC 20036
Tel.:  (202) 326-7900
Fax:  (202) 326-7999
Email:   mhansen@kellogghansen.com
            eleo@kellogghansen.com
            kmiller@kellogghansen.com
            jhall@kellogghansen.com
            tschultz@kellogghansen.com
            jhafenbrack@kellogghansen.com

*Counsel for Plaintiffs fuboTV Inc. and fuboTV Media Inc.*