**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FUBOTV INC. and FUBOTV MEDIA INC.,

*Plaintiffs*,

-against-

THE WALT DISNEY COMPANY, ESPN,
INC., ESPN ENTERPRISES, INC., HULU,
LLC, FOX CORPORATION, and WARNER
BROS. DISCOVERY, INC.,

*Defendants*.

---

Civil Action No.  24-cv-1363-MMG-JW

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

GLOSSARY ...................................................................................................................... viii

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................3

I.     Sports and The Live Pay TV Ecosystem ........................................................................3

II.    Defendants Have Leveraged Their Control Over Significant Sports Licensing Rights
to Prevent Fubo from Offering a Sports-Centric Package of Channels.............................6

III.   Defendants Announced a JV to Consolidate Their Control Over Sports Content,
Offering the Sports-Centric Package They Have Prevented Fubo from Offering..............7

IV.   Fubo's Lawsuit and Procedural History ........................................................................7

LEGAL STANDARD...............................................................................................................8

ARGUMENT ..........................................................................................................................8

I.     Fubo Is Likely To Suffer Irreparable Harm Absent a Preliminary Injunction ...................8

     A.    The JV Is Likely To Cause ███████████████████
███ .......................................................................................................................9

     B.    Formation of the JV Threatens ███████████████
██████ .............................................................................................................11

     C.    Formation of the JV Will Irreparably Harm Competition and Consumers ...........12

II.    Fubo Is Likely to Succeed on the Merits of Its Claims....................................................13

     A.    The JV Will Substantially Lessen Competition and Unreasonably Restrain
Trade in the Streaming Live Pay TV Market.......................................................13

     B.    The JV Will Substantially Lessen Competition and Unreasonably Restrain
Trade in the Sports Licensing Market..................................................................18

     C.    Defendants' Bundling Requirements Also Constitute Unlawful Tying
Under Section 1 of the Sherman Act ...................................................................20

III.   The Balance of Hardships and the Public Interest Strongly Favor a Preliminary
Injunction .................................................................................................................23

IV.    This Court Should Permit Expedited Discovery on the Claims in This Motion and Hold a Preliminary Injunction Hearing ..................................................................................24

CONCLUSION ...............................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Needle, Inc. v. Nat'l Football League,*
560 U.S. 183 (2010) ................................................................................................ 14

*Anacomp, Inc. v. Shell Knob Servs., Inc.,*
1994 WL 9681 (S.D.N.Y. Jan. 10, 1994) ............................................................... 10

*Antitrust Litig.,*
627 F. Supp. 3d 346 (S.D.N.Y. 2022) ............................................................... 21, 22

*Behrend v. Comcast Corp.,*
2012 WL 1231794 (E.D. Pa. Apr. 12, 2012) .......................................................... 15

*Biddle v. Walt Disney Co.,*
2023 WL 6453799 (N.D. Cal. Sept. 30, 2023) ....................................................... 15

*Brantley v. NBC Universal, Inc.,*
675 F.3d 1192 (9th Cir. 2012) ................................................................................. 18

*Brenntag Int'l Chems., Inc. v. Bank of India,*
175 F.3d 245 (2d Cir. 1999) ...................................................................................... 8

*Brown Shoe v. United States,*
370 U.S. 294 (1962) ..................................................................................... 14, 15, 16

*Cablevision Sys. Corp. v. Viacom Int'l Inc.,*
2014 WL 2805256 (S.D.N.Y. 2014) ........................................................... 21, 22, 23

*Caruso Mgmt. Co. Ltd. v. Intl. Council of Shopping Ctrs.,*
403 F. Supp. 3d 191 (S.D.N.Y. 2019) ..................................................................... 14

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
598 F.3d 30 (2d Cir. 2010) ....................................................................................... 13

*Consol. Gold Fields PLC v. Minorco, S.A,*
871 F.2d 252 (2d Cir. 1989) ............................................................................... 12, 13

*Dodge v. Cnty. of Orange,*
208 F.R.D. 79 (S.D.N.Y. 2002) ............................................................................... 24

*F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.,*
597 F.2d 814 (2d Cir. 1979) ..................................................................................... 24

*Fengler v. Numismatic Americana, Inc.*,
   932 F.2d 745 (2d Cir. 1987)...........................................................................24

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005)............................................................................9

*Fruehauf Corp. v. FTC*,
   603 F.2d 345 (2d Cir. 1979)..........................................................................19

*FTC v. IQVIA Holdings Inc.*,
   2024 WL 81232 (S.D.N.Y. Jan. 8, 2024) ................................................19, 24

*FTC v. Sysco Corp.*,
   113 F. Supp. 3d 1 (D.D.C. 2015) ..............................................................15, 19

*FTC v. Vyera Pharms., LLC*,
   479 F. Supp. 3d 31 (S.D.N.Y. 2010)..............................................................17

*Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*,
   789 F. Supp. 760 (S.D. Miss. 1992).............................................................18

*Glaberson v. Comcast Corp.*,
   2006 WL 3762028 (E.D. Pa. Dec. 19, 2006)................................................15

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*,
   922 F. Supp. 2d 435 (S.D.N.Y. 2013)............................................................23

*Good Sports, Inc. v. Am. Iron Outfitters, Inc.*,
   2019 WL 10303629 (D. Conn. Feb. 1, 2019) .................................................9

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007).........................................................................9, 10

*Grunman Corp v. LTV Corp.*,
   527 F. Supp. 86 (E.D.N.Y. 1981) .................................................................24

*Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*,
   476 F.2d 687 (2d Cir. 1973)..........................................................................24

*Haymount Urgent Care PC v. Gofund Advance, LLC*,
   2022 WL 836743 (S.D.N.Y. Mar. 21, 2022) ................................................11

*Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*,
   510 F.2d 1140 (2d Cir. 1975)........................................................................14

*Illumina, Inc. v. FTC*,
    88 F.4th 1036 (5th Cir. 2023) ..................................................................................... 20

*In re Applications for Consent to the Assignment and/or Transfer of Control of Licenses*
    *Adelphia Commc'ns Corp.*,
    21 FCC Rcd. 8203 (2006) ............................................................................................ 20

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (2022) ......................................................................................................... 22

*John Lenore & Co. v. Olympia Brewing Co.*,
    550 F.2d 495 (9th Cir. 1977) ...................................................................................... 14

*Metso Mins., Inc. v. Powerscreen Int'l Distrib. Ltd.*,
    788 F. Supp. 2d 71 (E.D.N.Y. 2011) ............................................................................ 9

*MLW Media LLC v. World Wrestling Ent., Inc.*,
    2023 WL 4053802 (N.D. Cal. June 15, 2023) ........................................................... 16

*Muze, Inc. v. Digital On-Demand, Inc.*,
    123 F. Supp. 2d 118 (S.D.N.Y. 2000) ........................................................................ 10

*Nat. Organics, Inc. v. Proteins Plus, Inc.*,
    724 F. Supp. 50 (E.D.N.Y. 1989) ........................................................................ 10, 13

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
    992 F.3d 430 (2d Cir. 1993) ....................................................................................... 12

