**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FuboTV, Inc., and FuboTV Media, Inc.,

                                    Plaintiffs,

                    v.

The Walt Disney Company, et al.,

                                    Defendants.

1:24-cv-01363-MMG

ORAL ARGUMENT REQUESTED

---

**MEMORANDUM OF LAW**
**IN SUPPORT OF DISNEY'S MOTION TO DISMISS**

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants The Walt Disney*
*Company; ESPN, Inc.; ESPN Enterprises,*
*Inc.; and Hulu, LLC.*

April 9, 2024

# TABLE OF CONTENTS

Page

Preliminary Statement................................................................................................1

Background .................................................................................................................3

    I.     Industry Background................................................................................3

    II.    Evolution of the Media Space..................................................................5

    III.   The JV......................................................................................................6

Legal Standard ...........................................................................................................6

Argument ...................................................................................................................7

    I.     Fubo Does Not Plausibly Allege the JV Will Cause Anticompetitive
          Effects in Any Market................................................................................7

          A.     Fubo's Section 7 Claim Fails.......................................................7

          B.     Fubo fails to allege a Section 1 or Donnelly Act Claim Relating to
               the JV. ...........................................................................................19

    II.    There is No Unlawful Tie. .......................................................................20

          ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

          B.     Fubo Has Failed to Plausibly Plead *Per Se* Tying. .......................22

          C.     Fubo's Rule of Reason Tying Claims Fail....................................28

    III.   The MFN Clauses Are Not Agreements in Restraint of Trade.................29

          A.     Fubo Does Not Allege a Horizontal Agreement Between Disney,
               Fox and WBD. ..............................................................................30

           B.     Fubo Fails To Plausibly Allege Market Power..............................31

          C.     Fubo Fails To Plausibly Allege Harm to Competition in the Sports
               Program Licensing Market. ..........................................................32

Conclusion ................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)......................................................................29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................6, 7, 11, 19

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)......................................................................10, 18

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
  813 F. Supp. 2d 569 (S.D.N.Y. 2011)......................................................28

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................... passim

*Blue Cross Blue Shield v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) ......................................................................34

*BOC Int'l Ltd. v. FTC*,
  557 F.2d 24 (2d Cir. 1977)......................................................................9

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
  985 F. Supp. 2d 612 (S.D.N.Y. 2013)......................................................29, 30, 31

*Bourjois, Inc. v. McGowan*,
  12 F. Supp. 787 (W.D.N.Y. 1935) ......................................................................35

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) ......................................................................23, 24, 25, 26

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)......................................................................1

*Cablevision Sys. Corp. v. Viacom Int'l Inc.*,
  2014 WL 2805256 (S.D.N.Y. 2014)......................................................24

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993)......................................................................12, 34

*CDC Techs., Inc. v. IDEXX Lab'ys., Inc.*,
  7 F. Supp. 2d 119 (D. Conn. 1998)......................................................................31

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)........................................................................17

*Citizens United v. Schneiderman*,
   882 F.3d 374 (2d Cir. 2018)..........................................................................6

*Collins v. Assoc. Pathologists, Ltd.*,
   844 F.2d 473 (7th Cir. 1988) .......................................................................27

*Concord Assocs., L.P. v. Entm't Props. Trust*,
   817 F.3d 46 (2d Cir. 2016).....................................................................12, 27

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984)......................................................................................32

*Copy-Data Sys., Inc. v. Toshiba Am., Inc.*,
   663 F.2d 405 (2d Cir. 1981).........................................................................13

*DeHoog v. Anheuser-Busch Inbev SA/NV*,
   899 F.3d 758 (9th Cir. 2018) ....................................................8, 10, 12, 16

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
   423 F. Supp. 2d 173 (S.D.N.Y. 2006).........................................................12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992)................................................................................26, 32

*Fields Prods., Inc v. United Artists Corp.*,
   318 F. Supp. 87 (S.D.N.Y. 1969) ...............................................................29

*FTC v. Meta Platforms Inc.*,
   654 F. Supp. 3d 892 (N.D. Cal. 2023) ........................................................16

*FTC v. Peabody Energy Corp.*,
   492 F. Supp. 3d 865 (E.D. Mo. 2020)......................................................9, 11

*G.K.A. Beverage Corp. v. Honickman*,
   55 F.3d 762 (2d Cir. 1995)............................................................................8

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
   711 F.3d 68 (2d Cir. 2013).......................................................................8, 19

*Giordano v. Saks Inc.*,
   654 F. Supp. 3d 174 (E.D.N.Y. Feb. 1, 2023) ............................................32

*In re Aluminum Warehousing Antitrust Litig.*,
   2015 WL 6472656 (S.D.N.Y. Apr. 28, 2020)..............................................32

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
    2022 WL 4581903 (S.D.N.Y. Aug. 3, 2022) ............................................................34

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
    2023 WL 6006525 (S.D.N.Y. July 31, 2023) ............................................................31

*In re Application of MobiTV, Inc.*,
    712 F. Supp. 2d 206 (S.D.N.Y. 2010) .....................................................................13

*In re Bookends & Beginnings LLC*,
    2023 U.S. Dist. LEXIS 151757 (S.D.N.Y. Aug. 3, 2023) ........................................31

*In re Google Dig. Advert. Antitrust Litig.*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022) .....................................................................23

*In re Wireless Tel. Sys. Antitrust Litig.*,
    385 F. Supp. 2d 403 (S.D.N.Y. 2005) .....................................................................31

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ...............................................................................................22, 23

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016) ..........................................................................22, 23, 26

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
    2008 WL 4547518 (S.D.N.Y. 2008) .......................................................................21

*Mathias v. Daily News, L.P.*,
    152 F. Supp. 2d 465 (S.D.N.Y. 2001) .....................................................................34

*N. Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) .....................................................................................................23

*Nat'l Gear & Piston, Inc. v. Cummins Pwr. Sys., LLC*,
    861 F. Supp. 2d 344 (S.D.N.Y. 2012) .....................................................................20

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020) .......................................................................8

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*,
    883 F.2d 1101 (1st Cir. 1989) .................................................................................34

*Ohio v. Am. Express, Inc.*,
    585 U.S. 529 (2018) ...........................................................................................31, 32

*OJ Com., LLC v. KidKraft, Inc.*,
    34 F. 4th 1232 (11th Cir. 2022) ..............................................................................32

*Pac. Bell Tel. Co. v. linkLine Comms. Inc.*,
   555 U.S. 438 (2009)..................................................................................33

*Port Dock Stone Corp. v. Oldcastle Ne., Inc.*,
   507 F.3d 117 (2d Cir. 2007)...................................................................8, 18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)........................................................................27

*RBS Holdings, Inc. v. Wells Fargo Century, Inc.*,
   485 F. Supp. 2d 472 (S.D.N.Y. 2007)..........................................................20

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)............................................................................7

*Shop & Save Food Mkts., Inc. v. Pneumo Corp.*,
   683 F.2d 27 (2d Cir. 1982)..........................................................................23

*Sprint Nextel Corp. v. AT&T Inc.*,
   821 F. Supp. 2d 308 (D.D.C. 2011) ............................................................12

*SureShot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*,
   2021 WL 5313620 (5th Cir. Nov. 15, 2021)................................................16

*Tops Markets, Inc. v. Quality Markets, Inc.*,
   142 F.3d 90 (2d Cir. 1998)..........................................................................23

*United States. v. Columbia Pictures Industries, Inc.*,
   507 F. Supp. 412 (S.D.N.Y. 1980) ................................................................9

*United States v. AT&T Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018) ..............................................................8

*United States v. Brewbaker*,
   87 F.4th 563 (4th Cir. 2023) .......................................................................13

*United States v. Marine Bancorporation, Inc.*,
   418 U.S. 602 (1974)....................................................................................18

*United States v. Paramount Pictures*,
   334 U.S. 131 (1948)....................................................................................29

*United States v. Paramount Pictures, Inc.*,
   2020 WL 4573069 (S.D.N.Y. Aug. 7, 2020)................................................29

*United States v. Penn-Olin Chem. Co.*,
   378 U.S. 158 (1964)..................................................................................8, 9

*United States v. Phila. Nat'l Bank*,
 374 U.S. 321 (1963)............................................................................8, 10

*United States v. Siemens Corp.*,
 621 F.2d 499 (2d Cir. 1980)........................................................16

*USFL v. NFL*,
 842 F.2d 1335 (2d Cir. 1988)........................................................35

*Vantico Holdings S.A. v. Apollo Mgmt., LP*,
 247 F. Supp. 2d 437 (S.D.N.Y. 2003)..........................................19

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004)..........................................................2, 3, 33

*Yentsch v. Texaco, Inc.*,
 630 F.2d 46 (2d Cir. 1980)............................................................22

**Statutes & Rules**

Section 7 of the Clayton Act ................................................................. passim

Donnelly Act ........................................................................................ passim

Federal Rule of Civil Procedure 12(b)(6) .............................................. passim

Section 1 of the Sherman Act ............................................................... passim

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law* ¶ 1722c (4th ed. 2018) .........................................23

The Walt Disney Company and its affiliates ESPN, Inc. and ESPN Enterprises, Inc. (together, "ESPN") and Hulu, LLC ("Hulu") (collectively, "Disney") respectfully submit this memorandum of law in support of their motion to dismiss the Complaint (Dkt. 1, the "Complaint") filed by fuboTV, Inc. and fuboTV Media, Inc. (together, "Fubo") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

The antitrust laws were enacted to protect "***competition*** not ***competitors***." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (emphasis added) (citation omitted). But Fubo does not sue Defendants to protect competition. To the contrary: Fubo sues to insulate itself from competition. If Fubo succeeds, it will eliminate a potential rival in the form of Defendants' announced new joint venture and will upend industry-wide, procompetitive business practices that have existed for decades; Fubo will gain, competition will suffer and consumers will lose. That is the opposite of what the antitrust laws demand and is why the Complaint should be dismissed.

Fubo's claims fall into three categories. Fubo: (a) challenges Defendants' announced sports streaming joint venture (the "JV"), (b) alleges that The Walt Disney Company and Fox Corporation each illegally tie critical sports networks to other non-critical television networks by licensing networks as a bundle and (c) complains that most-favored-nation ("MFN") clauses included in Defendants' carriage agreements—which guarantee the lowest available prices for those distributors that have negotiated for them—result in Fubo paying higher prices. All of these claims seek to co-opt the antitrust laws to secure a better deal for Fubo at the expense of consumers and competitors. All must be dismissed.

