**FROM UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FuboTV, Inc., and FuboTV Media, Inc.,

                              Plaintiffs,

                    v.                                  1:24-cv-01363-MMG

The Walt Disney Company, et al.,

                              Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

*Attorneys for Defendants The Walt Disney*
*Company; ESPN, Inc.; ESPN Enterprises,*
*Inc.; and Hulu, LLC.*

DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500

*Attorneys for Defendant Fox Corporation*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Attorneys for Defendant Warner Bros.*
*Discovery Inc.*

July 25, 2024

# TABLE OF CONTENTS

**Page**

I.  Preliminary Statement...................................................................................1

II. Statement of Facts......................................................................................7

    A.  Historical Context:  Evolution of the Pay TV Industry. ............................7

    B.  Recent History:  Dynamic Innovation, Market Entry and Disruption. ..........................................................................................8

    C.  Venu:  A Competitive Response to Market Disruption and Innovation. ....................................................................................12

    D.  Defendants' Industry-Standard Licensing Practices Are Not Anticompetitive..........................................................................18

    E.  Fubo's Struggle To Compete in a Dynamic Industry. .............................23

III. Legal Standards......................................................................................31

    A.  Principles of Antitrust Law. ...........................................................31

    B.  The Clayton Act Applied to Joint Ventures...............................................32

    C.  Preliminary Injunction Standards. ....................................................33

IV. Argument.............................................................................................35

    A.  Fubo Cannot Show a Likelihood of Success on the Merits. .....................35

        1.  Fubo's Proffered Markets Are Flawed. ...........................................35

        2.  Fubo Cannot Demonstrate Anticompetitive Effects. ...................41

    B.  Fubo Cannot Show Irreparable Harm. .......................................................53

        1.  Fubo's Weak Business Model Is the Source of Its Challenges. ....53

        2.  Any Harm Caused by Venu Is Legitimate Competition at Work..54

        3.  Fubo's Claimed Harms Are Unsubstantiated. .............................56

        4.  Even if Some Harm Were Attributable to Anticompetitive Effects, It Can Be Remedied by Money Damages...................................61

    C.  The Balance of the Hardships and Public Interest Do Not Favor an Injunction To Halt the JV.................................................................62

    D.  Fubo's Alternative Remedy Should Be Rejected. ...................................64

V.  Conclusion .............................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Recovery Hedge Fund v. Gaylord Container*,
   185 F. Supp. 2d 381 (S.D.N.Y. 2002)..........................................................................62

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
   181 F.3d 216 (2d Cir. 1999)................................................................................36, 40

*Addamax Corp. v. Open Software Found., Inc.*,
   152 F.3d 48 (1st Cir. 1998)................................................................................33, 52

*Am. Civil Liberties Union v. Clapper*,
   804 F.3d 617 (2d Cir. 2015)........................................................................................63

*Am. Sales Co. v. AstraZeneca AB*,
   2011 WL 1465786 (S.D.N.Y. Apr. 14, 2011)............................................................41

*Atlantic Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990)......................................................................................31, 32

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994)..........................................................................................32

*Bansavich v. McLane Co.*,
   2008 WL 4821320 (D. Conn. Oct. 31, 2008) .............................................................41

*Behrend v. Comcast Corp.*,
   2012 WL 1231794 (E.D. Pa. Apr. 12, 2012) ..............................................................38

*Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*,
   719 F.2d 42 (2d Cir. 1983)..........................................................................................34

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979)........................................................................................35

*Biddle v. Walt Disney Co.*,
   2023 WL 6453799 (N.D. Cal. Sept. 30, 2023) ...........................................................38

*Blanksteen v. N.Y. Mercantile Exch.*,
   879 F. Supp. 363 (S.D.N.Y. 1995) .............................................................................60

*Brantley v. NBCUniversal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) ...............................................................................8, 65

*British Printing & Commc'n Corp. PLC v. Harcourt Brace Jovanovich, Inc.*,
  664 F. Supp. 1519 (S.D.N.Y. 1987)................................................................59

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)..........................................................................................39

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)..................................................................................... passim

*Canaan X L.P. v. MoneyLion Inc.*,
  2024 WL 2214268 (S.D.N.Y. May 15, 2024) ...........................................59

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
  479 U.S. 104 (1986)...........................................................................31, 32, 34, 54

*ChoiceParts, LLC v. Gen. Motors Corp.*,
  203 F. Supp. 2d 905 (N.D. Ill. 2002) ............................................................64

*Commercial Data Servers, Inc. v. Int'l Bus Machs. Corp.*,
  262 F. Supp. 2d 50 (S.D.N.Y. 2003)...............................................................35

*Consolidated Gold Fields PLC v. Minorco, S.A.*,
  871 F.2d 252 (2d Cir.), *amended*, 890 F.2d 569 (2d Cir. 1989) .................60

*DeHoog v. Anheuser-Busch InBev SA/NV*,
  899 F.3d 758 (9th Cir. 2018) ..........................................................................42

*DeMartini v. Microsoft Corp.*,
  662 F. Supp. 3d 1055 (N.D. Cal. 2023) ...................................................49, 50

*Dexter 345 Inc. v. Cuomo*,
  663 F.3d 59 (2d Cir. 2011).........................................................................53, 61

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
  423 F. Supp. 2d 173 (S.D.N.Y. 2006).............................................................63

*Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*,
  436 F. Supp. 3d 754 (S.D.N.Y. 2020).............................................................36

*Fraser v. Major League Soccer L.L.C.*,
  97 F. Supp. 2d 130 (D. Mass. 2000), *aff'd,* 284 F.3d 47 (1st Cir. 2002)..............41, 44

*FTC v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004)................................................................38

*FTC v. Equitable Res., Inc.*,
  2007 WL 1500046 (W.D. Pa. May 21, 2007).................................................60

*FTC v. Peabody Energy Corp.*,
   492 F. Supp. 3d 865 (E.D. Mo. 2020)................................................................43, 45

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) .........................................................................53

*FTC v. Vyera Pharms., LLC*,
   479 F. Supp. 3d 31 (S.D.N.Y. 2020)..............................................................49

*FTC v. Warner Commc'ns Inc.*,
   742 F.2d 1156 (9th Cir. 1984) .......................................................................43

*FTC v. Whole Foods Market, Inc.*,
   548 F.3d 1028 (D.C. Cir. 2008) .....................................................................39

*Geneva Pharms. Tech. Corp. v. Barr Labs Inc.*,
   386 F.3d 485 (2d Cir. 2004)...........................................................................35

*Glaberson v. Comcast Corp.*,
   2006 WL 3762028 (E.D. Pa. Dec. 19, 2006) ................................................38

*Grand River Enter. Six Nations, Ltd. V. Pryor*,
   481 F.3d 60 (2d Cir. 2007)............................................................................34

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*,
   2019 WL 2454094 (S.D.N.Y. June 12, 2019) ...............................................58

*IME Watchdog, Inc. v. Gelardi*,
   No. 22-CV-1032-PKC-JRC, 2023 WL 6958855 (E.D.N.Y. Oct. 20, 2023) ................7

*In re German Auto. Mfrs. Antitrust Litig.*,
   497 F. Supp. 3d 745 (N.D. Cal. 2020) ..........................................................39

*In re Keurig Green Mountain Single-serve Coffee Antitrust Litig.*,
   2014 WL 12778832 (S.D.N.Y. Sept. 19, 2014)............................................61

*In re MGT Cap. Invs., Inc. Sec. Litig.*,
   2018 WL 1224945 (S.D.N.Y. Feb. 27, 2018)...............................................59

*Jacobson & Co. v. Armstrong Cork Co.*,
   416 F. Supp. 564 (S.D.N.Y. 1976), *aff'd*, 548 F.2d 438 (2d Cir. 1977)....................62

*Jayaraj v. Scappini*,
   66 F.3d 36 (2d Cir. 1995)..............................................................................61

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v.*
   *Indep. Ink, Inc.*, 547 U.S. 28 (2006) .............................................................8

*Juster Assocs. v. City of Rutland*,
  901 F.2d 266 (2d Cir. 1990)............................................................................63

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007).......................................................................................52

*Local 1159 of Counsel 4 AFSCME, AFL-CIO v. City of Bridgeport*,
  435 F. Supp. 3d 400 (D. Conn. 2020).............................................................62

*Loveridge v. Pendleton Woolen Mills, Inc.*,
  788 F.2d 914 (2d Cir. 1986)............................................................................62

*Marks v. Lainoff*,
  466 F. Supp. 301 (S.D.N.Y. 1979) ..................................................................60

*Metromedia Broad. Corp. v. MGM/UA Entm't Co.*,
  611 F. Supp. 415 (C.D. Cal. 1985) .................................................................61

*Mfrs.' Fin. Co. v. McKey*,
  294 U.S. 442 (1935).......................................................................................63

*MLW Media LLC v. World Wrestling Entertainment., Inc.*,
  2023 WL 4053802 (N.D. Cal. June 15, 2023) ................................................39

*Monocoque Diversified Interests, LLC v. Aquila Air Capital (Ireland) DAC*,
  No. 22-cv-10015 (MKV), 2023 WL 2557457 (S.D.N.Y. Mar. 17, 2023).....................7

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
  883 F.3d 32 (2d Cir. 2018)........................................................................33, 65

*N.Y. v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020)...............................................42, 45, 63

*Nat'l Bancard Corp. v. Visa U.S.A., Inc.*,
  596 F. Supp. 1231 (S.D. Fla. 1984) ................................................................43

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015)............................................................................34

*Nimbus Therapeutics, LLC v. Celgene Corp.*,
  570 F. Supp. 3d 100 (S.D.N.Y. 2021).............................................................32

*Norlin Corp. v. Rooney, Pace Inc*,
  744 F.2d 255 (2d Cir. 1984)............................................................................59

*Osawa Co. v. B & H Photo*,
  589 F. Supp. 1163 (S.D.N.Y. 1984)................................................................34

*Our Wicked Lady LLC v. Cuomo*,
   2021 WL 915033 (S.D.N.Y. Mar. 9, 2021) ...............................................................61

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
   555 U.S. 438 (2009) ....................................................................................32, 47, 48, 65

*Paladin Assocs., Inc. v. Montana Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) ...................................................................................42

*Pepsico, Inc. v. Coca-Cola Co.*,
   114 F. Supp. 2d 243 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002) ................36

*PepsiCo, Inc. v. Coca-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002) .......................................................................................38

*Polymer Tech. Corp. v. Mimran*,
   37 F.3d 74 (2d Cir. 1994) ...........................................................................................62

*Re-Alco Indus., Inc. v. Nat'l. Ctr for Health Ed., Inc.*,
   812 F. Supp. 387 (S.D.N.Y. 1993) .............................................................................35

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
   971 F.2d 37 (7th Cir. 1992) ........................................................................................42

*Sampson v. Murray*,
   415 U.S. 61 (1974).......................................................................................................61

*SEC v. Citigroup Global Mkts. Inc.*,
   673 F.3d 158 (2d Cir. 2012)........................................................................................62

*Sprint Nextel Corp. v. AT & T Inc.*,
   821 F. Supp. 2d 308 (D.D.C. 2011) ...........................................................................50

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*,
   8 F.4th 479 (6th Cir. 2021) ...................................................................................61, 64

*Staley v. Gilead Scis., Inc.*,
   446 F. Supp. 3d 578 (N.D. Cal. 2020) .......................................................................52

*Starbucks Corp. v. McKinney*,
   144 S. Ct. 1570 (2024).........................................................................................33, 34

*Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*,
   906 F. Supp. 2d 202 (S.D.N.Y. 2012)........................................................................59

*Stellar Beach Rentals, LLC v. Redstone Advance, Inc.*,
   No. 23-CV-955 (VSB), 2023 WL 4421809 (S.D.N.Y. July 8, 2023)...........................7

*Students for Fair Admissions v. U. S. Military. Acad. At W. Point*,
  2024 WL 36026 (S.D.N.Y. Jan. 3, 2024) ............................................................34, 65

*Sure Fit Home Products, LLC v. Maytex Mills, Inc.*,
  2022 WL 3594578 (S.D.N.Y. Aug. 23, 2022), *vacated on other grounds*, 2023
  WL 3834470 (S.D.N.Y. May 16, 2023) ................................................................63

*Time Warner Cable Inc. v. FCC*,
  729 F.3d 137 (2d Cir. 2013) ................................................................................50

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
  60 F.3d 27 (2d Cir. 1995) ..................................................................53, 59, 61

*TomGal LLC v. Castano*,
  2022 WL 17822717 (S.D.N.Y. Dec. 19, 2022) ......................................................63

*Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n*,
  641 F. Supp. 1179 (S.D.N.Y. 1986) ....................................................................65

*Triebwasser Katz v. American Tel.& Tel. Co.*,
  535 F.2d 1356 (2d Cir. 1976) ..............................................................................64

*Trump v. Deutsche Bank AG*,
  943 F.3d 627 (2019) ............................................................................................34

*Tucker Anthony Realty Corp. v. Schlesinger*,
  888 F.2d 969 (2d Cir. 1989) ................................................................................58

*United States v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S.
  Ct. 2274 (2018) ....................................................................................................35

*United States. v. AT & T Inc.*,
  310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).........38, 51

*United States v. Columbia Pictures Indus., Inc.*,
  507 F.Supp. 412 (S.D.N.Y. 1980) ..................................................................43, 49

*United States v. E. I. Du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) ............................................................................................36

*United States v. Ivaco, Inc.*,
  704 F.Supp. 1409 (W.D. Mich. 1989) ..................................................................43

*United States v. Microsoft Corp.*,
  253 F.3d 35 (D.C. Cir. 2001) (en banc) ..............................................................53

*United States v. Paramount Pictures, Inc.*
    334 U.S. 131 (1948)............................................................................49, 64

*United States v. Penn-Olin Chem. Co.*,
    378 U.S. 158 (1964)..................................................................33, 35, 42, 44

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963)............................................................................42

*Vantico Holdings S.A. v. Apollo Mgmt., LP*,
    247 F. Supp. 2d 437 (S.D.N.Y. 2003)........................................................33

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..................................................................32, 47, 65

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................34

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ................................................................61

