# Exhibit 140

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **FUBOTV INC. and FUBOTV MEDIA INC.,**<br><br>**Plaintiffs,**<br><br>-against-<br><br>**THE WALT DISNEY COMPANY, ESPN, INC., ESPN ENTERPRISES, INC., HULU, LLC, FOX CORPORATION, and WARNER BROS. DISCOVERY, INC.,**<br><br>**Defendants.** | Civil Action No.  24-cv-1363-MMG-JW |

# Updated Expert Declaration of Jonathan Orszag

# June 24, 2024

[Pages Intentionally Omitted]

17. **First**, the sale of sports network programing to vMVPDs and MVPDs in the United States is a relevant antitrust market. This finding is supported by market evidence—including statements by executives of the Defendants and internal planning documents of the Defendants that were produced in discovery—that live sports programming is a key driver of demand for linear television networks, and that advertisers uniquely value live sports programming to reach consumers. Because of the unique value of sports programming, sports programming focused networks command higher market prices than those focusing on general entertainment programming due to their ability to help vMVPDs and MVPDs attract and retain subscribers. The geographic scope of this market is the United States, because the sports networks at issue are licensed to vMVPDs and MVPDs on a national basis. (See **Section II.B**)

18. **Second**, there is a downstream market for the sale of pay TV services to consumers (read: subscribers), that is no broader than vMVPDs and MVPDs, and may be as narrow as vMVPDs only. There is also likely a nascent market for "skinny sports bundles"—that is, streaming packages containing a limited number of channels that all have live sports content. These relevant markets are consistent with the prior statements of the U.S. Department of Justice ("DOJ"), market evidence, and the Defendants' internal planning documents. (See **Section II.C**)

19. **Third**, Raptor will enhance the market power of the Defendants in licensing their "must have" sports programming to vMVPDs and MVPDs.[15] Standard measures of market concentration suggest that, post-transaction, Raptor will have significant share. Defendants' internal planning documents indicate that the sports programming on Raptor will have 58 percent of total sports viewership, while third-party analysts estimate that Raptor will control sports programming that accounts for more than 54 percent of the total U.S. sports rights. (See **Section II.D**)

---

[15] The FCC has described "non-replicable sports programming" as "must have" programming. *See* Federal Communications Commission, "Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming," MB Docket No. 16-247, Eighteenth Report, Released: January 17, 2017, p. 15. I should note that the term "must have" has no precise definition in economics.

[Pages Intentionally Omitted]

mechanism for distribution of the JV content, the Defendants would presumably allow Fubo and other vMVPDs and MVPDs to offer such a product too. Rather, because the Defendants have decided to continue restricting unbundling by vMVPDs but offer an unbundled skinny sports package through Raptor, the vertical restrictions more likely reflect an anticompetitive strategy, which serves to harm—not enhance—competition. (See **Section III.C**)

23. The remainder of this report develops the empirical and theoretical bases for these findings.

## II. THE DEFENDANTS HAVE MARKET POWER IN THE RELEVANT MARKETS FOR EVALUATING THE COMPETITIVE EFFECTS OF THE PROPOSED JV

### A. PRINCIPLES OF MARKET DEFINITION

24. Market definition helps to specify the lines of commerce and geographic areas in which firms may exercise market power, enables the identification of market participants and measurement of market shares and concentration and thus, most importantly, facilitates the analysis of whether a firm (or firms) has market power in a relevant market.[17]

25. Market definition focuses on demand-side substitution, meaning customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service.[18]

26. A relevant market has a product and a geographic dimension, which are two sides of the same coin. The fundamental question in determining both product and geographic market boundaries is to determine what firms are (inside the boundary) and are not (outside the boundary) relevant competitors to the firm in question. It is the set of firms selling reasonably close substitute *products* into a *geography* that limits some customers' willingness or ability to substitute to some products, and thus limits the ability of firms in the relevant market profitably to raise prices.[19]

---

[17] U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," Issued: August 19, 2010, ("2010 Horizontal Merger Guidelines"), p. 7.

[18] 2010 Horizontal Merger Guidelines, p. 7.

[19] 2010 Horizontal Merger Guidelines, p. 8.

9

[Pages Intentionally Omitted]

market, I rely on the available evidence, including the economics literature, the limited discovery record, materials provided to me by Fubo, and publicly available data.[24]

### B. THE SALE OF SPORTS NETWORK PROGRAMMING TO VMVPDS AND MVPDS IN THE UNITED STATES IS A RELEVANT MARKET

31. I conclude that there is a relevant market for the sale of sports programming to vMVPDs and MVPDs in the United States. That is, a relevant market is the sale of channels that contain live sports programming to the vMVPDs and MVPDs that distribute that content—as well as the content obtained from other programmers—to consumers.

32. Programmers that produce television channels with live sports programming (such as Disney's ESPN or WBD's TNT) negotiate with MVPDs (such as DirecTV or Comcast) and vMVPDs (such as Fubo or Sling) for the right to distribute those channels to pay television subscribers. Typically, vMVPDs and MVPDs pay programmers a license fee—called an "affiliate fee"—that pays the programmer a contractually negotiated amount per month for each subscriber to the vMVPD/MVPD.

33. For example, industry analyst SNL Kagan estimated that in 2023, ESPN's affiliate fees were $9.42 per subscriber per month, while TNT's affiliate fees were $3.00 per subscriber per month. Distributors similarly pay programmers for non-sports programming based on the same fee structure. For example, SNL Kagan reports that, in 2023, the Fox News Channel received affiliate fees of $2.42 per subscriber per month, while WBD's CNN news channel

---

[24] In this declaration, I only analyze those antitrust markets that are relevant to Fubo's claims in its complaint that Raptor will cause antitrust harm to Fubo and consumers. There are likely other antitrust markets that are relevant to other allegations made by Fubo in its complaint. Similarly, there are likely other antitrust markets that are relevant to other aspects of potential competitive effects due to Raptor beyond those discussed here. The fact that I do not address such markets does not mean that I either agree or disagree with whether such antitrust markets exist—or whether there is harm in such markets.

