**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FUBOTV INC. and FUBOTV MEDIA INC.,

*Plaintiffs,*

-against-

THE WALT DISNEY COMPANY, ESPN, INC., ESPN ENTERPRISES, INC., HULU, LLC, FOX CORPORATION, and WARNER BROS. DISCOVERY, INC.,

*Defendants.*

Civil Action No. 24-cv-1363-MMG-JW

**[PROPOSED] BRIEF OF AMICI CURIAE SPORTS FANS COALITION, AMERICAN ECONOMIC LIBERTIES PROJECT, THE ELECTRONIC FRONTIER FOUNDATION, OPEN MARKETS INSTITUTE, AND PUBLIC KNOWLEDGE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS...........................................................................................................i

TABLE OF AUTHORITIES ..............................................................................................iii

STATEMENT OF INTEREST OF AMICI CURIAE ...................................................... 1

SUMMARY OF ARGUMENT ........................................................................................ 2

BACKGROUND ............................................................................................................. 3

LEGAL STANDARD...................................................................................................... 5

ARGUMENT .................................................................................................................. 6

I.    Defendants' JV and Continued Anticompetitive Conduct Will Cause Irreparable Harm .. 6

A.    Defendants' Proposed JV Will Result in a Substantial Loss of Competition.................. 7

1.    The JV Will Eliminate Competition Among Defendants ........................................... 7

2.    The JV will Create a Fat Monopoly with Complete Control Over the Market for Skinny Sports Bundles ...................................................................................................... 9

B.  The JV Increases the Risk Of Anticompetitive Coordination Among the Defendants and Other Market Participants................................................................................................ 11

C.  Consumers Will Suffer Irreparable Harm from the JV Combined with Defendants' Anticompetitive Conduct................................................................................................ 12

1.  Consumers Will Be Vulnerable to Price Increases and Decreased Quality................ 13

2.  Consumers Will Have Fewer Options and Reduced Access to Diverse Sports Programming................................................................................................................ 13

3. The JV Will Result In Less Innovation........................................................................ 15

i

D.  Sports Leagues and Other Creators of Sports Content Will Suffer Irreparable Harm from the JV Combined with Defendants' Anticompetitive Conduct ............................................. 16

II.     The Requested Injunctive Relief Serves the Public Interest by Preventing Harm to Consumers and Preserving Competition .................................................................................... 17

CONCLUSION ......................................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ................................ 12

*Brown Shoe v. U.S.*, 370 U.S. 294 (1962) .................................................................................... 9

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30 (2d

    Cir. 2010). ............................................................................................................................. 6

*Consumers Warehouse Center, Inc. v. Intercounty Appliance Corp No. 05 CV 5549, 2007 WL*

    *922423 (E.D.N.Y. Mar. 26, 2007)* ..................................................................................... 10

*Doe v. Zucker*, No. 1:17-cv-1005, 2019 WL 111020 (S.D.N.Y. Jan. 4, 2019) ............................ 18

*FTC v. Sysco Corporation*, 113 F.Supp.3d. 1 (D.D.C. 2015) ...................................................... 18

*New York v. Actavis PLC*, 787 F.3d 638 (2d. Cir. 2015) .............................................................. 5

*New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020) ..................... 8, 12, 13

*U.S. v. Bertelsmann Se & Co. KGaA*, 646 F.Supp.3d 1 (D.D.C. 2022) ...................................... 16

*U.S. v. Columbia Pictures Industries, Inc.*, 507 F. Supp. 412 (S.D.N.Y. 1980).......................... 18

*U.S. v. Penn-Olin Chemical Co.*, 378 U.S. 158 (1964) ................................................................ 7

*U.S. v. Phila. Nat'l Bank*, 374 U.S. 370 (1963) .......................................................................... 9

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) ................... 16

**Other Authorities**

Andy Buhler, et al., *Port Neches-Groves dethrones South Oak Cliff: Live Texas high school

    football championship updates recap*, SI.COM (Dec. 17, 2023), https://perma.cc/99Y4-AEYX

    ................................................................................................................................................ 14

*Broken Promises: Media Mega-Mergers and the Case for Antitrust Reform*, WRITERS GUILD OF

    AM. WEST (Dec. 21, 2021), https://perma.cc/R7AB-F3DE .................................................. 15

Daniel Frankel, *Pay TV Companies, and the DOJ, Push Back on Big 'Spulu' Sports Streaming Joint Venture*, Next TV (Feb. 15, 2024), https://perma.cc/YR9S-4M5T ................................. 4

David Jarvis, et. al, *Live sports: The next arena for the streaming wars*, DELOITTE INSIGHTS, (Nov. 30, 2022), https://perma.cc/ESH5-CBJU ....................................................... 15

David Pierce, *Streaming services keep getting more expensive*, THE VERGE (June 24, 2024), https://perma.cc/CKK7-FV7X ................................................................... 4

