**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

FUBOTV INC. and FUBOTV MEDIA INC.,

                      *Plaintiffs*,

   -against-

THE WALT DISNEY COMPANY, ESPN, INC., ESPN ENTERPRISES, INC., HULU, LLC, FOX CORPORATION, and WARNER BROS. DISCOVERY, INC.,

                      *Defendants*.

Civil Action No. 24-cv-1363-MMG-JW

**PLAINTIFFS' POST-HEARING BRIEF**

**TABLE OF CONTENTS**

**Page**

I. Fubo Seeks to Enjoin *Concerted* Action, Not Unilateral Conduct ........................................1

    A. *Trinko* and *Linkline* are Irrelevant Section 2 Cases Dealing with a Single Firm's Duty to Deal ..................................................................................................2

    B. *Columbia Pictures* Is Squarely Applicable ..................................................................4

II. Raptor's Anticompetitive Effects Trump Defendants' Stated Intent ......................................7

Plaintiffs, fuboTV Inc. and fuboTV Media Inc. ("Fubo"), submit this post-hearing brief.

I.      **Fubo Seeks to Enjoin *Concerted* Action, Not Unilateral Conduct**

This preliminary injunction proceeding concerns the collective action of Disney, Fox, and Warner Brothers—three admitted horizontal competitors. Their collective actions include (1) combining their collective 60-80% of US live sports streaming rights; (2) forming a jointly owned entity (Raptor) to exploit the market power of those combined rights as a monopoly product; (3) determining jointly to unbundle their sports content for Raptor with the knowledge that all existing distributors are subject to bundling requirements preventing them from offering a skinny sports bundle; (4) agreeing both formally and informally *not* to compete with Raptor or each other in the "ocean of opportunity" that only Raptor will serve upon launch; and (5) agreeing with each other to fund and staff Raptor (with six board members from Defendants as its ultimate management). *None* of this involves unilateral conduct by any defendant. While this joint action is carried out under the joint venture rubric, such collaborations of competitors are suspect and have been condemned and enjoined in closely analogous circumstances, *see infra* pp. 5-6.

The antitrust laws recognize that concerted action amongst independent economic units poses a significantly greater threat to competition. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767-69 (1984) ("The reason Congress treated concerted behavior more strictly than unilateral behavior is readily appreciated. Concerted activity inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands."). In assessing whether defendants are engaged in collective action, courts ask "whether there is a contract, combination, or conspiracy amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition." *Am. Needle, Inc. v. Nat'l*

1

*Football League*, 560 U.S. 183, 195 (2010) (cleaned up).  In making this assessment, courts must "avoid tightly compartmentalizing the various factual components of Plaintiffs' case and wiping the slate clean after scrutiny of each."  *Watson Lab'ys, Inc. v. Forest Lab'ys Inc.*, 101 F.4th 223, 235 (2d Cir. 2024) (cleaned up).  Instead, a course of "anticompetitive conduct"—such as Defendants' joint venture and their bundling practices—"must be considered as a whole."  *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 2024 WL 3642432, at *11 (4th Cir. 2024).

*None* of this involves unilateral conduct by any defendant.  While Fubo's complaint alleges unlawful unilateral conduct—*e.g.*, "tying" in violation of Section 1 of the Sherman Act—the present Motion turns on Defendants' collective action.  Joint ventures among horizontal competitors are suspect and have been condemned—and enjoined—in closely analogous circumstances, *see infra* pp. 5-6.  And while the longstanding and suspect practice of forcing fat bundles on distributors may or may not involve actual or tacit collusion, the question is irrelevant for present purposes.  The joint conduct occurs against the backdrop of forced bundling, and its effects must be assessed on that basis.  *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 244 (S.D.N.Y. 2019) ("competitive landscape" is "directly related" to anticompetitive effects of agreement).

