UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FuboTV, Inc., and FuboTV Media, Inc.,

    Plaintiffs,

v.

The Walt Disney Company, et al.,

    Defendants.

1:24-cv-01363-MMG

**DEFENDANTS' SUPPLEMENTAL POST-HEARING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

*Attorneys for Defendants The Walt Disney Company; ESPN, Inc.; ESPN Enterprises, Inc.; and Hulu, LLC*

DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500

*Attorneys for Defendant Fox Corporation*

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Attorneys for Defendant Warner Bros. Discovery Inc.*

August 12, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

I. Fubo Failed To Establish Harm to Competition......................................................2
    A. There Is No Harm to Competition Downstream.........................................2
        1. Defendants Do Not Foreclose Entry................................................3
        2. *LinkLine* Authorizes Defendants' Conduct; *Columbia Pictures* Is Inapt. ................................................................................................5
    B. There Is No Harm to Competition Upstream..............................................6
    C. Venu Is Procompetitive. ..............................................................................7
II. Any Harm to Fubo Is Not Antitrust Injury...............................................................7
III. Fubo Failed To Establish Irreparable Harm.............................................................8
IV. The Public Interest Would Be Disserved by an Injunction......................................9
V. Any Injunctive Relief Must Be Narrowly Tailored. ............................................. 10
VI. Any Injunction Would Require Fubo To Post a Bond.......................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atlantic Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) .................................................................................................. 9

*Blue Cross & Blue Shield of Wis. v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) ..................................................................................... 5

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  910 F.2d 1049 (2d Cir. 1990) .................................................................................. 10

*Brantley v. NBCUniversal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) ................................................................................... 6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) .......................................................................................... 2, 7, 8

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
  479 U.S. 104 (1986) .......................................................................................... 2, 7, 8

*Fraser v. Major League Soccer, L.L.C.*,
  284 F.3d 47 (1st Cir. 2002) ................................................................................... 3, 4

*Fruehauf Corp. v. FTC*,
  603 F.2d 345 (2d Cir. 1979) ...................................................................................... 2

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
  386 F.3d 485 (2d Cir. 2004) ...................................................................................... 6

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007) ........................................................................................ 1

*JTH Tax, LLC v. Agnant*,
  2 F.4th 658 (2d Cir. 2023) ......................................................................................... 8

*Kearns v. Cuomo*,
  2019 WL 5060623 (W.D.N.Y. Oct. 9, 2019) .......................................................... 10

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020) ....................................................................... 2

*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009) ............................................................................................... 2, 5

*Polymer Tech. Corp. v. Mimran*,
 37 F.3d 74 (2d Cir. 1994) ............................................................................................ 8

*SCM Corp. v. Xerox Corp.*,
 645 F.2d 1195 (2d Cir. 1981) ...................................................................................... 3

*Soltex Polymer Corp v. Fortex Indus., Inc.*,
 832 F.2d 1325 (2d Cir. 1987) .................................................................................... 10

*Sprint Nextel Corp. v. AT&T Inc.*,
 821 F. Supp. 2d 308 (D.D.C. 2011) ............................................................................ 8

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*,
 454 F. Supp. 2d 62 (E.D.N.Y. 2006) ........................................................................... 9

*United States v. AT&T Inc.*,
 310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) .......... 7, 10

*United States v. Columbia Pictures Indus, Inc.*,
 507 F. Supp. 412 (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1063 (2d Cir. 1981) ..................... 5

*United States v. Phila. Nat'l Bank*,
 374 U.S. 321 (1963) .................................................................................................... 3

*Waldman Pub. Corp. v. Landoll, Inc.*,
 43 F.3d 775 (2d Cir. 1994) ........................................................................................ 10

**Statutes & Rules**

Clayton Act Section 7, 15 U.S.C. § 18 ............................................................... 3, 5, 6, 10

Fed. R. Civ. P. 65(c) ........................................................................................................ 10

**Other Authorities**

4A Areeda & Hovenkamp, *Antitrust Law* ¶ 1004d .......................................................... 8

11 Areeda & Hovenkamp, *Antitrust Law* ¶ 1902 ............................................................. 7

FTC & DOJ, *Antitrust Guidelines for Collaborations Among Competitors*
 (Apr. 2000) ................................................................................................................... 7

Fubo seeks "an extraordinary and drastic remedy"—a preliminary injunction to block the launch of Defendants' joint venture, Venu (also, the "JV"). *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). The "burden of proof and persuasion rest[s] squarely" on Fubo. *Id.* at 67–68. Fubo has failed to carry its burden.

