O862Fub1_redacted

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     FuboTV INC., et al.,
 3
                   Plaintiffs,
 4
              v.                          24 Civ. 1363 (MMG)
 5
     THE WALT DISNEY COMPANY, et
 6   al.,
                                          Hearing
 7              Defendants.               Redacted
     ------------------------------x
 8                                        New York, N.Y.

 9                                        August 6, 2024
                                          9:50 a.m.
10
     Before:
11
                     HON. MARGARET M. GARNETT,
12
                                          District Judge
13

14                        APPEARANCES

15   KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC
          Attorneys for Plaintiffs
16   BY:  MARK HANSEN
          JOSHUA HAFENBRACK
17        GAVAN W.D. GIDEON
          THOMAS G. SCHULTZ
18        MATTHEW WILKINS
          GEOFFREY BLOCK
19        DENNIS HOWE
          KATHERINE TONDROWSKI
20        RACHEL ANDERSON

21

     CRAVATH SWAINE & MOORE LLP
22        Attorneys for Defendants Disney, ESPN, Hulu
     BY:  ANTONY L. RYAN
23        J. WESLEY EARNHARDT
          YONATAN EVEN
24        DAMARIS HERNÁNDEZ
          MICHAEL P. ADDIS
25
```

O862Fub1_redacted

```
 1   DECHERT LLP
          Attorneys for Defendant Fox Corp.
 2   BY:  ANDREW J. LEVANDER
          STEVEN A. ENGEL
 3        STEVEN BIZAR
          ERICA FRUITERMAN
 4        MICHAEL H. McGINLEY
          JOHN (JAY) JURATA, JR.
 5

 6   WEIL GOTSHAL & MANGES LLP
          Attorneys for Defendant Warner Bros. Discovery, Inc.
 7   BY:  ADAM C. HEMLOCK
          DAVID L. YOHAI
 8        ELAINA K. AQUILA
          ROBERT W. TAYLOR
 9        THEODORE E. TSEKERIDES