*New York ex rel. Schneiderman v. Actavis*,
    787 F.3d 638 (2d Cir. 2015) ............................................................................ 8, 12, 13

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020) ................................................................. 14, 19

*Norbrook Lab'ys Ltd v. G.C. Hanford Mfg. Co.*,
    126 F. App'x 507 (2d Cir. 2005) ............................................................................... 10

*Norlin Corp. v. Rooney, Pace Inc.*,
    744 F.2d 255 (2d Cir. 1984) ....................................................................................... 11

*Nostalgic Partners, LLC v. Off. of Commr. of Baseball*,
    637 F. Supp. 3d 45 (S.D.N.Y. 2022) ......................................................................... 14

*Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*,
    290 F.3d 578 (3d Cir. 2002) ....................................................................................... 10

*Park Irmat Drug Corp. v. Optumrx, Inc.*,
   152 F. Supp. 3d 127 (S.D.N.Y. 2016) ................................................. 22

*PepsiCo, Inc. v. Coca-Cola Co.*,
   315 F.3d 101, 105 (2d Cir. 2002) ...................................................... 14

*Ralph C. Wilson Indus., Inc. v. Chron. Broad. Co.*,
   794 F.2d 1359 (9th Cir. 1986) .......................................................... 18

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) ...................................................... 8, 9, 10

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
   754 F. Supp. 2d 616 (S.D.N.Y. 2010) ................................................ 10

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) .................................................................. 8

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
   2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) ......................................... 20

*Sprint Nextel Corp. v. AT&T, Inc.*,
   821 F. Supp. 2d 308 (D.D.C. 2011) ................................................... 20

*State of New York v. Hendrickson Bros., Inc.*,
   840 F.2d 1065 (2d Cir. 1988) ........................................................... 23

*Tecnimed SRL v. Kidz-Med, Inc.*,
   763 F. Supp. 2d 395 (S.D.N.Y. 2011) .................................................. 9

*Time Warner Cable Inc. v. FCC*,
   729 F.3d 137 (2d Cir. 2013) ............................................................. 20

*trueEX, LLC v. MarkitSERV Ltd.*,
   266 F. Supp. 3d 705 (S.D.N.Y. 2017) ................................................ 11

*Tucker Anthony Realty Corp. v. Schlesinger*,
   888 F.2d 969 (2d Cir. 1989) ............................................................. 12

*United States v. E. I. du Pont de Nemours & Co.*,
   353 U.S. 586 (1957) ......................................................................... 19

*United States v. AT & T Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018) ................................................... 15

*United States v. AT&T, Inc.*,
   916 F.3d 1029 (D.C. Cir. 2019) ................................................................... 5, 17

*United States v. Columbia Pictures Indus., Inc.*,
   507 F. Supp. 412 (S.D.N.Y. 1980) ........................................................ 12, 17, 24

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ........................................................................... 23

*United States v. Paramount Pictures*,
   334 U.S. 131 (1948) ........................................................................................ 17

*United States v. Penn-Olin Chemical Co.*,
   378 U.S. 158 (1964) ...................................................................... 1, 13, 14, 20

*United States v. Walt Disney Co.*,
   2018 WL 3146076¶¶ (S.D.N.Y. June 27, 2018) ............................................ 19

**STATUTES**

15 U.S.C. § 18 ..................................................................................................... 13

## GLOSSARY

| Term | Definition |
|---|---|
| DOJ | U.S. Department of Justice |
| MLB | Major League Baseball |
| MVPD | Multi-Channel Video Distributor (*e.g.*, Comcast) |
| NBA | National Basketball Association |
| NFL | National Football League |
| NHL | National Hockey League |
| NYSE | New York Stock Exchange |
| Virtual MVPD | Streaming or Virtual Multi-Channel Video Distributor (*e.g.*, Fubo) |
| **Declarants** | **Title** |
| Henry Ahn | Advisor and former Chief Business Officer, Fubo |
| David Gandler | Co-Founder and Chief Executive Officer, Fubo |
| Alberto Horihuela | Co-Founder and Chief Operating Officer, Fubo |
| John Janedis | Chief Financial Officer, Fubo |
| Todd Mathers | Senior Vice President of Content Strategy, Fubo |
| Jonathan Orszag | Senior Consultant, Compass Lexecon, LLC |
| Gary Schanman | Executive Vice President, EchoStar Corporation |
| Robert Thun | Chief Content Officer, DirecTV |
| James Trautman | Managing Director, Bortz Media & Sports Group, Inc. |

**INTRODUCTION**

This Motion seeks to enjoin Defendants from carrying out an illegal and anticompetitive campaign to consolidate control over sports television in a single streaming platform before it inflicts irreparable damage on competition and consumers. If Defendants' consolidation of the majority of U.S. streaming sports content is allowed to close as envisioned, innovative competitors like Plaintiffs fuboTV Inc. and fuboTV Media Inc. ("Fubo") will be driven from the streaming marketplace and consumers will be forced to pay higher prices—the very harms that federal antitrust law seeks to prevent by "arrest[ing] anticompetitive tendencies in their incipiency.'" *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 171 (1964).

Defendants—The Walt Disney Company ("Disney"), Fox Corporation ("Fox"), Warner Bros. Discovery, Inc. ("Warner Brothers"), and their respective affiliates—are media giants that dominate live-sports programming in the United States, through sports channels such as ESPN, ABC, Fox, and TNT. Collectively, they control well over half the television rights to the Nation's professional and collegiate sports.

These programming giants are now joining together—in a Joint Venture ("JV") set to launch this fall—to offer the service they have long used their market power to prevent every other television distributor in the market, including Fubo, from offering: a streaming platform with a streamlined live sports television package targeted to sports fans.

Defendants leverage their control of must-have sports to force streamers like Fubo to license and distribute dozens of unwanted general entertainment channels, as a take-it-or-leave-it condition of licensing Defendants' critical sports channels such as ESPN and Fox. These anticompetitive "bundling" requirements have allowed Defendants to extract billions in supra-competitive profits by forcing distributors and consumers to pay for unwanted content.

1

Yet in stark contrast to the bundling requirements they impose on Fubo, through their JV the Defendants have given themselves—and themselves alone—the rights to offer a premium sports package *without* the dozens of unwanted channels that drive up costs and turn consumers away. The JV service will feature just 15 channels, all featuring popular live sports—the kind of skinny sports bundle that Fubo has tried to offer for nearly a decade, only to encounter tooth-and-nail resistance from the Defendants and other large programmers.

In short, Defendants are weaponizing their own bundling requirements to insulate their JV from competition on the merits. The JV will corner the market for a television bundle targeted to sports fans because Defendants prohibit all other distributors from offering a competing product. Indeed, Disney's CEO Bob Iger has gloated to investors about this anticompetitive disparity, noting how the JV's streaming package will undercut the "big fat bundle" that Defendants force on rival distributors.

Under Rule 65, the Court should preliminarily enjoin this anticompetitive campaign, because (1) it will irreparably harm Fubo's business, (2) Fubo is likely to succeed on the merits of its antitrust claims, and (3) the hardships and public interest weigh in favor of injunctive relief. At the very least, if the JV's streaming service is allowed to proceed, the Defendants should be enjoined from enforcing the contractual restraints that insulate their cartel from competition. Sports fans should be free to choose from multiple options in the marketplace, not forced to accept the one choice that three programming giants agree amongst themselves to provide.