*First*, Fubo's challenge to the JV is an attempt to insulate itself from competition. By Fubo's estimate, the JV will offer a package of certain networks allegedly at just $30–50 per month, introducing a new, multichannel, live streaming TV option for consumers, and thus increase competition. While Fubo, as a competitor, may not benefit from facing that increased competition, enhancing competition is the objective of the antitrust laws. Because Fubo cannot

come right out and *say* that it wishes to block the JV on the grounds that it does not want to face more competition, it advances a hodgepodge of speculative and unsupported theories. None work. The JV will *decrease* concentration in the TV distribution market. Also, Fubo's theory that, because of the JV, Defendants will have some incentive to harm distributors in the upstream licensing market is rendered implausible by its own Complaint because Fubo also alleges Defendants have an incentive to license their content as broadly as possible to reach as many viewers as they can. Fubo's remaining strained theories lack the factual bases required under *Twombly* and *Iqbal*. Its challenges to the JV therefore fail as a matter of law.

*Second*, Fubo's MFN claims are unmoored from antitrust law and logic. Fubo theorizes that the MFNs discourage Defendants from giving Fubo better prices. But it is black-letter law that none of the Defendants is obligated to give Fubo better prices, or to deal with Fubo at all. *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004). Nor does Fubo explain why, absent the MFNs, any Defendant would agree to lower the prices they currently charge Fubo—prices that Fubo agreed to in arm's-length negotiations and clearly is willing to pay. More fundamentally, it is entirely implausible that the MFNs alleged here, which guarantee the *lowest possible price* to other distributors, including the largest distributors with the greatest numbers of subscribers, could have a market-wide effect to *raise* prices on consumers (or otherwise restrict output). For these and other reasons, Fubo's MFN claims fail.

*Third*, Fubo fails to state a tying claim. To start, ███████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████ they would still fail because Fubo has not alleged—as it must—that the supposed bundling of "Non-Critical Television Channels" with "Commercially Critical Sports Channels" has injured competition in the tied market. Thus, rather than allege that Disney's bundling forecloses other programmers from the alleged Non-Critical Television Channels market, it points to purported— and inapposite—difficulties of entering the Commercially Critical Sports Channel market or harms to distributors like Fubo. Fubo also contends that "non-critical" channels and "critical

sports" channels compete in entirely different markets, but fails to allege that there is separate demand for the so-called "non-critical" channels to establish such a market. What is more, Fubo does not plausibly define either market or attempt to allege any meaningful distinction between the two based in market realities, rather than Fubo's own nebulous and subjective preferences.

## BACKGROUND

The following facts are taken from the Complaint. Disney assumes them to be true only for purposes of this motion.[1] Defendants are Disney, Fox Corporation ("Fox") and Warner Bros. Discovery, Inc. ("WBD"). (¶¶ 24-30.)

### I.     Industry Background.

The parties all participate in the "pay TV ecosystem", in which a web of companies interact to create, package and distribute television services through which consumers watch live sports. (¶¶ 43, 49-53.) The pay TV ecosystem has three general levels in the distribution chain.

**Rightsholders.** Sports rightsholders are the entities, such as sports leagues like the NFL and NBA, that hold the copyright to live sports content. (¶¶ 45, 156.) Those rightsholders sell media rights to their events to programmers. Sports leagues seek to maximize viewership of their content, so they license primarily to popular programmers with significant viewership. (¶ 174.) "By licensing their rights to ESPN, Turner, and Fox—programmers with huge, established subscriber bases—the leagues ensure their content will be distributed as widely as possible." (*Id.*) Allegedly, Disney licenses 26.8% of all U.S. sports rights, Fox licenses 17.3%, WBD licenses 9.9%, CBS licenses 12.9% and NBC licenses 13.1%. (¶ 168.) Around 20% of U.S. live sports content is licensed by a variety of programmers that Fubo does not identify. (*Id.*)

**Programmers.** Sports rightsholders license their live sports content to programmers, which provide basic and premium broadcast and cable networks. (¶ 46.) Programmers combine various programs to create networks, also called channels—such as ▮▮▮▮▮▮▮▮, TNT and NBC—which programmers license to distributors through carriage agreements. (¶¶ 46, 62.)

---

[1] All citations to the Complaint (ECF No. 1) are designated by "¶" and the relevant paragraph number(s).

Programmers' primary objective when combining content and advertising into networks is to secure the greatest number of possible viewers. (¶¶ 72, 196.) Programmers seek to maximize viewership because, among other reasons, the sale of advertising included on their networks generates significant revenue for programmers (¶ 62), sports rightsholders prefer to license their content to programmers with higher viewership (¶ 174), and programmers earn affiliate fees from distributors ████████████████████████████████ (¶ 194).

Individual networks generally include varied content, such that a single network may include entertainment programming, news and sports-related programming. (¶¶ 57, 176.) While networks with sports-related programming may include live sports content, because "[l]eagues have limited numbers of games [and] each game occurs only once", these networks also show content that is not live sports. (¶¶ 55, 98, 176.)

Programmers license their networks to distributors, including traditional cable and satellite providers, known as multi-channel video programming distributors ("MVPDs"), which provide their service via facilities-based systems, as well as virtual MVPDs ("vMVPDs") like Fubo, which provide their service over the internet. (¶ 47.) Programmers also distribute their content direct-to-consumer, making some of their live sports content available through streaming services like ESPN+ for Disney and MAX for WBD. (¶¶ 67, 79.)

**MVPDs and vMVPDs.** MVPDs and vMVPDs license linear networks from multiple programmers to create packages of linear networks that they distribute to subscribers for a fee (usually monthly). (¶¶ 46-47.) Whereas traditional MVPDs distribute their networks through a cable connection or a satellite feed and require a cable box or satellite dish, vMVPDs distribute their networks over the internet. (¶¶ 89-94.) Examples of MVPDs include Comcast, Charter, Verizon FiOS, DirecTV and DISH. (¶¶ 47, 175.) Examples of vMVPDs include YouTube TV ("YTTV", owned and operated by Google), Hulu + Live TV ("Hulu TV", owned and operated by Hulu, a subsidiary of Disney) and Sling (owned and operated by DISH). (¶ 175.)

The carriage agreements through which distributors license networks from programmers typically last for ███████████; for example, Fubo's agreements with Fox and Disney each ████

██████████████████████████████████████ (¶¶ 70, 77.)  Carriage agreements contain various terms governing the licensing of linear networks by distributors, and may include pricing provisions that govern the license fees paid to programmers (¶ 59),

████████████████████████████████████████████████████

██████████████████████████████ (¶ 114), and MFN provisions that guarantee certain distributors the same or better terms than those received by certain other distributors (¶ 122).

Fubo is a vMVPD that offers its most basic package of networks for $79.99 a month, for a combination of sports and non-sports programming.  (¶¶ 82, 143.) ████████████████████

████████████████████████████████ (¶ 82.)  It also licenses networks from programmers besides Defendants, like NBC, and would like to add even more networks from even more programmers, like A&E and AMC.  (¶¶ 98, 118.)  Defendants allegedly contract with larger vMPVDs like YTTV and Hulu TV for certain services, ████████████████

████████████████████████████████████████ (¶¶ 132, 134, 140.) Fubo contends that, as a result, it cannot take advantage of "rebates" that would lower the effective prices it pays to license Defendants' programs, preventing it from effectively competing as a vMVPD.  (¶ 139.) ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ (*See* Earnhardt Decl., Ex. 2.)

## II.    Evolution of the Media Space.

Historically, almost all MVPDs were traditional cable companies that operated "localized monopolies" that "controlled Americans' access to linear television and live sports content".  (¶ 83.)  For decades, these MVPDs licensed networks in a bundle from programmers.  (¶ 85.)  In the past decade, there has been significant new entry by companies that distribute their content over the internet, as opposed to traditional cable and satellite connections.  (¶ 89.)  As a result, "[m]illions of American[s]" have chosen to "cancel[] their cable TV subscriptions in favor of internet-based programming."  (*Id.*)  Internet-based options include streaming services that carry multiple linear programming networks, like those offered by vMVPDs and video-on-demand

services like Disney+, Hulu, MAX, Netflix, Peacock and Paramount+.  (¶¶ 177-178.)  Whereas consumers previously could access live sports only through their local cable operator or a direct broadcast satellite service, they can now use vMVPDs and streaming services like MAX and ESPN+, too.  (¶¶ 79, 155.)  Since the advent of streaming over the internet, vMVPDs have grown in popularity, from almost no subscribers in 2016 to almost 20 million subscribers today.  (¶ 195.)  Indeed, Fubo asserts that its own "growth has continued" in the last two years, reaching 1.477 million subscribers by the third quarter of 2023.  (¶ 104.)

## III.    The JV.

On February 6, 2024, Defendants announced that ESPN, Inc., Fox and WBD would form a joint venture that would launch an all-new streaming service.  (¶ 15.)  The JV will license 14 linear networks from Defendants on a non-exclusive basis:  ESPN, ESPN2, ESPNU, SEC Network, ACC Network, ESPNEWS and ABC from Disney; FOX, FS1, FS2 and Big Ten Network from Fox; and TNT, TBS and truTV from WBD.  (¶ 155.)  It will also carry content from Disney's sports-focused streaming service, ESPN+.  (*Id.*)  With these 14 networks, the JV will allegedly carry 54% of live sports content in the U.S.—and will therefore ***not*** carry 46% of live sports content available in the U.S., including sports content carried by CBS and NBC.  (¶ 168.)  The JV is slated to launch in the fall of 2024, and Fubo alleges it will cost just $30 to $50 per month, below the price point of vMVPD streaming services, like Hulu TV, YTTV and Fubo, that offer broader packages.  (¶¶ 143-144, 153-154, 160.)  Defendants have stated that they will continue to license their sports content to third-party distributors outside the JV.  (¶ 18.)