*Yamaha Motor Co. v. FTC*,
    657 F.2d 971 (8th Cir. 1981) ................................................................43

**Statutes & Rules**

15 U.S.C. § 18..................................................................................32, 35

15 U.S.C. § 26..................................................................................34

Administrative Procedure Act..................................................................50

Clayton Act ..............................................................................passim

Sherman Act..................................................................................33, 47

**Other Authorities**

Federal Trade Comm'n & U.S. Dep't of Justice, *Antitrust Guidelines for
    Collaborations Among Competitors* (Apr. 2000) ...................................33, 52

Federal Trade Comm'n & U.S. Dep't of Justice, Merger Guidelines (2023)...................42

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF
    ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶100a (2024)................................31

| TABLE OF TERMS | |
|---|---|
| **Entities** | |
| Disney or TWDC | The Walt Disney Company; ESPN, Inc.; ESPN Enterprises, Inc. |
| ESPN | ESPN, Inc.; ESPN Enterprises, Inc. |
| Fox | Fox Corporation |
| Fubo | FuboTV, Inc.; fuboTV Media, Inc. |
| WBD | Warner Bros. Discovery, Inc. |
| **Docket Items** | |
| Motion | Motion for Preliminary Injunction (Dkt. 76) |
| **Government Agencies** | |
| DOJ | Department of Justice |
| FTC | Federal Trade Commission |
| **Sports Leagues** | |
| MLB | Major League Baseball |
| MLS | Major League Soccer |
| NBA | National Basketball Association |
| NFL | National Football League |
| NHL | National Hockey League |
| UEFA | Union of European Football Associations |
| **Streaming Terms** | |
| DTC | Direct-to-Consumer |
| FAST Service | Free Advertising Supported Television Service |
| vMVPD | Virtual Multi-Channel Video Programming Distributor |
| MVPD | Traditional Multi-Channel Video Programming Distributor and Virtual Multi-Channel Video Programming Distributor |
| Traditional MVPD | Multi-Channel Video Programming Distributor |
| Raptor | A deal name the Joint Venture Members used to refer to Venu |
| RSN | Regional Sports Network |
| SVOD | Subscription Video on Demand Service |
| Venu, Joint Venture or JV | Streaming joint venture involving The Walt Disney Company; ESPN, Inc.; ESPN Enterprises, Inc.; Warner Bros. Discovery, Inc. and Fox Corporation |
| **Witnesses** | |
| *Fubo* | |
| David Gandler | Chief Executive Officer |
| John Janedis | Chief Finance Officer |
| Alberto Horihuela | Chief Operating Officer |
| Todd Mathers | Senior Vice President (Content Strategy and Acquisition) |

| TABLE OF TERMS | |
|---|---|
| Ben Grad | Senior Vice President (Head of Strategic Partnerships and Operations) |
| Salvatore Marchesano | Vice President (Content Strategy and Acquisition) |
| Ameet Padte | Vice President (Financial Planning Analysis, Corporate Development and Investor Relations) |
| *Fox* | |
| John Nallen | Chief Operating Officer |
| David Espinosa | President of Distribution |
| Eric Shanks | CEO and Executive Producer of Fox Sports |
| Disney | |
| Robert Iger | Chief Executive Officer |
| James Pitaro | Chairman of ESPN |
| Justin Connolly | President of Platform Distribution |
| Justin Warbrooke | Head of Corporate Development |
| *WBD* | |
| Dan Fox | Executive Vice President Corporate Development |
| Scott Miller | President of Networks and Streaming Distribution |
| Bruce Campbell | Chief Revenue and Strategy Officer |
| *Other Witnesses* | |
| Anthony Petitti | Commissioner, Big Ten Conference |
| Gary Schanman | Executive Vice President and Group President, Video Services, EchoStar |
| Robert Thun | Chief Content Officer, Direct TV |
| Peter Distad | Chief Executive Officer – Designate, Venu |

## I.    PRELIMINARY STATEMENT

The antitrust laws protect "competition[,] not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).  Fubo's Motion turns that bedrock principle on its head.  If granted, it would shield Fubo ***from*** competition—by blocking a new competitor with an innovative new product from entering the market.  That might benefit Fubo, but it would harm consumers.  Sports fans would be deprived of a new, lower-cost option for watching games; innovation would be thwarted; and output would be suppressed.  ***Competition*** would be hindered.  The antitrust laws do not countenance that outcome.

Fubo hopes to throttle competition because it is (and always has been) a weak competitor. It adds little value to the TV ecosystem.  Unlike traditional cable and satellite companies, Fubo did not invest billions of dollars to build infrastructure to deliver content to homes; it uses the Internet through broadband connections built and supplied by others.  Unlike other vMVPDs, such as YouTube TV and Hulu, Fubo did not spend billions of dollars to develop the scale, complementary products, brand name and consumer following necessary to disrupt traditional cable and satellite companies.  And unlike Defendants and other programmers, Fubo did not risk billions of dollars to acquire unique content and then billions more to turn that content into attractive programming.  Fubo thus remains an undercapitalized startup with minimal differentiation that acts as a middleman aggregator of content that other companies make possible.  Because Fubo does nothing different or better than other companies, it has long struggled to stay afloat in a highly competitive market.  That is not anticompetitive; to the contrary, that ***is*** competition.

Defendants seek to compete on the merits.  Their joint venture, Venu, is an innovative and bold attempt to stem the trend of "cord cutting"—subscribers leaving the linear TV ecosystem in favor of streaming video on demand ("SVOD") services like Netflix, Prime and many others.  To that end, Defendants developed a vMVPD designed to offer "cord cutters" and "cord nevers" (people who have never subscribed to linear TV) a lower-cost, sports-centric alternative that carries, ***on a non-exclusive basis***, Defendants' networks that contain live sports.

Like any other distributor, Venu will pay market rates to license those networks from Defendants.  Defendants will continue to license the very same networks to Venu's many competitors, including Fubo, pursuant to heavily negotiated carriage agreements.  Other programmers—such as CBS and NBC—can offer "skinny" services similar to Venu; consumers can create their own "skinny" services by cobbling together various SVODs (including SVODs already offered by CBS and NBC); Disney itself plans to offer a forthcoming direct-to-consumer service, ESPN Flagship, that will offer some of the same Disney networks and events as Venu; and traditional MVPDs and vMVPDs, if they so desire, can negotiate with programmers for skinnier bundles than they offer to consumers today.

Notwithstanding Fubo's many references to "consolidation" or even "collusion", Venu's launch will not shut down, foreclose or stifle any distribution option.  Nothing will be eliminated.  To the contrary, market concentration will decrease because Venu will add a new distribution competitor to an already dynamic market.  Courts and antitrust authorities recognize as ***procompetitive*** joint ventures like Venu that enable products that would not exist but for the members' collaboration.  Case in point, Fubo could not offer a Venu-like service—and importantly, Fubo could not offer it even if Fubo had requested and obtained from each Defendant an identical license to Venu's, because Fubo's multitude of contracts with non-defendant programmers like NBC, CBS and Hallmark prevent Fubo from doing so.

Enjoining an innovative new product like Venu would be particularly ill-advised while the Pay TV market is in the midst of a dynamic transformation.  Broadband and cellular technologies are increasingly replacing cable and satellite as the go-to means for delivering content.  As a result, traditional MVPDs (*e.g.*, Comcast, Charter, Verizon FiOS, DirecTV, EchoStar/DISH) face stiff competition both from vMVPDs (*e.g.*, YouTube TV, Hulu + Live TV, Fubo) and even newer types of Internet-based entrants, such as SVODs (*e.g.*, Netflix, Apple TV+, Amazon Prime) and DTC offerings (*e.g.*, NFL+, NBA League Pass).  That explosion of competition has led to market fragmentation and unprecedented consumer choice.

In response to that dynamic market, Defendants conceived Venu.  Defendants believe

they have identified a potential gap in the market between the traditional everything-you-could-want-for-a-household offerings of traditional MVPDs and vMVPDs, and the various narrow offerings of SVODs and DTCs.

Venu will offer less sports content than traditional MVPDs and vMVPDs but more sports content than any SVOD or DTC service offers on its own. It will cost less than many traditional MVPDs and vMVPDS, but more than any single SVOD or DTC service. Venu will attempt to compete by offering a niche product that sports fans among the "cord cutters" and "cord nevers" will want to buy, bringing them back into the fold of the linear TV ecosystem.

Consistent with the *Antitrust Guidelines for Collaboration Among Competitors*, issued jointly by the U.S. DOJ and the FTC, Venu is structured to maintain and protect competition among its members. Each JV member will continue to negotiate individually with leagues to acquire sports rights; Venu will not acquire sports rights itself. Each member will continue individually to negotiate carriage agreements for its networks with Venu and other distributors; Venu will have no exclusive content, no say in how its members license their content to others, and no right to license its content to other MVPDs. A firewall prevents sharing of competitively sensitive information. Venu is finite, with a nine-year term. Fubo points to ***no case*** where a joint venture with characteristics like these has been enjoined as violating antitrust laws.

Put simply, Venu is procompetitive. Fubo can show neither a likelihood of success on the merits nor any imminent, irreparable anticompetitive harm. Each of Fubo's arguments fail.

***Fubo's market definitions are flawed.*** Fubo's claimed "upstream" Sports Programming Licensing market fails because there is no evidence that MVPDs view programmers' sports networks as substitutes for each other. Most MVPDs seek to license from all the major programmers. At the same time, Fubo's claimed "downstream" markets—the "Streaming Live Pay TV Market" and "Skinny Sports Bundle Market"—are far too narrow. It is undisputed that Venu will focus on attracting "cord cutters" and "cord nevers". Fubo's exclusion of those consumers (and the SVODs to which they subscribe) from its analysis of relevant competitive dynamics defies antitrust principles and common sense. Moreover, every Fubo witness has

admitted that Fubo competes with traditional MVPDs, not just vMVPDs, refuting any separate "***Streaming*** Live Pay TV Market". Each also views Venu as Fubo's competitor, refuting the existence of a "Skinny Sports Bundle Market". The evidence confirms that MVPDs, SVODs and DTCs all compete in a dynamic and thriving Pay TV Market. (*Infra* § IV.A.1.)

> ***Fubo cannot show market consolidation, no matter how the markets are defined.*** Venu is a joint venture, not a merger. Venu adds a new competitor, whereas a merger would eliminate one or more. Thus, Fubo's authorities and arguments from the merger context are inapposite. Yet, Fubo and its expert baldly insist on analyzing Venu as if it were a merger—and moreover, as a merger of Defendants' *licensing* activities, which are separate from Venu. That flaw, alone, is a basis to deny Fubo's Motion. (*Infra* § IV.A.2.a.)

> ***Fubo cannot show harm to competition in any downstream market.*** Fubo's alleged harms to the downstream "Streaming Live Pay TV" and/or "Skinny Sports Bundle" markets fail.

> ***First***, Defendants will not license networks to Venu on terms they have refused other distributors. Defendants do ***not*** have a policy of forcing unwanted non-sports networks on distributors as a condition for obtaining access to their sports networks. For instance, for many years Fubo licensed ***only*** WBD's ***non-sports*** networks, choosing ***not*** to take WBD's ***sports networks***. Fubo specifically demanded the Fox News Network, Fubo's second most-watched channels, and never sought a sports only package from Fox. And while Fubo has never asked Disney for a sports-only license, Disney ***has*** offered sports-centric packages to ***other*** distributors. Fubo is simply wrong about Defendants' licensing practices. (*Infra* § IV.A.2.b.i.)

> ***Second***, the terms on which Venu licenses content from Defendants do not foreclose competition from existing MVPDs, nor do they prevent rivals (such as CBS and NBC) from introducing their own skinny sports bundles. (*Infra* § IV.A.2.b.ii.)

> ***Third***, even if Defendants did provide Venu with licensing terms they have denied to others, that would not be an antitrust problem. The Supreme Court has made clear that Defendants are under no obligation to license their networks at all, let alone on terms preferred by distributors. (*Infra* § IV.A.2.b.iii.)

**Fourth**, the major premise of Fubo's Motion is flawed because Fubo could not offer a skinny sports offering even if each Defendant granted Fubo a license to do so. Fubo has licensed myriad non-sports networks from numerous programmers not involved in this litigation and, in most of those cases, it has agreed to distribute those networks to all of Fubo's subscribers. Fubo is required to distribute the following non-sports networks from non-defendants to 100% of its subscribers: Bravo, CNBC, E!, MSNBC, Oxygen, Syfy, Universal Kids, Smithsonian Channel, Pop, Dabl, StartTV, Hallmark Channel, Hallmark Movies and Mysteries, Hallmark Drama, Charge!, TBD and The Nest. Thus Fubo's inability to offer a Venu-like service is the result of its contracts with other parties—not the Defendants' decision to increase consumer choice by offering Venu as a new product in a highly competitive marketplace. (*Infra* § II.E.)

_**Fubo cannot show harm to competition in any upstream market.**_ Fubo argues that Defendants, as licensors of content, will harm competition in the upstream "Sports Programming Licensing Market" once Venu is launched. Those arguments all fail.

**First**, Defendants have no plan to disadvantage MVPDs during future licensing negotiations. Fubo has access to reams of documents from all three Defendants. It has seen numerous long-range plans and financial models. Yet it can present no evidence that Defendants plan to change their licensing practices after Venu's launch. None. (*Infra* § IV.A.2.c.i.)

**Second**, Defendants have no incentive to disadvantage other MVPDs after Venu's launch. Each Defendant will continue licensing its own networks, independently, to MVPDs, and each Defendant stands to earn more (or, in the case of Disney, roughly the same) total revenue from each MVPD subscriber than they will earn from each Venu subscriber. Thus, Defendants have no incentive to cause subscribers to migrate from MVPDs like Fubo to Venu. Venu benefits Defendants only to the extent it encourages "cord cutters" and "cord nevers", who currently are not MVPDs subscribers, to enter the market. (*Infra* § IV.A.2.c.ii.)