[Pages Intentionally Omitted]



42.     Consistent with the substantial viewership of sports programming, data produced by Disney indicates that it receives a high share of its advertising revenue from sports programming. 

---

[45]     These channels include ESPN, Sports on ABC, ESPN+, ESPN2, ESPN3, SEC Network, ESPN Deportes, ESPNU, ACC Network, ESPNews, and Longhorn Network.

17

[Pages Intentionally Omitted]

106. To be sure, such relief would not eliminate all of the anticompetitive harms resulting from Raptor. As I explain in Section III.B below, Raptor itself will change Defendants' incentives in a way that will likely result in increased incentives for the Defendants to increase affiliate fees to Fubo and other vMVPDs and MVPDs, which in turn will ultimately result in higher prices to consumers.

107. 

## B. THE JV WOULD HAVE THE INCENTIVE TO RAISE PRICES OF SPORTS NETWORKS TO RIVAL VMVPDS AND MVPDS, THUS HARMING COMPETITION

108. As discussed in Section II.C above, Raptor will increase the market power of the JV members in the sale of sports programming to MVPDs and vMVPDs, and will give each party to the JV the incentive and ability to substantially increase prices in that relevant market.

109. Today, the Defendants' unilateral economic incentives to increase the affiliate fees they charge to MVPDs and vMVPDs are constrained by at least two effects.

---



110. First, increases in the affiliate fees paid to networks will result in MVPDs and vMVPDs raising prices to consumers.[133] In turn, price increases to consumers would result in declines in subscribership to MVPDs and vMVPDs.[134] Because networks, as noted above, are paid per subscriber per month, increases in the affiliate fees collected by networks are offset by declines in the number of subscribers, which would dampen the incentive to raise prices, because some of the increases in prices would result in lower revenue to the networks. To take a hypothetical example, suppose a network charged an MVPD with 10 subscribers an affiliate fee of $10 per customer per month. In that case the network would earn $100 in revenue per month. Now suppose the network increased its affiliate fee to $11 per month, which resulted in a price increase to customers which caused one customer to cancel its MVPD subscription. In that case the network would earn $99 per month. While the ultimate effect on the network's pricing decision would be determined by the rate at which the MVPD or vMVPD passes on programming costs to customers and the price elasticity of demand for that MVPD's services, this simple example illustrates that networks must recognize that their pricing choices can affect the total subscribership of their MVPD distributors.

111. Second, currently, the availability of sports programming from multiple Defendants provides some constraint on the ability of any one Defendant to raise affiliate fees to an vMVPD or MVPD. This is because if any individual Defendant unilaterally raised their prices to vMVPDs and MVPDs, each vMVPD/MVPD could play one provider of sports programming off against another in trying to negotiate lower affiliate fees or better terms.

112. Following the launch of Raptor, both effects would be weakened. First, because the Defendants will now have a JV that competes with vMVPDs and MVPDs, if the higher affiliate fees charged by the Defendants resulted in lost vMVPD/MVPD subscribership, some of those lost subscribers would be "recaptured" by Raptor. That is, if a subscriber—in

---

[133] *See* Footnote 16 above.

[134] Recent economic literature estimates that the own-price elasticity of demand for cable MVPDs is -1.69 and for satellite providers is between -2.90 (for DirecTV) and -4.15 (for Dish). *See* Gregory S. Crawford, Robin S. Lee, Michael D. Whinston, and Ali Yurukoglu, "The Welfare Effects of Vertical Integration in Multichannel Television Markets," *Econometrica*, 86(3) (2018), p. 925.

particular, a subscriber that watches sports programming—cancels his or her Fubo subscription because the monthly fee is too high, he or she may sign up for the lower priced "skinny bundle" of sports programming offered by Raptor.  Thus, some of the revenue and profits that a JV member would forgo by raising prices to Fubo (or other vMVPDs/MVPDs) would be recouped by the profits earned by increased subscribership for the JV.

113. Second, because each JV member would know that each other member of the JV would have the unilateral incentive to raise prices to vMVPDs/MVPDs, each distributor would have a decreased ability to play the Defendants off against each other, resulting in further upward pricing pressure.  For example, Fubo currently contracts for programming that includes significant live sports content from Disney and Fox, but does not do so from WBD.  Currently, if Fox is negotiating with Fubo over the license fees and other terms of its content, it knows that Fubo can walk away from the Fox package and attempt to replace it with the WBD package should Fox demand too high a price—and WBD would likely find it advantageous to replace Fox as a provider of live sports programming to Fubo.  However, after Raptor is launched, both Fox and WBD will recognize that Fubo has less bargaining leverage, because Fox and WBD will each recognize each other's ability to recapture lost sales through Raptor, thereby increasing each other's unilateral incentives to raise prices.  This in turn means that Fox will recognize that WBD has a reduced incentive to compete for Fubo's business, and hence will not constrain Fox's ability to negotiate for higher prices from Fubo.

114. The increased incentives to raise prices to purchasers of sports programming (the vMVPDs and MVPDs) creates a direct antitrust injury to the firms like Fubo that are participants and direct purchasers in that market.

115. Both of the above effects would increase the bargaining leverage of Defendants in their negotiations with Fubo and other vMVPDs and MVPDs.[135]  All other factors equal, this increase in bargaining leverage would lead to increases in the affiliate fees that the Defendants would charge to Fubo and other distributors.

---

[135] [redacted]

[Pages Intentionally Omitted]