*Earnings call: Warner Bros. Discovery has seen a reduction in debt*, INVESTING.COM (Feb. 23, 2024), https://perma.cc/D55J-QUKV .......................................................... 8

FUBO HOME PAGE, https://perma.cc/SZV7-Y5L9 ..................................................... 11

Jared Newman, *The little live-TV streaming service that could*, FASTCOMPANY (Aug. 9, 2018), https://perma.cc/JE9C-ANQB .................................................................. 15

John Koblin, *Zombie TV Comes for Cable*, N.Y. TIMES (Dec. 15, 2023), https://perma.cc/RP3A-XN5M ............................................................................................. 4

Joseph F. Brodley, Joint Ventures and Antitrust Policy, 95 Harv. L.Rev. 1523, 1532-34 (1982) 10

Letter from Reps. Jerrold Nadler and Joaquin Castro, Congress of the United States, to Robert Iger, Lachlan Murdoch and David Zaslav (Apr. 16, 2024), https://perma.cc/A99U-QKAB ... 10, 12

Mark Lemley and Matt Wansley, Opinion, *How Big Tech Is Killing Innovation*, N.Y. TIMES (June 13, 2024), https://perma.cc/H5KP-SVVG ...................................................... 15

Michael McCarthy, *Tuned In: Sports Leagues Suspicious of Giant Streamer*, FRONT OFFICE SPORTS (Feb. 8, 2024), https://perma.cc/6XGY-2DPP ............................................ 17

Press Release, FUBO, *Fubo Bolsters Expansive Sports Programming With Launch of Willow by Vricbuzz, The Premier Cricket Broadcaster* (May 30, 2024), https://perma.cc/P2P7-RCX9 . 14, 17

Press Release, Open Markets Institute, *Open Markets Institute Supports the Justice Department's decision to sue to block AT&T's effort to buy Time Warner* (Nov. 21, 2017), https://perma.cc/W2A5-U3WM ............................................................................. 14

*Public Knowledge Petition to Deny on AT&T/DirecTV Merger*, PUBLIC KNOWLEDGE (Sep. 16, 2014), https://perma.cc/4WAH-SP2J ...................................................................... 14

Sandeep Vaheesan, *Merger Policy for a Fair Economy*, LAW AND POLITICAL ECONOMY BLOG (Apr. 5, 2022), https://perma.cc/CQS7-MGXN ........................................................ 9

Shiva Stella, *Public Knowledge Calls for Thorough Antitrust Review to Block Disney-Fox Deal to Protect Consumers*, PUBLIC KNOWLEDGE (Dec. 14, 2017), https://perma.cc/N3CN-WUUJ 14

Squawk Box, *Disney CFO Hugh Johnston on Q1 results, new sports streaming alliance and Epic Games investment*, CNBC (Feb. 8, 2024), https://perma.cc/EL9T-Z682 ............................ 6, 16

Tim Winter & David Goodfriend, Opinion, *Web-based content is ushering in affordable a la carte programming*, WASHINGTON TIMES (July 1, 2015), https://perma.cc/96WK-672F .......... 3

Tony Maglio, *A Running List of Everyone Who Already Hates the Disney, Fox, and WBD Sports-Streaming Service*, INDIEWIRE (Feb. 21, 2024), https://perma.cc/EWJ9-TF6W............. 10, 12

U.S. Dep't of Just. & Fed. Trade Comm'n, Competitor Collaboration Guidelines (2000) ............ 7

U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines (2023) ........................ 7, 9, 10, 11

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010) ................. 16

*Venu Sports may be available for $42.99 per month with its planned launch targeted for this fall*, ASSOCIATED PRESS (Aug. 1, 2024), https://perma.cc/EV2E-68HR ......................................... 11

*Walt Disney Co Q1 2024 Earnings Conference Call Transcript*, Rev (Feb. 8, 2024),

    https://perma.cc/KX49-93ZY ................................................................................................. 8

*What Soccer (Football) Leagues can I watch on Fubo?*, FUBO HELP CENTER (Updated July 15,

    2024), https://perma.cc/98HF-V3P6 ........................................................................................ 14

## STATEMENT OF INTEREST OF AMICI CURIAE[1]

*Amici curiae* are five organizations devoted to advocacy on behalf of consumers and the public interest in the context of antitrust policy and litigation, as well as other issue areas. *Amici* are uniquely positioned to opine on this motion for a preliminary injunction given their expertise on antitrust law. In addition, *amici* have relevant expertise in how anticompetitive mergers and conduct cause harm to consumers and the public interest. Consumers whose interests *amici* represent, and advocate on behalf of, would be adversely affected if this Court were to deny Plaintiffs' motion for a preliminary injunction.

The *amici* joining this brief are Sports Fans Coalition (SFC), the American Economic Liberties Project (AELP), the Electronic Frontier Foundation (EFF), Open Markets Institute (OMI), and Public Knowledge (PK).