### A. *Trinko* and *Linkline* are Irrelevant Section 2 Cases Dealing with a Single Firm's Duty to Deal

Because this proceeding involves concerted action, the Defendants' reliance on *Trinko* and *Linkline* is misplaced.  Those cases hold that a *single* firm, acting unilaterally, does not normally have a duty to deal with its rivals under Section 2.  Fubo claims no such duty here.  It instead seeks to enjoin the collective action of three horizontal competitors that seek to pool their extensive live sports holdings to create a "must have" monopoly that will, stated plainly, put Fubo out of business and harm competition and consumers as well.

In *Trinko*, the plaintiff alleged that Verizon—acting alone—violated Section 2 by "den[ying] interconnection services to" them. *Verizon Commc'ns. Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). The Court rejected this claim, emphasizing repeatedly the unilateral nature of Verizon's conduct. *See*, *e.g.*, *id.* at 408 (acknowledging "the long recognized right of *a* trader or manufacturer engaged in an *entirely private* business, freely to exercise his own *independent* discretion as to parties with whom he will deal") (emphases added) (cleaned up); *id.* (observing "the difficulty of identifying and remedying anticompetitive conduct *by a single firm*") (same). The Court also specifically distinguished *Trinko* from prior "cases involv[ing] *concerted* action, which presents greater anticompetitive concerns." *Id.* at 410 n.3. *Trinko* therefore has nothing to say about Defendants' joint venture and concerted action.

*Linkline* is even further afield. There, the plaintiffs alleged that AT&T—acting alone—"subjected them to a 'price squeeze' in violation of § 2 of the Sherman Act." *Pac. Bell Tel. Co. v. linkLine Commc'ns., Inc.*, 555 U.S. 438, 442 (2009). The alleged price squeeze consisted of "setting a high wholesale price for DSL transport and a low retail price for DSL Internet service." *Id.* at 443. The Court rejected the price-squeeze claim because AT&T had "no duty to deal at the wholesale level" (meaning the plaintiffs could not complain about a price they did not like) and engaged in "no predatory pricing at the retail level." *Id.* at 452. The price-squeeze claim was therefore "an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level." *Id.* The Court also emphasized that "price-squeeze claims challenge . . . unilateral conduct." *Id.* at 449.

This case could not be more different. *Linkline* involved unilateral conduct; this case involves concerted action. *Linkline* involved Section 2 claims generally and price-squeeze claims specifically; this case involves neither. *Linkline* involved unmeritorious claims in both the

3

upstream and downstream markets; this case involves concerted action in the downstream market and tying in the upstream market.

Nor does *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.* 386 F.3d 485 (2d Cir. 2004), provide Defendants any help. In a portion of the decision, which Defendants appear to have relied on for the first time at closing argument, the Second Circuit held that the purchase by a company's 75% shareholder of the remaining 25% of shares did not violate Section 7 where plaintiffs "alleged no potential antitrust harm stemming from the acquisition" itself. *Id.* at 511 ("The fact that the 1996 purchase removed a layer of internal corporate control is not by itself a concern of the Clayton Act, for that removal standing alone is not an antitrust violation."). That exceedingly narrow holding has no application here, where Fubo has established that formation of Raptor against the backdrop of Defendants' bundling practices is itself anticompetitive.

### B.  *Columbia Pictures* Is Squarely Applicable

*United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412 (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1063 (2d Cir. Apr. 7, 1981), is squarely on-point: Like this case, *Columbia Pictures* involved horizontal competitors in an upstream programming market who combined "one-half of the essential product of the industry" in a downstream distribution market through formation of a JV. *Id.* at 430. And like Defendants here, the movie production companies denied any third-party distributor the opportunity to offer a product competitive with their downstream JV by making that product exclusive.