Defendants are entitled to license their networks to anyone on any terms—or no terms at all. Defendants are thus not required to help Fubo assemble a skinny sports package. Each Defendant may choose instead to offer Fubo a license to distribute all of its networks. At the same time, each Defendant may choose to license a subset of networks with sports content to another entity that may offer consumers a skinny sports package. That licensee could be an incumbent vMVPD, such as Sling (which does in fact license a subset of Defendants' networks), or a new entrant. The launch of Defendants' joint venture, Venu, as the new entrant downstream is no different. Each Defendant gives Venu a ***non-exclusive*** license to a subset of its networks. Thus, Venu does not lessen competition in any market. Quite the opposite. Venu is additive, giving sports-focused consumers an additional, attractive choice.

The record disproves Fubo's claim that Venu will monopolize a "skinny sports bundle" market. Contrary to Fubo's assertion that Defendants did not show "a single document" about competition from SVODs (Tr. 1136:4–9, 1150:3–6), Defendants' ordinary-course business documents feature that topic. For example, Fox's internal deck for approval of Venu, which Fubo's counsel used with Mr. Orszag (PDX703), explains that "a consumer could subscribe to multiple competing SVOD services to receive similar sports plus entertainment". (PX414 at 24; *see also* PX253 at 12–14 (Disney deck).) Competing services include Peacock and Paramount+, which have extensive sports content and can be self-bundled. (Tr. (Horihuela) 554:3–13; (Orszag) 687:22–688:4.) Defendants showed how consumers can create numerous bundles at different price points. (DDX11.32.) Venu does not stop Defendants from entering individually: WBD has placed its sports content on Max, with the B/R add-on (Tr. (Campbell) 834:2–7), and it is undisputed that ESPN will launch Flagship next year (Tr. (Pitaro) 491:21–492:6).

Moreover, ***even if*** Venu prevented Defendants from offering separate "skinny sports

bundles" (it does not), Fubo lacks antitrust standing to complain about any injury from *increased* competition. As a matter of law, a vMVPD such as Fubo, a competitor to Venu, cannot claim antitrust injury from actions that *reduce* concentration. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Mr. Orszag confirmed that if (hypothetically) each Defendant licensed its networks to YouTube TV on similar terms as to Venu, Fubo would stand to lose the same customers to that offering. (Tr. 709:23–710:6.) Fubo would "face harm from the fact that other people have skinny sports bundles and Fubo doesn't". (*Id.* at 710:4–6.) Because Fubo would suffer the same harm, without any alleged coordination between Defendants, Fubo's "loss or damage [is] due merely to increased competition", which "does not constitute [antitrust] injury". *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 122 (1986).

Fubo's claim also fails because Defendants are coordinating *only* downstream (in the Venu JV), *not* upstream (in their licensing businesses). Recognizing that there is no duty to deal, even if (unlike Defendants) a company with an essential upstream input enters downstream, *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009), Fubo promised to present evidence that Defendants formed a "cartel" to engage in a "group boycott" by refusing to grant other distributors a license on the same terms as Venu. (Tr. 11:23–12:2; Reply 28–29.) But Fubo has delivered *no* evidence of any such agreement. Instead, Defendants proved that there is no agreement restricting how each JV member may license its networks, and each JV member will decide independently whether to license to any MVPD or vMVPD on bundled or unbundled terms. (Tr. (Nallen) 413:15–19; (Pitaro) 508:7–11; (Campbell) 838:13–24.)

## I. FUBO FAILED TO ESTABLISH HARM TO COMPETITION.

Under Section 7, Fubo must prove "a reasonable probability of a substantial impairment of competition, rather than a mere possibility". *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 198 (S.D.N.Y. 2020) (citing *Fruehauf Corp. v. FTC*, 603 F.2d 345, 351 (2d Cir. 1979)).