10

11   STEPTOE & JOHNSON, LLP
          Attorneys for EchoStar Corporation
     BY:  PANTELIS MICHALOPOULOS
12

13

14   ALSO PRESENT:  Gina DiGioia, General Counsel, FuboTV
                    Alec Lipkind, General Counsel, Disney
15

16

17

18

19

20

21

22

23

24

25
```

O862Fub1_redacted

| 1 | (Case called; all parties present) |

2          THE COURT:  Good morning, everyone.

3          Okay.  So most of you know this, but for the press and

4  public who may be here, I just want to welcome everyone.  We

5  are here today, of course, for the start of the hearing on

6  plaintiff Fubo's motion for a preliminary injunction opposed by

7  defendants Disney, Warner Bros. and Fox.  We will begin and

8  conclude the hearing with attorney argument, and throughout the

9  next four days I expect to hear testimony from approximately 19

10  witnesses.

11          As the witnesses testify and attorneys for the parties

12  ask questions, documents may be displayed on the various

13  screens we have around this courtroom.  I have a screen, the

14  witness has a screen, counsel have a screen, and the Court has

15  set up a screen in the -- to my far right for members of the

16  public so that exhibits can be displayed to the gallery.

17          However, as the parties know, but some members of the

18  audience may not, key issues in this case center around

19  extremely commercially sensitive and highly confidential

20  business information.  Specifically, many of the topics central

21  to the core issues of the plaintiff's motion concern the

22  parties' carriage agreements, negotiation terms, proprietary

23  financial analyses, marketing data, and business strategies as

24  well as similar information from third parties who are either

25  competitors or customers or both to the parties in this case.

1    Indeed, many of the documents that have been filed in this case

2    have already been placed under seal, at least in part, and

3    currently only available for viewing by the parties and the

4    Court, and the Court has already granted numerous motions to

5    seal since this action was initiated.

6          All of this means that during the course of the

7    hearing, certain documents or portions of documents will not be

8    displayed on the public-facing monitor.  Furthermore, on

9    occasion the Court will need to hear from witnesses regarding

10   certain topics that cannot be aired publicly at all because

11   they would reveal the contents of sealed documents that contain

12   highly sensitive information.  In these instances, the Court

13   will need to temporarily and briefly close the courtroom to the

14   public.

15         Finally, in order to guard against errors, the

16   transcript will remain sealed until the parties and the Court

17   have reviewed it, and then it will be unsealed to the greatest

18   possible extent.

19         The exact details and mechanics of these procedures

20   have already been reviewed with the parties and their lawyers

21   yesterday afternoon at a prehearing conference but, most

22   importantly, what I told them then was that we will all work

23   cooperatively together to maximize public access to these

24   proceedings while also balancing the need for an efficient

25   proceeding that protects commercially sensitive information

1    that has been treated as confidential thus far and should

2    remain so during the course of the hearing and, most

3    importantly, gives the parties the fairest and fullest

4    opportunity to present the facts and arguments to the Court

5    that they believe are important to resolving this motion.

6         Although the common law right of public access to

7    judicial documents and proceedings is firmly rooted in our

8    nation's history and the Constitution, this right is not

9    absolute, and courts must balance competing considerations

10   against the presumption of access.  *See, e.g.*, *Lugosch* v.

11   *Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006*);*

12   *see also*, *Nixon v. Warner Communications,* 435 U.S. 589, 599

13   (1978), holding that "the decision as to access is one best

14   left to the sound discretion of the trial court, a discretion

15   that is to be exercised in light of the relevant facts and

16   circumstances of the particular case."

17        I have carefully considered all available alternatives

18   to balance the competing interests that I have outlined, and I

19   do not implement these restrictions lightly.  But for the

20   reasons I have outlined above, I find these procedures are

21   necessary to protect the parties' sensitive commercial

22   information, ensure the Court has a full record on which to

23   decide the motion, and also maximize public access to the

24   greatest extent possible.

25        I will also note that prior to this hearing, pursuant

O862Fub1 -              Opening - Mr. Hansen

1    to my order at Docket No. 226, the parties submitted deposition

2    designations in the form of videos to the Court for eight

3    witnesses.

4              First, Ameet Padte, A-M-E-E-T P-A-D-T-E;

5              Anthony Petitti, P-E-T-I-T-T-I;

6              Paul Cheesbrough, C-H-E-E-S-B-R-O-U-G-H;

7              Peter Distad, D-I-S-T-A-D;

8              Dan Fox;

9              Robert Iger, I-G-E-R;

10              Justin Lancer; and

11              Justin Warbrooke, W-A-R-B-R-O-O-K-E.

12              Although these witnesses' testimony will not be played

13    in open court during the hearing, the depositions are part of

14    the record and will be reviewed and considered by the Court in

15    reaching its conclusions on this matter.

16              Okay.  With that, are there any housekeeping matters

17    either counsel would like to raise before we move to opening

18    statements?

19              MR. HANSEN:  Not for plaintiff, your Honor.

20              MR. EARNHARDT:  Nothing from defendants.

21              THE COURT:  Okay.  So, with that, Mr. Hansen.

22              MR. HANSEN:  Good morning, your Honor.  May I pass up

23    some demonstrative slides?

24              THE COURT:  That would be terrific, your Honor.

25              MR. HANSEN:  I have three copies for the Court.

O862Fub1 -              Opening - Mr. Hansen

1          And if the defendants will allow me, I have three

2   copies for defendants.  If you could pass those out.

3          Your Honor, may I proceed?

4          THE COURT:  Yes, you may.

5          MR. HANSEN:  May it please the Court:

6          There may be one thing that everyone in this courtroom

7   can agree on:  Americans love watching sports——live sports——on

8   television.

9          (Video played)

10         MR. HANSEN:  I confess to pandering here, your Honor.

11         THE COURT:  I would say going to say did you choose

12  that just for me, Mr. Hansen?

13         MR. HANSEN:  Randomly, your Honor, but we can agree

14  there are a lot of football fans out there and sports fans in

15  general, many, many TV-loving and -watching fans in America.

16  Americans love watching sports.

17         In just my lifetime, we have witnessed a dramatic

18  transformation on how people watch sports on television.  when

19  I grew up, we watched on a big box with signals coming through

20  the box on an antenna.

21         Then came cable and dish, with cables into the house,

22  a dish for satellite signals.  And the legacy cable and

23  satellite providers are still around and still entrenched.

24  They are referred to as multi-channel video programmers and

25  distributers.  That's a mouthful.  I'm sure the Court by now is

O862Fub1 -           Opening - Mr. Hansen

1   familiar with the acronym MVPD.  They provided consumers with a

2   lot more channels, but you had to pay for them.  And they

3   required cabled and dishes that had to be installed.

4          Today, antennas are gone, cables and dishes are still

5   around, but the new and innovative thing is streaming on the

6   Internet.  No set-top boxes, no cables, just an Internet

7   connection that many, if not most, Americans already have.

8          Sporting events are streamed online by virtual MVPDs.

9   VMVPDs, like cable and satellite television, virtual

10  distributors still require consumers to purchase a very large

11  number of channels.  You will hear that referred to in this

12  proceeding as the fat bundle.  But that's not because consumers

13  all want these fat bundles of hundreds of channels.  Some do,

14  but many don't.  And that's not because innovative

15  distributors, like Fubo, want to force consumers to pay for

16  those fat bundles.

17         Fat bundles are imposed by defendants.  For years,

18  they have insisted that Fubo and other distributors license not

19  just the channels that they want to provide to their customers,

20  but a lot of other channels as well.  Defendants use the power

21  of their——I'm doing air quotes here——must-have sports

22  programming to force distributors to take nonsports content

23  that consumers don't want in the fat bundle.

24         And it works like this.  If you want to get these

25  great ESPNs and ABCs and Fox Sports, you've got to distribute

O862Fub1 -            Opening - Mr. Hansen

1    these other things on the right, National Geographic Wild,

2    Disney Junior.  As you will hear today in the testimony, your

3    Honor, maybe 50,000 subscribers of Fubo TV watch Disney Junior.

4    But Fubo TV has a million three subscribers, and they

5    all—every one of them—have to pay for Disney Junior.  Disney

6    openly boasts that distributors can't offer a competitive

7    package that consumers will take unless they have ESPN.

8            Listen to Mr. Iger and what he says about it.

9            (Audio played)

10           MR. HANSEN:  To get what distributors must have, they

11   have to take other channels they don't want.  That's a textbook

12   admission of tying, in violation of Section 1 of the U.S.

13   antitrust laws, the Sherman Act.

14           But it's not just Fubo that's forced to take these fat

15   bundles.  Fat bundles are forced on other distributors, as

16   well, as the Court will hear in this proceeding, distributors

17   like DISH, who will be a witness in this court, distributors

18   like Comcast.  And your Honor sealed a document yesterday, so

19   I'm not going to quote from it or refer to it, but your Honor

20   knows from that document what the story is regarding Comcast

21   distribution as well and how it fits into this case.

22           Today, no one gets the must-have sports channels

23   without swallowing a whole lot of other stuff.  That's a

24   really, really important point.  Defendants argue that the

25   Court should not be concerned about these three horizontal

O862Fub1 -              Opening - Mr. Hansen

1    competitors combining because each defendant, they say, will

2    have independent negotiation, will be perfectly willing to

3    license their channels to people like Fubo.  But the evidence

4    will show that they have never done this.  And once they have

5    their Raptor——and Raptor being the code name they use for this

6    venture of theirs, this joint venture——once they have their

7    Raptor as the only skinny sports bundle in the market, the last

8    thing they are going to do is either compete with it themselves

9    or license others to compete with it.

10            Now, they can't say that openly in their formal

11   agreement because the lawyers won't let them.  But they say it

12   anyways when the lawyers aren't looking.  Like here.  You are

13   going to hear from this witness in the proceeding, your Honor.

14   It's an e-mail between two executives at Fox.  The gist of it

15   is that one employee, Mr. Lancer, whose deposition you have, is

16   worried that one of the partners is going to compete with

17   Raptor or license someone else to compete with Raptor.  That's

18   what it means by their own flagships or bundles of their

19   flagship services with third parties.  But what this is boss,

20   the chief operating officer, at Fox, Mr. Nallen, says:  "Don't

21   know why they would want to compete with this platform they are

22   investing in.  Don't overthink this one."  Don't over think

23   this one.

24            What this Fox executive wrote should not be

25   surprising.  It's just common sense.  Defendants will make more

O862Fub1 -            Opening - Mr. Hansen

1  money if they prevent competition with Raptor.  As Mr. Nallen

2  said, don't overthink it.

3          Other documents, your Honor, will show that defendants

4  actually agreed not to compete with their Raptor even after

5  their lawyers told them they couldn't put that in an agreement.

6  They are agreed in principle not to compete, agreed in

7  principle on a noncompete.

8          And what are they agreeing to do?  Well, we know that

9  from their documents, as well.  They agreed to steer clear.

10  They agreed, "We will all stay clear of a Raptor-like

11  platform."  Couldn't be clearer.

12          Fat bundling in today's world is a very controversial

13  subject.  It's drawn criticism from the U.S. Congress and from

14  many other quarters.  As I said, it's also unlawful tying, as

15  we have alleged in our lawsuit.

16          But even with the fat bundles that have been imposed

17  on Fubo and other distributors, virtual MVPDs like Fubo have

18  nevertheless provided consumers with a lot of advantages.  They

19  allow you to watch anywhere you have Internet on all kinds of

20  devices—like this iPhone that I am carrying.  And I do have a

21  court order that allows it, so please, marshals, don't take it

22  away from me.  That's the modern world.

23          Your Honor, this proceeding, this preliminary

24  injunction proceeding, is about the future of live sports

25  streaming and whether it is going to be dominated by three of

O862Fub1 -            Opening - Mr. Hansen

1    the largest programmers combining their power to form a very

2    powerful cartel.  The question is whether this Raptor

3    horizontal combination is likely to harm competition and

4    consumers or tend to create a monopoly.  I'm paraphrasing

5    Section 7 of the Clayton act.  The answer to that, your Honor,

6    is yes.

7            The cases tell us that we are to look at the realities

8    of commercial competition in the relevant markets.  Well, the

9    evidence will show that the commercial reality here is a

10   defendant horizontal combination of competitors in substance

11   combining to have a monopoly of the sports licensing rights in

12   the United States.  These three horizontal competitors together

13   have what is effectively a monopoly of sports licensing rights.

14   Then they take that monopoly licensing rights and they create

15   the only competitor in the market for the skinny sports bundle.

16   That's the Raptor.  That would be the only product available to

17   serve a distinct consumer demand for a sports-first streaming

18   sports option.

19           It is textbook antitrust that when major competitors

20   join forces and concentrate their power.  It leads to bad

21   outcomes for competition and consumers both——higher prices,

22   reduced output, lower quality, reduced innovation, and fewer

23   choices for consumers.

24           That's exactly what was decided in this courthouse,

25   maybe not this courtroom, but in this very courthouse, 40 years

O862Fub1 -           Opening - Mr. Hansen

1    ago in the *Columbia Pictures* case.  And I know your Honor is

2    familiar with that case, so I'm not going to paraphrase it, but

3    it's basically *déjà vu* all over again——four horizontal

4    competitors combining to create a joint venture that had

5    exclusive rights to something, and the Court struck it down and

6    the Court of Appeals affirmed it.

7            Despite a whole lot of window dressing from defendants

8    here, what we have here is both similar to *Columbia Pictures*

9    and pretty simple; the three largest horizontal competitors

10   trying to combine their majority control over sports content in

11   that single Raptor venture.

12           Raptor.  What is a raptor?  I looked it up.  A raptor

13   is a large predatory bird.

14           Well, your Honor, we submit that they picked a very

15   appropriate name for their project.  If this combination is

16   allowed, it is designed to and it will indeed prey on

17   competition and consumers to devastating effect.  The evidence

18   that proves that will come largely from defendants' own

19   ordinary-course business documents and statements they have

20   made to the public as well as from experts and Fubo witnesses

21   and third-party witnesses, as well.  You will hear,

22   undoubtedly, a lot of things from defendants and their

23   witnesses in this courtroom, your Honor, but we think the most

24   telling evidence that you will have is what they said when they

25   were internally -- when they were writing e-mails to one

O862Fub1 -              Opening - Mr. Hansen

1  another before the antitrust lawyers took a look.  Here's what

2  that and some of the other evidence will prove.

3          Let's start with what the pay TV looks like,

4  organizational principle, pretty straightforward.  At the top

5  of the stack, you have the people who run the leagues——the NFL,

6  the NBA.  They have enormously valuable broadcasting rights,

7  tens of billions of dollars' worth.  It takes a pretty big

8  player to compete for those rights.  So the television

9  programmers which are enormously large companies,

10  multi-billion-dollar companies, buy those rights from the

11  leagues and, here, three of the very largest are Disney, Fox

12  and Warner.

13          The programmers then license the sports content to

14  distributors, and two basic kinds of distributors——the old

15  school dish and cable MVPDs and the new-era virtual MVPDs, like

16  YouTube TV, Fubo and Sling.

17          And then the distributors sell packages down to

18  consumers, who then pay for them on a monthly subscription

19  basis.  And in virtual MVPDs, they can cancel their

20  prescriptions at any time.

21          So what's Raptor?  Let's talk about what Raptor is and

22  what Raptor does.

23          First, a little background.  In 2019, Disney attempted

24  to buy another media conglomerate Twentieth Century Fox.  The

25  price was $73.1 billion.  Disney did not even attempt in that

O862Fub1 -              Opening - Mr. Hansen

1    transaction to acquire all of Fox's television assets.  Didn't

2    even try.  It would have been a nonstarter.  But Disney did try

3    to acquire the Fox regional sports networks and the Department

4    of Justice blocked it because it would be too much power in the

5    hands of Disney in terms of sports programming.  Successfully

6    blocked that transaction.

7            The Fox TV entities that were not combined into Disney

8    were spun off into a new business called the Fox Corporation,

9    and the Fox Corporation is one of the defendants here in court

10   today.

11           I'm sure the Court remembers the old saying that old

12   people like me use a lot, which is, if at first you don't

13   succeed, try, try again.  Well, your Honor, they are trying

14   again to combine the sports programming held by major

15   competitors, but to make matters worse, this new combination is

16   not just Disney and Fox.  Now they are adding another giant to

17   the combination, Warner.  Key point, key point, your Honor.

18   These three defendants control the vast majority of live sport

19   broadcasting rights in the United States, and let's look at

20   what they have.

21           You look at Disney.  Here are their sports channels.

22   Everyone knows ESPN and they have others.  What kind of sports

23   rights do they have?  Well, football, baseball, college

24   basketball, hockey, tennis, golf.  It's a lot.

25           Fox is also fully capable of delivering to the public

O862Fub1 -        Opening - Mr. Hansen

1   a very broad array of sports programming with their Fox

2   channels FS1, FS2.  They can give you football, baseball, drag

3   racing, soccer, college hoops, NASCAR.

4         And Warner, as well.  Warner, with the channels TBS,

5   TNT, can provide baseball, motor sports, hockey, professional

6   basketball, college basketball.

7         Each──it's an important point, your Honor──each of

8   these powerful media giants could offer an appealing and direct

9   consumer package of sports channels, but they haven't done

10  that.  There is certainly a demand for it, as you will see in

11  the evidence.  Consumers are waiting for it.  But no defendant

12  has offered a sports-only package to consumers.  They waited

13  until they could do it together as a cartel, basically, a

14  monopoly, the only products serving that distinct consumer

15  demand.

16        So here's what Raptor does, your Honor.  Raptor

17  combines in a single entity all of those sports rights I have

18  just reviewed with you, puts them into one place.  The result

19  is effectively a monopoly share.  And your Honor, I know

20  lawyers make arguments, lawyers talk, but you don't have to

21  take it from me.  Take it from the defendants.  Listen to what

22  the chief financial officer of Disney said about this, Mr. Hugh

23  Johnston.

24        (Video played)

25        MR. HANSEN:  Mr. Johnson isn't alone, your Honor.

O862Fub1 -            Opening - Mr. Hansen

1    Mr. Zaslav, the CEO of Warner, just a recent few weeks or days

2    ago, at the Sun Valley conference of Allen & Company, made the

3    following statement about what he thinks about their dominance

4    in the market.

5              (Video played)

6              MR. HANSEN:  Compelling indeed to control 75 percent

7    of a market.  And make no mistake, your Honor, sports licensing

8    is a relevant market.

9              The very same defendant here, Warner, represented by

10   the very same lawyers, able lawyers here, filed a lawsuit last

11   month in the State Supreme Court alleging that Warner's loss of

12   NBA rights was going to decrease Warner's market share in the

13   sports licensing market.

14             This is paragraph 84 from their complaint, your Honor,

15   a public complaint filed by Warner.  It also said, Warner also

16   said the loss of its market share in the sports licensing

17   market, and those are their words, was going to hurt its

18   advantage when are negotiating distribution rights with

19   downstream distributors.  That's people like Fubo.  So there

20   you have Warner telling you they are in a sports licensing

21   market and they are hurt and they can't get upstream rights,

22   but they can't plausibly argue there isn't a sports licensing

23   market when they have made that judicial admission.

24             Your Honor, defendants are not running from the power,

25   they are a massive sports licensing market.  They are bragging

O862Fub1 -              Opening - Mr. Hansen

1    to the public about it.  They are telling their shareholders

2    things are going to be great.  A proposed transaction that

3    results in 75 or 80 percent or even more than 60 percent

4    concentration in a market is presumptively illegal under the

5    Clayton Act, Section 7.  Even 30 percent concentration is too

6    much, your Honor, as the Supreme Court held in the *Philadelphia*

7    *National Bank* case and as Judge Marrero in this courthouse

8    reaffirmed just a few months ago.

9            But is it concentration?  Defendants say it isn't.

10   But the evidence will show that where defendants join forces to

11   put all these licensing rights in one place and they have an

12   increased incentive, indeed an actual agreement, not to license

13   those rights to anyone other than their joint entity, it is

14   concentration.  Substantively no different than if they merged,

15   at least in terms of those markets.

16           The concentration alone, your Honor, is enough to

17   block this Raptor deal, but here's how the evidence will show

18   that this horizontal agreement is likely to harm competition

19   and consumers.

20           First, Raptor is likely to cause increased prices for

21   live sports content both for distributors, and if distributors

22   have to pay more, they have to pass that on to consumers.

23   Whoops.  Wait a minute, though.  Didn't I just say that they

24   won't deal with people?  Very different.  It's a little

25   nuanced.  They will be happy to continue to sell fat bundles to

O862Fub1 -              Opening - Mr. Hansen

1    people like Fubo.  They won't license skinny bundles to compete

2    with Raptor, but they are more than happy to sell the fat

3    bundles at ever-increasing prices.  They can do that for a very

4    good reason.  As they have said in public, fat bundles, like

5    what they force Fubo to take, can't compete with Raptor, can't

6    compete with the skinny bundle.

7              And again, don't take my word for it, take Mr. Iger's

8    word.  "Raptor will come at a price point that will obviously

9    be more's attractive than the big fat bundle.  There are people

10   who have left that ecosystem because they didn't want all those

11   channels or that cost."  Couldn't have said it better

12   ourselves.  Makes perfect sense.  If sports fans can get what

13   they want for half the price of what they are paying now, of

14   course they will flee the fat bundle and Fubo and others and

15   they will go to Raptor.

16             But when there is no Raptor, your Honor, the

17   defendants have a check on the ability to raise prices on the

18   fat bundle and that's because of this.  The programmers get

19   paid on a per-subscriber basis.  So when Fubo takes on a number

20   of subscribers, the programmers get a cut.  You price it too

21   high, and this demonstrative kind of illustrates the point, if

22   they price it too high to us and we price too high to

23   subscribers in today's world, we lose subscribers and those

24   subscribers drop out and there is no money that goes back to

25   the defendants from those subscribers.

O862Fub1 -            Opening - Mr. Hansen

1          But what happens if you let Raptor go forward?  It's a

2     very different thing.  What happens is, when they force us to

3     charge our consumers more and some of our consumers leave, a

4     lot of our consumers leave, as you will hear in this

5     proceeding, some of them are going to go to, you guessed it,

6     Raptor, where defendants can extract monopoly prices and make a

7     lot of money.  So they don't have that check anymore.  They can

8     price higher without fear of losing money.

9          Competition and consumers are also likely to be harmed

10    by the introduction of the Raptor itself.  When defendants join

11    forces to offer a skinny bundle sports programming that no one

12    else can offer, that nothing else can compete with, they are

13    creating a monopoly, which is exactly what the Clayton Act

14    forbids.  Raptor will be the only product serving the distinct

15    consumer demand for live sports programming, skinny bundle of

16    live sports programming.  And again, that's what you are going

17    to see the defendants concluding in their own internal

18    documents.

19         Mr. Connolly, you will hear from Mr. Connolly at this

20    trial, or this hearing, "Raptor is primarily about creating and

21    launching a new package which others cannot currently develop

22    and others likely have significant encumbrances to launch."

23    Very true.  No one else can develop a Raptor because these

24    defendants hold so many rights that you can't do a competition.

25    And this is the first time, Raptor is the first time defendants

O862Fub1 -            Opening - Mr. Hansen

1    are unbundling, they are unbundling their networks to allow

2    licensing of sports content.  And again, that's what defendants

3    say internally.  This is the first time we are unbundling.

4            And again, they say what they are trying to do.  What

5    they are trying to do.  Anything, they are trying to avoid

6    anything that can offer competing features or functions,

7    anything that can be marketed head on against Raptor.  Okay.

8    That's their plan.

9            And how are they going to do that?  What's the path

10   according to Mr. Cheesbrough of Fox?  "We ensure that all

11   partners can't break their linear channels and streams to be

12   rebundled into other services."  This stops others combining

13   the user experience into a single place like Raptor is

14   attempting to.  It maintains Raptor's uniqueness to the sports

15   fan.

16           Perfectly clear, and it's the first time they are

17   doing something like this, as they have admitted internally.

18   If you look at these e-mails between Mr. Cheesbrough and

19   another Fox employee, Mr. Lancer, Mr. Lancer says at the

20   bottom, "Raptor represents the first time we are unbundling our

21   networks."

22           And what are they going to do?  Well, what

23   Mr. Cheesbrough says is, we are not going to laden Raptor with

24   the freight of a full fat bundle.

25           And why won't they do that?  Otherwise we end up at a

O862Fub1 -              Opening - Mr. Hansen

1    price point that won't be competitive.  Again, it's just what

2    Mr. Iger said.  The fat bundle can't compete.  The skinny

3    bundle has the market to itself.  And they are going to keep it

4    that way.  That's their plan.  Raptor will enter the market for

5    skinny sports bundles as the only competitor, and it will

6    create a monopoly.  Creating a monopoly is never good, and it's

7    prohibited by Section 7.

8            Now, Raptor will in fact be the first product that

9    serves this distinct consumer demand for a sports package, a

10   sports -- live sports package.  But, your Honor, contra to what

11   you may hear in this courtroom, it's not as if defendants are

12   creating something that doesn't exist.  No, they are exploiting

13   a demand that has been waiting for a product that they have

14   been preventing anyone from offering.

15           They basically say that themselves in their own

16   internal documents.  This is a strategy document that admits we

17   are capturing demand, not creating it.  Raptor captures that

18   existing demand for the skinny sports bundle that no one has

19   been able to offer because the defendants won't let them offer

20   it.

21           Giving consumers what they really want may sound great

22   at first glance, but it's not so great when you consider what

23   it means to create a monopoly, a product that faces no

24   effective competition.  This means consumers will be stuck with

25   less choice, less innovation, and higher prices.

O862Fub1 -          Opening - Mr. Hansen

1          And again, trust the defendants, not me.  In their own

2    internal documents they admit they will have what is referred

3    to as pricing power.  They will have the ability to jack up

4    prices year over year, year over year, boom, boom, boom, no

5    worry about competition, no restraint.  You see it right here

6    in this Warner Bros. document.  Just absolutely devastating

7    evidence of the pricing power that a monopoly has.

8          Can you do that in a competitive market, your Honor?

9    No, you can't, because when you raise price like that

10   competition comes in and competes the price down.  But when you

11   don't face competition, you have the freedom to do that.

12         Now, defendants will take credit for this great new

13   product, but you don't need to have a cartel to provide this

14   product.  That's a very important point.  There is no

15   technology or efficiency reason why live sports can't be

16   offered in attractive packages by each of the three main

17   holders of licensing rights.  They can each offer a skinny

18   bundle or a bundle of sports that would be appealing to

19   consumers.  They can each license their rights to distributors,

20   like Fubo and others, and then consumers can have choices of

21   which sports they want, which bundles they want; and people

22   will compete with one another, price will go down, quality will

23   go up, innovation will go up, choice will go up.

24         Put another way, your Honor, the sports people love

25   will be provided to consumers even if Raptor is grounded.  They

O862Fub1 -          Opening - Mr. Hansen

1    will just be provided on a competitive basis with more consumer

2    choice.  Let consumers decide whether to take one skinny bundle

3    or all of them.  That's how it is supposed to work.

4          But competition and choice of course force innovation

5    and lower prices, and defendants don't want competition.

6    That's what Raptor is about.  The predatory bird, your Honor,

7    is a competition killer.  And that is why we think, at the

8    conclusion of the proceeding, the Court will conclude that Fubo

9    is likely to be able to show that this is an antitrust

10   violation sufficient to grant an injunction against Raptor.

11         Now, there is the other element of this proceeding,

12   your Honor, with irreparable injury, and that is, frankly, if

13   anything, even simpler.  Raptor is flying straight at Fubo and

14   Fubo sports-loving customers.

15         And you can see it in how they are going to market.

16   On the right is they call it Venu, we call it Raptor.  That's

17   their code name.  This is their website on the left, is a Fubo

18   marketing document.  It just doesn't pass the straight face

19   test to say that Venu isn't trying to appeal to the

20   sports-loving fans who are now subscribers to Fubo, which has

21   long marketed itself as a sports-first product and has many,

22   many subscribers who are there for the sports.

23         Fubo's name itself is a play on the word "football."

24   And Fubo started as a sports-focused distributor.  Fubo's

25   business plan was to provide consumers with an affordable

O862Fub1 -           Opening - Mr. Hansen

1     sports-centric package.  It was looking to serve the sports

2     fan, the kind of person who wanted a menu of games, "all sports

3     all the time" basically.  I think we all know such people.

4          But there was a problem when Fubo tried to license

5     content from the defendants.  It was told, sure, you can have

6     some sports, but you've got to take a whole lot of other

7     channels as well.  *Ergo*, Fubo could have no business unless it

8     took the fat bundle.

9          Let's go back to that slide about the fat bundle.  To

10    get the sports Fubo wants, it's got a hundred plus other

11    channels its got to take, and it's got to charge a lot of

12    money.  In fact, it's got to charge more than double what the

13    defendants are going to offer Raptor, or Venu, to the public

14    for.

15         You will learn that Fubo pays tens of millions of

16    dollars for nonsports unwanted content costs, and content costs

17    are by far Fubo's largest cost.

18         Fubo has repeatedly asked defendants to unbundle their

19    channels and make sports available, and defendants have

20    admitted that internally.  You can see it in this document from

21    Warner.  "Fubo remains focused on lower costs and

22    distribution/penetration."  That's basically saying that Fubo

23    doesn't want to have to have all those channels.  Distribution

24    is all the channels.  Penetration is a requirement that, when

25    you buy the channels, you've got to provide them for the

O862Fub1 -          Opening - Mr. Hansen

1    subscribers.

2              You will hear -- I suspect we will hear a lot of

3    cross-examination, your Honor, from Fubo, oh, did you really

4    ask the right way?  Their own documents, your Honor, will tell

5    you they have never allowed anyone to get unbundled sports.

6    Fubo asked for unbundled sports.

7              And if Raptor is allowed, the defendants will have an

8    even greater incentive to not give Fubo and other distributors

9    the unbundled sports that they want to provide to the customers

10   who want those.

11             Now, defendants say, oh, Fubo is a weak sister.  It's

12   going to die on the vine.  Don't worry about Fubo.  It's going

13   to die anyways.

14             Well, that's just not true, your Honor.  Despite the

15   restrictions the defendants are putting on Fubo, they have

16   actually managed to build business.  Fubo has grown with

17   subscribers, substantially, and the company just this morning

18   reported one of its best quarters ever.  As things stand, Fubo

19   is on a path to being profitable next year.

20             Now, you will hear a lot about Fubo having lost money

21   over the years, just like Amazon lost money over a lot of

22   years, just like every start-up loses a lot of money over the

23   years.  But if Fubo is not preyed upon by Raptor, Fubo has a

24   path to becoming a profitable company, as you will hear from

25   the Fubo witnesses.  But if Raptor is allowed to launch, it's

O862Fub1 -            Opening - Mr. Hansen

1    just common sense that the sports-focused Fubo consumers are

2    going to fly away.

3           That's why the equity markets hammered Fubo's stock on

4    February 6 of this year when Venu, or Raptor, was announced to

5    the public.  Fubo stock was down 22 percent that day as

6    investors feared the sports JV, that's Venu, is a direct threat

7    to their, Fubo's, subscriber base.  We can see it's down 21

8    percent.  And no -- the other stocks were not down that day.

9    There was no other news about Fubo.

10          It's just like Mr. Iger said.  Who is going to pay

11   double for sports content?  No one.  Doesn't make any sense.

12          When Fubo loses a substantial number of its current

13   and new subscribers because those subscribers want sports-first

14   programming, the company is going to face a death spiral.  It's

15   just common sense.  You will hear from Fubo executives about

16   the calculation they have done on the likely loss of

17   subscribers going to Venu and the effect that loss would have

18   on Fubo's financials.  We think it is just common sense or, to

19   use Mr. Iger's words, obvious.

20          In fact, your Honor, we submit that common sense will

21   tell you the answers to every relevant question in this case.

22   Is there a market for sports streaming licensing?  Of course

23   there is.  Is there a market for paid TV distribution?  Of

24   course there is.  Is there also a market or submarket within

25   that broader distribution market for the skinny bundle of live

O862Fub1 -              Opening - Mr. Hansen

1    sports channels that defendants are now providing on a monopoly

2    basis if you allow Venu to go forward?  Well, defendants have

3    said so, and their actions are consistent with that.

4                   (Continued on next page)

O86HFub2          Opening - Mr. Earnhardt

1            MR. HANSEN:  Will it harm competition and consumers in
2    all three markets in the form of higher prices, reduced output,
3    quality, and choice loss if Raptor's allowed, yes?  We think
4    it's pretty clear, your Honor.  In the words of Mr. Nallen of
5    Fox, we don't think there's a reason to overthink it.
6            Thank you, your Honor.
7            THE COURT:  Thank you, Mr. Hansen.
8            MR. EARNHARDT:  Good morning, your Honor.
9            THE COURT:  Go ahead, Mr. Earnhardt.
10           MR. EARNHARDT:  Wes Earnhardt from Cravath on behalf
11   of Disney.  I will address the likelihood of success on the
12   merits prong, and Mr. Levander will address irreparable harm.
13           We have a fundamental disagreement about what the
14   evidence is going to show at this hearing.  Much of what
15   Mr. Hansen just said is flat wrong, and a lot of it is
16   misleading and taken out of context.  And we look forward to
17   the Court hearing the evidence in the context as it will be
18   presented.
19           It's also important, your Honor, to have squarely in
20   mind what the issue is for Fubo's preliminary injunction
21   motion.  Fubo's Section 7 claim is that the entry of Venu will
22   harm competition.  So you need to ask a very pointed question:
23   How does competition before the entry of Venu compare to
24   competition after the entry of Venu?  The question is, has Fubo
25   shown with credible evidence that the entry of Venu will lessen

O86HFub2          Opening - Mr. Earnhardt

1   competition in a well-defined market?  Not about what happened

2   in the past, not about what's going to happen to Fubo, but what

3   will the impact of Venu be on competition?  That's the relevant

4   analysis here, and Fubo cannot make the necessary showing.

5          The starting point, your Honor, is to understand the

6   competition in the market today.  We'll begin with content

7   creators.  Those are the folks that make television shows and

8   games.  Those content creators license the right to broadcast

9   the shows and games to what are called programmers.  The

10  programmers combine those games and shows with advertising and

11  other content to create linear television networks.  Those are

12  the things like ESPN, TNT, and Bravo that most folks are

13  familiar with.

14         The programmers then license those linear TV networks

15  further downstream to MVPDs.  Progammers charge MVPDs licensing

16  fees for every subscriber that receives their networks.  This

17  is important to keep in mind.  The licensing of networks from

18  programmers to MVPDs is what Fubo calls the upstream market,

19  and it's shown here by that green arrow.

20         The MVPDs then take the networks from the various

21  programmers, package them together, and sell them to consumers

22  as subscriptions.  And MVPDs, like Comcast and DISH and Fubo,

23  remain one way for consumers to get TV content.  There's no

24  debate about that.  But they're now also many other ways, and

25  Mr. Hansen, in his entire presentation, did not even mention

O86HFub2          Opening - Mr. Earnhardt

1    the existence of streaming video-on-demand services and

2    direct-to-consumer services.  And that is remarkable, your

3    Honor, because that is the very point of Venu, as I'll come to.

4         Right now the downstream market is not only MVPDs,

5    it's direct-to-consumer services, it's streaming

6    video-on-demand services, it's the league going direct to

7    consumers, it's programmers direct to consumers — it's all of

8    them.  ESPN — Mr. Hansen said the defendants have agreed not

9    to compete with Raptor in the downstream market.  That's flatly

10   false.  Next year ESPN is launching ESPN Flagship, and every

11   single Disney network that will be on Venu will be on Flagship,

12   and we're going to sell that directly to consumers, all the

13   ways in which consumers buy TV content in a downstream market,

14   and we've shown that here with orange arrow.

15        Now, the rise of streaming video on demand has had two

16   effects on programmers like defendants:  First, there's

17   increased competition to license content from the creators,

18   from the folks like the NBA, the NFL, and Lionsgate.  That

19   increased competition has caused the price of content to go up.

20   At the same time, folks have other ways of watching TV.  They

21   don't have to have a cable subscription or a satellite

22   subscription to do that.  They instead can have apps and take

23   content direct to consumers.  That has led folks to leave

24   MVPDs.  So for programmers, it's a double whammy.  Their costs

25   are going up, because they have to pay more to get content, but

O86HFub2          Opening - Mr. Earnhardt

1    their subscriber base, where they earn revenue, is shrinking.

2    They're getting hit both directions.

3         So how will the entry of Venu change things?  From a

4    competition perspective, Venu will simply be one more

5    distributor in the downstream market.  It slots in right there.

6    It's an additional licensee of some of defendants' networks in

7    the upstream market, and it's an additional seller of TV

8    content in the downstream market.  That's all it is.

9         What's the purpose of Venu?  It's a way to combat the

10   effects of cord-cutting.  The goal of Venu —— I'm going to do

11   something dangerous and try to draw on this —— the goal of Venu

12   is to bring sports fans that exist over here in the SI market,

13   back over here into the MVPD market.  Venu, like every other

14   MVPD, will pay defendants' licensing fees for their networks

15   when subscribers sign up for it.  SVOD services do not do that.

16   So to the extent defendants can bring folks from SVOD back to

17   Venu, they'll earn extra money, and that's what it's designed

18   to do.

19        Mr. Hansen made it seem like the purpose of Venu is to

20   somehow dominate the downstream market.  That is flatly

21   incorrect.  Take a look at defendants' models, each of our

22   models about what they think Venu is going to do.  They do not

23   predict Venu will even earn a material profit in the downstream

24   market.  This is not about defendants earning profits from Venu

25   that they then share in.  The reason Venu exists is because

O86HFub2          Opening - Mr. Earnhardt

1    it's going to pay incremental licensing fees upstream.  The

2    goal of Venu is not to take over or be a dominant player or

3    even a very profitable player in the downstream market.

4         By the way, Mr. Hansen said Venu's prices are going to

5    increase $5 every year for five years.  The reason that is is

6    because they're hemorrhaging money in the beginning.  Like

7    every streaming service, they start at a very low price to get

8    consumer interest, and then like every other streaming service

9    that anyone who signs up knows, the prices increase every year.

10   That's all that is.  They're not increasing prices above a

11   competitive level, they're trying to get up to a competitive

12   level.

13        Venu is not going to make profits downstream.  It is

14   not meant to dominate that market.  The only reason it exists

15   is for defendants to earn a bit more money in licensing.  And

16   here's the most important point, your Honor.  Every time

17   someone moves from one of these MVPDs to Venu, one of the

18   traditional ones, like Fubo, which Mr. Hansen said is the point

19   of Venu, defendants lose money.  They are better off licensing

20   their subscriptions to traditional MVPDs than they will be from

21   Venu.  For that reason they, have no reason to target

22   traditional MVPDs in the way Mr. Hansen said.

23        OK.  So what then is Venu's impact on competition?

24   Let's start upstream.  Not much changes upstream.  In the

25   upstream market, Venu is simply a new customer of defendants,

O86HFub2            Opening - Mr. Earnhardt

among many.  It functions as a nonexclusive licensee of a
subset of defendants' networks.  Each of those networks will
continue to be licensed many different times to many other
MVPDs.  And you can see that demonstrated here.  Venu will not
change defendants' licensing practices.

And, your Honor, if you don't remember anything else I