*First*, formation of the JV would irreparably harm Fubo. Defendants' exclusive sports-fan TV service will undercut Fubo in the market based on anticompetitive gamesmanship,

████████████████████████████████████████████

quintessential irreparable harms.

2

*Second*, Fubo is likely to succeed in showing that the JV violates federal antitrust law. The JV will unlawfully restrain competition by consolidating all of Defendants' sports content in a single platform and allowing that platform (but no others) to offer customers a skinny bundle of Defendants' sports content, driving competitors like Fubo out of the market and ultimately giving Defendants free reign to raise prices on consumers. Even before that point, the JV will give Defendants the unprecedented power and collective incentive to raise prices on rival distributors like Fubo (and their customers): When Defendants raise prices on rival distributors and cause users to flee those services, their new joint service will reap the benefits.

*Third*, the public interest and the balance of the hardships favor a preliminary injunction. Preventing a violation of the antitrust laws—and an emerging threat to competition—is firmly in the public interest. And while Fubo would be irreparably injured if the JV were allowed to go forward, Defendants would suffer no comparable harm from a preliminary injunction. That is particularly true if the Court merely allows Fubo to compete with the JV's streaming service; the Defendants can hardly claim they will be harmed by being exposed to competition on the merits.

Fubo also respectfully requests that the Court: (1) authorize tailored discovery into the JV, including appropriate depositions; and (2) set an evidentiary hearing at which Fubo can present—and the Court can assess—live fact and expert testimony on the irreparable harm the JV, as envisioned, will cause to Fubo, competition, and consumers.

## BACKGROUND

### I.    Sports and The Live Pay TV Ecosystem

1.    Many millions of Americans love sports—and they will pay for live television subscriptions to watch it. In the era of on-demand streaming, sports is the "last bastion of live television." Declaration of David Gandler ("Gandler Decl."), ¶ 8. Last year, 96 of the top 100 live-television broadcasts were sporting events. Declaration of James Trautman ("Trautman

3

Decl."), ¶ 14.  As a result, the "importance of live sports to programmers and distributors in the current pay TV marketplace is nearly impossible to overstate."  *Id.* ¶ 12.

The Defendants in this case are three dominant U.S. television programmers that collectively control access to most of the sports broadcast into American living rooms and screens.  Disney owns ABC and the sports juggernaut ESPN, the most-valuable cable channel in the United States.  Declaration of Jonathan Orszag ("Orszag Decl."), ¶¶ 6, 38 & Fig. 2.  Fox owns the Fox Network, which has key sports content and is ███████████████████████████

██████.  *Id.* ¶¶ 6, 35 & Fig. 1.  And Warner Brothers owns the Turner networks TNT, TBS, and TruTV, which likewise broadcast popular sports.  Trautman Decl., ¶ 11.

Collectively, Disney, Fox, and Warner Brothers control at least 54% of all U.S. sports television rights.  Orszag Decl., ¶¶ 18, 65.  Considering only nationally televised sports, the figure is even higher—80%—according to Disney's CFO.  *Id.* ¶ 58.  Defendants' sports holdings include all four major professional leagues (NFL, NBA, MLB, and NHL); college sports; golf, tennis, soccer, and a long tail of niche sports with devoted followings.  Trautman Decl., ¶ 11.

**2.**     The sports programming controlled by Defendants is a critical input for video distributors (also known as multi-channel video programming distributors, or "MVPDs").  MVPDs sell consumers television subscriptions comprised of the channels that they license from programmers such as Defendants.  *Id.* ¶ 8 (describing the pay TV ecosystem).

Sports content is "must-have" for any MVPD and, in the streaming era, the importance of sports to MVPDs has "grown to an unprecedented level."  *Id.* ¶¶ 14-15.  Consumers can readily access movies and scripted dramas from video-on-demand services such as Netflix and Amazon Prime—but they can only get consistent, broad-based access to live sports through an MVPD subscription.  *Id.* ¶¶ 12-18; Declaration of Henry Ahn ("Ahn Decl."), ¶¶ 8-9.  Unlike most

entertainment, sports are almost always watched live, because much of the appeal of sports lies in the uncertainty of the outcome.  Trautman Decl., ¶ 15.  Sports are thus the lynchpin for live TV (and therefore MVPDs) in today's marketplace.  *Id.* ¶¶ 12-18; Ahn Decl., ¶ 10; Declaration of Todd Mathers ("Mathers Decl."), ¶ 9.  An anecdote illustrates the power of live sports:  On the day Coco Gauff won the U.S. Women's Open, more than ███ people signed up for Fubo free trials—over *10 times* the daily average.  Declaration of Alberto Horihuela ("Horihuela Decl."), ¶¶ 18-21 (data on sports driving Fubo subscriptions).

**3**.      Before the streaming era, distributors of sports content were primarily cable and satellite companies, such as Comcast and DISH.  To get live sports through a cable subscription, customers traditionally had to purchase large bundles of channels, which included many rarely watched channels.  Ahn Decl., ¶¶ 11-12.  By 2019, the average cable package included 190 channels—even though most customers regularly watched only about 15 of them.  Trautman Decl., ¶ 28.  In the last decade, however, new distributors called "virtual MVPDs" emerged to challenge the old cable model.  Virtual MVPDs deliver live TV over a broadband connection, with more flexible packages and lower prices.  Gandler Decl., ¶¶ 16-17; Ahn Decl., ¶¶ 14-15; *United States v. AT&T, Inc.*, 916 F.3d 1029, 1034 (D.C. Cir. 2019) (noting that, as of 2019, virtual MVPDs were "gaining market share" because they were "easy to use and low-cost").

Fubo was among the first virtual MVPDs.  A self-funded startup, Fubo launched in 2015 with three employees operating from a WeWork in New York City.  Gandler Decl., ¶ 5.  By the time Fubo launched, Netflix had already revolutionized entertainment TV—but no comparable service had modernized how sports fans watch live sports.  *Id.* ¶ 7.  Fubo wanted to change that by providing a streamlined television package tailored to sports fans.  *Id.* ¶ 8; Ahn Decl., ¶ 15.

From its first roots as a $7-a-month service for soccer fans, Fubo—in the face of the conduct described below—has grown to 1.6 million subscribers today.  Horihuela Decl., ¶¶ 4, 12 n.1.

## II.    Defendants Have Leveraged Their Control Over Significant Sports Licensing Rights to Prevent Fubo from Offering a Sports-Centric Package of Channels

Defendants have engaged in a variety of licensing tactics to prevent MVPDs and virtual MVPDs from offering streamlined, affordable television packages tailored to consumer interests.