## <u>LEGAL STANDARD</u>

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'".  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  For Fubo to "'nudge[ its] claim[] across the line from conceivable to plausible,' [it] must 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged".  *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*,

550 U.S. at 570).  If the alleged facts are "merely consistent with" the alleged wrongdoing, the complaint "stops short of the line between possibility and plausibility" and is subject to dismissal under Rule 12(b)(6).  *Twombly*, 550 U.S. at 557.  A court is "not required to credit conclusory allegations or legal conclusion couched as factual . . . allegations".  *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).  Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice".  *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.    Fubo Does Not Plausibly Allege the JV Will Cause Anticompetitive Effects in Any Market.

In Counts 1, 2 and 11, Fubo challenges Defendant's proposed JV under Section 7 of the Clayton Act, Section 1 of the Sherman Act and the Donnelly Act, respectively.  (¶¶ 233-251, 314-315.)  Fubo concedes that the proposed JV would offer consumers a new vMVPD—*i.e.*, a brand-new competitor to Fubo and other distributors—that would distribute 14 of Defendants' networks that include live sports, among other content.  (¶ 155.)  Fubo nonetheless contends that this new competitor would harm competition, rather than enhance it.  But Fubo's challenge to the JV under Section 7 fails because Fubo fails to allege adequately that the JV will (a) increase concentration in any alleged market, (b) incentivize Defendants to foreclose or otherwise harm vMVPDs, or (c) reduce potential entry into the alleged vMVPD market.  Fubo also fails to allege any facts to support its contention that the Defendants entered into a horizontal agreement to license their purportedly critical sports content on a standalone basis exclusively to the JV.  Counts 1, 2 and 11 must therefore be dismissed.

### A.    Fubo's Section 7 Claim Fails.

An acquisition violates Section 7 of the Clayton Act if "in any line of commerce . . . the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  Here, there is no acquisition.  While Section 7 may apply to the formation of a joint venture in the unusual case where the partners combine operations that currently compete or where a partner otherwise would enter the market independently, the

Supreme Court has cautioned that "[t]his is not to say that the joint venture is controlled by the same criteria as the merger or conglomeration.  The merger eliminates one of the participating corporations from the market, while a joint venture *creates a new competitive force therein*." *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170 (1964) (emphasis added).

To state a Section 7 claim, Fubo must plausibly allege that the new JV will "produce[] a firm controlling an undue percentage share of the relevant market, and result[] in a significant increase in the concentration of firms in that market".  *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963).  Two potential harms may flow from increased concentration: (a) unilateral effects, meaning "the elimination of competition between two firms that results from their merger"; and (b) coordinated effects, meaning the increased likelihood of coordination on price and output between the merged company and others in the market due to the reduced number of firms overall in the market following the merger.  *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 234-39 (S.D.N.Y. 2020).  But a transaction can increase concentration only if it eliminates a competitor from the relevant market.  *See* U.S. Dep't of Justice and Fed. Trade Comm'n, Merger Guidelines § 2.1 (2023) (the "Merger Guidelines").  If no competitor is eliminated, then there can be no change in concentration and none of the accompanying potential harm is possible.  *See DeHoog v. Anheuser-Busch Inbev SA/NV*, 899 F.3d 758, 764 (9th Cir. 2018) (explaining that, where there is no horizontal merger, "cases addressing the elimination of an actual competitor in a relevant market—and a concomitant increase in market concentration—are inapposite").[2]  Finally, Fubo must also allege "antitrust injury".  *Port Dock Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007).  This requires, at minimum, a causal link between "the actual injury" suffered by the plaintiff and "the asserted violation" of the antitrust laws, and the injury must be "of the type the antitrust laws were intended to prevent".  *Gatt*

---

[2] A smaller set of cases challenges so-called "vertical mergers" of firms at different levels in a distribution chain, but they are rarely challenged because they "will ordinarily be for the purpose of increasing [the merged firm's] efficiency, which is a prototypical valid business purpose".  *Port Dock*, 507 F.3d at 124; *see also G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 (2d Cir. 1995).  To the extent competition may be harmed by a vertical merger, it is merely through the potential for elimination of future competition.  *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 190 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).

*Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).

Fubo's Section 7 claims relating to the formation of the JV fail because Fubo's contention that the JV will substantially lessen competition is rendered implausible by its own allegations and, additionally, Fubo, as a competitor in the alleged market, lacks antitrust standing to sue on its potential competition theory of harm. Each of these flaws warrants dismissal.

1. <u>Fubo fails to plead a substantial lessening of competition because its allegations establish that the JV will not increase concentration in any market.</u>

Fubo fails to plausibly plead harm to competition through Defendants' announced JV because Fubo does not adequately plead a reduction in competition in any market. Instead, Fubo's allegations show that the JV will serve to enhance competition, not diminish it. As discussed, courts have blocked certain mergers that increase concentration in a relevant market by combining existing competitors and therefore eliminating one from the market. *See, e.g.*, *BOC Int'l Ltd. v. FTC*, 557 F.2d 24, 30 (2d Cir. 1977). But Fubo does not challenge a merger ***at all***. It challenges a joint venture that will introduce an entirely new participant to the alleged vMVPD market, while the members of the joint venture continue to operate independently of one another outside the joint venture. This distinction is critical because a "merger ***eliminates*** one of the participating corporations from the market while a joint venture ***creates a new competitive force therein***". *Penn-Olin*, 378 U.S. at 170 (emphasis added). Indeed, in ***every one*** of the handful of cases where courts have blocked a joint venture under Section 7, the joint venture consolidated competing or potentially competing operations of two or more horizontal competitors into the joint venture.[3] *See, e.g.*, *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) (combining two existing coal mines that were formerly independent into one JV). That is simply not the case here; the JV will not merge ***any*** of the Defendants' existing

---

[3] For example, in *United States v. Columbia Pictures Industries, Inc.*, 507 F. Supp. 412 (S.D.N.Y. 1980), four large movie studios all agreed not to license their films to premium cable networks, like Showtime and HBO, for the first nine months after theatrical release. *Id.* at 420. The four studios instead agreed to exclusively license their movies to a jointly owned JV. *Id.* This practice was held to be a *per se* illegal group boycott. *Id.* at 429. No group boycott is alleged here. To the contrary, Fubo can continue to license from Defendants the same channels as the JV will: Fubo pleads that Defendants have committed to "continue to license their sports content to third-party distributors". (Compl. ¶ 18.)

or potential operations, and Fubo does not plausibly allege otherwise.

**The Alleged Streaming Live Pay TV (vMVPD) submarket**.  As a new entrant to the alleged Streaming Live Pay TV submarket, the JV decreases concentration and increases competition—the *opposite* of what a Section 7 plaintiff needs to plead.  Accepting Fubo's allegations as true, the JV represents a new competitive force, an entirely new streaming service, in the alleged Streaming Live Pay TV submarket, without eliminating any existing or plausibly alleged potential competitor from any market.  (¶ 15.)  The JV will offer consumers a new service with 14 networks licensed by Defendants at an alleged competitive rate between "$30 and $50 per month".  (¶¶ 154-155.)  Defendants' sports programming will continue to be available from Fubo and other MVPDs and vMVPDs, and Fubo concedes that Defendants have committed that "they will continue to license their sports content to third-party distributors". (¶ 18.)  A new competitor that allegedly offers lower prices, such as the JV here, clearly enhances competition.  *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990). The JV threatens Fubo *because* the JV is procompetitive—leading to lower prices and increased competition in a market in which Fubo currently operates.

**The Sports Programming Licensing submarket**.  Nor does the JV increase concentration upstream.  Fubo fails to plausibly allege the JV would "control[] an undue percentage share" of the Sports Program Licensing Market.  *Phila. Nat'l Bank*, 374 U.S. at 363. Fubo baldly contends that "[t]he JV would massively increase [the] concentration" of that alleged market.  (¶ 169.)  And Fubo makes two arguments in support of this contention: (a) Defendants collectively "control" 54% of U.S. sports rights (¶ 168), and (b) the Herfindahl-Hirschman Index ("HHI") "shows" that the Sports Program Licensing Market is concentrated and the JV will significantly increase that concentration (¶ 169).  But neither argument holds water because Fubo does not—and cannot—plausibly allege that the JV will "control" any of the content it will license from Defendants.  *See DeHoog*, 899 F.3d at 764.

*First*, Defendants' combined share of U.S. sports rights is irrelevant because, under Fubo's allegations, the JV will be a *licensee*, not a licensor of those rights.  It will not own *any*

rights; it will simply license them from its members on a non-exclusive basis.  Stated differently, the JV will not secure sports rights as an upstream licensor participating in the Sports Program Licensing market.  Instead, the JV will be one of many downstream participants that, like Fubo and other MVPDs, will license sports content from Defendants.  (¶ 18.)  Accordingly, adding up Defendants' shares as licensors to assert that the JV has a 54% share of U.S. sports rights is like saying Fubo has a 70.1% share of U.S. sports rights because it licenses networks from ESPN, Fox, CBS and NBC.  (*See* ¶ 168.)  If Fubo's contention of increased concentration were right, then every time a new vMVPD entered the downstream market and secured carriage agreements from Defendants, concentration in the upstream market would increase.  Nonsense.

Fubo suggests that the JV will concentrate sports licensing rights because Defendants' commitment to continue to license their content to third parties is "false" and was made solely "[t]o disguise their predatory intent".  (¶ 18.)  This conclusory accusation must be ignored under *Twombly* and *Iqbal* because it is unsupported by alleged facts, and, therefore, "not entitled to be assumed true".  *Iqbal*, 556 U.S. at 664.  Indeed, elsewhere in the Complaint, Fubo alleges the opposite—that Defendants will continue to license their content to MVPDs.  (*See infra* I.A.2.)

*Second*, the HHI analysis is inapplicable because Fubo fails to assert any consolidation within, or that any competitor will be eliminated from, the Sports Program Licensing Market.  While Fubo cites the DOJ and FTC Merger Guidelines concerning HHI, Fubo somehow omits that the HHI analysis applies to a horizontal "merger that ***eliminates*** a significant competitor".  Merger Guidelines at 5; *see also Peabody*, 492 F. Supp. 3d at 902-03.  Not so here.  As discussed, the transaction will create a new product, not eliminate a competitor.  Because Defendants are not combining or consolidating any existing operations—competing or otherwise—and are instead forming a JV to launch an entirely new business that will distribute their content (in the downstream market) on a non-exclusive basis, these allegations do not plead reduced competition in the upstream licensing market (or in any market).  Fubo's allegations show only that the JV will enhance competition by adding a new entrant.