**Third**, even if Defendants had an incentive to disadvantage rival MVPDs (and they do not), long-term carriage agreements prevent Defendants from doing so. For example, Disney's carriage agreement with Fubo does not expire until 2027. The price Fubo will pay for Disney's

networks is locked in until that agreement expires. As a result, if Disney raised its prices on other MVPDs, Fubo would ***benefit***, as any subscribers leaving those other MVPDs could be diverted to Fubo, whose pricing would be stable. Other MVPDs with long-term carriage agreements enjoy the same protections. Yet, to obtain a preliminary injunction, Fubo must establish ***imminent*** irreparable harm. That mismatch is fatal. (*Infra* § IV.A.2.c.iii.)

 ***<u>No Irreparable Harm.</u>*** Fubo cannot show that the threat of competing with Venu will amount to irreparable harm. Fubo's business has long been in decline. Fubo faced its theories of harm—loss of customers, insolvency, and stock decline—before Venu was announced. Indeed, Fubo's stock declined from $62 to $2.42, an approximately 97% fall, ***before*** the February 6, 2024, announcement of Venu. And discovery has shown that Fubo contemplated litigation against other programmers long before hearing of Venu. Venu is a convenient excuse for an expedited proceeding. A preexisting harm unrelated to the claimed antitrust violation cannot be irreparable harm for purposes of an injunction. (*Infra* § IV.B.)

 ***<u>Balance of Hardships and Public Interest.</u>*** Vigorous competition, which is all Fubo can show, is no hardship. By contrast, Defendants would face significant hardship were a venture—in which they have invested more than a year negotiating, planning and building, at the costs of tens of millions of dollars—enjoined. Venu is important to their ability to compete in a competitive and dynamic market. And an injunction here would affirmatively harm the public interest by denying consumers a new product and insulating Fubo from competition. (*Infra* § IV.C.)

 ***<u>Fubo's "Alternative Remedy" Should Be Rejected.</u>*** In perhaps the clearest indication that Fubo seeks to interfere with competition, Fubo asks the Court not to maintain the status quo, but to compel Defendants to enter into different, non-negotiated contracts with Fubo—unrelated to Venu—on terms that Fubo prefers after the fact. Antitrust law may not be used to rewrite freely-negotiated contracts for parties who fear competition. Fubo's agreements reflect a balance between carriage and price commitments, and the Court should not relieve Fubo from its carriage commitments any more than it should relieve it of its commitments to pay Disney and Fox the

bundled price Fubo negotiated.  (*Infra* § IV.D.)

## II.    <u>STATEMENT OF FACTS</u>[1]

### A.  Historical Context:  Evolution of the Pay TV Industry.

The parties here participate in a dynamic Pay TV ecosystem in which numerous players interact in an increasingly competitive market to create, package and distribute linear television.

Traditionally, studios and sports leagues licensed content for a term of years to programmers.  (Desser ¶28.)[2]  Programmers added value by combining that content with programmer-produced content and packaging it all into linear channels, which they licensed to MVPDs.  (Desser ¶¶30, 32; Whinston[3] ¶49; Orszag[4] ¶32; Trautman[5] ¶8.)  MVPDs, in turn, packaged the licensed channels from multiple programmers to create subscription offerings, which they marketed to end-subscribers—with programmers receiving a per-subscriber "affiliate fee".  (Desser ¶¶37, 32.)  For decades, traditional MVPDs provided their subscription offerings via cable (*e.g.*, Comcast Xfinity, Cox Communications and Charter's Spectrum) or satellite (*e.g.*, DirecTV and DISH Network).  (Desser ¶37.)  Traditional MVPDs added significant value by investing billions of dollars in infrastructure in cable wire and satellite networks, which, along with set-top equipment, enabled content to reach subscribers' homes.  (*See, e.g.*, Desser ¶37: ███

███████

---

[1] Defendants respectfully submit the Declaration of J. Wesley Earnhardt and the exhibits attached thereto, together with the testimony and documents to be presented at the preliminary injunction hearing, in opposition to Plaintiff's motion for preliminary injunction.  *See Monocoque Diversified Interests, LLC v. Aquila Air Capital (Ireland) DAC*, No. 22-cv-10015 (MKV), 2023 WL 2557457, at *1 n.1 (S.D.N.Y. Mar. 17, 2023) (relying on evidentiary hearing as well as "the affidavits and exhibits the parties submitted, after taking discovery, as exhibits in support of their briefs"); *Stellar Beach Rentals, LLC v. Redstone Advance, Inc.*, No. 23-CV-955 (VSB), 2023 WL 4421809, at *1 (S.D.N.Y. July 8, 2023) (similar); *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032-PKC-JRC, 2023 WL 6958855, at *1 (E.D.N.Y. Oct. 20, 2023) (similar).

[2] Edwin Desser is Defendants' industry expert.  His report is cited as "Desser" (Ex. 133).

[3] Michael Whinston, Ph.D., is Defendants' economic expert.  His report is cited as "Whinston" (Ex. 134).

[4] Jonathan Orszag is Fubo's economic expert.  His updated report is referred to as "Orszag". (Ex. 140.)

[5] James Trautman is Plaintiff's industry expert.  His report is cited as "Trautman".  (Ex. 139.)

It was in the context of this ecosystem that the industry-standard practice of bundling channels emerged.  (Desser ¶40.)  Programmers bundled channels in license agreements at group discounted rates, and traditional MVPDs bundled channels in packaged offerings to subscribers. In the past, a particular household would purchase cable or satellite service from a traditional MVPD, which would reach that household by going through the expensive process of laying cable or installing a satellite dish.  (*Id.* ¶37.)  That traditional MVPD would then bundle channels into subscription offerings for end consumers.  (*Id.* ¶40.)  Bundling benefitted subscribers by providing access to a variety of content to meet the varied preferences of a household, simplifying the purchase process and lowering the cost.  (*Id.* ¶¶41-44.)  Traditional MVPDs benefitted from bundling at discounted rates from programmers lowering the overall licensing cost of individual networks.  (*Id.* ¶¶45-46.)  Bundling also benefitted programmers, who sought to maximize distribution of their networks.  (*Id.* ¶¶35, 41, 45.)  And content creators benefitted from bundling up and down the distribution chain because it allowed them to draw the most viewers for their content.  (*Id.* ¶¶32, 45.)  By spreading the costs and risks of individual channels across the bundled offering and simplifying the marketing process, bundling across the Pay TV ecosystem advanced the interests of all participants and paved the way for the content explosion that subscribers take for granted today.  (*Id.* ¶¶41, 44.)

Courts have reviewed bundling and long recognized that "[b]uyers often find package sales attractive" and that offering such packages may be a sign of a competitive market. *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).  Over a decade ago, in *Brantley v. NBCUniversal, Inc.*, a case involving nearly every participant in the Pay TV ecosystem, the Ninth Circuit examined bundling and held that it was "fully consistent with a free, competitive market".  675 F.3d 1192, 1202 (9th Cir. 2012).  Since then, the market has only become more competitive and dynamic, with numerous new entrants and formats becoming available.

### B.  Recent History:  Dynamic Innovation, Market Entry and Disruption.

Over the past decade, the Internet has transformed Pay TV.  (Trautman ¶2.)  Distributing

content over the Internet, rather than over the cost-intensive, specific-to-Pay-TV infrastructure built and maintained by traditional MVPDs, has led to flourishing competition, and an alphabet soup of innovative new offerings competing with traditional MVPDs.

**Virtual MVPDs (vMVPDs)**.  vMVPDs deliver the same linear networks to consumers as traditional MVPDs but do so over the Internet.  vMVPDs include YouTube TV, Hulu + Live TV, Sling, DirecTV Stream and Fubo.  (Desser ¶¶30, 51.)



**Subscription Video on Demand (SVODs) and Direct-to-Consumer (DTC) Platforms**.  A primary reason for "cord cutting" is the rise of SVOD and DTC platforms as competitive alternatives.  SVODs include Netflix, Apple TV+, Amazon Prime Video and Hulu.  SVODs traditionally offered consumers on-demand (as opposed to linear) content streamed over the Internet.  (Desser ¶56.)  SVOD subscriptions have exploded in recent years, with many households subscribing to multiple services.  (Desser ¶¶56, 67; Trautman ¶30.)  Similar to SVODs, DTC platforms provide a means for rights owners or content creators to stream their content to consumers outside the traditional MVPD ecosystem.  (Desser ¶56.)[6]  For simplicity, we refer herein to SVODs and DTC platforms collectively as "SVODs".

SVODs and other DTC services increasingly carry live programming, including exclusive rights to popular sporting events.  For example:  In 2021, Amazon Prime Video

---

[6] The lines between SVOD and DTC are blurry.  For example, Peacock is a Comcast-owned SVOD, but it also offers much of NBC's linear content.  (Desser ¶63; Whinston ¶67.)  Other programmer-owned SVODs include Disney+ (owned by Disney), Paramount+ (owned by the parent of CBS/Viacom), Max (owned by WBD) and Fox Nation (owned by Fox).  (Desser ¶63.)

announced an 11-year agreement to stream NFL Thursday Night Football for $1 billion per year; in May 2024, Netflix announced it will exclusively stream two NFL games on Christmas Day from 2024 through 2026; Apple TV+ has offered MLB's Friday Night Baseball since 2022, and MLS matches since 2023; Roku secured exclusive rights for MLB's Sunday Leadoff live games in 2024; and Amazon has bid on NBA broadcasting rights.  (*See* Desser ¶73; Ex. 4 (Article: *Many possibilities for NBA rights as market opens*));  ██████████████████████████

██████████████████████████████████████████████████████████

████████████████████

Many sports leagues self-distribute content through DTC platforms, bypassing programmers and distributors altogether.  Such offerings include:  NBA League Pass, MLB.TV, NFL+, NHL.TV and F1 TV.  (Desser ¶85.)  And RSNs, which broadcast sports content available within a particular geographic area, also have begun distributing their content DTC.  For example, the YES Network offers a DTC service covering New York Yankees, Brooklyn Nets and New York Liberty games ██████████████████████████

████████████████  YES and MSG announced that they will "partner[] to create a joint venture that will offer streaming services to third parties called GAME", delivered directly to consumers.  (*See* Ex. 9 (Article: *YES, MSG partner for new GAME streaming offering.*)

**Free advertising supported television ("FAST") services.**  Consumers are also increasingly able to access both live and on-demand programming free of charge, without any paid subscription, on FAST apps.  (Desser ¶50.)  FAST platforms include Pluto TV (owned by Paramount), Tubi (owned by Fox), Freevee (owned by Amazon) and The Roku Channel. (Desser ¶64.)  Some FAST services offer live sports content; Roku, for example, distributes a package of MLB games for free.  (Desser ¶64.)

**Market Dynamism.**  While MVPD subscribers (including vMVPDs) declined by more than 26% from 2015 to 2023, SVOD subscribers increased by more than 430%.  (Desser ¶56.) As of 2023, of the 128 million U.S. households, approximately 60% are MVPD subscribers, 28% are cord cutters, and 12% are cord nevers.  (Desser ¶57.)

The rise of SVODs and other streaming platforms has dramatically increased competition. For example, SVODs are now competing for exclusive sports rights, and the cost to license sports rights from sports leagues has skyrocketed. (Desser ¶¶50, 83–86; Trautman ¶21.) Sports leagues have recognized this increase in competition. (*See* Ex. 135 (Petitti Decl.) ¶14 ("Given the increased number of programmers, the industry has recently seen intense interest in athletics content from a greater number of bidders. This has resulted in financially competitive bids for available sporting events and sports-related content.").) ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████ █████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ The recent bidding for the exclusive rights to NBA games is illustrative: NBA games in the 2025–2035 period are expected to cost ***$6.9 billion annually***, a ***1,027%*** increase over the 1998–2001 period. (Whinston ¶46.)

The disruptive pressure of SVODs forced network programmers to innovate. Many have launched their own SVODs to reach cord cutters and cord nevers. ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████ As subscribers are faced with an increasing number of options offered by various traditional MVPDs, vMVPDs, SVODs and DTCs, customers are also becoming increasingly frustrated with content fragmentation. ████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████

████████████████████████████████████████████████████

███████

**C.  Venu:  A Competitive Response to Market Disruption and Innovation.**

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████  █████████████████████████████

█████████████████████████████████████████████

███████████████ Big Ten commissioner, Anthony Petitti, confirms the benefit of the JV to

leagues and consumers, agreeing that it is in the interest of the "Conference, its member

institutions, and sports fans of those institutions" to have "an additional method for the public to

access Conference content".  (Ex. 135 ¶¶16, 17.)

   *Conception and Negotiations.*  ███████████████████████████

██████████████████████████████████████████████████████

███████████████████████████)  ████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████  ███████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████

███████████  ████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████   ████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████ ▌

On February 6, 2024, Disney, Fox and WBD ████████████████████████

announced the new sports-centric JV. ██████████████████████████████ Ex. 20

(Raptor Press Release).) The JV, since named Venu Sports, will offer subscribers 14 linear

networks offering a mix of sports and general entertainment, along with DTC service ESPN+,

digital companion services SEC Plus and ACC Network Extra, and the base tier of the

forthcoming ESPN Flagship.[8] ████████

*Non-Exclusive Content.* No content on Venu will be exclusive. Each member will

continue to license the same channels to MVPDs. ████████████████████████

████████████████████████████████████████████

*Financial and Operational Terms.* ████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██   █████████████████████████████████████████████████

██████████████████████████████████████████████

███████████   ████████████████████████████████

██████████████████████████   ████████████████████

████████████████████████████████████████████   █████████

---

[7] ████████████████████████████████████████████████
[8] The Disney networks in Venu are ABC, ESPN, ESPN2, ESPNU, ESPNews, SEC Network and
ACC Network. The Fox networks included are Fox, FS1, FS2 and Big Ten Network. And the
WBD networks are TNT, TBS and TruTV.

Venu's members will continue to negotiate licenses individually with sports rightsholders.

██████████████████████████████████████████

████████████████████████████████ because there is no merging of any

member assets, the JV can be unwound relatively easily at any time.

     ***Competitive Positioning.***  Venu is designed to target sports fans among cord cutters and

cord nevers who are not subscribers to linear television. ██████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

     Venu will increase consumer choice. ████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████

     ██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████  █████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████  ████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

YouTube TV had eight million at the end of 2023.  (Desser Fig. 11.)