SFC is a grassroots, fan-driven sports advocacy organization that represents sports fans wherever public policy impacts the games people love. Established in 2009, SFC is the largest fan-oriented consumer group with advocates that transcend geographic, demographic, socio-economic, and political boundaries. SFC's Board of Directors includes a former member of the U.S. women's Olympic soccer team; a sports writer; a former corporate CEO; and the CEO of a non-profit consumer advocacy group, among others. SFC has an engaged digital community of fan activists who are deeply concerned with issues of access to sports programming and the affordability of sports media more broadly.

AELP is an independent nonprofit research and advocacy organization dedicated to understanding and addressing the problem of concentrated economic power in the United States. AELP organizes and employs a diverse set of leading policy experts in a wide range of areas

---

[1] This brief was not authored in whole or part by counsel for a party. No one other than *amici curiae* or their counsel made a monetary contribution to preparation or submission of this brief.

impacted by concentrated power that include digital media and the technology industry, private equity, airlines, and healthcare. AELP advocates for policies that address today's crisis of concentration through legislative efforts and public policy debates.

EFF is a non-profit civil liberties organization with tens of thousands of dues-paying members. EFF has worked for over 30 years to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF and its members have an interest in ensuring that the public receives all the benefits of robust competition in high-tech markets, including the ability to choose, curate, and engage with media through a diverse array of technologies that put users' interests first.

OMI is a non-profit organization dedicated to promoting fair and competitive markets. It does not accept any funding or donations from for-profit corporations. Its mission is to safeguard our political economy from concentrations of private power that undermine fair competition and threaten liberty, democracy, and prosperity. OMI regularly provides expertise on antitrust law and competition policy to Congress, federal agencies, courts, journalists, and members of the public.

PK is a nonprofit technology policy organization that promotes freedom of expression, an open Internet, access to affordable communications tools and creative works, and a competitive media marketplace. As part of that mission, PK advocates on behalf of consumers, including sports fans, supporting policies that promote competition and open markets.

## SUMMARY OF ARGUMENT

The Court should grant Plaintiffs' motion for a preliminary injunction to prevent Defendants from consummating their proposed joint venture (the "JV"). Allowing the JV to proceed would result in irreparable harm to consumers and granting a preliminary injunction is in

the public interest. Also, Fubo is likely to succeed on the merits (or, at a minimum it has established serious questions going to the merits to make them fair ground for litigation).

Should the Court decide to allow the JV to be consummated, it is critical that the Court grant injunctive relief to halt Defendants' anticompetitive conduct. Defendants' restrictive licensing practices have already caused significant harm to consumers and competition; and, combined with the JV, this conduct will all-but guarantee Defendants an immediate and durable monopoly in the market for skinny sports bundles.

Given their expertise, *amici* focus their arguments on the harm to consumers and competition that is likely to result absent injunctive relief and, relatedly, why granting Plaintiffs' request for a preliminary injunction is decidedly in the public interest.

## **BACKGROUND**

For decades, the cable industry has forced a "big fat bundle" of unwanted channels and junk fees on consumers. As Sports Fans Coalition founder David Goodfriend observed, in 2015, "[a]sk any sports fan if he or she would prefer to watch just the home team's games, league or post-season championship, rather than buy the expensive pay-TV packages or sports programming tiers offered today, and you will get a loud yes." Tim Winter & David Goodfriend, Opinion, *Web-based content is ushering in affordable a la carte programming*, WASHINGTON TIMES (July 1, 2015), https://perma.cc/96WK-672F. In that same op-ed, Goodfriend noted the promise of the Internet as hopefully presenting an opportunity to every sports fan "who ever bemoaned the bundle." *Id.* He added that sports fans "would benefit from a more flexible, consumer-driven, unbundled video ecosystem that allows each of us to pay for what we want, rather than pay a ransom to watch what we don't." *Id. Amici* strongly agree that fans should have more freedom to

subscribe to the content they want, without being forced to purchase large bundles that include pricey, non-sports content.

Nearly a decade after SFC's founder called out consumer dissatisfaction with bundling, sports fans are still saddled with bloated, expensive packages. To date, streaming services have failed to live up to their promise of offering unbundled sports programming and have steadily been hiking their prices. *See, e.g.*, David Pierce, *Streaming services keep getting more expensive*, THE VERGE (June 24, 2024), https://perma.cc/CKK7-FV7X. There are distributors that stand ready to deliver the benefits of innovation like unbundled content to consumers, but Defendants' anticompetitive restraints have largely blocked the way.