Defendants claim that *Columbia Pictures* is different because the defendants there had an express agreement to license films exclusively to the defendants' JV, while the Raptor parents do not. That elevates form over substance. Each Defendant in this case *already* prohibits third parties from offering skinny sports bundles and has locked in these bundling requirements through long-

4

term contracts, so Defendants can guarantee Raptor's exclusivity simply by agreeing with each other to *unbundle* their sports for Raptor. Given the fat bundles that they impose on virtually all other distributors, Defendants can rest assured that no other distributor will be able to offer a package that competes with Raptor—as Defendants have admitted in their ordinary course documents. Nor will they compete directly with their progeny – "don't overthink it," as Mr. Nallen of Fox advised. PX015. The JV term sheet contains provisions limiting competition between Defendants (PX289 at 5, 17), and the evidence demonstrates that Defendants' agreement not to compete extends well beyond the term sheet (PX286; PX52; PX53; Trial Tr. 402:24-403:2).

In any event, the holding of *Columbia Pictures* is not dependent on the existence of an express non-compete agreement. The agreement there was relevant to the *Columbia Pictures* court's analysis only of *per se* illegality, which is not at issue here. The *Columbia Pictures* court's analysis of the Premiere JV's anticompetitive effects did not depend on whether there was an express exclusivity agreement. Instead, *Columbia Pictures* focused on the anticompetitive effects of the exclusivity—the same effects that are present here. *See*, *e.g.*, *id.* at 432 (nine-month exclusive window "could be disastrous" "[f]or new and struggling [competitor] companies"). Ergo, *Columbia's* holding (and the Second Circuit's affirmance) did not turn on the existence of an agreement not to compete. Even if it did, the facts here demonstrate that defendants have arranged their collaboration to prevent competition as a result of formal and informal agreements as well as the common sense incentive not to harm the prospects of a joint product that can proceed without effective competition. *Eastman Kodak*, 504 U.S. at 466–67 ("[F]ormalistic distinctions rather than actual market realities are generally disfavored in antitrust law"); *Copperweld*, 467 U.S. at 760 (1984) (antitrust law "is aimed at substance rather than form"). In any event, Section

5

7 requires no agreement and can warrant injunctive relief against anticompetitive transactions even where Section 1 (the basis for relief in *Columbia Pictures)* cannot.

There is another important difference between this case and *Columbia Pictures* that Defendants do not mention: Unlike the government in *Columbia Pictures*, Fubo has brought a Section 7 claim against Defendants. And the focus of Section 7 is on the challenged transaction itself (i.e., the Raptor JV)—not any agreement beyond the transaction at issue. The key question is whether the JV "may substantially lessen competition," regardless of any underlying agreements. And on that question, *Columbia Pictures'* reasoning regarding a strikingly similar joint venture is directly on point.

*Columbia Pictures* is not unique. Courts and enforcement agencies have repeatedly barred similar horizontal joint ventures that would substantially lessen competition. *See*, *e.g.*, *Yamaha Motor Co. v. F.T.C.*, 657 F.2d 971, 980 (8th Cir. 1981) (affirming FTC's finding that a joint-venture agreement between two horizontal competitors would substantially lessen competition and would not benefit consumers because it "did not bring into the market an additional independent decisionmaker . . . but only added to the productive capacity of the second largest firm in a four-firm-dominated industry"); *United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65, 73 (D. Mass. 2023) (striking down joint venture between American Airlines and JetBlue and noting that federal antitrust law "aims to preserve the free functioning of markets and foster participation by a diverse array of competitors. Those principles are generally undermined, rather than promoted, by agreements among horizontal competitors to dispense with competition and cooperate instead.") *appeal filed* No. 23-1802 (1st. Cir. Oct. 5, 2023); *see also* Joseph F. Brodley, *Joint Ventures and Antitrust Policy*, 95 Harv. L. Rev. 1521, 1552–53 (1982) ("[T]he horizontal [joint

6

venture] is inherently the most anticompetitive, because it involves the formation of a joint venture in the markets in which the parents operate."). The same result is appropriate here.