### A. There Is No Harm to Competition Downstream.

The downstream market for distribution of sports programming to consumers is competitive and unconcentrated, with many traditional MVPDs and vMVPDs, as well as new

2

entries from DTCs and SVODs. Venu will be another new entrant, which by definition reduces concentration. No one expects Venu to earn more than a relatively small market share (even if, as Fubo contends, the market were limited to MVPDs and vMVPDs). Because Fubo cannot show that Venu will "produce[] a firm controlling an undue percentage share of the relevant market, and result[] in a significant increase in the concentration of firms in that market", its claim of harm to competition fails. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963).

Recognizing it cannot show harm to competition in any reasonably defined downstream market, Fubo tries to gerrymander a narrow downstream market for "skinny sports bundles". Fubo asserts that Venu will be "the first-ever skinny sports bundle" in the U.S. and would "immediately monopolize" a supposed skinny sports bundle market. (Reply 1, 12.) That makes little sense in light of Fubo's claim that Venu will divert its subscribers. But even if it were true, such entry could not harm competition. Clayton Act Section 7 requires a reduction in competition in an existing market. *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1211 (2d Cir. 1981). The first entrant in a new market cannot diminish competition that did not previously exist. *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 69–70 (1st Cir. 2002) (citing *SCM*, 645 F.2d at 1210-11). Nor has Fubo shown that the launch of the JV prevents Defendants from entering on their own (a test of questionable validity, *see id.* at 70–71), because it has not shown that such entry is "inevitable" in the but-for world without Venu's launch, *id.* at 71.

Fubo cannot distinguish *Fraser* by arguing that Defendants combine Venu with "other wrongful conduct"—namely, allegedly "blocking every other distributor from offering a skinny sports bundle". (Reply 25.) That is wrong on the facts, because Defendants do not foreclose entry, and on the law, because Defendants' licensing practices are both lawful and irrelevant to assessing the anticompetitive effects of **Venu** under Section 7.

### 1. Defendants Do Not Foreclose Entry.

Fubo has not shown that Defendants prevent entrants to a skinny sports bundle market. Fubo must provide an "accurate definition of the relevant market". *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 & n.7 (2018). Mr. Orszag initially defined "skinny sports bundles" as

3

"streaming packages containing a limited number of channels that *all* have live sports". (Orszag Supp. Decl. (Dkt. 161-1) ¶ 2 (emphasis added).) At the hearing, he walked that back, testifying that a "skinny sports bundle" "can have other entertainment content, but it has to have *a substantial amount* of live sports". (Tr. 645:14–23, 693:9–22 (emphasis added).) Mr. Orszag claimed that any skinny bundle that is "built around ESPN" is a "skinny sports bundle". (*Id.* at 695:7–11.) He confirmed that Flagship—a DTC service ESPN will launch "in addition" to Venu (*see* Tr. (Pitaro) 498:24–500:15, 505:14–18)—will be a "skinny sports bundle" (Tr. (Orszag) 700:14–17) and "each and every package that a . . . subscriber to Flagship puts together with other SVODs is going to be a sports-oriented skinny bundle" (*id.* at 702:7–10).

By Mr. Orszag's new definition, consumers already can self-bundle to create "skinny sports bundles" (PDX703; PX414 at 24; DDX11.32), and EchoStar already offers three in Sling Orange (with ESPN and WBD sports content for $40), Sling Blue (with Fox and WBD and more sports content for $45), and Sling Orange & Blue (with ESPN, Fox, WBD and NBC sports content for $60). (DDX10.1–10.7; Tr. (Schanman) 463:3–468:21.) Moreover, Disney has already offered other MVPDs the right to create such packages (they have declined) (Tr. (Connolly) 877:22–894:25; DX236), and WBD is negotiating to do the same with its sports networks (Tr. (Miller) 945:16–24). Fox has not ruled out licensing smaller packages, but since Fox offers only two networks without sports anyway (Tr. (Espinosa) at 755:7–11), any distributor licensing all Fox networks could meet Mr. Orszag's definition.