say this morning, this is the most critical point.  There is
absolutely no evidence of any agreement whatsoever between
defendants as to how each of them independently will license
their networks to MVPDs other than Venu.  That is a false and
defamatory accusation.  There is going to be no evidence in
support of that.  There's no verbal agreement about licensing
or anything else.  We have instituted a firewall to prevent
even the sharing of competitive information about licensing
practices.  Each defendant will remain free to license each of
its networks to whomever it wants, on whatever term it wants,
whenever it wants, as many times as it wants.

Now, contrary to what Mr. Hansen just said, there will
be no combination of defendants' licensing practices upstream.
That's just flat wrong.  This is not a merger; it's a joint
venture.  Fubo and other MVPDs will never be sitting across the
table from the three of us.  They'll be sitting across the
table from Disney, they'll be sitting across the table from
Warner and Fox, exactly as it is today.  Venu doesn't change
that at all.

O86HFub2              Opening - Mr. Earnhardt

1              Fubo also says that the entry of Venu will give the

2      defendants incentive to disadvantage MVPDs in the licensing

3      market, but there's just no evidence to support that claim.

4      The Court will have access to all the defendants' short-term

5      and long-term plans, and you will not find in any of them any

6      suggestion that they're going to change their licensing

7      practices to MVPDs in light of Venu.  It's just not there.  Nor

8      will that be economically rational.  Again, every time Venu

9      takes a subscriber from an MVPD, defendants lose money.  That's

10     not what they're trying to do.  In fact, defendants have no

11     practical ability to do that, even if they wanted to, because

12     most MVPDs are locked into long-term carriage agreements, which

13     prevent defendants from changing the pricing or their terms

14     even if they wanted to.

15             Now, we heard a new theory today and in Fubo's reply

16     brief that ── hold on one second.  Technical difficulties here

17     ── that Venu will somehow cause defendants to resist

18     debundling.  There's no evidence to support that theory either

19     and in fact, if you look carefully at the evidence you'll see

20     that folks believe Venu might lead to debundling.  We're going

21     to show you that.  People think that Venu might cause

22     defendants and others in the industry to resist bundling or

23     change bundling the way they have.

24             Let me take a quick detour to talk about bundling.

25     Reading Fubo's brief and listening to Mr. Hansen this morning,

O86HFub2          Opening - Mr. Earnhardt

1    you'd think that defendants invented the bundling of networks,

2    and that we're the only one engaging in that practice, but

3    that's absolutely not true.  Bundling in the upstream network

4    has been an industry-wide practice for decades.  It is

5    ubiquitous.  Fubo entered this market understanding the

6    prevalence of bundling.  It has asked for it and has benefited

7    from it.  It cannot complain about it now.  In fact, if they

8    wanted to have a preliminary injunction against bundling, they

9    should have come here 40 years ago, because that's when it

10   started.

11        The quotes, by the way, that he showed you from

12   Mr. Iger about how you can't launch a service without ESPN,

13   that was in 2015.  That was when Fubo launched, and for five

14   years Fubo did not have ESPN or any other networks from the

15   defendants.  So they're taking Mr. Iger's quotes out of

16   context, and it's contradicted by their own history.

17        Now, defendants have licensed MVPDs larger bundles

18   because that's what MVPDs have wanted.  They haven't forced

19   those larger bundles.  That would have better for everyone.

20   You're going to hear evidence that bundling is good for MVPDs

21   because it's a one-stop shop that will serve the interests of

22   entire households, you're going to hear it's good for

23   programmers because it expands the reach of their networks, and

24   you're going to hear it's good for consumers because they don't

25   have to henpeck all around to find the content they want.

O86HFub2          Opening - Mr. Earnhardt

1    That's why bundling is ubiquitous.  Now, the Ninth Circuit in

2    *Brantley* examined this entire industry and determined that

3    bundling is "fully consistent with a free competitive market."

4              The parties have not engaged in any discovery

5    regarding historical bundling practices, apart from how they

6    relate to Venu in the context of this preliminary injunction.

7    It would be extraordinary, your Honor, to grant a preliminary

8    injunction based on a decades-long practice, not unique to

9    defendants, that does not result from Venu that the Ninth

10   Circuit has blessed all on an incomplete record.  Again, the

11   question this week should be what does competition look like

12   with Venu and without Venu?  This should not be a referendum on

13   bundling.

14             OK.  Back to the task at hand.  Let's turn to the

15   downstream market.

16             Fubo cannot show harm to competition in the downstream

17   market.  Fubo's downstream theory is that Venu will have an

18   unfair advantage because it will have only sports networks,

19   while defendants force other MVPDs to take nonsports networks.

20   There are several problems with that theory.

21             First, no one is forced to take defendants' nonsports

22   networks.  MVPDs have asked for defendants' nonsports networks.

23   Fubo is simply wrong about defendants' licensing practices.

24   I'm not going to go into the evidence right now in open court,

25   but you're going to hear a lot about that, and we look forward

O86HFub2           Opening - Mr. Earnhardt

1   to presenting your Honor with the true facts.

2        Second, any disadvantage that Fubo has has come from

3   its own licensing choices.

4        And if we can please turn off the public monitor for

5   this one.

6        Every single —— virtually every Fubo subscriber must

7   take all of these channels because Fubo has committed to

8   distribute many nonsports channels from many non-defendants to

9   virtually all the subscribers.  So even if defendants gave Fubo

10  complete freedom to do whatever it wants with defendants'

11  networks, they still would not be able to offer a skinny sports

12  bundle.

13       Fubo is wrong that Venu will foreclose competition

14  downstream.  Venu will face stiff competition from numerous

15  incumbents.  All the distributors listed on this page —— the

16  SVODs, the DTCs, the MVPs —— will compete with Venu, and

17  there's nothing to prevent a new competitor from entering.

18  Nothing prevents CBS or NBC or various regional sports

19  networks, from the YES Network or MSG, from assembling to

20  compile their own version of Venu that can compete by offering

21  a narrow version of sports channel to consumers.  There is no

22  foreclosure.

23       Finally, your Honor, Venu will not create a new skinny

24  sports market in which only it exists.  Nothing about that

25  market appeared in Fubo's original preliminary injunction

O86HFub2          Opening - Mr. Earnhardt

1    brief, and for good reason.  Making a product with new

2    desirable characteristics is how you compete within a product

3    market.  It's not the creation of a new market.

4              Just to take an example, there's an MVPD out there

5    called Friendly and Friendly shows only what it calls feel good

6    channels.  Friendly has nearly a million subscribers.  It has

7    absolutely no sports.  But Friendly, unlike Fubo, is

8    profitable, according to public statements it has made.  Does

9    that mean Friendly has created a new market for feel good

10   entertainment that it alone participates in?

11             To take an even more obvious example, Coca-Cola is the

12   only drink that you can buy that has the ingredients of its

13   secret formula.  I know a lot of people that would never switch

14   from drinking Coca-Cola to drinking Pepsi.  Does that mean

15   Coca-Cola operates in its own market because it has distinct

16   characteristics that appeal to consumers?  Absolutely not.

17   Just because a product competes by having different

18   characteristics does not mean that it's in a unique market.

19             FUBO cannot have the argument both ways.  Fubo says it

20   will lose so many subscribers to Venu that it's going to do

21   irreparable damage to its business.  That's their theory of

22   harm, but if that's true, that means Venu is a substitute for

23   Fubo, which means they're the same market.  So under Fubo's

24   theory of harm, Venu cannot be a market of one.  The simple

25   fact is there is no separate skinny sports bundle market.  The

O86HFub2          Opening - Mr. Earnhardt

1    entire point of Venu is to compete against streaming services

2    and direct-to-consumer services to try to get consumers back

3    into the MVPD arena.

4         OK.  Your Honor, let me pause here.  The facts will

5    not support Fubo's theory about what's going on.  We look

6    forward to showing you that evidence.  They rely on

7    speculation.  They argue by ellipses, by deleting things, and

8    they take stuff out of context.  They don't have evidence, and

9    that's not good enough to obtain a preliminary injunction.

10        But Fubo's problems don't stop there.  Even if one

11   were to assume the truth of all of Fubo's facts and all of

12   Fubo's theories, Fubo would still lose.  And that's because the

13   Supreme Court has said that what Fubo is alleging we're doing,

14   we are allowed to do.

15        Fubo's overarching claim is that defendants are giving

16   Venu an unfair advantage by licensing unbundled sports networks

17   only to Venu.  Fubo says that's discrimination.  It claims that

18   defendants are preferencing Venu, which they own, as compared

19   to other MVPDs, and it says that favoritism in licensing

20   upstream will prejudice rivals of Venu downstream and prevent

21   them from effectively competing with Venu.  That is Fubo's

22   theory.  That's not true, but even if it was, the Supreme Court

23   has twice held that that is not anticompetitive, in both the

24   *Trinko* case and the *LinkLine* case.

25        I think it's instructive to read the Supreme Court's

O86HFub2          Opening - Mr. Earnhardt

1    own description of what *Trinko* and *LinkLine* were about.  The

2    Supreme Court said:  "The nub of the complaint in both *Trinko*

3    and this case is identical.  The plaintiffs alleged that the

4    defendants, upstream monopolists, abused their power in the

5    wholesale market to prevent rival firms from competing

6    effectively in the retail market."

7          The Supreme Court said that might be true, but that's

8    not anticompetitive, and that's exactly Fubo's theory here.

9    They're alleging that defendants are abusing their power in the

10   upstream wholesale sports licensing market to prevent rival

11   MVPDs from competing effectively downstream in the retail pay

12   TV market.  That is exactly the theory that *LinkLine* rejected

13   based, by the way, on my friends at Kellogg arguing that case

14   in the Supreme Court.

15         We depict this here visually.  In *LinkLine*, AT&T

16   charged so much for unnecessary input upstream and so little

17   for the final output downstream that rival competitors

18   downstream can never make a profit.  That was the theory.  The

19   Supreme Court said that's totally fine.  Absent a duty to deal

20   upstream, which Fubo doesn't allege here, a company, even a

21   monopolist, is completely free to license upstream in a way

22   that disadvantages its rivals downstream.

23         Now, on the one hand, that might seem unfair, and it

24   might seem that doing things to disadvantage a rival is somehow

25   bad.  But I want to make two points about that.  Defendants

O86HFub2        Opening - Mr. Earnhardt

1    have spent billions of dollars and taken incredible risk to

2    create networks that people really value.  Those networks are

3    defendants' property, and in a free market system, like we have

4    here in the United States, people get to choose what they do

5    with their own property.  Defendants can sell their networks

6    however they want to whomever they want on whatever terms they

7    want.  They can keep them to themselves.  There is no

8    obligation that defendants give any of their networks to Fubo

9    at all, and there's certainly no obligation that we give our

10   networks to Fubo on terms that it demands.  That's point one.

11          Point two, even if it is unfair, the antitrust laws

12   are not concerned with fairness.  When there's competition,

13   there are going to be winners and there are going to be losers.

14   That is what competition is.  The Supreme Court has made clear

15   that competing in the way they're alleging we're competing

16   might be hypercompetitive, but it is not anticompetitive.

17          It's instructive to compare this case to a case that

18   shows what would be a problem.  The only case that Mr. Hansen

19   mentioned and that they cite in their papers in which a joint

20   venture has been enjoined is *Columbia Pictures*, and they cite

21   that extensively and they put a lot of eggs in the *Columbia

22   Pictures* basket.  There, movie companies plan to license their

23   movies to a joint venture that they were creating called

24   Premiere, and if they had stopped there and done just that,

25   there would have been no problem.  The world would have looked

O86HFub2          Opening - Mr. Earnhardt

1    as it does on the screen.

2          But the joint venture members did not stop there.  In

3    *Columbia Pictures*, the joint venture's members had this:  They

4    had an additional agreement upstream that each would refuse to

5    license their movies to JV competitors, folks like HBO, for

6    nine months at a time.  They had an agreement not to license to

7    others.  That's a joint refusal to deal, that is a group

8    boycott, and that is illegal.  But nothing like that is

9    happening here.  Each defendant here can bundle or unbundle or

10   deal or not deal or charge or not charge whatever it wants

11   individually to third parties.  This case at most is about

12   unilateral self-preferencing, not a joint refusal to deal.

13         Now, defendants' agreements related to the joint

14   venture are in writing, and your Honor will have access to

15   them.  You can read them.  And what those agreements say is

16   that defendants will license to Venu on a nonexclusive basis.

17   That is the opposite of the agreement that the joint venture

18   members entered into in *Columbia Pictures*.  There, it was a

19   problem because they had an agreement to license exclusively to

20   the joint venture, not permitted to license to anyone else.

21   This is the opposite of *Columbia Pictures*.  Doesn't support

22   Fubo's case; it supports our case.

23         Now, Fubo tries to engage in some sleight of hand

24   here, and they say:  Look, right there there's something that

25   says noncompete right in the documents.  He said a lot about

O86HFub2          Opening - Mr. Earnhardt

1    the antitrust laws.  If we put a noncompete in something that

2    says we can't compete with each other upstream, that wouldn't

3    make any sense.  So what does that noncompete say?  It just

4    says that you can't launch another Venu.  You can license your

5    own networks to MVPDs or however you want.  ESPN is going to

6    and has committed to going direct to consumer with its

7    networks.  The other members are able to do that too.  You just

8    can't launch another JV, which is entirely different.

9          Bottom line, your Honor, Fubo's theories of

10   anticompetitive harm fail under the facts and they fail under

11   the law.  But even if they were able to show some harm to

12   competition, and they can't, any harm to competition would be

13   outweighed by Venu's obvious pro-competitive benefits.  Venu

14   checks nearly every conceivable pro-competitive box one can

15   imagine:  It's innovative.  It offers a product that no

16   defendant could offer on their own.  It's lower priced.  It

17   creates a new competitive force in an already dynamic market.

18   This is not a merger.  This isn't eliminating a competitor.

19   This is a joint venture.  It's creating a new one.  For that

20   reason, it reduces market concentration.

21         Venu is entirely additive.  Nothing is removed.

22   Nothing is eliminated.  Nothing it taken away.  Venu is great

23   for consumers.  Consumer-benefiting joint ventures like Venu

24   are pro-competitive and should be encouraged, not enjoined.  In

25   fact, a court has never enjoined a joint venture like Venu.

O86HFub2          Opening - Mr. Earnhardt

1    Never.  Only a handful of joint ventures have ever been

2    enjoined, period.  And in each of them, one of three things was

3    happening:  Either operations were being consolidated expressly

4    or there was an elimination of a competitor or potential

5    competitor, or there was a joint refusal to deal, a group

6    boycott.  Nothing like that is happening here, your Honor, and

7    for that reason Fubo, has no likelihood of success on the

8    merits of a Section 7 claim.

9          MR. LEVANDER:  Good morning, your Honor.  Do you want

10   a hard copy of the defendants' slides?

11          THE COURT:  I have them.

12          MR. LEVANDER:  Andrew Levander.

13          Good morning, your Honor.  May it please the Court.

14   We join in our codefendants' arguments on the merits of this

15   motion for preliminary injunction.  I will focus on

16   plaintiff's utter failure to establish imminent irreparable

17   harm from the joint venture's alleged violation of the

18   antitrust laws.  The Second Circuit has over and again

19   emphasized that a preliminary injunction is an extraordinary

20   and "drastic remedy" to be granted only if the plaintiff

21   satisfies its heavy burden of proof by a "clear showing" as to

22   each of the factors necessary to issue a preliminary

23   injunction.  And the Second Circuit has emphasized repeatedly

24   that irreparable harm is "the single most important

25   prerequisite for issuance of a preliminary injunction."

O86HFub2        Opening - Mr. Earnhardt

1          Moreover, a plaintiff seeking injunctive relief under

2     the Clayton Act must show that its purported irreparable harm

3     is attributable to antitrust injury, on this motion, the

4     creation of the joint venture.  Accordingly, as the Supreme

5     Court said in the *Cargill* decision, a showing of loss or damage

6     due merely to increased competition does not constitute such

7     injury.  Plaintiffs have not and cannot prove this imminent

8     irreparable harm for numerous reasons as this hearing will

9     show.

10         First, plaintiffs have not and cannot show imminent

11    irreparable harm.  Fubo has long-term contracts with Fox,

12    Disney, and other programmers that will not expire for years,

13    and Fubo voluntarily ended its carriage agreement with Warner

14    Bros. in 2020.  Neither Fox nor Disney have any incentive or

15    have given any indication, and there will be none in the

16    record, that because of the joint convenient they will either

17    try to terminate their contracts with Fubo early or will be

18    averse to renewing or extending those contracts in the years to

19    come.  To the contrary, it's indisputable that Fox makes more

20    money for each continuing Fubo subscriber than it will make

21    from a new Venu subscriber.

22         As Mr. Earnhardt suggested, Fox earns affiliate and

23    advertising fees from Fubo for anyone who watches not only

24    sports on Fox but Fox News or any other Fox nonsports

25    programming.  With regard to Venu, however, Fox will only earn

O86HFub2          Opening - Mr. Earnhardt

1    fees for sports viewers.  And however popular Fox Sports might

2    or might not be, Fox News is the most-watched news program in

3    the United States, and it is the second most-watched program of

4    any kind, sports or otherwise, on Fubo.  So, by definition, Fox

5    will make less money on one Venu subscriber than it does on one

6    Fubo subscriber.

7          Moreover, the joint venture does not pose an imminent

8    threat to Fubo.  If Venu is successful, it may have roughly

9    1 million subscribers by the end of 2024.  That's 1 million out

10   of 120 million or more households in the United States today.

11   And Venu hopes to have 5 million subscribers five years from

12   now.  Those long-term predictions from Venu, assuming it is

13   successful, hardly give rise to imminent irreparable harm under

14   the antitrust laws.

15         Second, Fubo's claims of harm, much less irreparable

16   harm, are entirely speculative.  Fubo told this Court that the

17   launching of the joint venture threatens Fubo's business.  But

18   that broad argument is based on dubious speculation after

19   dubious speculation.  For starters, Fubo's has claimed a

20   potential loss of hundreds of thousands of subscribers in the

21   fourth quarter of 2024 alone.  However, that number is not only

22   pure speculation, it's entirely contrived and violates, as

23   Mr. Hansen said, one's common sense.

24         Indeed, the vast majority of Fubo's guess at lost

25   subscribers is not based on current Fubo subscribers, but on

O86HFub2          Opening - Mr. Earnhardt

1    Fubo's sheer speculation about how, given the joint venture,

2    consumers who are currently not Fubo's subscriber might respond

3    to free 30-day trial subscription offers Fubo makes in the

4    future.

5          In addition, Fubo's speculative numbers bear no

6    relationship to reality.  The joint venture is hopeful that it

7    might generate 1 million subscribers by year-end.  Yet we are

8    to believe Fubo's wild estimates of 400,000 lost customers,

9    including those unknown future customers, that 40 percent of

10   new Venu subscribers will have come from Fubo alone, more than

11   from YouTube, Hulu, Comcast, or any of Fubo's competitors, and

12   that's absurd given the fact that Fubo represents less than

13   2 percent of the pay TV ecosystem.

14         What makes Fubo's loss prediction even more absurd is

15   that the undisputed focus of the joint venture is not on the

16   existing subscribers in the pay TV ecosystem, whatever cable,

17   satellite or streaming service they use, but on people outside

18   the pay TV ecosystems, the cord-cutters and the cord-nevers.

19   Remember, your Honor, this case arises against a backdrop of a

20   dynamic, competitive, and fast-changing industry that has been

21   losing 3 to 5 million pay subscribers a year for most of the

22   last decade.  Consequently, defendants are all looking for ways

23   to keep those more valuable subscribers in the linear pay TV

24   ecosystem rather than having them go to less valuable

25   subscriptions like Venu.  Accordingly, the joint venture will

O86HFub2        Opening - Mr. Earnhardt

1  be laser focused on marketing to, attracting, and keeping this

2  underserved portion of consumers.

3         So whether you assume 30 percent, 50 percent, or

4  70 percent of the new Venu subscribers will come from consumers

5  currently outside of the pay TV ecosystem, the actual number of

6  subscribers that Venu predicts it will add from within the

7  entire pay TV ecosystem, including Fubo and all its main larger

8  competitors, will be roughly equal to the speculative losses

9  Fubo claims it alone will suffer.

10        Let me do the math.  Venu thinks it might have a

11 million subscribers by year-end.  If half of those are

12 cord-cutters or cord-nevers, Venu's impact in 2024 on all MVPDs

13 and all MVPDs combined is probably about 500,000 subscribers.

14 Fubo represents less than 2 percent of the entire pay TV

15 market.  There's no reason to think that FUBO will have a

16 disproportionate loss of subscribers that go to Venu unless

17 there's something particularly awful about Fubo's product

18 compared to YouTube, Hulu, Comcast, and others.  Two percent of

19 the 500,000 pay TV subscribers that might leave for pay TV for

20 Venu is about 10,000 Fubo subscribers, not 400,000.  As

21 Mr. Hansen said in his opening, let's use our common sense.

22        Furthermore, Fubo's exaggerated claims make no sense

23 not only because they're speculative, but because they're

24 fundamentally flawed.  And one of those obvious flaws is the

25 primary basis for Fubo's speculative number of potential lost

O86HFub2          Opening - Mr. Earnhardt

subscribers.  Fubo has predicated its loss claim on what show

did the new Fubo subscriber watch first.  If it was a sports

show, Fubo wants this Court to assume a high likelihood that

those sports subscribers will leave Fubo to go to Venu.  Of

course, you cannot know the first show for potential future

subscribers, which make up a majority of Fubo's speculative

claim of lost subscribers.

          And even for actual existing subscribers, Fubo's

assumption makes little sense.  Just because someone in a

household happens to make a sporting event the first Fubo

watch, that does not mean that the household will opt to leave

Fubo and get Venu.  How much news does that Fubo subscriber

watch?  Who are all the members of the particular household and

what do they watch?  And who in the household made the first

selection, and is that the person who pays for the subscription

or watches the most TV?

          Plaintiffs just pulled a number out of thin air and

doubled down on an arbitrary assumption of what might happen in

the future.  It's like saying you can evaluate my likely

behavior and what's important to my family based on my first

selection at a grocery store.  The fact is my first selection

may be occasioned by the physical setup of the grocery store or

the need to have butter for baking or vinegar for salad.  And I

can tell you this:  Personally, I like ice cream, but I always

pick that item last because I don't want it to melt.  If one of

O86HFub2        Opening - Mr. Earnhardt

my sons made the first selection, does that foretell my

family's future with that grocery store?

Third, Fubo's speculative claim of harm is not

irreparable for another reason. Venu is a joint venture, not a

merger. Accordingly, if, after completing discovery and a

trial, this Court were to somehow conclude the joint venture is

an antitrust violation, the Court could simply terminate it

down the road. The joint venture members would have wasted a

lot of money trying to provide a new product to consumers

through an independent new entity, but there would be no merged

entity to unscramble. And for that reason, too, this Court

should be loath to grant the drastic and invasive equitable

remedy Fubo now seeks. Indeed, your Honor, granting an

injunction would cause serious hardship to the defendants, to

the joint venture, and most importantly, to the consuming

public.

Fourth, an injunction under the Clayton Act must be

based on irreparable harm directly connected to antitrust

injuries, but the speculative claims of corporate death that

Fubo has presented to the Court are not attributable to any

alleged antitrust violation. Even assuming there was merit to

plaintiff's claims, Fubo's parade of horribles are, if true,

the product of Fubo's failures that long predate the joint

venture announcement in February of 2024. Fubo has lost

millions of dollars every quarter of its existence. It has

O86HFub2          Opening - Mr. Earnhardt

lost approximately $1.8 billion in the last four years alone.
And in 2023, before the joint venture, Fubo forecast it will
lose money again in 2024.  Consequently, between December 2020
and January 2024, before the announcement, Fubo's stock fell
from $62 a share to $2 a share, more than 95 percent.

          Analyst after analyst has panned Fubo's business model
and performance.  Here are a few of those headlines from
various commentators well before the Venu announcement:
"Fubo's's Stock is Tumbling Because It's a Terrible Business";
"3 Reasons to Avoid Fubo Stock"; JPMorgan, "Underweight."
Speculative future loss of some Fubo subscribers to Venu did
not cause Fubo's existing problems.  It was its lack of cash,
its lack of brand, its lack of scale, its lack of technology, a
disastrous sports betting operation, and on and on.

          In fact, ironically, your Honor, Fox invested
$24 million in Fubo between 2016 and 2018, helping Fubo get off
the ground and go public.  But whatever problems Fubo has
encountered since, that's their own business failings, wholly
unrelated to Venu.  The Court should not grant a preliminary
injunction based on speculative harm attributable to
preexisting bad business decisions.  Nor should the Court
enjoin Venu, a new entity offering a new product in a dynamic
TV industry, because Fubo does not like the members' bundling
practices, an issue this Court has made clear is for later in
this litigation.

O86HFub2          Opening - Mr. Earnhardt

Now, fifth, and perhaps most importantly, an injunction should not be granted in this case because plaintiffs have an adequate remedy of money damages. As Fubo's chief financial officer has conceded, you can readily calculate the loss of revenue from lost subscribers. If Fubo can ultimately show it lost 100,000 subscribers to the joint venture, in violation of the antitrust laws, it has a readily quantifiable monetary claim for those lost subscribers. The availability of an adequate monetary award is simply the antithesis of irreparable harm. That fact also powerfully compels the conclusion that Fubo's request for drastic equitable immediate relief be denied. Indeed, the Second Circuit has stated a bright-line test: "Where monetary damages may provide adequate compensation, a preliminary injunction should not issue."

Your Honor, all of these reasons independently and collectively weigh strongly against granting a preliminary injunction. But if there are any lingering doubts about that conclusion, plaintiffs' own words to the investing public are dispositive. In March 2024, after the joint venture announcement, after this lawsuit was commenced, while plaintiffs were hard at work on this preliminary injunction, David Gandler, the CEO of Fubo, who now predicts the end of the world because of the joint venture, gave the following answers to two analysts' questions about what happens to Fubo if it

O86HFub2          Opening - Mr. Earnhardt

1    loses in this lawsuit.

2              In response to the first question about litigation

3    loss, Mr. Gandler stated:  "You know, it's very difficult to

4    say, but, ultimately, I think things will remain status quo."

5              And then a few minutes later, in response to another

6    analyst's similar question about losing litigation, Mr. Gandler

7    unambiguously stated:  "Well, first of all, losing the lawsuit

8    doesn't really change anything, as we said."

9              In other words, Mr. Gandler twice explicitly rejected

10   the notion of imminent irreparable harm.  Plaintiffs would have

11   you believe, in footnote 32 of their reply brief where they

12   inaccurately claim this March 1, 2024, earnings call happened

13   in February of 2024, that when Fubo made these statements to

14   the public in March 2024, they had no idea the negative

15   implications of the joint venture until they filed their

16   preliminary injunction papers a month later.  If there's

17   anybody in this courtroom who buys that argument, who wants to

18   ignore their common sense, I have a bridge right outside the

19   courthouse to sell them.

20             We should take plaintiffs at their word.  Denying the

21   injunction will not "really change anything."  It will not

22   affect "the status quote."  And it certainly will not cause

23   imminent irreparable harm to Fubo.

24             Thank you, your Honor.

25             THE COURT:  All right.  I think this is a good time to

O86HFub2

| 1 | take a brief break before we get started with witnesses.  And

2 | just for the lawyers' planning, my practice is generally to

3 | take a short break every roughly 75 to 90 minutes so the

4 | reporters can have a break and everyone is comfortable.

5 |         OK.  So it's 11:12.  We'll resume at 11:25.

6 |         All right.  Thank you very much.

7 |         (Recess)

8 |         THE COURT:  OK.  You can be seated.

9 |         A couple of minor points before the witnesses begin.

10 | First, we have a lot of lawyers here, and that means a lot of

11 | phones.  Everyone should just double-check to make sure that

12 | their phones are on silent, that they don't make any noise at

13 | all in the course of witness testimony.

14 |         I'll also just remind folks that we have a lovely

15 | little cafeteria here in the courthouse down on the lower

16 | level.  So during our short breaks, there's coffee and other

17 | things available there.

18 |         Lawyers at the tables are ── I'm fine if you have

19 | water or coffee if you want, so long as any drinks you have

20 | have a lid on them so that, if we have a spill, we don't ruin

21 | the space that's being loaned to us for this proceeding.

22 |         With that, Mr. Hansen, you can call your first

23 | witness.

24 |         MR. HANSEN:  Your Honor, Mr. Schultz will call the

25 | next witness for us.

O86HFub2

1              MR. SCHULTZ:  Thank you, your Honor.

2              One procedural matter before we call the first

3      witness.  We disclosed to defendants last night exhibits that

4      we planned to be used with the witness today in court.  We met

5      and conferred about those last night and narrowed objections to

6      those exhibits to only a handful.  The rest were unobjected to.

7              To speed up the presentation of evidence at the

8      hearing today, we want to move those into evidence right now,

9      absent objection from the defendants.

10             MR. JURATA:  The only question I have is these are all

11     demonstrative exhibits.  They're PDX, so normally that would

12     not actually be evidence.  It would just be a demonstrative.

13     Obviously, your Honor, if you want to admit them into evidence,

14     but these are demonstrative exhibits.  They're not documents.

15             MR. SCHULTZ:  Just to clarify, these actually are

16     exhibits underlying the demonstratives, not the demonstratives

17     themselves, your Honor.

18             THE COURT:  Sure, I think, given that we don't have a

19     jury here, that the easiest way to proceed on exhibits that are

20     unobjected to is once you use an exhibit during the course of

21     the hearing, it's deemed admitted.  Given that the vast

22     majority of exhibits are without objection, I think just to

23     streamline things, if an exhibit is used during the witness

24     examination, it will be deemed admitted, assuming neither side

25     objects, and I'll be relying on the lawyers.  You know which

O86HFub2            Trautman - Direct

1    documents are objected to.  If you know there's no objection,

2    you should just use the exhibit with the witness.  That will

3    promote efficiency.  And once an exhibit has been used with a

4    witness, it's deemed admitted.

5            If you reach —— I think the simplest thing for us is

6    if we get to the end of each day of testimony and there are

7    some additional exhibits that, for whatever reason, you didn't

8    end up showing to the witness but that you'd like to move in so

9    that you are sure they're part of the record, we can deal with

10   that at the end of each day.  But otherwise, I think we'll all

11   benefit from that as an efficient way to deal with exhibits.

12           MR. SCHULTZ:  Understood, your Honor.  Thank you.

13           THE COURT:  OK.

14           MR. JURATA:  Thank you, your Honor.

15           MR. SCHULTZ:  Fubo calls James Trautman to the stand.

16           THE COURT:  Mr. Trautman, you'll just come forward

17   here to the left, to my left, and remain standing to take the

18   oath.

19   JAMES TRAUTMAN,

20        called as a witness by the Plaintiff,

21        having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MR. SCHULTZ:

24   Q.  Good morning.  Please state your name and favorite sports

25   team for the record.

O86HFub2            Trautman - Direct

1   A.  James Trautman, Denver Nuggets

2   Q.  Mr. Trautman, what do you do for work?

3   A.  I am imaging director of Bortz Media & Sports Group.

4   Q.  What is Bortz Media & Sports Group?

5   A.  We are a consulting firm providing services to clients in

6   the media and sports industries.

7   Q.  And why are you here today?

8   A.  I've been retained as an expert witness by Fubo to provide

9   testimony about the pay TV industry, the role of sports

10  programming within that industry, and the joint venture.

11  Q.  Did you prepare some slides today to aid in your testimony?

12  A.  I did.

13          MR. SCHULTZ:  Permission to publish, your Honor.

14          THE COURT:  Yes.

15          MR. SCHULTZ:  Let's go to the next slide.

16  Q.  So just tell us briefly about your professional background,

17  Mr. Trautman.

18  A.  Sure.  Well, I've been providing consulting services to

19  clients in the media and sports industries for somewhat over 40

20  years now, and a particular focus of our consulting services is

21  to assist programmers and rights-holders with valuation and

22  negotiation of sports rights contracts.  And then, in addition,

23  we also help clients across all aspects of the media industry

24  to understand and respond to changes brought about by

25  technology.

O86HFub2          Trautman - Direct

1    Q.  What is your experience, if any, advising clients on the

2    negotiation of carriage agreements between programmers and

3    distributors?

4    A.  We have assisted programmers on numerous occasions in

5    negotiations with distributors.

6    Q.  The other way around?

7    A.  Occasionally, yes.

8    Q.  Did you submit a report in this case?

9    A.  I did, an initial report and then a supplemental report.

10            MR. SCHULTZ:  For the record, Mr. Trautman's

11    supplemental report is Exhibit 139 to Fubo's reply brief in

12    support of its PI motion.

13    Q.  Does that report provide a fuller description of your

14    qualifications as well as the opinions in this case that you're

15    offering?

16    A.  It does.

17    Q.  Let's go to the summary of your opinions.  Just give us a

18    brief overview of the opinions that you are expressing in this

19    case, Mr. Trautman.

20    A.  Well, first of all, that live sports are extremely valuable

21    and that defendants' control of a substantial percentage of the

22    rights to those sports has allowed them to implement practices

23    that have limited MVPD flexibility and, ultimately, contributed

24    to cord-cutting.

25            And then with respect to the venture, specifically,

O86HFub2                Trautman - Direct

1  that Raptor venture will be the only skinny sports bundle in

2  the United States at its launch, and also that it will provide

3  the defendants with additional leverage in negotiations with

4  distributors.

5  Q.  So you mentioned live sports are valuable.  What

6  distinguishes live sports from other forms of television

7  content?

8  A.  Well, a few things, really.  I think that there are —— they

9  are nonreplicable.  The outcome is uncertain but becomes known

10  immediately after the event ends, and that results in most live

11  sports programming being watched on a live basis.  And —— which

12  distinguishes it from much entertainment programming in the

13  market today.  And then, in addition, there's a finite supply

14  of sports because there's only so many games that are played

15  within the major leagues and sports organizations.

16  Q.  From a distributor's perspective, how valuable is live

17  sports content relative to other television content?

18  A.  Well, it's extremely valuable.  It is reflected in the

19  license fees that are paid for it for the networks that carry

20  live sports programming, which tend to be substantially higher.

21  For example, ESPN's license fee is four times the license fee

22  for the most expensive nonsports network.

23  Q.  In the current marketplace, how feasible would it be to

24  operate an MVPD without significant live sports?

25  A.  Well, I think, to compete in the broader distribution

O86HFub2          Trautman - Direct

1  marketplace, it would be very difficult.

2  Q.  What are the —— are some live sports more valuable than

3  others?

4  A.  Yes.

5  Q.  What are the most valuable live sports?

6  A.  Well, I think it's typically thought of as the four major

7  sports leagues:  NFL, NBA, NHL, and Major League Baseball,

8  along with major college football and basketball.

9  Q.  Which companies own the most sports rights.

10 A.  Well, there are five major programmers.  The three

11 defendants here —— Disney, WBD, and Fox —— as well as Comcast,

12 or its NBC sports, and Paramount, CBS Sports.

13 Q.  And what proportion of sports rights do the defendants in

14 this case own collectively?

15 A.  Well, in terms of the value of the rights, approximately

16 60 percent.

17 Q.  What is this chart showing us here in slide 105?

18 A.  This just kind of graphically illustrates that, showing

19 that the defendants control a significant portion of all of the

20 major sports rights, including nearly all of Major League

21 Baseball, NBA, and NHL rights, as well as a substantial

22 percentage of both NFL and college rights.

23        THE COURT:  Mr. Schultz, can I just interrupt you for

24 a moment.

25        Mr. Trautman, for clarity, the slides that we are

O86HFub2              Trautman - Direct

1    looking at, did you play a role in creating these slides?

2              THE WITNESS:  Yes.

3              THE COURT:  So they reflect, at least in part, your

4    own work product, is that right?

5              THE WITNESS:  Yes.

6              THE COURT:  You can continue, Mr. Schultz.  Thank you.

7              MR. SCHULTZ:  Sure.

8    BY MR. SCHULTZ:

9    Q.  Now, the defendants in this case own live television

10   content beyond sports?

11   A.  I'm sorry.  Could you repeat the question.

12   Q.  Sure.

13             Do the defendants in this case control television

14   content beyond live sports?

15   A.  Yes.  They control many nonsports networks as well as the

16   sports-oriented networks that they own.

17   Q.  And just at a high level, how have defendants historically

18   provided that content to consumers?

19   A.  Well, generally, it's been provided as part of an MVPD ——

20   through distributors as part of an MVPD or vMVPD bundle.  And

21   in offering those products to distributors, they've typically

22   negotiated for distribution for all of their networks

23   concurrently.

24   Q.  Now, how does defendants' ownership of live sports content

25   impact the negotiations that they have with distributors over

1  carriage agreements?

2  A.  It gives them substantial leverage in those negotiations

3  because of the value of the live sports content and their

4  sports networks in particular.  This enables them, as I already

5  mentioned, to charge high license fees, but also to extend the

6  value of those, the sports control, to provisions they obtain

7  in negotiating other agreements for the nonsports networks as

8  well.

9  Q.  What is the document that we're looking at on the screen

10  right now?

11  A.  This is a complaint filed by Warner Bros. Discovery in

12  relation to its efforts to retain the NBA rights.

13  Q.  And what is the upshot of the highlighted statement here in

14  this document?

15  A.  Well, just an acknowledgment that they do gain an advantage

16  in negotiating distribution rights from their control of the

17  NBA rights.

18  Q.  And how do programmers actually implement the leverage that

19  they have in negotiations with distributors?

20  A.  Well, first, they use it to obtain very high license fees

21  for the sports networks that they carry, but then they also use

22  it to secure distribution for nonsports networks.  And in

23  addition to securing distribution, to assist them in making

24  sure that those networks are distributed to as wide of an

25  audience as possible.

1          MR. SCHULTZ:  Now, this next slide contains

2    information sealed by the Court.  So, Mr. Roberts, please turn

3    off the public monitor.

4    Q.  Mr. Trautman, please do not discuss or reference any

5    specific information in the next slide.

6          Are we good?

7          (Counsel conferred)

8    Q.  So just at a high level, Mr. Trautman, what is the document

9    that we're looking at on the screen, at a very high level?

10   A.  It is a distribution agreement between Disney and Fubo.

11   Q.  And what does this contract actually cover?

12   A.  It covers all of Disney's programming networks.

13   Q.  Without disclosing the specific terms, what are the

14   provisions we're looking at on the screen here?

15   A.  There are specific provisions related to packaging ——

16   packages and penetration rates.

17   Q.  What is a minimum penetration requirement?

18   A.  That's a requirement that specifies the proportion or

19   number of subscribers that a distributor is obligated to make a

20   particular programming service available to.

21   Q.  And how do minimum penetration requirements affect a

22   distributor's ability to offer different packages of

23   programming to different consumers?

24   A.  Well, in instances where the minimum penetration

25   requirement is very high, it limits their ability to offer

O86HFub2              Trautman - Direct

1    different packages, essentially forcing them to include a very

2    large number of networks in the so-called basic package.

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O862Fub3                    Trautman - Direct

1   BY MR. SCHULTZ:

2   Q.  And what effect do those minimum penetration environments

3   have on MVPD's customers?

4   A.  Well, ultimately the customer ends up receiving and paying

5   for a number of channels that they may not have interest in.

6   Q.  Why would a distributor agree to distribute channels to its

7   customers that its customers are not interested in?

8   A.  Well, because of the leverage that we have already talked

9   about, they really don't have a choice.

10  Q.  And what do you call that practice?

11  A.  That practice would be referred to as bundling.

12  Q.  What do programmers themselves get out of this bundling?

13  A.  Well, distributors pay for networks on a per-subscriber

14  basis.  So when a network reaches more subscribers, or

15  typically they do, when a network reaches more subscribers,

16  then more revenue flows back to the programmer.

17  Q.  So how has bundling impacted programmers' bottom lines?

18  A.  It enhances their bottom line, ultimately their

19  profitability.

20  Q.  Okay.  If you turn back on the public monitor, Geoff.