1.    Defendants have re-imposed the cable "bundling" regime on virtual MVPDs, licensing their live sports channels (such as ESPN) only on a bundled basis with lower-value channels.  Ahn Decl., ¶ 16.  In other words, to license Defendants' must-have sports content, virtual MVPDs must also license and distribute Defendants' other channels, whether or not the distributor (and its customers) wants them.  Mathers Decl., ¶¶ 23-32; Declaration of Gary Schanman ("Schanman Decl."), ¶¶ 7-12.  For example, ███████████████████████ ███████████████████████████████████████████████ ███████████████████  Mathers Decl., ¶¶ 24, 27; Schanman Decl., ¶ 12a███████████████████████████████████████.  Defendants also impose "penetration" requirements that force Fubo to include ████████████ ██████████████████ that Fubo offers to subscribers—preventing Fubo from, for example, ███████████████████████████████████████████████████████ █████████████████.  Mathers Decl., ¶¶ 25-29.  Defendants employ similar tactics with other distributors.  *See* Schanman Decl., ¶ 10; Declaration of Robert Thun ("Thun Decl.), ¶ 5.

2.    These contractual restrictions, among others, have caused virtual MVPD services like Fubo increasingly to resemble the bloated cable packages of old.  For example, Fubo's minimum package now includes 185 channels.  Gandler Decl., ¶¶ 30.  Costs too have soared, with consumer prices for a typical virtual MVPD package doubling from around $40 in 2018 to

6

around $80 today.  Trautman Decl., ¶ 35.  Indeed, programmer bundling policies force Fubo to

spend more than ████████ per year on content that Fubo does not want and most customers

do not watch—including ██████ on unwanted Disney content alone.  Mathers Decl., ¶ 31.

### III.    Defendants Announced a JV to Consolidate Their Control Over Sports Content, Offering the Sports-Centric Package They Have Prevented Fubo from Offering

In February 2024, Defendants announced their JV to consolidate their sports content in a

single streaming platform.  Orszag Decl., ¶ 6 n.1.  The platform will offer Defendants' entire

combined catalogue of sports channels, comprising 14 linear channels and ESPN+.  *Id.*  The JV's

package will include 12 of the top 15 sports channels in the United States.  *Id.* ¶ 60.

Defendants will license their sports channels to the JV on an "unbundled" basis—that is,

without any of the other channels that they require distributors like Fubo to license and

distribute.  *Id.* ¶ 19.  Defendants plan to launch the JV service this fall for $35 to $50 a month.

Trautman Decl., ¶ 46.  In contrast to the JV's slim, 15-channel sports package, programmer

bundling restrictions require other MVPDs to sell an average of 178 channels for $93.99 a month

in order to replicate most (but not all) of the JV's sports offering.  Orszag Decl., ¶ 78 & Tab. 4.

### IV.    Fubo's Lawsuit and Procedural History

On February 22, 2024, Fubo filed a complaint alleging (among other claims) that the JV

and Defendants' restrictive contracting terms violate federal antitrust law.  Doc. 3,

Compl., ¶¶ 233-269.  Fubo's complaint alleges that the JV will lessen competition and restrain

trade in the markets for Sports Program Licensing (in which programmers like Disney license

television channels to distributors like Fubo) and Streaming Live Pay TV (in which virtual

MVPDs sell television subscriptions to consumers).  The complaint also alleges that Defendants'

bundling policies are unlawful tying under the Sherman Act.  *Id.* ¶¶ 162-223.

**LEGAL STANDARD**

"Section 16 of the Clayton Act entitles a party to obtain injunctive relief 'against threatened loss or damage by a violation of the antitrust laws.'" *New York ex rel. Schneiderman v. Actavis*, 787 F.3d 638, 650 (2d Cir. 2015) (citation omitted). "A party seeking a preliminary injunction must ordinarily establish (1) 'irreparable harm'; (2) 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party'; and (3) 'that a preliminary injunction is in the public interest.'" *Id.*

**ARGUMENT**

**I.    Fubo Is Likely To Suffer Irreparable Harm Absent a Preliminary Injunction**

By consolidating all of their sports in a single streaming platform and imposing contractual restraints to prevent Fubo from competing with that platform, Defendants' JV will irreparably harm Fubo in multiple respects. *First*, ███████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████. *Second*, ████████████████████████ ████████████████████████████ *Third*, the JV will fundamentally alter the streaming marketplace in a way that irreparably harms competition and consumers.

"Harm might be [irreparable] for many reasons, including that a loss is difficult to replace or difficult to measure." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010); *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (similar). Irreparable injury exists where, without preliminary relief, "there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

A.    **The JV Is Likely To Cause** ████████████████████████████████████

Defendants' manufactured competitive advantage will allow the JV to sell the *only*

skinny sports bundle at half the price (or less) than the "big fat bundle" that Defendants force

Fubo to license and distribute.  *See infra* p. 17.  By exploiting these anticompetitive restraints

and stacking the deck in their favor, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████ .

"It is well-established that a movant's loss of current or future market share may

constitute irreparable harm."  *Grand River Enters. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d

Cir. 2007); *see also Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) ("An

anticipated loss of market share growth may suffice as an irreparable harm."); *Register.com, Inc.*,

356 F.3d at 404 ("loss of reputation, good will, and business opportunities" can constitute

irreparable harm).[1] ███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

---

[1] *See also Good Sports, Inc. v. Am. Iron Outfitters, Inc.*, 2019 WL 10303629, at *10 (D. Conn. Feb. 1, 2019) ("erosion of future . . . market share" constitutes irreparable harm); *Metso Mins., Inc. v. Powerscreen Int'l Distrib. Ltd.*, 788 F. Supp. 2d 71, 75 (E.D.N.Y. 2011) (loss of market share irreparable where "difficult to quantify, as it includes a loss of unknown opportunities for positive references, repeat sales, and expanded goodwill"); *Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 410-11 (S.D.N.Y. 2011) (irreparable injury where infringing product's low price would make customers "less likely to purchase" plaintiff's product, causing loss of "indeterminate amount of business in years to come.").

 At the very

least, the difficulty of calculating Fubo's damages from this loss of market share after trial makes

the harm irreparable.  Horihuela Decl., ¶¶ 26-30; *Register.com, Inc.*, 356 F.3d at 404.[2]

Defendants' scheme to launch a JV premised on Fubo's founding idea—while blocking

Fubo from offering a competing service—would also irreparably damage the customer goodwill

that Fubo has built among sports fans since its founding.  Gandler Decl., ¶¶ 5-9, 17; Horihuela

Decl., ¶¶ 4-5.  The JV threatens to displace Fubo's sports-first brand through anticompetitive

tactics.  And once Fubo loses its market position as the industry leader in live sports, it may be

impossible to regain.  *See Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118, 131

(S.D.N.Y. 2000) ("potential loss of market advantage" constitutes irreparable harm).[3]

---

[2] *See also Grand River Enters.*, 481 F.3d at 67 (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002)) (loss of market share is irreparable because it cannot be redressed "by a legal or an equitable remedy following a trial"); *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 623 (S.D.N.Y. 2010) (harm irreparable where customers may "refuse to return" to plaintiff after leaving it in favor of "competing products").

[3] *See also Norbrook Lab'ys Ltd v. G.C. Hanford Mfg. Co.*, 126 F. App'x 507, 509 (2d Cir. 2005) (citation omitted) ("loss of the advantage of being the pioneer in [a] field . . . may constitute irreparable harm"); *Anacomp, Inc. v. Shell Knob Servs., Inc.*, 1994 WL 9681, at *6 (S.D.N.Y. Jan. 10, 1994) (similar); *Nat. Organics, Inc. v. Proteins Plus, Inc.*, 724 F. Supp. 50, 54 (E.D.N.Y. 1989) (similar).