2.    Fubo's allegation that the JV's launch will incentivize Defendants to harm competition in the Sports Program Licensing Market is implausible and entirely speculative.

Fubo also strains to argue that the JV will harm competition by incentivizing Defendants to change their business practices outside the JV, as licensors in the Sports Program Licensing Market, in a way that would harm distributors. This alternative theory of competitive harm is entirely speculative. Under Fubo's theory, the JV will "increase Defendants' incentives to raise prices or withhold commercially critical sports channels in licensing negotiations with third-party distributors including Fubo—causing them to pay supracompetitive carriage rates or driving them out of business altogether". (¶ 240.) But Fubo's allegations do not come close to supporting the conclusion that the JV will incentivize each Defendant, independently, to harm distributors broadly, or even Fubo specifically. This is a fatal flaw, as Fubo must "plead specific facts showing that 'the challenged action has had an actual adverse effect on competition as a whole in the relevant market,' not just on [Fubo] as a competitor." *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 180 (S.D.N.Y. 2006) (quoting *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993)).

Fubo alleges no facts to support a reasonable inference that Defendants will change their licensing practices after the JV's formation, and Section 7 "does not authorize suits by those whose allegations of threatened injury amount to little more than conjecture". *Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 317 (D.D.C. 2011). Thus, Fubo fails to plausibly allege a reasonable probability that the JV's launch will substantially lessen competition by changing Defendants' incentives. *See DeHoog*, 899 F.3d at 765 (dismissing Section 7 claim because mere "speculation as to how a [company] will do business" after a transaction is insufficient to state a claim). Despite Fubo's speculation that the JV's launch will incentivize Defendants to cease licensing their sports content to distributors, Fubo's Complaint is replete with allegations that Defendants are ***disincentivized*** to harm competition in this way, both before and after the JV launches. Contradictory allegations warrant dismissal of the complaint. *See Concord Assocs., L.P. v. Entm't Props. Trust*, 817 F.3d 46, 55 (2d Cir. 2016).

12

**No incentive to divert customers from existing vMVPDs**.  Fubo's argument that Defendants will harm vMVPDs is implausible because it is contradicted by Fubo's allegations that Defendants are incentivized to maximize viewership.  As Fubo recognizes, Defendants have every incentive to maximize viewership for their channels.  Fubo thus alleges that:

- Sports programmers "seek to maximize distribution of their content" because "large audiences" are necessary to obtain licensing rights from sports leagues.  (¶ 174.)

- Defendants control advertising time that brings in "substantial advertising revenue", and advertising revenue depends on viewership.  (¶¶ 14, 62.)

- ████████████████████████████████████████████████████████████████

This is unsurprising, as it is well-recognized that "networks simply license as many distributors of their programming as they can to reach as many viewers as possible in order to maximize their return".  *In re Application of MobiTV, Inc.*, 712 F. Supp. 2d 206, 213 (S.D.N.Y. 2010).  Fubo alleges that Defendants seek to maximize viewership at a time when vMVPDs are a popular and growing option for consumers that recently reached "nearly 20 million subscribers" in total.  (¶ 95.)  Fubo alleges that it alone contributes around 1.5 million viewers for Defendants' content.  (¶ 104.)  Fubo never plausibly explains why Defendants would cease licensing their content to Fubo and other vMVPDs.

Moreover, licensing content through multiple distribution channels, including the JV, is procompetitive.  As "dual distributors", Defendants license their programming content directly to consumers and to other distributors.  Courts have recognized that dual distribution "increases distributive efficiency" and "can be a good thing for intrabrand competition, as more outlets are selling the same good" as well as "for interbrand competition, because the greater reach of a certain brand means greater competition between that brand and other, competing brands".  *United States v. Brewbaker*, 87 F.4th 563, 581 (4th Cir. 2023); *see also Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 408, 411 (2d Cir. 1981) ("a dual distributorship" had "sufficient potential for enhancing interbrand competition").  As a brand-new vMVPD, the JV will add another outlet to distribute programming content to consumers, spurring competition.

Fubo's argument that Defendants will harm vMVPDs once the JV launches is also

implausible because it is predicated on the improbable notion that Defendants will divert current vMVPD customers to the JV, when in fact the JV is likely to appeal to new and different subscribers, and therefore grow the market. That is precisely Defendants' goal in launching the JV. The JV will carry 14 networks that offer some live sports programming (¶ 155), which will likely attract new sports-focused consumers interested in the JV's mix of sports offerings, and who do not currently subscribe to existing MVPDs or vMVPDs. Other vMVPDs carry far more networks and far more sports programming. For example, Fubo chose to carry *45* networks in 2016—before it even licensed Disney's content—and carries more than 200 networks today. (¶ 98.) Fubo alleges that 46% of all live sports will be ***unavailable*** through the JV, including networks that Fubo identifies as "key general sports programmers" such as NBC and CBS, which each offer around 13% of sports content. (¶¶ 98, 168.) Also absent from the JV will be networks such as NBA TV, as well as non-sports content from networks such as ██████████ ████████████████████ Univision and A&E, or any dedicated live news networks such as CNN, which most other MVPDs and vMVPDs carry. (¶¶ 82, 98, 138.) The Complaint never explains why droves of consumers would give up access to potentially ***hundreds*** of networks and ***almost half*** of all live sports to switch from existing vMVPDs to the JV, particularly when the non-JV sports content includes supposedly "key" programming. (¶ 98.) Fubo's diversion theory is thus facially implausible.

**Alleged supracompetitive profits**. Fubo's allegation that Defendants' "[p]ractices [c]aused Fubo . . . to [p]ay [s]upra-[c]ompetitive [p]rices" is likewise fatal to Fubo's theory that the JV will incentivize Defendants to withhold programming from Fubo. (§ XII.A.) Fubo alleges that Disney and Fox force it to take networks Fubo does not want (¶ 195), to accept more onerous terms than its competitors (¶ 129) and to accept worse technology than its competitors (¶ 11). Together, this conduct allegedly results in "supracompetitive prices for [Defendants'] content". (¶ 112.) Defendants deny these allegations, but accepting them as true for purposes of this motion makes Fubo a reliable and established source of significant revenue for Defendants, and so, even after the JV's launch, Defendants would have no incentive to forgo earning these

14

profits by ceasing licensing their networks to Fubo.

**Existing arrangements with other vMVPDs**.  Fubo's "changed incentive theory" is also inconsistent with its allegations regarding Defendants' agreements with Hulu TV and YTTV. Fubo suggests that Defendants give lucrative "rebates" and "side-deals" to YTTV and Hulu TV because they are the vMVPDs that attract the most customers, with 41% and 28% "of all virtual MVPD subscribers", respectively.  (¶¶ 127, 131.)  Fubo alleges that, as an independent vMVPD, it cannot secure similar deals.  (¶ 140.)  That Defendants allegedly favor Hulu TV and YTTV, which account for 69% of the purported market, is consistent with the fact that Defendants seek to secure the widest possible viewership for their content.  (¶ 174.)  Moreover, given Hulu TV and YTTV's wide reach, it is implausible that Defendant would forgo licensing to those vMVPDs.  And Fubo offers no facts to explain why Defendants would foreclose these vMVPDs, which together allegedly account for 69% of vMVPD users, particularly when the JV will not be a reasonable substitute for either offering for the vast majority of consumers.

**Duration of vMVPD carriage agreements**.  The potential that, after the JV's launch, Defendants will harm competition by raising their prices to other distributors is speculative for another reason:  the duration of the vMVPDs' carriage agreements.  For example, Fubo alleges that its licenses to Defendants' networks are ██████████████████████████████████ ███████████████████████████.  (¶¶ 70, 77.)  Therefore, accepting Fubo's allegations as true, ███████████████████████████████████████████ ████████████████████████████████  Fubo's allegations with respect to WBD are even more speculative:  Fubo currently licenses none of WBD's networks with sports programming—TNT, TBS or truTV.  (¶¶ 79, 204.)  Therefore, WBD has no ability to raise prices and thus "harm" Fubo, a vMVPD that does not carry WBD's sports content.

**Speculative allegations of incentives to collude**.  Finally, Fubo blithely asserts that the JV will facilitate collusion between Defendants.  But its only support for this allegation is that the JV has "aligned [Defendants'] interests and will [give them] the opportunity and incentive to collude when it comes to licensing must-have sports content to third-party distributors".  (¶ 221.)

As the Supreme Court stated in *Twombly*, "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality". 550 U.S. at 557. A conclusory allegation of a ***potential*** agreement at some unidentified point ***in the future*** is even less plausible. Under Fubo's theory, every Section 7 claim challenging a transaction between competitors could survive a motion to dismiss by claiming the transacting companies will collude. That is not the law. *See, e.g.*, *DeHoog*, 899 F.3d 758 (dismissing Section 7 claim concerning merger of alleged competitors under Rule 12(b)(6)); *SureShot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, 2021 WL 5313620 (5th Cir. Nov. 15, 2021) (same).

3.   Fubo's allegation that the JV's launch will reduce potential competition in the vMVPD market is unsupported and fails as a matter of law.

Separate from its claims of changed incentives and facilitation of collusion in the upstream Sports Program Licensing Market, Fubo alleges that the JV will substantially lessen competition in the purported vMVPD submarket because "[a]bsent the JV, Defendants would compete against one another—and with other virtual MVPDs—to offer the best streaming sports package based on price, content, and quality features". (¶ 223.) This is known as a "potential competition" theory of harm, which can apply when "the elimination of [] a potential competitor would substantially lessen competition within the meaning of [Section] 7". *United States v. Siemens Corp.*, 621 F.2d 499, 504 (2d Cir. 1980). For a potential competition theory to succeed, a plaintiff must show that it was "reasonably probable that [a defendant] would have entered the [relevant] market *de novo* if it was not able to acquire [another firm]". *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 928 (N.D. Cal. 2023).