     ***No Incentive To Divert Subscribers from MVPDs to Venu.*** ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

Cannibalization estimates in this case vary widely.  Venu will be cheaper than other MVPD offerings, but does not provide the wider variety of programming of the larger bundle—for sports or other programming—that many households prefer.  According to Fubo's allegations, Venu will include approximately 54% of national sports content available to viewers (Mot. at 19); Fubo and other MVPDs, by contrast, broadcast far more—closer to 100% of sports content.  (*See* Whinston Fig. 17; ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████  Venu will not include a number of the most-watched games, including Sunday Night Football (the highest rated primetime program in 2023), Thursday Night Football (the third-highest-rated primetime program in 2023), and half of the Sunday afternoon NFL games.  (Desser ¶100(a)–(c); ██████████████  Likewise, Venu will not include RSNs.  (Desser ¶100(e).)  Venu also lacks certain popular soccer games, as well as the Olympics.  (Desser ¶100(f)–(g).)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

Thus, contrary to Fubo's claims, the JV members have no incentive to divert subscribers to Venu by raising prices on distributors or any other means. Defendants are taking a risk by way of significant expenditure to expand the Pay TV ecosystem and have every incentive to do so with minimal harm to the existing players. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ Carriage agreements set the rates that the distributor will pay to the licensor during

the term of the agreement, and they typically span many years. ████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████ ██████████████████████████████████████████

██████████████████████████████████████████████████

████████████████ ███████████████████████████████████████

████████████████████████████████████████████████████

██████████ ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████ ██████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ █████████████████████████

████████████████████████████████████████████████

████████████████████

**D. Defendants' Industry-Standard Licensing Practices Are Not Anticompetitive.**

Fubo claims that Defendants' joint venture is "anticompetitive" because they agreed to

license to Venu their networks with live sports content—without also requiring Venu to license

networks without live sports.  Fubo claims that Defendants have refused to provide similar terms to Fubo or any other MVPDs.  Although the antitrust laws in no way require uniformity in licensing practices, the evidence will establish that Fubo's claims about Defendants' licensing practices are simply not true.

**Disney.**  Disney does not require distributors to license its general entertainment and family networks to be able to license its networks with live sports content ███████████ ████████████████████████████████████████████████████████████ ████

Historically, distributors preferred to license Disney's full suite of networks because they sought a diverse array of content to appeal to households.  (*See, e.g.*, Desser ¶¶45–47.) ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████

Historically, Disney also preferred distributors to license its channels on a portfolio basis. Disney wants as many people as possible to have access to as many of Disney's networks as possible. ████████████████████████████████ █████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████





- 

- 

**WBD.**  While WBD generally prefers to license all of its networks, WBD does not *require* bundling of its networks with only non-sports content with its networks that include live sports.  Indeed, Fubo has not brought a tying claim against WBD.



---

[11]



***Fox.***  Distributors have not been forced to take Fox's non-sports networks to access Fox's networks with sports content.

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

**E. Fubo's Struggle To Compete in a Dynamic Industry.**

*Fubo's Strategy To Carry Sports and Non-Sports Content.*  Although Fubo has claimed in this proceeding that it wants to offer a sports-centric bundle like Venu, Fubo's actions and ordinary-course documents belie that allegation.

███████████████████████████████████████

███████████████████   █████████████████████████████

████████████████████████████████████████

██████████████████████████████   ████████████████████

███████████████████████████████████████

████████████████████████████████████████

███

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████   Fubo licenses the YES Network, for example, which provides subscribers in the New York area more than 100 Yankees games per year. █████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████   ████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████

███████████████████████████████

    The RSNs provide a competitive advantage to Fubo, but they also increase the price of its

bundle. █████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

                        ███████████████████████████████████████

████████████████████████████████████████████ )     ██████

███████████████████████████████████████████████████

██████████████████████████████

                        ████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████

    In marked contrast to Fubo's allegation that non-sports networks are worthless and that

Fubo licenses them only to obtain sports channels, Fubo licenses general entertainment and news

networks from programmers *that offer no sports content whatsoever*.   ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████ )  ████████████████████████████████████████

24

████████████████████████████████████████████████████████

████████████████████    Likewise, Fubo licenses the Hallmark channels from Crown Media,

which has no sports content at all, ████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████    ████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

        ██████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

***Fubo Has Always Sought Disney's Non-Sports Networks.*** Fubo operated for five years without any Disney programming.  ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

In 2023, Fubo negotiated a renewal of its Disney carriage agreement. ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████

***Fubo No Longer Carries the WBD Networks.*** ██████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████  ████████

███████████████████████████████████████████████████████

---



████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████ )  ████████████████████████████████████████████████

█ )  ████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████

        ███████████████████████████████████████████████████

████████████████████  ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████  █████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████  Fubo then dropped all WBD networks.

*Fubo's Agreements with Fox Include High-Value News Content.*  ██████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████  In 2016, Fubo asked Fox to be among its first content

partners.  █████████████████████████████████████████████

████████████████████████████  ████████████████████████████████

███████████████████████  ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Some, like FS1, feature live sports.  Others, like Fox News Channel, feature only news content.

████████████████████████████████████████████

        ███████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████   █████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████

**Fubo Competes with MVPDs, SVODs and DTCs.**  In Fubo's 2023 10-K, Fubo explained

its competitive positioning thus:  "We principally compete with Pay TV operators, such as

[traditional MVPDs] Comcast, Cox and Altice, along with other [vMVPDs]" and "[w]e also

compete to a lesser extent with network-operated direct-to-consumer streaming services, such as

Peacock, Paramount+, ESPN+, and would expect to compete with the proposed joint venture."

(Ex. 102 (fuboTV Inc., Annual Report at 10 (Form 10-K) (Apr. 26, 2024).)  ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████        Likewise, Fubo's Interrogatory Response

admits that "Fubo currently competes against traditional cable companies, such as Comcast and

DISH".  (Ex. 105 (Pls' Third Suppl. R&Os to Disney Defs' First Set of Interrogs.) at 16.)

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████        Ex. 106

((EchoStar Q4 2023 Earnings Call Transcript (Mar. 1, 2024)) at 4 (describing how EchoStar's

"results were impacted by an increasingly competitive streaming market").)

***Fubo's Failing Business Model.*** ████████████████████████

█████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

██ ████ ) ████████████████████████████

███████████████████████████████

████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████

████████████████████

Fubo, to a greater extent than other vMVPDs, faces the threat of eroding value. ████

███████████████████████████████████

███████████████████████████████ And unlike

other vMVPDs, such as Hulu Live and YouTube TV, and unlike SVODs, such as Amazon Prime

and Apple TV+, Fubo does not produce any unique content and does not license sports rights

directly from leagues. ████████████████████████

█████████████████████████████████████

███████████████████████████████

███████████████████████████████████

█████████████████████████████████

██████████████

Fubo sits as a middle-man between programmers and subscribers, trying to make money

by bundling programmers' channels and distributing them to subscribers over someone else's

internet connection. █████████████████████████████



Consistent with those challenges, market analysts have opined that Fubo's business is "structurally unprofitable". (Ex. 112 ("fuboTV Stock Is Tumbling Because It's a Terrible Business"); *see also* Ex. 113 (Business Insider article (Jan. 19, 2023)) (opining that "Fubo still needs to demonstrate its core business model is sustainable").) ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████ ) Fubo's stock declined from $62 to $2.42, an approximately 97% decline, ***before*** the announcement of the JV on February 6, 2024. (Ex. 7, 80:2–13.)

Teetering on the edge of bankruptcy, Fubo has contemplated lawsuits, including against non-Defendants, as a business strategy to negotiate for lower affiliate fees and favorable terms. In 2023, before the announcement of Venu, Fubo was considering litigation against a variety of participants in the Pay TV ecosystem, entirely unrelated to the yet-to-be created, announced or

launched JV. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

     Upon the announcement of the JV, Fubo seized an opportunity to claim the need for expedited relief that might enable Fubo to win favorable leverage through a preliminary injunction motion.  Contrary to the made-for-litigation irreparable harm claims Fubo has made to obtain an expedited hearing, in a context where the securities laws require Fubo to speak truthfully, Fubo's CEO acknowledged the truth:  "Losing the lawsuit doesn't really change anything."  (Ex. 115 (fuboTV Inc. FQ4 2023 Earnings Call Transcript (Mar. 1, 2024)) at 2.)  Win or lose, "things will remain status quo".  (*Id*.at 8.)

## III.    LEGAL STANDARDS

### A. Principles of Antitrust Law.

     The antitrust laws "were enacted for the protection of competition[,] not competitors".  *Brunswick*, 429 U.S. at 488 (internal quotations omitted).  Their "principal objective" is to "maximize consumer welfare by encouraging firms to behave competitively while yet permitting them to take advantage of every available economy that comes from internal or jointly created production efficiencies, or from innovation producing new processes or new or improved products".  PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶100a (2024) (hereinafter, "Areeda").  "[T]he antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition".  *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986).  Were it otherwise, it would "render illegal any decision by a firm to cut prices in order to increase market share"—a "perverse result" because "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition".  *Id.* (internal quotations omitted); *see also Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337–38 (1990).

     "[B]usinesses are free to choose the parties with whom they will deal, as well as the

prices, terms, and conditions of that dealing". *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). "[I]nsufficient assistance in the provision of service to rivals" is not an antitrust violation. *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004). In all but the exceptional case, "[t]here is no duty to aid competitors". *Id.* at 409, 411 (recognizing only narrow exception of "unilateral termination of a voluntary (and thus presumably profitable) course of dealing") (emphasis omitted).

To the same ends, "in order to have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them an injury". *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994). Plaintiffs must show an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful". *Atlantic Richfield*, 495 U.S. at 334 (internal quotations omitted). "[A] showing of loss or damage due merely to increased competition does not constitute [antitrust] injury". *Cargill*, 479 U.S. at 122.

## B. The Clayton Act Applied to Joint Ventures.

Fubo moves for a preliminary injunction under Section 7 of the Clayton Act, which prohibits mergers where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly". 15 U.S.C. § 18. The Clayton Act condemns only transactions that "may produce anticompetitive effects". *Brunswick*, 429 U.S. at 487.

"A plaintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market". *Nimbus Therapeutics, LLC v. Celgene Corp.*, 570 F. Supp. 3d 100, 124 (S.D.N.Y. 2021). "After a prima facie case of anticompetitive conduct has been established, the burden shifts to the defendant to proffer procompetitive justifications for the agreement". *Id.* "Assuming defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means". *Id.*

The Federal Trade Commission ("FTC") and the Department of Justice ("DOJ") Antitrust Division recognize that effects of joint ventures "may differ from those of mergers due to a

number of factors".  *Antitrust Guidelines for Collaborations Among Competitors* (Apr. 2000) ("Collaboration Guidelines") at 5.  While a "merger eliminates one of the participating corporations from the market", "a joint venture creates a new competitive force therein".  *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170 (1964).

Joint ventures "often increase output and thus are deemed procompetitive when joint activity reduces the costs or risk facing individual firms or enables the firms to develop a product or process that, acting individually, they could not develop".  Areeda ¶1902.  Benefits from joint ventures include "goods or services that are cheaper, more valuable to consumers, or brought to market faster than would be possible absent the collaboration"; joint ventures often "allow [their] participants to better use existing assets, or may provide incentives for them to make output-enhancing investments that would not occur absent the collaboration".  Collaboration Guidelines at 6.  "Where the venture is producing a new product . . . there is patently a potential for a productive contribution to the economy".  *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 52 (1st Cir. 1998).  Likewise, a "[l]ack of production exclusivity often indicates [a] lack of any competitive threat".  Areeda ¶2104b.

Fubo also asserts that the JV violates Section 1 of the Sherman Act, which prohibits "[o]nly unreasonable restraints on competition".  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 41 (2d Cir. 2018).  "Because § 1 of the Sherman Act looks to the probable effects of an agreement, there is no substantive difference between the standards underlying a violation of § 7 and § 1."  *Vantico Holdings S.A. v. Apollo Mgmt., LP*, 247 F. Supp. 2d 437, 458 (S.D.N.Y. 2003); Areeda ¶301c1.

## C. Preliminary Injunction Standards.

"A plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest'".  *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (holding that "absent a clear command from Congress, courts must adhere to the traditional four-factor test" set forth in

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).[13]  Because "[p]reliminary injunctions are granted on an incomplete record" following "hearings [] held on relatively short notice after less than full discovery", they are "only for the purpose of preventing irreparable harm".  *Osawa Co. v. B & H Photo*, 589 F. Supp. 1163, 1181 (S.D.N.Y. 1984).  Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction".  *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983).

      "A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion'".  *Students for Fair Admissions v. U. S. Military. Acad. At W. Point*, 2024 WL 36026, at *6 (S.D.N.Y. Jan. 3, 2024) (quoting *Grand River Enter. Six Nations, Ltd. V. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).  "A preliminary injunction is . . . never awarded as of right".  *Starbucks*, 144 S. Ct. at 1576 (citations omitted).  The "burden of proof and persuasion rest[s] squarely" on the party moving for a preliminary injunction.  *Grand River*, 481 F.3d at 67–68 (2d Cir. 2007).

      A plaintiff seeking injunctive relief under § 16 of the Clayton Act, as Fubo does here, must show a threat of antitrust injury—"a showing of loss or damage due merely to increased competition does not constitute such injury".  *Cargill* 479 U.S. at 122.  Thus, Fubo must show irreparable harm that also is antitrust harm.  *Id.*

---

[13] Fubo's brief, filed before *Starbucks*, cites the Second Circuit's "sliding-scale" test, which includes three factors.  (Mot. at 8 (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).)  As the Second Circuit has recognized, it applied the sliding-scale test even though it was "not clear whether the Supreme Court intended courts to require these four components of the *Winter* standard in all preliminary injunction cases".  *Trump v. Deutsche Bank AG*, 943 F.3d 627, 640 (2019).  Recently, in *Starbucks*, the Supreme Court clarified that courts must use the four-factor test "absent a clear command from Congress".  *Starbucks*, 144 S. Ct. at 1576.  Section 16 of the Clayton Act, which governs the injunction Fubo seeks and permits the grant of injunction "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity", includes no such "clear command".  15 U.S.C. § 26.  Under *Starbucks*, the four-factor test must apply.  Regardless, Fubo fails to meet either the four-factor test or the sliding-scale test.