A handful of dominant U.S. television programmers and owners of most U.S. sports television rights (namely, the Defendants) have kept sports fans trapped in a bad deal. Defendants have actively sought to perpetuate the status quo by refusing to license sports content on an unbundled basis to companies like Fubo. Daniel Frankel, *Pay TV Companies, and the DOJ, Push Back on Big 'Spulu' Sports Streaming Joint Venture*, Next TV (Feb. 15, 2024), https://perma.cc/YR9S-4M5T. ("The distributors have been begging for the right to offer cheaper and skinnier bundles, especially bundles that would segregate expensive sports from cheaper non-sports programming, for at least two decades, and they've been met with a brick wall"). They perpetuate this forced bundle because it serves their interests, but it does not serve the interests of consumers. *See, e.g.*, John Koblin, *Zombie TV Comes for Cable*, N.Y. TIMES (Dec. 15, 2023), https://perma.cc/RP3A-XN5M ("The media companies that own the channels are in a bind. The so-called cable bundle was enormously profitable for media companies, and more than 100 million households subscribed at the peak."). Consumers have communicated their dissatisfaction with

bundling, in part by switching from bundles to less expensive, less-bloated options in skinny Direct-to-Consumer (DTC) offerings–that is, where they have the option to do so. *Id.*

On its face, it may seem that Defendants are finally willing to give consumers what they want, but that is far from the reality of what would ensue if the Court allows the JV to proceed. Defendants propose to address a common consumer complaint about sports streaming–the fragmentation of sports across a variety of different services and platforms–but, they propose to do so in a way that deliberately locks out competitors, who have long tried, and been blocked, from addressing that exact consumer demand. There is undoubtedly consumer demand for a skinny sports bundle, or even a la carte sports offerings, but Defendants' own licensing practices have thus far prevented anyone from satisfying that demand.

Consumers want independent companies offering a selection of skinny sports bundles that compete for their business on price, product innovation, customer service, or any multitude of factors. In stark contrast, Defendants aim to use their JV as a vehicle to create a monopoly and position themselves as the sole offeror of that product with zero competitive constraints on its price or quality. The Court should intervene to block the JV and put a stop to Defendants' anticompetitive conduct. This result comports with the law and the public interest. By granting the preliminary injunction, the Court can ensure consumer access to new products and services that sports fans want without forcing them to accept the whims of a monopolist.

## <u>LEGAL STANDARD</u>

In the Second Circuit, a party is entitled to injunctive relief when there is a "threatened loss or damage by a violation of the antitrust laws." *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d. Cir. 2015) (internal quotation marks omitted). In assessing whether to grant a preliminary injunction, courts require that movants "establish (1) 'irreparable harm'; (2) 'either (a) a likelihood

of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party'; and (3) 'that a preliminary injunction is in the public interest.'" *Id*. The threshold for granting a preliminary injunction in the Second Circuit is flexible; even if the typical elements for a preliminary injunction are not met, a court can still grant one "in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claim, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). The present case is one such example.

## ARGUMENT

### I.    Defendants' JV and Continued Anticompetitive Conduct Will Cause Irreparable Harm

The JV will combine three entities that currently operate as independent competitors. On their own, each of them already has an immense amount of market power. Collectively, Defendants control as much as 80 percent of the market for U.S. live sports broadcasting rights. Squawk Box, *Disney CFO Hugh Johnston on Q1 results, new sports streaming alliance and Epic Games investment*, CNBC (Feb. 8, 2024), https://perma.cc/EL9T-Z682.

The JV will result in a substantial loss of competition and an increased risk of anticompetitive coordination among competitors. Ultimately, the JV will create a single, dominant entity with no check on its ability to raise prices or reduce quality, and little incentive to innovate. In combination with the JV, Defendants' continued anticompetitive conduct will cause increased harm to consumers.

### A. Defendants' Proposed JV Will Result in a Substantial Loss of Competition

The proposed JV will eliminate competition between Defendants in several markets, including the market for streaming live sports content to consumers. The JV will specifically eliminate competition among Defendants to offer independent, competing skinny sports bundles. Furthermore, the JV will substantially reduce competition by driving competing distributors, like Fubo, out of business and raising barriers to entry for any new competitors to an insurmountable height.

Although Defendants claim that the JV is not subject to Section 7 of the Clayton Act, clear case law holds that "Section 7 of the Clayton Act applies to joint ventures." *U.S. v. Penn-Olin Chemical Co.*, 378 U.S. 158, 167 (1964) (internal quotation marks omitted). Similarly, the Federal Trade Commission (FTC) and Department of Justice (DOJ) joint Competitor Collaboration Guidelines make clear that "in some cases, competitor collaborations have competitive effects identical to those that would arise if the participants merged in whole or in part." U.S. Dep't of Just. & Fed. Trade Comm'n, §1.3 Competitor Collaboration Guidelines (2000). Under those circumstances, "[t]he Agencies treat a competitor collaboration as a horizontal merger in a relevant market and analyze the collaboration pursuant to the Horizontal Merger Guidelines." Id.;

### 1. The JV Will Eliminate Competition Among Defendants

Competition between rivals serves consumers and the public. As the FTC and DOJ Merger Guidelines explain, "Competition often involves firms trying to win business by offering lower prices, new or better products and services, more attractive features, higher wages, improved benefits, or better terms relating to various additional dimensions of competition." U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines, § 2.2 (2023) [hereinafter Merger Guidelines]. With the consummation of the JV, Defendants will jointly control a majority of U.S. live sports

broadcasting rights and face little competitive pressure to improve their services or their terms. *See, e.g.*, *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 238 (S.D.N.Y. 2020) (explaining that the elimination of competition between firms through mergers could lead to unilateral anticompetitive effects, such as higher prices and reduced quality, independent of competitive responses from other firms).