**II.     Raptor's Anticompetitive Effects Trump Defendants' Stated Intent**

Defendants devote much of their defense to the profession of their intent to take only people who have left the Pay TV ecosystem, and to stay clear of Fubo and other distributor's subscribers.

That is malarkey, as the evidence has demonstrated. The entire intent of Raptor is to grow the subscriber base so that the parents can make more money, which they admit they will make starting on day one. The compensation of Raptor's incoming CEO Peter Distad is notably based on *total subscriber growth.* PX69. It is *not* based on acquisition of non-Pay TV subs – though presumably it could be. It does not encourage him to attract only "cord cutters." It encourages him to get as many subscribers as he can find. Defendants seek and intend to reward management for attracting as many subscribers as it can from whatever quarters. The seemingly curious "profit" split of 1/3 for each parent, even though Disney is contributing more licensing rights, is actually not curious at all. As Defendants have argued, they intend through internal "transfer" pricing to suppress Raptor's profits, and to make money only at the owner level, which is within their power to arrange, as Mr. Orszag explained. That is precisely why Mr. Distad's compensation is not based on Raptor profits. And that is why Disney can confidently be indifferent to Raptor profits it does not expect to receive (since its profits will be earned at the parent company through license fees).

Defendants' claims of benign intent are both implausible, given the above and much other evidence, and irrelevant legally. What matters is the likely *effects* of challenged conduct, and intent matters only to the extent it can help predict those effects. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018); *Sidibe v. Sutter Health*, 103 F.4th 675, 688 (9th Cir. 2024) (restraint's "purpose" is relevant "not because a good intention will save an otherwise objectionable

[combination]; but because knowledge of intent may help the court to interpret facts and to predict consequences." (quoting *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918) (Brandeis, J.)); *see also State of N.Y. by Abrams v. Anheuser-Busch, Inc.*, 811 F. Supp. 848, 874 (E.D.N.Y. 1993) ("Although lawful purpose will not save an otherwise anticompetitive restraint from its unlawful effects, knowledge of the purpose can help courts interpret the effects."); *General Leaseways, Inc. v. Nat'l Tuck Leasing Assoc.*, 744 F.2d 588, 595–96 (7th Cir. 1984) (Posner, J.) ("We attach rather little weight to . . . anticompetitive intent, because" it "cast[s] only a dim light on what ought to be the central question in an antitrust case: actual or probable anticompetitive effect.").[1]

Market research for *baby* Raptors (two rather than three cartel members) showed that the prospective product will have huge appeal (perhaps similar to the appeal of ESPN+ which notably attracted 25 million subscribers to a limited sports offering, PX454 at 31-32). As ESPN Chairman Pitaro wrote to colleagues, Raptor will be "must have for hard core and even moderate sports fans." PX 238. Those fans are now populating Fubo because, fat bundle notwithstanding, Fubo may be the current best option for sports fans. All that changes on Raptor day one, as evidence from other distributors, investors, analysts, other market participants, and common sense demonstrate. Defendants' claimed desire to attract cord-cutters exists side by side with their recognition in internal documents that Raptor is likely to attract from 50-67% of its subscribers from current Pay

---

[1] *See, e.g.*, *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013); Herbert Hovenkamp, *Post-Chicago Antitrust: A Review and Critique*, 2001 Colum. Bus. L. Rev. 257, 277, 327 (2001) (when "the focuses of the inquiry" is on an antitrust defendant's intent a court "is almost always asking for trouble"); Frank H. Easterbrook, *On Identifying Exclusionary Conduct*, 61 Notre Dame L. Rev. 972, 977 (1986) ("Objective indicators, not intent, are what matter.").Steven C. Salop & R. Craig Romaine, *Preserving Monopoly: Economic Analysis, Legal Standard, and Microsoft*, Geo. Mason L. Rev. 617, 652 (1999) ("Focusing solely on effects is consistent with first principles of antitrust.").