Moreover, Fubo's own witnesses confirmed it is contractually obligated to carry non-sports networks from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and other programmers at a cost that prevents Fubo from offering a skinny sports bundle at a competitive price. (DDX02.1; Tr. (Mathers) 220:17–234:18; DX131; DDX03.1; Tr. (Marchesano) 336:22–344:18.)

Ultimately, Fubo hangs its hat on the assertion that but for the JV, each Defendant would enter on its own with a sports DTC service. Fubo lacks antitrust standing for this claim. (*See infra* pp. 7–8.) Also, the evidence is clear: WBD already has entered (Tr. (Campbell) 834:2–7); ESPN will enter with Flagship (Tr. (Pitaro) 491:21–492:6); and Fox is unlikely to have entered

4

on its own, nor is prevented from entering in the future (Tr. (Nallen) 403:16–18, 405:7–9). Fubo's speculation falls far short of its burden for a PI. *See Fraser*, 284 F.3d at 70–71.

## 2. *LinkLine* Authorizes Defendants' Conduct; *Columbia Pictures* Is Inapt.

Even if Defendants did prevent Fubo from entering, Defendants' licensing practices cannot support a Section 7 claim. The law is clear: a plaintiff cannot state a claim by alleging that "defendants (upstream monopolists) abused their power in the wholesale market to prevent rival firms from competing effectively in the retail market". *LinkLine*, 555 U.S. at 450. This applies with even greater force where, as here, there is no claim of upstream monopoly. In *LinkLine*, plaintiff providers of digital subscriber line ("DSL") to customers alleged that AT&T, a vertically-integrated upstream provider of essential DSL infrastructure and downstream provider of DSL to customers, "refused to deal with the plaintiffs, denied the plaintiffs access to essential facilities, and engaged in a 'price squeeze'" by "setting a high [upstream] wholesale price for DSL transport and a low [downstream] retail price for DSL Internet service". *Id*. at 443. The Supreme Court rejected this legal theory as "an amalgamation of a meritless claim at the [downstream] retail level and a meritless claim at the [upstream] wholesale level". *Id.* at 452. AT&T had no antitrust duty to provide plaintiffs access to its infrastructure, and providing access at prices that made it hard for plaintiffs to compete downstream was no antitrust violation. *Id.* Defendants have no duty to grant Fubo licenses, let alone on the same terms as Venu.

To try to distinguish *LinkLine*, Fubo cites *United States v. Columbia Pictures Indus, Inc.*, arguing that Defendants have taken "***collective action*** in pooling their unbundled sports in their own JV while refusing to unbundle for any other distributor". (Reply 28 (emphasis added).) Fubo's argument fails because Venu's license is non-exclusive and does not affect how Defendants license others. In *Columbia Pictures*, film studios created a joint venture for premium cable broadcast of first-run movies and all expressly agreed to license their new movies exclusively to this joint venture for the first nine months after release. 507 F. Supp. 412, 419 (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1063 (2d Cir. 1981). Here, Fubo concedes Defendants license their networks independently. (Tr. (Mathers) 234:24–235:20.) Venu offers only non-exclusive

5

content, and Defendants have no agreement on licensing to other distributors.[1] (Tr. (Nallen) 413:15–19; (Pitaro) 508:7–11; (Campbell) 838:13–24.) Fubo's only evidence of "collective action" is a narrowly drawn non-compete, against owning an equity interest in another sports-centric vMVPD for three years. (Reply 16; PX289 at 16.) But that agreement does not bear on Defendants' licensing practices to other distributors, nor prevent future DTC products, such as ESPN Flagship. (Tr. (Nallen) 411:18–412:2; (Pitaro) 506:9–19; (Campbell) 838:13–24.)