21          So what is this slide showing here, what is this on

22  this slide?

23  A.  This is a document from a -- the Kagan organization, which

24  is part of S & P Global, that estimates the cash flow margins

25  of cable networks, including an overall industry average.

O862Fub3                    Trautman - Direct

1    Q.  And what is cash flow margin, generally speaking?

2    A.  It's a measure of profitability within the program network

3    industry.

4    Q.  Okay.  And based on margin, where does The Disney Channel

5    rank among the most profitable channels in the United States in

6    2020?

7    A.  In this instance, third with a margin of approximately 60

8    percent.

9    Q.  Okay.  How does that compare to the industry average?

10   A.  It's substantially higher, although the industry average is

11   high, as well, 37 percent.

12   Q.  And how do minimum penetration requirements affect the

13   margins that programmers earn on their channels?

14   A.  Well, as we discussed before, because it generates

15   incremental revenue from driving additional subscribers.

16   Without affecting the cost structure of the network, it drives

17   higher margins.

18   Q.  And how has bundling and penetration requirements affected

19   the costs that consumers pay for television?

20   A.  I believe they have increased them.

21   Q.  And why is that?

22   A.  Well, as we see on this chart, the average consumer to an

23   MVPD package receives approximately 190 channels, but only

24   regularly watches about 15 of them.  So they are ultimately

25   paying for many channels that they don't watch or aren't

O862Fub3                     Trautman - Direct

1    interested in.

2    Q.  And what is the source of the number on this slide here?

3    A.  This is a 2022 analysis that was intended to show the

4    incremental cost to consumers of channels that they don't --

5    that they pay for but don't watch.

6    Q.  So why would consumers put up with this?

7    A.  Well, for many years they didn't have much of a choice

8    because the bundled service providers were the only pay TV

9    alternatives out there have.  So if they were a cable -- they

10   could choose between cable and satellite, but those providers

11   all offered large bundles.

12   Q.  Did that change at some point for some folks?

13   A.  Yes, it did, principally for entertainment-oriented

14   customers, when SVOD services or streaming or subscription

15   video on demand services came on the scene, well, starting in

16   2007, but really in the early 2010s, a number of consumers

17   began to what's called "cut the cord."

18   Q.  What is an SVOD?  What is on-demand publishing?

19   A.  Well, linear channels offer programming on a scheduled

20   basis designed to be viewed at the time that it appears in the

21   schedule.  On demand just refers to a collection of programming

22   that's available to the consumer to be watched at a time of

23   their choosing.

24   Q.  Do SVOD services offer live sports?

25   A.  Generally, no.  A few do, but it's relatively limited.

O862Fub3                      Trautman - Direct

Q.  What SVOD offers the most sport content?

A.  It would be either the Peacock service or the Paramount+

service.

Q.  And what percentage of live major sports do those services

have?

A.  About 14 percent.

Q.  And how does that compare to the proportion of sports that

an MVPD has?

A.  It would be close to a hundred percent for an MVPD.

         THE COURT:  That 14 percent number, is that Peacock

and Paramount+ combined or meaning that they each have about 14

percent.

         THE WITNESS:  That would be individually.  I think one

is a little higher than the other, but individually.

BY MR. SCHULTZ:

Q.  Now, after SVODs -- before I get to that, when did SVODs

begin proliferating?

A.  Well, as I mentioned, really in the -- it started in 2007

with Netflix and then in the early 2010s.

Q.  And after they began proliferating, what happened?

A.  Well, they continued to grow rapidly in terms of number of

subscribers and more and more consumers began to cut the cord.

You can see on this chart that as of 2015, roughly 100 million

subscribers subscribed to a -- paid for an MVPD service.  That

has declined in 2023 to I think 59 million, and then there is

O862Fub3                    Trautman - Direct

1  about 16 million vMVPD customers, for a total of about 75

2  million now, as compared to 100 million.

3  Q.  And which consumers are cutting the cord primarily?

4  A.  Mostly entertainment-oriented customers that were nonsports

5  fans.

6  Q.  What happened to sports fans in this movement here?

7  A.  Sports fans have generally stayed in the bundle because a

8  lot of live sports still requires a bundle subscription in

9  order to obtain it.

10  Q.  Why did distributors offer sports fans an alternative to

11  big bundle at this point?

12  A.  Because of the contractual requirements that we talked

13  about previously.  They didn't have the ability to unbundle and

14  offer a sports-only package.

15  Q.  So how did the cord-cutting movement overall affect the

16  composition of MVPD subscribers?

17  A.  MVPD subscribers increasingly consist of sports fans as a

18  principal portion of the subscriber base.

19  Q.  Okay.  What is the document we are looking at on the screen

20  right now?

21  A.  This is a Disney document addressing the importance of

22  sports content in the current marketplace.

23  Q.  I am going to walk through the boxes with you.

24       What does this left box show here?

25  A.  Well, this shows that viewing to sports and news

1  programming, live programming, has remained fairly stable over

2  the last few years, while the viewing of entertainment or

3  essentially all other types of programming has declined nearly

4  in half.

5  Q.  Let's move to the right.  What is this box showing here?

6  A.  Well, in reflecting that, and the departure of a lot of

7  entertainment-oriented customers from the bundle, what we have

8  seen is that live sports telecasts, which were always

9  important, accounting for maybe two-thirds of the top 100

10  telecasts, have now become -- have now come to represent nearly

11  all of the top 100 telecasts.

12  Q.  So today how do most sports fans get their sports content?

13  A.  Still through the bundle.  I believe more than 80 percent

14  still have a pay TV subscription of sports viewing.

15  Q.  Generally speaking, how do sports fans use SVODs?

16  A.  Well, about three-quarters of them subscribe to the

17  bundle -- of the bundled sports fans also subscribe to SVODs.

18  So I would say SVODs are generally complimentary for them in

19  that respect.

20  Q.  What is the document we are looking at on the screen right

21  now?

22  A.  This is a Fox document that illustrates the percentages

23  that I was talking about.

24  Q.  So we have discussed bundling and the rise of SVODs.  How

25  have those two dynamics impacted the structure of the pay TV

O862Fub3                     Trautman - Direct

1  industry as a whole at this stage?

2  A.  Well, they created a gap in the marketplace.  On the one

3  hand, you have SVODs that are very low cost and feature

4  principally entertainment content; and at the other end of the

5  spectrum, you have vMVPD and MVPD services that are much more

6  expensive and also contain a lot of entertainment content but

7  contain substantial live sports content.

8  Q.  And tell us about this slide here.

9  A.  So this sort of shows the gap, or the ocean, between the

10  SVODs and the MVPDs in terms of the service offering and the

11  pricing.

12  Q.  And what does the ocean refer to here in this slide?

13  A.  It reflects internal documents in the case that refer to

14  the ocean -- an ocean of opportunity between SVODs and MVPD.

15  Q.  How long has this ocean existed in your view?

16  A.  Really for a decade or so with the -- as soon as the SVODs

17  began to gain significant popularity.

18  Q.  And why isn't anyone taking advantage of this ocean of

19  opportunity until now?

20  A.  Well, the distributors don't really have the flexibility to

21  be able to offer packages that would fit within these two ends

22  of the spectrum.

23  Q.  Why is that?

24  A.  And when I am referring to distributors, I am referring to

25  the vMVPDs and the MVPDs because of the contractual

O862Fub3                    Trautman - Direct

1   requirements we previously talked about.

2   Q.  Now, you are familiar with the joint venture code named

3   raptor between Disney, Fox, and Warner Bros.?

4   A.  Yes.

5   Q.  Where does Raptor fit into this ocean?

6   A.  Right in the middle.

7   Q.  The next slide.  So let's talk about Raptor.  What is

8   Raptor at a high level?

9   A.  So Raptor is a skinny sports bundle featuring 14 channels,

10  each of which has sports content, most of which have live

11  sports content, and does not feature any nonsports channels.

12  Q.  And how does Raptor's content compare to other MVPDs in the

13  market right now?

14  A.  Well, because it doesn't include any nonsports channels,

15  it's distinct from other vMVPDs and MVPDs in the marketplace.

16  Q.  And how does Raptor's price of $42.99 compare to the price

17  of other MVPDs in the market currently?

18  A.  It's substantially lower.

19  Q.  And how is Raptor able to offer such a lower price?

20  A.  Well, because they don't incur the costs of carrying the

21  nonsports networks, they have the pricing flexibility to offer

22  the service based only on the skinny bundle of networks that

23  they are offering.

24  Q.  Okay.  And why is it possible for Raptor to only offer 14

25  linear channels with sports on them?

1    A.  Well, the defendants own those networks and therefore are

2    able to unbundle them for purposes of providing Raptor.

3    Q.  Now, this is a slide you created.  Based on the documents

4    you have seen in this case, how do defendants themselves see

5    Raptor as fitting into the current ecosystem?

6    A.  They also see it as fitting right in the middle and also as

7    an opportunity to offer a virtual MVPD at a low price.

8    Q.  So what is the document we are looking at on the screen

9    right now?

10   A.  This is another Disney document that identifies the skinny

11   sports bundle, or Raptor, as fitting in between the big bundle

12   at a much higher price and in this case a direct-to-consumer

13   service that would be offered potentially at a lower price.

14   Q.  This calls Raptor a skinny sports bundle.  What does that

15   mean in the industry?

16   A.  Well, what I already mentioned, which is in -- I think --

17   it's a new service, a skinny sports bundle, but it's a service

18   that features only networks that include sports programming or

19   sports content.

20   Q.  Are there any other skinny sports bundles in the

21   United States currently?

22   A.  No.

23   Q.  Have there ever been any skinny sports bundles in the

24   United States, to your knowledge?

25   A.  Not to my knowledge.

1    Q.  And why is that?

2    A.  Because the distribution agreements and structure of the

3    relationships between programmers and distributors hasn't

4    enabled that to be the case.

5    Q.  Now, who do you see as the kind of closest analog or

6    competitor to Raptor in the current marketplace?

7    A.  Well, I think that Raptor will compete with virtual MVPDs

8    and MVPDs, principally.

9    Q.  Why do you think that?

10   A.  Because that's where the sports fans are currently

11   predominantly, and so they are concentrated there.  They also

12   have shown the means to pay for the more expensive bundle, and

13   so I would expect it to compete there.

14   Q.  Okay.  This is a new slide.  What is the document we are

15   looking at on this slide?

16   A.  Well, this is another Disney document that -- where they

17   are highlighting the competitive positioning of Raptor.

18   Q.  And what is the competitive positioning of Raptor

19   highlighted here?

20   A.  Well, again, they are focusing on how it will compete with

21   virtual MVPDs and MVPDs and specifically emphasizing that it

22   will provide a comprehensive sports offering or relatively

23   comprehensive sports offering at a significantly lower price

24   than virtual MVPDs or MVPDs.

25   Q.  So this slide discusses the competitive positioning between

O862Fub3                    Trautman - Direct

1    Raptor and MVPDs.  Does this slide mention SVODs at all that
2    you can see?
3    A.  It does not.
4    Q.  Do you see SVODs as potential competitors to Raptor?
5    A.  Not really.  I see them as more complementary.  There are
6    some SVODs that offer limited amounts of sports, but it is
7    typically not the focus and I think they would be more
8    complementary.
9    Q.  When you say complementary, what do you mean by that
10   exactly?
11   A.  Well, I think that, for example, you could combine the
12   Peacock and Paramount+ services with a Raptor subscription and
13   create a sports package that would mirror what you would get
14   from an MVPD.
15   Q.  And what is the document we are seeing on the screen right
16   now?
17   A.  This is -- I believe it's a Fox document that compares the
18   joint venture's comprehensive collection of sports content to
19   what's available through SVOD services currently.
20   Q.  And you mentioned a consumer kind of self-bundling Raptor
21   with Peacock and Paramount+.  How would the price of that kind
22   of self-created bundle compare to the price of a typical MVPD?
23   A.  Well, you could get those three services for a total cost
24   of $63.
25   Q.  And how would the content on those services compare with an

O862Fub3                    Trautman - Direct

1   MVPD in terms of sports?

2   A.   It would be very consistent with that.

3   Q.   Tell us about this slide here.

4   A.   Well, this is another way of looking at the same idea,

5   which is that SVODs could ultimately allow a sports fan to

6   essentially complete the puzzle by subscribing to Raptor and

7   then potentially adding an SVOD or two.

8   Q.   Let's talk about your putting out incentives.  How in your

9   view will Raptor change defendants' incentives in negotiations

10  with distributors?

11  A.   Well, I think, because Raptor provides sort of a fallback

12  for defendants and mitigates the risk associated with

13  cord-cutting, it will allow them to be more aggressive in

14  negotiations with distributors.

15  Q.   And why is that exactly?

16  A.   Well, because as it stands today, the interaction between a

17  distributor and programmer is sort of -- if an agreement is not

18  reached, there is sort of an all or nothing situation from the

19  programmers' perspective.  With Raptor in the marketplace,

20  there is the potential that some of the customers that might

21  have gone to a distributor in the absence of -- with sports

22  content, now if that sports content is not available through a

23  distributor, a consumer could go to Raptor instead.

24  Q.   Okay.  Now, you were in the gallery here, Mr. Trautman, for

25  the opening statements, is that correct?

O862Fub3

1    A.  I was.

2    Q.  And did you hear defendants' counsel talk about the

3    benefits of consumers by Raptor?

4    A.  Sorry.  Could you repeat that?

5    Q.  Sure.  Did you hear defense counsel discuss what they

6    characterized as benefits to consumers from Raptor?

7    A.  I did.

8    Q.  In your view, is Raptor pro consumer?

9    A.  I don't really see it that way.  I would consider a service

10   that was available through multiple distributors to be pro

11   consumer.

12   Q.  And how could that be accomplished?

13           MR. JURATA:  Objection, your Honor.  None of this

14   testimony is in Mr. Trautman's expert report.

15           THE COURT:  He is responding to the things that you

16   said this morning, so I don't see how it could be in his expert

17   report.

18           MR. JURATA:  Thank you, your Honor.

19   Q.  Go ahead, Mr. Trautman.

20   A.  Well, if networks were available on an unbundled basis to

21   distributors, they would be able to offer packages similar to

22   Raptor.

23           MR. SCHULTZ:  Thank you.  I pass the witness.

24           THE COURT:  I just have a couple of questions before

25   the cross.

O862Fub3

1              Mr. Trautman, are you familiar with products that some

2      major league sports leagues offer on a direct-to-consumer

3      basis, so I am thinking like NBA League Pass, you know,

4      direct-to-consumer services that a particular sports league

5      offers.

6              THE WITNESS:  Yes.

7              THE COURT:  And would you consider those products to

8      be within what you have called a skinny sports bundle or how

9      would you think about those products in the sports media

10     landscape?

11             THE WITNESS:  I view those as different because those

12     are very specialized services that are primarily designed for

13     out-of-market -- what's called out-of-market fans, because they

14     don't feature the games of the team in your home market.  So if

15     you are a Yankees fan and you purchase Extra Innings, you can't

16     watch Yankees games through it, so it's for -- if you live in

17     New York.  So it's really for -- it's very specialized, and

18     they have actually -- we assisted the NBA in developing the

19     League Pass service, and we worked with Major League Baseball

20     and Extra Innings.  Those services have been around since the

21     '90s, and they have always remained very specialized services.

22             THE COURT:  And I'm trying to think of how to phrase

23     this question.  All sports fans are not the same, right, would

24     you agree with that?

25             THE WITNESS:  I would, yes.

O862Fub3

1          THE COURT:  So I will just posit that there are at

2     least three different kinds of sports fans, right?  If bucket

3     one is the omnivorous sports fan, someone who watches a lot of

4     different sports and wants unlimited access to as many sporting

5     events as possible; bucket two is, let's say, a team-loyal

6     sports fan, so that kind of fan maybe has two or three or four

7     specific teams that they would like to see all events that

8     those specific teams are involved in, so you have -- you are a

9     fan of the Yankees, and the Giants and the Rangers, and you

10    just want to see all the games that those teams are in and you

11    don't care about other stuff; and then maybe the third

12    bucket——and maybe there are more, I'm just positing these as

13    examples——the third bucket might be someone who is very

14    interested in what I think the parties have referred to as

15    niche sports, so they are a golf fan or tennis or NASCAR.  And

16    I think typically, I posit, those fans, they are not tracking a

17    particular athlete, right, they just -- it's just not Rory

18    McIlroy, they just want to watch golf and all of the major golf

19    events they would watch.

20         So how -- do you have opinions or how would you think

21    or think I should think about how these different kinds of

22    sports fans act as consumers in their live pay TV marketplace?

23    And I know I packed a lot into that, but if you have opinions

24    and would like to comment on that, I would be interested to

25    hear.

O862Fub3                    Trautman - Cross

1              THE WITNESS:  Well, I think that generally I would say

2     that the first and second categories would be the most likely

3     to have remained in the bundle, and then maybe the third

4     category, depending on what their specific sport of interest

5     is, they may or may not have chosen to remain in the bundle

6     depending on what the alternatives might have been.

7              What other types of behavior did --

8              THE COURT:  Well, people's sports interests are

9     generally not transferable, right?  Like if I'm a hockey fan,

10    and I can't -- like a network that's cheaper doesn't have

11    hockey, it's not like, well, it's cheaper, so it's fine,

12    because they have football.

13             THE WITNESS:  Right.

14             THE COURT:  Right?  So -- okay.  I think that was

15    helpful to me.  Thank you.

16             Okay.  Mr. Shultz, any follow-up you wanted to ask,

17    before you sit down, on the questions I asked?

18             MR. SCHULTZ:  No, your Honor.  Thank you.

19             THE COURT:  Okay.

20    CROSS-EXAMINATION

21    BY MR. JURATA:

22    Q.  Good morning, Mr. Trautman.

23    A.  Good morning.

24    Q.  Now, you are a sports fan, sir, correct?

25    A.  I am.

O862Fub3                    Trautman - Cross

1    Q.  And you routinely watch sports from your home.

2    A.  Yes.

3    Q.  And at home you subscribe to a traditional MVPD service,

4    correct?

5    A.  I do.

6    Q.  And you have never subscribed to Fubo, correct?

7    A.  I have not.

8    Q.  I want to turn to your discussion about bundling.  Now, you

9    testified that minimum penetration requirements limit the

10   packaging flexibility of MVPDs, correct?

11   A.  Correct.

12   Q.  And you would agree with me that the effect of minimum

13   penetration requirements is to get broad distribution of the

14   content covered by them.

15   A.  I would agree with that.

16   Q.  Now, the JV members are not the only programmers that seek

17   to negotiate minimum penetration requirements, correct?

18   A.  That's correct.

19   Q.  And so other programmers have minimum penetration

20   requirements of a hundred percent, correct?

21   A.  Well, I'm not certain if they have -- what the specific

22   percentage might be, but I would expect that other programmers

23   have minimum penetration requirements.

24   Q.  And in fact, you did not analyze Fubo's carriage agreements

25   with nonsports programmers, or should I -- let me take that

O862Fub3                    Trautman - Cross

1    back.

2           You did not analyze Fubo's carriage agreements with

3    programmers that have no sports content at all to determine if

4    those agreements had minimum penetration requirements, correct?

5    A.  I did not.

6           THE COURT:  Mr. Trautman, in your experience, is it

7    standard industry practice for distributors to have minimum

8    penetration -- or programmers to have minimum penetration

9    requirements of MVPDs?

10          THE WITNESS:  Well, I think that it's common to have

11   minimum penetration requirements for some and, in certain

12   cases, even all networks, but the percentages that are required

13   may vary considerably and so flexibility can obviously vary

14   considerably.

15   BY MR. JURATA:

16   Q.  Mr. Trautman, I want to go back.  If Fubo has a carriage

17   agreement with a programmer who doesn't have any sports

18   content, then it's impossible that that minimum penetration

19   requirement could come from leveraging live sports, correct?

20   A.  In that instance, that would be true.

21   Q.  And it is also true that minimum penetration requirements

22   have been in use for decades, correct?

23   A.  Yes, they have been a part of the industry for as long as I

24   have been in it.

25   Q.  Okay.  I want to bring up a slide that you used when you

1  talked about the opportunity for Raptor.  That's a slide with

2  the ocean which I found a little interesting.  So can we bring

3  up PDX 118, please.

4          Now, Mr. Trautman, you have the word "ocean" in quotes

5  in your title for this slide, correct?

6  A.  I did, yes.

7  Q.  And that's because the word "ocean" came from one of the

8  documents that you reviewed in the case, correct?

9  A.  Correct.

10  Q.  And that would be PX 246, which is the document down in the

11  left-hand corner, right?

12  A.  Yeah, I believe it was referred to and the ocean term

13  was -- terminology was used in multiple documents, but that's

14  the one referenced here.

15  Q.  And this is a document that you relied upon for your expert

16  report --

17  A.  I --

18  Q.  I could represent to you, Mr. Trautman --

19          THE COURT:  Okay, okay.  We can't just -- I remind

20  everyone, it is extremely important that only one person be

21  talking at a time.  So both the witness and the lawyer, you

22  each have to wait for the other person to finish before you can

23  talk.

24          Okay.  So why don't you restate the question that you

25  asked and then we will go from there.

O862Fub3                    Trautman - Cross

1              MR. JURATA:  Thank you, your Honor.

2      BY MR. JURATA:

3      Q.  Isn't it true, Mr. Trautman, that the document that talked

4      about the ocean of opportunity for Raptor did so specifically

5      in the context of attracting cord-nevers and cord-cutters back

6      into the pay TV ecosystem, correct?

7      A.  I don't recall the specifics of what it discussed.

8              MR. JURATA:  Okay.  Why don't we put up on the screen

9      PX 246, which is the document that this slide is based on.  And

10     Mr. Christopher, if you could blow up the document just a

11     little bit, if we could see the middle in the e-mail that

12     starts from Mr. Castellani.

13     BY MR. JURATA:

14     Q.  So isn't it true, Mr. Trautman, that Mr. Castellani says:

15     You know, my thought on that big ocean of blue between sub-20

16     SVODs and 70-plus dMVPDs just waiting for the Raptor shark to

17     come in at a 49.95 launch price and bring back all those

18     cord-cutters and cord-nevers.

19              Did I read that correctly?

20     A.  You did.

21     Q.  And nowhere on this document, Mr. Trautman, does it say

22     that Raptor has intended to go after existing MVPDs, does it?

23     A.  I don't see anything on this specific document to that

24     effect, no.

25     Q.  And there is nothing in this document that says that Raptor

1    is designed to go after Fubo subscribers, correct?

2    A.   Nothing specific to Fubo.

3    Q.   Let's turn to --

4              THE COURT:  I'm sorry.  I just have a question.

5              Mr. Trautman, based on your industry experience, do

6    you have an understanding for yourself of what cord-cutters

7    means, which consumers are in the cord-cutter bucket and what

8    cord-nevers means?

9              THE WITNESS:  Well, this is how I would define it.

10             THE COURT:  That's all I am asking you.  You obviously

11   don't know what this document is, but how would you define

12   those groups.

13             THE WITNESS:  A cord-never would be an individual that

14   has never subscribed to a pay TV service in their lifetime.

15   There has always been a percentage of those, even going back

16   before streaming and all of that.  It hasn't necessarily grown

17   all that much, although there are certainly maybe somewhat more

18   of them today.

19             In terms of cord-cutters, that refers to someone who

20   at one point or another subscribed to a live pay TV service and

21   no longer does.

22             THE COURT:  And does cord, in your view, as you would

23   define these groups, only refer to physical MVPDs, like Comcast

24   or DISH, or does it include people who subscribe to a virtual

25   MVPD, like Fubo or Blue.

O862Fub3                    Trautman - Cross

1          THE WITNESS:  No, it's a term of art.  I think it

2    refers to anyone who has left any of those types of live pay TV

3    services.

4          THE COURT:  Including both physical and virtual.

5          THE WITNESS:  Correct.  It originated because at the

6    time people started that behavior, cable TV was the dominant

7    form and they were cutting the cable cord.

8          THE COURT:  Okay.  Thank you.  Go ahead.

9          MR. JURATA:  Thank you, your Honor.

10   BY MR. JURATA:

11   Q.  I want to turn now, Mr. Trautman, to the makeup of Venu

12   Sports specifically.  Now, you testified on direct examination

13   that Venu is the most comprehensive sports package available in

14   a standalone basis, correct?

15   A.  I did, yes.

16   Q.  Now, you have done no independent analysis to project what

17   the number of subscribers to Venu Sports will be, correct?

18   A.  No, I haven't.

19   Q.  Now, let's talk about the comprehensiveness of Venu Sports'

20   offering.  Now, you testified that 96 of the top 100 broadcasts

21   for 2023 were live sports, correct?

22   A.  Correct.

23   Q.  Isn't it true that less than 50 of those broadcasts were on

24   the channels that would be included as part of Venu Sports?

25   A.  I haven't looked at that.

O862Fub3                    Trautman - Cross

1    Q.  Are you familiar that 93 of the top 100 sports broadcasts

2    for 20 -- I'm sorry, let me take that back.

3              Out of the top 100 broadcasts for 2023, you would

4    agree with me that 93 of those, per the article you cite, were

5    professional football games, correct?

6    A.  I don't recall that specifically, but it wouldn't surprise

7    me.

8    Q.  And Venu Sports carries less than 50 percent of live -- or

9    the channels that will make up Venu Sports comprise less than

10   50 percent of live football telecasts, correct?

11   A.  That's correct.

12   Q.  And that's because those NFL games are on CBS and NBC as

13   well, correct?

14   A.  Predominantly, yes.

15   Q.  Let's put up one of the slides you used, PDX 105.

16             Now, you used this chart to state the defendants

17   control significant live sports rights, correct?

18   A.  Yes.

19   Q.  Now, to be clear this chart only includes sports telecasts

20   that are done nationally, correct?

21   A.  That is correct.  This is based on national sports rights.

22   Q.  So any sports distributed by regional sports networks, such

23   as, YES, are not included in the percentages that you attribute

24   to the JV members in this chart.

25   A.  That's correct.

O862Fub3                Trautman - Cross

1  Q.  Nor does this chart include any direct-to-consumer

2  offerings that the sports leagues make available to customers,

3  correct?

4  A.  Well, I am not certain whether that's included or not.  In

5  the value assessment, at least one of those services was

6  included in an analysis I did.  I don't believe it is reflected

7  on this chart.

8  Q.  And there are direct -- for example, this chart shows that

9  the JV members will have 100 percent coverage for the NBA and

10  the NHL, correct?

11  A.  Yes.

12  Q.  And both NBA and NHL games are shown on regional sports

13  networks, correct?

14  A.  Yes.

15  Q.  They are also shown through direct-to-consumer offerings by

16  the NBA and NHL, correct?

17  A.  In highly specialized product offerings, yes.

18  Q.  And same thing for Major League Baseball.  Most Major

19  League Baseball games are delivered through regional sports

20  networks, correct?

21  A.  Well, I'm not sure I would agree with that.  In terms of

22  sheer number of games, because they are delivered in individual

23  markets, that would be technically correct.  But in terms of

24  aggregate availability in any given market, I don't think that

25  would necessarily be correct.

O862Fub3                      Trautman - Cross

1    Q.  If I was a Yankees fan, I would watch far more Yankees

2    games through the YES Network than I would through either

3    Disney, Fox, or Warner Bros., correct?

4    A.  Well, I can't say what you would watch, but availability

5    would be greater through YES than through these networks, yes,

6    if you lived in New York, in the New York area.

7    Q.  And Fubo subscribes to regional -- I mean Fubo licenses

8    content from regional sports networks, correct?

9    A.  Yes, they do.

10   Q.  So that content would be available in Fubo, but not on --

11   but not through Venu Sports.

12   A.  Correct.

13   Q.  I want to go back to the NFL.  You would agree with me,

14   Mr. Trautman, that the NFL is the most valuable sport for

15   distributors.

16   A.  On -- certainly on a per-telecast basis that would be true.

17   Q.  And your chart shows, before we even get to NFL Sunday

18   Ticket, that when we look at -- when we look at the telecasts

19   of NFL games, less than 50 percent would be on Venu Sports,

20   correct?

21   A.  That's correct.  As I talked about earlier, they would be

22   available through SVOD services, but not on Venu Sports.

23   Q.  So you are a fan of the Denver Broncos, correct?  You told

24   me that in your deposition.

25   A.  Yes.

1    Q.  And so you would not be able to watch most Denver Bronco

2    games through Venu Sports, correct?

3    A.  Because the AFC -- that's true.

4    Q.  And Venu Sports will not have the Super Bowl every year,

5    correct?

6    A.  Correct.

7    Q.  And the Super Bowl tends to be the most watched program in

8    any given year, correct?

9    A.  That is correct.

10   Q.  And you mentioned on your direct examination the lawsuit

11   that Warner Bros. has filed against the NBA.  If Warner Bros.

12   ultimately ends up not being successful in that lawsuit, then

13   the sports that are attributed to Venu Sports for the NBA would

14   go down as well, correct?

15   A.  Yes, it would still be a very large percentage, but it

16   would go down.

17   Q.  Now, one sport that's not on here is the Olympics, which is

18   going on right now.  It is your opinion, Mr. Trautman, that the

19   Olympics are extremely valuable sports content, correct?

20   A.  It -- they are very -- extremely valuable, yes, in the

21   years that they occur.

22   Q.  So in the years of the Summer Olympics, those Olympics will

23   not appear on Venu Sports because they are on NBC, correct?

24   A.  Correct.

25   Q.  And the same would hold true for the Winter Olympics as

O862Fub3                    Trautman - Cross

1    well.

2    A.  Yes.

3    Q.  Moving on to the defendants' incentives following the

4    launch of Venu Sports, first of all, to be clear, it is your

5    understanding that the JV members are licensing their channels

6    to Venu Sports on a nonexclusive basis.

7    A.  I'm -- yes, they intend to continue licensing the channels

8    to other distributors.  I'm aware of that.

9    Q.  And you would agree with me -- so you testified that you

10   thought -- it was your opinion that the existence of Venu

11   Sports would allow the JV members to take a more aggressive

12   posture in their future individual negotiations with

13   distributors, correct?

14   A.  Yes.

15   Q.  Now, you would agree -- you agree with me that if a

16   subscriber leaves an MVPD, like Fubo, and goes to Venu Sports

17   instead, that each of the JV members will make less money on

18   that subscriber than they do should that subscriber remain with

19   the MVPD.

20   A.  That is correct on an aggregate basis, yes.  That's

21   correct.

22   Q.  And you have done no quantitative analysis to determine the

23   extent to which any of the JV members could increase prices to

24   distributors in the next two years, have you?

25   A.  I have not.

O862Fub3                    Trautman - Cross

1    Q.  And you have done no quantitative analysis to determine

2    that should the JV members seek to get higher prices when a

3    carriage agreement comes up for a renewal, you have done no

4    analysis to determine whether a subscriber would leave that

5    distributor and go to Venu Sports instead, correct?

6    A.  I haven't done a quantitative analysis, no.

7    Q.  Let's put up PDX 120.

8        Now, you testified that it was your opinion that

9    Raptor would undercut MVPDs on price.  But this chart here that

10   you are showing, again, any difference in price between Venu

11   and an MVPD, it doesn't reflect the value for, say, the NBC

12   broadcast channels, right?

13   A.  I'm not sure what you are referring to.

14   Q.  In other words, so Venu Sports, which will be priced

15   cheaper than an MVPD per your chart here, it doesn't carry

16   channels for NBC, correct?

17   A.  That's correct.

18   Q.  And NBC is the most watched channel on Fubo, right?

19   A.  I believe that the four broadcast networks are.  I don't

20   know which one is number one.

21   Q.  And because CBS is not in Venu Sports, Venu Sports will not

22   have the value of CBS's offerings as well, right?

23   A.  No, and it won't be paying for them either.

24   Q.  And Venu Sports won't have the content that's available

25   through regional sports networks.

O862Fub3                     Trautman - Cross

1    A.   That is correct.

2    Q.   And Venu Sports won't have many of the entertainment

3    channels that subscribers to Fubo watch, correct?

4    A.   Yes, it's specifically designed to unbundle sports networks

5    from nonsports networks.

6    Q.   And you are aware that 70 percent of the time spent by

7    subscribers to Fubo are spent watching nonsports content,

8    correct?

9    A.   I'm aware of that, yes.

10   Q.   Last thing I want to talk about is PDX 123.  So your

11   opinion is that you testified that a consumer could replicate

12   much of the sports content that appears in an MVPD bundle by

13   taking Venu Sports and then adding Peacock to that and adding

14   Paramount to that, correct?

15   A.   Yes, as similar to what we just talked about, you could now

16   get the Olympics and much of the rest of the NFL and much of

17   the programming we just talked about.

18   Q.   Okay.  Now, to be clear, this document with this blue box

19   and this cost, this is not any document which was produced in

20   the case.  This is a mockup that you did on top of a document

21   which was produced in the case, correct?

22   A.   That's correct.

23   Q.   Okay.  And this is also not an analysis which appeared

24   anywhere in your expert report, correct?

25   A.   No.  I believe we discussed it in my deposition, but

O862Fub3                   Trautman - Cross

1   it's -- I don't believe it was included in my report.

2   Q.  And you have done no consumer studies to determine what

3   percentage of consumers would want to create such a

4   hypothetical bundle that you have here.

5   A.  I have not.

6   Q.  You have done no quantitative analysis of the importance of

7   RSN networks and league channels that aren't included in this

8   hypothetical bundle here, right?

9   A.  I have actually done a lot of analysis of -- regarding RSN

10  channels but not specific to this case, no.

11  Q.  And you have done no quantitative analysis of the

12  desirability of live news that won't be included as part of

13  this hypothetical bundle here, right?

14  A.  Well, I have reviewed some documents in the case that

15  addressed the possibility of including live news as part of the

16  Venu package or a version of the Venu package.  But other than

17  that, no.

18  Q.  And for the consumers that might want to try to put

19  together this hypothetical sub-bundle package, that would be an

20  additional choice to them which is not available today, right?

21  A.  Well, certainly they have the option to purchase the SVOD

22  services today, but the joint venture offering is not currently

23  available today.

24  Q.  And for the consumers that decide to put together this

25  hypothetical bundle that you have here, they would be able to

O862Fub3              Trautman - Cross

1    do so at a cost which is lower than subscribing to an MVPD

2    distribution service, correct?

3    A.   Correct.

4    Q.   Okay.

5         MR. JURATA:  I have no further questions, but one of

6    my codefendants has just a couple questions for you,

7    Mr. Trautman.

8         THE COURT:  While we are changing places, just to

9    follow up on my earlier question, Mr. Trautman, about

10   cord-cutters and cord-nevers, in your experience, how would the

11   industry refer to a customer who previously had a physical

12   pay TV, service like cable or satellite, and has ended that

13   service and gone to virtual- or streaming-only ways of getting

14   entertainment?

15        THE WITNESS:  So that would be referred to as a cord

16   cutter, yes.

17        THE COURT:  Okay.  So when I asked about this

18   previously, and I may have -- entirely possible that I

19   misunderstood, but I think it is important to clarify, the

20   bucket of cord-cutters can include both -- as it's commonly

21   used in the industry in your experience, can include both

22   customers who no longer subscribe to any live pay TV service

23   and are just SVOD based, as well as customers who previously

24   had a physical MVPD service that they paid for and have shifted

25   to all of their content, whether it is live or on demand, it

O862Fub3                    Trautman - Cross

1    comes from broadband streaming.

2              THE WITNESS:  Correct.

3              THE COURT:  You --

4              THE WITNESS:  I want to make sure I understand what

5    you are asking me, though.  So I think what I was trying to say

6    before, and I just want to make sure we are on the same page,

7    was that someone who left a traditional MVPD and no longer has

8    any kind of live pay TV subscription is considered a

9    cord-cutter and someone who left a virtual MVPD and no longer

10   has any live pay TV subscription is also considered a

11   cord-cutter.

12             THE COURT:  Right.  But what would you call a person

13   who no longer has any physical like a traditional MVPD -- they

14   used to have cable or satellite, the traditional physical

15   MVPDs.

16             THE WITNESS:  Right.

17             THE COURT:  They don't have that, and they have

18   canceled that.

19             THE WITNESS:  Yes.

20             THE COURT:  They still have a live TV service——YouTube

21   TV, Hulu, Fubo——that's a virtual MVPD, but they don't have any

22   physical connection to TV.  What is that person called?

23             THE WITNESS:  In the way it's been talked about here,

24   they would still be considered to be a live paid customer or

25   part of the bundled service market.  So they would not be a

O862Fub3                    Trautman - Cross

1    cord-cutter or a cord-never.

2            THE COURT:  Okay.  And so is there a term for that

3    customer that I described in your experience in the industry?

4            THE WITNESS:  Well, other than being a virtual MVPD

5    subscriber, that would really be the only term I would --

6    sometimes it's referred to as a digital MVPD, but there

7    wouldn't be another term that I would be familiar with.

8            THE COURT:  So within the industry, the term

9    cord-cutter, in your experience, would not encompass that last

10   customer that I have just been describing?

11           THE WITNESS:  No.  Cord-cutter would be someone who

12   only has SVODs and other nonlive pay TV services.

13           THE COURT:  Okay.  Thank you that's very helpful.

14   CROSS-EXAMINATION

15   BY MR. EARNHARDT:

16   Q.  A subscriber to Fubo is not a cord-cutter, correct?

17   A.  Correct.

18   Q.  You had some testimony about when networks are not

19   available on MVPDs based on going dark.  Do you remember that

20   testimony?

21           THE COURT:  I think you have to talk a little more

22   slowly, Mr. Earnhardt, sorry.  Not for me, for the reporters.

23   BY MR. EARNHARDT:

24   Q.  Do you remember that testimony about going dark?

25   A.  I'm not sure I caught your question either.

1    Q.  Sorry.  You had some testimony upon your direct examination

2    about how sometimes programming on MVPDs, when negotiations

3    fall apart, can cause the programming to, quote, go dark,

4    correct?

5    A.  Well, I'm certainly aware of that, yes.

6    Q.  And that happens from time to time, correct?

7    A.  It does occasionally.

8    Q.  For example, Disney's channels went dark on Charter last

9    year, correct?

10   A.  That's correct.

11   Q.  Now, when that happens today, if a network's channels go

12   dark on a distributor, those -- the consumers who are missing

13   out on those networks have other options today, correct?

14   A.  They could subscribe to another MVPD or vMVPD.

15   Q.  So, for example, when Disney's networks went dark on

16   Charter, Disney could and did direct Charter subscribers to go

17   to places like Fubo, correct?

18   A.  That's my understanding, yes.

19   Q.  Or YouTube TV, correct?

20   A.  Correct.

21   Q.  Or Hulu Live TV which Disney owns 66 percent of, correct?

22   A.  That's correct.

23   Q.  And Raptor, once it exists, will be one more place where

24   some consumers who are not getting channels could go, correct?

25   A.  Well, yes.  Many sports fans have indicated that they are

O862Fub3                    Trautman - Redirect

1    keeping the bundle pretty much solely for the sports, and so

2    that would provide an attractive alternative for them in this

3    scenario that you talked about.

4    Q.  But to not be an attractive alternative for people who want

5    to watch The Disney Channel, correct?

6    A.  If that's their primary focus, they may not choose Raptor.

7    Q.  And if a subscriber that is suffering from the channels

8    going dark go to Raptor instead of to Fubo, then the Disney --

9    Disney would earn less money from that subscriber, correct?

10   A.  In -- on an aggregate basis, yes.

11              MR. EARNHARDT:  No further questions.

12              THE COURT:  Mr. Shultz, any redirect?

13              MR. SCHULTZ:  Thank you, your Honor.

14   REDIRECT EXAMINATION

15   BY MR. SCHULTZ:

16   Q.  Just a few questions, Mr. Trautman.

17              You had some questions from Mr. Jurata earlier about

18   Raptor targeting cord-cutters and cord-nevers.  Do you recall

19   that?

20   A.  I do.

21   Q.  We talked about what a cord-cutter is.  I think we are on

22   the same page now.  In your view, who are the primary target

23   market for Raptor among cord-nevers, cord-cutters, and existing

24   pay TV subscribers?

25   A.  Well, I think the customers that are most likely to have

O862Fub3                    Trautman - Redirect

1    interest in Raptor are customers that are still in the pay TV

2    bundle because that's where most of the sports fans -- sports

3    viewers are and especially most of, in my view, the serious

4    sports fans.

5    Q.  Okay.  Mr. Jurata also asked you some questions about

6    sports that were not available on Raptor but were available on

7    other services, like the Olympics on NBC, football, AFC

8    football on, I think, CBS.  Do you recall that?

9    A.  I do.

10   Q.  How could a Raptor subscriber get those services if that

11   person wanted to?

12   A.  Well, I think we talked about this.  You could subscribe to

13   the Peacock or Paramount+ or both SVOD services.

14            MR. SCHULTZ:  No further questions.  Thank you.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O86HFub4

1          THE COURT:  Any recross?

2          MR. JURATA:  No recross, your Honor.

3          THE COURT:  Mr. Earnhardt?

4          MR. EARNHARDT:  No, your Honor.  Thank you.

5          THE COURT:  Thank you, Mr. Trautman.  You can step

6    down.

7          (Witness excused)

8          THE COURT:  With the end of Mr. Trautman's testimony,

9    it seems like this is a good place to break for lunch.  It's

10   12:45.  Let's be back and ready to resume at 1:55.  Thank you

11   very much.

12          (Lunch recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

O86HFub4