**B.** **Formation of the JV Threatens** ███████████████████████████

Fubo's projected subscriber loss will likely have irreversible and devastating

consequences beyond the immediate loss of market share and customer goodwill, ████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████

*First*, Fubo's projected subscriber loss creates a material, imminent risk that ███████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████ Fubo's stock fell 23% on the day the Defendants

announced their JV and now hovers around $1.50— ███████████████████████

██████████████████████████████████

██████████████████████████████████████

███████████████████████████████

████████████████████████████████████████

██████████████████████████████

***Second***, the launch of the JV threatens Fubo with ██████████████████ ████████████████—long before a trial could be conducted.  Janedis Decl., ¶¶ 14, 19, 45; Gandler Decl., ¶¶ 39, 43. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

### C.    Formation of the JV Will Irreparably Harm Competition and Consumers

Finally, harm to competition and consumers is an additional, independent basis for finding irreparable harm in antitrust cases under established Second Circuit law.  *See Actavis*, 787 F.3d at 661 ("Threaten[ed] economic harm to . . . consumers . . . is plainly sufficient to authorize injunctive relief."); *Consol. Gold Fields PLC v. Minorco, S.A*, 871 F.2d 252, 261 (2d Cir. 1989) (irreparable harm where merger would likely cause defendant to "dominate" market).  Here, the JV threatens an "irreparable alteration of the marketplace"—the formation of a new streaming service that will be insulated from competition by Defendants' refusal to sell unbundled sports content to anyone other than their own JV—that will take root "long before a trial on the merits could be completed."  *United States v. Columbia Pictures Indus., Inc*., 507 F. Supp. 412, 434 (S.D.N.Y. 1980).

Moreover, once the JV is "consummated," it will "become[] difficult . . . for [this Court] to 'unscramble the eggs.'"  *Gold Fields*, 817 F.2d at 261.  If Fubo prevails at trial and rival distributors are ultimately freed to offer an unbundled sports package that can compete with Defendants' JV, Defendants will still benefit from a potentially years-long first-mover advantage; it thus may be impossible to restore a vibrant competitive marketplace where rivals can compete on the merits. *See Nat. Organics*, 724 F. Supp. at 54.  And in the meantime, rival distributors may be driven out of business—as some already have been.  Ahn Decl., ¶ 19.

## II.    Fubo Is Likely to Succeed on the Merits of Its Claims

Fubo is likely to succeed in showing that formation of the JV, and the contractual restraints Defendants impose on Fubo and other distributors to prevent them from competing with the JV, violate Section 1 of the Sherman Act and Section 7 of the Clayton Act.  At a minimum, Fubo's claims raise "sufficiently serious questions going to the merits" that justify a preliminary injunction where, as here, the balance of hardships decidedly favors Fubo.  *Actavis*, 787 F.3d at 650; *see also Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010); *infra* p. 23 (discussing balance of hardships).

### A.    The JV Will Substantially Lessen Competition and Unreasonably Restrain Trade in the Streaming Live Pay TV Market

Fubo is likely to prevail on its claims that the JV will substantially lessen competition and unreasonably restrain trade in the Streaming Live Pay TV market under Section 7 and Section 1.

Section 7 prohibits acquisitions whose "effect . . . may be substantially to lessen competition, or to tend to create a monopoly," 15 U.S.C. § 18,[4] while Section 1 prohibits

---

[4] Joint ventures—like mergers—are subject to Section 7 scrutiny.  *See United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 169 (1964) (blocking joint venture under Section 7) ("The joint venture, like the 'merger' and the 'conglomeration,' often creates anticompetitive

agreements that "unreasonably restrain[] trade," *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010).   Importantly, Section 7 is designed is to "arrest anticompetitive tendencies in their incipiency," *before* they harm competition and consumers.  *Penn-Olin*, 378 U.S., at 171 (citation omitted).[5]  Similarly, the "central evil addressed by Sherman Act § 1" is the "elimin[ation of] competition that would otherwise exist."  *Nostalgic Partners, LLC v. Off. of Commr. of Baseball*, 637 F. Supp. 3d 45, 51 (S.D.N.Y. 2022) (citation omitted).

To prevail on these claims, Fubo must first define a relevant antitrust market—here, the Streaming Live Pay TV market.  Fubo can then prevail on its Section 7 claim by showing that the JV has "a reasonable probability of a substantial impairment of competition" in that market. *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 198 (S.D.N.Y. 2020).  Fubo can prevail on its Section 1 claim by showing that the agreements at issue will have "adverse effects on competition in that market."  *Caruso Mgmt. Co. Ltd. v. Intl. Council of Shopping Ctrs.*, 403 F. Supp. 3d 191, 201 (S.D.N.Y. 2019).  Fubo is likely to prevail on both claims.

***Relevant Market***.  Fubo is likely to succeed in defining a relevant antitrust market for Streaming Live Pay TV—*i.e.*, a market in which virtual MVPDs (like Fubo and the JV) compete with each other to sell linear television subscriptions to consumers.  Orszag Decl., ¶¶ 46-53.

A relevant antitrust product market consists of products that are "reasonably interchangeable," meaning "consumers treat them as 'acceptable substitutes.'"  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  In determining whether products are

---

dangers."); *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140, 1145 (2d Cir. 1975) ("[S]ection 7 does apply to joint ventures . . . by corporations").

[5] *Brown Shoe v. United States*, 370 U.S. 294, 317-18 (1962) (Section 7 gives courts "the power to brake [an anticompetitive] force at its outset and before it gather[s] momentum."); *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 498 (9th Cir. 1977) (similar).

reasonably interchangeable, courts often look to the "practical indicia" described in *Brown Shoe* and expert economic testimony.  *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 27 (D.D.C. 2015).[6]

Courts have repeatedly recognized that MVPDs compete in a relevant product market (the Live Pay TV Market), which is distinct from the market for video-on-demand streaming services like Netflix.  *See*, *e.g.*, *United States v. AT & T Inc.*, 310 F. Supp. 3d 161, 196 (D.D.C. 2018) (recognizing product market for the "distribution of live-TV content to consumers"); *Glaberson v. Comcast Corp.*, 2006 WL 3762028, at *10 (E.D. Pa. Dec. 19, 2006) (similar); *Behrend v. Comcast Corp.*, 2012 WL 1231794, at *17 (E.D. Pa. Apr. 12, 2012) (similar). MVPDs and on-demand streaming services offer fundamentally distinct services:  MVPDs offer live content—critically including live sports—while video-on-demand services generally do not. Orszag Decl., ¶¶ 42-44; Trautman Decl., ¶¶ 15-16.  Accordingly, for sports fans, video-on-demand services are not reasonably interchangeable with a Live Pay TV subscription.