As Fubo's counsel noted in a recent brief, "[i]n the past four decades, no court has accepted a 'potential competition' theory to find an acquisition in violation of Section 7 of the Clayton Act". *See* Defendants' Motion to Dismiss at 1, *FTC v. Meta Platforms, Inc., et al.*, No. 5:22-cv-04325-EJD (N.D. Cal. Oct. 13, 2022), ECF No. 108. Fubo's potential competition theory claim also fails because Fubo: (a) makes no plausible allegations of diminished entry as a result of the JV, (b) does not explain why Defendants offering their content jointly through the

JV is worse for competition than independent entry, given the lack of concentration in the market and that the JV will not be a substitute for existing vMVPD services, and (c) lacks antitrust standing to pursue a potential competition claim.

**The JV does not diminish entry**.  Fubo maintains that the JV will result in reduced competition in the vMVPD market, yet Fubo does not even attempt to allege any facts that would suggest that *any* Defendant even contemplated launching a vMVPD with a "sports package" (¶ 223), much less that such plans were reasonably probable.  Nor does Fubo allege any facts to show that, to the extent that Defendants had such independent entry plans (which is not alleged), Defendants will ***not*** enter independently now that the JV has been agreed to.  Fubo concedes that Disney has already entered the vMVPD market with its Hulu TV product.  (¶ 101.)  And Fubo's allegations are further contradicted by Disney's 2024 investor day call, which Fubo incorporates into its Complaint by reference[4], during which Disney committed to offer all of ESPN's sports content through a direct-to-consumer service referred to as "Flagship", starting in 2025.  (*See* Earnhardt Decl., Ex. 1.)  While not a vMVPD, Flagship is a direct-to-consumer service that will have Disney sports programming overlapping with the JV and will compete for sports-focused consumers.  Fubo alleges no facts to conclude that Fox or WBD have (or ever had) any plans to offer a vMVPD or sports-focused direct-to-consumer service, let alone that they decided to shelve those plans once the JV launches.  Fubo's potential competition claim fails.

**The JV does not harm future competition**.  Even if Fubo could plausibly allege that it was reasonably probable that one or more Defendants would enter the vMVPD space but for the JV's launch, Fubo still fails to plausibly allege harm to competition through the elimination of potential competition.  Critically, Fubo fails to explain why competition would be stronger in a market that two or more of the Defendants independently entered than a market where the JV entered.  For example, nowhere in the Complaint does Fubo allege that the vMVPD market is

---

[4] On a motion to dismiss under Rule 12(b)(6), "the complaint is deemed to include . . . any statements or documents incorporated in it by reference".  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  A complaint incorporates statements or documents by reference when the plaintiff relies on them in drafting the complaint.  *Id.* at 153.  That is met for Mr. Iger's statements during Disney's earnings call, as Fubo quotes directly from those statements in the Complaint.  (¶¶ 18, 160).

concentrated, such that it would meaningfully benefit more from entry by two or more players, as opposed to entry by one player. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 624 (1974) (requiring "the target market [to be] substantially concentrated" for a potential competition claim to be viable). Indeed, Fubo's allegations suggest that the alleged market is **un**concentrated and competitive, because there are a number of vMVPDs in the market, and Fubo and others compete on price and features to secure a growing customer base. (¶¶ 91, 96-104.) Moreover, the Complaint suggests that Defendants would be ***unable*** to compete if they entered independently. Fubo alleges that securing certain "critical" sports content is necessary to compete as a vMVPD. (¶ 187.) Accepting Fubo's allegation that each of these programs are independently essential to offer a viable vMVPD product as true, which Disney denies[5], it would be implausible to assume, as Fubo does, that each of the Defendants would successfully enter the market independently, as products containing only their own content would lack the other Defendants' supposedly "critical" channels Fubo contends are necessary to offer a viable package. If Fubo's allegations were true, only by entering the vMVPD submarket jointly, pursuant to the JV, could each of the Defendants effectively compete.

**Fubo lacks antitrust injury**. Finally, Fubo has no standing based on diminished competition between vMVPDs because Fubo, as a competitor in the purported vMVPD submarket, would not suffer harm from any reduction in competition in that market. As a result, Fubo has no "antitrust injury" from reduced competition in the market in which it competes as a seller; indeed, Fubo would ***benefit*** from such reduced competition. Fubo has no standing to challenge a JV that it contends makes it less likely that Fubo's competitors will lower prices or improve their features. (¶ 144); *see Atl. Richfield Co.*, 495 U.S. at 344 (holding that competitors lack "antitrust injury" based on allegations of higher prices in the market because they benefit from higher prices in the market); *Port Dock*, 507 F.3d at 124-25.

---

[5] Fubo's allegations that all of Defendants' "critical" channels are necessary to compete is also clearly wrong, as evidenced by Disney's announcement of its direct-to-consumer "Flagship" product, which will carry ***only*** Disney/ESPN's sports content. (*See* Earnhardt Decl., Ex. 1.)

**B.** **Fubo fails to allege a Section 1 or Donnelly Act Claim Relating to the JV.**

Fubo next challenges the JV under Section 1 of the Sherman Act and New York's Donnelly Act (claims 2 and 11). Fubo appears to rely largely on the same allegations to support those claims as underlie its Section 7 claim. (*See* ¶¶ 233-251, 314-315.) Accordingly, Fubo's Section 1 and Donnelly Act claims relating to the JV fail. It is well-recognized that if allegations fail to support a Section 7 claim, then Sherman Act claims based on the same allegations fail, too. *See Vantico Holdings S.A. v. Apollo Mgmt., LP*, 247 F. Supp. 2d 437, 458 (S.D.N.Y. 2003) ("Because § 1 of the Sherman Act looks to the probable effects of an agreement, there is no substantive difference between the standards underlying a violation of § 7 and § 1."). Donnelly Act claims also rise and fall with Sherman Act claims. *See Gatt Comms.*, 711 F.3d at 81-82. Therefore, all claims relating to the JV should be dismissed for the reasons stated in Section I.A.

Fubo makes one allegation concerning the JV that may be intended to support only a Section 1 claim: that "the JV reflects an anticompetitive agreement between horizontal competitors to exclusively license their must-have sports content on a standalone basis to their jointly owned application". (¶ 220.) To the extent Fubo is alleging that, separate and apart from forming the JV and licensing their sports content to the JV, Defendants have agreed among themselves not to license their sports content on an unbundled basis to others, that claim fails. Fubo alleges **no** fact that plausibly could suggest the existence of such an agreement. And while Fubo specifically alleges an agreement among Defendants to license 14 of their networks to the JV (¶ 155), that allegation says ***nothing*** about an agreement among Defendants on how they will license their sports content to any other vMVPD.

Fubo's conclusory allegation must be ignored under *Twombly* and *Iqbal*. As discussed, "parallel conduct" plus "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality". *Twombly*, 550 U.S. at 557. And "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements". *Iqbal*, 556 U.S. at 663. That is all Fubo offers here—a threadbare assertion of agreement concerning licensing outside

19

the JV, with no specific (or even general) factual support.  Moreover, any inference of such an agreement is contradicted by Fubo's allegation that Defendants have sold their networks on a bundled basis "[f]or decades".  (¶¶ 83-85.)  Defendants' independent, decades-long conduct therefore represents the "norm" in this industry, wholly unconnected to any supposed agreement among Defendants.  *See Twombly*, 550 U.S. at 567-68.  Because Fubo's allegations of an agreement among Defendants separate from the JV are decidedly ***im***plausible, its Sherman Act Section 1 and Donnelly Act claims must be dismissed.

## II.    There is No Unlawful Tie.

In Counts 3, 5, 12 and 13, Fubo claims Disney's alleged practice of bundling television channels licensed to distributors constitutes an unlawful tying arrangement in violation of Section 1 of the Sherman Act and the Donnelly Act.[6]  (¶¶ 252-260, 270-274.)  Fubo alleges that Disney ties the purchase of so-called "Commercially Critical Sports Channels" (the tying product) to the purchase of "Non-Critical Television Channels" (the tied product), when Fubo would prefer to license only the former.  (¶ 162.)  Fubo contends that Disney therefore "forces" Fubo to license non-critical content it does not want, which has "prevented Fubo from executing on its business plan to offer a consumer-friendly package of sports content".  (¶ 8.)  Fubo's tying claims fail because (a) ████████████████████████████ (b) Fubo does not sufficiently plead the elements of *a per se* unlawful tie, and (c) Fubo similarly fails to plausibly allege its tying claims under the rule of reason.

██  ███████████████████████  ████
    ███████████████████████████████████
██████████████████████████  █  ██████████████

---

[6] In Counts 12 and 13, Fubo repackages its tying and block-booking claims under the Donnelly Act, and alleges that Disney's/ESPN's practice violates the Donnelly Act for the same reasons it violates the Sherman Act.  (¶¶ 316-319.)  The Donnelly Act is coextensive with the Sherman Act, and, therefore, Fubo's Donnelly Act claims rise and fall with the Sherman Act claims.  *Nat'l Gear & Piston, Inc. v. Cummins Pwr. Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012) ("The standard for a well-pleaded Donnelly Act claim is the same as a claim under Section 1 of the Sherman Act." (citations omitted)).

[7] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████



**B.    Fubo Has Failed to Plausibly Plead *Per Se* Tying.**

████████████████████████████████████████Fubo has still failed to

adequately plead Disney's multi-network licenses are illegal.  The gist of a tying claim is that a

firm with market power in one product market extends that market power to another product

market by forcing buyers to purchase both products, such that competing sellers of the tied

product are excluded from the market.  *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2,

14 (1984).  In Counts 3 and 12, Fubo contends that Disney's alleged tying arrangements are *per

se* illegal and, in the alternative, illegal under the rule of reason.  (¶¶ 257, 316-317.)  Fubo's

claims fail as a matter of law because Fubo:  (i) must plead anticompetitive effects to support its

*per se* tying claims, (ii) does not plausibly plead anticompetitive effects in the tied product

market and (iii) fails to plausibly allege a tie of two separate, well-defined products.

**1.    Anticompetitive Effects Are an Element of *Per Se* Tying Claims.**

A plaintiff must plausibly allege five elements to state an illegal tying claim:

> (i) the sale of one product (the tying product) is conditioned on the purchase of a
> separate product (the tied product); (ii) the seller uses actual coercion to force
> buyers to purchase the tied product; (iii) the seller has sufficient economic power
> in the tying product market to coerce purchasers into buying the tied product;
> (iv) the tie-in has anticompetitive effects in the tied market [*i.e.*, the tie excludes
> competitors from that market] and (v) a not insubstantial amount of interstate
> commerce is involved in the tied market.

*Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016).  Unlike with horizontal agreements

to set prices or restrict output (which antitrust law condemns as *per se* unlawful without the need

to show anticompetitive effects), *per se* tying requires allegations of (1) market power in the

tying market and (2) anticompetitive effects in the tied market.  In *Coniglio v. Highwood Servs.,

Inc.*, the Second Circuit held that "anti-competitive effects in the tied market" is one of the

"factors essential in determining whether a particular sales practice constitutes an illicit tying

arrangement".  495 F.2d 1286, 1289 (2d Cir. 1974).  Since then, the Second Circuit has required

a plaintiff to allege anticompetitive effects to state *any* tying claim, including one under the *per

se* rule.  *See Kaufman*, 836 F.3d at 141; *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 58 (2d Cir. 1980)

("We require at least some showing that the illegal tying arrangement results in actual foreclosure of competition in the tied product market."); *see also* 9 Areeda & Hovenkamp, *Antitrust Law* ¶ 1722c (4th ed. 2018) (explaining that "anticompetitive effects" are an element of *per se* tying in the Second Circuit).[8]

### 2.    Fubo Fails To Allege Anticompetitive Effects in the Tied Market.

Fubo's *per se* tying claims must be dismissed because Fubo does not plausibly allege foreclosure of competition in the market for non-critical channels.  To state a claim, Fubo must allege that Disney's licensing of multiple channels "has anticompetitive effects in the tied market".  *Kaufman*, 836 F.3d at 141.  "[T]he vice of tying arrangements lies in the use of economic power in [the tying] market to restrict competition on the merits in [the tied market]." *Shop & Save Food Mkts., Inc. v. Pneumo Corp.*, 683 F.2d 27, 30 (2d Cir. 1982) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 11 (1958)).  In other words, the anticompetitive harm of tying is the use of market power in the tying product market to foreclose competition in the tied product market—***not*** simply the use of market power in the tying market to force a buyer to buy products it might not otherwise buy.  *See Jefferson Parish*, 466 U.S. at 16.

The Ninth Circuit's opinion in *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012), is instructive here and compels dismissal of Fubo's tying claims.  In *Brantley*, the Ninth Circuit affirmed the dismissal of tying claims similar to Fubo's because the *Brantley* plaintiffs failed to plead anticompetitive effects in the tied market.  *Id.* at 1204.  There, a putative class of linear television network customers alleged unlawful tying under Section 1 based on a provision in the carriage agreements between linear television programmers and distributors that "require[d] each [d]istributor that wishe[d] to purchase that [p]rogrammer's high-demand channels (the tying product) to purchase all of that [p]rogrammer's low-demand channels (the

---

[8] The court in *In re Google Dig. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 368 (S.D.N.Y. 2022), suggested that, where a defendant has monopoly power, a tying arrangement may be unlawful *per se* without the need to prove anticompetitive effects.  This decision is contrary to binding precedent.  Moreover, even if Fubo could plead a *per se* tying claim without alleging anticompetitive effects (it cannot), Fubo makes no allegation that any Defendant has monopoly power in the market for the tying product.  *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) (noting that even "a share between 50% and 70% can [only] occasionally show monopoly power").

tied product) as well" and "[d]istributors [to] sell consumers cable channels only in packages consisting of each [p]rogrammer's entire offering of channels". *Id.* at 1201. The court dismissed the claims for failure to plead facts showing an injury to competition flowing from the tie. *Id.* Specifically, the court reasoned that plaintiffs "d[id] not allege that [the] [p]rogrammers' practice of selling 'must-have' and low-demand channels in packages excludes other sellers of low-demand channels from the market, or that this practice raises barriers to entry into the programming market", nor did plaintiffs allege that "the arrangement between the [p]rogrammers and [d]istributors forces [d]istributors or consumers to forego the purchase of alternative low-demand channels". *Id.* The Ninth Circuit held that "mere allegations that [p]rogrammers have chosen to limit the ability of [d]istributors to offer [p]rogrammers' channels for sale individually" or that "an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition", as "[b]oth effects are fully consistent with a free, competitive market". *Id.* at 1202.

As *Brantley* illustrates, bundling of networks is commonplace and can be procompetitive. In fact, like the distributors in *Brantley*, Fubo itself sells consumers its services in four different bundles of channels[9] yet asserts that Disney's decision to license its content in the same way is somehow anticompetitive. Like the *Brantley* plaintiffs, Fubo has not adequately alleged injury to competition through foreclosure in the tied market. Fubo does not allege that Disney's purported bundling practices foreclose other programmers in the "non-critical television channels" market.[10] *Id.* at 1201. Fubo does not even allege that the licensing of multiple channels here impacts other programmers' efforts to produce "non-critical channels" at all. Fubo does not attempt to point to a single programmer that has been foreclosed from the Non-Critical

---

[9] *See* Which Plan is best for you?, FuboTV, available at: https://www.fubo.tv/welcome.

[10] For example, in *Cablevision Sys. Corp. v. Viacom Int'l Inc.*, 13-cv-1278 (LTS) (JLC), 2014 WL 2805256 (S.D.N.Y. 2014), a cable company that operated an MVPD successfully pleaded that a programmer's bundling practices foreclosed competition in the tied product market because "if it were not forced to carry the [programmer's networks], it would carry other networks on the numerous channel slots that [the programmer's networks] currently occupy." *Id.* at *3. But, as explained in the Complaint, Fubo streams its content over the internet and does not plead that it has a finite number of channel slots. Fubo fails to plead exclusion because it pleads no impediment, besides its unilateral marketing decisions, to carrying Disney's non-critical channels.

24

Television Channels market, let alone that the bundling arrangements at issue were the cause of the foreclosure.  To the contrary, Fubo alleges numerous programs that compete with Disney in the purported market, including Cartoon Network, Bravo, TNT, TBS and AMC.  (¶¶ 194-195.)

Fubo alleges that "to get access to ESPN, Fubo was forced to drop TNT and TBS to maintain an economical channel package (because Disney's prices are so high)" (¶¶ 195, 204), but this does not plausibly allege that programmers that offer "non-critical channels" are prevented from entering the market.  Fubo concedes that it dropped TNT and TBS not because of the alleged tie, but instead because of Disney's prices.  (¶ 204.)  The fact that Fubo chose to pay high prices "to get access to ESPN" proves that Fubo's decision was driven by its preference to license Disney's channels.  But that does not mean that the purported tie "forced" Fubo to forgo licensing TNT or TBS—Fubo remained free to license ESPN, TNT and TBS, but chose not to do so.  Put differently, Fubo alleges it made a business decision to offer a cheaper product instead of carrying TNT and TBS, but no bundling arrangement forced Fubo to do so.  Fubo claims that Disney's alleged bundling practice has forced Fubo to license ██████████████████ ████████████████████████ from Disney and "prevented Fubo from licensing other content that Fubo would prefer to distribute", specifically TNT and TBS, but again, Fubo fails to allege that any non-critical channels have been foreclosed from the market.  (¶¶ 118, 202.)[11] Fubo elides the fact that TNT and TBS are owned and operated by Defendant WBD, which itself does not assert that it was foreclosed from any relevant market due to Disney's conduct.  (¶ 79.) Fubo's attempt to claim foreclosure on behalf of the Defendants it sues belies its claims.

Finally, Fubo argues that Disney's alleged bundling arrangements raise barriers "by requiring any new entrant or nascent competitor to license dozens of low-value channels, raising

---

[11] Fubo admits that it "currently licenses *non-sports content* from WBD" including ████████████ ██████████████████████ (¶ 82 (emphasis added)), but remains notably silent regarding whether it considers these non-sports channels to be Non-Critical Television Channels, presumably because Fubo would have to admit that it can license and has licensed non-critical channels outside a bundle, from one of the Defendants here. Moreover, the fact that Fubo licenses non-sports content from WBD without sports content further supports that Fubo has failed to allege anticompetitive harm in the tied market since Fubo cannot allege "that any programmer's decision to offer its channels only in packages constrained other programmers" (here, WBD) "from offering their channels individually if that practice was competitively advantageous".  *Brantley*, 675 F.3d at 1203-04.

entrants' costs and impeding their ability to offer a differentiated service to consumers". (¶ 119.) Critically, the "new entrant[s]" and "nascent competitor[s]" Fubo references are not programmers that offers non-critical channels—as would be required to state a tying claim—but vMVPDs. Yet again, that is not a cognizable harm for a tying claim. Whether Defendants' pricing raises barriers for MVPDs—their downstream licensees—has nothing to do with whether Defendants' conduct forecloses their competitors from the alleged market for non-critical channels—the tied product.[12] Accordingly, Fubo's tying claims must be dismissed.

### 3. Fubo Fails To Plausibly Allege the Tie of Two Separate, Well-Defined Products.

Fubo's tying claim also fails for the independent reason that Fubo fails to adequately allege that "Commercially Critical Sports Channels" and "Non-Critical Television Channels" are separate, well-defined products in different product markets. For a tying arrangement to exist, the purported "tying product and tied product must be separate, *i.e.*, each must be in a separate and distinct product market". *Kaufman*, 836 F.3d at 141. "This is because if there is no separate market for the allegedly tied product, there can be no fear of leveraging" economic power in the tying market to harm competition in the tied market since the latter "simply does not exist". *Id.* at 142. For a separate market to exist, "there must be sufficient consumer demand so that it is efficient for a firm to provide [them] separately". *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992).