# IV.     ARGUMENT

## A.  Fubo Cannot Show a Likelihood of Success on the Merits.

To prevail at this stage, Fubo must show a substantial likelihood that Venu is tantamount to an acquisition where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly" in a well-defined market.  15 U.S.C. § 18.  Fubo does not come close.  Fubo asks the Court to evaluate Venu through gerrymandered markets, including a downstream market that entirely ignores the cord cutters and cord nevers whom Venu is targeting.  Even more fundamentally, Venu will not lessen competition in any market because, while a "merger eliminates one of the participating corporations from the market", the "joint venture creates a new competitive force therein".  *Penn-Olin*, 378 U.S. at 170.  Venu is procompetitive, offering consumers more choice, lower prices and increased output.

### 1.  Fubo's Proffered Markets Are Flawed.

The threshold issue "is determining the relevant market".  *Commercial Data Servers, Inc. v. Int'l Bus Machs. Corp.*, 262 F. Supp. 2d 50, 63 (S.D.N.Y. 2003) (citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d Cir. 1979)).  "Absent an adequate market definition, it is impossible for a court to assess the anticompetitive effect of challenged practices".  *Re-Alco Indus., Inc. v. Nat'l. Ctr for Health Ed., Inc.*, 812 F. Supp. 387, 392 (S.D.N.Y. 1993).  "[M]arket definition is a deeply fact-intensive inquiry. . . because its purpose is 'to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output'".  *United States v. Am. Express Co.*, 838 F.3d 179, 196-97 (2d Cir. 2016) (internal quotations omitted), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018). Defining markets incorrectly may distort the court's later analysis by excluding "the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output".  *Geneva Pharms. Tech. Corp. v. Barr Labs Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).

A relevant product market is "composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities

considered."[14] *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). The question is whether "consumers treat them as acceptable substitutes". *Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 765 (S.D.N.Y. 2020) (citation omitted). "[P]roducts or services need not be identical to be part of the same market." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999). To have any likelihood of success on the merits, Fubo must come forward with facts to show that "'market realities' support the market it has alleged". *Pepsico, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 247 (S.D.N.Y. 2000) , *aff'd*, 315 F.3d 101 (2d Cir. 2002). Fubo has not.

### a. Fubo Does Not Establish an Upstream Market for Sports Licensing from Programmers to MVPDs.

Fubo proffers a market for "licensing sports content between MVPDs and programmers". (Mot. at 18.) Fubo fails to show that this is a well-defined market encompassing reasonable substitutes. As Dr. Whinston will testify, Fubo fails to show that MVPDs and consumers consider different sports, and different networks carrying live sports, to be substitutes for one another. (Whinston ¶178.) No one believes a football fan would substitute watching football for watching golf if it became marginally more expensive to watch football (in part because the sports are played during different months of the year). Consequently, there is no evidence that MVPDs typically view one programmer's networks (say Disney's) as good substitutes to another programmer's networks (say Fox's); to the contrary, with the exception of Fubo (which does not carry WBD), the major MVPDs carry all the major networks that offer live sports from all major programmers, including the Defendants, CBS, and NBC. Because Fubo's upstream market cannot withstand scrutiny, its upstream antitrust claims fail at the starting block.

### b. Fubo's Downstream Streaming Live Pay TV Market Is Too Narrow.

Venu will compete for subscribers in a broad Pay TV Market, which includes MVPDs

---

[14] "In economists' terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." *AD/SAT*, 181 F.3d at 227.

(including vMVPDs), SVODs and DTCs.  (Whinston ¶¶100–02, 109, 119, 121–22, 125–26, 153–55.)  Fubo has admitted as much in its own SEC filings:

> We principally compete with ***Pay TV operators***, such as Comcast, Cox and Altice, along with other virtual multichannel video programming distributors ("***vMVPDs***"), such as YouTube TV, Hulu Live and Sling TV. We also compete to a lesser extent with ***network-operated direct-to-consumer streaming services***, such as ***Peacock, Paramount+, ESPN+***, and ***would expect to compete with the proposed joint venture*** between The Walt Disney Company ("Disney"), Fox Corporation ("Fox") and Warner Brothers Discovery, Inc. ("WBD") (the "Network JV"), which, if it becomes operational, would operate a new sports streaming service.

(Ex. 102 at 10 (emphasis added).)  Substantial evidence confirms this broad market:

- ██████████████████████████████████████████████ (*See supra* § II.E.)

- ██████████████████████████████████████████████

- Fubo's expert, Mr. Trautman, agrees that "vMVPDs compete directly with traditional MVPDs for subscribers" and "millions of consumers have chosen to 'cut the cord' from the traditional MVPD bundle" in favor of "both vMVPDs and streaming VOD services". (Trautman ¶¶2, 10, 37; ██████████████████████████████████ ████████████████████████████████████

- EchoStar, the parent company to DISH Network, states in its 10-K that it competes with "programmers and other companies who distribute video directly to consumers over the Internet", "traditional satellite television providers, cable companies, and large telecommunications companies", "services with live-linear television programming" and "single programmer offerings and offerings of large libraries of on-demand content".  (Ex. 116 (EchoStar, Form 10-K, (Feb. 29, 2024) at 5.)

- ██████████████████████████████████████████████

- ██████████████████████████████████████████████

███████████████████████████

- ████████████████████████████████████████████████████████████████████████████

Notwithstanding the overwhelming evidence of a broad Pay TV market, Fubo, in its brief, argues for two narrower markets:  (i) a "Streaming Live Pay TV Market" that includes MVPDs but excludes SVODs and other DTC offerings and (ii) a still narrower "Streaming Live Pay TV Market" that is limited to vMVPDs, excluding even traditional MVPDs.  Fubo may not "define the elements of the relevant market to suit its desire for" Defendants to have a high market share or outsize influence on pricing "rather than letting the market define itself".  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 106 (2d Cir. 2002) (internal quotations omitted).  And Fubo has no evidence to counter the overwhelming evidence of broader competition.  *See FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 121 (D.D.C. 2004) (holding that plaintiffs failed to show a separate market for 8800 Btu coal because expert testimony did not "account for the substantial evidence regarding the purchasing practices of utilities, which establishes that 8800 and 8400 Btu coal are substitutable").

*First*, Fubo cites three cases to argue that SVODs and other streaming services do not compete with MVPDs.  (*See* Mot. at 15).  None is persuasive.  Product market definition was uncontested in all of those cases, and the cases are years old and, at this point, not reflective of current market conditions.  *See United States. v. AT&T Inc.*, 310 F. Supp. 3d 161, 195 (D.D.C. 2018) (market definition in 2018 not "meaningfully challenged"), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019); *Glaberson v. Comcast Corp.*, 2006 WL 3762028, at *10 (E.D. Pa. Dec. 19, 2006) (accepting without discussion in 2006 that allegations of an MVPD market sufficed for a motion to dismiss); *Behrend v. Comcast Corp.*, 2012 WL 1231794, at *19 n. 28 (E.D. Pa. Apr. 12, 2012) (same in 2012).

*Second*, Fubo cites a recent motion to dismiss ruling, *Biddle v. Walt Disney Co*., for the proposition that traditional MVPDs are in a separate market from vMVPDs.  But that decision merely accepted plaintiffs' alleged market definition on a motion to dismiss; it has no bearing on

whether there are facts to support a separate vMPVD market.  The evidence adduced here

directly refutes a separate vMVPD market. ████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

even Fubo's interrogatory responses confirm that Fubo competes with traditional MVPDs.  (Ex.

105 at 16 ("Fubo currently competes against traditional cable companies, such as Comcast and

DISH").)

> ***Third***, Fubo wrongly distinguishes SVODs on the basis that they do not "offer live

content—critically including live sports".  (Mot. at 15.)  But SVODs such as Amazon Prime,

Apple+ and Netflix, now ***do*** carry live content, including many live sports.  (Whinston ¶114; *see*

*supra* § II.B.)  Leagues distribute their own games via direct to consumer offerings too.  For

example, the NFL launched NFL+, a direct-to-consumer service for its games; WBD launched a

live sports add-on for Max; Amazon Prime airs Thursday Night football; and Apple+ is expected

to acquire rights to a new FIFA tournament in 2025.  (Whinston ¶115 (Fig. 18).)

> ***Fourth***, Fubo's attempt to rely on the *Brown Shoe* factors to carve traditional MVPDs out

its alleged vMVPD downstream market fails:

- Fubo argues that "[v]irtual MVPDs target different customers—***younger and more tech-savvy***—than traditional cable".  (Mot. at 15–16.)  A distinct customer group defines a submarket only if the customer is so price insensitive as to be "core consumers, demanding exclusively a particular product or package of products".  *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1041 (D.C. Cir. 2008).  Fubo does not even attempt to meet that test here, instead conceding that Fubo competes with traditional MVPDs.[15]

- Fubo argues that vMVPDs are ***closer substitutes*** but have ***technological differences*** compared to traditional MVPDs.  But, like vMVPDs, many traditional MVPDs now deliver content through apps that are accessed by the Internet using ubiquitous devices (smart TVs (owned by 69% to 84% of adults depending on age cohort), smartphones (owned by 90% of US adults) and tablets).  (Whinston ¶145.) ████████████████

---

[15] Fubo's reliance on *MLW Media LLC v. World Wrestling Entertainment., Inc.* is misplaced. That court found a submarket sufficiently pleaded based on *age and gender*.  2023 WL 4053802, at *1, 4 (N.D. Cal. June 15, 2023).  Not only does Fubo not argue gender here, but, more importantly, distinctions such as age and gender cannot delineate "a cognizable submarket" where, as here, a product "nonetheless faces obvious competition".  *In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745, 756–57 (N.D. Cal. 2020).

███████████████████████████████████████████████████

- Fubo argues that vMVPDs are in a submarket based on ***price***.  But price is a metric on which traditional MVPDs, vMVPDs, SVODs and DTCs compete—it is not a limit on substitution.  (███████████████████████████████████████████ ███████████████████████████████████  Nor is there a clean distribution of prices among Pay TV services.  Fubo is among the more expensive vMVPDs and falls well within the range of prices for traditional MVPDs.  (████████████████████ ██████████████████████████); Desser ¶38 ("MVPD subscription costs generally range from $40 to $159 per month").)  Because SVOD and DTC consumers subscribe to multiple services, the combined price subscribers pay may be similar to an MVPD.  (Whinston ¶129; ████████████████████ ███████████████████)

The record is clear that consumers ***are*** substituting among MVPDs (and beyond), and none of the arguments advanced by Fubo can undermine that evidence.  *See, e.g.*, *AD/SAT,* 181 F.3d at 229 (finding broad market for "delivery of advertisements to newspapers" without distinction between electronic and physical, price or expected delivery time based on (i) deposition testimony acknowledging competition irrespective of method of delivery and (ii) ordinary course documents assessing price among options).

### c.  Fubo's "Skinny Sports Bundle Market" Also Must Fail.

Fubo's expert tentatively posits a further market that is not found in Fubo's motion:  an even more gerrymandered market for "streaming packages containing a limited number of channels that all have live sports content".  (Orszag ¶18.)  This likewise fails.

***First***, Fubo does not provide a cogent test for what would be in and out of this supposed "skinny sports bundle" market.  In his declaration, Fubo's expert, Mr. Orszag, defines the market as "streaming packages containing a limited number of channels that all have live sports content".  (Orszag ¶18.)  But then he excludes sports DTC services such as NBA League Pass, NFL+ and Bally Sports+, despite each of them having only sports content.  (Whinston ¶150; ██

██████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██  ████████████████████████████████████

████████████████████████    ████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████  All of this is, simply, incoherent.  *See Am. Sales Co. v. AstraZeneca AB*, 2011 WL 1465786 at *3 (S.D.N.Y. Apr. 14, 2011) (dismissing case due to failure "to allege any product characteristics or evidence of consumer buying patterns that limit[ed]" substitutability.).

**Second**, the "Skinny Sports Bundle Market" conflicts with Fubo's basic theory of irreparable harm:  that some customers will prefer Venu to Fubo.  (Orszag ¶¶25–26, 107.)  "If consumers view products as substitutes, the products comprise the same market."  *Bansavich v. McLane Co.*, 2008 WL 4821320, at *4–5 (D. Conn. Oct. 31, 2008).  Clearly, "Fubo believes that consumers will significantly substitute between the JV's 'skinny sports bundle' and vMVPD packages.  But, if so, that is an indication that 'skinny sports bundles' are unlikely to be a relevant market of their own."  (Whinston ¶157.)

**Third**, even if Fubo were correct that there is a "Skinny Sport Bundle Market", then Venu would be its first entrant and, by definition, it could not lessen competition.  In *Fraser v. Major League Soccer L.L.C.*, the court explained that because "the relevant test under § 7 looks to whether competition in *existing* markets has been reduced", if "there is no existing market, there can be no reduction in the level of competition".  97 F. Supp. 2d 130, 140–41 (D. Mass. 2000), *aff'd,* 284 F.3d 47 (1st Cir. 2002) (internal quotations omitted).  "Competition that does not exist cannot be decreased."  *Id.*  Thus, if Venu creates a one-entity market, then it cannot lessen competition.

### 2.  Fubo Cannot Demonstrate Anticompetitive Effects.

Fubo cannot establish competitive harm.  Harm to competition "requires a finding of a

reasonable probability of a substantial impairment of competition, rather than a mere possibility". *N.Y. v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 198 (S.D.N.Y. 2020). "Courts must judge the likelihood of anticompetitive effects in the context of the 'structure, history, and probable future' of the particular markets" at issue. *Id.* Fubo shows none.

### a. Venu Will Not Increase Market Concentration.

Fubo attempts to show anticompetitive effects by claiming Venu will "produce[] a firm controlling an undue percentage share of the relevant market, and result[] in a significant increase in the concentration of firms in that market". *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963); (Mot. at 19; ███████████████████████████

███████████████████████████████████████████████████████

████████  *see also id*. 274:6–20.)