The JV will also eliminate competition among Defendants to offer independent, competing skinny sports bundles. Absent the JV, Defendants Disney, Warner Brothers, and Fox are likely to continue to develop stand-alone, direct-to-consumer (DTC) products. With Peacock, Max, Fox Sports, ESPN+, and ESPN's forthcoming DTC streaming service, consumers were getting the benefit of competition among the Defendants and other market participants over price, quality, innovation, and other metrics. If the Defendants could not combine their market power into a single, dominant JV, they would likely continue to develop their own DTC offerings in response to strong consumer demand for an alternative to the *status quo* fat bundle. *See, e.g.*, *Earnings call: Warner Bros. Discovery has seen a reduction in debt*, Investing.com (Feb. 23, 2024), https://perma.cc/D55J-QUKV (CEO David Zaslav describing the JV's forthcoming skinny sports bundle as "a unique product that's looking to meet a very strong demand"); *Walt Disney Co Q1 2024 Earnings Conference Call Transcript*, Rev (Feb. 8, 2024), https://perma.cc/KX49-93ZY (CEO Bob Iger stating that "[Disney] believe[s] there are a number of sports fans out there that want to watch sports on television, but didn't want to sign up to the big cable and satellite bundle."). Absent the JV, consumers would likely have more choice among DTC products, including new competitive offerings from Defendants and potential new entrants.

Antitrust law and policy generally favor entry or expansion into a new market by internal growth rather than acquisition. As the Supreme Court observed, "surely one premise of an

antimerger statute such as § 7 is that corporate growth by internal expansion is socially preferable to growth by acquisition." *U.S. v. Phila. Nat'l Bank*, 374 U.S. 370 (1963); *see also* Merger Guidelines § 2.4.A ("Merging a current and a potential market participant eliminates the possibility that the potential entrant would have entered on its own—entry that, had it occurred, would have provided a new source of competition in a concentrated market.") Similarly, in another case, the Court stated that "[i]nternal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output." *Brown Shoe v. U.S.*, 370 U.S. 294, 345 n.72 (1962) The Court added, "Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output." *Id.*; *see also* Sandeep Vaheesan, *Merger Policy for a Fair Economy*, LAW AND POLITICAL ECONOMY BLOG (Apr. 5, 2022), https://perma.cc/CQS7-MGXN. Contrary to Defendants' characterization of the JV as adding competition to the market, *amici* strongly believe the JV will result in a significant net loss of competition and, in practice, fewer options for consumers.

### 2. The JV will Create a Fat Monopoly with Complete Control Over the Market for Skinny Sports Bundles

The JV will enable Defendants to create a single fat monopoly in the market for skinny sports bundles. Allowing the JV to proceed without addressing Defendants' anticompetitive conduct effectively ensures the creation of a new monopoly. The JV will have the incentive and ability to drive competing distributors, like Fubo, out of business and raise barriers to entry for any new competitors to insurmountable heights. The DOJ and FTC joint Merger Guidelines explain that "[w]hen a merger creates a firm that can limit access to products or services that its rivals use to compete, the Agencies examine the extent to which the merger creates a risk that the merged

firm will limit rivals' access, gain or increase access to competitively sensitive information, or deter rivals from investing in the market." Merger Guidelines § 5.

Here, Defendants collectively own a majority of live U.S. sports broadcasting rights. *See, e.g.*, Tony Maglio, *A Running List of Everyone Who Already Hates the Disney, Fox, and WBD Sports-Streaming Service*, INDIEWIRE (Feb. 21, 2024), https://perma.cc/EWJ9-TF6W. In forming the JV, Defendants will have the power and the motive to deny competitors access to a significant portion of U.S. live sports programming on competitive terms. Without access to this content at a competitive price, no current or future distributor can offer a viable competing product. Representatives Jerrold Nadler and Joaquin Castro accurately summarized the situation, stating that, "the Joint Venture raises questions about how this new offering would affect access, competition, and choice in the sports streaming market." Letter from Reps. Jerrold Nadler and Joaquin Castro, Congress of the United States, to Robert Iger, Lachlan Murdoch and David Zaslav (Apr. 16, 2024), https://perma.cc/A99U-QKAB.

In the Second Circuit, courts explicitly recognize that a joint venture can increase the incentive and ability of otherwise independent entities to exclude competitors from essential inputs in ways that may be harmful to competition. In *Consumers Warehouse Center, Inc. v. Intercounty Appliance Corp* a district court discussed how joint ventures might injure competition by excluding outside firms from essential requirements. No. 05 CV 5549, 2007 WL 922423, at *4, *5 (E.D.N.Y. Mar. 26, 2007) (citing Joseph F. Brodley, Joint Ventures and Antitrust Policy, 95 HARV. L.REV. 1523, 1532-34 (1982). The court endorsed the idea that such exclusion could impair market efficiency and fairness, and that "market exclusion and access discrimination provide early warnings of collusion risk." *Id.* (internal quotation marks omitted).