TV customers. Mr. Pitaro admitted as much during the hearing. *See* Trial Tr. 481:11-19 ("So from day one you testified that you have been intending to target cord-nevers and cord-cutters and doing everything you can to do that, correct? A. Yes. Q. And despite that stated intent, at this point in January 2024, you told Disney's board and executives that you expected 67 percent of Raptor subscribers to be trade-downs from pay TV, is that correct? A. That is correct. My job is to make sure that we are being financially conservative and putting in front of them a plan that we believe we can hit.").

What the evidence actually shows about defendants' intent is this: they intend to create a monopoly in the skinny sports bundle market. In the words of Disney's Justin Connolly, Raptor "is primarily about creating and launching a new package which others cannot currently develop and others likely have significant encumbrances to launch." PX 220. Unchallenged testimony in this case has confirmed that, because of Defendants' pervasive bundling practices, Raptor will be the only skinny sports bundle on the market if it is allowed to launch. Trial Tr. 1040:19-22 (Whinston); 857:14-17 (Campbell); 394:1-11 (Nallen); *see also* Iger Dep. Tr. 26:4-7. And Defendants have made no bones about their intention to "avoid" the creation of "[a]nything that can offer . . . a material set of content e.g. a dedicated sports product, that can be marketed head on against Raptor." PX 19.

\* \* \*

The other three preliminary-injunction factors—irreparable harm, public interest, and balance of hardships—all decidedly favor Fubo. As to irreparable harm, Fubo has established that Raptor will likely cause Fubo to become insolvent—the most extreme form of irreparable harm for a business—and Defendants' arguments about how little harm the Raptor will cause have no support in the evidence (and defy the evidence and common sense as well). As to public interest,

consumers, market participants, and members of Congress have been uniform in their opposition to Raptor as well as to the fat bundling practices that have made Raptor a likely monopoly if it launches. And as to balance of hardships, there is no balance. Fubo will face insolvency absent an injunction. But there is literally no harm to multibillion media giants if Raptor is delayed for some period of time while the merits of the case can be fully resolved. Indeed they tell the Court that Raptor will be a marginal product, a loss leader barely worth doing. As counsel admitted this morning, they love the fat bundles (for obvious reasons) but "[they] like Venu, but [they] don't love it." Trial Tr. 1083:7-8. While Defendants' lawyers argued in summation that a delayed launch might cause harm, they made no efforts to introduce evidence that could support that argument, and they pointed to no record evidence. They will not suffer anything other than a temporary delay, assuming they prevail at trial.

      For all the above reasons, The Court should ground the Raptor pending that full trial.

| | |
|---|---|
| Dated: August 12, 2024 | Respectfully submitted, |

                                                  /s/ *Mark C. Hansen*
                                                  Mark C. Hansen (admitted *pro hac vice*)
Joseph S. Hall (SDNY Bar No. JH2612)
Thomas G. Schultz (admitted *pro hac vice*)
Joshua Hafenbrack (admitted *pro hac vice*)
Matthew J. Wilkins (admitted *pro hac vice*)
Dennis D. Howe (admitted *pro hac vice*)
Geoffrey J.H. Block (admitted *pro hac vice*)
Gavan W. Duffy Gideon (admitted *pro hac vice*)
Katherine V. Tondrowski (admitted *pro hac vice*)
Rachel T. Anderson (admitted *pro hac vice*)
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street NW
Suite 400
Washington, DC 20036
Tel.: (202) 326-7900
Fax: (202) 326-7999
Email:  mhansen@kellogghansen.com
           jhall@kellogghansen.com
           tschultz@kellogghansen.com
           jhafenbrack@kellogghansen.com
           mwilkins@kellogghansen.com
           hdepalo@kellogghansen.com
           dhowe@kellogghansen.com
           gblock@kellogghansen.com
           ggideon@kellogghansen.com
           ktondrowski@kellogghansen.com
           randerson@kellogghansen.com

*Counsel for Plaintiffs fuboTV Inc. and fuboTV Media Inc.*