Defendants' preexisting licensing practices simply have nothing to do with Venu. The issue for the Clayton Act is whether a merger (here, the JV formation) "*itself* may cause antitrust injury". *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 511 (2d Cir. 2004). It is undisputed that, historically, all Defendants preferred to license to distributors a large bundle of content, which maximizes their revenue. (Tr. (Espinosa) 760:13–16; (Connolly) 869:15–17; (Campbell) 829:21–830:1.) The licenses that Fubo (wrongly) contends "block" others from launching a skinny sports bundle are a years-long industry standard, and the launch of Venu cannot transmute historical practice into competitive harm from the JV. In *Geneva*, the Second Circuit affirmed the dismissal of a Section 7 claim because there was "no potential antitrust harm" from the acquisition when defendants had a pre-acquisition monopoly and the "exclusive dealing agreement, which [was] the crux of the antitrust claims, was entered into before" the acquisition. 386 F.3d at 511. Fubo, likewise, seeks to rely on longstanding industry practices to condemn a new JV. *See Brantley v. NBCUniversal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012). As in *Geneva*, unrelated earlier conduct cannot be a basis to prohibit the JV under Section 7.

**B. There Is No Harm to Competition Upstream.**

Nor is there any harm to competition upstream, in a program licensing market. Fubo argues that with the launch of Venu, Defendants would have an "ability and incentive to

---

[1] *Columbia Pictures* also involved a price-fixing formula. 507 F. Supp. at 420, 426–27. Price-fixing is not claimed here and could not be. Venu will pay market rate affiliate fees subject to an MFN and firewalls will protect pricing information. (JX45 at 7; Tr. (Nallen) 394:21–395:3.) *See Blue Cross & Blue Shield of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (MFN provisions are "the sort of conduct that the antitrust laws seek to encourage", not prohibit).

6

foreclose [downstream] rivals from sources of supply or distribution". (Reply 31–32.) At the PI hearing, however, Fubo did not establish any foreclosure plan, ability or incentive.

The undisputed evidence is that Defendants prefer that Venu draw subscribers from cord-cutters and cord-nevers, not existing MVPD subscribers. Defendants make more money in affiliate fees when they license a package with **all** or **most** of their channels than if they license a subset of channels to Venu. (Tr. (Desser) 728:4–9); (Pitaro) Tr. 490:13–24; (Espinosa) Tr. 811:20–812:5; (Campbell) 829:21–830:1.) As in *United States v. AT&T Inc.*, where the court permitted a vertical merger, it would "not make sense as a matter of logic" for Defendants to limit their distribution, and "long-term affiliate agreements" prevent them from raising prices for multiple years. 310 F. Supp. 3d 161, 224, 239 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). Moreover, the JV members recognized that the launch of Venu would *accelerate* requests for unbundling, rather than conserve bundling. (JX3 at 1 (Fox); JX58 at 5 (WBD).)

### C. Venu Is Procompetitive.

Venu will offer consumers an innovative product at a lower price. (Tr. (Desser) 725:6–7.) Because its content is nonexclusive, Venu will not remove any other options for consumers. That is textbook procompetitive. (*See* Opp'n 51–53.) Fubo ignores the well-established procompetitive benefits of joint ventures that "reduce[] the costs or risk facing individual firms", "enable[] the firms to develop a product or process that, acting individually, they could not develop", 11 Areeda & Hovenkamp, *Antitrust Law* ("Areeda") ¶ 1902, or where they "allow [] participants to better use existing assets", FTC & DOJ, *Antitrust Guidelines for Collaborations Among Competitors* 6 (Apr. 2000). Venu does all these things. (Tr. (Nallen) 367:13–20; (Trautman) 75:14–24.) Venu thus benefits consumers by offering them an additional choice.

## II. ANY HARM TO FUBO IS NOT ANTITRUST INJURY.

Fubo lacks antitrust standing. "The antitrust laws . . . were enacted for the protection of competition not competitors." *Brunswick*, 429 U.S. at 488. Accordingly, a plaintiff must show an antitrust injury that "reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation". *Id.* at 489; *see also Cargill*, 479 U.S. at

122 (same for injunctive relief). This requirement ensures that private antitrust suits further the purposes of the antitrust law and private actors do not "abuse[]" those laws to stymie more successful rivals. *Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 313–14 (D.D.C. 2011).