```
 1                          AFTERNOON SESSION

 2                               2:00 p.m.

 3              (Hearing resumed)

 4              THE COURT:  Good afternoon, everyone.  You can be

 5      seated.

 6              We're having a little bit of an issue with the doors

 7      in the back due to the —— they have an automatic opening

 8      feature for folks who need help with these heavy doors, and it

 9      seems to be malfunctioning.  We're going to begin.  The

10      engineers are going to come and fix it, and we'll just see

11      where we are.  If it's too noisy, we'll take a pause, but

12      hopefully —— I mean, I see it's now acting on its —— it has a

13      mind of its own now.  If it becomes too distracting or too

14      noisy, we'll pause so they can fix it.  But I'm hopeful we can

15      continue, and they'll do what they do and we'll do what we do.

16              Mr. Hansen, do you have a witness?

17              MR. HANSEN:  Thank you, your Honor.  May I approach to

18      hand the Court some demonstratives?

19              THE COURT:  Just hand them to Ms. Ghotbi, and she'll

20      hand them to me.

21              MR. HANSEN:  Thank you.  We call David Gandler as next

22      witness.

23              THE COURT:  Mr. Gandler, you can come forward and

24      remain standing in front of the witness stand, please.

25      DAVID GANDLER,
```

O86HFub4          Gandler - Direct

1          called as a witness by the Plaintiff,

2          having been duly sworn, testified as follows:

3          THE COURT:  There's some water in the pitcher,

4    Mr. Gandler, and cups if you need.

5          MR. HANSEN:  We put a bottle up there, your Honor.  We

6    were afraid of violating your Honor's injunction about capless

7    waters.  I have capless water here.  I apologize.

8          THE COURT:  I'm less concerned about water than

9    coffee.  If it's a small cup of water, it doesn't have to have

10   a cap.  It's the coffee that's the concern.

11         You can obviously drink whichever water you prefer

12   Mr. Gandler.

13         Go ahead, Mr. Hansen.

14   DIRECT EXAMINATION

15   BY MR. HANSEN:

16   Q.  Mr. Gandler, what do you do for work?

17   A.  I am the co-founder and CEO of fuboTV.

18   Q.  Where does the name Fubo come from?

19   A.  Well, we wanted a name that resonates with sports fans all

20   over the world, and Fubo sounds like futbol in many languages

21   and dialects.

22   Q.  Did you play futbol in your youth?

23   A.  I did.  I played Division I soccer in Boston University.

24   Q.  What companies did you work for after getting out of

25   college?

O86HFub4              Gandler - Direct

1    A.  I worked for NBC Telemundo, Charter, and Warner Bros.

2    Discovery on the scripts side before the acquisition.

3    Q.  When did you start Fubo?

4    A.  I started Fubo in 2015.

5    Q.  What was the idea behind Fubo?

6    A.  Well, we wanted to build a purpose-built platform dedicated

7    to sports fans that was flexible, affordable, and aggregated

8    their favorite teams.

9    Q.  Why did you want to offer sports-centric or sports-first

10   content?

11   A.  At the time Netflix, I think, hit about 50 million paid

12   subscribers, and I thought that the sports space was a very

13   compelling space, and it was white space, actually.

14   Q.  What do you mean by "white space"?

15   A.  Meaning nobody else participated in the sports universe

16   from a streaming perspective.

17   Q.  Was there a consumer demand for what you characterized as

18   skinny sports package?

19   A.  Absolutely.

20   Q.  How did you know that?

21   A.  Back in 2014 there were three things that caught my eye:

22   One was the Super Bowl, which reached 112 million American

23   citizens —— or Americans, I should say, and then the World Cup

24   also reached about a billion viewers.  And then the last thing

25   that really caught my eye was the fact that Cristiano Ronaldo,

O86HFub4            Gandler - Direct

1   a very famous soccer player, had exceeded 100 million followers

2   on Facebook.

3   Q.  Does any distributor, a streaming distributor, today

4   provide a product to serve this sports-first demand?

5   A.  No.

6   Q.  Why not?

7   A.  Media companies prevent distributors from, you know,

8   creating skinny bundles to sell to customers.

9   Q.  What sports did you want to offer on Fubo?

10  A.  We started with soccer and wanted to expand to the big

11  four, which is NFL, NBA, NHL, Major League Baseball, and

12  college football.

13  Q.  You said Fubo wanted to offer these live sports.  Who had

14  those rights when you started the company?

15  A.  All the major media companies.

16  Q.  Including?

17  A.  Disney, of course, Fox, Warner Bros. Discovery, NBC.

18  Q.  Which companies, in your experience, hold the most of those

19  rights?

20  A.  Most of those rights are held by Disney, of course.

21  Q.  Did you personally attempt to license live sports content

22  from any of the three defendants here at this proceeding?

23  A.  I did.

24  Q.  Which?

25  A.  Fox and Disney.

O86HFub4          Gandler - Direct

1    Q.  At the time of your deposition, did you remember doing that

2    with Fox?

3    A.  Initially, I said I didn't, but then I think in subsequent

4    questions I thought that I did.

5    Q.  What refreshed your recollection?

6    A.  I went back to my emails and found very specific emails in

7    2015 and '16 with executives both across Fox and ESPN where I

8    had very explicit requests for Fox Sports, for instance, and on

9    the Disney side, I asked for a limited number of networks

10   skewing towards sports.

11   Q.  What success did you have in getting those limited numbers

12   of sports channels?

13   A.  None.

14   Q.  What happened instead?

15   A.  Instead I ended up acquiring the rights to their full suite

16   of content across all the media companies that were licensing

17   to us.

18   Q.  Is there a name for a bundle or a package like that?

19   A.  Yes.  It's called a fat bundle.

20   Q.  Now I want to ask you about Fubo's growth and evolution,

21   particularly the business you developed given the limitations

22   that the defense imposed on you.

23        Why did you accept the fat bundles that they insisted

24   that you take?

25   A.  We had no choice.  It was the only way we could access

O86HFub4          Gandler - Direct

1    sports programming.

2    Q.  Did you have a slogan that you developed to deal with this

3    business reality?

4    A.  Yes.  It was "Come for the sports.  Stay for the

5    entertainment."

6    Q.  What does that mean?

7    A.  Essentially, you know, we acquire customers very

8    efficiently because there's a lot of pent-up demand for sports,

9    and then we try and monetize customers by surfacing

10   entertainment and news content through, you know, upsells and

11   advertising.

12   Q.  What do you mean by "upsell"?

13   A.  Selling another type of small SVOD on top of the base

14   package, which is the full bundle.

15   Q.  Now, you say the slogan is come for the sports.  How do you

16   know that the consumers who come to Fubo are coming for the

17   sports?

18   A.  Well, all of our marketing materials are predicated on the

19   time urgency of sports.  Our product features historically have

20   all been built for sports fans, not for consumers that like

21   variety programming.  And if you just look at the content mix,

22   we skew heavily towards sports both on the premium side as well

23   as on the long tail end.

24   Q.  What are the most popular channels on Fubo?

25   A.  All the Disney sports channels, Fox, FS1.  I would say

O86HFub4          Gandler - Direct

1   those are some of the most widely viewed.

2   Q.   There was some discussion this morning about Fox News being

3   popular.   Is there a difference between Fox News and the sports

4   channels in terms of viewership?

5   A.   Of course, nobody signs up for Fox News.   They sign up for

6   the sports and they end up — we try and surface as much news

7   programming as we can to create habitual viewing, but I think

8   it's more background noise than anything.

9   Q.   What do you mean by that?

10   A.   These people just turn on their TVs and put the news on.

11   Q.   How does that affect advertising revenues?

12   A.   Obviously, if the TV's on, there are considered to be

13   eyeballs watching, and so you get more ad inventory.

14   Q.   What problems are created for distributors, streaming

15   distributors like Fubo, as a result of these fat bundles you

16   are required to take?

17   A.   I would say one is we have to pay for unwanted channels

18   which drive prices up for consumers, and more importantly, we

19   can't superserve our core subscriber, which is that sports fan,

20   with a skinny bundle.

21   Q.   What do you mean by superserve?

22   A.   We started as a sports-only platform, and so we've been

23   building out features and capabilities, like calendar views.

24   And we just can't really offer them something that's

25   affordable, flexible, and you know, we think it's going to

O86HFub4          Gandler - Direct

1   create a lot of value.  When I say "value," I mean price value

2   equation.

3   Q.  What do you mean by the "price value equation"?

4   A.  Not only — it doesn't only affect the amount of content

5   you have or, you know, the mass of content that's on the

6   platform, what also matters is the price.  It has to be

7   affordable, and a consumer has to believe they're getting value

8   for the money they're spending.

9   Q.  Let me take Disney as an example.  Give us an example of a

10  nonsports channel that Disney requires you to license and

11  distribute that is not very popular.

12  A.  We have channels like Nat Geo, Disney Junior, Disney

13  Channel.

14  Q.  Let's take Disney Junior for an example.  How many of your

15  subscribers watch Disney Junior?

16  A.  I would say on average a month, about 50,000, which is less

17  than 4 percent of our subbase.

18  Q.  Next question, how many total subscribers do you have?

19  A.  We have over 1.4 million base subscribers as of this

20  morning.

21  Q.  How many of those 1.4 million subscribers have to pay for

22  Disney Junior?

23  A.  100 percent.

24  Q.  Which defendants do you currently license content from?

25  A.  We license content from Fox and Disney.

1    Q.  Why not Warner?

2    A.  Well, Warner refuses to license to us content on the same

3    terms as they've licensed to Venu.

4    Q.  Have you asked for that?

5    A.  We did specifically and explicitly.

6    Q.  What was the response?

7    A.  They said it was too complicated.

8    Q.  Have you always had a deal with Disney?

9    A.  No, not until 2020.

10   Q.  So you're able to stay in business from —— 2012, you said?

11   A.  2020, I said.

12   Q.  I'm sorry.  I couldn't hear.

13   A.  Sorry.

14   Q.  So you were in business from the starting point till 2020

15   without Disney?

16   A.  Correct.

17   Q.  Based on your business experience as the CEO of Fubo,

18   Mr. Gandler, if Venu is allowed to proceed, what do you think

19   will happen in your negotiations with the defendants for live

20   sports rights?

21   A.  They will have no incentive, or very little incentive, to

22   license to us programming.

23   Q.  What, if anything, will happen to the price of the fat

24   bundles that they've been giving you?

25   A.  They'll certainly raise prices for us, and obviously, we

O86HFub4          Gandler - Direct

will pass those along to consumers.

Q.  Now, defendants have said that they have no incentive to raise prices on Fubo and drive subscribers away from Fubo because they make so much money on those subscribers and that Venu doesn't change that.  Do you agree with that?

A.  That's very far from the truth.

Q.  Please explain to us why.

A.  So, well, they wouldn't be incentivized to sell anything to us unless they felt that they can get a premium to the price that they were getting for Venu.  So they would have extract premium economics that were greater than the net payback that they would get through Venu.  So if they're close to that, it would make sense because this way they would own the customer and they would control all the advertising inventory that we would get as well.

Q.  Just explain that for me a little bit.  How does their control of the advertising change the economics?

A.  Because if you look at what virtual MVPD or even traditional companies, distribution companies, make, they average between $5 and $10 of ad revenue, which falls right to the bottom line.  Now Venu would also get access to all of that inventory that they're not sharing with us.  I also think that as the size of that service grows, they'll also be able to command much higher CPMs from advertisers than they are today.

Q.  What do you mean by CPMs?

O86HFub4          Gandler - Direct

A.  Sorry.  Cost per thousand of advertising impressions.

Q.  Now, another part of the defendants' argument is that they don't want your subscribers.  They want only to sign up people who are cord-cutters or cord-nevers and not part of your current subscriber base or even your future subscriber base. Does that make sense to you?

A.  That makes no sense.

Q.  Why?

A.  Well, because from the onset we've been after cord-cutters and cord-nevers, and you know, that's it.

        THE COURT:  Mr. Gandler, can I ask you, as a participant in the TV industry, how do you define those terms, "cord-cutters" and "cord-nevers"?  To you, who is the person that is in each of those buckets?

        THE WITNESS:  Yeah, a cord-cutter is a person who at one point had a subscription to cable or satellite television. Someone who's a cord-nevers is someone younger who has never subscribed to a cable or satellite service, but they do subscribe, we know, to over four services per household.

        THE COURT:  So the cord-cutter would include someone who, in your view, previously had a cable or satellite subscription, a physical means of getting TV, and now might subscribe to a vMVPD like YouTube TV or Fubo?

        THE WITNESS:  Correct, or some smaller OTT service that's dedicated to sports.  ESPN+ is a good example.

O86HFub4          Gandler - Direct

1          THE COURT:  In addition to they might have some SVOD

2    services?

3          THE WITNESS:  Yes, correct.

4          THE COURT:  OK.  Thank you.

5          MR. HANSEN:  Thank you, your Honor.

6    BY MR. HANSEN:

7    Q.  Explain for us, Mr. Gandler, why your subscribers and

8    potential subscribers are the actual target market for a

9    product like Venu?

10   A.  Well, 50 percent of our first views come from Fox and

11   Disney, and when you couple that with a significant discount,

12   which I believe is over 50 percent of the price of our product,

13   I think it makes it very obvious, you know, who they'd be going

14   after.

15   Q.  So now I want to ask you some questions about the launch

16   announcement on February 6, 2024.

17   A.  Yes.

18   Q.  Did you have an initial reaction to that announcement?

19   A.  Of course.  I was, I don't know, frustrated, angry, upset.

20   It was the last straw for me.

21   Q.  So did you make some statements to the public within a few

22   weeks of the public announcement?

23   A.  I did.

24   Q.  So on or about March 1, did you say, in substance, to the

25   public that things would continue in the ordinary course?

O86HFub4          Gandler - Direct

1   A.  Yes, I did.

2   Q.  What —— the status quo.  Sorry, status quo.

3        What did you mean by that?

4   A.  Yeah.  Well, you know, I was really angry about the

5   excessive above-market rates that I think would continue.  I

6   was upset about the unreasonable penetration rates.  I was

7   upset about the continuation of the —— of media companies

8   forcing us to bundle unwanted channels and charge consumers

9   more.  So, yes, I said that things would continue in the normal

10  course.

11  Q.  Did you also say words to the effect that loss of the

12  lawsuit wouldn't change anything?

13  A.  I did.  But I also said this was a duel to the death.

14  Q.  What did you by mean by duel to the death?

15  A.  Clearly, given the market that they're after and the

16  exclusivity of the bundle that they are offering, that it was

17  clear to me that they were exerting monopoly power, that they

18  were attempting to manipulate prices, and they were trying to

19  eliminate competition.

20  Q.  How does the defendants' proposed Venu joint venture

21  compare with what Fubo has been attempting to license from the

22  defendants, one or more of them, since 2015?

23  A.  I would say it's extremely similar.

24  Q.  Would Fubo be willing to license content on the same terms

25  as is being licensed to Venu?

1    A.  Yes, we would, and we've asked.

2    Q.  If Venu launches, in your experience as a businessperson,

3    in this field, what effect of competition will there be for

4    Venu?

5    A.  There will be no competition.

6    Q.  Tell us why.

7    A.  Well, because, you know, this is a very powerful bundle.

8    Again, price matters, so this would be a product in which it

9    would become the *de facto* new base platform on top of which

10   consumers can add on other services.

11          But, you know, the sports market is a very mature

12   market, so the defendants are not creating anything new.  This

13   market has existed for a very long time, and so anybody who's

14   wanted a —— to watch sports will either have cable or some

15   streaming service or virtual MVPD.  So any consumer or

16   consumers that would find a $40 Venu bundle most appealing are

17   consumers that pay $95, not consumers that pay zero.  That

18   wouldn't make any sense.

19   Q.  Let's talk about two polar cases, if we can.  Let's talk

20   about the fat bundle.  Do you have a fat bundle now?

21   A.  We do.

22   Q.  What do you charge for a fat bundle?

23   A.  I think the average price, retail sticker price, is around

24   $90.

25   Q.  Do you have sports in your base package?

O86HFub4          Gandler - Direct

1    A.  We do.

2    Q.  Why is it that you can't compete with your sports with the

3    Venu sports offerings?

4    A.  Well, because you can't replicate the Venu bundle, and so

5    it's very easy for someone to buy the Venu package and then

6    stack on top of that new type of base package whatever content

7    they would like.

8    Q.  So a sports fan looking for sports, is there any reason for

9    a sports fan to pay twice what they can get for a Venu package?

10   A.  Absolutely not.  And there's already — since the release

11   of the new pricing strategy, it's all over social media.

12   Q.  Let's go to the other — my sleeve again, sorry.

13           Let's go to the other end of the polar case.  What

14   about these one-sport offerings like a Golf Channel or Formula

15   1?  Aren't they competitors with a Venu?

16   A.  No, that's impossible.  These are peripheral services that

17   actually overlap quite well with major sporting events like the

18   NFL.  So, again, the way that a consumer would typically buy is

19   that they would buy a simple base, $42, for instance, or

20   whatever the price is for Venu, and then on top of that they

21   would look to stack niche sporting events.  My sense is that

22   they would churn out of these events when the sports season was

23   over, which with the Venu product you really can't do because

24   there's seasonality that each of the defendants controls.

25   Q.  Now, have you ever heard the term "self-bundling"?

O86HFub4          Gandler - Direct

1    A.  Yes.

2    Q.  Are you aware that defendants and one of their witnesses

3    said that competition for Venu can be created by consumers

4    assembling, themselves, a package of channels?  Do you believe

5    that's possible?

6    A.  That's, unfortunately, absurd.  You cannot do that because

7    you can't buy ESPN as a standalone.  You can't buy Fox or Fox

8    sports as a standalone.  And you certainly can't buy TNT and

9    TBS, which I believe will carry their sporting events, as a

10   standalone.  So it would be impossible to self-bundle.

11            What you could do, again, as I stated, is you can buy

12   that basic bundle and then, on top of that, stack all the sort

13   of non-defendant programming.

14   Q.  That's on top of the Venu bundle?

15   A.  Correct, yes, sir.

16   Q.  Can the defendants themselves discourage self-bundling by

17   the pricing of their products?

18   A.  Yeah.  Of course.

19   Q.  How?

20   A.  Well, they control pricing and they control packaging, and

21   they can change —— as they've done here in this case, they can

22   change the requirements in bundling.  So, of course, their goal

23   would be to control the market, exclude competitors, increase

24   barriers to entry, and control the market for as long as they

25   possibly can.

O86HFub4          Gandler - Direct

1    Q.  Now I want to ask specifically about why, if at all, this

2    Venu joint venture is a big problem for Fubo.  Let's start with

3    the market reaction to the announcement on February 6.

4             What did happen to Fubo's ──

5             THE COURT:  Sorry, Mr. Hansen, before you go to the

6    next topic, can I ask the witness a question.

7             MR. HANSEN:  Yes.

8             THE COURT:  On the testimony you were just giving,

9    Mr. Gandler, the last few minutes about what a sports-focused

10   customer wants, are you familiar with documents from the

11   defendants or discussion in this case that Venu is not intended

12   to cannibalize existing MVPD customers but, rather, to seek out

13   new customers?  Are you familiar with those documents?

14            THE WITNESS:  I am not, but if I may answer?

15            THE COURT:  Well, I'll ask you a question that

16   incorporates that.

17            Based on your understanding of the sports-focused

18   customer, do you think that there is a customer who currently

19   has no pay TV sports subscription but would nonetheless be

20   willing to pay $43 a month to get Venu?

21            THE WITNESS:  Ma'am, sports fans are avid.  They love

22   their sports.  It's not something that the defendants can ──

23   have just created.  People have been watching sports at record

24   levels every year since 2015.  If there is, these people are,

25   you know, a needle in a haystack.  The real value is for

O86HFub4          Gandler - Direct

1    someone who's paying a lot to actually go down to $42, not from

2    zero to 42.  I just don't believe there's a market for that.

3    Very tiny.

4              THE COURT:  So in your experience in the industry —— I

5    just want to make sure I understand —— where would you expect

6    Venu customers to be coming from?

7              THE WITNESS:  Without a doubt they would be coming

8    from the cable services —— sorry, the satellite services, cable

9    companies, and of course, virtual MVPD.

10             THE COURT:  Go ahead, Mr. Hansen.

11             Thank you, Mr. Gandler.

12             MR. HANSEN:  Thank you, your Honor.

13   BY MR. HANSEN:

14   Q.  Mr. Gandler, just so we're clear, let's take a

15   hypothetical.  Let's say defendants don't want to have your

16   subscribers.  What do you think happens when they announce Venu

17   to the public?  What will your subscribers do in response to

18   that offering?

19   A.  Well, I mean, they've already announced the price, and I

20   think there have been numerous media outlets that have been

21   talking about this.  In fact, they've already stated that

22   YouTube TV, which is another competitor in the virtual MVPD

23   space, is going to have a real problem.  If you go to social

24   media platforms like Reddit, everyone's already talking about

25   how they could rebundle with this new base pack.

O86HFub4          Gandler - Direct

1          So I anticipate that there will be tens of millions of

2     people interested almost in the first month because they'll be

3     looking.  There's a market for football fans, which is an

4     extremely large market, that's going to be looking for what is

5     the best value they can find.  The Fox-ESPN bundle, as I

6     stated, 50 percent of our customers watch those two content

7     partners first when they come to the platform.  So I think it's

8     a very dangerous situation.

9  Q.  And just so we're clear of your understanding, once Venu

10    goes live on the Internet and it's available for subscribers,

11    what, if anything, prevents a subscriber to Fubo or YouTube TV

12    or anything else from subscribing?

13 A.  Well, we have no contracts, and we know that all of our

14    customers is very tech savvy because they're shopping online.

15    I anticipate the floodgates will open as soon as the website

16    goes up and the service is turned on.

17 Q.  Now, at the time you made your public statements, had Fubo

18    done a detailed analysis of likely subscriber loss?

19 A.  I'm sorry.  I couldn't hear that.

20 Q.  At the time of the statements you made to the public a few

21    weeks after the announcement, had Fubo done a detailed analysis

22    of likely subscriber loss at that time?

23 A.  No.  We were focused on ── the announcement was on

24    February 6.  We were focused on earnings.  Earnings were

25    March 1, and I believe we started after earnings.  I don't know

O86HFub4          Gandler - Direct

1  exactly when, but it was post-earnings.

2  Q.  Has that work now been done?

3  A.  It has.

4  Q.  What does it show, at a high level?

5  A.  It shows that we'll lose somewhere between 300- and 400,000

6  base subscribers.

7  Q.  What do you believe, based on your business experience, as

8  to whether that's an accurate estimate of likely loss?

9  A.  I think that that forecast is very conservative and

10  includes churn rates that are, I would say, modest relative to

11  what I believe is going to be a massive marketing blitz by all

12  three defendants across all of their assets, which include TV,

13  I think, TV and cable, which will all be advertising, of

14  course, on our service.

15  Q.  But you mentioned marketing materials.  Have you reviewed

16  Venu's website?

17  A.  I have.

18  Q.  Have you compared that to some of Fubo's marketing

19  materials?

20  A.  I have.

21          MR. HANSEN:  Your Honor, could we display a

22  demonstrative that makes that comparison?

23          THE COURT:  Of course.

24  Q.  Mr. Gandler, have you reviewed this demonstrative?

25  A.  I have.

O86HFub4          Gandler - Direct

1  Q.  What does it show on the left?

2  A.  That's an ad for Fubo.

3        THE COURT:  I'm sorry, Mr. Gandler.

4        Mr. Hansen, can you identify for the record what

5  you've shown, just so the transcript reflects.

6        MR. HANSEN:  It is a demonstrative.  Does it have a

7  number on it?

8        THE COURT:  PDX 202.

9        MR. HANSEN:  PDX 202.  Thank you, your Honor.  I'm

10 sorry.

11 Q.  I'm sorry, Mr. Gandler, on the left it's a Fubo ad?

12 A.  Yes, it's an ad for Fubo.

13 Q.  Used in actual marketing?

14 A.  Yes.

15 Q.  How about on the right?

16 A.  That's a Venu ad.

17 Q.  And where can this be found?

18 A.  I believe it's on their website now.

19 Q.  Just what do you take from this side-by-side comparison?

20 A.  Well, to the average person I would say this is almost

21 identical to our graphics treatments, our colors, etc.

22 Q.  So I now want to ask you a flip-side question of the

23 question I asked you earlier.

24       Let's say the Court does not allow Venu to take

25 effect.  What are your expectations, as an experienced

O86HFub4          Gandler - Direct

1   businessman in this space, as to what things will be like

2   dealing with defendants as to licensing?

3   A.   I think they will approach negotiations in good faith, and

4   the market will be extremely competitive.  And I believe that

5   they can still achieve many of their results independently, and

6   this is not a necessary joint venture.

7   Q.   Why do you believe that?

8   A.   Sorry.  Why do I believe what?

9   Q.   Why do you believe what you just told me?

10  A.   Oh.  I believe that because if this joint venture is

11  enjoined, they'll have to compete more for sports rights, which

12  will push them to compete for distribution.  Because,

13  obviously, if they're paying more, they're going to want a

14  wider distribution.  Wider distribution is very important to

15  them because they have to maximize monetization.  That

16  monetization can only be maximized through the sale of

17  subscriptions, affiliate sales, which are companies like us

18  acquiring those rights, and advertising.  So it's key.  They'll

19  also compete for ad dollars, which means they'll create and

20  produce better quality programming which, ultimately, I think,

21  will result in a high quality experience or better quality

22  experience for the consumer at a better price.

23  Q.   I now want to ask you some questions about Fubo's

24  viability.  You're aware, are you not, that defendants have

25  said that we shouldn't be concerned about Fubo here because

O86HFub4          Gandler - Direct

1  Fubo was going to go out of business anyways.  Do you believe

2  that to be true?

3  A.  Well, certainly not as of this morning with our earnings

4  report.

5  Q.  Tell me why.

6  A.  Well, I think on multiple levels we've proven that we can

7  deliver results.  The first thing is I'll say that we went

8  public in 2020.  If you look at our numbers from January 2020

9  —— you don't have to go all the way back through, you know, the

10  most recent quarter —— we've added over, I would say, roughly a

11  million customers.  And at the same time, over that same time

12  frame, you look at Hulu, Hulu Live TV, which is owned by

13  Disney, has only added about 500,000.

14       So from an absolute perspective, I think we've

15  executed very well.  From an investment perspective, we've

16  delivered now, as of this morning, 13 quarters —— 13 out of 14

17  quarters that have exceeded guidance.  And I think this —— as

18  of this morning, we've also delivered, you know, six sequential

19  quarters of profitability, profitability KPI improvements on a

20  year over year basis.  So we are certainly on track to achieve

21  what we said we were going to achieve in 2022, despite all the

22  disruption, that we would be profitable in 2025.

23  Q.  Has Fubo lost money?

24  A.  Of course.  All startups do.

25  Q.  Is that unexpected?

O86HFub4          Gandler - Direct

1   A.  No, it's not unexpected.  Frankly, if you look at all

2   streaming companies, both Netflix or Spotify or Roku, they've

3   lost money for decades.  So it's nothing out of the ordinary.

4   I would say it's normal course.  We will be, next year, in our

5   tenth year, and as I said, we are still on track, we remain on

6   track to achieve profitability in 2025.

7   Q.  You mentioned a minute ago that you gave guidance in 2022

8   about this path to profitability.  Are there benchmarks along

9   the way of that path that you have to check yourself against?

10  A.  We do.  We check those benchmarks every quarter.  We have

11  audit committee meetings.  We talk to our auditor, KPMG, and

12  they've never issued a going concern to date, and so we feel

13  very comfortable that we continue to remain on track.

14  Q.  How have you performed relative to the benchmarks that you

15  announced you were going to measure yourself against?

16  A.  I believe that we are ahead of our benchmarks, our internal

17  benchmarks.

18  Q.  So I want to ask you two different hypotheticals.  Let's

19  say Venu is stopped.  Knowing everything you know about the

20  market and about Fubo, what are your expectations as to whether

21  and when Fubo will become profitable?

22  A.  We will become profitable next year, 2025.

23  Q.  You mentioned you were in an earnings call this morning?

24  A.  I was.

25  Q.  How did those earnings compare to prior quarters?

O86HFub4          Gandler - Direct

1    A.  As I said, we've delivered 20 percent-plus top-line growth.
2    We continue to improve our operating cash.  Our operating
3    losses continue to improve.  We actually brought back our bond.
4    We repurchased $46 million worth of bonds at a significant
5    discount to the market.  And now headed —— I would say that we
6    only have less than $150 million of debt that's due in '26.
7    So, again, it was a very strong quarter.  It was the best
8    quarter we've ever had from a profitability perspective.
9    Q.  Next question I'm going to ask may be a little difficult
10   one to answer because you've put so much of your life into this
11   company, but I want to give you the other end of it.
12        Let's say Venu launches, as they planned, sometime
13   later this month.  Based on everything you know, what is your
14   expectation of what will happen to Fubo?
15   A.  Well, I think I would say my base case is going to be we
16   will very quickly lose customers because this service is
17   launching into the most important time of the year for us.
18   Once we lose customers, we'll have to revise our guidance down.
19   Once we revise our guidance down, the stock will plummet below
20   $1.  We will be delisted.  We won't be able to service our
21   debt.  KPMG will issue a going concern, and we'll find
22   ourselves very quickly in bankruptcy court, Chapter 7.
23   Q.  So that's what will happen to Fubo.  Why should consumers
24   care about what happens here?
25   A.  I mean, it's important.  They are denying consumers choice.

O86HFub4          Gandler - Cross

 1   There's no product that they can buy, there's no checks and

 2   balances whether they're receiving high-quality customer

 3   service.  And the historical track record for Disney in

 4   particular has been to raise prices.  If you look at the price

 5   of Disney+ when it launched four years ago, the price has now

 6   doubled.  Frankly, before I came to court this morning, I

 7   believe I saw another media outlet say they've decided to raise

 8   prices again this morning.

 9              So I think this is all bad for customers.  They've

10   already spent tens of billions of dollars of wasted, you know,

11   discretionary income on trying to acquire services to give them

12   a relatively complete view of the sports industry.  So this is

13   all bad for consumers.

14              MR. HANSEN:  Mr. Gandler, thank you very much.  I have

15   no further questions.

16              THE WITNESS:  Thank you.

17              MR. LEVANDER:  Thank you, your Honor.

18   CROSS-EXAMINATION

19   BY MR. LEVANDER:

20   Q.  Mr. Gandler, you submitted a declaration to this Court in

21   support of Fubo's motion for a preliminary injunction, correct?

22   A.  Correct.

23   Q.  You carefully read that document before and declaration

24   before signing it, correct?

25   A.  I did.

O86HFub4          Gandler - Cross

1   Q.  And you understood that you were swearing to tell the

2   truth, just like you've sworn to tell the truth today, right,

3   sir?

4   A.  Yes.

5   Q.  Nonetheless, Mr. Gandler, would you agree with me that your

6   sworn declaration has a number of overstatements,

7   exaggerations, and inaccuracies?

8   A.  I'm sorry.  Can you be a little bit more specific?

9   Q.  Do you think that your declaration contains overstatements

10  and exaggerations, yes or no?

11  A.  I don't believe so.

12  Q.  Well, there's no dispute between us, I think, that the

13  essence of Fubo's amended complaint is that Disney, Fox, and

14  Warner Bros. have conspired to violate the antitrust laws to

15  Fubo's detriment.  That's your case, right, sir?

16  A.  It is to our detriment, yes.

17  Q.  You're not suing on behalf of consumers; you're suing on

18  behalf of yourself, right, sir?

19  A.  That is true.

20  Q.  You've described Disney Fox and Warner Bros. as among the

21  "big programmers that Fubo has battled for years," correct?

22  A.  Correct.

23  Q.  Now, indeed, turning to paragraph 23 on page 6 of your

24  declaration, PX 102, you swore under oath, page 6,

25  paragraph 23, that Fubo's quest to provide a better television

O86HFub4            Gandler - Cross

1    experience has been a nine-year relentless battle against the

2    big programmers who have fought us at every turn in our efforts

3    to offer a sports-centric bundle of channels, right, that's

4    what you said under oath?

5    A.  Yes, I did.

6    Q.  Now, isn't it a fact, Mr. Gandler, that between 2016 and

7    2018, the first three years of that so-called relentless

8    battle, Fox in fact invested $24 million in Fubo?

9    A.  Correct, in return for 85 million in MGs.

10   Q.  Sir, if you can just answer my questions.

11          Did Fox invest $24 million in Fubo in the first three

12   years of which you've called a relentless battling?

13   A.  They did, sir.

14   Q.  $24 million was a lot of money to Fubo in those days,

15   right, sir?

16   A.  It was.

17   Q.  In fact, notwithstanding your claim of a nine-year battle,

18   if Fox had not invested $24 million in Fubo between 2016 and

19   2018, Fubo may well never have gone public, correct, sir?

20   A.  It's possible.

21   Q.  Didn't you say "probable" in your testimony?

22   A.  Probable, possible, yes.  Sorry.

23   Q.  In fact, Fubo could use $24 million today, right, sir?

24   A.  We could use more money, yes.

25   Q.  Indeed, Fubo has lost money in every quarter of every year

O86HFub4          Gandler - Cross

1   of its existence, correct?

2   A.  That is correct.

3   Q.  And your announcement this morning was that you lost money

4   again, correct, sir?

5   A.  Correct.

6   Q.  Now, between 2020 and 2023, Fubo lost more than

7   $1.8 billion, right, sir?

8   A.  Correct, we've invested more than $1 billion.

9   Q.  You've lost more than $1.8 billion in your annual four-year

10  reports for those four years, correct?

11  A.  Yes, sir.

12  Q.  And all of those losses in all the years through 2023 had

13  nothing to do with the defendants' JV announcement, correct,

14  sir?

15  A.  Correct.

16  Q.  And in fact, in 2023, before the JV announcement, Fubo

17  predicted more losses for 2024, correct?

18  A.  Correct.

19  Q.  And Fubo has not only lost money in its streaming business,

20  but it lost approximately $168 million in '20 and '21 from its

21  failed sports betting business, correct?

22  A.  Yes, 6 to 8 percent of our total losses, correct.

23  Q.  And one of the many fundamental problems Fubo has is lack

24  of scale, correct?

25  A.  More scale is always better.

O86HFub4          Gandler - Cross

1   Q.   You're smaller than Hulu.  A lot smaller, right?

2   A.   Yes, but punching above our weight class.

3   Q.   Could you just answer my questions.

4          Smaller than ——

5          THE COURT:  Well, let me just say for the witness'

6   benefit and everyone's benefit, in order to give a truthful

7   answer, Gandler Mr. Gandler, if you feel you need to say more,

8   you can.  To the extent you're able to still give truthful

9   answers, you should just answer the question ——

10          THE WITNESS:  OK, ma'am.

11          THE COURT:  —— that Mr. Levander is asking.

12          Go ahead.

13          MR. LEVANDER:  Thank you, your Honor.

14   BY MR. LEVANDER:

15   Q.   And you're much smaller than YouTube as well, right, sir?

16   A.   Yes, sir.

17   Q.   And this lack of scale, being smaller than your

18   competitors, existed long before the JV announcement, correct?

19   A.   Yes.

20   Q.   In order to fund the continuing losses over many years,

21   Fubo has borrowed many tens of millions of dollars and sold

22   many millions of shares of stock, correct?

23   A.   That is correct.

24   Q.   Indeed, Fubo announced this morning it was going to sell

25   another $100 million worth of stock, or try to, right, sir?

O86HFub4          Gandler - Cross

1    A.  Not exactly.

2    Q.  Said it's going to do an offering?

3    A.  Oh, yes.  That's, I would, say normal course.

4    Q.  And when you mentioned a moment ago that you were able to

5    buy back your debt at a substantial discount, that's because

6    the creditors who held that debt were worried about whether

7    you're going to survive or not, right, sir?

8    A.  Yes, they're worried about the outcome of this trial.

9    Q.  In fact, in the four years prior to the JV announcement in

10   February 2024, Fubo's stock fell from more than $60 a share to

11   $2 per share, right, sir?

12   A.  Correct.

13   Q.  And that's well before the joint venture announcement,

14   correct?

15   A.  That is correct.

16   Q.  And before the joint venture announcement, numerous

17   analysts publicly commented on Fubo's many problems, correct,

18   sir?

19   A.  Yes.

20   Q.  Let's take a look at DX 4, which is an article by Timothy

21   Green entitled "FuboTV Stock is Tumbling Because It's a

22   Terrible Business."  Do you see that article, sir?

23   A.  Yes.

24   Q.  And it came out in February of 2023, a year before the

25   joint venture announcement, right, sir?

O86HFub4          Gandler - Cross

1    A.  Correct.

2    Q.  And one of the key points on page 2 of the article is that

3    Fubo can't keep selling stock at lower and lower prices and

4    discounts to pay for its losses, right, sir?

5    A.  Yes.

6    Q.  And you don't disagree with that that.  Ultimately, you

7    can't keep doing that forever, right, sir?

8    A.  Not forever.

9    Q.  So let's take a look at Exhibit 5, which is a March 3,

10   2023, article headlined "3 Reasons to Avoid Fubo Stock."

11          And among various points Mr. Bowman, the author of

12   that article, points out is that your stock had fallen more

13   than 95 percent, that Fubo was selling stocks at a discount to

14   cover ongoing losses, and Fubo assets as of Q3 2022 were less

15   than its current liabilities, correct?

16   A.  Yes, in 2022, correct.

17   Q.  And all of those points that the author made at that time

18   were true, correct?

19   A.  I'm sorry.  Can you be specific?  Which points?

20   Q.  That your stock had fallen more than 95 percent, that you

21   can't keep selling your stock at discount ——

22          THE COURT:  OK.  You both can't talk at the same time.

23          Mr. Levander, you have to ask one question at a time,

24   then we let Mr. Gandler answer, then you get to ask a question

25   again.

1              MR. LEVANDER:  Thank you.

2              THE COURT:  Each statement one at a time and let him

3       answer.

4       BY MR. LEVANDER:

5       Q.  Stock had fallen more than 95 percent?

6       A.  Yes.

7       Q.  Fubo is selling stock at a discount to cover its losses?

8       A.  We were.

9       Q.  And as of Q3 '22, your current assets were less than your

10      current liabilities?

11      A.  Yes, at that time.

12      Q.  And all those observations from that article, from