Fubo is also likely to show that the Streaming Live Pay TV market—in which streaming-based virtual MVPDs compete with each other—is a relevant submarket within the Live Pay TV market.  *See Brown Shoe*, 370 U.S. at 325 ("well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes"); *Biddle v. Walt Disney Co.*, 2023 WL 6453799, at *10-11 (N.D. Cal. Sept. 30, 2023) (recognizing the "Streaming Live Pay TV" submarket consisting of virtual MVPDs); Orszag Decl., ¶¶ 46-52.

Important distinctions between traditional and virtual MVPDs show that their services are not reasonably interchangeable:  Virtual MVPDs target different customers—younger and more

---

[6] The *Brown Shoe* factors include: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  370 U.S. at 325.

tech-savvy—than traditional cable. *See MLW Media LLC v. World Wrestling Ent., Inc.*, 2023 WL 4053802, at *3-4 (N.D. Cal. June 15, 2023) (evidence that the average viewer "skews male and toward the 35 to 44 age range" supported finding that "other forms of programming content are not economic substitutes"); Horihuela Decl., ¶¶ 8-10; Orszag Decl., ¶ 49. Indeed, Defendants claim their new joint streaming service will <u>not</u> target traditional cable customers, precisely because streaming television has a different target audience than cable. Orszag Decl., ¶ 51 (Mr. Murdoch explaining that the JV's "platform is focused entirely on cord-nevers," *i.e.*, customers who have never subscribed to cable); *see also* Horihuela Decl., ¶ 10. Virtual MVPD services are also the closest substitutes for one another, Horihuela Decl., ¶ 14, and have distinct uses, characteristics, and prices, *see Brown Shoe*, 370 U.S. at 325. For example, compared to cable, virtual MVPDs are lower-priced and rely on broadband infrastructure that allows consumers to watch from mobile devices. Horihuela Decl., ¶¶ 11-13; Gandler Decl., ¶ 17.

***Substantial Lessening of Competition / Unreasonable Restraint of Trade.*** Fubo is likely to show that the JV will substantially lessen competition and unreasonably restrain trade in the Streaming Live Pay TV market (and the broader Live Pay TV market).[7] Through the JV, Defendants are using their power over must-have sports programming to give their own platform—and deny all rivals—the exclusive rights to sell a skinny sports bundle. Orszag Decl., ¶ 73. That arrangement will give the Defendants an insuperable advantage in the Streaming Live Pay TV Market, driving out competitors and allowing Defendants to raise prices for consumers.

---

[7] Fubo is likely to succeed on this claim regardless of whether the relevant antitrust market is defined as the Live Pay TV Market (consisting of MVPDs) or the Streaming Live Pay TV market (consisting of virtual MVPDs), because Defendants' bundling restrictions prevent MVPDs and virtual MVPDs alike from competing with their JV.

This Court has previously granted a preliminary injunction under Section 1 to stop a remarkably similar scheme. In *Columbia Pictures*, 507 F. Supp. 412, four major movie producers formed a joint venture to start their own pay TV network called Premiere, through which they would distribute their movies exclusively for nine months before licensing them to other distributors, like Showtime and HBO. This Court preliminary enjoined the joint venture on grounds that it prevented other distributors from competing fairly with Defendants' new network. *Id.* at 434; *see also United States v. Paramount Pictures*, 334 U.S. 131, 154 (1948) (condemning licensing arrangement as "device[] for stifling competition and diverting the cream of the business to the large operators"); *FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31, 48 (S.D.N.Y. 2010) (Section 1 claim where seller of a branded drug impeded competition from generic drugs through contractual restrictions on distribution and exclusive supply contracts).

Defendants here are following the same playbook: They will license their unbundled sports content *exclusively* to their own JV, while denying it to rivals. Notably, Defendants make no bones about their plan to deny rivals—which Defendants force to sell the "big fat bundle"— the ability to compete on comparable terms. Orszag Decl., ¶¶ 70-72. In the past, the DOJ and courts have prevented programmers from engaging in similar exclusionary tactics. For example, the DOJ and U.S. District Court for the District of Columbia recently conditioned a merger between NBC and Comcast on NBC's agreement to make "comparable" programming available on "economically equivalent" terms to other MVPDs. *United States v. Comcast Corp.*, No. 11-cv-00106, Doc. 28, at 9-11 (D.D.C. Jan. 18, 2011); *see also AT&T-Time Warner*, 916 F.3d at 1041 (in AT&T-Time Warner merger, Turner Broadcasting agreed to baseball-style arbitration with no blackouts when licensing content to rival distributors); Trautman Decl., ¶¶ 41-43 (describing history of licensing conditions on TV programmers). Here, Defendants have made

17

no such promises and, on the contrary, are already using their market power to stifle downstream competition.  Mathers Decl., ¶¶ 23-34; Schanman Decl., ¶¶ 9, 13; Thun Decl., ¶ 5.

## B. The JV Will Substantially Lessen Competition and Unreasonably Restrain Trade in the Sports Licensing Market

Fubo is independently likely to prevail on its claims by showing that the JV will cause serious anticompetitive harms in a second market:  the upstream market for licensing sports content between MVPDs and programmers (the "Sports Licensing Market").  The JV represents an unprecedented consolidation of sports rights among three rival programmers that collectively control over half of all U.S. sports content; standing alone, this alarming concentration is strong evidence of anticompetitive harm under both Section 1 and Section 7.  But the JV's pernicious effects go beyond horizontal consolidation:  The JV represents a coordinated effort by three of Fubo's key suppliers to introduce a direct competitor to Fubo.  The JV will dramatically increase Defendants' power and incentive to impose unreasonable prices and terms on Fubo and other distributors that depend on access to their must-have sports channels:  If Fubo rejects Defendants' terms (or goes out of business under their weight), Defendants will benefit when Fubo's customers flock to their new JV.  Numerous courts have recognized that arrangements that create these anticompetitive incentives and opportunities violate antitrust laws.

*Relevant Market.*  Courts regularly recognize an upstream product market for the licensing of television channels from programmers to distributors.  *See, e.g.*, *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 776 (S.D. Miss. 1992) (recognizing "market of suppliers of programming for cable television"); *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1195 (9th Cir. 2012) (similar); *Ralph C. Wilson Indus., Inc. v. Chron. Broad. Co.*, 794 F.2d 1359, 1363 (9th Cir. 1986) (similar).

The market for licensing sports content is a relevant antitrust market because live sports are uniquely valuable and hence non-interchangeable with other forms of programming.  *See supra* pp. 3-4; Orszag Decl., ¶¶ 16, 32-38.  The DOJ agrees:  It recognized the "licensing of cable sports programming to MVPDs" is a product market in filings for a consent decree as to the 2019 merger of the non-sports assets of two of the Defendants in this case, Disney and Fox. *United States v. Walt Disney Co.*, 2018 WL 3146076, at ¶¶ 12, 15 (S.D.N.Y. June 27, 2018).