*First*, Fubo fails to allege separate demand for non-critical channels. To adequately plead a tying claim, Fubo must allege that but for the purported tie, distributors would license non-critical channels from programmers other than the Defendants. It does not. Instead, Fubo contends that but for the supposed tying arrangement, distributors would not carry such channels *at all*. Fubo alleges that "[i]f an MVPD or virtual MVPD attempted to offer a multichannel

---

[12] Fubo's other arguments about barriers to entry—that "[h]igh barriers to entry protect Disney's and Fox's market power in the tying market" (¶ 196) and creating a Commercially Critical Sports Channel "requires obtaining the media rights to major sports leagues and events", which is "difficult and expensive" (¶ 196)—are irrelevant to its tying claims. Fubo must plead foreclosure from the tied market (Non-Critical Television Channels), not the tying market (Commercially Critical Sports Channels). And Fubo must plausibly allege that the bundling practices are responsible for "rais[ing those] barriers to entry". *Brantley*, 675 F.3d at 1201. These allegations accomplish neither.

package featuring non-critical television channels, in lieu of commercially critical sports channels, the package would not be commercially viable". (¶ 200.) Taking this allegation as true, distributors would never demand "Non-Critical Television Channels" separate and apart from "Commercially Critical Sports Channels", since on its own, a "non-critical" television channel bundle would not support a "commercially viable" product. As such, it is implausible that separate demand for Non-Critical Television Channels exists. *See Collins v. Assoc. Pathologists, Ltd.*, 844 F.2d 473, 477 (7th Cir. 1988) (reasoning that "no tying arrangement can exist unless there is a distinct demand for the purchase of [the alleged tied product] by [consumers] separate from the demand for [the alleged tying product]").

*Second*, even if Fubo did allege that there was separate demand for Non-Critical Television Channels, Fubo does not plausibly define the outer bounds of either the tying or tied market, which is fatal to Fubo's tying claim. *See Concord Assocs.*, 817 F.3d at 53 (noting that dismissal is appropriate "where the plaintiff has failed to articulate a plausible explanation as to why a market should be limited in a particular way"). Fubo alleges that "[t]he tying product market is the market for licensing commercially critical sports channels", which are "'must-have' sports channels" that "an MVPD or virtual MVPD *must* license to offer a commercially viable package of channels". (¶ 187.) However, Fubo's categorization of channels as "critical" and "non-critical" appears to be entirely subjective, based on Fubo's preferences rather than market realities. Such a market fails as a matter of law. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) ("The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'" (citation omitted)).

For example, Fubo alleges that "[t]he linear networks ESPN, ABC, and Fox are commercially critical sports channels"—the *only* channels Fubo specifically identifies as participating in this purported market[13]—but Fubo, perplexingly, does not consider TNT or TBS

---

[13] The only channels that Fubo names as participating in the Non-Critical Television Market are ████████

27

Commercially Critical Sports Channels, even though Fubo also alleges that TNT and TBS broadcast WBD's extensive sports programming content, which Fubo contends accounts for approximately 10% of the licensing rights in the so-called Sports Program Licensing market.[14] (¶¶ 53, 79, 168, 190-193, 195, 204.)  Fubo provides no explanation for why ABC, for example, is "critical", while TNT and TBS are not—and does not allege that all or even most distributors share that view.  (*See* ¶ 204.)  Conclusory statements that some channels are "critical" while other are not, without any explanation of that distinction or allegation that the distinction is uniform and clear to all or at least most buyers in the alleged market, are insufficient to plead relevant markets.  *See Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011) ("[A] 'court cannot accept the market boundaries offered by plaintiff without at least a theoretically rational explanation for excluding [alternatives].'" (citation omitted)).

### C.    Fubo's Rule of Reason Tying Claims Fail.

In Counts 3 and 12, Fubo pleads, in the alternative, that Disney's alleged tying arrangements are illegal under the rule of reason (¶¶ 257, 316-317), and also alleges so-called "block-booking" in Counts 5 and 13 (¶¶ 270-274, 318-319).  As discussed in Section B.1 above, a plaintiff must plausibly allege anticompetitive effects to state a tying claim, whether *per se* or under the rule of reason; and as explained in Section B.2 above, Fubo falls woefully short in its attempts to do so, having failed to allege any foreclosure of any competitor from the tied market. Nor does Fubo adequately allege the existence of separate demand for the tying and tied products, as set out in Section B.3.  Accordingly, Fubo's rule of reason tying claims fail for the same reasons as its *per se* tying claim.

Nor does Fubo's attempt to bring separate so-called "block booking" claims change this result.  "Block-booking is the practice of licensing, or offering for license, one feature or group

---

████████████████████████ A&E, AMC ████████████████████████████████████, TNT, TBS ████████████████.  (¶¶ 194-195, 202-203.)  It is not even clear whether Fubo contends that all channels—or even just the channels that it does not mention from its own 208-channel Pro package, *see* Channel Lineup, FuboTV, available at: https://www.fubo.tv/welcome/channels—fall into either the tying or tied markets, or whether some channels are in neither market.

[14] WBD's sports programming includes high-demand sports content, including the NCAA March Madness tournament and NBA regular season and finals conference games.  (¶ 80.)

of features [*i.e.*, films] on condition that the exhibitor will also license another feature or group of features released by the distributors".  *United States v. Paramount Pictures*, 334 U.S. 131, 156 (1948).  As courts have clarified, block-booking is just "a form of tying agreement".  *Fields Prods., Inc v. United Artists Corp.*, 318 F. Supp. 87, 88 (S.D.N.Y. 1969).  As this Court recently explained, "[t]he legal framework used to evaluate . . . block booking" is "the rule of reason".  *United States v. Paramount Pictures, Inc.*, 2020 WL 4573069, at *6 (S.D.N.Y. Aug. 7, 2020).  The factual allegations underlying Fubo's tying claims in Counts 3 and 12 and block-booking claims in Counts 5 and 13 are identical.  (*Compare* ¶ 253 *with* ¶ 271.)  Fubo's block-booking claims are insufficient for the same reasons as its tying claims and should be dismissed.

## III.  The MFN Clauses Are Not Agreements in Restraint of Trade.

In Counts 7, 10 and 14, Fubo claims that the MFN clauses in Disney's carriage agreements with YTTV and Hulu TV, and in Hulu TV's carriage agreements with programmers, including Fox, WBD, NBC, Univision and A&E, unreasonably restrain trade in violation of Section 1 of the Sherman and the Donnelly Act.[15]  (¶¶ 280-288, 301, 306-313, 320-321.)  All of Fubo's claims based on MFN clauses in Disney's and Hulu TV's carriage agreements fail, as Fubo has not plausibly pled market power or anticompetitive effects.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade".  15 U.S.C. § 1.  "To state a claim under Section 1, a plaintiff . . . must [plausibly allege] (1) 'a combination or some form of concerted action between at least two legally distinct economic entities,' and (2) 'that the agreement constituted an unreasonable restraint of trade either *per se* or under the rule of reason.'"  *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 618 (S.D.N.Y. 2013) (citation omitted).  "Agreements within the scope of § 1 may be either horizontal, *i.e.,* agreement[s] between competitors at the same level of the market structure, or vertical, *i.e.,* combinations of persons at different levels of the market structure, *e.g.,* manufacturers and distributors."  *Anderson News, L.L.C. v. Am. Media,*

---

[15] In Count 14, Fubo repackages its claims related to MFN clauses in Counts 7-10 under the Donnelly Act. (¶ 321.)  As explained above in footnote 6, Fubo's Donnelly Act claims rise and fall with the Sherman Act claims.

*Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (quotations and citation omitted).

Fubo concedes that its claims related to MFN clauses are challenging vertical restraints that must be evaluated under the rule of reason.  (¶¶ 285, 310.)  To plausibly allege a restraint is unreasonable, Fubo must plead (1) "'that defendants possess the requisite market power and thus the capacity to inhibit competition market-wide,' plus some 'other grounds to believe that the defendant's behavior will harm competition market-wide, such as the inherent anticompetitive nature of defendant's behavior or the structure of the interbrand market'" or (2) "an actual adverse effect on competition, such as reduced output", increased prices or decreased quality in the relevant market.  *Bookhouse of Stuyvesant Plaza*, 985 F. Supp. 2d at 620 (citation omitted).

Fubo's claims based on the MFN clauses fail because Fubo (a) does not allege a horizontal agreement between Disney, Fox and WBD to include MFN clauses in their respective carriage agreements with distributors; (b) fails to plausibly allege that Disney/ESPN or Hulu TV has market power in the purported Sports Program Licensing Market and (c) fails to plausibly allege that the MFN clauses harm competition.

### A.     Fubo Does Not Allege a Horizontal Agreement Between Disney, Fox and WBD.

Fubo suggests—without any support—that Disney, Fox and WBD each include MFN clauses in their respective carriage agreements with YTTV and Hulu TV as "part of a larger collusive scheme", which may "facilitate coordination or collusion among horizontal competitors".  (¶¶ 122, 286, 311.)  To be clear, Fubo has not brought horizontal restraint of trade claims against any Defendant related to the MFN clauses.  Fubo admits as much in its Complaint, labeling its Section 1 claims related to the MFN clauses as *vertical* restraint of trade claims that it challenges under the rule of reason.  (*See* ¶¶ 280-288, 306-313, 320-321.)  At most, Fubo has alleged that these Defendants independently entered into carriage agreements with YTTV and Hulu TV that contain MFN clauses.  But "lawful parallel conduct fails to bespeak unlawful agreement".  *See Twombly*, 550 U.S. at 556.

**B.    Fubo Fails To Plausibly Allege Market Power.**

Fubo fails to plausibly allege, as it must, that either Disney/ESPN (for Count 7) or Hulu

TV (for Count 10) has market power in the Sports Program Licensing Market.  *See, e.g.*, *Ohio v.*

*Am. Express, Inc.*, 585 U.S. 529, 543 & n.7 (2018).  "To show market power, a plaintiff must

show not only that defendant had a significant share of the market, but also that this share can be

sustained over a period of time."  *CDC Techs., Inc. v. IDEXX Lab'ys., Inc.*, 7 F. Supp. 2d 119,

130 (D. Conn. 1998).  Notably, "a market share of between 30 and 40% does not lead to an

inference of market power".  *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525,

at *26 (S.D.N.Y. July 31, 2023), *R&R adopted*, 2024 WL 918030 (S.D.N.Y. Mar. 2, 2024).

*First*, Fubo fails to sufficiently allege that Disney/ESPN have market power in the Sports

Program Licensing Market.  Fubo contends that "Disney and ESPN control must-have sports

channels", yet alleges only that Disney/ESPN have a ***26.8%*** share of the purported Sports

Program Licensing Market.  (¶¶ 283, 168, Fig. 5.)  A market share that low is insufficient as a

matter of law to infer market power.  *See, e.g.*, *In re Amazon.com, Inc. eBook Antitrust Litig.*,

2023 WL 6006525, at *26.  Moreover, Fubo alleges that there are four other major competitors

in the purported Sports Program Licensing Market that each have between 9.9% and 17.3%

market share.[16]  The presence of multiple competitors with similar shares in the alleged market

further supports that Disney/ESPN do not have market power.  *See In re Wireless Tel. Sys.*

*Antitrust Litig.*, 385 F. Supp. 2d 403, 417 (S.D.N.Y. 2005).