That is demonstrably false. A transaction increases market concentration only if it eliminates a competitor from the relevant market. *See* U.S. DOJ and FTC, Merger Guidelines § 2.1 (2023) (the "Merger Guidelines"). That happens when two competitors merge. *Id.*

But Venu is a joint venture, ***not*** a merger. That is a critical distinction—a "merger eliminates one of the participating corporations from the market while a joint venture creates a new competitive force therein". *Penn-Olin*, 378 U.S. at 170. Thus, Venu will ***decrease*** market concentration (no matter how the market is defined), not ***increase*** it. (*See* Whinston ¶¶218–221.)

As a result, each of the authorities Fubo cites concerning the dangers of increased market concentration undermine Fubo's claims. *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 764 (9th Cir. 2018) (where there is no horizontal merger, "cases addressing the elimination of an actual competitor in a relevant market—and a concomitant increase in market concentration—are inapposite"); *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 54 (7th Cir. 1992) ("the entry of new competitors is consistent with a competitive market"); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1157 (9th Cir. 2003) (to hold that antitrust law "disfavors a business's offering new products . . . would restrict an important form of non-price competition"). We take each market in turn.

42

Starting upstream in Fubo's purported "Sports Programming Licensing Market", Venu will have no impact on market concentration.  Venu is an additional customer in that market; it merely is a non-exclusive *licensee* of content.  Defendants will continue independently to license their respective networks.  Venu will bring about no consolidation of that licensing activity.

Turning to the downstream market in which content is distributed to consumers (however defined), Venu will expand (rather than reduce) the number of competitors.  Consumers will continue to have access to all existing MVPDs, SVOD and DTC offerings—*plus they now will have Venu as an option*.  Venu will not prevent individual Defendants from entering the market with their own streaming services, and, in fact, Disney will compete with Venu through ESPN Flagship.  Venu will have *no* exclusive content; so its existence will not change the nature or quality of any other service.  And Venu will not "control" any share of sports content, just as Fubo does not "control" the greater amount of sports content that it carries under a license. ■

████████████████████████████████████████████████████████

███████████████████████████████████

Fubo cites *no case* enjoining the launch of a joint venture with these characteristics. Only a handful of joint ventures have ever been enjoined, period.  In each case, the members *consolidated* existing competitive operations into the joint venture and/or provided some critical input *exclusively* to the joint venture.  *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) (combining two existing independent coal mines into one JV); *United States v. Ivaco, Inc.*, 704 F.Supp. 1409 (W.D. Mich. 1989) (combining operations of two of the three firms in the market for automatic tampers); *FTC. v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984) (one company would close its U.S. operations in favor of JV); *Yamaha Motor Co. v. FTC.*, 657 F.2d 971 (8th Cir. 1981) (after joint venture, foreign firm eliminated as a potential entrant to the US market); *United States v. Columbia Pictures Indus., Inc.*, 507 F.Supp. 412 (S.D.N.Y. 1980) (parties agreed to exclusive distribution period for films).  Venu will do none of those things.  By contrast, courts approve market-expanding joint ventures such as Venu.  *See e.g.*, *Nat'l Bancard Corp. v. Visa U.S.A., Inc.*, 596 F. Supp. 1231, 1253 (S.D. Fla. 1984) ("The fact that VISA

members have integrated to the extent of agreeing on the terms of interchange, but have not fully integrated and still compete for cardholders and merchants, is typical of procompetitive joint ventures and serves to maximize VISA's competitive potential."); *Fraser*, 97 F.Supp. 2d at 142 (joint venture creation of Major Soccer League did not violate Clayton § 7).

Faced with these undeniable legal, commercial and market realities, Fubo resorts to sleight of hand, urging the Court to treat Venu as a combination of Defendants' licensing operations in Fubo's so-called "Sports Programming Licensing Market". Specifically, Fubo claims that (a) Defendants collectively "control" 54% of U.S. nationally televised sports rights, and (b) the Herfindahl-Hirschman Index ("HHI") shows that the Sports Program Licensing Market is concentrated and Venu will significantly increase that concentration. (Mot. at 19.) That, frankly, makes no sense, for numerous reasons.

*First*, Defendants do not "collectively" control or license any content; they will continue to license their sports rights *individually*—not as a group—after Venu is launched. Venu's formation documents *prohibit* even information sharing concerning how each Defendant, individually, will license its content to Venu, let alone to other distributors. There will be no coordination, let alone consolidation, of Defendants' sports licensing rights.[16] Each Defendant remains free even to offer its own content directly to consumers, as Disney plans to do with ESPN Flagship.[17] Fubo will never negotiate with any entity that "controls" the networks of all three Defendants, and the supposed combination of Defendants' sports licensing rights is therefore irrelevant.

*Second*, Venu will be merely a *non-exclusive licensee* of Defendants' sports rights, just like Fubo and other incumbent distributors. (*See* Whinston ¶¶201, 224; *supra* § II.C.) Venu will

---

[16] Fubo's assertion that Defendants "will have the same joint incentive to advantage the JV because they will retain the profits just as they would in a merger" is wrong. (Mot. at 19–20 n.9.) Each Defendant will earn revenue from its own networks and content and the JV itself is not expected to turn a profit in the near term. (*See supra* § II.C.)
[17] The JV is not a case where "parent companies will not compete with their progeny", as Fubo suggests. (Mot. at 19-20 n.9 (quoting *Penn-Olin*, 378 U.S. at 168).)

have no say concerning how each Defendant independently licenses that content to Venu's competitors. And it will have no content of its own. Venu's ability to **distribute to consumers** 54% of U.S. nationally televised sports content (as a non-exclusive licensee) has no relation to how that content is licensed to others. In fact, Fubo has the non-exclusive right to distribute 70.1% of U.S. sports content to consumers; DISH, Charter and DirecTV each have close to 100%. (*See* Am. Compl. ¶169.) These nonexclusive rights to carry programming—held by multiple MVPDs—do not have any impact on the market concentration for sports rights. Nonexclusive licenses are not a proxy for market shares or concentration because, by definition, they do not restrain output—that is the very meaning of nonexclusive.

*Third*, and relatedly, the HHI analysis Fubo trumpets does not apply. No sports licensing rights are being consolidated; no competitor is being eliminated; and nothing is being provided to any entity exclusively (let alone something that heretofore was nonexclusive). As a result, there is no change to HHI concentration in any market for the licensing of sports content. Merger Guidelines at 5; *see also Peabody*, 492 F. Supp. 3d at 902–03.

### b. Fubo Cannot Show Harm to Competition in the Downstream Market.

Just as it cannot show an increase in market concentration, Fubo also cannot show "a reasonable probability of a substantial impairment of competition". *Deutsche Telekom*, 439 F. Supp. 3d at 198. This section discusses the downstream market; the next section addresses upstream.

i.    <u>Fubo is wrong about Defendants' licensing practices.</u>

Fubo's theory of harm to competition in the downstream market (*i.e.*, the market where distributors sell subscriptions to consumers) is based entirely on the premise that Defendants force non-sports networks on other distributors as a condition of obtaining their sports networks, but that Defendants will not force those non-sports networks onto Venu. Fubo's theory is demonstrably false as a factual matter. As shown above, each carriage agreement negotiation is different, and Defendants have proposed (and agreed to) a variety of packaging alternatives for their networks, depending on the back-and-forth each has had with individual distributors. ██

██████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████. ████████████████████████████████

██████████████████████████████████████████ ) Once Venu

launches, Defendants will continue to discuss with each MVPD the terms for licensing packages

that fit each distributor's specific business needs.

ii.    <u>Venu will only enhance competition in the downstream market.</u>

Even if Venu were to receive packaging terms that Defendants had denied to other

MVPDs, Fubo has adduced no evidence to support its claim that Venu would be able to "driv[e]

out competitors". (Mot. at 16.) To the contrary, overwhelming evidence suggests that Venu will

be forced to compete in a vibrant market with powerful incumbents and that there will be

pervasive opportunities for entry and increased competition. (*See supra* § II.B.)

Venu will be forced to compete with existing MVPDs, SVODs and DTC services. Venu

will have a non-exclusive ***subset*** of the broader sports content available on other MVPDs,

including about half of football and no RSNs. Most sports fans will likely prefer those broader

offerings to Venu. Many casual sports fans may prefer cheaper SVOD offerings. Venu seeks to

compete by offering a niche service to price-sensitive consumers who sit in the middle: cord

cutters and cord nevers who watch sports, but have not wanted to pay the higher price required to

receive a broader package. That type of offering will not drive out any competitors, and Fubo

has adduced no evidence suggesting it will. ███████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████ Attracting people who do not have a MVPD subscription can cause no cognizable

harm to MVPDs.

Venu also faces additional competition from new entrants.  Disney will launch ESPN Flagship next year; RSNs YES and MSG will soon launch their DTC joint venture (GAME); Roku recently announced an agreement to distribute a package of MLB games for free; Amazon Prime Video now streams NFL Thursday Night Football, Netflix will stream two NFL games on Christmas Day from 2024 through 2026; and Apple TV+ has offered MLB's Friday Night Baseball since 2022, as well as MLS matches worldwide since 2023.  (*See* Desser ¶¶73, 81.)  And that only reflects **announced** future competition; there also are powerful potential competitors who might join forces to compete with Venu—*e.g.*, CBS, NBCU and others who could team up to create competitive sports-focused services.  This evidence thus demonstrates that Venu is not stifling competition.  To the contrary, Venu is just one in a long line of innovative offerings being brought to market in the face of changing industry dynamics.

          iii.    <u>Defendants have no duty to deal with Fubo or other distributors.</u>

Even if Defendants chose to license their networks to Venu on terms that disadvantaged competing MVPDs, that would not be an antitrust problem.  "Businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Linkline*, 555 U.S. at 448; *see also Trinko*, 540 U.S. at 409 (even an upstream monopolist has no duty to deal with its downstream competitors, let alone on terms that they demand).

*Linkline* is instructive.  There, plaintiff providers of digital subscriber line (DSL) to customers alleged that AT&T, a vertically integrated provider of essential DSL infrastructure and a provider of DSL to customers, violated the Sherman Act because it "refused to deal with the plaintiffs, denied the plaintiffs access to essential facilities, and engaged in a 'price squeeze.'"  *Linkline*, 555 U.S. at 442.  The Supreme Court rejected what it called "an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level".  *Id.* at 452.  AT&T had no duty under the antitrust laws to provide the plaintiffs with access to its infrastructure, and the fact it did provide such access but at prices that made it hard for the plaintiffs to compete with AT&T downstream did not give rise to an antitrust violation.

*Id.* Fubo's claim is analogous. Here, as in *Linkline*, Fubo alleges that Defendants "abused their power in the wholesale market to prevent rival firms from competing effectively in the retail market". *Id.* at 450. But absent a duty to deal upstream (or predatory pricing downstream, which Fubo does not allege), *Linkline* precludes that theory.

### c. Fubo Cannot Show Harm to Competition in the Upstream Market.

Fubo asserts that "[t]he JV will dramatically increase Defendants' power and incentive to impose unreasonable prices and terms on Fubo and other distributors that depend on access to their must-have sports channels". (Mot. at 18.) But no evidence supports that claim as to MVPDs broadly, or as to Fubo specifically. To the contrary, the evidence is overwhelming that (i) Defendants will have no incentive to divert customers from existing MVPDs to Venu; and (ii) even if Defendants had an incentive to do so, they lack the ability to do so in the near future.

### i.    No evidence that Venu will increase prices for MVPDs.

In the absence of evidence, Fubo tries to distort the law, relying on exclusive-licensing cases to suggest harm. But in those cases, the terms of the joint ventures themselves provided the evidence that the joint ventures would cause the members to disadvantage rivals post-JV formation. For example, in *United States v. Columbia Pictures Industries, Inc.*, movie producers agreed ***not*** to license their films to rival distributors at all for a nine-month period, so as to provide the joint venture with exclusive rights to the films, which the court concluded was an anticompetitive boycott. *Columbia Pictures*, 507 F. Supp. at 434; *see also United States v.*

*Paramount Pictures*, *Inc*. 334 U.S. 131, 154 (1948) (JV "g[ave] no opportunity for other theatre owners to bid for the feature in their respective areas"); *FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31, 48 (S.D.N.Y. 2020) (adequate pleading of exclusive supply contracts).  Here, undisputed evidence demonstrates that Defendants will continue to license their content to other distributors consistent with past practices.

        ii.      <u>No evidence Defendants would or could raise prices.</u>

Defendants, like all programmers, are incentivized to maximize viewership across distribution platforms.  Venu will not change those incentives. ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████

Increased prices to MVPDs, if passed on to consumers, would further accelerate cord cutting, diminishing Defendants' own subscribership and increasing further the subscribership of SVODs.  This would harm not only Defendants' revenues but also their ability to bid successfully on sports content from leagues, as it is in the leagues' interest to maximize distribution of their content.  (Desser ¶¶107–113.)  One of the reasons that Defendants have successfully licensed content from a wide array of leagues and conferences over the years is that Defendants have broadly licensed their networks to MVPDs across the industry, reaching many millions of households.  (*See id*. ¶116.)  Defendants would not jeopardize the lifeblood of their business by intentionally diverting customers to a less profitable distribution platform while accelerating cord cutting.