Post-consummation of the JV, Defendants will jointly offer the same core content that competitors, like Fubo, offer, but reportedly for a significantly lower price. *See Venu Sports may be available for $42.99 per month with its planned launch targeted for this fall*, ASSOCIATED PRESS (Aug. 1, 2024), https://perma.cc/EV2E-68HR; FUBO HOME PAGE, https://perma.cc/SZV7-Y5L9 (last visited Aug. 1, 2024). The JV will be able to undercut rivals on cost because Defendants will not subject themselves (i.e., the JV) to anticompetitive restraints like bundling, which drive up rivals' costs. There is good reason to believe that Fubo and other distributors of sports bundles will go out of business within a year.

The JV, combined with Defendants' anticompetitive conduct will "eliminate a potential entrant [and] eliminate current competitive pressure from a perceived potential entrant." Merger Guidelines § 1. Further, if Defendants are allowed to use their JV to raise rivals' costs even higher for access to the critical sports broadcast programming that any competitor would need to enter the market, the barrier to entry for any future entrant would become insurmountable–regardless of how much the JV might raise prices or degrade customer experience.

### B. The JV Increases the Risk Of Anticompetitive Coordination Among the Defendants and Other Market Participants

The JV will increase the risk of harmful coordination among Defendants and other market participants. As the Merger Guidelines explain, "Coordination among rivals lessens competition whether it occurs explicitly–through collusive agreements between competitors not to compete or to compete less–or tacitly, through observation and response to rivals." Merger Guidelines § 2.3. The markets in which Defendants operate are already vulnerable to harm from coordinated conduct and the JV consolidates these markets further. In particular, the JV will increase concentration among owners of live sports programming and also among bidders for leagues' live sports content.

"In the § 7 context, it has long been settled that excessive concentration and the oligopolistic price coordination it portends, may be the injury to competition the Act prohibits." *Brooke Grp. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209, 227-30 (1993). To determine whether a transaction increases the risk of coordination, courts consider "whether the relevant market shows signs of vulnerability to coordinated conduct and whether there is a credible basis on which to conclude that the merger may enhance that vulnerability." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d at 234; *accord, FTC v. Tronox Ltd*., 332 F. Supp. 187, 210 (D.D.C. 2018).

Here, the markets in which Defendants operate show clear signs of vulnerability to coordinated conduct. Collectively, Defendants will control as much as 80 percent of the market for U.S. live sports broadcasting rights. *See, e.g.*, Tony Maglio, *A Running List of Everyone Who Already Hates the Disney, Fox, and WBD Sports-Streaming Service*, INDIEWIRE (Feb. 21, 2024), https://perma.cc/EWJ9-TF6W. Defendants' past conduct also shows a tendency towards coordination rather than competition. *See, e.g.*, Am. Compl. ¶ 123 (alleging that the inclusion of MFN clauses in contracts between each of the Defendants and YoutTube TV and HuluTV are part of a "larger collusive scheme" to raise rivals' costs). Lastly, Defendants' participation in the JV would facilitate the sharing of pricing or other competitively sensitive information. *See Letter from Reps. Jerrold Nadler and Joaquin Castro to Robert Iger et al.* (Apr. 16, 2024) (raising concerns about anti-competitive sharing of information among the JV partners).

### C. Consumers Will Suffer Irreparable Harm from the JV Combined with Defendants' Anticompetitive Conduct

If the JV is consummated, combined with Defendants' continued anticompetitive conduct, consumers are likely to suffer irreparable harm. In the aftermath of the JV, there will likely be (1)

minimal constraints on the JV's ability to raise prices or decrease quality; (2) less choice and reduced access to diverse sports programming; and (3) less innovation from the elimination of an innovative competitor in Fubo, as well as the elimination of other actual or potential competitors.

### 1. Consumers Will Be Vulnerable to Price Increases and Decreased Quality

If the JV is allowed to proceed, consumers will be vulnerable to price increases and decreased quality, including on key features like customer service. As the sole offeror of a skinny sports bundle, the JV will have substantial power to raise prices and decrease quality. with no discipline from actual or potential competitors. *See, e.g.*, *Deutsche Telekom AG,* 439 F. Supp. 3d at 238.

Defendants' JV, combined with their continued anticompetitive conduct, will deprive consumers of the benefits of competition. In a competitive marketplace, sports fans would be able to choose among independent companies offering a selection of skinny sports bundles, that have to compete for fans' business on price, product innovation, customer service, or any multitude of factors. In place of competition, however, the JV will sit alone as a fat monopoly atop the skinny sports bundle market and consumers will sit below, subject to its whims.