Fubo's claimed injury results from competition from a skinny sports bundle, not anything anticompetitive. Fubo stakes its injunction on the "subscribers it will lose when Raptor launches". (Reply 34 n.25.) While the alleged subscriber loss may be "causally linked" to Venu, it is unrelated to what Fubo contends "makes defendants' acts unlawful". *Brunswick*, 429 U.S. at 489. Fubo's theory is that Defendants' licensing practices harm competition because they are, allegedly, pursued in concert, not unilaterally. (Tr. (Orszag) 709:15–22.) Yet if (hypothetically) each Defendant licensed its networks to YouTube TV on similar terms as to Venu, Fubo would stand to lose the same customers to that offering. (*Id*. at 709:23–710:6.) The same holds if a Defendant (hypothetically) created a new distributor independently and bargained for a Venu-like license from the others. (*Id*.) But there is concededly no coordination between Defendants in those scenarios. Accordingly, Fubo's "loss or damage [is] due merely to increased competition" and is unactionable. *Cargill*, 479 U.S. at 122; 4A Areeda ¶ 1004d n.16 ("lost profits resulting from increased competition is not one of 'antitrust injury'").

## III. FUBO FAILED TO ESTABLISH IRREPARABLE HARM.

Irreparable harm is "the single most important prerequisite" of a PI. *JTH Tax, LLC v. Agnant*, 2 F.4th 658, 672 (2d Cir. 2023). Fubo has not shown it here. *First*, Fubo can quantify a dollar amount for each subscriber it might lose (Tr. (Janedis) 622:21–623:22; DX117), so it has not "suffered irreparable injury". *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 82 (2d Cir. 1994).

*Second*, Fubo's projections of alleged subscriber losses lack credibility. The ordinary-course documents on which Defendants relied to invest in Venu projected that it will have on average 1.8 million subscribers by the end of 2025, with only half from existing MVPDs. (DDX08.11; PX414 at 16; PX253 at 23; JX58 at 4; DX67 at 6). For Fubo, with a current 2% market share in the MVPD market (Tr. (Espinosa) 769:18–21), that equates to a subscriber loss of less than 20,000. By contrast, Fubo has never used the model on which it relies for its alleged

subscriber losses to assess the impact of entry by another distributor; the model omits viewership data, which predict retention; and Fubo declined to use survey data to predict customer behavior. (Tr. (Horihuela) 540:13–18; (Janedis) 602:7–21, 621:23–622:7.)  Moreover, most of the alleged "losses" are not Fubo customers:  Fubo's model counts as losses just 78,689 ***actual*** subscribers and relies for the rest on speculative "***future*** subscriber[s]".  (DX22 ¶ 311; PX103 ¶ 20; JX29.)

*Third,* even if Fubo's dubious projections withstood scrutiny, Fubo has not shown that any harm is imminent.  Taking the midpoint of its "high" and "low" impact scenarios, Fubo will have ***more*** subscribers and ***higher*** revenue at year-end 2024 (following a launch of Venu around September 1, 2024) than it did at June 30, 2024.  (PDX605 (subscribers); PDX607 (revenue).)  It is unsurprising, then, that Fubo's CEO told the public on March 1, 2024, after Fubo had filed this lawsuit, that if Fubo loses, "things will remain status quo", and it wouldn't "really change anything".  (DX12 at 8, 12; Tr. (Gandler) 177:13–178:18.)

*Fourth*, Fubo's precarious financial condition predates the JV, and has nothing to do with Venu.  Fubo lost more than $1.8 billion from 2020 to 2023, experiencing losses each quarter. (Tr. (Gandler) 131:6–15.)  As a result, Fubo's stock price declined by 97% (from $62 to $2.42 a share) ***before*** the JV's announcement in February 2024.  (*Id.* at 133:9–15; (Janedis) 606:9–24.) Venu's "self-inflicted" wounds are not irreparable harm.  *See Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 70–71 (E.D.N.Y. 2006).  Fubo may not evade the antirust injury requirement, *supra* § II, with speculation about insolvency or delisting.