13      Mr. Bowman, predated the joint venture announcement?

14      A.  Correct.

15      Q.  Indeed, your own company disclosures during the same period

16      of time warned shareholders of these same kind of problems,

17      right, sir?

18      A.  Yes.

19      Q.  Let's turn to JX 62, the 2022 Fubo annual report issued in

20      May of '23.

21              If we could turn to page 16 of that, in the bold print

22      above the third paragraph, it says:  "We have incurred

23      operating losses in the past, expect to incur operating losses

24      in the future, and may never achieve or maintain

25      profitability," right, sir?

O86HFub4          Gandler - Cross

1    A.  Yes.

2    Q.  Now we go down to the next bolded statement, it says:  "We

3    may require additional capital to meet our financial

4    obligations and support planned business growth, and this

5    capital might not be available on acceptable terms or at all,"

6    right, sir?

7    A.  That is correct.

8    Q.  Now turning to paragraph 3 of your sworn declaration,

9    PX 102, you told this Court that you were "leader in the global

10   sports industry," right, sir?

11   A.  I did.

12   Q.  Now, that's a bit of an overstatement, isn't it, sir?

13   A.  I don't think it's an overstatement.

14   Q.  Well, the three things that you cited in paragraph 3 in

15   support of your claim that you were a global sports —— leader

16   of the global sports industry, number one, that you were

17   co-owner of the soccer team Paris FC; number two, that you're a

18   trustee of the Olympic Foundation; and number three, that

19   you're on the board of directors of something called the Bare

20   Knuckle Fighting Championship, right, sir?

21   A.  Yes, in combination with my role as CEO of a publicly

22   traded company in the streaming space.

23   Q.  The three things you cited in paragraph 3 were the three

24   things I just read to you, right, sir?

25   A.  Yes.

O86HFub4          Gandler - Cross

1    Q.  And as to Paris FC, you are a co-owner of an LLC that in

2    turn owns a small minority position in Paris FC, right, sir?

3    A.  Well, not exactly.  It's not a small minority.  We're the

4    second largest shareholder in the club.

5    Q.  There's a majority owner, right, sir?

6    A.  Yes, correct.

7    Q.  And your LLC, your interest in the LLC indirectly owns

8    about 10 percent of the company?

9    A.  That is correct.

10   Q.  Now, Paris FC is a mediocre soccer club that was last in

11   the top French men's league in 1978, correct, sir?

12   A.  That is correct.

13   Q.  That's about 45 years ago?

14   A.  That's not why I acquired the team.  I acquired for the

15   women's team, which is a champion ——

16   Q.  Can you answer my question, sir.

17             Was it about 45 years ago?

18   A.  Yes, sir.

19   Q.  Now, the Olympic Foundation, you're one of approximately

20   200 trustees, correct?

21   A.  I am, yes.

22   Q.  And the point of the Olympic Foundation is to raise money

23   for the Olympics teams?

24   A.  That's right.

25   Q.  And it's fair to say you don't know most of the other

O86HFub4          Gandler - Cross

1    trustees.  You don't know what they do for a living, where they

2    live, and you don't consider them to be leaders in the global

3    sports industry just because they're a trustee of the Olympic

4    Foundation, right, sir?

5              THE COURT:  I was just asking Mr. Gandler if he

6    understood the question.  So let's start with part one.

7              You don't personally know most of the other trustees

8    of the Olympic Foundation?

9              THE WITNESS:  Most I don't, correct.

10              THE COURT:  And do you or do you not consider them to

11    be ——

12              MR. LEVANDER:  Leaders.

13              THE COURT:  —— leaders in the global sports industry

14    simply by virtue of their position as trustees of the Olympic

15    Foundation?

16              THE WITNESS:  I don't.

17              THE COURT:  Next question.

18    BY MR. LEVANDER:

19    Q.  As to the Bare Knuckle Fighting Championship, when one of

20    your colleagues at Fubo questioned why Fubo was making a small

21    investment in that entity, you said it was "too small for

22    financials," correct?

23    A.  Sorry.  Can you repeat that question?

24    Q.  Sure.

25              When one of your colleagues at Fubo questioned why you

O86HFub4          Gandler - Cross

1    were having Fubo invest a small amount of money in the Bare

2    Knuckle Fighting Championship, you told your colleague that the

3    Bare Knuckle Fighting Championship was "too small for

4    financials"?

5    A.  It seems out of context, but, yes, I did say that.

6    Q.  Now, whether or not you're fairly described as a "leader of

7    the global sports industry," Mr. Gandler, you would agree with

8    me, would you not, that the pay TV ecosystem is a dynamic

9    competitive and changing industry?

10   A.  Yes.

11   Q.  And turning to page 28 of JX 62, again, Fubo's 2022 annual

12   report, could you please look at the second paragraph on

13   page 28 under the risks to our product section, page 28, where

14   Fubo warned that TV streaming is highly competitive, right?

15   You agree with that?

16   A.  Yes.

17   Q.  And if we could go to the first sentence of the paragraph

18   at the bottom of that page, you said:  "We expect competition

19   in TV streaming from the large technology companies and service

20   operators described above, as well as new and growing companies

21   to increase in the future," right, sir?

22   A.  I did, yes.

23   Q.  Now, Fubo principally competes with pay TV operators such

24   as Comcast and Cox, along with virtual MVPD, such as YouTube

25   and Hulu, right, sir?

O86HFub4          Gandler - Cross

1   A.   Sorry.  I think you conflated too many companies.

2   Q.   Well ——

3   A.   If I may answer, I will.

4   Q.   Do you agree with me that you compete with the MVPD?

5   A.   MVPD?

6   Q.   Yes.

7   A.   I don't think so.

8            MR. LEVANDER:  OK.  Can we take a look at DX 13.

9            THE COURT:  Mr. Gandler, is that because you

10  distinguish between a streaming customer and a physical MVPD

11  customer?

12           THE WITNESS:  Yes, ma'am.

13           THE COURT:  And does Fubo attempt to attract current

14  physical MVPD customers to switch to Fubo?

15           THE WITNESS:  Yes.  There's a market shift that's

16  occurring right now where folks are moving from cable to

17  streaming, and so we're actually competing directly with Hulu

18  Live, YouTube TV, others that are offering —— actually, a

19  satellite company like DirecTV also has a streaming product,

20  which is called DirecTV stream.  So I would say we compete with

21  DirecTV stream, not DirecTV.

22           THE COURT:  But if you are —— and you'll tell me if

23  this is a naive question —— if you are trying to, in effect,

24  steal or attract away customers from traditional DirecTV or

25  Comcast or Charter, isn't that in —— you are competing with

O86HFub4          Gandler - Cross

1  them for the customer who's interested in MVPD products

2  generally, right, or is that not correct?

3              THE WITNESS:  May give you an example?

4              THE COURT:  Sure.

5              THE WITNESS:  So that's like saying a mobile operator

6  like T-Mobile would be stealing a customer from Ma Bell, the

7  landline company, because both of those are selling

8  communications.  So yes and no.  I would say our primary

9  competitors are the virtual MVPD and then, to some extent, the

10  cable companies.  But they're really focused on trying to

11  retain customers.  There's no one that's actually going in and

12  saying I would like a new cable subscription.

13              THE COURT:  OK.  Thank you.

14              Go ahead, Mr. Levander.

15  BY MR. LEVANDER:

16  Q.  If you'd look at your 10-K form for the year ending

17  December 31, 2023, which would have been published sometime in

18  the first quarter of 2024, right, sir?

19  A.  Correct.

20  Q.  And if you can turn to page 10 of DX 13 and look at the ——

21  what you said to the public about competition in the first

22  paragraph, and what you said is:  "We principally compete with

23  pay TV operators such as Comcast, Cox, and Altice, along with

24  other virtual multi-channel video programming distributors,

25  vMVPDs such as YouTube, Hulu, and Sling."

1          Is that an accurate statement that you made to the

2     shareholders and the public, sir?

3     A.  Yes.

4     Q.  Now, Fubo doesn't consider Fox to be a competitor, correct?

5     A.  We don't.

6     Q.  Turning to Fubo's 2023 10-K, DX 13, again, and we look at

7     page 7 now of DX 13.  What we said on the second paragraph ——

8     what you said in the second paragraph is "We are a sports-first

9     pay TV replacement product offering subscribers access to tens

10    of thousands of live sporting events annually, alongside

11    leading news and entertainment content both live and on

12    demand," right?

13    A.  I did.

14    Q.  And Fubo produces virtually none of that content, right,

15    sir?

16    A.  Yes.

17    Q.  Rather, Fubo licenses that content primarily through

18    carriage agreements and with programmers like NBC, Fox, and

19    Disney, right?

20    A.  That is correct.

21    Q.  Carriage agreements are multiyear, multi-term contracts

22    that vary between various programmers like defendants and the

23    various distributors like Fox, right, sir?

24    A.  Correct.

25    Q.  And Fubo's carriage agreements with Fox and Disney expire

O86HFub4          Gandler - Cross

1  at different times in the next several years, right, sir?

2  A.  They do.

3  Q.  Now, Fubo has been repeatedly late in paying carriage fees

4  to Fox, correct?

5  A.  Yes.

6  Q.  And Fubo has refused to pay Fox certain required carriage

7  fees for subscribers that Fubo has decided to offer, for

8  example, a free 30-day subscription, correct?

9  A.  I believe we're in dispute and have been accruing for that

10  payment.

11  Q.  And you're accruing in accordance with terms of the

12  contract, right, sir?

13  A.  You would have to ask counsel.

14  Q.  Despite your sworn claim that Fubo has been in a nine-year

15  war with Fox, Fox never sought to terminate your carriage

16  agreement because of Fubo's payment failures, correct?

17  A.  Because it's highly lucrative, correct.

18  Q.  Now, the focus of this hearing is Fubo's complaint against

19  the JV announced in February 2024 by Disney, Fox, and Warner

20  Bros., right?

21  A.  Correct.

22  Q.  And you understand that the JV is not a merger among

23  Disney, Fox, and Warner Bros., correct?

24  A.  Technically, it's not.

25  Q.  And Venu, the joint venture, will be a new company with a

O86HFub4        Gandler - Cross

1    new product, correct?

2    A.  Correct.

3    Q.  Now turning to JX 62, again, your '22 annual report,

4    Mr. Gandler, on page 19, Fubo warned its shareholders in the

5    eighth bullet that the entrance of new competitors or

6    competitive products or services, whether by established or new

7    companies, might adversely affect your operating results,

8    right, sir?

9    A.  Sorry.  Just to be clear, is this in the risk factor

10   section again?

11   Q.  Yes.

12   A.  Yes, it's all-encompassing, correct.

13   Q.  And you understood that —— and you understand that Venu,

14   the joint venture, reflects a nonexclusive arrangement among

15   the members who remain free to compete against each other,

16   correct?

17   A.  Sorry.  Can you repeat that?

18   Q.  Yes.

19   A.  Or rephrase it.

20   Q.  You understand that Venu, the joint venture, reflects a

21   nonexclusive arrangement among the members who remain free to

22   compete against each other, correct?

23   A.  But it's exclusive to them, that particular offer.

24   Q.  Disney has announced that it's going with a separate

25   product that would be competitive with the JV, right, sir?

O86HFub4          Gandler - Cross

1   A.  Can you be specific?  You mean ESPN+?

2   Q.  Yes.

3   A.  Yes.

4   Q.  And ——

5   A.  It's already out, actually.  It exists.

6   Q.  By the way, when you were asked questions by your counsel

7   before about "niche sports," he didn't ask you about, for

8   example, the NBA or the NFL direct-to-consumer products, did

9   he?

10  A.  Those products do not compete, for multiple reasons, with

11  virtual MVPD.

12  Q.  They're not niche products, are they, sir?

13  A.  Sorry?

14  Q.  They're not niche products?

15  A.  If you limit the NFL to a mobile phone, I would believe

16  that it is a niche product because most people watch sports on

17  their big TVs.

18  Q.  Now can we turn to IMX 7, which is your February 2024 board

19  agenda, and if we could turn to page 18 of that document, sir.

20          You had a page about the joint venture, right, sir?

21  A.  I did.

22  Q.  And the very top of the page it says:  "Companies will

23  license the sports content to the JV on a nonexclusive basis."

24  The very first bullet, right, sir?

25  A.  Yes.

1  Q.  Now, and you understood that Venu will be focused on

2  signing up cord-cutters and cord-nevers, right?

3  A.  Yes.

4  Q.  And you understand that cord-cutters and cord-nevers are

5  potential subscribers now outside the pay TV ecosystem,

6  correct?

7  A.  I don't think that's true.

8  Q.  Sir, when you said that you were competing for the same

9  people in your testimony ——

10  A.  Yes.

11  Q.  —— of cord-cutters and cord-nevers, you weren't saying that

12  you were competing to get somebody who had left Comcast and had

13  gone to Hulu as one of your competitors.  You were talking

14  about potential subscribers out there outside the pay system,

15  weren't you, sir?

16  A.  Sorry.  I'm confused.

17  Q.  Okay.  Let's turn to page 125 of your transcript, line 5:

18  "Q.  And you understand that the JV has announced its focus on

19  the cord-nevers and people that have already cut the cord?

20  "A.  Yes, you're, correct.  I'm just smiling.

21  "Q.  Right.  You understand that?  That's what they said their

22  focus?

23  "A.  That's what we've been doing for ten years, focusing on

24  cord-cutters and cord-nevers.

25            Now, sir, if it was a cord-cutter that had been at

O86HFub4          Gandler - Cross

1  Comcast and had gone to Hulu, that's not the focus of your

2  primary recruiting of customers, is it, sir?

3  A.  Sorry.  Can you just rephrase that again.  I'm still

4  processing from your last question.

5  Q.  Try it one more time, and then we'll move on.

6          In response to the Court's questions, you suggested,

7  contrary to your expert, that cord-cutters were people who had

8  left cable and were now subscribers to a vMVPD like Fubo or

9  Hulu.  That's what you said?

10 A.  Yes.

11 Q.  And that's contrary to what your expert said, right, sir?

12 A.  I wasn't ——

13         MR. HANSEN:  He can't talk about it.  He wasn't

14 present in court.  That's not fair.

15         THE COURT:  Right.  He's not here to testify about

16 what other witnesses said.

17 Q.  And with regard to what you testified to in the deposition,

18 you used the word "cord-cutter" to include people who had left

19 the pay TV system altogether, right, sir?

20 A.  Yes, I believe it says here "cord-cutters, cord-nevers,"

21 right?

22 Q.  Now, you also understood that for the —— now, you

23 understand that for the big sports fan, Fubo is a better place

24 to subscribe than the JV will be, correct?

25 A.  Why would I think that, sir?  Sorry.  I didn't understand.

O86HFub4          Gandler - Cross

1    Q.  Let's turn to paragraph 169 of the amended complaint,

2    IMX 8, at page 48.

3           That's the chart that's in your complaint, right, sir?

4    A.  I believe so.

5    Q.  And if we look at ESPN, Fox, and Warner Bros., the three

6    percentages that are totaled there are about 54 percent, more

7    or less?

8    A.  I believe so.

9    Q.  And if we look at what Fubo would offer a subscriber, Fubo

10   has ESPN, Fox, Warner Bros. ⎯ excuse me, doesn't have Warner

11   Bros.  I apologize.

12          It has ESPN, Fox, CBS, NBC, and others, right, sir?

13   A.  We do.

14   Q.  And you have more than 80 percent of the sports market,

15   according to figure 5 in your amended complaint, right, sir?

16   A.  Yes, with a substantially higher price, correct.

17   Q.  And that means that for a sports fan, they can get about

18   50 percent more sports or more on Fubo than they could on the

19   JV, right, sir?

20   A.  Sir, this is not a yes-or-no question.  I can answer it,

21   but it's not yes or no.

22   Q.  Mathematically, 54 percent is what you said the three ⎯

23   ESPN, Fox, and Warner Bros. ⎯ defendants would have, right,

24   sir?

25   A.  I do.

O86HFub4          Gandler - Cross

1  Q.  And would you agree with me that half of 54 is 27?

2  A.  Yes.

3  Q.  And 27 plus 54 is 81, right, sir?

4  A.  Correct.

5  Q.  So Fubo offers the sports fan more than 50 percent more

6  sports than the JV will offer, right, sir?

7  A.  And the JV offers channels for more than a 50 percent

8  discount to Fubo.  And a person can, if they wish, buy around

9  the other networks.  They can't buy around Venu.

10        MR. LEVANDER:  Move to strike, your Honor.  My

11  question was simply a mathematics question of what it was.

12        MR. HANSEN:  He's arguing with the witness, your

13  Honor.  I think it's a fair answer.

14        THE COURT:  Right.  Why don't you ask the question.

15  I'm not striking the answer, but if you want to repeat the

16  question with just asking for the math, you can.  But I think

17  we can all do the math.  So I don't know that it's adding

18  anything.

19        MR. LEVANDER:  Thank you.

20  Q.  The joint venture does not have CBS, correct?

21  A.  I read in a media outlet last night that you've —— sorry,

22  the defendants have engaged CBS.  That's all I know.

23  Q.  Sir, does the Venu announcement include CBS as of this

24  time?

25  A.  No, it doesn't.

O86HFub4              Gandler - Cross

1   Q.  Does the Venu announcement include NBC as of this time?

2   A.  No, it doesn't.

3   Q.  Does the joint venture announcement include the regional

4   sports networks?

5   A.  It doesn't.

6   Q.  Now, in the last two weeks, as part of the dynamic pay TV

7   ecosystem we've been talking about, you've read that the NBA

8   has awarded Amazon, NBC, and ESPN an 11-year contract for

9   $77 billion, right, sir?

10   A.  Yes.

11   Q.  And in doing so, the NBA ended its relationship with Warner

12   Bros., which has had NBA rights for many years, correct?

13   A.  I thought they were going to try —— I'm not sure.  Has it

14   ended?  Yes.

15   Q.  No, no, if the NBA's decision not to give games to Warner

16   Bros. is upheld by the courts, Venu will have even less sports

17   in 2025 unless it can find something to replace the Warner

18   Bros. basketball games, right, sir?

19   A.  Sorry.  In what year did you say they would not have

20   basketball?

21   Q.  2025.

22   A.  Not this year.  Yes, that's correct, next year.

23   Q.  But Fubo would be able to continue broadcasting NBA games,

24   right, sir?

25   A.  Yes, I believe so.

O86HFub4          Gandler - Cross

1    Q.   And Fubo has Sunday night NFL games and Venu does not,

2    right, sir?

3    A.   That is correct.

4    Q.   Fubo has the PGA golf tour and Venu does not?

5    A.   Correct.

6    Q.   And Fubo has the Premier League and Venu does not?

7    A.   Correct.

8    Q.   Premier League are among the most watched soccer games in

9    the world, right, sir?

10   A.   It is.

11   Q.   And Fubo has the regional sports networks that Fubo has and

12   Venu doesn't, including baseball, football, and basketball

13   games, right, sir?

14   A.   Yes.

15   Q.   Now, you terminated your carriage arrangement with Warner

16   Bros. in 2020, right?

17   A.   Sorry.  Could you repeat that.

18   Q.   You terminated your carriage agreement with Warner Bros. in

19   2020?

20   A.   To substitute in ESPN, yes.

21   Q.   And you have current carriage agreements with Disney, Fox?

22   A.   That is correct.

23   Q.   And neither Disney nor Fox has threatened to terminate

24   those long-term carriage agreements with Fubo early because of

25   the joint venture, correct?

O86HFub4            Gandler - Cross

1    A.   They have not.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O862Fub5                Gandler - Cross

1   BY MR. LEVANDER:

2   Q.  And neither Disney nor Fox has suggested in any way that

3   they would be unwilling to extend or renew Fubo's carriage

4   agreements in the years ahead because of the joint venture,

5   correct?

6   A.  They have not stated that, that is correct.

7   Q.  And certainly nobody from Warner Bros. has said it is

8   unwilling to negotiate a carriage agreement with Fubo now or

9   later because of the joint venture, correct?

10  A.  Sir, with all due respect, we were denied two months ago.

11  That's the reason why we don't have a deal with Warner Bros.

12  Q.  You didn't ask for a broad bundle from Warner Bros., right,

13  sir?

14  A.  We didn't ask for the fat bundle.  We asked for the skinny

15  bundle that will be provided to Venu, and we were told no.

16  Q.  Now, turning to paragraph 23 of your declaration, sir, you

17  describe Fubo's supposed nine-year battle with the big

18  programmers over the skinny sports bundle, right, sir?

19  A.  Yes, sir.

20  Q.  And turning to paragraph 27 of your declaration, PX 102, at

21  page 6, you wrote and swore to, "From the beginning, defendants

22  and other programmers made clear that they would not

23  license" --

24          THE COURT:  Sorry, Mr. Levander, that -- are we

25  reading from the complaint or --

1    MR. LEVANDER:  This is the declaration of Mr. --

2    THE COURT:  Okay.  Sorry.  Go ahead.

3    MR. LEVANDER:  It is PX 102.

4  BY MR. LEVANDER:

5  Q.  You swore that "from the beginning, defendants and other

6  programmers made clear that they would not license sports

7  content to us on an unbundled basis," correct?

8  A.  I did.

9  Q.  That's not entirely accurate, is it, sir?

10  A.  I'm not sure.

11  Q.  You never asked Disney for a skinny sports bundle, did you,

12  sir?

13  A.  That's actually false.

14  Q.  Let's take a look at your transcript, transcript page 204,

15  lines 18 to 23.  Now, sir, you said:

16  "Q   Okay, but in those two conversations, the first one with

17  Sean Corrigan and the second with Justin Connolly, you never

18  asked if Fubo could license Disney's linear networks on an

19  unbundled basis, did you?

20  "A   I did not."

21  Q.  Remember --

22  A.  I think your question technically was "did you ever."  This

23  conversation, I believe, is from six months ago.  So if you

24  could just repeat the exact question, I would appreciate it.

25  Q.  Okay.  Did you in the recent past, when you had those

O862Fub5                    Gandler - Cross

1   conversations with Justin Connolly and Sean Corrigan, did you

2   ask them for a sports -- skinny sports bundle?

3   A.  Not since 2016.

4   Q.  Now, in 2017 and '18, Fubo voluntarily sought and obtained

5   carriage agreements with Scripps and Discovery Networks, right?

6   A.  I'm sorry.  Can you repeat that question slowly.

7   Q.  In 2017 and '18, Fubo voluntarily sought and obtained

8   carriage agreements with Scripps and Discovery Networks,

9   correct?

10  A.  That is not factually correct.

11  Q.  You didn't get carriage agreements with Scripps and

12  Discovery in those years?

13  A.  We did, but you said voluntarily.

14  Q.  Okay.  You signed a contract, right, sir?

15  A.  Yes, obligated by the Fox contract to offer nonsports

16  programming to our customers.  That's correct.

17  Q.  Neither of those entities have any sports content, right,

18  sir?

19  A.  As I said, it's an obligation in the contractual

20  arrangements we have with Fox.

21  Q.  You never asked Fox for a skinny sports bundle, did you,

22  sir?

23  A.  I did.

24  Q.  Let's take a look at your testimony.  Transcript 28/line 3.

25          THE COURT:  To be clear for the record, this is your

O862Fub5                    Gandler - Cross

1  deposition testimony --

2              THE WITNESS:  Correct.

3              THE COURT:  -- not your testimony --

4              THE WITNESS:  Yes, ma'am.

5  Q.  Line 3:

6  "Q   Did you specifically ask this Jessica or anybody else

7  'could we only license a skinny sports bundle from Fox?' Yes or

8  no.

9  "A   At Fox, I did not."

10             Do you remember giving that answer, sir?

11 A.  Yes.  And in subsequent questions around Fox I believe I

12 also said that I might have, further down the page, if I'm not

13 mistaken.

14 Q.  Well, let's go down the page.

15 "Q   "And to your knowledge, sir" -- you were asked this

16 question.  "Isn't it a fact that nobody at Fubo ever asked Fox

17 specifically for a skinny sports bundle?

18 "A   At Fox specifically, no". . . . "I believe it was in 2019

19 or '20 so the BabyTVs of the world, which we never needed, but

20 were within the bundle -- actually, I do recall speak to her

21 about channels like BabyTV, which at the time were owned by

22 Fox, and we did discuss not including some of those channels.

23 It was certainly not over e-mail.

24 "Q   When do you think this conversation occurred?

25 "A   I don't know.  Between 2016 and 2018.

O862Fub5               Gandler - Cross

1    "Q   And that was before Fox sold various properties to Disney,

2    correct?

3    "A   Correct.

4    "Q   And at that time, you did not specifically ask her for a

5    sports-only bundle?" Next page.  "Correct?"

6    "A   I specifically did not ask her for a sports-only bundle.

7    "Q   And to your knowledge, nobody at Fubo ever asked Fox for a

8    sports-only bundle, correct?

9    "A   To my knowledge, no, but I haven't participated in these

10   discussions since we hired I believe it was Ben Grad."

11           Do you remember giving those answers under oath?

12   A.  Yes.  If you can just show me my comments again.  I didn't

13   want to interfere.  Higher up, where I said "I do recall."  Can

14   you show me that again because it was -- turned by the page

15   quickly.

16   Q.  Sure.

17   A.  I think I said I recall talking about channels.

18           MR. LEVANDER:  Keep going down?

19           THE COURT:  While we are finding that segment, I will

20   just remind all counsel this is a perfect example where it is

21   very helpful to have a hard copy of the entire document to show

22   to the witness.

23   BY MR. LEVANDER:

24   Q.  I believe your answer -- is that what you were talking

25   about, sir?

O862Fub5              Gandler - Cross

1  A.  Give me a moment.  Let me just read this.

2         Yes.  I said here, actually, I do recall speaking to

3  her about channels.  And after the deposition, I went through

4  my e-mails to refresh my memory, and I can assert to you, sir,

5  today, that my request for Fox Deportes was explicit, and I

6  think my counsel would be more than happy to provide that

7  document to you when you wish.

8  Q.  So, sir --

9         MR. HANSEN:  It's been provided.  The documents were

10 turned over.

11        THE COURT:  Thank you, counsel.

12 BY MR. LEVANDER:

13 Q.  About ten days ago your counsel provided the documents you

14 are referring to, right?

15 A.  Perhaps.

16 Q.  So let's take a look at the documents that your counsel

17 provided from 2015.

18        Now, in early 2015, you contacted Fox to see what

19 content Fubo could license from Fox, right?

20 A.  I did.

21 Q.  And in March 2015, you met with three representatives of

22 Fox to see if you could license content from Fox, right, sir?

23 A.  I did.

24 Q.  And then at that meeting you did not specifically ask for a

25 skinny sports bundle, correct?

O862Fub5                  Gandler - Cross

1    A.  In that particular meeting, I did not.

2    Q.  Now, looking at your e-mail from March 15, 2015, PX 176 --

3    is that right?  PX 176?  And looking at the third paragraph,

4    and what you told Fox was that you were building Fubo around

5    soccer first but that you were willing "to support your key

6    initiative, including content (or networks) not available

7    through our distribution platform," right, sir?

8    A.  Yes.  There is sports programming related to Fox Soccer

9    Channel, yes.  There are many soccer leagues that they had.

10   Q.  And there are networks, and not all the networks that Fox

11   has contain sports, right, sir?

12   A.  Fox Deportes and Fox Soccer Plus at the time did.

13   Q.  It says, "Moreover, we would support your key initiative

14   (including content) not available through our distribution

15   platform," right, sir?

16   A.  Sir, with all due respect, I tried to acquire the content.

17   I was told in some very nice words, no.  Of course I came back

18   to my e-mail and attempted to figure out a way to move forward,

19   and I have already testified to the fact that we have had no

20   choice in the matter and we were forced to acquire all the

21   content.  So, yes, this is accurate.

22   Q.  Well, take a look at the -- when you thanked -- you thanked

23   them for the meeting and you sent a little brochure PowerPoint

24   about Fubo, right, sir?

25   A.  Yes, which led to their investment in the company.

O862Fub5            Gandler - Cross

1   Q.  Can we show you PX 176.  And in 2015, before you had any

2   license with any of the defendants in this case, on page 5, you

3   describe Fubo as having soccer first, but that it had -- Fubo

4   had -- in the right-hand side, TV series and news, right, sir?

5   A.  Yes.

6   Q.  That's not a skinny sports bundle, right, sir?

7   A.  I mean, again, I don't understand.  It says "The first,"

8   "first," meaning the leader, "Internet TV service dedicated to

9   the most popular sport in the world."  Yes, that's how things

10  start from one sport and they grow.

11  Q.  And you also told them in this description that you had TV

12  series and news, which are not sports, right, sir?

13  A.  The TV series that I was referring to—and this is, of

14  course, on record—is a TV show called *Everton TV*, which is a

15  Premier League soccer team that I flew to England, acquired the

16  rights, and we produced, if I'm not mistaken, it was a long

17  time ago, 38 episodes that we released both on I believe it was

18  Goal TV and the remainder of the programs we kept for us.  So

19  TV series refers to sports TV, obviously, and news was also

20  sports news.

21  Q.  Let's take a look at PX 178, which is an e-mail.

22          THE COURT:  Mr. Levander, while we are pulling that

23  up, I want to give you as much time as you need within reason,

24  but just for planning purposes, especially for our reporters,

25  we have been going for about an hour and 20 minutes, so how --

O862Fub5                Gandler - Cross

1   what's your estimate of how much time you have remaining?

2   Not -- the cross has not been an hour and 20 minutes, but we

3   have been going that long since lunch, so do you have an

4   estimate --

5            THE WITNESS:  I thought I was at the deposition again.

6            THE COURT:  Do you have an estimate of how much longer

7   you have, just so I can plan out appropriate time for the

8   break?

9            MR. LEVANDER:  30 minutes.

10           THE COURT:  So why don't you tell me within the next

11   five to ten minutes when it is a convenient time to take a

12   break and then --

13           MR. LEVANDER:  Why don't we finish these documents.

14   BY MR. LEVANDER:

15   Q.  So let's take a look at PX 178, which is your -- it's an

16   e-mail to you from Jessica Fang at Fox in June of 2016, a year

17   later, right?

18   A.  That is correct.

19   Q.  And this is one of the documents you produced last --

20   within the last week or so, right?

21   A.  I couldn't hear that, sir.

22   Q.  This is one of the later-produced documents that you --

23   A.  Yes, correct.

24   Q.  And she attached a Fubo-Fox potential proposal for an

25   agreement, right, sir?

O862Fub5              Gandler - Cross

1   A.  I believe so.

2   Q.  And turning to page 8 of PX 178, which is the first page of

3   the Fox proposal, and if we turn to paragraph 3, the proposal

4   has all of the Fox stations, including Fox News, Fox Business,

5   etc., right, sir?

6   A.  Yes, sir.

7   Q.  That's not a skinny bundle, right, sir?

8   A.  That is not a skinny bundle.

9   Q.  It's not a skinny sports bundle.

10  A.  Of course not, yes.

11  Q.  Now, on June 15, 2016, about two weeks later, Fubo sent

12  back its comments on Fox's proposal, correct?

13  A.  Perhaps, yes.  I don't know which document you are

14  referring to.

15  Q.  Well, it's not one that your counsel produced.  They

16  produced the other ones, but they didn't produce the one we are

17  about to show you.

18  A.  Okay.  Show it to me.

19  Q.  IMX 14.

20          MS. FRUITERMAN:  Your Honor, may I approach?

21          THE COURT:  Please hand them to Ms. Ghotbi.

22  BY MR. LEVANDER:

23  Q.  This is your e-mail back to Fox, right?

24  A.  Sorry, can you -- hold on again, I need my glasses.

25  Q.  Maybe you can blow up the document.

O862Fub5                    Gandler - Cross

1              THE COURT:  Use mine.

2              THE WITNESS:  Thank you.

3   A.  Sir, what were you specifically discussing?

4   Q.  So this is your e-mail back to Ms. Fang at Fox on June 15,

5   2016, correct?

6   A.  That is correct.

7   Q.  And you didn't say to, her whoa, whoa, whoa, I want a

8   skinny sports bundle, right, sir?

9   A.  I did not.

10  Q.  And you didn't say, this is unacceptable, right, sir?

11  A.  To her specifically or to her boss?

12  Q.  To either of them.

13  A.  Well, if you said counsel has provided you with e-mails

14  from Fox, then you should know that I did ask for specific

15  channels.  I was told no.  I agreed to accept a full suite of

16  channels.  And I was then asked to speak with Jessica Fang, who

17  handles the administration and the licensing of these networks.

18  So, yes, I did agree to accept the full suite of channels

19  consistent with my testimony earlier.

20  Q.  2015, you sent an e-mail thanking the three people from Fox

21  that you met and saying that you were interested in sports,

22  soccer --

23  A.  Correct.

24  Q.  -- and all other initiatives.  Right, sir?  That's the

25  document we already looked at.

O862Fub5                Gandler - Cross

1   A.  Sorry, I'm confused again.  Which document now again?

2   Q.  We took a look at Exhibit 176 already, right, sir?

3   A.  If you could just flash it quickly.  Again, I'm being

4   technical here because there are some things that have not been

5   asked properly.  I just want to make sure I am answering them

6   the right way.

7   Q.  Right.

8            And this is the document you were shown where it says

9   Fubo TV would be honored to build a basic package around Fox

10  Soccer Plus, right, in the third paragraph and, then you

11  said --

12  A.  Yes.

13  Q.  -- "We would support your key initiative, including content

14  (or networks) not available through our distribution platform."

15  Right?  That's what you said.

16  A.  I did.

17  Q.  And then a year later came back the proposal from Fox,

18  right, sir?

19  A.  A year later, consistent with my testimony that we had no

20  choice and we capitulated to accept the full bundle a year

21  later, correct, yes, sir.

22  Q.  But you said a year later, from you to Ms. Fang, it was in

23  the first paragraph, "I wanted to reiterate that it is indeed

24  wonderful to be able to get such a succinct and clear

25  document."  That's what you said, right, sir?

O862Fub5                    Gandler - Cross

1   A.  I did, sir.

2           THE COURT:  Can I just ask a question?  Mr. Gandler,

3   are you in business?  Are you a business person?

4           THE WITNESS:  Yes, ma'am.

5           THE COURT:  And is it within your normal practice in

6   the course of business negotiations to tell people necessarily

7   all your true feelings about your interactions with them?

8           THE WITNESS:  That is correct.  You have to be

9   cordial.

10          THE COURT:  Thank you.  Go ahead, Mr. Levander.

11  BY MR. LEVANDER:

12  Q.  Turning now to the redline that you sent back to Fox on the

13  16th, which is, page 8, as a businessman, you know, you send

14  back and forth markups to the other guy's document, right?

15  A.  Correct.

16  Q.  And you didn't put in there anything about sports only,

17  right, sir?

18  A.  Sir, we were way beyond that.  You are correct.

19  Q.  And you included and agreed to a Fox content that included

20  Fox News, Fox Business, and all kinds of nonsports channels.

21  Right, sir?

22  A.  Yes, as I have testified.

23  Q.  And by the way, Mr. Gandler, isn't Fox News one of the two

24  most-watched channels on Fubo?

25  A.  Sir, it's not the reason why people subscribe.

1  Q.  Answer my question, please.  Is it one of the two

2  most-watched channels on Fubo?

3  A.  Yes.

4  Q.  And that's not a sports channel, right, sir?

5  A.  It is not.

6        MR. LEVANDER:  Your Honor, do you want to take a break

7  at this time?

8        THE COURT:  Sure.  If it's a convenient time for you,

9  Mr. Levander.  Okay.  It's 3:22.  We will begin again --

10  everyone be ready to begin again at 3:35.  Thank you very much.

11        You can step down, Mr. Gandler.  Before we go off the

12  record, Mr. Gandler, I will just remind you that because you

13  are on cross, you are not allowed to speak to your counsel.

14        THE WITNESS:  Okay.  I will stay here.

15        THE COURT:  No, no.  You can step down.  You just

16  can't talk to them about the content of your testimony.

17        THE WITNESS:  I won't.

18        THE COURT:  You can talk to them about the weather or

19  whatever else you would like.  I will see you in 12 minutes.

20        THE DEPUTY CLERK:  All rise.

21        (Recess)

22        THE COURT:  You can all be seated.

23        Mr. Gandler, I'm just reminding you that you are still

24  under oath.

25        Mr. Levander.

1             MR. LEVANDER:  Thank you your Honor.

2    BY MR. LEVANDER:

3    Q.  Fox, in fact, has provided a sports-only license to Fubo,

4    correct?

5    A.  Can you -- I'm not sure.

6    Q.  Sure.  You know who UEFA is?

7    A.  Yes, I do.

8    Q.  It's a leading sports soccer authority in Europe, right?

9    A.  Yes.

10   Q.  And it produces the Champions League's games, which put the

11   best soccer clubs in Europe in a playoff, annual championship

12   series, leading to a championship game.  Is that correct, sir?

13   A.  That's correct.

14   Q.  Paris FC is not a part of that process, right, sir, hasn't

15   been?

16   A.  Again, you need to be technically correct.  We are.

17   Because our women's team is in Champions League, not our men's

18   team.  Correct.

19   Q.  Now, in 2022, Fubo approached Fox about trying to get UEFA

20   rights through Fox, right, sir?

21   A.  Yes.

22   Q.  And when Fox succeeded in licensing exclusive rights to

23   various UEFA games, including the championships games in 2024

24   and 2028, it sublicensed those rights to Fubo, right?

25   A.  Yes, in a different context, yes.

O862Fub5                 Gandler - Cross

1  Q.  And UEFA was willing to sign a license with Fox but it

2  wasn't going to sign a license with Fubo, right, sir?

3  A.  That I don't know, sir.

4  Q.  You needed Fox to get that license, right, sir?

5  A.  I believe Fox was the incumbent.

6  Q.  Answer my question.

7  A.  Yes.

8  Q.  Now, in paragraph 10 of your declaration, you have sworn

9  that, from the beginning, Fubo wanted to offer a live sports

10 package that wouldn't be bloated with 150 channels, right, sir?

11 A.  Yes.

12 Q.  But even if the defendants in this case agreed to offer you

13 skinny sports bundle rights under their carriage agreements,

14 Fubo's carriage agreements with NBC and many other programmers

15 who are not party to this litigation would preclude Fubo from

16 doing so at this time, right, sir?

17 A.  Yes, but this would be new information for them.

18 Q.  It's also a fact that -- withdrawn.

19         Now, you have talked about your goal as being one for

20 a skinny sports bundle, so let's turn to IMX 10, which is an

21 interview you gave in November of 2018.  And what you said in

22 2018, turning to page 2 of the interview, is that, in the

23 bottom of the bottom paragraph, that you had recently launched

24 a new home page which showcases the full breadth of our sports,

25 entertainment, and news programming, right, sir?

1   A.  That is correct.

2   Q.  And turning to page 4 at the top, you chose to emphasize to

3   the interviewer that Fubo's members come for the sports, then

4   stay for the entertainment, right?

5   A.  That is correct.

6   Q.  And what you said was, We now have more news networks than

7   our competitors.  That was a bragging point for you, right,

8   sir?

9   A.  No, that was factually correct.

10  Q.  But you chose to tell that to the interviewer, right, sir?

11  A.  Yes, because it was factually correct.

12  Q.  And you said Fubo is a real cable replacement product for

13  everyone in the household.  Is that right, sir?

14  A.  That's correct.

15  Q.  And everyone in the household can include people who are

16  not sports fans, right, sir?

17  A.  That is correct.

18  Q.  Now, if we could turn to DX 2, which is an interview you

19  gave to CNBC on August 18, 2021, and if we could turn to page 7

20  in the second line and the third paragraph --

21          MR. HANSEN:  Can we wait until the witness has a copy,

22  please?

23  Q.  Look at the second line in the third paragraph.  You said,

24  "I do not think there is a world that customers would be okay

25  with having six or seven streaming services.  Which, by the

O862Fub5                Gandler - Cross

1    way, is a bundle."  You said that, right, sir?

2    A.  Yes.  But are we talking about the same thing?

3    Q.  I'm just asking whether that's the words you said at the

4    interview.

5    A.  Yes, six or seven separate services could be considered, in

6    a household, a form of a bundle, yes.

7    Q.  Turning to the top of page 8, what you stated was, in the

8    first full paragraph, "What I'm saying is that Fubo or a

9    bundler like Fubo will be the core TV experience."  Do you see

10   that, sir?

11   A.  Yes, in the absence of a skinny bundle, correct.

12   Q.  You didn't say in the absence of a skinny bundle, did you,

13   sir?

14   A.  That was 2018, sir.

15   Q.  No.  This is 2021, sir.

16   A.  2021, still, way before a joint venture.

17   Q.  But you didn't say at that time that the future was going

18   to be a skinny sports bundle, right, sir?