***Substantial Lessening of Competition / Unreasonable Restraint of Trade.***  The JV will significantly harm competition in the Sports Licensing Market for two independent reasons:

***First***, the JV will consolidate Defendants' control of at least 54% of U.S. sports rights in their joint venture.  Orszag Decl., ¶¶ 65-66.  That consolidation, standing alone, is strong evidence the JV will have anticompetitive effects.  *Deutsche Telekom AG*, 439 F. Supp. 3d at 205 (merger "will be presumptively anticompetitive" with more than a 30% market share).[8]

The same conclusion follows from the application of the Herfindahl-Hirschman Index (HHI) that courts and the DOJ use to measure market concentration in antitrust cases:  The JV will more than double the market's HHI from 1,600 to over 3,400, Orszag Decl., ¶¶ 67-69—far beyond what courts typically view as anticompetitive, *see FTC v. IQVIA Holdings Inc.*, 2024 WL 81232, at *34 (S.D.N.Y. Jan. 8, 2024) ("HHI increase of 510 points 'creates, by a wide margin, a presumption that the merger will lessen competition'"); *Deutsche Telekom AG*, 439 F. Supp. 3d at 206 (HHI increase of 679 and total HHI of 3186 was presumptively anticompetitive).[9]

---

[8] *See also Fruehauf Corp. v. FTC*, 603 F.2d 345, 352 n.9 (2d Cir. 1979) (describing *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957), where large size of merging companies "left no doubt that [transaction] conferred market power"); 2023 DOJ Draft Merger Guidelines § 6.A (foreclosure share "above 50 percent . . . is a sufficient basis to conclude that the effect of the merger may be to substantially lessen competition").

[9] Defendants' tactical decision to structure their new streaming service as a joint venture instead of a merger is immaterial—Defendants will have the same joint incentive to advantage

**Second**, the JV will increase Defendants' "ability and incentive to foreclose [the JV's] rivals from sources of supply" that those distributors need to compete with the JV—namely, Defendants' must-have sports channels. *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1051 (5th Cir. 2023).[10]  The JV's launch will give Defendants ownership of a direct competitor to Fubo that will directly benefit if Fubo is forced to raise prices (or goes out of business entirely).  The JV will thus give Defendants the unprecedented ability and collective incentive to raise price on Fubo, because the JV will be poised to capture customers that flee Fubo and other rival services. Orszag Decl., ¶¶ 79-92; Mathers Decl., ¶¶ 37-40; Schanman Decl., ¶¶ 13-17.[11]

## C.    Defendants' Bundling Requirements Also Constitute Unlawful Tying Under Section 1 of the Sherman Act

As an alternative to enjoining formation of the JV, Fubo has requested that the Court preliminarily enjoin Defendants from enforcing the contractual restraints that would insulate the JV from effective competition.  *See supra* p. 2.  This form of injunctive relief would not require

---

the JV because they will retain the profits just as they would in a merger.  *See Penn-Olin*, 378 U.S. at 168 ("Realistically," parent companies will "not compete with their progeny," particularly where the JV "progeny was organized to further the business of its parents"); Orszag Decl., ¶ 55 ("[T]he JV changes the incentives and market power of the Defendants in the licensing of sports programming content to vMVPDs and MVPDs in ways that are analogous to a merger of Defendants in the sale of sports programming.").

[10] *See Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 163 (2d Cir. 2013) ("[A] vertically integrated cable operator with a significant share of an MVPD market will have the incentive and ability to prevent unaffiliated networks from competing fairly in a video programming market."); *Sprint Nextel Corp. v. AT&T, Inc.*, 821 F. Supp. 2d 308, 330 (D.D.C. 2011) (similar); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 2000 WL 264295 at \*22 (S.D.N.Y. Mar. 9, 2000) (merger between movie studios and theaters would "enhance Defendant's ability to divert more profitable films away from Plaintiff's theatres").

[11] Additionally, the FCC has recognized that "[a] downstream firm that wholly owns the upstream affiliate has an incentive to raise the price of its programming for . . . its competitors in order to raise rivals' costs."  *In re Applications for Consent to the Assignment and/or Transfer of Control of Licenses Adelphia Commc'ns Corp.*, 21 FCC Rcd. 8203, 8268 (2006).  "In the MVPD market, a vertically integrated cable operator will likely charge the highest price that its [satellite] rivals are willing to pay . . . ."  *Id.* ¶ 141.

finding that the JV itself is unlawful; rather, this Court could order preliminary injunctive relief based on a finding that Fubo is likely to prevail on its independent claims that the contractual "bundling" requirements that Defendants have imposed on Fubo are unlawful tying under the Sherman Act, independent of the JV.  Fubo is likely to prevail on these claims.[12]

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'" *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 367 (S.D.N.Y. 2022).  A tying claim turns on "the seller's exploitation of its control over the tying product to force the buyer into the purchase of the tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.* at 367-68.

Fubo's tying claim is straightforward:  Defendants have exploited their market power over commercially critical "must-have" sports content (such as ESPN and Fox) to coerce Fubo into licensing other channels that Fubo and its customers do not want.  Mathers Decl., ¶¶ 23-32; Schanman Decl., ¶¶ 11-12; *see Cablevision Sys. Corp. v. Viacom Int'l Inc.*, 2014 WL 2805256, at *2 (S.D.N.Y. 2014) (distributor stated tying claim where programmer "use[d] [its most popular networks] . . . to force the licensing of [less popular networks]").  Such coercion is "illegal *per se*" under antitrust law, without the need to show anticompetitive effects, *Cablevision*, 2014 WL 2805256, at *2—though here, Defendants' bundling practices create a litany of anticompetitive effects, such as precluding Fubo from offering consumer-friendly streaming packages.

---

[12] Although Fubo does not currently license sports from Warner Brothers—and therefore has not asserted a tying claim against Warner Brothers—Warner Brothers has also refused to license its Turner sports networks on an unbundled basis to Fubo.  Mathers Decl., ¶ 21.  As a condition of launching the JV, the Court should require Warner Brothers to license its sports channels on comparable and economically equivalent terms.

To determine whether a tying arrangement is illegal *per se*, a court must examine whether "there exists: (1) a tying and tied product; (2) evidence of actual coercion by the seller that forced the buyer to accept the tied product; (3) sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; and (4) the involvement of a 'not insubstantial' amount of interstate commerce in the tied market." *Id.* Fubo is likely to prevail on each showing:

*First*, Fubo has identified (1) a tying product (Defendants' "must-have" sports channels) and (2) a tied product (Defendants' non-critical content) that exist in distinct markets. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (2022) (whether two products are distinct turns "on the character of the demand for the two items"); *Cablevision*, 2014 WL 2805256, at *1, 3 (recognizing tying market of commercially critical channels and tied market of non-critical channels). Defendants' "must-have" sports channels have no reasonable substitutes; an MVPD must license them to offer a commercially viable service. Orszag Decl., ¶¶ 28-39; Trautman Decl., ¶¶ 2, 15; Mathers Decl., ¶¶ 9, 11; Schanman Decl., ¶¶ 8, 14. By contrast, Defendants' non-critical channels are discretionary and not essential to a successful MVPD service, because they have far lower demand from live pay TV consumers, and are thus not substitutes to must-have sports channels. Orszag Decl., ¶¶ 32-35; Trautman Decl., ¶¶ 16-18.