*Second*, unlike with Disney/ESPN, Fubo does not even try to allege that Hulu TV has

market power in the Sports Program Licensing Market.  Instead, Fubo alleges that "Hulu TV has

facilitated and entered into MFN agreements with *counterparties that have market power* in the

Sports Program Licensing Market" and that "Hulu TV's *majority owner Disney has market*

*power* in the Sports Program Licensing Market" as a programmer.  (¶ 309 (emphasis added).)

But pointing to these licensors' purported market power simply does not plead *Hulu TV's* market

---

[16] Fubo cannot aggregate the purported market shares of Disney, Fox and WBD to support its MFN claims
because Fubo does not allege a horizontal conspiracy between them, as explained in Section III.A, and thus
"grouping [their] market share together is inappropriate".  *Bookhouse of Stuyvesant Plaza*, 985 F. Supp. 2d at 622;
*see also In re Bookends & Beginnings LLC*, 2023 U.S. Dist. LEXIS 151757, at *75-76 (S.D.N.Y. Aug. 3, 2023).

power as a licensee in this alleged market.  Moreover, Fubo does not allege that Hulu TV itself had market power among vMVPDs in the alleged Sports Program Licensing Market, this claim would fail too.  Fubo alleges that Hulu TV has only "28% of all virtual MVPD subscribers". (¶ 127.)  To the extent that Fubo claims that Hulu TV is able to negotiate MFNs to secure the lowest price it can for its subscribers, that is procompetitive.  *See, e.g.*, *Kodak*, 504 U.S. at 477 ("[C]utting prices to increase business is 'the very essence of competition.'" (citation omitted)). The antitrust laws do not provide Fubo with a cognizable claim against its rival simply because Fubo is losing a competitive race.

### C.    Fubo Fails To Plausibly Allege Harm to Competition in the Sports Program Licensing Market.

To state its MFN claims, Fubo must plausibly allege the MFN clauses in the Disney Defendants' carriage agreements caused anticompetitive effects by pleading "actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market".  *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 208 (E.D.N.Y. Feb. 1, 2023) (granting motion to dismiss) (quoting *Am. Express*, 585 U.S. at 542).  Here, Fubo alleges that the MFN clauses in Disney's carriage agreements with YTTV and Hulu TV have "inflate[d] the prices that Fubo (and others) must pay for content and pric[ed] smaller competitors out of the market".  (¶¶ 122, 126.)  According to Fubo, Disney accomplishes this through three steps: (1) YTTV and Hulu TV[17] agree to "content prices, penetration requirements, and other economic terms" in their carriage agreements with Disney that would be "nearly impossible for Fubo to bear"; (2) in exchange for accepting these, Disney "afford[s] [YTTV] and Hulu TV MFN status in the virtual VMPD market", which prevents Disney from "offer[ing] Fubo better terms unless

---

[17] Any MFNs in Disney's carriage agreements with Hulu cannot be challenged under Section 1.  As a majority-owned subsidiary of Disney (¶ 309), Hulu is incapable of reaching an unlawful agreement with Disney under Section 1.  *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) (holding that "the coordinated activity of a parent and its wholly owned subsidiary" does not violate Section 1 because they have "a complete unity of interest" that prevents them from conspiring with one another for the purposes of Section 1); *OJ Com., LLC v. KidKraft, Inc.*, 34 F. 4th 1232, 1243 (11th Cir. 2022) (applying *Copperweld* immunity to a 57%-owned subsidiary); *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 6472656, at *10 (S.D.N.Y. Apr. 28, 2020) ("[A] non-wholly owned affiliate cannot conspire with its parent in violation of § 1 of the Sherman Act if they are jointly controlled").  Accordingly, Fubo cannot state a Section 1 claim based on agreements between Disney and Hulu TV.

[Disney] also agree[s] to offer those same terms to YTTV and Hulu TV"; and (3) Disney "enter[s] side deals with [YTTV] and Hulu TV" that give them "relief from the above-market prices". (¶¶ 129-131.)  Fubo allegedly suffers harm because its rivals get better terms and lower prices than Fubo, resulting in Fubo paying "above-market price" for Disney's content. (¶ 110.) Fubo asserts that Disney gives YTTV and Hulu TV better terms and lower prices ***not*** because YTTV and Hulu TV are allegedly two of the largest vMVPDs with millions more subscribers than Fubo and correspondingly greater leverage in negotiations with Disney.  Instead, Fubo alleges that it "will never have a better cost structure and thus cannot effectively compete on price" due to the MFNs and ███████████████████████████████ (¶¶ 120, 122, 130, 140, 144.)  In essence, Fubo's theory of harm is that, absent the MFN clauses, Disney would offer Fubo lower prices than it currently offers YTTV and Hulu TV.  That is implausible and does not support a finding of anticompetitive effects for numerous independent reasons.

*First*, Fubo's core theory of harm is that Disney charges YTTV and Hulu TV more favorable prices than it charges Fubo.  The antitrust laws do not require Disney to deal with Fubo or other vMVPDs at all, let alone give any of them Fubo's desired price.  "[T]he Sherman Act 'does not restrict the long recognized right . . . [of] an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"  *Trinko*, 540 U.S. at 408 (citation omitted).  That is because, "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing".  *Pac. Bell Tel. Co. v. linkLine Comms. Inc.*, 555 U.S. 438, 448 (2009).  Disney's independent decision to allegedly give Fubo's competitors preferential terms on price and features (*e.g.*, DVR hours and video-on-demand services), even if true, is not a cognizable antitrust claim.  Fubo's claims that ██████ ███████████████████████████████████████████████ ████████████████████████████ fail for the same reason. (¶ 140.)  Even if "it will be nearly impossible for Fubo to bear these terms economically" whereas "highly profitable conglomerates" such as YTTV and Hulu TV "can better afford these premiums" (¶ 129), the antitrust laws do not protect a competitor merely because it is too weak to compete successfully.

Instead, the antitrust laws encourage the success of the most efficient firms.

*Second*, MFN clauses are **enhancers** of competition.  It is well-established that MFNs "are standard devices by which buyers try to bargain for low prices".  *Blue Cross Blue Shield v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (Posner, J.); *see Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1110 (1st Cir. 1989) ("[A] policy of insisting on a supplier's lowest price . . . tends to further competition on the merits.").  This is precisely why MFNs are commonly demanded by buyers, like the vMVPDs here, to ensure them the same or better deal than any of their competitors receive in the market.  *See In re Amazon.com, Inc. eBook Antitrust Litig.*, 2022 WL 4581903, at *3 (S.D.N.Y. Aug. 3, 2022) ("MFNs are common devices that guarantee buyers will get the lowest prices or best terms from their suppliers").  In short, Fubo's allegations regarding the MFN clauses are inconsistent with an anticompetitive conspiracy and are instead consistent with normal competitive behavior where some buyers have greater bargaining power and can demand lower prices.  Fubo asserts that Disney includes MFNs in its carriage agreements with the largest distributors to avoid giving discounts to smaller distributors who have less leverage.  But it would be plausible that Disney would give YTTV and Hulu TV better terms and lower prices than Fubo because they have more subscribers than Fubo and thus greater leverage in negotiations with Disney.

*Third*, and relatedly, Fubo's price theory of harm also fails because it is not the type of harm the antitrust laws protect.  "[T]he antitrust laws are designed to protect competition, and not competitors, [and so] private antitrust plaintiffs must allege harm to competition in the market rather than primarily harm to themselves."  *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 479 (S.D.N.Y. 2001).  Thus, Fubo must plead that the MFNs have "had an actual adverse effect on competition as a whole in the relevant market".  *Capital Imaging*, 996 F.2d at 543.  But here, Fubo's allegations reflect that the MFNs ensure that the two largest vMVPDs, who have tens of millions of subscribers, pay lower prices.  (*See* ¶ 9.)  That Fubo allegedly pays higher license fees than these rival vMVPDs (whether that has anything to do with the MFNs or not) might disadvantage Fubo as a competitor but would not harm competition as a whole.

*Fourth*, Fubo's price increase theory of harm also fails because Fubo does not plausibly allege a causal connection between the MFNs in Disney's carriage agreements with YTTV or Hulu TV and the allegedly high prices Fubo pays for Disney's networks. Fubo's claim that YTTV and Hulu TV have the largest audiences of any vMVPDs (¶ 127) suggests that, even without MFNs, Disney would have an incentive to charge these vMVPDs more competitive rates than it charges Fubo.[18] And, Fubo clearly is willing to pay the allegedly supracompetitive prices it currently pays. Fubo fails to allege why, absent the MFNs, Disney would have offered Fubo lower prices than it offers today. Indeed, it would be economically ***irrational*** for Disney to do so. The market price is "the price at which a seller is ready and willing to sell and a buyer ready and willing to buy in the ordinary course of trade". *Bourjois, Inc. v. McGowan*, 12 F. Supp. 787, 790 (W.D.N.Y. 1935). Fubo is currently willing to pay the price Disney set because of the value of Disney's programming, and "[s]etting a high price . . . is not in itself anticompetitive". *USFL v. NFL*, 842 F.2d 1335, 1361 (2d Cir. 1988) (citation omitted). Accordingly, Fubo has failed to plausibly allege harm to competition and Counts 7, 10 and 14 should be dismissed.

## <u>CONCLUSION</u>

For the reasons stated above, Disney respectfully requests that Fubo's Complaint be dismissed, in its entirety, with prejudice.

---

[18] This argument is even more attenuated with respect to Hulu TV; Fubo does not plausibly allege that, absent MFNs in Hulu TV's carriage agreements with programmers, those programmers would give Fubo better pricing.

April 9, 2024

CRAVATH, SWAINE & MOORE LLP,

/s/ *J. Wesley Earnhardt*
Antony L. Ryan
J. Wesley Earnhardt
Yonatan Even
Michael P. Addis
Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for The Walt Disney Company, ESPN, Inc., ESPN Enterprises, Inc., and Hulu, LLC.*