*DeMartini v. Microsoft Corp.* is instructive.  662 F. Supp. 3d 1055, 1063 (N.D. Cal. 2023).  There, plaintiffs alleged that Microsoft "would have an incentive" to make popular video games exclusive to its platform.  The court rejected this argument as too speculative:  "Why would Microsoft make *Call of Duty* exclusive to its platforms thus resulting in fewer games sold?"  *Id*.  The mere possibility that Microsoft would make games exclusive was insufficient to

show harm.  *Id.*  The same is true here.[18]

Mr. Orszag, Fubo's economic expert, speculates that *if* Defendants raised prices to ***all*** MVPDs, and this resulted in lost MVPD subscribers, Defendants would "recapture" some of these subscribers with the JV, whereas Defendants would be unable to recoup affiliate fees from such lost subscribers absent the JV.  (Orszag ¶112.)  But the fact that a price increase might lead *some* subscribers to switch to Venu does not demonstrate an incentive for Defendants to do so. Basic economics teaches that downstream entry may incentivize distributors to raise *or lower* prices, depending on factors such as how many subscribers leaving MVPDs would be recaptured by Venu as opposed to cutting the cord altogether; the difference in affiliate fees between MVPDs and Venu; and the level of cannibalization by Venu at current prices.  As Dr. Whinston points out, Mr. Orszag has done no analysis showing the direction or magnitude of Defendants' incentives in this case—or their ability to raise prices in the foreseeable future even if they had the incentive to do so.  (Whinston ¶257.)  For example, Mr. Orszag does not consider that Defendants' existing agreements restrict their ability to raise prices across the industry for several years.  (*Id.* ¶258.)  Nor does he consider the magnitude of any consumer response to any increase in the price of a distributor's subscription, including how many of them would cut the cord, rather than switch to Venu.  (*Id.* ¶¶258, 273.)  Without analyzing these (and other) factors or doing *any* analysis to corroborate Mr. Orszag's claims, Fubo cannot demonstrate, as it must, any serious likelihood that Defendants will have the incentive or the ability to increase prices to MVPDs as a result of Venu, let alone that they actually will do so.

---

[18] Fubo misrepresents the holding in *Time Warner Cable Inc. v. FCC.*  (Mot. at 20 n.10.)  The matter, which arose under the Administrative Procedure Act, held merely that "*in some cases*, a vertically integrated cable operator with a significant share of an MVPD market will have the incentive and ability to prevent unaffiliated networks from competing fairly in a video programming market."  729 F.3d 137, 163 (2d Cir. 2013).  Venu will *not* have a significant share of any market, and Fubo has not shown that Defendants have such an incentive.  Likewise, *Sprint Nextel Corp. v. AT&T Inc.* underscores that Fubo must support its assumed incentives with actual evidence.  821 F. Supp. 2d 308, 333 (D.D.C. 2011).

The District Court in *United States v. AT&T Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019), rejected the very same argument in denying the Justice Department's effort to enjoin the Time Warner/AT&T merger.  The government's "primary theory of harm to competition" was that "Turner's relationship with AT&T [would] enable Turner to extract greater prices from AT&T's rival distributors for its 'must-have' content" because some of the rival distributors' lost customers would switch to DirecTV.  *AT&T*, 310 F. Supp. 3d at 198, 201.  The district court rejected this "increased-leverage theory of harm" in part because it would "not make sense as a matter of logic" for the merged entity to limit Turner's distribution, *id.* at 224, and because Turner's "long-term affiliate agreements" would prevent it from raising prices for multiple years after the merger, *id.* at 239.  The same is true here.

     iii. <u>Price increases, were they to occur, would benefit Fubo in the near term.</u>

As noted above, existing contracts lock in distributors into their existing prices for a term of years.  It would, therefore, take years, and the expiration of all carriage agreements, for Defendants to raise prices on all their distributors.  ███████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████)  (Because Fubo does not license *any* content from WBD, WBD cannot do anything to "harm" Fubo.)  By virtue of its locked-in prices, Fubo would be a beneficiary of any hypothetical price increases in others' shorter-term contracts.  Any subscribers migrating away from increased prices could go to Fubo.  (Whinston ¶¶263–264.)  This also illustrates why, even if Fubo could show some possibility of anticompetitive harm in the future—and it cannot and has not done so—that still would not entitle Fubo to a preliminary injunction because that harm, by its very nature, cannot be the cause of any *imminent* irreparable harm to Fubo now.

   **d.  The JV's Procompetitive Benefits Outweigh Any Harm to Competition that Fubo Could Show.**

Even if Fubo could make a prima facie showing of anticompetitive effects, Venu's procompetitive benefits surmount them.  It is widely recognized that joint ventures promote

competition because they enable "services that are . . . more valuable to consumers", "allow [their] participants to better use existing assets" and "provide incentives for [their participants] to make output-enhancing investments that would not occur absent the collaboration". Collaboration Guidelines at 6; *see also Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 594 (N.D. Cal. 2020) ("Joint ventures or other business collaborations between competitors can actually be procompetitive—offering to the market a product that could not otherwise be offered".)  In particular, "[n]ew products and new brands are essential to a dynamic economy". *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 891 (2007).  Thus, "[w]here the venture is producing a new product . . . there is patently a potential for a productive contribution to the economy".  *Addamax*, 152 F.3d at 52.

Here, Venu will offer an innovative new product that the JV members could not create on their own.  Venu will offer a suite of fourteen linear networks at a price point designed to attract "cord nevers" and "cord cutters", people who currently find no suitable option among MVPDs.

(███████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████████████

Venu hopes to narrow that gap.

Third-party researchers independently have recognized the value of Venu's product.  (*See* Ex. 16 (Citi research that a lower-priced sports tier by Disney and Fox would bring back "cord cutters").)  Consumer and market reaction to Venu's announcement has been enthusiastic.  (Ex. 120 (David Satin, *How Joint Venture Sports Streamer From Disney, Fox and Warner Bros. Discovery Points to Streaming's Possible Future*, THE STREAMABLE (Feb. 7, 2024).)  (The JV is "a move that will have undeniable benefits for cord-cutting sports fans, and it points to a future that all content providers might want to consider pursuing."); Ex. 119 (Morgan Stanley report (Feb. 13, 2024) at -580 (the "JV and its sport-first streaming product are proactive moves by the owners to increase distribution of their sports networks in a market facing both cont'd cord-

cutting and the splintering of sports rights").)  Venu is an innovative and procompetitive response to shifting industry dynamics, which will provide consumers with more choice, and incumbents with more competition. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) ("procompetitive justification[s]" include "greater efficiency or enhanced consumer appeal") (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) (en banc)).

### B.  Fubo Cannot Show Irreparable Harm.

A plaintiff must prove it will suffer "immediate" and "irreparable" injury to receive a preliminary injunction under Section 16 of the Clayton Act.  15 U.S.C. § 26.  The plaintiff cannot rely on a "remote or speculative" injury; instead, the plaintiff must point to an injury that is "actual and imminent, and for which a monetary award cannot be adequate compensation". *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (internal quotations omitted); *see also, e.g.*, *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995).

Fubo's irreparable harm arguments fail for a series of independent reasons, each on its own a basis to reject Fubo's motion.  ***First***, Fubo's preexisting weak business model, not any purported harm from the JV, is the source of Fubo's challenges.  ***Second***, to the extent the JV will further challenge Fubo's business model, that is legitimate competition at work.  ***Third***, Fubo's allegations of harm are unproven, speculative and baseless.  ***Fourth***, Fubo ignores that its claimed damages are readily quantifiable and compensable with money damages, and that Venu can relatively easily be unwound if necessary.

### 1.  Fubo's Weak Business Model Is the Source of Its Challenges.

The source of Fubo's challenges is its weak business model and insufficient scale.  Those weaknesses remain regardless of the launch of Venu.  Indeed, Fubo's CEO himself has already conceded that Venu changes nothing for Fubo.  When speaking to investors, under an obligation to tell the truth, Fubo's CEO admitted that "losing the lawsuit doesn't really change anything" for Fubo and that "things will remain status quo" should Fubo lose.  (Ex. 115 (Fubo Earnings Call Tr.) at 8, 12:███████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████

As described above, Fubo is a middleman that adds no infrastructure or unique content to the Pay TV ecosystem, operates on limited scale and lacks brand loyalty.  (*See supra §* II.E.)  Fubo has ***never*** turned a profit in its eight-year history.  ██████████████████████

████████████████████████████████████████████  ███████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████  Before the JV's announcement, Fubo's stock price had already collapsed about 97%—from a high of over $62 in December 2020 to $2.42.  (*See* Ex. 131 YAHOO! FINANCE, *fuboTV Inc. (FUBO): Historical Data*.)  Of course, the JV could not have caused that massive loss in value.  Market observers have recognized that Fubo's troubles are due to its weak business model, not the actions of others.  (*See* Ex. 112 (Timothy Green, *fuboTV Stock Is Tumbling Because It's a Terrible Business*, The Motley Fool (Feb. 28, 2023).)  Fubo cannot credibly attribute its financial woes to the JV.

## 2.  Any Harm Caused by Venu Is Legitimate Competition at Work.

A "plaintiff seeking injunctive relief under § 16 of the Clayton Act must show a threat of antitrust injury, and [the] showing of loss or damage due merely to increased competition does not constitute such injury".  *Cargill*, 479 U.S. at 122.  An alleged harm is "not of the type that the [antitrust laws were] intended to forestall" when it "bears no relationship to" the reason why the defendants' action would violate antitrust laws in the first place.  *Pueblo Bowl-O-Mat,. Inc.*, 429 U.S. at 486–88 (internal quotations omitted).  Even if Fubo could show harm caused by Venu (and it has not), those harms would stem from competition with Venu, not ***antitrust injury***.

The antitrust laws are meant to ensure competition and consumer choice.  *See id*. at 488.

Fubo admits that loss of subscribers is its principal claimed harm.  (█████████████

██████████████████████████████████████████████████)▗ ███████████

███████████████████████████████████████████████████████████

██████████████████████████████  But Pay TV subscriber churn is routine.  ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

Fubo cannot meet its burden to claim antitrust injury when it "would [] suffer[] identical 'loss'"

from lawful conduct.  *Pueblo Bowl-O-Mat.*, 429 U.S. at 487.

Fubo's lone response seems to be that ***these*** losses to competition are wrongful because

Defendants have "block[ed] Fubo from offering a competing service".  (Mot. at 10; ████████

██████████████████████  That is untrue.  ████████████████████████████████

████████████████████████████  ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████  Fubo's own slogan touts that its "subscribers come for the sports, [but]

stay for the entertainment".  (Ex. 102.)ᐧ Nor would refusing to license to Fubo on the same terms

as to others give rise to a cognizable antitrust claim even if Defendants had done so.  (*See supra*

§ IV.A.2.b.iii)  And, Fubo has locked in content prices for well after the launch of the JV.  Its

allegation of imminent loss of subscribers can have nothing to do with its baseless claim that

Defendants may someday raise prices on distributors.  (Am. Compl. ¶¶257, 266)  Fubo cannot

seek an injunction to protect itself from healthy competition.

### 3. Fubo's Claimed Harms Are Unsubstantiated.

#### a. Fubo's Alleged Loss of Subscribers Is Unsubstantiated.

Fubo's irreparable harm argument assumes that, if Venu launches, Fubo will "lose" ███████████████████████ subscribers.  (███████████████████ Market observers predict no such exodus.  Analyst projections issued after Venu's announcement predict that Fubo's subscribership will rise in 2025.  (██████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ Fubo's litigation claims also differ widely from Defendants' own estimates of Venu's subscribership. ███

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████

In fact, Fubo's projections are the product of a faulty model resting upon many implausible assumptions.[19] ███████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████ Venu bringing back cord cutters and cord nevers is procompetitive.

---

[19] Fubo itself appears to recognize that its models are flawed. ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████ Hence the outcome of the model is unreliable.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Fubo seems to ignore that it carries

more Disney and Fox Channels than the JV will. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████. Fox and ABC, two networks carried

by Fubo that will be carried by the JV, show general and family entertainment and news content,

along with sports.  Fubo provides no basis to infer, let alone prove, that a subscriber who tunes to

these networks is likely to prefer the more limited sports offerings of the JV.  (*Id.*)

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████  ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████)  Fubo, as compared to the JV, has not only more sports programming,

but a plethora of general and family entertainment and news programming.  (██████████



***Fifth***, the model does not account for steps Fubo has since taken, in response to the JV's announcement, to mitigate subscriber switches to the JV and to attract additional subscribers.

Even if Fubo's model were built on substantiated assumptions, and it is not, Fubo cannot make itself appear worse off by ignoring its own efforts to compete with the JV.

### b. Fubo's Allegations of Insolvency or Delisting Are Unsubstantiated.

Fubo alleges that it may go bankrupt or be delisted.  (Mot. at 12.)  A threatened bankruptcy that is the result of anticompetitive conduct must be ***imminent*** to constitute irreparable harm to warrant a preliminary injunction; financial injuries are not enough.  *See Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 2019 WL 2454094, at *3 (S.D.N.Y. June 12, 2019).  Fubo has provided ***no*** reliable evidence that the JV will cause Fubo's "imminent" demise.  Fubo's CFO speculates simply that "it is ***unlikely*** that Fubo would be able to find investors or lenders willing to provide Fubo with the capital it would need to remain solvent".  (Ex. 124 ¶44 (emphasis added).)

*Tucker Anthony Realty Corp. v. Schlesinger*, which Fubo cites, shows why Fubo's claims are insufficient.  888 F.2d 969 (2d Cir. 1989).  There, the court rested not on the mere "***possibility*** of bankruptcy", but on "ample evidence of plaintiffs' ***imminent*** bankruptcy, absent

the issuance of a preliminary injunction", because a defendant "could demand payment [on debts] at any time and . . . bring down the whole house of cards". *Id.* at 975 (emphases added).

Nor is the mere possibility of delisting, which is all Fubo has alleged, irreparable harm. Again, Fubo's own cases explain why. This case is unlike *Norlin Corp. v. Rooney, Pace Inc*, where the NYSE has "indicated its intention to delist the stock". 744 F.2d 255, 260 (2d Cir. 1984). Fubo's fear of delisting is too "speculative and insufficient" to show a danger of irreparable injury. *British Printing & Commc'n Corp. PLC v. Harcourt Brace Jovanovich, Inc.*, 664 F. Supp. 1519, 152 (S.D.N.Y. 1987) (citing *Norlin*, 744 F.2d at 260). Moreover, even if Fubo's stock someday falls below $1.00, NYSE rules give Fubo six months to bring its share price above the $1.00 threshold. *See* NYSE Listed Company Manual § 802.01C. And in the interim, Fubo could do what other underperforming stocks have done and do a reverse stock split to avoid it. *See, e.g.*, *Canaan X L.P. v. MoneyLion Inc.*, 2024 WL 2214268, at *2 (S.D.N.Y. May 15, 2024) (recounting an example of a reverse stock split to avoid delisting); *In re MGT Cap. Invs., Inc. Sec. Litig.*, 2018 WL 1224945, at *2 (S.D.N.Y. Feb. 27, 2018) (same); *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 906 F. Supp. 2d 202, 241 n.32 (S.D.N.Y. 2012) (same).