### 2. Consumers Will Have Fewer Options and Reduced Access to Diverse Sports Programming

The JV is likely to reduce consumer choice and access to diverse sports programming including niche sports, international sports, and foreign language broadcasts by eliminating competing distributors. Fubo, for instance, is a large, virtual multi-channel video programming distributor (vMVPD) that also offers a broad range of niche sports content. Fubo subscribers can access up to 55,000 hours of sports a year, including diverse programming like Spanish-language

soccer, high school sports, and cricket. *See, e.g.*, Press Release, FUBO, *Fubo Bolsters Expansive Sports Programming With Launch of Willow by Vricbuzz, The Premier Cricket Broadcaster* (May 30, 2024), https://perma.cc/P2P7-RCX9; *What Soccer (Football) Leagues can I watch on Fubo?*, FUBO HELP CENTER (Updated July 15, 2024), https://perma.cc/98HF-V3P6; Andy Buhler, et al., *Port Neches-Groves dethrones South Oak Cliff: Live Texas high school football championship updates recap*, SI.COM (Dec. 17, 2023), https://perma.cc/99Y4-AEYX. Because Fubo is uniquely focused on offering a long tail of niche sports, including options for foreign-language broadcasts (e.g., soccer in French, Portuguese, and Spanish), its elimination will make it harder for consumers to access a diverse range of content.

Several *amici* have raised similar concerns about other large media transactions that eliminated competition by consolidating market power among a smaller number of distributors. These mergers include AT&T-DirecTV, AT&T-Time Warner, and Disney-Fox, among others. *See, e.g.*, *Public Knowledge Petition to Deny on AT&T/DirecTV Merger*, PUBLIC KNOWLEDGE (Sep. 16, 2014), https://perma.cc/4WAH-SP2J; Press Release, Open Markets Institute, *Open Markets Institute Supports the Justice Department's decision to sue to block AT&T's effort to buy Time Warner* (Nov. 21, 2017), https://perma.cc/W2A5-U3WM; Shiva Stella, *Public Knowledge Calls for Thorough Antitrust Review to Block Disney-Fox Deal to Protect Consumers*, PUBLIC KNOWLEDGE (Dec. 14, 2017), https://perma.cc/N3CN-WUUJ. Despite promises that the mergers would result in countless benefits for consumers, including an increase in output, those promises rarely came to fruition. As the Writers Guild of America West observed, "Over and over, these companies promised lower prices and more choice for customers. However, once regulators cleared the mergers, consumers saw price hikes at AT&T-DirecTV, less diversity of content at Disney-Fox, and fewer streaming choices at AT&T-Time Warner." *See, e.g.*, *Broken Promises:*

*Media Mega-Mergers and the Case for Antitrust Reform*, WRITERS GUILD OF AM. WEST (Dec. 21, 2021), https://perma.cc/R7AB-F3DE.

### 3. The JV Will Result In Less Innovation

As the only player in the skinny sports bundle market, the JV (i.e., Defendants) would have little incentive to innovate. Competition is a key driver of innovation and the absence of competition breeds stagnation. Currently, there is a particularly high rate of innovation in sports broadcasting, thanks to some degree of competition and new technologies. Real-time data analysis, multiple feeds, and new broadcasting techniques like drone-mounted cameras are just a few of the relatively new features that sports fans can enjoy. David Jarvis, et. al, *Live sports: The next arena for the streaming wars*, DELOITTE INSIGHTS, (Nov. 30, 2022), https://perma.cc/ESH5-CBJU. In the context of this broader trend, Fubo has shown itself to be an innovative competitor. One commentator noted, "FuboTV was the only live-TV streaming service . . . to support 4K HDR video for the World Cup, and it was the first to adopt an industry standard for handling sports blackouts. It also introduced dynamic ad insertion ahead of Hulu and YouTube TV. Those moves have helped turn industry skeptics into believers." Jared Newman, *The little live-TV streaming service that could*, FASTCOMPANY (Aug. 9, 2018), https://perma.cc/JE9C-ANQB.

If the JV drives companies like Fubo out of business, consumers will be deprived of the innovation that a relatively smaller and more nimble company can bring to market. The bottom line is that absent the threat of consumers switching to a different skinny sports bundle, Defendants will have little to no incentive to innovate. As a recent *New York Times* op-ed aptly stated, "[I]n the long run, it is competition — not consolidation — that delivers technological progress." Mark Lemley and Matt Wansley, Opinion, *How Big Tech Is Killing Innovation*, N.Y. TIMES (June 13, 2024), https://perma.cc/H5KP-SVVG.

**D. Sports Leagues and Other Creators of Sports Content Will Suffer Irreparable**

**Harm from the JV Combined with Defendants' Anticompetitive Conduct**

The JV will result in a loss of competition among Defendants, not only as sellers of sports broadcasting rights to distributors and as sellers of a skinny sports bundle to consumers, but also as buyers. While Disney CFO Hugh Johnston claims the Defendants will continue to compete as buyers, there is reason to be skeptical of that claim. Squawk Box, *Disney CFO Hugh Johnston on Q1 results, new sports streaming alliance and Epic Games investment*, CNBC (Feb. 8, 2024), https://perma.cc/3VGF-SW4B. This JV will create misaligned incentives, and may lead to illegal collusion.