## IV.   THE PUBLIC INTEREST WOULD BE DISSERVED BY AN INJUNCTION.

Fubo seeks to enjoin a new differentiated, lower-priced option for consumers.  The Supreme Court has held that (except in rare circumstances not argued here) low prices "benefit consumers regardless of how those prices are set".  *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340, (1990).  And Fubo's alleged harm of subscriber loss will occur only if consumers like and subscribe to Venu.  Removing that choice is not in the public interest.

Amici Sports Fans Coalition *et al.* purport to speak for consumers.  (Dkt. 253-1.)  But Amici simply parrot Fubo's arguments, mixed in with factual errors.  They argue that the JV will

"combine three entities that currently operate" independently (*id*. at 6), even though the JV is not a merger of Defendants' operations. Amici suggest that Venu will cause the same type of harm (*see id.* at 11 (arguing JV will "undercut rivals on cost")) that *LinkLine* rejected. Amici argue that the JV would facilitate the sharing of competitively sensitive information (*id.* at 12), yet there is a firewall in place to prevent just that (DX70). An amicus brief like this one, which merely "repeat[s] in a cursory fashion the more robust arguments already advanced by" a party, is unhelpful. *Kearns v. Cuomo*, 2019 WL 5060623, at *8 (W.D.N.Y. Oct. 9, 2019).

## V. ANY INJUNCTIVE RELIEF MUST BE NARROWLY TAILORED.

"A basic principle of the law of equitable remedies [] is that the relief granted should be no broader than necessary to cure the effects of the harm caused." *Soltex Polymer Corp v. Fortex Indus., Inc.*, 832 F.2d 1325, 1329 (2d Cir. 1987). Fubo's proposed alternative remedy that the Court should order Defendants to unbundle (Reply 44) runs far afoul of that well-established principle. It wrongly asks the Court, which on this PI motion is considering only whether the launch of Venu would violate Clayton Act Section 7, to sweep into an injunction Defendants' longstanding, lawful licensing practices. *See, e.g.*, *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) (limiting injunction to acts that violate statute).[2]

## VI. ANY INJUNCTION WOULD REQUIRE FUBO TO POST A BOND.

Defendants request the Court, if it issues an injunction, to require Fubo to post security. A bond of $100 million would be appropriate to cover Defendants' expected affiliate fees from Venu over the first four months (PX414 at 15–16). *See* Fed. R. Civ. P. 65(c); *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1054-55 (2d Cir. 1990) (bond should cover damages to enjoined party if enjoined conduct turns out to have been lawful).

---

[2] Fubo also urges the Court to impose on Defendants "[t]he exact terms of [an] arbitration" agreement requiring "binding, baseball-style arbitration" on licensing. (Reply 45 n.40.) But the court in the *AT&T* case rejected a theory of harm similar to what Fubo advances. 310 F. Supp. 3d at 224. Also, Time Warner voluntarily proposed the arbitration agreement, which the court deemed "extra icing on a cake already frosted". *Id.* at 241 n.51. Fubo cites no case where a court has imposed such an agreement on a party, much less for a joint venture like this one.

August 12, 2024

        CRAVATH, SWAINE & MOORE LLP

        */s/ J. Wesley Earnhardt*
        Antony L. Ryan
        J. Wesley Earnhardt
        Yonatan Even
        Damaris Hernández
        Michael P. Addis

        Two Manhattan West
           375 Ninth Avenue
              New York, NY 10001
                (212) 474-1000

*Attorneys for The Walt Disney Company; ESPN, Inc.; ESPN Enterprises, Inc.; and Hulu, LLC*

DECHERT LLP

        Andrew J. Levander
        Steven E. Bizar
        Steven A. Engel
        Michael H. McGinley
        Erica Fruiterman

        1095 Avenue of the Americas
           New York, NY 10036
             (212) 698-3500

*Attorneys for Defendant Fox Corporation*

WEIL, GOTSHAL & MANGES LLP

        David L. Yohai
        Adam C. Hemlock
        Theodore E. Tsekerides
        Robert W. Taylor
        A.J. Green
        Elaina K. Aquila

767 Fifth Avenue
   New York, NY 10153
      (212) 310-8000

*Attorneys for Warner Bros. Discovery Inc.*