19   A.  I was acting with the most information that I had at that

20   moment in time.

21   Q.  And then if we could turn to IMX 11, which is your tweet on

22   June 15, 2022?

23          THE COURT:  When you give the copies to Ms. Ghotbi, if

24   you could give her two, so that I have one.  Thank you.

25          MR. LEVANDER:  You can have as many as you want, your

O862Fub5                  Gandler - Cross

1   Honor.

2           THE COURT:  There may be a shortage, but it seems to

3   me I'm the one who should have it.

4           MR. LEVANDER:  I agree.

5           THE COURT:  Thanks.

6   BY MR. LEVANDER:

7   Q.  And what you told the public at that time was, "Our

8   strategy has always been, Come for the sports, stay for the

9   entertainment."  Right, sir?

10  A.  Since launching a fat bundle, yes.

11  Q.  You didn't say that, since launching a fat bundle in 2015

12  or '16, what you said was, "Our strategy has always been, Come

13  for the sports, stay for the entertainment."  Right, sir?

14  A.  I did.

15  Q.  And if you look a little bit further down, you say

16  "consumers want more content, not less."  Right?

17  A.  Yes, as evidenced by four streaming services per household,

18  correct.

19  Q.  And that's not consumers want a skinny sports bundle, it's

20  consumers want more content.  Correct?

21  A.  Sorry.  Can you repeat that one more time.

22  Q.  When you say consumers want more content, not less, you

23  didn't say consumers want a skinny sports bundle.  Right, sir?

24  A.  Sir, I can only sell a product that I have.  If I have a

25  full bundle, that's the product I'm selling.  Thank you.

O862Fub5                    Gandler - Cross

1    Q.  So we are trying to mislead the public about what consumers

2    have?

3            THE COURT:  No.  Were you telling the truth,

4    Mr. Gandler.

5            THE WITNESS:  Of course I was.  We have a fat bundle.

6    That's the truth.

7            THE COURT:  And what was the purpose of this tweet in

8    terms of your private thoughts versus marketing versus hyping

9    the business versus any of -- what is the purpose of this

10   tweet?

11           THE WITNESS:  Just reading it here, it says, "If your

12   focus is on sports, why do you have the Home Shopping Network?"

13   I don't recall.  But basically we are saying that we have a

14   full bundle and consumers want more content that's the

15   skinniest of the bundles at the time that you could have.

16           THE COURT:  Go ahead, Mr. Levander.

17   BY MR. LEVANDER:

18   Q.  Now if we could go to Exhibit IMX 12.

19           These were talking points prepared by Fubo for your

20   discussion with a reporter.  Right?

21   A.  Can you expand that, please.

22   Q.  These are talking point that is were --

23   A.  No, sir.  Can you expand it on the screen?  Thank you.

24   Q.  Are you with me?

25   A.  Yes, I am.

O862Fub5                Gandler - Cross

1    Q.  And what you said is, in the second bullet, "The future of

2    streaming is bundling and aggregation."  Right, sir?

3    A.  Yes, that sounds accurate.

4    Q.  And then in the fifth bullet, you said, "The bundle needs

5    sports, but sports needs the bundle more."  Isn't that what you

6    said, sir?

7    A.  Yes.

8    Q.  Now, let's take a look -- withdrawn.

9            At the end of your declaration, Mr. Gandler, at pages

10   9 to 10, you swore about various things that you say that the

11   joint venture threatens essentially Fubo's existence, right?

12   A.  It does.

13   Q.  And you have claimed in this courtroom that Fubo is going

14   to lose 400,000 subscribers in the first -- by the end of the

15   year if Venu goes active.  Right, sir?

16   A.  Yes.

17   Q.  And that calculation of subscribers includes substantial

18   numbers of people who are not currently Fubo subscribers but

19   that you would hope would otherwise become Fubo subscribers in

20   the fall football season, right, sir?

21   A.  Yes, cord-cutters and cord-nevers as you call them,

22   correct.

23   Q.  And of course you don't know for a fact one way or the

24   other whether you are going to lose 400,000 or 200,000 or

25   10,000, right, sir?

O862Fub5                    Gandler - Cross

1   A.   There are things we know for a fact, and the numbers that

2   my team has put together for you, 300 to 400, in my

3   professional opinion, someone who has been in subscription

4   business for over a decade, I can tell you that that number is

5   conservative.  So they did -- they put their best foot forward

6   to put a number in front of the Court, in front of you that

7   shows a modest churn rate.  And, again, price is king and $42

8   is a very inexpensive price for key sports that Fubo has in the

9   month of September.

10  Q.   Again, sir, you didn't take a survey of any of your

11  subscribers to come up with those numbers, sir, right?

12  A.   Sir, we don't use surveys.  We use 2 billion data points

13  that we collect a month.  As I said before, we are very good at

14  forecasting.  And so what I believe my team put together is

15  something that is, I would say, very accurate, but I believe

16  somewhat conservative.

17  Q.   Well, let's take a look at DX 9, which is Fubo's public

18  statement on February 7, 2024, the day after the joint venture

19  announcement.

20          Now, you reviewed that statement before Fubo issued

21  it, correct?

22  A.   Yes.

23  Q.   And you had your experience as the CEO of Fubo and a leader

24  of the global sports industry when you approved that statement,

25  right, sir?

O862Fub5              Gandler - Cross

1    A.  Yes.

2    Q.  And what you told the public in paragraph 1 was that,

3    "Streaming joint ventures rarely work," and that's in the

4    fourth line, right, sir?

5    A.  Yes.

6    Q.  And you further said, "As well, we know sports-only program

7    [sic] is highly challenged."  Those were your words, right,

8    sir?

9    A.  Yes.  Within 24 hours with what little information we had,

10   correct.

11   Q.  But you had all your experience as Fubo's CEO, right, sir?

12   A.  Yes, except the one most important thing, what is the

13   price?  That's the one thing we didn't know, at least I didn't

14   know.

15   Q.  You knew the range of prices that they had been talking

16   about.  Right, sir?

17   A.  I can speculate ranges or . . .

18   Q.  The next paragraph you stated that, "Consumers have

19   demonstrated they want an aggregated sports, news, and

20   entertainment package differentiated by a quality product

21   experience."  Those are your words, right?

22   A.  Yes.

23   Q.  And you said, "This is what Fubo delivers."  Right, sir?

24   A.  Correct.

25   Q.  In fact, in the last paragraph of Fubo's statement you told

O862Fub5                Gandler - Cross

1  the public, "We believe our robust programming and quality

2  product experience cannot be duplicated by what is likely to

3  emerge from this joint venture."  Right, sir?

4  A.  I said that, but I don't believe that is true anymore.  I

5  believe the exact opposite of that; that Venu has something

6  nobody else will have given their price point.

7  Q.  Let's turn to IMX 15, and that's a Slack chat among you

8  Mr. Wang and Mr. Eric Gerson, right, on February 6, 2024?

9  A.  Sorry, what day?  February?

10  Q.  February 6.

11  A.  Oh, the day of.  Okay.

12  Q.  And by the way, Mr. Wang is the executive vice president

13  for marketing for Fubo?

14  A.  Yes.

15  Q.  And what's Mr. Gerson's role?

16  A.  He is also an executive vice president, I believe.  He is

17  executive vice president of data analytics and retention.

18  Q.  And let's turn to page 3 of that chat internally and that's

19  on the evening of February 6, after the JV announcement, right,

20  sir?

21  A.  Yes.

22  Q.  And at 10:28 p.m., on page 3, what you told your colleagues

23  was, "It's not going to get easier this year, but in the end I

24  think everyone will agree the best experience will be a

25  complete bundle."  Right, sir?

O862Fub5                    Gandler - Cross

1    A.  I did.

2    Q.  And you weren't lying to your executive vice presidents,

3    were you, sir?

4    A.  My job was to be motivational.  You would not expect me to

5    tell them to go pack up their bags and go home, would you?

6    Q.  Were you lying to your co-executives?

7    A.  It was a pep talk.

8    Q.  Now, let's take a look at DX 12, which is a transcript of

9    your earnings call on March 1, 2024.  March 1, 2024 is about a

10   month after your -- after the joint venture announcement,

11   right, sir?

12   A.  Three weeks.  Short month, February 28.

13   Q.  No, it's March -- okay, I will accept that.  Short month.

14          So let's turn to page 7 of the transcript and at the

15   bottom, at the end of her question, she is asking you, "What

16   happens if you lose the lawsuits?  What happens if none of

17   those injunctions -- no one intercedes on your behalf and you

18   have to compete against this new entity, please?"

19          And if we go to the top of the next page, you answered

20   her and told the public in the second paragraph, "I guess, you

21   know, it's very difficult to say, but ultimately, I think

22   things will remain status quo."  Those were your words, right,

23   sir?

24   A.  Correct, ours were pernicious.

25   Q.  Excuse me?

O862Fub5                Gandler - Cross

1    A.  I said pernicious, just saying status quo.  We will

2    continue to have to deal with the prices, the unrealistic

3    penetration rates, and the bundling of unwanted channels.  That

4    will be the status quo.

5    Q.  Status quo wouldn't be Fubo goes out of business, right,

6    sir?

7    A.  That is not what I said.

8    Q.  And turning to page 12 at the bottom, a second analyst,

9    Ms. Khajuria asked you a similar question.  She said, "I was

10   just wondering what you think if the lawsuit goes against you.

11   I mean, you mentioned that you've been fighting the fight, but

12   that fight could get a little bit tougher in the event that you

13   lose the lawsuit.  So how does the business change, and what

14   are your thoughts for the event happening?"

15          And what you answered was, "Well, first of all, losing

16   the lawsuit doesn't really change anything, as we said."

17   Right, sir?  Those were your words?

18   A.  That is correct.

19   Q.  Those were your answers, unambiguous, to two different

20   analyst questions on the Fubo's earning call on March 1, 2024,

21   correct?

22   A.  I said duel to the death.  That is correct.

23   Q.  You didn't say:  I think we are going to lose 400,000 or a

24   lot of subscribers, right, sir?

25   A.  Sir, how could I do that?  This is March 1.  It takes at

O862Fub5          Gandler - Cross

least two weeks to prep for an earnings call.  We had very

little information.  We were, all of us——consumers, media,

media partners——everyone was surprised and we were drip fed

information.  At that moment in time I didn't understand the

pricing.  We did not model anything out.  You are correct.

That process started after the earnings call.

Q.  Is it your testimony under oath, sir, that you and your

lawyers for Fubo had not started to think about a preliminary

injunction motion as of March 1, 2024?

A.  Sure, we did.  I believed that the collusion of three of

the largest media companies with what Bob Iger said, which is

ESPN is a must-have, with the CFO saying I will have 80 percent

of the sports programming, we believed that that was

anticompetitive, that it would manipulate pricing, that it

would restrict or even, in our case, eliminate competition.

So, yes, we did file that, and I believe we were correct.

Q.  Sir, as of March 1, 2024, you and the lawyers for Fubo had

already started working on a preliminary injunction motion in

this case, correct?

A.  Yes.

Q.  And what you said to the public at that time was that if

you lose that motion for a preliminary injunction, that won't

really change anything and that Fubo's business will remain

status quo, right?

        MR. HANSEN:  Objection.  Asked and answered.

O862Fub5                Gandler - Cross

1    Misstates the testimony.

2            THE COURT:  Do you understand the question,

3    Mr. Gandler?

4    A.  If you can repeat it again.

5    Q.  Yes.

6            And at that time, in response to questions about

7    losing the preliminary injunction motion, what you said is

8    losing the motion won't change -- really change anything and

9    that Fubo's business will remain quote/unquote status quo,

10   right, sir?

11           THE COURT:  Is that what you said on March 1,

12   Mr. Gandler?

13           THE WITNESS:  That's what I was referring to.

14           MR. HANSEN:  Objection, your Honor.  That wasn't the

15   question.

16           THE COURT:  Right, and the question was about the --

17           MR. HANSEN:  Lawsuit.

18           THE COURT:  -- the lawsuit.  And did you say that on

19   March 1?

20           THE WITNESS:  Sorry, the lawsuit?

21           THE COURT:  The portion of the quote that Mr. Levander

22   read about, things will remain status quo, did you say that on

23   March 1?

24           THE WITNESS:  I did.

25           THE COURT:  And do you know sitting here today when

O862Fub5                Gandler - Cross

1    Fubo's complaint in this case was filed?

2            THE WITNESS:  I don't know.

3            THE COURT:  Okay.

4            THE WITNESS:  But I -- again, I don't know.

5    BY MR. LEVANDER:

6    Q.  It was before this press conference, right, sir?

7    A.  Before this press conference?

8    Q.  Yes.

9            THE COURT:  Earnings call.

10           THE WITNESS:  Oh, the earnings call.

11   Q.  Yes.

12   A.  Again, I don't know the date.  Maybe.

13   Q.  Well, isn't that why the analysts are asking you about the

14   lawsuit?

15   A.  Yes.

16   Q.  And if we turn back to page 7, notwithstanding your

17   counsel's comments a moment ago, weren't -- wasn't Laura Martin

18   asking about injunctions?

19   A.  Yes, correct.

20           MR. LEVANDER:  I have no further questions.

21           MR. HANSEN:  Just one or two.

22           THE COURT:  Mr. Ryan has questions.

23           MR. HANSEN:  I'm sorry, your Honor.

24           THE COURT:  No, it's quite all right.

25           MR. RYAN:  This will just be a few minutes.

O862Fub5                    Gandler - Cross

1    CROSS-EXAMINATION

2    BY MR. RYAN:

3    Q.  Antony Ryan on behalf of Disney defendants.

4            Good to see you again, Mr. Gandler.

5    A.  Good to see you, sir.

6    Q.  All right.  So you testified on direct that you founded

7    Fubo in 2015 as a sports-focused platform, right?

8    A.  I believe, yes, I said that.

9    Q.  It's also the case that Fubo didn't carry any Disney

10   content until 2020, right?

11   A.  That is correct.

12   Q.  And so Fubo operated for the first five years of its

13   existence without any ESPN or other Disney content, right?

14   A.  That is correct.

15   Q.  Now, you were asked a number of questions previously today

16   about cord-cutters, right?

17   A.  Yes.

18   Q.  You haven't seen the internal Disney documents about the

19   Venu joint venture, have you, sir?

20   A.  No, of course not.

21   Q.  So do you know what Disney means when it uses the term

22   cord-cutter?

23   A.  I don't know.

24   Q.  Let me turn now to the summer of 2023, so this is around

25   the same time last year.  Did you reach out to Justin Connolly

O862Fub5                    Gandler - Cross

1   at Disney --

2   A.  I did sir.

3   Q.  -- and ask to speak with him?

4   A.  Sorry, yes.

5   Q.  And did you then meet with Mr. Connolly over Zoom?

6   A.  That is correct.

7   Q.  And did you tell Mr. Connolly that you had a business

8   development opportunity that you thought might be of interest

9   to Disney?

10  A.  I did.

11  Q.  And did you discuss with Mr. Connolly the possibility of

12  Fubo acquiring or merging with Hulu + Live TV?

13  A.  I did.

14  Q.  And did you believe at the time that the consolidation of

15  two vMVPDs like Fubo and Hulu + Live TV would benefit Fubo by

16  providing it with greater scale?

17  A.  I did.

18  Q.  Did you hope that greater scale would help Fubo obtain

19  better price terms and also better nonprice terms in licensing

20  negotiations with programmers?

21  A.  Sir, did you say did I hope?

22  Q.  Yes.  Did you hope that having greater scale would help

23  Fubo obtain both better price terms and better nonprice terms

24  in negotiations with programmers?

25  A.  Correct.  I hoped to access ESPN+ and other programming.

O862Fub5                 Gandler - Cross

1   Q.  Ah.  Now, did you also discuss with Mr. Connolly how a

2   potential merger between Fubo and Hulu + Live TV could benefit

3   Disney?

4   A.  Yes.

5   Q.  Did you tell Mr. Connolly that you believed it would be a

6   positive investment to have a second scaled vMVPD player that

7   could compete with YouTube TV?

8   A.  I did.

9   Q.  And did you mention in that discussion with Mr. Connolly

10  your view that YouTube TV was going to try to knock everybody

11  out of the vMVPD space?

12  A.  I did.

13  Q.  Did you tell Mr. Connolly that one of the biggest

14  differentiators between Fubo and Hulu + Live TV is that Fubo

15  has regional sports networks?

16  A.  I highlighted that because Disney terminated its agreement

17  with the RSNs.

18  Q.  And in your view, some consumers come to Fubo because of

19  the regional sports networks, right, sir?

20  A.  60 percent of our users do not watch the RSNs, but it is a

21  differentiator to some degree, correct.

22  Q.  And you believed that there are some consumers who come to

23  Fubo because of these regional sports networks, right?

24  A.  I do, sir.

25  Q.  All right.  And as far as you are aware, Venu has no

1  agreement to carry any regional sports networks, right?

2  A.  I don't.

3  Q.  Now, did you tell Mr. Connolly that you thought that a

4  merger between Fubo and Hulu + Live TV would be a positive

5  development for Disney and other companies looking to sustain

6  the pay TV bundling proposition?

7  A.  I can't recall exactly, but something along those lines,

8  yes.

9  Q.  Did you tell Mr. Connolly that in your view pay TV bundles

10  are good for consumers and are products that customers actually

11  like?

12  A.  Yes, in the absence of a skinny bundle that is priced at

13  $42.

14  Q.  And in fact you believed that consumers do generally like

15  pay TV bundlings, don't you, sir?

16  A.  In the absence of a skinny bundle, of course, they do.

17  That's the way programmers bundle programming.  There was no

18  other way to get a smaller bundle that was geared towards

19  sports fans, so yes.

20  Q.  So that's why you told Mr. Connolly about your belief that

21  consumers like pay TV bundles, right?

22  A.  Correct.

23  Q.  Now around that same time did you discuss the potential of

24  a Fubo and Hulu + Live TV merger with Sean Corrigan?

25  A.  He told me to call Justin, yes.

O862Fub5                    Gandler - Cross

1    Q.   Okay.  And was Mr. Corrigan a Disney executive who used to

2    serve on the Fubo board?

3    A.   Yes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O86HFub6         Gandler - Cross

1    Q.  And in those two conversations with Mr. Corrigan and

2    Mr. Connolly, you never asked if Fubo could license Disney

3    linear networks on an unbundled basis, did you, sir?

4    A.  Sean Corrigan is not in the licensing department, so I

5    wouldn't ask him.  And Mr. Connolly and I discussed things that

6    were not tied to our recent renegotiation, so no.

7    Q.  At the time you had these two conversations with

8    Mr. Corrigan and Mr. Connolly, you were aware that Fubo and

9    Disney were in the course of license renewal negotiations,

10   right?

11   A.  Yes.  And as a gentleman, I suggested that we don't talk

12   about the licensing discussion, allow the teams to work through

13   their deal, correct.

14   Q.  So is it then correct that in those two conversations with

15   Mr. Corrigan and Mr. Connolly, you never asked if Fubo would

16   license Disney linear networks on an unbundled basis?

17   A.  No, I didn't.

18   Q.  And it's also the case in those two conversations you never

19   asked if Fubo could change the packaging terms or the

20   penetration terms of its carriage agreement with Disney, right?

21   A.  That's a licensing question for the licensing team.

22   Q.  All right.  And you ——

23   A.  I did not, no.

24   Q.  You never brought that topic up in either of those

25   conversations, right?

O86HFub6          Gandler - Redirect

1  A.  The only topics that came up were my discussion around Hulu

2  Live and his response to me, which was we don't want another

3  Netflix.  Those were the topics that we discussed.

4  Q.  OK.

5          MR. RYAN:  No further questions, your Honor.

6          THE COURT:  Thank you, Mr. Ryan.

7          Mr. Yohai, I assume we're good?

8          Go ahead, Mr. Hansen.

9          MR. HANSEN:  I thought you had some questions.  I

10  didn't want to interrupt you.

11          THE COURT:  I was just making sure the defendants'

12  counsel were finished before, so we didn't have a repeat of the

13  last.  So it's your turn.

14          MR. HANSEN:  Thank you.  This will be very, very

15  brief.

16  REDIRECT EXAMINATION

17  BY MR. HANSEN:

18  Q.  There was no preliminary injunction filed by Fubo on

19  March 1, 2024, was there?

20  A.  There wasn't.

21  Q.  And you did, in fact, on this earnings call say a lot of

22  things other than what Mr. Levander cherry-picked from these

23  series of questions and answers, right?

24  A.  I did.

25  Q.  And you had not yet done the analytic work as to how

O86HFub6          Gandler - Redirect

1    damaging this effect would be on your subscribers, had you?

2    A.  No, we had not.

3    Q.  So if you look at page 3 of this exhibit, which you have in

4    front of you in paper, DX 12 —

5            THE COURT:  That's this one, Mr. Gandler.

6            THE WITNESS:  Oh, OK.

7    A.  Sorry.  You said page 3?

8    Q.  Page 3, third paragraph, you didn't pull any punches about

9    what you thought about this JV, did you?

10   A.  Is that the paragraph that starts with "we assert"?

11   Q.  "We assert that this JV."

12   A.  OK.

13   Q.  Read that aloud.

14   A.  "We assert that this JV is an attempt to monopolize the

15   sports streaming industry and eliminate competition."

16           You want me to keep going?

17   Q.  Sure.

18   A.  Yep.

19           "Their proposed venture is, we believe, just the

20   latest example of the sports cartel's attempt to block and

21   steal Fubo's vision of what a sports streaming bundle should

22   look like, resulting in billions of dollars in damages to our

23   business.  We consider the defendants' pernicious contractual

24   terms and other anticompetitive practices borderline

25   racketeering.  As stated in our complaint, this sports cartel

1  has levied content rates on us that are 30 to 50 percent-plus

2  higher than those of other distributors, forced us to license

3  unwanted nonsports content there" —— sorry —— "nonsports

4  content, their must-have sports programming, imposed

5  above-market penetration rates for this content, and restricted

6  our ability to offer certain features while permitting

7  competitors in their own vertically integrated service to do

8  so"

9  Q.  Do you believe that to be true?

10  A.  I do.

11  Q.  When you speak to your shareholders, do you have to be

12  careful about making projections of lost subscribers because it

13  will affect the market?

14  A.  Yes, we have to be very careful.

15  Q.  So were you cautious about that until you actually had

16  better information?

17  A.  Yes.

18  Q.  And when you referred to the ordinary course, what you just

19  read, was that the ordinary course of dealing?

20          MR. LEVANDER:  Objection.  Leading.

21          THE COURT:  It's OK on redirect.

22          MR. HANSEN:  No further questions, your Honor.

23          THE COURT:  Any recross, Mr. Levander?

24          MR. LEVANDER:  No, your Honor.  Thank you.

25          THE COURT:  Mr. Ryan?

O86HFub6          Gandler - Redirect

1          MR. RYAN:  No, your Honor.

2          THE COURT:  OK.  Mr. Gandler, thank you very much.

3     You're excused.

4          Mr. Hansen, you can call your next witness.

5          MR. HANSEN:  Mr. Duffy will call our next witness.

6          THE COURT:  Welcome, Mr. Duffy.

7          MR. GIDEON:  Thank you.  Gavan Duffy Gideon on behalf

8     of Fubo.  Tom Mathers is our next witness.  In light of the

9     court's ruling yesterday, we think it would be most efficient

10    for the Court to seal the courtroom during Mr. Mathers'

11    testimony which will deal almost exclusively with negotiations

12    over carriages agreements and terms of carriages agreements.

13         THE COURT:  Thank you, Mr. Gideon, for raising that.

14         OK.  So, ladies and gentlemen, if you are not a lawyer

15    — well, let me ask the parties, and you might want to take a

16    moment to confer.  We had discussed a couple of options, one

17    being outside counsel only; one being that the party

18    representatives, including in-house counsel, can stay, and the

19    members of the public have to leave.  So I don't know if you

20    know, Mr. Gideon, what you want to do, where we are in terms of

21    Mr. Mathers, or if you need to confer with defense counsel for

22    a moment, that's fine.

23         MR. GIDEON:  I think we need to confer.  These are

24    defendants' concerns.  We'd keep it open if we could.

25         THE COURT:  All right.  Why don't you just confer, and

O86HFub6          Gandler - Redirect

1  let's make a decision about what we're going to do so that,

2  once Mr. Mathers is here, we're all on the same page.

3          (Counsel conferred)

4          THE COURT:  Counsel, I should have said this earlier,

5  but just so you know, we have a live feed to our in-house press

6  room from the request of our in-house press.  So just when you

7  all are conferring, if your microphone is live, you just want

8  to be careful.  I just don't know how much it picks up.

9          MR. LEVANDER:  I've noticed if you hold it down, it

10  goes off.

11          THE COURT:  Yes.

12          MR. LEVANDER:  But if you take your finger off, it

13  doesn't go red, it goes back to green.

14          THE COURT:  Right.  Just be mindful of that.

15          MR. GIDEON:  If I understand correctly, your Honor, I

16  think the parties have agreed to keep all counsel who were

17  within ⸻ or fell within the parameters of the protective

18  order, so all litigation counsel as well as Ms. DiGioia here

19  for this testimony.

20          THE COURT:  OK.  So in light of that, I have to excuse

21  all members of the public and the press.  We'll turn off the

22  live feed to the press room.

23          Ms. Verneus, if you can do that.

24          And everyone who is not an outside counsel or a lawyer

25  for a party needs to be temporarily excused.

O86HFub6            Gandler - Redirect

1              MR. RYAN:  And it's only those in-house counsel, your

2      Honor, who are authorized under the parties' protective order.

3              THE COURT:  Understood.  Once the courtroom is clear,

4      I'll just ask the lawyers for the parties to look around and

5      confirm for the record that they are satisfied that no

6      unauthorized persons are in the courtroom.

7              Thank you all.  We'll reopen the doors once this part

8      of the hearing is concluded.

9              (Continued next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O86HFub6          Gandler - Redirect

1          (Courtroom sealed)

2          MR. GIDEON:  Your Honor, just one point for clarity,

3     these are all Fubo-produced documents.  There were at least two

4     Fubo counsel who weren't privy to documents produced by

5     defendants under the protective order, but who we would ask to

6     stay — who we'd ask for permission to stay because these are

7     all Fubo-produced documents.  I don't understand defendants to

8     disagree, but I just want to confirm on the record.

9          MR. RYAN:  I think it would be simplest for us to

10    comply with existing order.  We've agreed on a category of

11    in-house counsel — we've agreed on a category of in-house

12    counsel who are litigators who do not negotiate carriage

13    agreements as part of their ordinary daily responsibilities,

14    and that seems to me like the right category that the parties

15    have agreed on previously.  I'm not sure why we would vary from

16    that.

17         MR. GIDEON:  Again, these are all Fubo documents,

18    documents that Fubo has been privy to, documents Fubo's counsel

19    is able to access at any time.  We're not going to be asking

20    about any documents.

21         THE COURT:  I don't think anyone from a party needs to

22    be excused if it's their own documents.  So on the

23    representation that all the documents at issue for Mr. Mathers

24    are Fubo's own documents, I'm not going to exclude Fubo

25    representatives, and the same will go for defendants, right?

O86HFub6          Gandler - Redirect

1    When we get to a point in the hearing where we need to close

2    the courtroom for defendants' businessperson testimony and the

3    documents at issue are documents that Disney or Fox produced

4    from their own records, then I think also, if the plaintiffs

5    objected, I would reject their suggestion that people from the

6    company who have access to the documents in their regular

7    course of business need to be excused.

8                MR. RYAN:  Makes sense, your Honor.

9                THE COURT:  Can I just ask counsel for all parties to

10   take a moment and look around the courtroom and satisfy

11   yourselves that no one is present who is unauthorized.

12               MR. GIDEON:  I think it all looks good from Fubo's

13   perspective, your Honor.

14               THE COURT:  Mr. Gideon, do you prefer to go by

15   Mr. Duffy or Mr. Gideon?

16               MR. GIDEON:  Mr. Gideon would be great.

17               THE COURT:  Mr. Ryan, for defendants, are you

18   satisfied that no one that's unauthorized is present?

19               MR. RYAN:  Yes, your Honor.

20               THE COURT:  I'll just note for the record, again, I've

21   closed the courtroom in accordance with the procedures I

22   outlined this morning and yesterday's conference.

23               And with that, Mr. Gideon, you can call your witness.

24               MR. GIDEON:  Thank you, your Honor.  Fubo calls Todd

25   Mathers to the stand.

O86HFub6          Mathers - Direct

1          THE COURT:  I'm sorry.  You can come forward.

2          Just so the counsel understands what's happening, I

3    sent a member of my staff to the press room just to confirm,

4    since this is the first time we're doing it, that the live feed

5    is successfully off.  So we'll just wait for that to happen,

6    but in the meantime, we certainly can swear in Mr. Mathers.

7          Just remain standing, sir.

8          Ms. Verneus, could you swear in the witness, please.

9    TODD MATHERS,

10        called as a witness by the Plaintiff,

11        having been duly sworn, testified as follows:

12         THE COURT:  If you're comfortable, Mr. Gideon, you can

13   just do your introductory questions while we're waiting for

14   confirmation.

15   DIRECT EXAMINATION

16   BY MR. GIDEON:

17   Q.  Please state your name for the record.

18   A.  Todd Mathers.

19   Q.  Who is your current employer, Mr. Mathers?

20   A.  Fubo.

21   Q.  And when did you first start working for Fubo?

22   A.  June of '22.

23   Q.  What is your current position with the company?

24   A.  Head of content acquisition.

25   Q.  And have you held that same position during your entire

O86HFub6          Mathers - Direct

1    time at Fubo?

2    A.  Yes.

3    Q.  Who do you report to at Fubo?

4    A.  David Gandler.

5    Q.  And what are your responsibilities as head of content

6    acquisition?

7    A.  For the United States, generally to acquire content.

8    Q.  Does that content include linear television networks?

9    A.  Yes.

10   Q.  And are you responsible for negotiating carriage agreements

11   with programmers?

12   A.  Yes, I'm the lead negotiator.

13   Q.  How long have you worked in the live pay TV industry,

14   Mr. Mathers?

15   A.  Since April 2000.

16   Q.  What companies did you work for in the industry prior to

17   joining Fubo?

18   A.  I first started at DirecTV, and then DirecTV was ultimately

19   merged with AT&T, so I worked for that company.  And that —— I

20   stopped working there at the end of 2020, and then in June

21   of '21, I began working at Verizon, with a similar position

22   that I have now, head of content acquisition.  I worked there

23   for one year, and then in June of '22, I went over to Fubo as

24   head of content acquisition.

25              THE COURT:  And, Mr. Gideon, just so everyone knows,

O86HFub6        Mathers - Direct

1   we're confirmed that the live feed is off, so you can just

2   carry on.

3          MR. GIDEON:  Excellent.  Thank you.

4   Q.  How did your responsibilities at AT&T, DirecTV, and Verizon

5   compare to your responsibilities at Fubo?

6   A.  Well, as I said, at A —— sorry, at Verizon and at Fubo, I

7   was head of content acquisition.  When I was at AT&T, me and

8   another person, we basically split all of the content deals,

9   and then we report up to the head of our group.

10  Q.  How many distribution agreements with programmers have you

11  helped negotiate over the course of your career?

12  A.  Over the 24 years, just hundreds and hundreds of carriage

13  agreements.

14  Q.  Could you provide an example of a distribution agreement

15  you negotiated before joining Fubo.

16  A.  Sure.  I think, you know, the best example, XXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  Q.  Are you familiar with all of the defendants in this case?

25  A.  Yes, I've done multiple carriage agreements with each of

O86HFub6          Mathers - Direct

1  the defendants during the course of my career.

2  Q.  Are you familiar with the linear networks that each

3  defendant owns?

4  A.  Yes.

5  Q.  And are you familiar with the sports programming that each

6  defendant controls?

7  A.  Yes.

8  Q.  How would you describe, at a high level, the defendants'

9  sports programming?

10  A.  They have the rights for the best and —— the best sports

11  programming, which we would regard as must have, in the sense

12  that there's the four pro leagues —— NBA, NHL, MLB, and NFL ——

13  would be deemed must have for sports fans to have access to,

14  and I would also add, based on my experience, men's college

15  basketball and men's college football.  And they control at

16  least 80 percent of the national live sports rights.

17  Q.  Based on your firsthand experience in the industry,

18  Mr. Mathers, what impact, if any, does the defendants' control

19  of must-have sports content have on negotiations between the

20  defendants and distributors?

21  A.  Yes.  Based on my experience, it's a tremendous impact in

22  two regards:  They use that must-have sports content to force

23  distributors to carry not only to carry nonsports content but

24  carry it on a very broad basis such that distributors are

25  forced to distribute the nonsports content to a lot of

O86HFub6          Mathers - Direct

1    customers who don't want to pay for that content because they

2    don't watch it.  So it greatly increases the customer's bill.

3    Without that must sports leverage, distributors would want to

4    carry the nonsports at a much lower percentage of their base.

5    Q.  Do you have a slide deck to assist with your testimony

6    today, Mr. Mathers?

7    A.  Yes.

8              MR. GIDEON:  Permission to publish, your Honor?

9              THE COURT:  Yes.

10   Q.  Does Fubo currently license any networks from Disney?

11   A.  Yes.

12   Q.  What, if any, sports networks does Fubo license from

13   Disney?

14   A.  Yes, they have two types of sports networks.  They have the

15   national sport networks, which carry national sporting events,

16   which are the ESPN networks, and then they have regional sports

17   networks of college, which is ACC and SEC, and they are those

18   — those games are broadcast on a regional basis.

19             THE COURT:  Can I ask you, Mr. Mathers, the PowerPoint

20   deck that we're using as a demonstrative here, did you

21   participate in its preparation?

22             THE WITNESS:  Yes.

23             THE COURT:  So have you seen these slides before?

24             THE WITNESS:  Yes.

25             THE COURT:  And confirmed their accuracy from your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O86HFub6          Mathers - Direct

1    perspective?

2              THE WITNESS:  Yes, your Honor.

3              THE COURT:  OK.  Go ahead, Mr. Gideon.

4    BY MR. GIDEON:

5    Q.  Where on the slide are the sports networks you just

6    referred to?

7    A.  On the left side.

8    Q.  Does Fubo license any nonsports networks from Disney?

9    A.  Yes.  So on the right side, you have the kids-oriented

10   networks of the Disney Channels, and then we used to carry

11   these networks that were owned by Disney, but then Disney

12   subsequently sold the Nat Geo and FX channels to Fox.

13   Q.  Disney sold those channels to Fox?

14   A.  Yes.

15   Q.  OK.

16   A.  Sorry, sorry, reverse.  Sorry.  Fox sold the FX and Nat Geo

17   channels to Disney.  Sorry, got reversed.

18   Q.  No worries.

19              Those sports and nonsports networks that Fubo licenses

20   from Disney, are they licensed as part of a bundle?

21   A.  Yes.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXX

24   Q.  Is there a name for that sort of requirement?

25   A.  Yeah, the tool they used to achieve that is a minimum

O86HFub6          Mathers - Direct

1  penetration; XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3  XXXXXXXXXXXXX

4  Q.  Have you been part of any content negotiations with Disney

5  since you joined Fubo?

6  A.  Yes.  We renewed the parties' carriage agreement XXXXXXXXX.

7  Q.  Did you lead those negotiations?

8  A.  Yes.

9  Q.  Who were your primary negotiating counterparts at Disney

10  during those negotiations?

11  A.  Yeah, there was a whole team.  It consisted of the most

12  senior person, Sean Breen, and I spoke to him a handful of

13  times as part of those negotiations.  And then more frequently,

14  I spoke to Lauren Morrisey, Pete O'Connell, and then Sarah

15  Flood was part of the team, and there were some other people on

16  the team as well.

17  Q.  So was Mr. Breen involved in all of the discussions between

18  Fubo and Disney last year?

19  A.  No, I would say just a handful.  Sometimes we would have

20  one-on-one conversations.  I've known Sean for over a decade.

21  And then sometimes he would be part of a group call with his ——

22  his Disney team.

23  Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXX

O86HFub6            Mathers - Direct

1   XX  XXXX

2   Q.  Did you make those requests verbally or in writing?

3   A.  I made it repeatedly verbally and repeatedly in writing.

4   XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   Q.  I'd like to now turn to PX 135.

8           Mr. Mathers, do you have a binder in front of you?

9   You might not.

10  A.  No, I'm sorry.

11          MR. GIDEON:  Permission to approach the witness, your

12  Honor?

13          THE COURT:  Yes.

14  A.  Sorry, what was the number?

15  Q.  PX 135, and it will also be on the screen in front of you.

16  A.  Oh, OK.  Great.  Thanks.

17  Q.  Do you recognize this document, Mr. Mathers?

18  A.  Yeah.  This is an email I sent on June 30 last year to the

19  Disney team, and then Sarah Flood replied.

20  Q.  Was this email drafted as part of renewal negotiations with

21  Disney last year?

22  A.  Yes.

23  Q.  I want to refer you to the third bullet on the second page.

24  A.  Got it.

25  Q.  That bullet begins, "Teams to discuss protections for

O86HFub6          Mathers - Direct

1    Fubo."

2              Do you see that?

3    A.  Yes.

4    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6              Do you see that?

7    A.  Yes.

8    Q.  Could you explain what you were referring to there?

9    A.  Yeah.  So Bob Iger had recently announced before our

10   renewal negotiations had commenced that Disney intended to

11   eventually offer the ESPN linear network on a DTC, direct to

12   consumer, basis, so on a streaming basis, à la carte, which was

13   a game changer because no programmer had done that with a

14   linear network.  And what this meant for us was that ESPN was

15   going to have a huge competitive advantage because they were

16   going to be able to offer sports to sports fans without

17   requiring sports fans to buy nonsports networks that they don't

18   watch, and they also wouldn't have to pay for that.  So that

19   would be a huge competitive advantage because Fubo, like other

20   distributors, has to —— has to make customers pay for, you

21   know, almost all of Disney's networks.

22             MR. GIDEON:  OK.  We can take that down, and I want to

23   turn to PX 134.

24   Q.  Are you familiar with this document, Mr. Mathers?

25   A.  Yes.  Again, this is an email from me to the Disney team,

O86HFub6          Mathers - Direct

1    and then Sarah Flood replied.

2    Q.  I want to refer you to the paragraph that begins "as

3    discussed," at the top of the second page.

4    A.  Got it.

5    Q.  Do you see the paragraph I'm referring to?

6    A.  Yes.

7    Q.  In the last two sentences of that paragraph, you wrote:

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13          Do you see that?

14   A.  Yes.

15   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   A.  Well, because we're essentially a sports-centric platform.

18   So most of our customers are sports fans, and we don't want ——

19   we want to provide customers choice.  So we don't want to tell

20   the sports fan, hey, you don't have to pay for a network that

21   you don't want to watch, like Freeform, or maybe they don't

22   have kids so they don't —— they obviously wouldn't want to pay

23   for kid networks.

24          So XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXand so that ——

O86HFub6          Mathers - Direct

1    obviously, the more networks a customer has to pay for, the

2    higher their bill.  So because Disney was selling ESPN DTC, or

3    would sell ESPN DTC à la carte, and they were already selling

4    ESPN+ à la carte, they were free of that burden and so could

5    offer sports at a dramatically lower price.