*Second*, Defendants have used "actual coercion" to force Fubo to license and distribute their non-critical channels—that is, they have "condition[ed] [Fubo's] purchase of one product on the purchase of another product." *In re Google Advertising Antitrust Litig.*, 627 F. Supp. 3d at 368. Absent Defendants' tying arrangements, Fubo would not license the "big fat bundle" of channels. Gandler Decl., ¶¶ 10, 17, 27; Mathers Decl., ¶¶ 27, 31; Schanman Decl., ¶¶ 7-8, 10.

*Third*, Defendants possess market power by virtue of their control over must-have programming. *See Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 139 (S.D.N.Y.

2016) ("appreciable market power" suffices).  As noted above, Defendants wield tremendous power over MVPDs and virtual MVPDs, because those services cannot succeed without their must-have sports channels.  Gandler Decl., ¶¶ 38-39; Mathers Decl., ¶ 9; Ahn Decl., ¶ 10; Schanman Decl., ¶14.  Indeed, Defendants agree:  As Disney's Mr. Iger put it, "You cannot launch a new multichannel platform or bundle successfully without ESPN."  Orszag Decl., ¶ 57.

*Fourth*, Defendants' conduct affects a substantial amount of interstate commerce.  Mathers Decl., ¶ 31 (Fubo spends more than ███████ per year on unwanted channels).

*Finally*, Defendants' tying restrictions have significant anticompetitive effects.  They force Fubo—and its customers—to pay much higher prices, buy content they do not want, and forgo other channels from different programmers.  Gandler Decl., ¶¶ 22, 30-31; Mathers Decl., ¶¶ 30-32; Schanman Decl., ¶ 12; Orszag Decl., ¶¶ 74-78; Trautman Decl., ¶ 39-40; *see also Cablevision*, 2014 WL 2805256, at *2 (anticompetitive effects present where distributor "would buy other 'general programming networks' from [a programmer's] competitors absent the tying arrangement").  And the anticompetitive effects here are heightened by the JV, because the Defendants are now seeking to exploit their own tying requirements to artificially undercut rivals.[13]

## III.    The Balance of Hardships and the Public Interest Strongly Favor a Preliminary Injunction

**A.**    "[T]he balance of hardships inquiry asks which of the two [sides] would suffer most grievously if the preliminary injunction motion were wrongly decided."  *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (citation

---

[13] Fubo is likely to show antitrust injury for each of its claims.  In the downstream market for Streaming Live Pay TV, Defendants are preventing competition for their skinny sports bundle, which frustrates the "competitive *process* and thereby harm[s] consumers."  *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001).  In the Sports Licensing market, Fubo is a direct purchaser forced to pay supra-competitive prices from Defendants' unlawful conduct.  *See State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1079 (2d Cir. 1988).

omitted).   Here, the balance of hardships tips decidedly in Fubo's favor.  As explained above,

absent a preliminary injunction, Fubo stands to suffer severe irreparable harm that could include

██████████████████.  No comparable harm exists for Defendants.  Granting

Fubo's request for preliminary relief would merely preserve the status quo or allow Fubo to

compete more fairly with the JV pending the resolution of its antitrust claims.

> **B.**     A preliminary injunction also would serve the public interest.  "If [Defendants

are] in fact proceeding in violation of the [antitrust laws], a preliminary injunction would serve

the public interest."  *Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 698-99

(2d Cir. 1973); *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 819 (2d Cir.

1979) (similar); *Columbia Pictures*, 507 F. Supp. at 433-34 ("Far more important than the

interests of either the defendants or the existing industry … is the public's interest in

enforcement of the antitrust laws and in the preservation of competition.").  Because Fubo has

shown that Defendants' JV and bundling requirements likely violate Section 1 and Section 7, the

public interest "weighs heavily" in favor a preliminary injunction.  *Grunman Corp v. LTV Corp.*,

527 F. Supp. 86, 105 (E.D.N.Y. 1981); *IQVIA*, 2024 WL 81232, at *52 (similar).[14]

## IV.   This Court Should Permit Expedited Discovery on the Claims in This Motion and Hold a Preliminary Injunction Hearing

"On a motion for preliminary injunction, where 'essential facts are in dispute, there must

be a hearing . . . and appropriate findings of facts must be made.'"  *Fengler v. Numismatic

Americana, Inc.*, 932 F.2d 745, 747 (2d Cir. 1987) (citation omitted); *see Dodge v. Cnty. of

Orange*, 208 F.R.D. 79, 86 (S.D.N.Y. 2002).  And as this Court has already recognized,

---

[14] Indeed, other industry participants and consumers groups have already expressed concerns that the JV will harm competition and consumers.  *See* Schanman Decl.; Thun Decl., ¶¶ 5-6; Exs. 2-8, Schultz Decl. (describing public concerns).  And the DOJ is investigating whether the joint venture constitutes a "violation of the antitrust laws."  Ex. 7, Schultz Decl.; *see also* Ex. 8 (Civil Investigative Demand issued by DOJ to Fubo).

24

"[r]equests for expedited discovery are typically appropriate where they would better enable the court to judge the parties' interests and respective chances for success on the merits at a preliminary injunction hearing."  Doc. 66 at 1 (citation omitted).[15]

Expedited discovery is warranted so Fubo can provide the Court with a full presentation of the relevant facts at an evidentiary hearing.  Most information about the JV is within Defendants' sole control, including facts such as the terms of the JV; Defendants' motivations and rationale for entering into the JV; Defendants' projections for the market demand and target audience for the JV; and the extent to which Defendants believe that offering sports content on an "unbundled" basis will give the JV a competitive advantage over the "big fat bundle" that Defendants force on rival distributors.  Discovery related to the JV is thus necessary to "enable [this Court]" to better assess the parties' interests and chances for success on the merits.  *Id.*

## CONCLUSION

For the foregoing reasons, Fubo respectfully requests that the Court grant this Motion and enjoin Defendants from either proceeding further with formation of the JV or enforcing contractual restraints that prevent Fubo from offering a competitive service.

---

[15] Pursuant to Rule II(A)(5) of this Court's Individual Rules & Practices, the parties intend to submit a joint proposed Case Management Plan and Scheduling Order in advance of the Initial Pretrial Conference on April 16.  If the parties are unable to reach agreement regarding the timing of discovery, Fubo plans to renew its request for a Court order authorizing preliminary injunction–related expedited discovery at the April 16 conference.  *See* Doc. 66 at 1.

Dated:  April 8, 2024                    Respectfully submitted,

                                             */s/ Mark C. Hansen*
                                             Mark C. Hansen (admitted *pro hac vice*)
                                             Evan T. Leo (admitted *pro hac vice*)
Kevin J. Miller (admitted *pro hac vice*)
Joseph S. Hall (SDNY Bar No. JH2612)
Thomas G. Schultz (admitted *pro hac vice*)
Joshua Hafenbrack (admitted *pro hac vice*)
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street NW
Suite 400
Washington, DC 20036
Tel.:  (202) 326-7900
Fax:  (202) 326-7999
Email:  mhansen@kellogghansen.com
         eleo@kellogghansen.com
         kmiller@kellogghansen.com
         jhall@kellogghansen.com
         tschultz@kellogghansen.com
         jhafenbrack@kellogghansen.com

*Counsel for Plaintiffs fuboTV Inc. and fuboTV Media Inc.*