### c. Fubo's Alleged Loss of Goodwill Is Unsubstantiated.

The Second Circuit has found irreparable harm based on loss of goodwill when "the very viability of the plaintiff's business . . . or substantial losses of sales beyond those of the terminated product . . . have been threatened". *Tom Doherty Assocs., Inc. v. Saban Ent'mt., Inc*, 60 F.3d 27, 38 (2d Cir. 1995). As set forth above, Fubo has shown neither. ██████████████ ████████████████████████████████████████████ ████████████████████ Fubo's goodwill arguments fail.

### d. Fubo's Speculative Future Harm Is No Basis for a PI.

Fubo speculates that the JV will ***someday*** "fundamentally alter" the streaming marketplace by causing the JV members to "refus[e] to sell unbundled sports content to anyone other than their own JV". (Mot. at 8, 12.) As described above, Fubo's prediction has no basis. The JV itself is set up to preserve future competition. None of its content will be exclusive.

███████████████████████████████████████████████████████

████████████████████████████

Nor is there any basis for Fubo's allegation that the JV will have an insurmountable first mover's advantage. For the reasons above, the JV will not be the first mover in its own market, and Fubo has failed to acknowledge that Disney itself plans to compete with the JV by launching ESPN Flagship. (*See supra* § IV.A.2.a.) Moreover, as Fubo admits, the market for video distribution is highly dynamic, characterized by low switching costs among consumers, high churn rates, and new entrants on a monthly basis. (██████████████████████████

████████████████████████    ████████████████████████████

█████████████████████████████████████ Fubo has not proven it will suffer irreparable harm that cannot be remedied after trial.

### e. The JV Is Not a Merger and Presents No "Unscrambling Eggs" Problem.

Fubo seeks to manufacture irreparable harm by incorrectly likening the JV to a merger that may be challenging to "unscramble" once consummated. An "unscrambling of the eggs" challenge arises in a merger because merged entities cease to exist independently and their combined assets must be "unscrambled".[20] But "[t]his is not a case . . . where a merger is to be voted on, corporations combined, and the eggs thereafter cannot be unscrambled." *Blanksteen v. N.Y. Mercantile Exch.*, 879 F. Supp. 363, 368 (S.D.N.Y. 1995). This is a joint venture to which the parties have agreed for a term of years and which the Court could dissolve should it find antitrust violations after a trial on the merits. Fubo points to no remedial difficulties that would justify a preliminary injunction. *See FTC v. Equitable Res., Inc.*, 2007 WL 1500046, at *6 (W.D. Pa. May 21, 2007) (finding no irreparable harm even in a merger case because the FTC's

---

[20] For example, Fubo cites *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252 (2d Cir.), *amended*, 890 F.2d 569 (2d Cir. 1989), where the court recognized: "Erring on the side of granting the injunction becomes especially imperative *in corporate control contests* because once the tender offer has been consummated it becomes difficult, and sometimes virtually impossible, for a court to 'unscramble the eggs.'" *Id.* at 261 (emphasis added) (internal quotations omitted).

assertion that the court could not "unscramble the eggs" was "non-specific and d[id] not spell out why or how the merger will be irrevocable, i.e., unable to be divested"); *Marks v. Lainoff*, 466 F. Supp. 301, 304 (S.D.N.Y. 1979) ("Were the reorganization to be approved and then ultimately found to be unfair it would be quite easy to reconstruct the company's capitalization.").

### 4. Even if Some Harm Were Attributable to Anticompetitive Effects, It Can Be Remedied by Money Damages.

"[E]conomic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). "[I]rreparable harm and inadequacy of legal remedies" together are "[t]he basis of injunctive relief in the federal courts". *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (internal quotations omitted). "The possibility that adequate or compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id*. at 90 (internal quotations omitted). "[W]here monetary damages may provide adequate compensation, a preliminary injunction should not issue." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995).

██████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████ Related losses of market share and goodwill are likewise calculable based on Fubo's "history of operation". *Dexter* 345, 663 F.3d at 63; *see also In re Keurig Green Mountain Single-serve Coffee Antitrust Litig.*, 2014 WL 12778832, at *10 (S.D.N.Y. Sept. 19, 2014); *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 489 (6th Cir. 2021) ("economists can and do assess . . . injuries" like "the loss of [subscribers] and market share" in "monetary terms"). Because Fubo's alleged losses would be "calculable 'by past sales of [its] product and of current and expected future market conditions'", there are no grounds for finding irreparable harm. *Our Wicked Lady LLC v. Cuomo*, 2021 WL

915033, at *7 (S.D.N.Y. Mar. 9, 2021) (quoting *Tom Doherty Assocs., Inc.*, 60 F.3d at 38); *Metromedia Broad. Corp. v. MGM/UA Entm't Co.*, 611 F. Supp. 415 (C.D. Cal. 1985) (injunctive relief unavailable because damages from lost advertising revenue were readily measurable).

Unlike cases in which an alleged loss was "difficult" to precisely calculate "in dollars and cents," calculating Fubo's losses here would be possible. *Jacobson & Co. v. Armstrong Cork Co.*, 416 F. Supp. 564, 570 (S.D.N.Y. 1976), *aff'd*, 548 F.2d 438 (2d Cir. 1977). "[B]ecause [Fubo] could be adequately compensated with money damages" should it somehow prevail at trial, it has not "suffered irreparable injury". *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 82 (2d Cir. 1994); *see Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 918 (2d Cir. 1986).

### C. The Balance of the Hardships and Public Interest Do Not Favor an Injunction To Halt the JV.

"A preliminary injunction is 'in the public interest' if the preliminary injunction would not 'cause harm to the public interest.'" *Local 1159 of Counsel 4 AFSCME, AFL-CIO v. City of Bridgeport*, 435 F. Supp. 3d 400, 415–16 (D. Conn. 2020) (quoting *SEC v. Citigroup Global Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012)). "[T]he balance of hardships inquiry asks which of the two [sides] would suffer most grievously if the preliminary injunction motion were wrongly decided." *Absolute Recovery Hedge Fund v. Gaylord Container*, 185 F. Supp. 2d 381, 388 (S.D.N.Y. 2002) (internal quotations omitted). Here, the public interest counsels against an injunction, and the balance of hardships tips decidedly in Defendants' favor.

Enjoining Venu to protect Fubo from competition is antithetical to antitrust laws. Although Fubo argues that consumers should have access to a skinny sports bundle, Fubo nonetheless tries to block the launch of Venu. Fubo posits no imminent increase in prices or reduction in output. To the contrary, otherwise disinterested market players, such as the President of the Big Ten Conference, have recognized Venu to be part of a "very dynamic" market bursting "with technical, business and distribution innovations from both traditional and multiple non-traditional entrants". (Ex. 135 ¶13.)

Fubo seeks only to avoid the impacts of consumers selecting a competing service they prefer at a price they prefer. That is the very essence of competition. That Fubo seeks this relief in a market bursting with competitive energy and innovation is all the worse. Federal courts have "counsel[ed] greater caution in judicial intervention" in antitrust cases involving dynamic markets because "a presumption of anticompetitive effects would be misleading in [a] particularly dynamic and rapidly changing industry". *Deutsche Telekom*, 439 F. Supp. 3d at 241–44, 248. The grant of such an injunction would undermine the basic tenet of the antitrust laws and would not advance the public interest. *See, e.g., Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 181 (S.D.N.Y. 2006) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 270 (2d Cir. 1990) (holding that it would "stand antitrust law on its head" to strike down an agreement that "effectively increased competition" and gave "consumers a new alternative in the marketplace"). Rather, denying the injunction and allowing competition to operate will advance the public interest. *See Sure Fit Home Products, LLC v. Maytex Mills, Inc.*, 2022 WL 3594578, at *7 (S.D.N.Y. Aug. 23, 2022), *vacated on other grounds*, 2023 WL 3834470 (S.D.N.Y. May 16, 2023) (denying injunction because "[l]imiting consumer choice by enjoining sales" of defendant would not serve the public interest); *TomGal LLC v. Castano*, 2022 WL 17822717, at *7 (S.D.N.Y. Dec. 19, 2022) (denying injunction where "[t]he public would be deprived of the goods . . . and competition").

Nor can Fubo prove that the balance of hardship tips in its favor. Defendants have invested substantial resources in Venu and its launch. Venu is an effort to remain competitive in a highly dynamic market packed with well-heeled competitors. Fubo, by contrast, seeks benefits for itself ███████████████████████████████████████████ ██████████████████████████████████████ There is nothing equitable in Fubo asking, in hindsight, to be insulated from the consequences of its business decisions. *See Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) ("A preliminary injunction is an equitable remedy and an act of discretion by the court."); *Mfrs.' Fin. Co. v. McKey*, 294 U.S. 442, 449 (1935) ("'[The party] who seeks equity must do equity'".).

**D. Fubo's Alternative Remedy Should Be Rejected.**

Fubo proposes as an "alternative" remedy that in lieu of enjoining the launch of Venu, the Court could require Fox and Disney to change the terms of their existing carriage agreements with Fubo.  (*See* Mot. at 20.)  Such an alternative remedy is beyond the scope of this proceeding and unsupported by fact and law.

"[T]he normal function of the preliminary injunction is to maintain the status quo pending a full hearing on the merits." *Triebwasser Katz v. American Tel.& Tel. Co.*, 535 F.2d 1356, 1360 (2d Cir. 1976).  The Court has made clear that "the PI hearing is to focus on the Section 7 claims that relate to the joint venture", not Fubo's tying claim based on longstanding carriage agreements.  (*See* Ex. 130 (Tr. Initial Pretrial Conference) 7:7–9).)  That is because the Court properly did not "see the emergency of resolving [Fubo's tying claim] as an urgent problem".  (*Id.* at 11:22–23.)  Nonetheless, Fubo continues to ask the Court, in effect, to grant the relief on its tying claim, as an alternative remedy, before discovery on Fubo's tying or MFN claims.  *See St. Luke's Hosp.,* 8 F.4th at 489 (economic injury and harm to goodwill "do not suffice at this fledgling stage of the case to warrant" enforcing a duty to deal.)

Fubo's requested alternate relief is not a modest one.  Fubo asks the Court to wade into and rearrange the complex contractual agreements of sophisticated counterparties.  "A forced license with the Plaintiff would either involuntarily and fundamentally change the way that each of the Defendants do business or remove their ability to make certain substantive business decisions autonomously." *ChoiceParts, LLC v. Gen. Motors Corp.*, 203 F. Supp. 2d 905, 925 (N.D. Ill. 2002).  To implement the "alternative relief", the Court would be required to substitute its judgment for that of sophisticated parties who engaged in an arm's-length bargaining to agree upon prices, penetration rates and content bundles.  Fubo in fact seeks to leverage the Court to reopen negotiations and seek licensing terms that Fubo itself never sought.  Such relief would "involve[] the judiciary so deeply in the daily operation of this nation-wide business" and would "uproot[] business arrangements and established relationships". *Paramount Pictures*, 334 U.S. at 162, 164.  The Court should decline Fubo's invitation.

Moreover, what Fubo asks for—an ill-defined judicial revision of the parties' carriage agreements—is a "mandatory injunction" because it would shift rather than maintains the status quo.  *Students for Fair Admissions*, 2024 WL 36026 at *6 (internal quotations omitted).  Such injunctions are not granted "unless extreme or very serious damage will [otherwise] result" and are never granted "in doubtful cases".  *Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n*, 641 F. Supp. 1179, 1190–91 (S.D.N.Y. 1986) (internal quotations omitted).  The requesting party must show a "a clear or substantial likelihood of success on the merits".  *N. Am. Soccer League*, 883 F.3d at 37 (internal quotations omitted).

Fubo cannot make the required showing given that the bundling practices with which Fubo now claims to be concerned were examined over a decade ago by the Ninth Circuit and found to comply fully with antitrust law.  *See Brantley*, 675 F.3d at 1202.  As the Ninth Circuit held, "limit[ing] the ability of [d]istributors to offer [p]rogrammers' channels for sale individually" or "reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition", as "[b]oth effects are fully consistent with a free, competitive market".  *Id*.  The limited record in this proceeding is no basis to reject this precedent, or the industrywide practice that it examined and upheld.

And it is black-letter law that none of the Defendants is obligated to give Fubo better prices, or to deal with Fubo at all.  *Trinko*, 540 U.S. at 415.  That is because "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing".  *Linkline*, 555 U.S. at 448.  Fubo's complaint that Defendants give Fubo's competitors better terms, even if true, is not a cognizable antitrust claim.  There is likewise no imminent, irreparable harm that the alternative relief would prevent.  The public interest cannot possibly be served by throwing into question industry-standard practices that would implicate contracts around the industry, without comprehensive discovery or a full litigation of the issues.

## V.    CONCLUSION

For the reasons stated above, Defendants respectfully request that Fubo's motion for preliminary injunction be denied.

July 25, 2024

CRAVATH, SWAINE & MOORE LLP

*/s/ J. Wesley Earnhardt*

Antony L. Ryan
J. Wesley Earnhardt
Yonatan Even
Michael P. Addis

2 Manhattan West
   375 9th Avenue
      New York, NY 10001
         (212) 474-1000

*Attorneys for The Walt Disney Company, ESPN, Inc., ESPN Enterprises, Inc., and Hulu, LLC.*


DECHERT LLP

Andrew J. Levander
Steven E. Bizar
Steven A. Engel
Michael H. McGinley
Erica Fruiterman

1095 Avenue of the Americas
   New York, NY 10036
      Telephone: (212) 698-3500

*Attorneys for Defendant Fox Corporation*

WEIL, GOTSHAL & MANGES LLP

David L. Yohai
Adam C. Hemlock
Theodore E. Tsekerides
Robert W. Taylor
Elaina K. Aquila

767 Fifth Avenue
   New York, NY 10153
      (212) 310-8000

*Counsel for Warner Bros. Discovery Inc.*