Section 7 of the Clayton Act prohibits transactions that would result in monopsony power to the same degree that it prohibits transactions that would result in monopoly power. *See, e.g.*, *U.S. v. Bertelsmann Se & Co. KGaA*, 646 F.Supp.3d 1, 21-22 (D.D.C. 2022). Monopsony power, also known as buyer power, is the mirror image of monopoly power. Thus, transactions that create a monopsony are assessed under "essentially the [same] framework" as transactions that create a monopoly. *Id.*, quoting U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 12 (2010), https://perma.cc/X8G5-PPNM; *see also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 321-22 (2007) (because there is a "close theoretical connection" between monopoly and monopsony theories of harm, "similar legal standards should apply").

The JV could effectively reduce the number of buyers that bid for sports leagues' licenses. In markets where there are fewer buyers (i.e., reduced competition), the price for media content is likely to decrease, causing economic harm to sellers. *See Bertelsmann SE & Co. KGaA*, 646 F.Supp 1 at 35-38. Niche sports leagues and sellers of foreign-language sports content are most likely to

be harmed by this loss of competition and Defendants' morphing from independent, competing bidders into a single power buyer. Even larger professional leagues could be affected by the JV's creation of a power buyer in the form of reduced media rights fees and pressure from the all-powerful JV to enter into exclusive deals. In other words, the JV may very well be in a position to make offers to large, professional leagues that "they can't refuse." *See, e.g.*, Michael McCarthy, *Tuned In: Sports Leagues Suspicious of Giant Streamer*, FRONT OFFICE SPORTS (Feb. 8, 2024), https://perma.cc/6XGY-2DPP.

As noted above, Fubo is by far the largest MVPD that offers niche sports content including Spanish-language soccer, high school sports, and cricket. Fubo is also a key promoter of niche sports. *See, e.g.* Press Release, FUBO, *Fubo Bolsters Expansive Sports Programming With Launch of Willow by Vricbuzz, The Premier Cricket Broadcaster* (May 30, 2024), https://perma.cc/UB9K-YZRJ. If the JV proceeds, driving Fubo and other distributors out of business, these niche sports, such as professional pickleball, ultimate frisbee, and chess boxing, may struggle to find media partners willing to pay for media rights. Instead, these up-and-coming sports would be forced to deal with the JV, likely having to accept whatever paltry deal offered to the leagues. Because of this, these sports may never reach the eyeballs of potential fans who do not know what they are missing, including the excitement these newer sports can provide.

## II.    The Requested Injunctive Relief Serves the Public Interest by Preventing Harm to Consumers and Preserving Competition

Where a preliminary injunction is necessary to prevent harm to consumers, as in this case, that is generally sufficient for courts to find that a grant of such relief is in the public interest. Public interest was defined by one court in this district as "the general welfare of the public that warrants recognition and protection." *Doe v. Zucker*, No. 1:17-cv-1005, 2019 WL 111020, at *7

17

(S.D.N.Y. Jan. 4, 2019). In antitrust cases, courts often rely on the potential for harm to competition and consumers as grounds for finding injunctive relief is in the public interest. *See, e.g.*, *U.S. v. Columbia Pictures Industries, Inc.*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980) ("Far more important than the interests of either the defendants or the existing industry, however, is the public's interest in enforcement of the antitrust laws and in the preservation of competition."); *FTC v. Sysco Corporation*, 113 F.Supp.3d. 1, 87 (D.D.C. 2015) (finding that public equities favor grant of preliminary injunction where "the record as a whole . . . raises substantial questions about whether the merger will harm consumers"). Another court in this district held that "[a]ny doubt concerning the necessity of the safeguarding of the public interest should be resolved by the granting of a preliminary injunction." *U.S. v. Columbia Pictures Industries, Inc.*, 507 F. Supp. at 434. In that case, the court held that where a joint venture had "a high potential for the ultimate raising of prices," and would irreparably alter the marketplace, a preliminary injunction was necessary to prevent harm to the public. *Id.* Here, the JV and Defendants' conduct similarly present probable interim harm to the public. As such, the requested injunctive relief is necessary to prevent harm to consumers and competition, and, therefore, in the public interest.

## <u>CONCLUSION</u>

For the reasons described above, amici respectfully request that the Court grant Plaintiffs' motion for a preliminary injunction.

**CERTIFICATE OF SERVICE**

I hereby certify that on this second day of August 2024, a true and correct copy of the foregoing was filed with the Clerk of the United States District Court for the Southern District of New York via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.


*/s/ Amanda G. Lewis*
Amanda G. Lewis
Counsel for *Amici Curiae*