6    Q.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXX

10   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXX

18   Q.   Does Fubo currently license any networks from Warner Bros.

19   Discovery?

20   A.   No, not currently.

21   Q.   Does Fubo ever licensed any networks that are currently

22   owned by Warner Bros.?

23   A.   Yes.  We carried the Turner networks until 2020, and then

24   we carried the Discovery network until April of this year.

25   Q.   OK.  Let's break those down.

1    You referred to the Turner networks first.  Do the

2  Turner networks include sports networks?

3  A.  Yes, the —— on the slide, the networks on the left are

4  their sports networks.

5    THE COURT:  And just for the transcript, the slide

6  that's being shown is PDX 303.

7    MR. GIDEON:  Thank you, your Honor.

8  Q.  OK.  Then the Discovery networks —— if we could advance to

9  what I believe is PDX 304.

10    Do the Discovery networks include sports networks?

11  A.  Generally, they do not.

12  Q.  Are these the Discovery networks shown on PDX 304?

13  A.  Yes, on the right side, under nonsports networks.

14  Q.  So take a step back to the Turner networks.  Why did Fubo

15  stop carrying the Turner networks in 2020?

16  A.  Because we were forced into an impossible situation because

17  we were paying above-market economics for the defendants'

18  networks and other networks, so we couldn't afford to carry

19  Turner and Disney.  So we had to make a Sophie's choice.  So

20  Disney has a lot more sports than Turner, so we decided to drop

21  Turner, and in lieu of Turner then launch the Disney networks,

22  including the ESPN sports networks that we've discussed.

23  Q.  If Fubo had the choice, would Fubo prefer to license the

24  Turner networks or Disney's nonsports networks?

25  A.  Yeah, if we could get unbundling and if we could get market

O86HFub6          Mathers - Direct

1    economics, we could afford to carry all those networks, because

2    we want to be a content store.  We want to give customers

3    choice where they could walk in and say, OK, I choose this

4    network and/or I —— I don't watch this network, so I don't want

5    to pay for that, but I watch this other network.

6         So, yeah, in a perfect world, we want to offer

7    customers choice and not force them to pay for networks that

8    they don't watch, which is what bundling is.

9    Q.  Since 2020, has Fubo asked Warner Bros. about licensing the

10   Turner networks again?

11   A.  Yes.

12   Q.  When?

13   A.  Excuse me?

14   Q.  When did Fubo do that?

15   A.  Well, we had, as I stated, Discovery expiring this year in

16   April.  So as part of the exploration, we made a few offers

17   where we offered to carry the Turner networks.

18   Q.  If you could turn, Mr. Mathers, to JX 21, or refer to it on

19   your screen.

20        Are you familiar with this document, Mr. Mathers?

21   A.  Yes.

22   Q.  What is it?

23   A.  It's an email from me to Scott Miller, who's my counterpart

24   —— he's the head of distribution for Warner Bros. Discovery ——

25   and then his reply.

O86HFub6          Mathers - Direct

1    Q.  Focusing on the email that you wrote, Mr. Miller, in the

2    first sentence, he referenced the Discovery renewal.  Could you

3    just explain again what the Discovery renewal was that you were

4    referring to here.

5    A.  Sure.  Our carriage agreement for the Discovery networks

6    was expiring in April of this year.

7    Q.  In the next sentence you wrote, "As I raised in our last

8    call" ──

9          THE COURT:  Sorry.  Pause one moment, Mr. Gideon,

10   because the back door is open.

11          Just, folks, everyone, when you leave during a time

12   the courtroom is sealed, if you can leave through the door

13   that's to my left, because this door to my right in the back is

14   not only problematic, as we know from earlier, but because it

15   has the ADA-compliant opening, when it gets opened, it closes

16   extremely slowly.

17          OK.  We're closed now.  Go ahead, Mr. Gideon.

18          MR. GIDEON:  Thank you.

19   Q.  The second sentence of the paragraph we were just looking

20   at, you wrote:  "As I raised in our last call, we want to carry

21   the Turner networks but not the Discovery networks because

22   Turner has sports and Discovery does not.  On that call, you

23   stated that you could not agree to that and that I have passed

24   that on to my leadership."

25          Do you see that?

O86HFub6          Mathers - Direct

1    A.  Yes.

2    Q.  How did Warner Bros. respond to this request?

3    A.  Well, on that call was Scott Miller.  He said immediately

4    there's no way they could allow us to carry Turner without

5    having to carry Discovery.

6    Q.  And the rejection of that request, it was — the request —

7    excuse me, the rejection, was it verbal or in writing?

8    A.  It was on that call, and then I confirmed it in this email.

9    Q.  Does Fubo currently license any networks from Fox?

10   A.  Yes.

11   Q.  Does Fubo currently license any nonsports networks from

12   Fox?

13   A.  Yes.  We carry their news network, which is Fox News, then

14   we also carry their Fox Business channel as well.

15   Q.  I believe you began to reference this earlier, but has Fubo

16   in the past licensed any additional nonsports networks from

17   Fox?

18   A.  Yes.  Before they sold those networks, we did carry them,

19   and again, those are the FX channels and the Nat Geo channels,

20   which are nonsports networks.

21   Q.  And PDX 305 is the slide where those nonsports networks are

22   shown on the slide?

23   A.  Yes.

24   Q.  Where on the slide are those nonsports?

25   A.  I'm sorry, on the right are the nonsports.

O86HFub6          Mathers - Direct

1    Q.  Has Fox licensed its sports and nonsports networks to Fubo

2    as part of a bundle?

3    A.  Yeah.  XXXXXXXXXXX, they force us to distribute all their

4    networks, sports and nonsports, to all of our subscribers and

5    make our subscribers pay for them.

6    Q.  Over the course of your 24-year career in the pay TV

7    industry, Mr. Mathers, have you ever been part of any

8    negotiation where any of the defendants agreed to license their

9    sports networks without their nonsports networks?

10   A.  No.  In my career, I've —— none of the defendants have ever

11   offered to unbundle their sports networks from their nonsports

12   networks, nor even discuss that, where they raised it.

13   Q.  Have you personally asked for unbundled sports every time

14   over the course of your career that you have negotiated with

15   the defendants?

16   A.  No.

17   Q.  Why not?

18   A.  Because the defendants have made it clear that the only way

19   to get their must-have sports is to carry also their nonsports

20   content.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O86HFub6          Mathers - Direct

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   Q.  What's a min pen, just for clarity?

4   A.  Yeah.  That's saying the number —— the percentage of subs

5   you're going to deliver based on your total subscriber base.

6   Q.  Are you familiar with the specific carriage agreements that

7   Fubo has reached with each of the defendants in this case?

8   A.  Yes.

9   Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXX

16  Q.  During renewal negotiations with Disney last summer, did

17  Fubo request any adjustments to any of its penetration

18  requirements?

19  A.  Yes.

20  Q.  What sorts of changes did Fubo ask for?

21  A.  Well, you know, again, our main goal was to reduce our

22  economics, and there's three factors for economics in these

23  deals:  It's rate, which is a per-sub rate you pay every month;

24  then it's packaging and pen; and then it's also rebates that

25  sometimes programmers give distributors.  So one of the key

O86HFub6          Mathers - Direct

1    ways to reduce our economics was to reduce the number of

2    subscribers we are delivering their networks to.  So, you know,

3    we first tried to unbundle, as I discussed, sports from

4    nonsports, and then we also tried to reduce penetrations,

5    minimum penetrations.

6    Q.  You refer to ——

7          THE COURT:  Mr. Gideon, sorry, can I just ask a

8    clarifying question.

9          Mr. Mathers, we heard some testimony about the

10   percentage of advertising revenue that an MVPD keeps versus

11   what might go back to the distributor, to the programmer.

12         THE WITNESS:  Right.

13         THE COURT:  Is that something that there's industry

14   standard on, or is that also the subject of negotiation in

15   these types of agreements?

16         THE WITNESS:  It's generally industry standard because

17   once they've established —— you know, generally in these bigger

18   networks, it's two minutes per hour that distributors get the

19   right to sell, and so if you're just —— if you're doing a new

20   deal, it's hard to change that because everybody else is at two

21   minutes.  So it's basically *de facto* standard.

22         THE COURT:  Just to make sure I understand, if I'm

23   watching ESPN on Fubo, two minutes of each hour —— two minutes

24   of the advertising in each hour will be sold to advertisers by

25   ESPN or Disney directly, and the remainder of the advertising

O86HFub6          Mathers - Direct

1    is sold by Fubo?

2              THE WITNESS:  Sorry.  It's the reverse, your Honor.

3              THE COURT:  OK.  That's why I just want to make sure I

4    understand.

5              THE WITNESS:  A distributor like Fubo would get two

6    minutes per hour to sell, and then the remainder of the

7    advertising, roughly, let's say, 14 minutes less the two

8    minutes, would be sold by the programmer.

9              THE COURT:  OK.  And that arrangement, when you're

10   talking about MVPD as distributors, whether they're physical or

11   virtual, is pretty standard across the industry?

12             THE WITNESS:  Yeah.  The technology of their platform

13   doesn't matter.  Everybody gets the same allotment of time to

14   sell.

15             THE COURT:  All right.  Understood.

16             So go ahead, Mr. Gideon.  Thank you.

17             MR. GIDEON:  Of course.

18   BY MR. GIDEON:

19   Q.  I want to refer you now, Mr. Mathers, to JX 24.

20   A.  OK.

21   Q.  Are you familiar with this document?

22   A.  Yes.  This is the email I sent to the Disney team.

23   Q.  Do you see there's a header about a third of the way down

24   the page that says "Disney/Fubo 2023 Renewal Discussion

25   Topics"?

O86HFub6          Mathers - Direct

1    A.  Yes.

2    Q.  And then below that there's a subheading that says

3    "Packaging"?

4    A.  Yes.

5    Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7             XXXXXXXXXXXXXXX

8    XX  XXXX

9    XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   Q.  And I'd like you now to turn to PX 131.  It will also be up

15   on your screen.

16             Are you familiar with this document, Mr. Mathers?

17   A.  Yes.  These are two emails I sent to the Disney team.

18   Q.  And I'd like to turn to the bottom of the second page.

19             There's a section at the very bottom of that page,

20   titled "Economics/Rates."  Do you see that?

21   A.  Yes.

22   Q.  And then number two in that section refers to minimum

23   penetration rates.  Do you see that?

24   A.  Yes.

25   Q.  Does this line here reflect a request that Fubo made of

O86HFub6          Mathers - Direct

1    Disney last summer?

2    A.   Yes.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXX

5    Q.   And then there's a series of networks listed there.   Are

6    any of the networks listed sports networks?

7    A.   No.   These are all nonsports.   The Disney ones and Freeform

8    are geared towards kids, and the other ones are just general

9    entertainment.

10   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXX

12   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   Q.   If we could advance to the next slide, the slide labeled

14   PDX 306.

15          What does this slide show, Mr. Mathers?

16   A.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXX

19   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   Q.   Did Fubo's previous carriage agreement with Turner include

O86HFub6          Mathers - Direct

1    any provisions that restricted the ways in which Fubo could

2    distribute Turner's networks to consumers?

3    A.  Yes.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    Q.  Are you familiar with the joint venture that the defendants

7    announced in February?

8    A.  Yes.

9    Q.  Are you familiar with the networks that will be included in

10   the joint venture?

11   A.  Yes, it will be their sports linear networks.

12   Q.  Will ESPN+ be included in the joint venture's product?

13   A.  Yes.

14   Q.  Has Disney ever allowed Fubo to license ESPN+?

15   A.  No.  We sought to resell that streaming service, XXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   Q.  When did these communications with Disney occur?

24   A.  During their carriage agreement negotiations.

25   Q.  OK.  Setting aside ESPN+, with respect to the other

O86HFub6          Mathers - Direct

1    networks that would be included in the joint venture, is Fubo

2    currently able to offer those other networks in a standalone

3    package like the package that Venu will offer?

4    A.  No.

5    Q.  Why not?

6    A.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   Q.  Has Disney ever offered to license ABC and the ESPN linear

12   networks to Fubo on a standalone basis?

13   A.  No, they've never offered it, and then when we requested it

14   repeatedly, every time they rejected it out of hand.

15   Q.  Has Fox ever offered to license Fox, FS1, FS2 and the Big

16   Ten Network to Fubo on a standalone basis?

17   A.  No, they've never offered that.

18   Q.  Has Warner Bros. ever offered TNT, TBS, or truTV to Fubo on

19   a standalone basis?

20   A.  No.  Again, they've never offered that.  As I stated, when

21   we requested it repeatedly, unbundling rights, they rejected

22   it.

23   Q.  Based on your 24 years of firsthand experience in the

24   industry, do you expect the JV to affect negotiations between

25   distributors like Fubo and defendants?

O86HFub6        Mathers - Direct

1   A.  Yes, dramatically.

2   Q.  Why do you expect the JV to affect negotiations

3   dramatically?

4   A.  Well, based on my experience and, you know, I've seen a lot

5   of marketing analysis internally at the various companies I've

6   been at, the number one concern of customers is their bill, how

7   high is their bill.  So the lower the bill, obviously, the

8   better for them, and the bill is higher the more networks they

9   have to pay.  So the fact that Venu will only charge customers

10  for sports networks almost cuts their bill in half compared to,

11  you know, Fubo's retail price because Fubo has to force

12  customers to pay for sports networks and nonsports networks.

13  So that gives Venu just a tremendous — I mean, I can't — I

14  can't say it enough, tremendous competitive advantage,

15  completely ties our hands, and will prevent us from competing

16  based on that price differential.

17  Q.  Would Fubo offer a package of sports programming like the

18  JVs if it were able to?

19  A.  Absolutely.

20  Q.  Why?

21  A.  Because it would dramatically lower the price that our

22  customers would have to pay to access the must-have sports that

23  defendants have.  It would cut it almost in half.

24          MR. GIDEON:  No further questions, your Honor.

25          THE COURT:  I know you haven't even started yet,

O86HFub6          Mathers - Cross

1    Mr. Ryan, but do you have a sense at the outset of how long you

2    expect to be?

3          MR. RYAN:  I'm going to try to do this in half an

4    hour, your Honor.

5          THE COURT:  OK.  Let me just check with the reporters.

6          (Discussion off the record)

7          THE COURT:  We'll try to finish with Mr. Mathers

8    today.

9          MR. RYAN:  I've got a binder, which if I may approach,

10   your Honor.

11         THE COURT:  Perfect.  Ms. Ghotbi will give you a hand.

12         (Discussion off the record)

13   CROSS-EXAMINATION

14   BY MR. RYAN:

15   Q.  All right.  Good afternoon, Mr. Mathers.  Good to see you

16   again.

17         Fubo has carriage agreements with a number of

18   programmers other than the defendants here, right?

19   A.  Yes.

20   Q.  And you have negotiated Fubo's carriage agreements with

21   programmers since June of 2022?

22   A.  Yes.

23   Q.  Is it the case that many of those agreements with

24   programmers other than defendants have packaging provisions

25   that require Fubo to carry networks in its base package or most

O86HFub6          Mathers - Cross

1   widely distributed package?

2   A.  Yes, some of them do.

3   Q.  And is it also the case that many of those agreements have

4   penetration requirements that require Fubo to carry certain

5   networks to a minimum proportion of subscribers?

6   A.  Yes.

7   Q.  Do you agree with me that Fubo's carriage agreements with

8   programmers other than defendants in this case are obstacles to

9   Fubo's ability to offer a sports-only package?

10  A.  If we launched a sports —— if we launched, for example,

11  Venu's linear networks in a package by itself, yes, there are

12  some other networks that we would have to include in that

13  package because they require packaging requirements such as

14  100 percent minimum penetration.  So that means we would have

15  to add them to that package.

16  Q.  Fubo has existing contracts with a number of programmers

17  other than defendants here that would require inclusion of

18  their networks in any Venu-like package that Fubo could offer,

19  right, sir?

20  A.  Yes, there are some networks that would require that, but,

21  obviously, we could call these programmers up anytime we want

22  and ask for a change, and then many of our large carriage

23  agreements —— XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, those are up this year

25  and next.  So we could use those expirations as an opportunity

O86HFub6          Mathers - Cross

1  to change those requirements.

2  Q.  Let me ask you about some of those programmers.  So Crown

3  Media, am I right that Crown licenses several Hallmark channels

4  to Fubo?

5  A.  That's correct.

6  Q.  Hallmark broadcasts family-oriented entertainment

7  programming, right?

8  A.  Yes.  It's a nonsports content, yes.

9  Q.  Right.  Hallmark doesn't broadcast any live sports, right?

10 A.  Not that I'm aware of.

11 Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14 XXXXXXXXXXXXXXXXXX

15 XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17 XXXXXXXXXXXXXXXXXX

18 Q.  Why don't we take a look at that.  So let's look at DX 147.

19 A.  I'm sorry.

20 Q.  This will be tab 5 in your binder, sir?

21 A.  Thanks.

22 Q.  It's DX 147.  Why don't we put that up on the screen.

23         Do you agree this is Fubo's carriage agreement with

24 Crown Media effective May 2, 2018?

25 A.  Yeah, it's an amended agreement to the original, looks

O86HFub6         Mathers - Cross

1    like.

2    Q.  All right.  If we go to the second page of this agreement,

3    do you see in the middle of the page there's the row called

4    "Networks" that defines three different networks:  The Hallmark

5    Channel, Hallmark Movies & Mysteries, and Hallmark Drama?

6    A.  Yes.

7    Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXX

15          Do you see that, sir?

16   A.  Yes.  By the way, I think this amendment —— there was a

17   subsequent amendment to this contract.

18   Q.  Yes, and I'll get to that in just a moment.

19          But do you agree that that's what DX 147 required Fubo

20   to do?

21   A.  That's —— that's what it says in HC.

22   Q.  All right.  And Fubo signed up this agreement with Crown

23   Media even though Crown Media had no sports leverage over Fubo,

24   right?

25   A.  Hallmark doesn't have any sports content.

O86HFub6          Mathers - Cross

1    Q.  OK.  And so Crown was not exerting any of what you

2    described as must sports leverage over Fubo, right?

3    A.  Yeah, Hallmark does not have any sports.

4    Q.  All right.  Let's look at page 4 of this same document,

5    DX 147.

6            Do you see toward the top of the page there's a row

7    for HMM, the Hallmark Movies & Mysteries channel?

8    A.  Yes.

9    Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   Q.  All right.  So now could you please look at tab 6 of your

20   binder, sir.

21           And do you see there DX 148?  And do you see that that

22   is a second amendment to the agreement between Fubo and Crown?

23   A.  Yes.

24   Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O86HFub6        Mathers - Cross

1    A.    Yes.

2    Q.    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XX    XXXX

8    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXX

12   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXX

14   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XX    XXXXXXXXXXX

18               XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXX

25   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O86HFub6          Mathers - Cross

1    XXXXXXXXXXXXXX

2    XX   XXXX

3    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   Q.   Now let me ask you about another programmer, CBS Paramount.

22   They license the former Viacom networks to Fubo, isn't that

23   right?

24   A.   Yes.

25   Q.   And those networks include BET, CMT, Comedy Central, MTV,

O86HFub6          Mathers - Cross

1    Nickelodeon, Nick Jr., the Paramount Network, TV Land, and VH1,

2    right?

3    A.  Yes.

4    Q.  And those are all entertainment networks with little or no

5    sports, right, sir?

6    A.  That's correct.

7    Q.  And you participated in a renewal of the agreement with CBS

8    Paramount in December 2022, right?

9    A.  Yes, I did.

10   Q.  And so you're aware that those former Viacom channels must

11   be distributed on Fubo's most widely distributed package of

12   programming services, right?

13   A.  I don't recall exactly.  That was almost a couple years

14   ago, so I don't know.  But, yeah, I mean, most of their

15   networks have to be distributed widely, that's correct.

16   Q.  And do you recall that Fubo's agreement with CBS Paramount

17   requires Fubo to distribute these nine Viacom networks to XX

18   XXXXXXXXXXXXXXXX of Fubo's subscribers?

19   A.  Again, I can't recall the exact penetration, but the key

20   there is it's the same thing as defendants.  They use their

21   must-have sports to force distributors like Fubo to distribute

22   their core nonsports networks to all —— to most of their

23   subscribers.  And CBS has must-have sports, including a lot of

24   NFL games and a lot of college football games.

25   Q.  And this is a matter of contract between Fubo and CBS

O86HFub6         Mathers - Cross

1   Paramount.  None of the three defendants in this case have

2   anything to do with that, right?

3   A.  Not that I'm aware of.

4   Q.  OK.  Let's look at tab 8 of your binder, sir.  That will be

5   DX 143.

6          Do you see that this is the binding term sheet between

7   Viacom and Fubo that then eventually ended up being renewed in

8   the December 2022 carriage agreement you worked on?

9   A.  Yes.

10  Q.  And do you see in paragraph 3 that the agreement defines as

11  the core services these nine channels that I've been talking

12  about?

13  A.  Yes.

14  Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXX

19  XX  XXXXX Just to be sure, so is this tab 8 —— I'm looking for

20  the date.  This is the '22 agreement?

21  Q.  No, this is —— sorry.  This is a previous agreement, and

22  I'm then about to show you that it was renewed on the same

23  terms.  But this was the agreement that was in place between

24  Fubo ——

25  A.  OK.  Thanks for clarifying.

O86HFub6          Mathers - Cross

1    Q.  —— and Viacom previously.

2              THE COURT:  I just caution you, Mr. Mathers, two

3    people can't talk at the same time.  Even if it's

4    conversational like just happened and no one's yelling over

5    each other, it's very difficult for our reporters to get an

6    accurate transcript.  So just be sure that you're not talking

7    when Mr. Ryan's talking, and he'll take the same care.

8              THE WITNESS:  Yes, your Honor, I'll be more careful.

9    Thank you.

10              MR. RYAN:  So will I.  I appreciate that.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O862Fub7                    Mathers - Cross.

1   BY MR. RYAN:

2   Q.  So let's look at one more provision on the same page,

3   paragraph 6(b).  Do you see -- this is still on DX 143.  This

4   provision requires Fubo to distribute the core services of

5   these non-Viacom networks to at least 95 percent of Fubo TV

6   subscribers.

7   A.  Yes.

8   Q.  And then if we look at DX 177, this is tab 7 of the binder,

9   do you recognize this as the agreement that you negotiated with

10  CBS Paramount in December 2022?

11  A.  Oh, sorry.  What tab number is this for me?

12  Q.  This is tab 7, sir.

13  A.  Thanks.

14  Q.  I hope it is, at least it should be DX 177.

15  A.  Yes, this is the agreement we entered into in '22.

16  Q.  If we go to page 2, you see paragraph 2 extends the term to

17  September 30, 2025.

18  A.  Yes.

19  Q.  And then do you see paragraph 3 provides that, except as

20  provided in a section below of this term sheet, the existing

21  carriage and carriage requirements set forth in the cable

22  agreements, which is a defined term above, shall continue

23  during the term and remain unmodified?

24  A.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O862Fub7                    Mathers - Cross.

1   XXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   Q.  Let me ask you about one more network, which is the Game

7   Show Network.  You are familiar with that, right?

8   A.  Yes.

9   Q.  That's licensed by Sony.  Right?

10  A.  Yes.

11  Q.  And Sony does not license any cable networks with sports

12  content, right?

13  A.  That's correct.

14  Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XX   XXXXXXXXXXXXXXX

17  Q.  That was an agreement that you worked on with Sony earlier

18  this year, right?

19  A.  Yes.

20  Q.  All right.  And so, again, Sony didn't exert any sort of

21  must-sports leverage over Fubo in getting Fubo to agree to

22  distribute the Game Show Network in its base package, did it?

23  A.  No.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O862Fub7                     Mathers - Cross.

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   Q.  And if Fubo were to offer a Venu-like sports package, it

4   would be contractually required by this agreement with Sony to

5   include the Game Show Network, wouldn't it?

6   A.  I'm sorry.  I would have to look at the actual packaging

7   language.

8   Q.  Okay.  Let's look at tab 11, which should be DX 179.  Do

9   you recognize this as an agreement you negotiated for Fubo with

10  Sony in May of this year?

11  A.  Yes.

12  Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XX  XXXX

15  XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XX  XXXX

19  XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXX

21  XX  XXXX

22  XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXX

O862Fub7              Mathers - Cross.

1    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXX

6    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXX

10   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XX    XXXXXXXXXXXXXXXXXXXXXXXXXX

15   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXX

24   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O862Fub7              Mathers - Cross.

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XX   XXXXXXXXXXXXXXXXXXXXXXXXX

3

4    XX   XXXXXXXXXXXXXXXXXX

5    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXX

9    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXX

14   Q.  All right.  And I have included the terms here on this

15   demonstrative, 2.1.  You have got no reason to believe that any

16   of these programmers other than defendants' would agree to

17   waive their contractual terms with Fubo, do you?

18   A.  Well, everything is subject to negotiation.

19   Q.  Now, you talked previously about how you have negotiated

20   over the years with a number of programmers and on behalf of

21   various companies who you have worked for who have agreed to

22   bundle programming deals, right?

23   A.  Sorry.  Could you say that again.

24   Q.  You testified on direct that over the years you have worked

25   for a number of different companies, including Fubo and also

O862Fub7                    Mathers - Cross.

1    others, and you negotiated with programmers on many carriage

2    agreements that had bundled carriage arrangements, right?

3    A.  Yes, and in many of those agreements the programmers had

4    required that distributors like us force customers to pay for

5    sports and even nonsports networks that they don't want.

6    Q.  These bundling requirements that you have testified to,

7    they came from many programmers other than the defendants here,

8    right?

9    A.  Yes.  Several other programmers require that type of

10   bundling.

11   Q.  And you negotiated separately with each of those

12   programmers, didn't you?

13   A.  Yes, those negotiations would be separate from the

14   defendants' negotiations.

15   Q.  You have got no reason to believe that any of those

16   programmers were working together in the licensing negotiations

17   that they were having with you in the various jobs that you

18   have had over the years, right?

19   A.  No.  Each of those programmers would just be negotiating on

20   their own behalf and not with other programmers.

21   Q.  Okay.  Now, you testified on direct that you had

22   discussions with Disney about a planned ESPN direct to consumer

23   product, right?

24   A.  Yes that was announced by Bob Iger.

25   Q.  All right.  So that's a product that Disney has announced

O862Fub7              Mathers - Cross.

1   publicly as a forthcoming product, right?

2   A.  Yes.

3   Q.  Announced already by the summer of 2023.  It still hasn't

4   come out, right?

5   A.  Yes.

6   Q.  And you are aware that that's often referred to as a

7   flagship?

8   A.  Not really, but that's a fine term.

9   Q.  Okay.  Are you aware that the planned ESPN direct to

10  consumer Flagship product is a different product from the ESPN

11  linear network?

12  A.  Oh, sorry.  I thought it was the same -- I thought it was

13  whereby -- when Iger announced, I thought it was taking ESPN

14  linear network and offering it on a D to C basis whereas ESPN+

15  is not a replicate of ESPN linear network.  It has different

16  content.

17  Q.  Right.  So I'm about to ask you about ESPN+.  That's the

18  next topic.  So let me just stick for a moment with the

19  Flagship direct to consumer product.  Are you aware that that

20  proposed product is going to have interactive features and

21  provide a user experience that is not available by watching the

22  ESPN linear network?

23  A.  No, I'm not aware of that.

24  Q.  And so when you have these discussions with Disney in the

25  summer of 2023 when you were asking whether Fubo could carry

O862Fub7                    Mathers - Cross.

1    the ESPN direct to consumer product, if I'm understanding you

2    right, you were unaware of these features of the planned

3    Flagship product, right?

4    A.  I was not aware of the features.

5    Q.  Okay.  So now let me ask you about ESPN+.  That's an

6    existing streaming direct to consumer product, right?

7    A.  Yes.

8    Q.  That tends to carry mostly more niche sports, right?

9    A.  I'm not certain of all of the sports it carries.

10    Q.  But --

11    A.  Generally sports streaming service.

12    Q.  It is certainly different from the ESPN network or any of

13    the other Disney linear networks, right?

14    A.  Yes, I would agree with that.

15    Q.  Okay.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19    XXXXXX

20    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23    Q.  Now, am I right, then, in the course of the carriage

24    agreement renewal negotiations with Disney, in the summer of

25    2023, you sent Disney two markups of the agreement.

O862Fub7                Mathers - Cross.

1    A.  Yeah.  I know we sent them two, yes.  I don't know if that

2    was the only ones; but, yeah, we were sent others.

3    Q.  Do you recall that one was on June 30, 2023 and the other

4    on July 21, 2023?

5    A.  June 30 and July 21?

6    Q.  Yes, sir.

7    A.  That sounds about right.

8    Q.  So I ask you to turn to tab 14 of the binder.  You should

9    see there JX 26.

10             MR. RYAN:  I will just state for the record, your

11   Honor, this JX 26, the cover e-mail is the same as we saw on

12   direct testimony in PX 135, but there are voluminous

13   attachments that are included in JX 26.

14   A.  Sorry, what number?

15   Q.  Tab 14 of the binder.

16   A.  Thank you.

17   Q.  Hopefully that's a fat document, cover e-mail from you, you

18   sent on June 30, with attachments that are identified here

19   in -- underneath the e-mail header on the first page, right?

20   A.  Yes.

21   Q.  All right.  And so these are Fubo's proposed edits to the

22   2023 carriage agreement with Disney that you sent on June 30,

23   2023.  Right?

24   A.  Yes.

25   Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O862Fub7                    Mathers - Cross.

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XX    XXXXXXXXXXXXXXX

4    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    A.    Give me a second.  I'm just looking at something, please.

10          Sorry, can you say the question again?

11   Q.   Yes.  Am I right that, for those channels for which Fubo

12   requested a reduction in the minimum penetration rate from 100

13   percent to 85 percent, Fubo did not request a change to the

14   requirement that the channels be carried in the base package.

15   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXX

17   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXX

19   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22          XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O862Fub7                    Mathers - Cross.

1    A.  What page is that on?

2    Q.  This is on the bottom of page 24 of JX 26, it's paragraph

3    4.2.  This is your markup of the agreement with Disney, right?

4    A.  Okay.  Yeah.  I see it now.

5    Q.  So you, I guess, changed the name of the company from

6    fuboTV to Fubo, but you have kept in there that Fubo must

7    distribute each network in accordance with the minimum

8    penetration rate set forth in schedule A, right?

9    A.  Yes.

10   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   Q.  All right.  And so there is a schedule A for each of the

17   networks.  Let's start with schedule A-3, which is on page 77

18   of this document, JX 26.  This is for a channel called

19   Freeform, right?

20   A.  What page is that?

21   Q.  Page 77, headed schedule A-3.

22   A.  Got it.

23   Q.  So you are aware that Freeform is an entertainment channel

24   aimed at teens and young adults, right?

25   A.  Yes.

O862Fub7                    Mathers - Cross.

1    Q.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XX   XXXX

5    Q.   That's Fubo's request to Disney that you are sending here

6    in this document JX 26, right?

7    A.   Yes, that's our request.

8    Q.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XX   XXXXX

17   XX   XXXXXXXXXXXXX

18           THE COURT:  Can I just ask you, Mr. Mathers, just to

19   make sure I am oriented correctly in time, this markup that we

20   are seeing, did this come before or after the e-mails we

21   discussed earlier where you had asked the Disney programming

22   people for -- to do sports separate from entertainment and they

23   had said no?

24           THE WITNESS:  Yes.  I mean, the chronology is out of

25   the gate we complained that ESPN was giving themselves the

O862Fub7                    Mathers - Cross.

 1    right to sell sports *à la carte* currently through ESPN+ and

 2    then their intent to do it through ESPN D to C.  So we said

 3    that from the get-go and complained about that and complained

 4    that would greatly impair our ability to compete with them with

 5    their streaming services because they were doing sports only

 6    and we had to do this bundle.  So throughout our discussions, I

 7    repeatedly requested that.  So this --

 8              THE COURT:  I -- go ahead.  Finish your answer.

 9              THE WITNESS:  So I had conversations with them, you

10    know, throughout -- even before we sent this and then

11    throughout the negotiations where we constantly brought this

12    up.

13              THE COURT:  So by the time you are sending this markup

14    back and forth, those conversations had already been had and

15    rejected.  Am I correct --

16              THE WITNESS:  Yes.

17              THE COURT:  -- about that?

18              Okay.  Go ahead, Mr. Ryan.  And I am in no way trying

19    to rush you, Mr. Ryan.  You can have as much time as you need.

20    But just where do you think you are?  Because I want to be

21    mindful of the court reporters' time.

22              MR. MICHALOPOULOS:  About ten minutes, your Honor.

23              THE COURT:  Why don't we do this.  Since I'm sure

24    Mr. Gideon will have a little bit of redirect, I think we ought

25    to -- if it's a convenient place for you to stop, Mr. Ryan,

O862Fub7            Mathers - Cross.

1   that we would stop and resume in the morning.  But if you are

2   on a topic and want to just finish that up with a couple more

3   questions, I'm happy to let you go a couple more questions.

4            MR. RYAN:  Why don't I just ask a couple more

5   questions because they actually relate to your Honor's

6   follow-up question.

7            THE COURT:  Okay, fine.

8   BY MR. RYAN:

9   Q.  So this document we are looking at, JX 26, at tab 14 of the

10  binder, this was Fubo's markup to the long form agreement with

11  Disney and it's an attachment to your June 30 e-mail, right?

12  A.  Yes.

13  Q.  So if we go back to the e-mail, the first page of JX 26,

14  and if we scroll down about midway on the page, a little bit

15  more, there we go, so if we look at this -- the fifth bullet

16  point under the heading SVOD/DTC that begins, "Teams to discuss

17  protections," just highlight that paragraph, please?

18  A.  Yes.

19  Q.  This is the bullet point that you testified to on direct,

20  right?

21  A.  Yes.

22  Q.  And it was -- and you testified on direct that it was about

23  being able to license ESPN's sports channels on an unbundled

24  basis from the nonsports channels, right?

25  A.  Yes.

O862Fub7

1  Q.  All right.  Isn't this bullet in fact about the launch of

2  ESPN DTC, that is the product now known as Flagship, and your

3  request to Disney that Fubo be able to provide the ESPN

4  Flagship service?  Isn't that what this bullet is about, sir?

5  A.  Well, this is -- this is not talking about reselling that

6  streaming service like we talked about us reselling ESPN+.

7  This is about us having the same unbundled rights that ESPN was

8  giving itself.  So we wanted to sell the linear network ESPN by

9  itself *à la carte* without having to force customers to pay for

10  any other networks --

11  Q.  All right.

12  A.  -- just like ESPN was going to do.

13  Q.  And if I have understood your testimony right, you were

14  unaware at that time──you may still be unaware today──that the

15  ESPN direct to consumer Flagship product is a different product

16  from the linear network, right?

17  A.  I'm not aware of that.

18      MR. RYAN:  Okay.  Why don't we break for the day here

19  and I will try to wrap up quickly in the morning tomorrow.

20      THE COURT:  Okay.  Why don't we do this.  Ms. Verneus,

21  if you can turn the live feed back on and if someone can just

22  open the doors.  Stay where you are for a second.

23      MR. RYAN:  If I could just ask the Court to inform the

24  witness that he --

25      THE COURT:  Yes, of course.

O862Fub7

1            MR. RYAN:  Not to have substantive discussions

2    overnight.

3            THE COURT:  Yes.  I plan to do that.  Thank you,

4    Mr. Ryan.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O862Fub7

1              (In open court)

2              Okay.  So we are going to end the hearing day for

3     today.  For any members of the public who were excluded from

4     the courtroom previously, I expect Mr. Mathers's testimony will

5     continue -- will begin tomorrow morning at 9:30, that I expect

6     Mr. Mathers to be on the stand for another 15 to 20, 25 minutes

7     maybe, during which time the courtroom will be sealed again

8     until his testimony is concluded.

9              So just for planning purposes, who, Mr. Gideon, who do

10    you expect to call after Mr. Mathers?

11             MR. GREEN:  We will be calling Mr. Ben Grad and

12    Mr. Sal Marchesano will be our next two witnesses.

13             THE COURT:  Okay.  Anything else either counsel wants

14    to raise before I excuse Mr. Mathers for the evening?

15    Mr. Ryan?

16             MR. RYAN:  Not from us, your Honor.

17             MR. GIDEON:  Not from Fubo, your Honor.

18             THE COURT:  Mr. Mathers, you are excused.  I remind

19    you, because you are still on cross, please do not discuss with

20    your counsel anything about the content of your testimony.  You

21    will be forbidden from doing that until your testimony is

22    finished.  Okay?  And otherwise have a great evening.

23             All right.  We are adjourned.  I will see you all at

24    9:30.

25             COUNSEL:  Thank you, your Honor.
              (Adjourned to Wednesday, August 7, 2024, at 9:30 a.m.)

1                          INDEX OF EXAMINATION

2    Examination  of:                                    Page

3    JAMES TRAUTMAN

4    Direct By Mr. Schultz  . . . . . . . . . . .57

5    Cross By Mr. Jurata  . . . . . . . . . . . .81

6    Cross By Mr. Earnhardt . . . . . . . . . . .98

7    Redirect By Mr. Schultz  . . . . . . . . . . 100

8    DAVID GANDLER

9    Direct By Mr. Hansen . . . . . . . . . . . . 104

10   Cross By Mr. Levander  . . . . . . . . . . . 128

11   Cross By Mr. Ryan  . . . . . . . . . . . . . 182

12   Redirect By Mr. Hansen . . . . . . . . . . . 188

13   TODD MATHERS

14   Direct By Mr. Gideon . . . . . . . . . . . . 196

15   Cross By Mr. Ryan  . . . . . . . . . . . . . 220

16

17

18

19

20

21

22

23

24

25