O87HFub1_redacted

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      FUBOTV INC., et al.,
 3
                      Plaintiffs,
 4
                 v.                        24 Civ. 1363 (MMG)
 5
      THE WALT DISNEY COMPANY, et
 6    al.,
                                           Hearing
 7                  Defendants.            Redacted
      ------------------------------x
 8                                         New York, N.Y.

 9                                         August 7, 2024
                                           9:40 a.m.
10
      Before:
11
                       HON. MARGARET M. GARNETT,
12
                                           District Judge
13

14                          APPEARANCES

15    KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC
            Attorneys for Plaintiffs
16    BY:  MARK HANSEN
            JOSHUA HAFENBRACK
17          GAVAN W.D. GIDEON
            THOMAS G. SCHULTZ
18          MATTHEW WILKINS
            GEOFFREY BLOCK
19          DENNIS HOWE
            KATHERINE TONDROWSKI
20          RACHEL ANDERSON

21
      CRAVATH SWAINE & MOORE LLP
22          Attorneys for Defendants Disney, ESPN, Hulu
      BY:  ANTONY L. RYAN
23          J. WESLEY EARNHARDT
            YONATAN EVEN
24          DAMARIS HERNÁNDEZ
            MICHAEL P. ADDIS
25
```

O87HFub1_redacted

DECHERT LLP
        Attorneys for Defendant Fox Corp.
BY:  ANDREW J. LEVANDER
        STEVEN A. ENGEL
        STEVEN BIZAR
        ERICA FRUITERMAN
        MICHAEL H. McGINLEY
        JOHN (JAY) JURATA, JR.


WEIL GOTSHAL & MANGES LLP
        Attorneys for Defendant Warner Bros. Discovery, Inc.
BY:  ADAM C. HEMLOCK
        DAVID L. YOHAI
        ELAINA K. AQUILA
        ROBERT W. TAYLOR
        THEODORE E. TSEKERIDES


STEPTOE & JOHNSON, LLP
        Attorneys for EchoStar Corporation
BY:  PANTELIS MICHALOPOULOS



ALSO PRESENT:  Gina DiGioia, General Counsel, FuboTV
                       Alec Lipkind, General Counsel, Disney

1          (Hearing resumed)

2          THE COURT:  Good morning, everyone.  Welcome back.

3   Please be seated.

4          So we're here for day two.  Before we close the

5   courtroom to continue Mr. Mathers' testimony, I just want to

6   inform the lawyers and the public of just a few observations.

7   I think, having observed Mr. Mathers' testimony yesterday,

8   obviously, we're currently in the thick of material that is

9   appropriately sealed, but I think, for the lawyers, I know we

10  have several more witnesses coming who are kind of in the mold

11  of Mr. Mathers, and I think it would be more appropriate to

12  leave the courtroom open for essentially the introductory

13  module for those witnesses.

14         I appreciate, Mr. Gideon, your efforts at efficiency

15  and maybe flagging maybe we should do it now.  I don't think

16  there's any time savings, and certainly for these witnesses,

17  the early questions about tell us who you are, tell us about

18  your background, what's your current role at the company where

19  you work, general descriptions of how the business works, what

20  a carriage agreement is, what is the relationship between

21  distributors and programmers —— I think all of those, it seems

22  to me, can smoothly and normally be asked and answered without

23  any tortured dancing around sealed material in a way that can

24  be on the public record and I think would be illuminating for

25  people in the public and press who are interested in this

O87HFub1_redacted

1    hearing.

2            Then when — again, I'll be relying on counsel — when

3    you know you're about to pivot to questions that either are

4    designed to elicit or could elicit the things we've discussed

5    that are highly sensitive, like the specific terms of

6    agreements between the witness' employer and the defendants' or

7    other distributors, I think at that point we'll seal so that

8    that questioning on those topics can proceed naturally and

9    efficiently.  And then when that subject is concluded, if the

10   witness has more to say, then we can reopen the courtroom,

11   we'll do that then.

12           So I just think we're all engaged in a process of

13   trying to find the best balance between the right of public

14   access and the need to protect extremely confidential

15   competitive information.  So that's my view, and we'll continue

16   to refine it as we go along.

17           I think we're ready to get Mr. Mathers back.  Anything

18   before we do that?  Anything either counsel wants to raise

19   before we begin?

20           Mr. Gideon?

21           MR. GIDEON:  Nothing for Fubo, your Honor.

22           THE COURT:  Mr. Ryan?

23           MR. RYAN:  Nothing for us.

24           THE COURT:  While we're getting Mr. Mathers, I'll say

25   we are continuing with the sealed portion of Mr. Mathers'

O87HFub1_redacted

1    testimony.  If you are not a lawyer for the parties or a Fubo

2    employee, you have to leave the courtroom for now.  If you

3    remain in the area, we'll reopen the doors when we return to a

4    nonsealed portion of the proceedings.  So thank you very much.

5            Ms. Verneus, can you just make sure the live feed is

6    turned off to the press room.

7            Thank you, everyone.  Hopefully, we won't keep you out

8    for too long.

9            (Continued next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

XO87HFub1 - SEALED          Mathers - Cross

1              (Courtroom sealed)

2              THE COURT:  Mr. Mathers, welcome back.  I'll just

3     remind you that you're still under oath, sir.

4              Mr. Ryan, whenever you're ready.

5     TODD MATHERS, resumed.

6     CROSS-EXAMINATION CONTINUED

7     BY MR. RYAN:

8     Q.  Good morning, Mr. Mathers.

9     A.  Good morning.

10    Q.  So when we broke yesterday, I think we were discussing your

11    negotiations with Disney in the summer of 2023 about the

12    renewal of Fubo's carriage agreement with Disney?

13    A.  Yes.

14    Q.  I believe that on your direct testimony, you referred to

15    four different written communications with Disney, so I'd just

16    like to touch briefly on those in chronological order.

17             So the first one is in the big binder that's perching

18    at the edge.  Not that one, but the one that you received from

19    Fubo's counsel that's at the front.  Sorry to inconvenience

20    you.

21             So this will be JX 24, Mr. Mathers.

22             THE COURT:  What was the tab number again, Mr. Ryan?

23             MR. RYAN:  It would be JX 24 in the Fubo binder, so

24    that's the one that has the white spine from yesterday.

25    Q.  All right.  Are you with me, sir, on an email that you sent

XO87HFub1 - SEALED            Mathers - Cross

1    on June 17 of 2023?

2    A.  Yes.

3    Q.  And there's an agenda here in the middle of the first page?

4    A.  Yes.

5    Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XX  XXXX

9    XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXX

15   XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXX

20   Q.  Let's go to tab 14 in the binder that I handed you

21   yesterday.  So that's the other big binder with the black

22   spine.  And this will be tab 14, towards the back of the

23   binder, and this is JX 26.  Again, for the record, this is a

24   more complete copy of what on direct was PX 135.

25              We see here right down toward the bottom of the first

XO87HFub1 - SEALED          Mathers - Cross

1  page, second to last bullet, XXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10 XXXXXXXXXXXXXX

11 XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14 XX   XXXXXXXXXXXXXXXXXXXX

15 XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16 XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21 Q.  And you're not aware of any distributor in the industry,

22 are you, sir, that has received a right to offer Disney's ESPN

23 Flagship product, right?

24 A.  No, they wouldn't give unbundling to anybody.

25 Q.  All right.  So now let's look at PX —— sorry, this will be

XO87HFub1 - SEALED          Mathers - Cross

1   tab 15, so the very next tab in the binder you're on.  It will

2   be DX 159.

3          For the record, this is a more complete record of what

4   on direct was PX 134.

5          So this is now your July 21 email to Disney, July 21,

6   2023?

7   A.  Yes.

8   Q.  Top of the second page, in the third full paragraph, begins

9   "as discussed," you say you're offering a compromise, whereby

10  Fubo will forgo getting protections on ESPN going direct to

11  consumer, right?

12  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXX

14  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XO87HFub1 - SEALED          Mathers - Cross

1    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXX

11   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   Q.   All right.  I'm right, though, sir, you don't see anything

21   inaccurate here in DDX 2.20 as a summary of Fubo's two written

22   requests, the one from June 30 and the one from July 31?

23   A.   This is so complicated there's no way I can verify just by

24   looking at it.  I didn't work on this.

25   Q.   I understand.  But you were Fubo's lead negotiator, right?

XO87HFub1 - SEALED          Mathers - Cross

1    A.  Yes.

2    Q.  And you've looked at these documents in preparation for

3    your testimony at this trial, right?

4    A.  Yeah, I looked at it.  I didn't memorize them.

5    Q.  All I'm asking you, sir, is you don't see anything

6    inaccurate in DDX 2.2 as far as a summary of what Fubo's

7    requests were, right?

8    A.  I'd literally have to go through each line.  I'm sorry.  I

9    don't want to waste any time, but there's a lot of information

10   here.

11   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXX

18   XX    XXXXXXXXXXXXXXXX

19   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   A.  I'm sorry.  Where should I go?

21   Q.  OK.  Sorry.  Down at the bottom of page 2 of PX 131, do you

22   see numbered paragraph 2?

23   A.  Yes.

24   Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXX

XO87HFub1 - SEALED          Mathers - Cross

1   XX   XXXXXXXXXXXXXXX

2   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   They already had ESPN+ out, which is a sports-centric streaming

9   service.  So they were already selling sports separate from

10  nonsports.  This was not just a key issue for Fubo but for the

11  entire industry.

12  Q.  All right.

13  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  XXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  Q.  Your testimony, sir, is that you had dozens of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

XO87HFub1 - SEALED          Mathers - Cross

1   conversations, including very heated conversations, in the

2   summer of 2023 where you made, if I'm understanding you right,

3   a XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXX

6   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   Q.  All right.  And when I asked you at deposition who at

10  Disney you had those repeated conversations with, you told me

11  that you can't recall, right?

12  A.  What I said in my deposition is I'm human and that was over

13  a — you know, almost a year, maybe over a year ago.  Like I

14  said, we had dozens and dozens of conversations.  So, no, I

15  could not recall the exact minute XXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  Q.  All right.  So your testimony, just so I understand it, is

18  that this was very important to you, you were very upset about

19  it, there were heated conversations, and you can't tell me who

20  at Disney you had any of these conversations with, right?

21  A.  Well —

22  Q.  That's your testimony?

23  A.  Sure.  All my conversations — again, as I said yesterday,

24  I had a handful of conversations with Sean Breen, I think

25  mostly one-on-one, I think some with other people from the

XO87HFub1 - SEALED          Mathers - Cross

1   Disney team and my team.  And then, yeah, then I had numerous

2   conversations with the rest of the Disney team.  So because

3   they were repeated conversations over, you know, probably more

4   than a month, yeah, I could not pinpoint, but I had repeated

5   conversations with the same people.  It was Sean Breen, Lauren

6   Morrisey, and Pete O'Connell.  So these three people are the

7   people I primarily spoke with.

8           When we're on those phone calls, obviously, probably

9   Zooms too, there would be other people from my team and their

10  team, but those were the three primary Disney people that I

11  spoke to over and over again.  I didn't speak to anybody

12  different.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  Q.  And you can't tell me, though, which of those three people

15  you had those specific conversations with.  That's what you

16  told me at deposition, right?

17  A.  Well, I can assure you I said that to all three people at

18  different times.

19  Q.  Can I refer you, sir, to your deposition, which is in this

20  binder.

21          Is it tab 3?  Yes, it's tab 3 in this binder.

22          You recall that I took your deposition, Mr. Mathers,

23  right?

24  A.  Yes.

25  Q.  And that was over Zoom, right?

1    A.  Yes.

2    Q.  And if you could turn in tab 3 of the binder to page 208 of

3    the transcript, using the little numbers in the upper right.

4    A.  Sorry.  Which page?

5    Q.  Page 208.

6              THE COURT:  Mr. Mathers, each page has four pages, and

7    they have a tiny number in the upper right of each quadrant.

8    So it's the quadrant that's labeled page 208.  Do you see where

9    it is?

10             THE WITNESS:  I think I'm getting there.  Yeah.

11             MR. RYAN:  Thank you, your Honor.

12             THE COURT:  You're welcome.  Lawyers know what you're

13   talking about, but regular people don't.

14             MR. EARNHARDT:  I understand.  Hard to recall a day

15   before Min-U-Scripts in my life, but I'm sure there was.

16   Q.  All right.  So do you see, sir, at line 12 on page 208, I

17   asked you the question:  "So you say you have a vivid

18   recollection, but you don't know how many conversations it was

19   or who you had them with, right?"  And your answer was:  "I

20   don't recall who I specifically said that to," right?

21             MR. GIDEON:  Objection, your Honor.  Improper

22   impeachment.  This is consistent with the witness' testimony

23   and at the very least I'd ask that he read the complete answer.

24             THE COURT:  I agree.  The answer immediately following

25   clarifies and is consistent with what Mr. Mathers has said on

XO87HFub1 - SEALED          Mathers - Cross

1   the stand today, so you can read him that whole segment ——

2          MR. RYAN:  Yeah.

3          THE COURT:  —— Mr. Ryan, if you want, but let's not

4   take it out of context.

5          MR. RYAN:  Yes.

6   Q.  So you then went on to say:  "I would bet everything I can

7   —— everything I have that I am sure I said it to both —— I'm

8   sure I said it to all three.  Because trust me, it was a common

9   theme."

10         That was your testimony, right?

11  A.  Yeah, that's what it says.

12  Q.  Now, let me ask you about —— strike that.

13         Let me ask you about when you first considering that

14  Fubo should file an antitrust action against programmers.

15         THE COURT:  Mr. Ryan, before you go on to that topic,

16  I just want to ask a question about the topic you've been

17  asking about.

18         MR. RYAN:  Please.

19         THE COURT:  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXwhy

24  did you not just walk away from the Disney negotiations

25  entirely and say, like, if you can't give us the thing that's

1   most important, we're done here?

2           THE WITNESS:  Yes, your Honor, that's a great

3   question.  Because as I stated yesterday, the best example is

4   when we dropped Turner, we had about 150,000 subs, and then we

5   launched Disney with ESPN networks with sports.  We grew to

6   over a million.  That was ── having the ESPN sports networks

7   with their must-have sports we're all familiar with, I mean,

8   that led to exponential growth for us.  And if we dropped

9   Disney, including the ESPN networks, we would lose all that

10  growth, and that's why having these must-have sports is

11  essential.

12          And so that's why, when they launch Venu where they're

13  going to be offering just sports at half the price, I mean,

14  that's a threat to our existence.  I mean, that's how critical

15  sports is.  And so we're not able to compete with Venu because

16  they're going to have sports at half the price.  We have the

17  same sports but at double the price, and there's no choice for

18  customers.

19          So it's both ── you know, it's both a matter of having

20  sports at a competitive price, but, yeah, if we had dropped

21  Disney, it would have destroyed our business.

22          THE COURT:  OK.  Thank you.

23          Go ahead, Mr. Ryan.

24  BY MR. RYAN:

25  Q.  You were already considering in 2023 that Fubo should file

XO87HFub1 - SEALED         Mathers - Cross

1  an antitrust action against programmers, right?

2  A.  Yes, I think there were some emails I could look at, but I

3  believe that's correct.

4  Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXX

18  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24  Q.  You would agree with me that Fubo's competitors include

25  cable TV companies like Comcast and Charter?

XO87HFub1 - SEALED          Mathers - Cross

1   A.  Yes.  I would regard any pay TV provider to be a

2   competitor.

3   Q.  So that would include satellite TV companies like DirecTV

4   or DISH?

5   A.  Yes.

6   Q.  Telephone fiber companies like Verizon Fios?

7   A.  Yes.

8   Q.  Regardless of what technology is used to deliver an MVPD,

9   you would agree that Fubo competes, regardless of technologies,

10  against all MVPDs, right?

11  A.  Yes.  I regard any pay TV provider to be a competitor ——

12  sorry.

13  Q.  I apologize.  There are increasingly SVOD services that

14  include live sports, correct?

15  A.  Yes.

16  Q.  For example, Peacock includes Olympic content, right?

17  A.  Yes.

18  Q.  And you would agree with me that rights holders are

19  increasingly making sports content available to

20  direct-to-consumer platforms, right?

21  A.  There's a huge difference, because a pay TV provider has

22  basically the full offering of sports, where, let's say, for

23  example, Peacock, it just has their sports.  So that's a

24  dramatically less amount.  Whereas Venu is three large media

25  companies which will represent over 80 percent of the national

XO87HFub1 - SEALED          Mathers - Cross

1  live sports, so they're much akin to a pay TV provider.

2  Q.  All right.  But you would agree with me, wouldn't you, sir,

3  that rights holders are increasingly making sports content

4  available on direct-to-consumer platforms, right?

5  A.  Yeah, they're making their own sports content available on

6  their own streaming, so it's very limited.

7  Q.  And this trend in the industry is a problem for Fubo's

8  business, right?

9  A.  Well, it's causing disaggregation.  I think it's very

10  frustrating for consumers trying to find it.  So if they take

11  ── obviously, if they take a sport event off the pay TV

12  platform, yes, that's a problem.  This disaggregation that's

13  happening where people are trying to find sports, I think in

14  the end is going to help pay TV providers because that's what

15  we do, we're an aggregator; we offer the full array of sports.

16  Q.  You would agree with me, wouldn't you, that most of the

17  deals you make are for content that other pay TV providers also

18  offer right?

19  A.  Yes, except we're my missing some of the linear networks ──

20  Q.  But the ──

21           THE COURT:  Mr. Ryan, he wasn't finished with his

22  answer.

23           MR. RYAN:  I apologize.

24           THE COURT:  He dropped his voice, so it's not your

25  fault, but let's just make sure.

XO87HFub1 - SEALED          Mathers - Cross

1          The last part of your answer, Mr. Mathers, was?

2   A.  Oh, just that we're not carrying some programming right

3   now, which is Turner, A & E, and AMC, but mostly we carry the

4   same.

5          THE COURT:  Go ahead, Mr. Ryan.

6   Q.  You would agree that the AMC networks and the A & E

7   networks have attractive content, right?

8   A.  Yeah, generally, they have nonsports content, yes.

9   Q.  And Fubo doesn't carry those services, I believe you told

10  me, because Fubo can't afford to, right?

11  A.  Right.  We can't afford to because we're paying these

12  above-market economics and because of bundling.

13  Q.  Similarly, Fubo would like to acquire direct sports rights

14  in the United States, but it's been outbid by other media

15  players, right?

16  A.  Yeah, generally, we stopped bidding for direct sports

17  because we can't afford it because of the premiums we're paying

18  for the linear networks.

19  Q.  All right.  Fubo carries almost all the regional sports

20  networks in the United States, right?

21  A.  Yeah, we carry most of them, correct.

22  Q.  And there are some MVPDs that don't carry regional sports

23  networks, right?

24  A.  That's correct.

25  Q.  So you would agree with me that there are subscribers who

1    choose to subscribe to Fubo because of its broad coverage of

2    regional sports networks, right?

3    A.  Yeah, I'm sure there are some subscribers that do that.

4    Q.  You would agree the inclusion of regional sports networks

5    is an important differentiator for Fubo against its

6    competitors, right?

7    A.  Yeah, it's an important differentiator versus pay TV

8    providers that don't have those RSNs.

9    Q.  And as announced, the Venu joint venture has not indicated

10   that it would carry any regional sports networks, right?

11   A.  I don't mean to split hairs here, but I would regard the ──

12   I was saying the SEC and ACC networks, I think, are akin to

13   RSNs because their rights are for regional distribution of the

14   games.

15   Q.  All right.  And those are college sports, right?

16   A.  Yes.

17   Q.  All right.  And so typically in the industry, when we refer

18   to regional sports networks, we're talking about local

19   geographic channels that carry primarily local Major League

20   Baseball and NBA and NHL games, right?

21   A.  That's correct.

22   Q.  And Venu's not indicating that ── Venu has not indicated

23   that it will carry any of those regional sports networks,

24   right?

25   A.  Yes, but Fubo having those pro RSNs is not going to help us

XO87HFub1 - SEALED          Mathers - Cross

1    at all to compete against Venu because Venu's price is going to

2    be almost half our price.  So it's —— again, consumers, based

3    on my experience —— I've seen a ton of marketing materials ——

4    consumers, the most important thing is price, price.  So if

5    they're faced with a decision between paying double the price

6    for a pay TV provider like Fubo versus half the price for Venu,

7    they're definitely going to —— they're going to flock to Venu.

8    I mean, Venu is going to be a juggernaut.  There can be no

9    question about this.

10   Q.   There are consumers, sports consumers, who value being able

11   to watch the Mets or the Yankees or the Knicks or Rangers and

12   who need regional sports networks, right?

13   A.   Here's the best example to explain what I was talking

14   about, the importance —— how good a differentiator RSNs are.

15   This is the best example.  YouTube TV, which is a very close

16   competitor of ours, pay TV provider, they've had exponential

17   growth, millions and millions.  I think they're at 8 or

18   9 million subscribers today.  They do not have the RSNs we have

19   at all, and their growth has been exponential and compared to

20   our —— our growth has been a fraction of YouTube TV.

21         So it shows you, yes, some subscribers will subscribe

22   to us because we have these RSNs, but it's not making a

23   difference for us being able to compete against providers that

24   don't have RSNs.  The YouTube TV example is a great example of

25   what Venu's going to do.  YouTube TV, they're killing us, and

XO87HFub1 - SEALED        Mathers - Cross

1    they have the same price we have.  So imagine how Venu's going

2    to do even if they don't have RSNs, because they're going to be

3    less, half the price.  So I think that explains the whole

4    picture.

5            MR. RYAN:  No further questions, your Honor.

6            THE COURT:  I have a couple of questions.

7            So, Mr. Mathers, again, just in your experience in

8    this industry, how would you say that Fubo executives or

9    business development people think about who the Fubo target

10   customer is?  If there's more than one kind of customer, you

11   can say that too.  Like, who is the customer?

12           THE WITNESS:  Your Honor, I mean, I don't have a ton

13   of experience in this, just general because I don't ——

14           THE COURT:  If you're not the right person to answer

15   it, you can just say you're not the right person, and that's

16   fine.

17           THE WITNESS:  I would say I'm not the right person.

18   You're going to be talking to our marketing people, so they

19   would be by far the best people.

20           THE COURT:  OK.  I will save my questions for those

21   folks, and thank you for ——

22           THE WITNESS:  Yeah, you'll be talking to Alberto.

23   He's probably the best person.

24           THE COURT:  All right.  I appreciate your candor, sir.

25   Thank you.

XO87HFub1                     Mathers - Redirect

1           Mr. Gideon, any redirect?

2           First, let me just make sure, any other defense

3    counsel want to have cross?

4           MR. LEVANDER:  No.  Thank you, your Honor.

5           THE COURT:  Mr. Gideon.

6           MR. GIDEON:  Just a few questions, your Honor.

7    REDIRECT EXAMINATION

8    BY MR. GIDEON:

9    Q.  Mr. Mathers, this will be in the binder that Mr. Ryan gave

10   you, JX 26, tab 14.  It's also on the screen in front of you.

11          For the record, on direct Mr. Mathers was asked about

12   a version of this same email that included a response from

13   Disney.  This version doesn't include a response from Disney

14   but includes the attached long-form agreement.  The exhibit we

15   used was PX 135.

16          Do you recall being asked questions by Mr. Ryan about

17   the draft long-form agreement that you attached to this email,

18   Mr. Mathers?

19   A.  First, I apologize.  My eyes are bad.  I can't see the

20   screen, so I have to look at this paper.  Don't get old.

21   Q.  No worries.  This is JX 26, which is tab 14 in the binder

22   that Mr. Ryan gave you.

23   A.  OK.  I'm there.

24   Q.  Do you recall being asked questions by Mr. Ryan about the

25   draft long-form agreement that you attached to this email?

XO87HFub1                    Mathers - Redirect

1    A.   Yes.

2    Q.   Turning to the cover email, four paragraphs below the first

3    line there's a sentence that says, "Other issues not fully

4    addressed in the long form."

5            Do you see that?  It's on your screen as well.

6    A.   Yes, I see that.

7    Q.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XX   XXXX

10   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XX   XXXX

13   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXX

16   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXX

20   Q.   Then I'd ask you to turn to the next document in that

21   binder, tab 15.  This is DX 159.

22           Do you recall being asked questions by Mr. Ryan about

23   this document?

24   A.   Yes.

25   Q.   And this is another document where you attached a long-form

XO87HFub1                      Mathers - Redirect

1   agreement, correct?

2   A.  Yes.

3   Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXX

6   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  Q.  Thank you.  We can take that down.

12          And I don't know if we'll be able to pull it up, but

13  DDX 2.2, it was a document towards the front of your binder

14  with Mr. Ryan.  I believe it was tab 2.

15          THE COURT:  Tab 2, Mr. Gideon is like a chart.

16  A.  Yeah.

17  Q.  Yes, the chart you used with Mr. Ryan?

18  A.  Yes.

19  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXX

22          THE COURT:  You're on the far right, Mr. Gideon, the

23  orange columns?

24          MR. GIDEON:  Yeah, in the orange columns.  Thank you.

25  A.  Yeah.  It says "Fubo's request," and there's a column

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

XO87HFub1                    Mathers - Redirect

1    "Packaging," and a column "Minimum Penetration," yes.

2    Q.  I think you testified about an e-mail stating something

3    similar in your direct.  Because this laid it out so nicely, I

4    thought it would be helpful to return to the document.

5           Do any of the networks in the highlighted rows include

6    sports programming?

7    A.  Yeah, the ones where we ask for 85 percent, those are

8    nonsports networks.

9    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XX   XXXXXXXXXXXXXXXXXXXXXXXX

13   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXX

19   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XO87HFub1                    Mathers - Redirect

1   XXXXXXXXX

2   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXX

14  Q.   OK.   Could we turn to PX 192.   This is going to be in your

15  other binder.   I'm sorry to ask you to keep switching.   We'll

16  try to make this fast.   It's also on the screen in front of

17  you, Mr. Mathers.

18  A.   Yeah.

19  Q.   Do you recognize this document?

20  A.   Yes.

21  Q.   What is it?

22  A.   It's the agreement we —— the new agreement we entered into

23  last year with Disney.

24  XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XO87HFub1                    Mathers - Redirect

1    A.   Yes.

2    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5            XXXXXXXXXXXXXXXX

6    XX   XXXX

7    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10            XXXXXXXXXXXXXXXX

11   XX   XXXX

12   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XX   XXXX

14   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXX

XO87HFub1                         Mathers - Redirect

1              XXXXXXXXXXXXXXXX

2      XX   XXXX

3      XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5      XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12     Q.   OK.  And then just two more questions.

13              Mr. Ryan asked you on cross whether you had any reason

14     to believe that any of the other programmers he mentioned would

15     agree to waive their contractual terms with Fubo.  Do you

16     remember that discussion?

17     A.   Yes.

18     Q.   Based on your 24 years of experience in the industry, what

19     impact, if any, do you think defendants' unbundling of their

20     sports networks would have on discussions between Fubo and

21     other programmers?

22     A.   Well, Disney, because it controls most of the sports in the

23     United States, is clearly a leader in the industry, and so if

24     they were —— I mean, they're launching Venu, which is going to

25     have many more sports than just Disney, is going to have a huge

XO87HFub1                    Mathers - Redirect

1   impact on the whole industry because it's going to push

2   everyone to want to compete with Venu.  And the only way you

3   could compete with Venu is to have the same unbundled rights

4   and to have the ability to charge a comparable price.  So

5   that's going to put pressure on everyone to try to compete with

6   Venu.

7            MR. GIDEON:  Thank you, Mr. Mathers.  Nothing further.

8            THE COURT:  Mr. Ryan, anything further?

9            MR. RYAN:  No, your Honor.

10           THE COURT:  Mr. Mathers, you're excused.  Thank you

11   very much.

12           THE WITNESS:  Thank you.

13           (Witness excused)

14           THE COURT:  What I think would be best, just to ensure

15   that any members of the public know the courtroom is reopened,

16   is why don't we take a brief break while we're getting the next

17   witness, who I think is Mr. Arad.  Is that correct, Mr. Gideon?

18           MR. JURATA:  XXXXX

19           THE COURT:  I know someone named Ben Arad.  Mr. Grad

20   of course.  It's 10:22.  We'll resume at 10:30 with Mr. Grad

21   ready to go on the stand.

22           Thank you, Mr. Mathers.

23           (Recess)

24           (Continued next page)

25

O872Fub2

```
 1              (In open court)
 2              THE COURT:  Welcome back, everyone.  You can be
 3    seated.
 4              Welcome back to our members of the public.
 5              Mr. Hansen, do you have another witness?
 6              MR. HANSEN:  Your Honor, our next witness will be
 7    called by Mr. Block, and it will be Ben Grad.
 8              THE COURT:  Mr. Grad, wherever you are, you can come
 9    forward.  Come forward to the witness area and remain standing,
10    please.
11    BENJAMIN GRAD,
12         called as a witness by the plaintiff,
13         having been duly sworn, testified as follows:
14              THE COURT:  Go ahead, Mr. block.  I'm going to
15    disappear for a second.  Pay no attention to that.  I can hear
16    you just fine.
17              MR. BLOCK:  For your Honor, this testimony will
18    concern 2018 negotiations between Fubo and the defendants,
19    which we do not expect need to be sealed based on this Court's
20    order.
21              THE COURT:  Okay.  Great.  Thank you for that heads
22    up.
23              And of course, defendants' counsel, as we get into
24    that testimony, if anyone has a different view, just let me
25    know we can take a break and discuss it.
```

XO872Fub2                           Grad - Direct

 1              MR. TSEKERIDES:  We will take it as it comes.

 2              THE COURT:  Go ahead, Mr. Block.

 3    DIRECT EXAMINATION

 4    BY MR. BLOCK:

 5    Q.  Good morning, Mr. Grad.  Can you please state your name for

 6    the record?

 7    A.  Benjamin Grad.

 8    Q.  Who is your current employer?

 9    A.  FuboTV.

10    Q.  How long have you worked there?

11    A.  About seven years.

12    Q.  What is your current position at Fubo?

13    A.  SVP strategic partnerships and operations.

14    Q.  Have you held that position for your entire time at Fubo?

15    A.  I have not.

16    Q.  What was your former role?

17    A.  SVP content strategy and acquisition.

18    Q.  In your role as content strategy and acquisitions, were you

19    responsible for negotiations with programmers concerning their

20    linear networks?

21    A.  Yes, I was.

22    Q.  Are you aware of who the defendants are in this case?

23    A.  Yes, I am.

24    Q.  And in your former role as the head of content acquisition

25    and strategy, were you responsible for negotiating with each of

XO872Fub2                    Grad - Direct

```
 1   the defendants?
 2   A.  Yes, I was.
 3   Q.  So during --
 4           THE COURT:  I'm sorry, Mr. Block.  I'm just having a
 5   little trouble hearing you, and I suspect maybe Kristen is,
 6   too.  Can you just straighten the microphone so it's a little
 7   closer to your mouth.  Thank you.
 8           MR. BLOCK:  Is this better, your Honor?
 9           THE COURT:  Yes, much.  Thank you.
10   BY MR. BLOCK:
11   Q.  Mr. Grad, during your time at Fubo, have you been part of
12   any content negotiations with Disney?
13   A.  Yes.
14   Q.  Did you lead these negotiations?
15   A.  Yes, I did.
16   Q.  Who were your primary counterparts at Disney?
17   A.  Pete O'Connell is my primary counterpart.
18   Q.  Did you ever ask to license only Disney's sports networks
19   for Fubo's base English language package?
20   A.  Yes.
21   Q.  Why did you ask to license only Disney's sports networks
22   for Fubo's basic English language package?
23   A.  Yes.  So, we believe that sports are what drives customers
24   to Fubo and services like Fubo that are live TV streaming
25   services.  So we don't seek to load our packages and content
```

XO872Fub2                     Grad - Direct

1    costs with nonsports content where we can avoid it.  That helps

2    keep prices lower to customers and helps drive customer

3    acquisition.

4    Q.  And who did you make these requests to?

5    A.  To Pete O'Connell, the proposal.

6    Q.  Do you recall whether you made these requests verbally or

7    in writing?

8    A.  Definitely in writing, and I believe verbally, too.

9    Q.  Did Disney ultimately agree to unbundle its sports networks

10   from its nonsports networks?

11   A.  They did not.

12   Q.  I would like to introduce PX 182.  It's been Bates stamps

13   as Fubo 0168596.

14        Mr. Grad, this is your binder under the PX 182 tab.

15   Are you familiar with this document?

16   A.  Yes, I am.

17   Q.  What is this document?

18   A.  This is a term sheet proposal from Fubo to Disney that

19   reflected our position for the content that we wanted to

20   acquire from Disney as well as proposed carriage, economic and

21   other terms.

22   Q.  Who is this e-mail from?

23   A.  I believe the e-mail is from myself.

24   Q.  Now, let's go to the second page of this document.  The

25   title of this document is "FuboTV-DEMN Term Sheet," correct?

XO872Fub2                        Grad - Direct

1    A.   Correct.

2    Q.   What is this attachment?

3    A.   Right.  This is the substance of the proposal for carriage

4    of Disney's broadcasting cable network services and other

5    associated content on Fubo.

6    Q.   I would like to refer you to the bottom of the second page.

7    Do you see where there is a section labeled packaging?

8    A.   Yes, I do.

9    Q.   What channels were you proposing to license for Fubo's

10   English language basic package?

11            MR. EARNHARDT:  Your Honor, I apologize.  Sorry to

12   interrupt.  But I believe we are going to get into some details

13   on carriage agreement negotiations between Disney and Fubo that

14   I do believe should be sealed, given the questioning that's

15   happening right now.

16            THE COURT:  Right.  Is that your view, Mr. Earnhardt,

17   even though this is not the current agreement between Fubo and

18   Disney but is a prior one that is now over?

19            MR. EARNHARDT:  Absolutely, your Honor.  Every single

20   negotiation in this industry is related to what's come before.

21            MR. BLOCK:  May I respond?  I'm sorry.

22            MR. EARNHARDT:  And I don't have a problem with any of

23   the questioning, but I'm just concerned that we are going to

24   see the back-and-forth here and other folks are going to see

25   the positions we took in light of the positions they took, and

XO872Fub2                      Grad - Direct

1    that's exactly the competitive concern we were concerned

2    with -- that we raised before that led to the sealing motion.

3              THE COURT:  Okay.  And just so I understand,

4    Mr. Earnhardt, are you just flagging a general concern about

5    where we might be going or about this specific question?

6              MR. EARNHARDT:  This is just -- as I understand, this

7    is Fubo's suggestion to Disney.  We are not as concerned about

8    that.  But once we get into the back and the forth and it shows

9    the position that Disney took in response, that's where I

10   believe they are competitively sensitive information.

11             THE COURT:  Mr. Block, is that where we are going?

12             MR. BLOCK:  Your Honor, I would just briefly respond

13   that yesterday, during the cross-examination of Fubo's CEO,

14   David Gandler, Mr. Levander showed a redline document between

15   Fubo and Fox to question Mr. Gandler about that.  So we are not

16   talking about the executed agreement.  We are not going to show

17   an executed agreement.  And this is from 2018.  We don't

18   believe, especially given the defendant's use of similar

19   documents, that it would be appropriate to seal it.

20             THE COURT:  Okay.  Well, let's take it one question at

21   a time and see where we go.  I am very mindful of your

22   concerns, Mr. Earnhardt, but I think especially if we are going

23   to stay focused on just the question of bundling versus

24   unbundling and that specific ask and answer, I think that we

25   are probably in a zone where we can remain open, but let's see

XO872Fub2                    Grad - Direct

1    how we go.  And you just be on alert, Mr. Earnhardt.  Before he

2    answers, let me know what you would like to do.

3              MR. EARNHARDT:  Thank you, your Honor.

4              And as an interim measure, perhaps only the specific

5    terms could be on the public -- on the nonpublic screen.

6              THE COURT:  Oh, yes.  I agree with that.  As a

7    precaution, let's not put the exhibit on the public screen.

8              MR. EARNHARDT:  Thank you, your Honor.

9              THE COURT:  And I see the plaintiff's counsel's hot

10   seat operator, as I have now learned, understands the

11   assignment, so. . .

12             MR. EARNHARDT:  Thank you, your Honor.

13             THE COURT:  Okay.

14             And just a caution to you, Mr. Grad, because, as you

15   have heard, there is some concern about the sensitivity of

16   answers you might give, your only job is to tell the truth.

17   Listen to the question, tell the truth, wait for the next

18   question.  My only caution to you is just to not answer too

19   quickly because it is possible that Mr. Earnhardt or one of the

20   other defendants' counsel might want to enter an objection or

21   make a request of the Court before you answer.  So just, you

22   know, don't be too quick out of the blocks, okay.

23             THE WITNESS:  Understood, your Honor.

24             THE COURT:  Go ahead, Mr. Block.

25   BY MR. BLOCK:

XO872Fub2                    Grad - Direct

1    Q.  Mr. Grad, in this section on packaging, what channels were

2    you proposing to license for Fubo's English language basic

3    package?

4    A.  Yes.  I was proposing ABC, ESPN, ESPN2, ESPNU, ESPN

5    Deportes, SEC Network in the SEC home market states, and ESPN

6    News.

7    Q.  And why were you proposing that Fubo carry only those

8    channels in its basic package?

9    A.  Yes.  So those are the channels as part of the Disney

10   portfolio that have a material amount of live sports content on

11   them.

12   Q.  Fubo did not want to include The Disney Channel in its

13   English language basic package, did it?

14   A.  That's correct.

15   Q.  Fubo did not want to include Freeform in its English

16   language basic package, correct?

17   A.  That's correct.

18   Q.  Fubo did not want to include Disney XD in its English

19   language basic package, correct?

20   A.  That's correct.

21   Q.  You were proposing that Fubo carry only Disney's sports

22   networks in Fubo's base package, correct?

23   A.  Yes, that's correct.

24   Q.  Now, Mr. Grad, do you recall whether Disney accepted your

25   proposal?

XO872Fub2                          Grad - Direct

1   A.  They did not.

2   Q.  What did -- did they send a counterproposal?

3   A.  Yes, they did.

4   Q.  I would like to introduce PX 183.  It is the next tab in

5   your binder, Mr. Grad.  Are you familiar with this document?

6   A.  Yes, I am.

7   Q.  And what is this document?

8   A.  So this first page is an e-mail from Disney that is a cover

9   e-mail for a counterproposal to Fubo for carriage of their

10  portfolio broadcast and cable networks on Fubo.

11  Q.  Now, I would like you to turn to page 7 of Disney's

12  counterproposal.  Under numeral 21, there is a section --

13          THE COURT:  Sorry, Mr. Block.  Just please don't

14  display the subsequent pages on the public screen for now.

15  Thank you.

16  BY MR. BLOCK:

17  Q.  Under numeral 21, there is a section entitled "Basic

18  Package."  Can you let me know when you are there?

19  A.  Yes, I am there.

20  Q.  Now, are the terms that Disney proposed in its

21  counterproposal to you different than those that we just

22  reviewed?

23  A.  Yes.

24  Q.  Now, focusing on the English language basic package, what

25  changes did Disney make to the proposal you offered?

XO872Fub2                      Grad - Direct

```
1    A.  Yes, so --
2                MR. EARNHARDT:  And your Honor, if we can just be
3    careful here.
4                THE COURT:  Yes.  So let me just try it, Mr. Block,
5    and see if my question can get at what you are trying to get
6    at.
7                When Disney responded to your proposal, Mr. Grad, did
8    their proposed description of the basic package include a
9    requirement to carry channels other than the Disney sports
10   channels that you were just talking about?
11               THE WITNESS:  Yes.  Yes, your Honor.
12               THE COURT:  Okay.
13               MR. BLOCK:  I'm fine with that, your Honor.
14               MR. EARNHARDT:  Thank you, your Honor.
15   BY MR. BLOCK:
16   Q.  Mr. Grad, did Fubo accept Disney's counterproposal?
17   A.  We did not accept this counterproposal.
18   Q.  Why not?
19   A.  There were a number of reasons.  There were some material
20   financial terms that were not something that we thought made
21   sense for Fubo or our customers, and that includes license fees
22   and other terms.  You know, however, the packaging portfolio
23   certainly didn't help those packaging requirements.
24   Q.  Fubo wanted only the sports content from Disney in its
25   basic package?
```

XO872Fub2                    Grad - Direct

1    A.  In our base package, yes.

2    Q.  Now, during your time at Fubo, have you ever been

3    responsible for negotiations with Fox?

4    A.  Yes, I have.

5    Q.  And during your negotiations with Fox, have you asked for

6    packaging flexibility as part of your negotiations?

7    A.  We have asked for some packaging flexibility with Fox, yes.

8    Q.  During your negotiations with Fox, did Fox ever accept any

9    of your requests for packaging flexibility?

10   A.  Not for their English language networks, no.

11   Q.  Have you ever asked Fox for them to eliminate completely

12   their penetration requirements?

13   A.  To eliminate completely their penetration requirements?

14   No, I don't think so.

15   Q.  Why didn't you ever ask for them to completely eliminate

16   those requirements?

17   A.  Yeah, it would be inconsistent with my understanding of

18   their go-to-market approach.  From my experience both at Fubo

19   and previously, I was adverse in a similar capacity in content

20   acquisition for around a decade and that would have been very

21   inconsistent with their go-to-market approach.  They always

22   seek those types of packaging requirements and as Fubo was

23   relatively newer and smaller operator, ultimately we didn't

24   want to be seen as an unproductive partner.

25            (Microphone feedback)

XO872Fub2                          Grad - Direct

```
 1              THE COURT:  I don't think it's anything you do.
 2     Either it's a Kellogg Hansen energy or it happens sometimes,
 3     and so I don't -- it's nothing you are doing.
 4              MR. BLOCK:  My apologies.
 5     BY MR. BLOCK:
 6     Q.  When did you start working in the pay TV industry,
 7     Mr. Grad?
 8     A.  Yes.  So I started working in sort of content acquisition
 9     capacity in pay TV in 2007 at Verizon.
10     Q.  Since 2007, have you ever heard of Disney ever offering any
11     distributor the right to license its sports content unbundled
12     from its general entertainment channels?
13     A.  Not that I can recall.
14     Q.  Since 2007, have you ever heard of Fox offering to unbundle
15     its sports content from its general entertainment channels?
16     A.  Not that I can recall.
17     Q.  And since 2007, have you ever heard of Warner Bros.
18     offering to license its sports content unbundled from its
19     general entertainment channels?
20     A.  No, definitely not.
21     Q.  Is Fubo sensitive about the price it charges consumers for
22     its basic package?
23     A.  Yes.
24     Q.  If Fubo was not required to purchase nonsports channels,
25     could it offer its customers additional sports channels?
```

O872Fub2                        Grad - Cross

1    A.  We might, we might do that or we might keep prices lower,

2    yes.

3              MR. BLOCK:  Pass the witness.

4              MR. TSEKERIDES:  I'm going to hand you some documents.

5              THE COURT:  Welcome to the party.

6    CROSS-EXAMINATION

7    BY MR. TSEKERIDES:

8    Q.  Good morning, Mr. Grad.  Ted Tsekerides from Weil Gotshal

9    for Warner Bros.  Good to see you again from the deposition

10   back in June.

11             Fubo currently carries nonsports networks, right?

12   A.  We do today carry some nonsports networks, yes.

13   Q.  Why don't we put up DX 19 and go to the next page.  Do you

14   remember this is one of the documents we went through at your

15   deposition.  And this is the offering from the Pro package, and

16   we see——let me see if I can use this thing here——some nonsports

17   networks there.  You have got USA.  You've got Bravo.  And what

18   is the other one there?  National Geographic. these are just

19   among the different nonsports channels that are on Fubo right

20   now, right?

21   A.  Yes.

22   Q.  Okay.  And many of the nonsports channels are very popular

23   with Fubo subscribers, right?

24   A.  Popular?

25   Q.  Popular, yeah.  You know popular, right?

O872Fub2                           Grad - Cross

1   A.   Yes.  So a number of the channels are watched by a number

2   of our subscribers, yes.

3   Q.   So why don't we put up JX 20 and help you out a little bit.

4   And let's go to the tab that says "by year."  This is

5   viewership data that was produced by Fubo in this litigation,

6   and this is the viewership data, according to this document,

7   percentage hours by channel by year.  And it shows different

8   networks, who owns them, and then it has '21, '22, '23, '24.

9   Do you see that?

10  A.   Yes, I do.

11  Q.   Let's go to row 286.  We see there Fox News Channel.  Do

12  you see that?

13  A.   I do.

14  Q.   And --

15          THE COURT:  I'm sorry, Mr. Tsekerides.  I want to

16  clarify and make sure I understand what these numbers mean.

17          MR. TSEKERIDES:  Sure.

18          THE COURT:  Can you just explain in, you know, my

19  level what these percentages refer to in these columns?

20          THE WITNESS:  Yes.  So this is the first time I'm

21  seeing this document.  However, my understanding of what this

22  document is is the percentage of total hours that are viewed by

23  customers on Fubo in a given year that are viewed on a

24  particular network that Fubo carries.  I'm not sure if this is

25  for all of Fubo or the English language or what, but it's

O872Fub2                              Grad - Cross

1    something like that.

2              THE COURT:  Okay.  So let's just be mindful,

3    Mr. Tsekerides, that this witness appears not to know exactly

4    the parameters of this document.

5              But just to make sure I understand, based on what you

6    do understand about this document, Mr. Grad, if you look on the

7    first page, you see row 10 says A & E.

8              THE WITNESS:  Yes.

9              THE COURT:  And if you go all the way across, or let's

10   just take 2021 as an example, it says 1.81 percent.

11             THE WITNESS:  Yes.

12             THE COURT:  Does that mean that if I added up all of

13   the hours that all of Fubo's subscribers watch, that 1.81 of

14   all of those hours for all customers is spent watching one of

15   these A & E networks?

16             THE WITNESS:  Yes, your Honor.  That's what it means.

17   I'm not sure it is for all of Fubo or our English language

18   packages; but, yes, that's my understanding of what this means.

19             THE COURT:  So it's not like the average customer is

20   watching this.

21             THE WITNESS:  Correct.

22             THE COURT:  It's aggregated over all customers.

23             THE WITNESS:  Correct.

24             THE COURT:  And it's percentage of hours.

25             THE WITNESS:  Correct.

O872Fub2                           Grad - Cross

1             THE COURT:  Okay.

2             MR. BLOCK:  Your Honor, I'm sorry to interrupt.  We

3    ask these documents also not be shown on the public screens, if

4    that would be okay.

5             THE COURT:  Oh, yes.  Can we take that down.

6             MR. TSEKERIDES:  I apologize, your Honor.  It was my

7    understanding that this was not one of the documents that they

8    had a problem with.

9             THE COURT:  No blame.

10            MR. TSEKERIDES:  It wasn't purposeful.

11            THE COURT:  And I think the questioning can proceed in

12   open court, and we will just see where we go.

13            Okay.  All right.  So I think we have the right

14   framing here and, again, with the caveat that Mr. Grad is not

15   sure if this is limited to English language channels or what

16   the universe is, you can go ahead, Mr. Tsekerides.

17   BY MR. TSEKERIDES:

18   Q.  So Fox News Channel the aggregate 6.11 percent, 7.41 for

19   24, correct, that's column E?

20   A.  Yes, I'm sorry.  Could you repeat the question?

21   Q.  Sure.  So for Fox News Channel, for the aggregate

22   percentage viewership, 6.11 percent aggregate, that's the last

23   row.

24   A.  Yes, that seems to be.

25   Q.  See it highlighted on your screen there, right?

O872Fub2                          Grad - Cross

1   A.  Yes, the last column, yes.

2   Q.  And you see for 2024 which is column E, 7.41 percent,

3   correct?

4   A.  Yes.

5   Q.  Why don't we go up to 219, row 219.

6           THE COURT:  Page 6, Mr. Grad.

7           THE WITNESS:  Thank you, your Honor.

8   Q.  You can follow it in the binder or look on your screen,

9   which might be easier.

10          But ESPN aggregate is 5.67 percent.  Do you see that,

11  row 219, column F?

12  A.  I do see that.

13  Q.  And that's lower, that aggregate for ESPN is lower than it

14  was for Fox News, correct?

15  A.  For this particular metric, yes, if we were looking at

16  other metrics to not be lower.

17  Q.  I appreciate that, sir.  But on the one that we are

18  actually looking at in court today right now, it's lower for

19  ESPN than it was for Fox News, right?

20  A.  That's correct.

21  Q.  Okay.  Let's take a look at row 169.  Crown Media, you know

22  Crown Media, right, sir?

23  A.  Yes, I do.

24  Q.  And Crown Media owns these Hallmark Channels, correct?

25  A.  That's correct.

1   Q.  And Crown Media's Hallmark Channels, totally nonsports,

2   right?

3   A.  That's correct.

4   Q.  Okay.  So the aggregate for all Crown Media was 3.18

5   percent, right?

6   A.  Yes, that's correct.

7   Q.  And let's go to 826, row 826.  It's down at the bottom

8   there.  This is Viacom, and Viacom owns -- scroll.  Stop right

9   there.  Viacom owns all of these networks that are 827 to 852,

10  correct?

11  A.  Yes, the company formerly known as Viacom owned those

12  channels.

13  Q.  Okay.  And all of those networks, every single one,

14  nonsports, right?

15  A.  Yes.  I mean, very limited exceptions like the Super Bowl

16  and Nickelodeon simulcast but, yes, they are substantively

17  nonsports.

18  Q.  The Viacom the aggregate 7 percent, right, higher than both

19  what, we saw earlier, actually just higher than ESPN for the

20  aggregate?

21  A.  Yes, that's correct.  All of Viacom relative to ESPN, the

22  percentage of viewing hours is higher.

23  Q.  So at least as relates to this metric, we can see that

24  these networks that are nonsports are popular with Fubo

25  subscribers, right?

O872Fub2                         Grad - Cross

1    A.  They are, in terms of hours viewed, highly -- in terms of

2    percentage of hours viewed, they are high percent of hours

3    viewed relatively, yes.

4    Q.  And some of these are news and some of these are

5    entertainment, right?

6    A.  Correct.

7    Q.  And in fact, you yourself recognized back in 2018 that news

8    and entertainment were key pillars of Fubo's strategy at least

9    to reduce churn, right?

10   A.  As I recall, there was a slide that we reviewed in the

11   deposition that included key pillars, and I believe the

12   reference to entertainment and news was maybe the fourth bullet

13   or so on that.

14   Q.  Why don't we put it up and help you out.  DX 133, please?

15            THE COURT:  Before we go on, I just have a question on

16   this topic, this percentage of viewing hours.

17            In your experience in the industry, Mr. Grad, is the

18   measure of what people watch once they actually have the

19   product the same as the thing that they are buying the product

20   for?  Does that make sense what I am asking?

21            THE WITNESS:  What you are asking, your Honor, makes a

22   lot of sense and in fact often, no, it is not the same.

23            THE COURT:  So might, if I'm a Fubo subscriber——I

24   don't know if this is true, it's just a hypothetical——I might

25   be drawn to buy Fubo instead of subscribe to YouTube TV or Hulu

O872Fub2                          Grad - Cross

1  or renew my cable subscription because Fubo has something that

2  I can't get someplace else, like RSNs or some of the other

3  things you have been talking about, and I don't care about

4  these other things in my purchasing decision, just

5  hypothetically.  But once I have Fubo and I have these

6  channels, I might watch them.  Is that -- is that at least

7  accurate for a hypothetical for Fubo customers in your

8  experience in the industry?

9             THE WITNESS:  Yes, your Honor.  Not only is that

10  accurate for a hypothetical customer, but that is what we

11  believe in general for most of our customers, and that

12  principle is how we operate our business.

13             THE COURT:  And so these metrics that we have been

14  looking at are obviously important to Fubo.  You are tracking

15  them, right?

16             THE WITNESS:  Yes.

17             THE COURT:  So they are not meaningless?

18             THE WITNESS:  That's correct.

19             THE COURT:  But they don't necessarily, from what you

20  have said -- I just want to make sure I understand what you are

21  saying.  It doesn't necessarily mean I am saying it.  That

22  these -- this is a metric that's tracking a certain kind of

23  behavior.  It doesn't necessarily mean that what people do once

24  they have the row is the thing that was causing them to

25  subscribe?

O872Fub2                        Grad - Cross

```
 1              THE WITNESS:  That's exactly right.
 2              THE COURT:  I just want to make sure I understand.
 3    BY MR. TSEKERIDES:
 4    Q.  Let me pick up on that a little bit.
 5              Whether somebody came to Fubo for something else, this
 6    at least shows us what they are watching when they are there,
 7    right?
 8    A.  Yes.
 9    Q.  So let's pull up at DX 133.  It's also tab 3 in the binder,
10    Mr. Grad.  And I believe you said you drafted this document,
11    right?
12    A.  Yes, I believe so.
13    Q.  This is while you were the vice president of content, so
14    responsible for what came in as content at Fubo, right?
15    A.  Yes, responsible for what came in its content and for
16    leveraging the content that we had.
17    Q.  Let's go to slide 2, the second page, and this says the
18    content strategy pillars and, as you pointed out earlier, the
19    merchandise entertainment/news content drive engagement, reduce
20    churn, and over to the right we see NBC and MSNBC.  You see
21    that, right?
22    A.  Yes, I do.
23    Q.  Okay.  And MSNBC is that news channel, right?
24    A.  That's correct.
25    Q.  And NBC, I appreciate, has some sports on it as well, but
```

O872Fub2                        Grad - Cross

1    it also has entertainment, right?

2    A.  That's correct.

3    Q.  Just in your words -- well, let me ask it this way.  Churn

4    is people leaving Fubo, right?

5    A.  That's correct.

6    Q.  So one of the key content pillars for Fubo at some level

7    was at least having entertainment and news content according to

8    the slide you prepared, right?

9    A.  So the first word in that section is "merchandise," so

10   that's not about acquiring the content.  But once we have

11   acquired the content, how we present it to customers.  So we

12   believe that if we were already paying for this content, we

13   wanted to make sure that it was somewhere that a customer could

14   find and watch and engage with, yes.

15   Q.  And having that content so the customer could find would be

16   a way to retain the customer, right?

17   A.  Yes.

18   Q.  And why don't we just look at the next page real quick,

19   slide 3, and at the top there we see the merchandise

20   entertainment/news content again, drive engagement, reduce

21   churn, and it says "Fubo base pack" at the right.  Do you see

22   that?

23   A.  Yes.

24   Q.  And does that mean these channels would be in the base

25   package of Fubo?

O872Fub2                          Grad - Cross

```
 1   A.  Yes, that means they were in the base package of Fubo, yup.
 2              THE COURT:  It's not aspirational.
 3              THE WITNESS:  Right.
 4              THE COURT:  It reflects what Fubo's packaging
 5   currently was.
 6              THE WITNESS:  That's correct.
 7   BY MR. TSEKERIDES:
 8   Q.  And Fubo does carry nonsports networks from providers that
 9   don't have any sports at all, right?
10   A.  Yes, that's correct.
11   Q.  Hallmark would be one of them, the Crown Media we just
12   looked at, right?
13   A.  Yes, it would.
14   Q.  Now, unlike Fubo, the JV, the JV understand is Venu Sports
15   that everybody is going to watch, the JV will not carry any
16   news or entertainment, right?
17   A.  They will have news and entertainment on the broadcast
18   networks such as ABC and Fox.  They will also have
19   entertainment on TNT, TBS, and truTV, but they won't have any
20   stand alone nonsports entertainment channels.
21   Q.  Fair enough.  Let's go back to JX 20 and let's go to row
22   115.
23   A.  Sorry.  Which --
24   Q.  It will be --
25   A.  This is the percentage of hours.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O872Fub2                              Grad - Cross

1    Q.  Yes, if you could look at the screen or it's tab two in

2    your materials.

3    A.  Yes.

4              MR. TSEKERIDES:  Take that down, please.  Sorry.  I

5    forgot.  Yup.  Thank you.

6    Q.  So we have here, these are all the CBS networks, and pretty

7    popular.  It looks like 7.96 aggregate and 9.59 for 2024,

8    right?  That's what the data show?

9    A.  Yes.

10   Q.  And then let's take a look at row 507.  A lot of networks

11   here from NBC Universal, right?

12   A.  Yes.

13   Q.  They are off the charts here; 17.96 percent aggregate

14   percentage viewers, right for NBC?

15   A.  Correct.

16   Q.  And Fubo carries both CBS and NBC, right?

17   A.  We currently do, yes.

18   Q.  And neither of those are going to be on the JV.

19   A.  In terms of what's been announced publicly to date, that's

20   accurate.  I don't know whether at some future point one or

21   both may be.

22   Q.  But right now from what you have heard --

23   A.  That's correct.

24             THE COURT:  Good.  Okay.

25             Now I'm going to switch gears a little bit.  When you

O872Fub2                          Grad - Cross

1    were in charge of content, you were responsible for, among

2    other things, negotiating contracts with my client, right,

3    Warner Bros. Discovery?

4    A.   Yes.

5    Q.   And that included at the time, they weren't combined, but

6    Turner was a separate entity, right, Discovery separate entity

7    at the time, and then Scripps as well before --

8    A.   Yes.

9    Q.   -- they merged.  Okay.

10            So I'm going to -- don't put public, please.

11            I'm going to just show you a couple of contracts.  We

12   are not going to go through them.  It's more for dates.  But I

13   don't want to put them on the screen.

14            So the Turner network contract, it's tab 5 in your

15   materials there, it's DX 161, put it up on my screen so I can

16   look at it.  And let's go to just flip down one page, and this

17   is the Turner agreement, right, sir?

18   A.   Yes, this appears to be our former agreement with --

19   affiliated agreement with Turner, yes.

20   Q.   And that was 2018?

21   A.   Yes, looks like executed and effective in 2018, yes.

22   Q.   Let's turn to page 25 and just so -- we see you signed this

23   contract for Fubo, right?

24   A.   I'm sorry?

25   Q.   You signed this contract for Fubo.

O872Fub2                          Grad - Cross

1    A.  Yes, I did.

2    Q.  And this contract expired in 2020.

3    A.  Yes.

4    Q.  And even in 2020 you were responsible still for content

5    acquisition at Fubo.

6    A.  Yes, that's correct.

7    Q.  And the Turner nets, they included sports networks like TNT

8    and TBS and to some extent truTV, right?

9    A.  Yes, correct.

10   Q.  But Fubo did not renew this contract in 2020.

11   A.  That's correct.

12   Q.  And since that date, Fubo has not carried any of the TNT

13   sports nets, right?

14   A.  That's correct.

15   Q.  Now, in 2017, Fubo entered into a contract with what was

16   Scripps, correct?

17   A.  Sir, what was the date?

18   Q.  2017.

19   A.  Yes, as I understand it.  That predated my employment at

20   Fubo.

21   Q.  Let's pull up DX 227 and, again, all of this will just stay

22   private screen.  And why don't we go to -- actually, I think we

23   can tell here, I think your CEO, Mr. Gandler, signed this

24   contract, right?

25   A.  Yes.  It appears to be the case.

O872Fub2                              Grad - Cross

1    Q.   And some of the networks that Scripps owns -- owned and

2    owns, HGTV, the Food Network, Travel Channel, correct?

3    A.   Yes, that's correct.

4    Q.   None of those are sports channels, right?

5    A.   Right.

6    Q.   In 2019, Fubo entered into an agreement to carry the

7    Discovery networks.  Let's pull up JX 67.  It will be tab 7,

8    Mr. Grad.

9    A.   Yes.

10   Q.   And we see here The Discovery Channel, TLC, Investigation

11   Discovery, Animal Planet, and so on.  Do you see that in II?

12   A.   I do see that.

13   Q.   Let's go to page 6.  And you signed this contract for Fubo,

14   right?

15   A.   I did sign this contract for Fubo, yes.

16   Q.   And none of the networks that I just read from II are

17   sports channels.

18   A.   That's correct, none of those are sports channels.

19   Q.   And in 2019, Fubo renewed the distribution agreement that

20   we just looked at from Scripps, right?  We will pull up DX 229,

21   tab 8.  This is the renewal of the Scripps agreement that we

22   looked at from 2017, correct?

23   A.   Yes.  So as a condition of the -- one of the conditions of

24   the Discovery -- the new Discovery deal was that we renew the

25   Lexi Scripps deal, and another condition was that Discovery

O872Fub2                              Grad - Cross

1    make an eight-figure investment in Fubo.  As a requirement of

2    that, we had to renew the Scripps deal and do Discovery.

3    Q.  I appreciate that.  My question was simply was this the

4    renewal from 2019?

5    A.  Yes.

6    Q.  Okay.  Scripps did not have any sports at that time either,

7    right?

8    A.  They did not, no.

9    Q.  And you signed this agreement, correct?

10   A.  Yes, I did.

11   Q.  So even after Fubo dropped the Turner nets, it was renewing

12   the Discovery and Scripps nets that had no sports on them,

13   correct?

14   A.  Sorry.  What time frame are we talking about here?

15   Q.  Post-2020.

16   A.  Yes, we did a renewal subsequent to that, yes.

17   Q.  2022?

18   A.  Yes, correct.

19   Q.  Let's pull up JX 6.

20          THE COURT:  Before we go on, just for my benefit,

21   Mr. Grad, why did you do that, if you know, if you were part of

22   the decision-making?

23          THE WITNESS:  Yeah, so it was something that we

24   actually discussed as a company, and ultimately, at that point

25   in our development, while it was not on strategy to take that

O872Fub2                           Grad - Cross

1    entertainment content, we had concerns about potential public

2    battles and potential subscriber issues and looking at

3    potential ad revenue and we thought if we could get a deal that

4    we thought economically it was not too bad, we would sort of do

5    that and move on.

6            THE COURT:  And you said that it was not on strategy.

7    If you -- what would have been the on-strategy choice for Fubo

8    at that time?

9            THE WITNESS:  Yes.  So as you pointed out in that

10   exhibit earlier on viewership, the A & E Network, so you saw

11   that 1.81 percent I think it was in 2021 and then you saw zeros

12   in the other columns, that was the on-strategy was to not renew

13   those entertainment networks that sell zeros because we had

14   A & E and it chose not to renew it.

15           THE COURT:  Mr. Tsekerides.

16   BY MR. TSEKERIDES:

17   Q.  Let's pull up JX 68.  That's not the right document.  Let's

18   take a look at tab 9.  Oh.  That is the right document.  I

19   threw myself off.  Can you put that back up?

20           It's referring to the 2017 agreement, but this is the

21   renewal from 2022, correct, Mr. Grad.

22   A.  Yes.

23   Q.  If you can go to page 7.  February 11, 2022?

24   A.  Yes.

25   Q.  So in 2022, Fubo renewed discovery and Scripps, correct?

O872Fub2                          Grad - Cross

1   A.   Correct.

2   Q.   And I think you told me at the deposition that one of the

3   concerns that led Fubo to do so was that it was concerned that

4   it might lose subscribers if you drop those nets, is that

5   right?

6   A.   We did have some concerns around that, yes.

7   Q.   Let's talk a little bit about RSNs, regional sports

8   networks.  We have heard a little bit about that.  I appreciate

9   you haven't been in the courtroom, but there has been some

10  discussion about that, and you and I talked about that in the

11  deposition.

12         Fubo carries RSNs, right?

13  A.   Yes, we carry a number of RSNs.

14  Q.   MSG, Yes Network here in New York, is that right?

15  A.   Yes, that's correct.

16  Q.   Do you also carry NESN in New England?

17  A.   Yes, we do.

18  Q.   And you would agree that RSNs are, if not the most,

19  definitely near the top differentiator for Fubo?

20  A.   Yes, they are a differentiator for Fubo.

21  Q.   And Venu Sports is not going to carry RSNs, right?

22  A.   So as I understand it, Venu Sports has not announced any

23  agreements with RSNs.  I can't speak to whether at some point

24  Venu Sports may take on any RSNs, but they have not made any

25  announcements about that to date.

O872Fub2                         Grad - Cross

1    Q.  So a consumer who wants to watch the Yankees, the local

2    games -- I'm an Islanders fan.  I watch MSG.  I know there are

3    Rangers fans here, unfortunately.  Or the Knicks we can

4    probably agree on, the Knicks, if a fan wanted to watch those,

5    they are not going to be able to watch those over on Venu,

6    right?

7    A.  So they won't be able to watch a number of Knicks games a

8    year that are on ESPN and ABC, but they would not be able to

9    watch Knick games that are exclusively on the RSNs, that's

10   correct.

11   Q.  So --

12   A.  Excuse me on -- yes, yes, that's right, ESPN and ABC, yeah.

13   Q.  So Venu subscribers also aren't going to be able to get Fox

14   News, Hallmark, CBS, NBC, or any of the Viacom networks which

15   are popular with Fubo subscribers because none of those are

16   going to be on the JV either, right?

17   A.  None of those have been publicly announced and I -- yes,

18   they have not been announced that they would be on Venu.

19   Q.  But all of those networks are on Fubo, right?

20   A.  Yes, that's right.

21            MR. TSEKERIDES:  Nothing further, your Honor.

22            THE COURT:  Mr. Block -- or Mr. Earnhardt.  Sorry.

23   Didn't mean to deny you your opportunity.

24            MR. EARNHARDT:  Thank you, your Honor.  I'm going to

25   try to be very brief.

1          THE COURT:  Take the time you need.

2     CROSS-EXAMINATION

3     BY MR. EARNHARDT:

4     Q.  Good morning, Mr. Grad.

5     A.  Good morning.

6     Q.  Just to make sure I understand something, you haven't had

7     any trouble acquiring nonsports networks out in the

8     marketplace, correct?

9     A.  I have not had any trouble acquiring?

10    Q.  Correct.

11    A.  Meaning?

12    Q.  Well, we have seen you license a lot of nonsports networks

13    from folks who don't have sports, right?

14    A.  Yes, we have acquired a number of nonsports networks.

15    Q.  And you are not saying that you are paying too much for

16    those nonsports networks from programmers that carry sports,

17    like Bravo and Hallmark Channels.  That's not your claim,

18    right?

19    A.  In this particular proceeding, that is not the claim.  I'm

20    not a lawyer.  I'm not responsible for legal strategy.  But my

21    understanding is that is not what we are talking about here.

22    Q.  Okay.  Let's talk about your negotiations with Disney.  If

23    I understand correctly, you -- Fubo did not carry Disney

24    channels back in 2018, correct?

25    A.  That's correct.  In 2018 we did not carry any of the Disney

O872Fub2                         Grad - Cross

1   channels.

2   Q.  So you made an offer for Disney, to carry their channels in

3   2018, right?

4   A.  Yes, that's correct.

5   Q.  And Disney countered to that offer, right?

6   A.  Yes, that's correct.

7   Q.  And Fubo did not agree to Disney's counter, right?

8   A.  That's accurate.

9   Q.  And so you didn't reach a deal, right?

10  A.  At that point we did not.

11  Q.  And so after that negotiation in 2018, you still did not

12  carry Disney channels, correct?

13  A.  Not in 2018, correct.

14  Q.  So you would agree with me that Disney has no obligation to

15  license to you any of its channels, right?

16  A.  I'm not sure that follows from --

17          THE COURT:  Are you a lawyer, Mr. Grad.

18          THE WITNESS:  No, I'm not.

19          THE COURT:  Move on, Mr. Earnhardt.

20  BY MR. EARNHARDT:

21  Q.  For many years Disney chose not to license any of its

22  networks to you, correct?

23  A.  I'm sorry.  Could you say that again?

24  Q.  For many years, from the beginning of Fubo's existence in

25  2015 until 2020, Disney licensed none of its networks to Fubo,

O872Fub2                              Grad - Cross

1   correct?

2   A.  That's correct.

3   Q.  In 2020 there was a separate negotiation, right?

4   A.  Yes, we had a subsequent negotiation I would say, yes.

5   Q.  And the result of that negotiation is you did reach a deal,

6   correct?

7   A.  We did reach an agreement as a result of that negotiation,

8   yes.

9   Q.  Mr. Grad, and just to make sure, you don't know the details

10  of confidential proposals that Disney might have made to MVPDs

11  other than Fubo, correct?

12  A.  I do not -- I mean, technically I would know from my

13  Verizon days what they did there, but I don't know of any

14  other, yes, that's correct.

15  Q.  And so you only know the terms of what Disney has offered

16  to Fubo when you have been at Fubo and Verizon when you were at

17  Verizon, correct?

18  A.  Yes, that's correct, in terms of what I actually have

19  direct knowledge of.

20          MR. EARNHARDT:  No further questions.

21          THE COURT:  I just have a couple of questions, and if

22  either of you wants to follow-up, I will allow it.

23          Mr. Grad, in your experience, do programmers, whether

24  they are RSNs or they are Disney or, you know, they are any

25  programmer -- I hope I'm using the right term.

O872Fub2                        Grad - Cross

1                THE WITNESS:  Yes, your Honor, you are.

2                THE COURT:  Is one of the primary goals of companies

3     in that category to maximize the number of eyeballs that see

4     their content?  Is that fair?  They want -- part of their role

5     is to maximize viewers.

6                THE WITNESS:  That is among their goals.  They tend to

7     balance that with the license fees that they get in terms of

8     direct license fees that they generate from the distribution.

9                THE COURT:  So a balance between maximizing eyeballs

10    and maximizing revenue.

11               THE WITNESS:  Yes.  And the license fees historically

12    for most cable networks are really the higher of those two

13    goals, but those are really the two goals maximizing subscriber

14    revenue and then maximizing reach, which also helps with ad

15    revenue.

16               THE COURT:  You were asked a number of questions by

17    Mr. Tsekeride about the JV, as is currently announced, doesn't

18    have RSNs and doesn't have certain other sports content.  Do

19    you remember these questions?

20               THE WITNESS:  Yes, your Honor, I do.

21               THE COURT:  If──I take no view on this in the

22    question──if Fubo's predictions of an exodus of, I will call

23    them, sports-motivated viewers, an exodus of such viewers to

24    the JV after it launches, if that prediction proves true, do

25    you have a view, based on your experience in the industry, of

O872Fub2                    Grad - Cross

1    whether RSNs or NBC Sports or CBS Sports, any of the other

2    sports content we have been talking about, would have a

3    motivation or interest in trying to get their content on to

4    Venu.

5            THE WITNESS:  Yes.  So I believe that, in particular,

6    the RSNs and Venu would ultimately reach some kind of

7    agreement.  I think the RSNs would be motivated to follow the

8    eyeballs and get that distribution revenue.  So obviously it's

9    subject to commercial terms amongst parties that I'm in neither

10   chair, but that would seem to make sense.  And I wouldn't be

11   surprised if there were some discussions amongst those parties

12   today.

13           I think with, you know, CBS, I think I actually just

14   read something this morning speculating that there may be

15   discussions.  Obviously I'm not a party to that.  It's just

16   something I read.  And, you know, with NBC, I don't know, they,

17   you know, probably have a lot of different concerns.  It's a

18   pretty complicated company owned by a cable network or cable

19   distributor.  They have a lot of entertain news networks, but

20   they need sports and certainly they are taking a look at it, I

21   would expect.

22           THE COURT:  And just I know you can speak only about

23   what's in Fubo's agreements.  Is there anything in Fubo's

24   agreements with RSNs or with Fox, regarding Fox News, that

25   would prevent -- like, are there any restrictions on the

O872Fub2                         Grad - Cross

1    programmer as to who else they can sell their content to?

2                THE WITNESS:  So --

3                THE COURT:  Like can Fubo, in its current agreements,

4    block content providers from selling their content to other

5    outlets?

6                THE WITNESS:  So there wouldn't be anything in the

7    Fubo agreements with those providers that would prevent those

8    providers from reaching a similar type deal that Fubo has.

9                XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXX

16                THE COURT:  Thank you.  That's very helpful.

17                Mr. Earnhardt.

18                MR. EARNHARDT:  Can I ask a few follow-up questions,

19   your Honor, if that's okay?

20                THE COURT:  Yes.

21   CROSS-EXAMINATION

22   BY MR. EARNHARDT:

23   Q.  Mr. Grad, you understand that NBC is owned by Comcast,

24   right?

25   A.  Yes, I do.

O872Fub2                          Grad - Cross

1   Q.  You understand that Comcast is a major MVPD, correct?

2   A.  Yes, I do.

3   Q.  You understand that Comcast distributes much of NBC's

4   content on a streaming service called Peacock, is that right?

5   A.  Yes.

6   Q.  You understand that CBS already distributes much of its

7   content on Paramount+, right?

8   A.  Yes.

9   Q.  And you don't have any personal knowledge, given those

10  dynamics and factors, whether there has been any discussion

11  between anyone involved in the Venu joint venture and NBC or

12  CBS, correct?

13  A.  That's correct.  I have no personal knowledge.

14  Q.  We would have to ask the people who would have personal

15  knowledge whether that's happened or not, right?

16  A.  Yes.  Again, I read something in this morning speculating

17  that, but I wouldn't have any direct knowledge.  Someone who is

18  directly involved would know that.

19          MR. EARNHARDT:  Thank you.

20          THE COURT:  Mr. Tsekerides?  Did I think maybe Fox

21  wants to be heard.

22          MR. BIZAR:  Your Honor, Steve Bizar.  I will just come

23  over to the podium.

24          THE COURT:  Mr. Bizar, yes, please.

25  CROSS-EXAMINATION

1  BY MR. BIZAR:

2  Q.  Again, Steve Bizar from Dechert.  I have been short my

3  whole life.  I will be very short today.

4          I just wanted to ask a follow-up question, Mr. Grad,

5  to Judge Garnett's hypothetical to you about the potential down

6  the road for the addition of RSNs or other content to the Venu

7  joint venture.  Are you with me?

8  A.  Yes, sir.

9  Q.  Content is not free.  Correct?

10  A.  So we carry a number of FAST channels instead of

11  free-to-consumer channels.  They are straight channels.  We

12  don't pay out-of-pocket.  But, yes, in terms of the premium

13  content that I think you are alluding to, yes, it would not be

14  free.

15  Q.  Premium content, the RSN content, the CBS content, the

16  sports must-have content, as it's been characterized, that

17  costs money --

18  A.  Yes.

19  Q.  -- right?

20  A.  Yes.

21  Q.  And it costs money because the leagues charge money for the

22  content that they sell to the programmers, that they license to

23  the programmers, correct?

24          MR. BLOCK:  Your Honor, I think we are getting far

25  afield from the direct testimony.

O872Fub2                        Grad - Cross

1          THE COURT:  Well, I agree, but I asked some questions

2    about the hypothetical industry behavior.

3          And so if you know, Mr. Grad, you know, obviously

4    always for you and any witness, if you don't have personal

5    knowledge, you should say that.  If you know and feel you can

6    answer based on your industry experience, then you can answer.

7    A.  Can you repeat the question?

8    Q.  My question, sir, is that the leagues charge for the

9    content that they license to the programmers, correct?

10   A.  Yes, absolutely.

11   Q.  So if Venu were to add additional content from RSNs or from

12   CBS or the other premium sports channels, is it fair to say,

13   using Judge Garnett's hypothetical, that the cost for Venu

14   would no longer be $42.99; it would cost more?

15   A.  Yes, I think that's fair to say.  I read a -- I think it

16   was a tweet by Andrew Marchand, who covers the industry, who

17   sort of got there and said, okay, Venu's 42.99, you can put on

18   Peacock for whatever that is, 7.99, whatever, and Paramount+

19   for 9.99 and you are at whatever that is, $60.  So that's still

20   25 or so below Fubo, yes.

21   Q.  My question was simply if you start adding on a variety of

22   different premium content, sports channels, must-have channels,

23   the price would no longer be half the price of Fubo?

24   A.  Yes.  I think that's reasonable to assume.

25          MR. TSEKERIDES:  Nothing further, your Honor.

O872Fub2            Grad - Redirect

1              THE COURT:  A significant component, Mr. Grad, of what

2    distributors charge customers is how much they have had to pay

3    for the content that they have, right?

4              THE WITNESS:  Yes, absolutely.

5              THE COURT:  Just like as a basic principle of

6    economics --

7              THE WITNESS:  Absolutely.

8              THE COURT:  -- what Mr. Bizar is getting at.

9              MR. BIZAR:  Thank you, your Honor.  Thank you.

10             THE COURT:  Counsel?  Redirect, Mr. Block?

11             MR. BLOCK:  Very brief.

12   REDIRECT EXAMINATION

13   BY MR. BLOCK:

14   Q.  Mr. Grad, do you recall you were asked a few questions

15   about Crown Media, which controls the Hallmark Channels?

16   A.  Yes.

17   Q.  Why does Fubo license the Hallmark Channels?

18   A.  We make more money in advertising revenue than we pay the

19   license fees to Crown.  We receive a certain amount of

20   advertising inventory.  We sell ads against that, based upon

21   viewership, and we make more money in revenue than we pay out

22   in license fees on that.

23   Q.  Is that normal?

24   A.  That is atypical for a cable network, yes.

25   Q.  You were also asked questions about the Scripps networks,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O872Fub2                              Grad - Recross

1    is that right?

2    A.   Yes.

3    Q.   Did Scripps make an investment in Fubo?

4    A.   Yes, they did at the -- again, predating me, but as I

5    understand it, at the same time as the content acquisition

6    agreement was signed, they made an investment in Fubo.

7    Q.   And was that investment part of the reason why Fubo carried

8    Scripps channels?

9    A.   Yes.  Again, predating me, but that's my understanding,

10   yes.

11   Q.   You were also asked questions about Discovery channels.  Do

12   you recall that?

13   A.   Yes, I do.

14   Q.   Do you recall whether Discovery made an investment in Fubo?

15   A.   They did.  They made an eight-figure investment in Fubo.

16   At the time, as a condition of that investment, we were

17   required to launch the Discovery networks.

18            MR. BLOCK:  Nothing further.

19            MR. TSEKERIDES:  I have one follow-up.

20   RECROSS EXAMINATION

21   BY MR. TSEKERIDES:

22   Q.   Mr. Grad, you just said that the investment that Scripps

23   and Discovery made were pre your time, correct?

24   A.   The Scripps investment was before my time, but I was here

25   for the Discovery one.

O872Fub2

1    Q.   Okay.  And that was pre the renewal in 2022.  There was no

2    investment at 2022's renewal, correct?

3    A.   That's correct.

4              MR. TSEKERIDES:  Okay.  Thank you.

5              THE COURT:  Mr. Bizar, Mr. Earnhardt, anything

6    further?

7              MR. EARNHARDT:  No.  Thank you, your Honor.

8              MR. BIZAR:  No, your Honor.

9              THE COURT:  Mr. Block.

10             MR. BLOCK:  No, your Honor.

11             THE COURT:  Thank you, Mr. Grad.  You can step down.

12             THE WITNESS:  Thank you, your Honor.

13             (Witness excused)

14             THE COURT:  Do you have another witness?

15             MR. HANSEN:  Our next witness is Mr. Marchesano, and

16   Ms. Tondrowski will present.

17             THE COURT:  Okay, terrific.

18             While we are waiting for Mr. Marchesano, I don't know

19   if you want someone to collect Mr. Grad's binders.  We run out

20   of space here quickly.

21             Mr. Marchesano, you can come forward to the witness

22   stand and just remain standing here to my left.

23   SALVATORE PETER MARCHESANO,

24        called as a witness by the plaintiff,

25        having been duly sworn, testified as follows:

O872Fub2                           Marchesano - Direct

1    DIRECT EXAMINATION

2    BY MS. TONDROWSKI:

3    Q.   Good morning.  Could you please state your name for the

4    record?

5    A.   Sal Marchesano.

6    Q.   What is your job?

7    A.   I am a VP of content strategy and acquisition at Fubo.

8    Q.   What does that position entail?

9    A.   It entails leading our deal negotiations and content

10   partner relationships with all of the providers at Fubo.

11   Q.   Sir, are you familiar with the content of all of Fubo's

12   carriage agreements?

13   A.   Yes.  I'm familiar a little bit.

14   Q.   Did you prepare any slides for today?

15   A.   I did, yes.

16   Q.   Did you participate in the creation of the slides?

17   A.   Yes, I did.

18   Q.   And can you confirm the accuracy of their contents?

19   A.   Yes, they are accurate.

20           MS. TONDROWSKI:  Your Honor, permission to publish.

21           THE COURT:  And do you have a copy for me?

22           MS. TONDROWSKI:  It should be --

23           THE COURT:  Yes, it's here.  Thank you very much.

24   BY MS. TONDROWSKI:

25   Q.   Let's talk about Fubo's base package.  How many channels

O872Fub2                         Marchesano - Direct

1    are in a base package today?

2    A.  About 190 channels in the base package.  Really depends on

3    the subscriber's location.

4    Q.  Is that WHAT we are seeing on the slide PDX 402?

5    A.  Yes.  There's about 190, a lot of TVs there, but I imagine

6    it's a lot, close to that.

7    Q.  Why does the number of channels depend on location?

8    A.  So channels are really -- it would come from either local

9    broadcast channels or our regional sports networks because

10   those are provided to subscribers based on their location, so

11   those are derived on a zip-code-by-zip-code basis.  So in

12   certain zip codes you might have additional local affiliate

13   channels or you might be in a zip code that has multiple RSNs.

14   It's an overlapping geography, so those are the two main

15   buckets of why the channel count can differ per user.

16   Q.  Their zip code?

17   A.  So an average, it's about two RSNs per subscriber, but that

18   can range from just having one at a certain geographic area to

19   as many as like six or seven, depending on the user's location

20   just, again, based off of the overlaps.

21        THE COURT:  Can I ask, I'm sorry, the -- is that

22   limitation because the leagues place certain restrictions on

23   where the RSNs can make their content available geographically?

24        THE WITNESS:  Absolutely.  Each RSN has their

25   exclusive zone, it's an amount of miles from a place; and then

O872Fub2                        Marchesano - Direct

1    there is nonexclusive zones, and that's where you are going to

2    get the overlaps.

3            THE COURT:  Okay.  Understood.  So that's not because

4    the RSNs themselves in theory independently don't want to be

5    everywhere, it's because they get the content on a basis that

6    requires them to have geographic limitations.

7            THE WITNESS:  Exactly.

8            THE COURT:  Okay.  I just want to make sure I

9    understand.  Go ahead.

10   BY MS. TONDROWSKI:

11   Q.  Does Fubo pay for all of its channels?

12   A.  No, Fubo does not pay for all 190.

13   Q.  How many channels does it pay for?

14   A.  We pay for about 70 of the channels.  The rest of them

15   would be like overflow channels that, when there is multiple

16   programming on, they obviously overflow to those channels.

17   There is also free channels, so those are free ad supported,

18   now also known as FAST.  So we have a lot of those.  And then

19   the other bucket would be channels that Fubo has is actually

20   paid to carry.

21   Q.  And is that -- that's being represented on PDX 403?

22   A.  Yes, about 70, yup.

23   Q.  How much does this content cost Fubo?

24   A.  On average, it's about $80 per subscriber.

25   Q.  Are there channels Fubo is required to distribute to 100

1  percent of its subscribers?

2  A.  Yes.

3  Q.  How many of the 70 pay channels that we are seeing on the

4  screen are required to be distributed to 100 percent of

5  subscribers?

6  A.  About like 50.

7  Q.  We have heard a lot about bundling.  Do Fubo's agreements

8  require it to distribute general entertainment channels

9  alongside sports channels?

10  A.  Yes, it does.

11  Q.  What's an example of that?

12  A.  So in order to have the privilege of carrying ESPN, you

13  also need to carry, say, Disney Channel.

14  Q.  Does Fubo want to license general entertainment channels at

15  all?

16  A.  Yes.

17  Q.  Why is that?

18  A.  We are really trying to -- you know, we want to go for the

19  largest swath of customers, so we want to have general

20  entertainment to be attractive to as many customers as

21  possible.  It really comes down to us of being -- forcing the

22  same channels on every single person.  We are looking for more

23  flexibility.  But we are interested in general entertainment.

24         THE COURT:  Does that mean, Mr. Marchesano, just to

25  make sure I understand what you are saying, if Fubo had the

O872Fub2                      Marchesano - Direct

1  ability to do so, it would offer a variety of products to

2  different consumers, so the skinny sports bundle we have been

3  talking about could be one product, but not necessarily the

4  only product?

5          THE WITNESS:  Absolutely.  You have it exactly,

6  exactly.

7          THE COURT:  Okay.  I just want to make sure I

8  understand what you are referring to.

9          Go ahead, Ms. Tondrowski.

10  BY MS. TONDROWSKI:

11  Q.  You mentioned Disney Channel.  Are there other general

12  entertainment channels that Fubo would prefer to have instead?

13  A.  Yeah, definitely.  So looking at our customer viewership

14  and dem -- I would say we would prefer to have The History

15  Channel over a kids channel like Disney Channel.

16  Q.  What is your understanding of the relief Fubo is seeking in

17  this hearing?

18  A.  So it would either be to stop the joint venture or to gain

19  the packaging flexibility that the defendants have given to the

20  joint venture so we could offer our own unbundled skinny sports

21  package.

22  Q.  What's preventing Fubo from offering a skinny sports bundle

23  today?

24  A.  It's really the bundle requirements that are imposed on us,

25  and that's a combination of, like, minimum penetration

O872Fub2                    Marchesano - Direct

 1   requirements and packaging requirements.

 2   Q.  Why are these minimum penetration rates preventing a skinny

 3   sports bundle?

 4   A.  So minimum penetration just refers to how many customers

 5   must receive that channel throughout all the different packages

 6   or tiers that a distributor has.  So when it is a channel is

 7   put at 100 percent, that means it has to go everywhere, which

 8   precludes you from not including it, which means you can't

 9   offer something smaller and smaller.  It travels everywhere.

10   Q.  And why are packaging requirements preventing a skinny

11   sports bundle?

12   A.  So this is like their -- the belts and suspenders approach,

13   where they will -- if you do potentially have a lower

14   penetration, the packaging requirements may say, well, you have

15   to include X amount of other types of channels, or if you

16   include another channel, then you have to pull our channels

17   along as well.  So it's kind of like these tag-alongs that

18   really kind of prevent distributors from being able to offer

19   more niche or specific bundles -- packages.

20   Q.  Which programmers have contract terms with Fubo that

21   prevent a skinny sports bundle?

22   A.  So the main ones are really the big four, so that's Disney,

23   Fox, NBCU, and Paramount Global, which is the tie-up of CBS and

24   Viacom.

25   Q.  If the Court granted packaging flexibility today on the

O872Fub2                          Marchesano - Direct

1    Disney and Fox agreements, what would Fubo's skinny sports

2    bundle look like?

3    A.   It would be about 40 channels.

4    Q.   Is this represented on the screen, PDX 404?

5    A.   Yes.

6    Q.   For this package of about 40 channels what would the

7    content cost be for Fubo?

8    A.   So it would be about $60 compared to the $80, so saving

9    about $20 in costs per subscriber, about 25 percent of the

10   overall costs of the package.

11   Q.   How many of the channels would have live sports?

12   A.   About half of them.

13   Q.   How significant would that sports offering be?

14   A.   Oh, it would be very significant because not only would you

15   have the Fox and Disney sports channels, but you would also

16   have the NBC Sports channels and CBS Sports channels.  So it

17   would be a very robust offering.

18   Q.   Would this skinny bundle include RSNs?

19   A.   No, it wouldn't have to, no.

20   Q.   Why not?

21   A.   Really as a cost saver.  So if we are going for a skinny

22   sports bundle, we are probably competing on price, so we would

23   want to shave off as much of the cost as possible, and we have

24   that type of flexibility with RSNs.

25   Q.   What about the sports fans who want the RSNs?

1   A.   They could still have them because you could have the

2   ability to have, you know, the skinny sports bundle plus the

3   RSN or add on the RSNs D to C, or there are still the

4   general -- the main package today that subscribers can get to.

5   It wouldn't be like people would be without the RSN.

6   Q.   Let's talk about Fubo's road to an even skinnier sports

7   bundle.  Assuming the Court grants relief on Disney and Fox

8   bundling requirements, what steps would Fubo take to get an

9   even skinnier sports bundle?

10  A.   We would immediately try and negotiate with our -- the

11  other members of the big four for the similar rights.

12          MS. TONDROWSKI:  Mr. Roberts, the next slide has

13  confidential information, so please don't publish to the

14  public.

15  Q.   And if those negotiations didn't work?

16  A.   We could try again -- we could, you know, in 10 to 13

17  months we would be able to offer something skinnier.

18  Q.   Why 10 to 13 months?

19  A.   That's when our deals are up with some of the other parties

20  that have those types of bundling requirements.

21          MS. TONDROWSKI:  Pass the witness.

22          THE COURT:  Just a quick question, Mr. Ryan, I think

23  quick, we will see.

24          From what you have said, Mr. Marchesano, is it fair to

25  say that in your view there are different kinds of sports

O872Fub2                    Marchesano - Direct

1    television consumers that might want different things?

2                THE WITNESS:  Yes.

3                THE COURT:  And as the lawyers know, I posited at an

4    earlier part of the hearing a couple of different versions of

5    potential sports consumers, right.  So I think the three

6    examples that I have posited to an earlier witness were they

7    are sort of like the omnivorous sports consumer, right, like

8    someone who cares a lot about sports, wants as many as

9    possible, has a general interest in sports content.

10               THE WITNESS:  Okay.

11               THE COURT:  A second type of sports consumer -- don't

12   be wedded to my categories, by the way, I know this is -- a

13   second type, it seems to me, it's like what I would

14   characterize as maybe a team loyal --

15               THE WITNESS:  Okay.

16               THE COURT:  -- consumer, so let's say that person is

17   like, listen, I want to see every Falcons game, every Braves

18   game, every whatever the Atlanta hockey team is.

19               THE WITNESS:  They lost their hockey team.

20               THE COURT:  There you go.  But I want every Falcons

21   game and Braves game, and I don't really care about anything

22   else.  And then maybe a third kind—and, again, there is

23   probably more than these three, but a third kind might be

24   some -- a sports fan who cares a lot about something that I

25   think Americans might view as a niche sport, like golf or

O872Fub2                    Marchesano - Direct

1    tennis, soccer might fall more in the team loyal category.  I

2    don't know.  But if I'm a golf person, it is not that I have to

3    see Rory McIlroy or another golfer, I just like watching golf,

4    and I would say tennis maybe in the same category, and golf is

5    what is driving my purchasing and I -- that's not transferable

6    to tennis or to hockey or whatever.

7            So first of all, do you think that what I said so far

8    is fair as far as accuracy?

9            THE WITNESS:  Yeah.  There is probably more buckets,

10   but those are absolutely fair buckets that we see.

11           THE COURT:  And when -- you can only speak for Fubo.

12   So when Fubo thinks about products it might offer or how it

13   would serve different customers, would you expect each of those

14   kinds of consumers to act in the same way in terms of

15   purchasing decisions?

16           THE WITNESS:  I would -- I think acting in a similar

17   way they would seek out exactly what they would want and they

18   would try to go for that.

19           THE COURT:  But the answer to what they might want

20   might be different.

21           THE WITNESS:  Correct.

22           THE COURT:  Okay.  And within Fubo, within its

23   business plans, again, in a hypothetical dream world, is Fubo

24   thinking about products to serve different kinds of customers?

25           THE WITNESS:  Absolutely.  I can give an example.

O872Fub2                         Marchesano - Direct

1            THE COURT:  Yes.  That would be helpful.

2            THE WITNESS:  Say in Canada, where we don't have the

3    similar type of bundling requirements, we offer more

4    soccer-specific packages.  We offer soccer plus general

5    entertainment package.

6            THE COURT:  Hockey?

7            THE WITNESS:  Well, those rights are really locked up

8    by a couple of giants up there.

9            THE COURT:  That's just a Canadian joke.  Just ignore

10   that.

11           THE WITNESS:  We would love to offer hockey, but we

12   are also now introducing -- we are trying to build a cricket

13   package out, where we have gotten cricket rights.  We can offer

14   just a smaller cricket-focused package to customers to serve

15   those needs, and if they want to then add general

16   entertainment, boom, we can add that on.  If they want to add

17   soccer to that, then we can add that on.  It's really just

18   giving the customer all of the different options to meet them

19   where they are for their watch needs.

20           THE COURT:  And under your current carriage agreements

21   and current industry practices, we have been hearing a lot

22   about, in this trial, in this hearing, if you were able to

23   offer all the different products that you think there might be

24   buyers for.

25           THE WITNESS:  In the U.S. today, no.

O872Fub2                           Marchesano - Direct

1              THE COURT:  Oh.  You are passing the witness.  Did you

2     have any follow-up based on my questions?

3              MS. TONDROWSKI:  I do not.

4              THE COURT:  Mr. Ryan, the witness is yours.

5              MR. RYAN:  Thank you, your Honor.

6              So my cross, I'm afraid, is going to focus on highly

7     confidential licensing rates from defendants and also

8     third-party programmers, so I'm afraid that I'm going to have

9     to request for the courtroom to be sealed for this.

10             THE COURT:  Okay.  And before we do that, do you have

11    any introductory questions that you would like to ask before we

12    get to that point?

13             MR. RYAN:  I don't.  No.

14             THE COURT:  Okay.  And it's actually a good time for a

15    break for our reporters and everyone's comfort anyway, so it is

16    11:46.  We will resume at 11:55.  And just so the members of

17    the press and the public know, that when we resume at 11:55,

18    the courtroom will be sealed temporarily for the cross of

19    Mr. Marchesano.

20             Just while I have everyone, I will note I don't know

21    if counsel, if the parties have seen this, but counsel for

22    DirecTV would like to be heard on the dispute about Mr. Thun.

23    And so we will take that up at 2:00 when we return from the

24    lunch break, just so everyone can factor that in for their

25    preparation.

O872Fub2                    Marchesano - Direct

1              Okay?  All right.

2              So we will resume at 11:55.  Thank you, everybody.

3              MR. RYAN:  Thank you, your Honor.

4              (Recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Courtroom sealed)

2              THE COURT:  Thank you, everyone.  You can be seated.

3              Mr. Marchesano, you can be seated.

4              I'll just ask counsel, on the record, can you just

5    look around and confirm that no unauthorized persons are

6    present.

7              MR. RYAN:  Seems so, your Honor.

8              THE COURT:  Ms. Tondrowski, yes?

9              MS. TONDROWSKI:  Yes.

10             THE COURT:  Ms. Verneus, can you go lock the doors.

11   We are at least temporarily under seal.

12             Go ahead, Mr. Ryan.

13             MR. RYAN:  Thank you, your Honor.

14             And I left two copies, Ms. Ghotbi, of a binder as

15   well, and I left one for the witness as well.  Thank you,

16   Mr. Marchesano.

17             THE COURT:  Thank you.

18   CROSS-EXAMINATION

19   BY MR. RYAN:

20   Q.  Mr. Marchesano, good morning.

21   A.  Good morning.

22   Q.  Am I right that in February of 2024, you created a

23   spreadsheet of what you called Fubo's unwanted content costs?

24   A.  Yes.

25   Q.  If you could turn, please, to tab 4 of the binder in front

1   of you, you should see there DX 131.  Do you see that, sir?

2   A.  Yes.

3   Q.  Is this the spreadsheet that you created?

4   A.  Yes.

5   Q.  Specifically, if I ask you to turn to page 5, so in the

6   bottom center it says DX 131-5, is this your spreadsheet of

7   so-called Fubo unwanted content costs?

8   A.  It is, yes.

9                THE COURT:  I'm sorry, Mr. Ryan.  I just missed the

10  number tab that you're referring to.

11               MR. RYAN:  Tab 4, your Honor.

12               THE COURT:  Yes, I'm there.

13               MR. RYAN:  DX 131-5, so the fifth page.

14               THE COURT:  I'm there.

15  BY MR. RYAN:

16  Q.  So this page that we're looking at, Mr. Marchesano, shows

17  subscription rates that Fubo pays to a variety of programmers

18  by channel, right?

19  A.  Yes, our 2023 rates.

20  Q.  Well, I'm here on page 5, so this is showing right now 2023

21  rates, right?

22  A.  Yes, this is showing our 2023 rates.

23  Q.  All right.  And elsewhere in the same document, 2024 rates

24  are shown, right?  On page 9 there's a listing there, Fubo 2024

25  rates, right?

O87HFub3                              Marchesano - Cross

1    A.  Yes, this — yes, in the document.

2    Q.  Going back to page 5, in the far right column, this shows,

3    based on the number of subscribers Fubo had in 2023, the total

4    cost that Fubo paid for each of these channels, right?

5    A.  Correct.

6    Q.  In creating this spreadsheet here on page 5 of DX 131, you

7    excluded sports and news channels, right?

8    A.  And any Spanish-language content costs.

9    Q.  And so for U.S. subscribers, you excluded sports and news

10   channels, right?

11   A.  Yes.

12   Q.  So, for instance, Fox News or MSNBC are not listed as

13   unwanted content here, right?

14   A.  They are not included in this chart.

15   Q.  All right.  And you created this chart within a couple

16   weeks of when the Venu joint venture was announced in February

17   of this year, right?

18   A.  Honestly, I don't recall when it was. Just earlier this

19   year, I know.

20   Q.  All right.  If we look at the first page of this

21   document —

22          THE COURT:  Mr. Ryan, sorry.  Can we just go back to

23   that previous page.  I just had a clarifying questioning.

24          XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O87HFub3                        Marchesano - Cross

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2            THE WITNESS:  Yes.

3            THE COURT:  Can you explain to me what those terms

4    mean?  Is carriage the minimum penetration rates that we heard

5    about?

6            THE WITNESS:  That is correct.

7            THE COURT:  What is pay-on?

8            THE WITNESS:  Pay-on is the number of subscribers we

9    have to pay on regardless of the carriage.  XXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXX

12           THE COURT:  And the measure or the calculus of what

13   you are paying a programmer like Disney or Fox is on a

14   per-subscriber basis?

15           THE WITNESS:  Exactly.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20           XXXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25           THE WITNESS:  Exactly.

O87HFub3                          Marchesano - Cross

1           THE COURT:  But that doesn't necessarily mean that

2     only 50 percent of subscribers are getting Nat Geo Wild; it

3     doesn't necessarily mean that in practice there is that gap.

4     It's just that there might be, and you can't get out of the

5     65 percent number?

6           XXXXXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10          XXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12          XXXXXXXXXXXXX  XXXX

13          XXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXXXX

14          XXXXXXXXXXXXX  XXXXX

15          XXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16          XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18          XXXXXXXXXXXXX  XXXXXXXXXXXXX

19          THE COURT:  OK.  I just —— this is all new to me, so I

20    just want to make sure I understand.

21          OK.  Mr. Ryan, sorry for taking up your time.  Go

22    ahead.

23          MR. RYAN:  No problem, your Honor.

24    BY MR. RYAN:

25    Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O87HFub3                          Marchesano - Cross

```
1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XX    XXXXXXXXXXXXXXXXXXXXXX

6   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

12  Q.  All right.  So other than the Warner Bros. Discovery

13  networks on this page, Fubo remains contractually committed

14  under carriage agreements with programmers to carry all of the

15  entertainment programming shown on this page, DX 131, page 5,

16  correct?

17  A.  Yes, in our base package.

18  Q.  Now, on direct you testified that if the Court were to

19  require defendants to make sports channels available outside

20  the broader packages to Fubo, then you believe Fubo could offer

21  a package with about 40 channels that would cost $60 in content

22  costs to Fubo per subscriber.  Do you remember that, sir?

23  A.  Yes.

24  Q.  All right.  When you gave that testimony, you had to make

25  some assumption then of what rate Fubo would be paying for

1    Disney and Fox Sports networks that it would receive outside

2    the broader packages that Fubo gets today, right?

3    A.  Yes, I had to make, yeah, assumptions on those calls.

4    Q.  OK.  And the assumption you made, I take it, is that Disney

5    and Fox would license the sports channels only to Fubo at the

6    same per-channel rate that Fubo pays today as part of a broader

7    package from Disney and Fox, is that right, sir?

8    A.  Yes, my assumption was they would not jack up the price for

9    being carried differently, yes.

10   Q.  Now, you also had to make an assumption as to content costs

11   that Fubo would continue to have from programmers who are not

12   defendants in this case, right?

13   A.  Yes, that's correct.

14   Q.  And so those are programmers like NBC Universal, CBS,

15   Paramount, and Univision, right?

16   A.  Yes.

17   Q.  And am I right that you assumed that the content cost to

18   Fubo from those non-defendant programmers would be

19   approximately $30-a-month per subscriber?

20   A.  I'd have to take a second to count them all up and then go

21   back, but sounds about right.

22   Q.  All right.  But you went through some exercise of this type

23   to arrive at the $60 figure ——

24   A.  Yes.

25   Q.  —— hypothetical figure that you testified to on direct,

1    right?

2    A.   Yes.

3    Q.   You could turn to tab 1 of the binder.  This should be

4    Demonstrative Exhibit 3.1, DDX 3.1.  I've taken these numbers,

5    as indicated at the bottom of the slide, from your unwanted

6    content document, DX 131.

7         Do these numbers look right in terms of what Fubo is

8    paying per subscriber to NBC Universal, to CBS Paramount, and

9    to Univision?

10   A.   Well, the Univision rate's an old rate, and then the NBC

11   Universal, we have a new rate there as well.  But the

12   Paramount, the CBS Paramount one, does look about right.

13   Q.   So you would agree, then, that in this hypothetical where

14   the Court were to order defendants to make sports channels only

15   available to Fubo on similar terms as to Venu, that Fubo would

16   continue to have approximately $30 per subscriber in monthly

17   costs that it owes to non-defendant programmers, right?

18   A.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXX

22   Q.   But you went through a very similar exercise to the one I'm

23   doing here.  You must have, right, to arrive at this

24   hypothetical $60, right?

25   A.   Correct.

1    Q.   So, broadly speaking, you would agree with me that there's

2    approximately $30 in additional content costs to non-defendant

3    programmers, right?

4    A.   Yes, sounds about right.

5    Q.   Content cost Venu doesn't have, right?

6    A.   Yes.

7    Q.   And so it would logically make sense, then, that the

8    additional $30 in content costs that in this hypothetical Fubo

9    would have to non-defendant programmers, Fubo would have to

10   pass that through in this hypothetical skinnier sports package,

11   right?

12   A.   Yes, because we would still have those costs.  It wouldn't

13   be our ideal skinny package.  We would still have to incur

14   those costs, right.

15   Q.   And so it would cost a lot more than $42.99 to the public,

16   right?

17   A.   Yes, it would cost more than 42.99, which is what Venu is

18   being priced at, which seems aggressive, yes.

19             MR. RYAN:  No further questions, your Honor.

20             THE COURT:  Ms. Tondrowski, any redirect?

21             MS. TONDROWSKI:  No redirect.

22             THE COURT:  You can step down, Mr. Marchesano.  Thank

23   you very much.

24             (Witness excused)

25             MR. HAFENBRACK:  Your Honor, Fubo calls John Nallen.

1            THE COURT:  OK.  We're going to reopen the courtroom

2       for Mr. Nallen.

3            Ms. Verneus, could you unlock the doors and turn back

4       on the live feed.

5            (In open court)

6            THE COURT:  I'm sorry, Mr. Earnhardt.  Were you locked

7       out?

8            MR. EARNHARDT:  No, I didn't want to interrupt the

9       testimony.

10           THE COURT:  Just for the lawyers, if that should

11      happen again, if you should happen to be locked out when the

12      courtroom is sealed because you're returning late from the

13      break, you always can just email Ms. Ghotbi.  I know you all

14      have your phones.  Just email Ms. Ghotbi that you're locked

15      out, and we'll do our best to get you in.

16           MR. EARNHARDT:  Thank you, your Honor.

17           THE COURT:  OK.

18           MR. HAFENBRACK:  Your Honor, Joshua Hafenbrack for

19      Fubo.  I'll be doing the examination for now.

20           THE COURT:  Nice to have you get a star turn,

21      Mr. Hafenbrack.

22           MR. HAFENBRACK:  I appreciate that, your Honor.  I've

23      been patiently waiting my turn.

24           MR. LEVANDER:  Mr. Nallen will be here in a moment.

25           THE COURT:  I'm sorry?

O87HFub3                          Marchesano - Cross

1              MR. LEVANDER:  Mr. Nallen will be here in a moment.

2              THE COURT:  OK.

3              MR. HAFENBRACK:  I believe we've handed up witness

4    binders.  Is that correct?

5              THE COURT:  Yes, we have them.

6              MR. HAFENBRACK:  Wonderful.

7              MS. TONDROWSKI:  Your Honor, may I go grab that extra

8    binder?

9              THE COURT:  Yes.  Thank you, Ms. Tondrowski, that

10   would be helpful.  Do you have one there for Mr. Nallen?

11             MS. TONDROWSKI:  Yes.

12             THE COURT:  Great.  Thank you.

13             Mr. Nallen, just come forward here to my left and just

14   remain standing so Ms. Verneus can administer the oath.

15   JOHN NALLEN,

16        called as a witness by the Plaintiff,

17        having been duly sworn, testified as follows:

18             THE WITNESS:  John Nallen, N-a-l-l-e-n.

19             THE COURT:  There's a pitcher there and some cups,

20   Mr. Nallen.  It just has fresh water if you'd like some, and

21   there's tissues here if you should need people.

22             Mr. Ryan, I saw you in the back.  Did you just confirm

23   that the door is unlocked?  Mr. Ryan, you're over here.  I

24   thought I saw you over there.

25             MR. RYAN:  No, I'm here, your Honor.

O87HFub3                      Nallen - Direct

1          THE COURT:  Ms. Verneus is checking it.  Thank you.

2     I'm trying to watch too many things at once.  Another tall

3     bearded gentleman was checking the door.

4          MR. RYAN:  It's like sports on multiple screens going

5     on.

6          THE COURT:  It's like a trading floor in here, yes.

7     But I see Ms. Verneus has confirmed that the door is unlocked

8     and open to the public.

9          And with that, Mr. Hafenbrack, you can begin.

10          MR. HAFENBRACK:  Thank you, your Honor.

11     DIRECT EXAMINATION

12     BY MR. HAFENBRACK:

13     Q.  Mr. Nallen, it's a pleasure to see you again this morning.

14     A.  Same here.  Thank you, counsel.

15     Q.  You are the chief operating officer of the Fox Corporation?

16     A.  That's correct.

17     Q.  And that's a role you've held since 2019, is that correct?

18     A.  That's correct.

19     Q.  Since the Fox Corporation spun off in the larger Fox-Disney

20     transaction, is that correct?

21     A.  That's correct.

22     Q.  And as COO, you oversee the company's finance strategy and

23     business development, among other areas, is that correct?

24     A.  That's correct.

25     Q.  And you were one of Fox's lead negotiators for the Raptor

O87HFub3                          Nallen - Direct

1   joint venture, is that correct?

2   A.  That is correct.

3   Q.  And you'll be a board member for the JV when it launches?

4   A.  That's still undecided.

5   Q.  OK.  Fox will have two board members?

6   A.  That's correct.

7   Q.  And you might be one of them?

8   A.  May be.

9   Q.  Who are the folks under consideration for those two slots?

10  A.  Probably two —— three candidates:  Myself; Paul

11  Cheesbrough, who heads our technology; and Steve Tomsic, who's

12  our chief financial officer.

13  Q.  Thank you, sir.

14          You report directly to Fox's CEO, is that correct?

15  A.  That is correct.

16  Q.  And that is Mr. Lachlan Murdoch, correct?

17  A.  That is correct.

18  Q.  Mr. Nallen, Fox has the media rights to marquee live

19  sports, correct?

20  A.  To many marquee live sports.

21  Q.  In particular, you identify four categories of marquee live

22  sports to which Fox has the rights, is that correct?

23  A.  I don't recall which ones I identified when we last spoke,

24  but, clearly, we have the NFL, Major League Baseball, college

25  football rights, and NASCAR.

O87HFub3                              Nallen - Direct

1    Q.  And those are four categories that you would agree are

2    marquee sports properties, correct?

3    A.  They're among the marquee sports properties, yes.

4    Q.  And Fox has the right to those four sports properties under

5    contract through late 2028, is that correct?

6    A.  Yes, through at least that.

7    Q.  Through at least then.  Could be longer, right?

8    A.  That's correct.

9    Q.  And the first deal among those four marquee categories

10   that's up for renewal is the Major League Baseball deal, is

11   that correct?

12   A.  That is correct.

13   Q.  And that's up for renewal in late 2028, correct?

14   A.  That is correct.

15   Q.  After the World Series in October 2028?

16   A.  That is correct.

17   Q.  The World Series that will be on Fox, is that right?

18   A.  That's correct.

19   Q.  And the World Series has been on Fox for 25 years and

20   running, is that correct?

21   A.  That is correct.

22   Q.  Fox's deal with NASCAR runs through 2031, correct?

23   A.  That is correct.

24   Q.  Fox's deal with the NFL runs at least through 2031,

25   correct?

O87HFub3                        Nallen - Direct

1    A.  No, through the 2029 season at least, and then the NFL has

2    an option to extend.

3    Q.  And if the NFL doesn't exercise its option, it runs for a

4    couple more years, correct?

5    A.  No, it will end at 2029 season.

6    Q.  So through the 2029 season?

7    A.  That's correct.

8    Q.  Thank you for that clarification.

9            Fox has a media rights deal with the Big Ten, is that

10   correct?

11   A.  That is correct.

12   Q.  And that deal runs through 2036, correct?

13   A.  That is correct.

14   Q.  In addition to the four categories of marquee sports, Fox

15   has the media rights to other sports as well, correct?

16   A.  That is correct.

17   Q.  College basketball, correct?

18   A.  Correct.

19   Q.  High-profile international soccer, correct?

20   A.  That is correct.

21   Q.  The FIFA World Cup among them?

22   A.  Through 2026.

23   Q.  Now, Mr. Nallen, Fox's sports telecasts on live linear

24   television had more viewership than ever in 2023, correct?

25   A.  I don't know that factually.

O87HFub3                          Nallen - Direct

Q.  The most viewership in the company's history, right?

A.  Again, I don't know factually that answer.

Q.  OK.  We'll take a look at a document in a little bit.

        First let me ask you, Fox distributes its live sports
programming through linear television networks, is that right?

A.  That is correct.

Q.  And Fox's English-language sports networks are Fox
Broadcast, FS1, FS2, Big Ten Network, is that right?

A.  English language, yes, that's right.

Q.  And then Fox Deportes is a Spanish-language channel that
also carries some sports?

A.  That is correct.

        THE COURT:  Mr. Hafenbrack, can I just interrupt you.

        Mr. Nallen, this term "linear networks" has been used
a lot, and I don't really know what many of these terms mean,
so I'm here to learn.  Can you just explain to me, a layperson,
how you would define a linear sports network — I mean a linear
network?

        THE WITNESS:  That's a great question.  The way I
would define it are channels that are provided to consumers in
a format where the stream of the channel is uninterruptible by
the consumer.  So in the case of Fox Broadcast, we provide a
channel.  It starts at X time in the morning and it ends at Y
time at night, and it's delivered via broadcast signals or
other signals to distributors to consumers.

O87HFub3                           Nallen - Direct

1          THE COURT:  And in part what linear, the term
2    "linear," is capturing is that a programmer at Fox is deciding,
3    OK, so at 9:00 — from 9:00 to 11:00, we're going to be pushing
4    out this program, then from in the 12:00 to 1:00 slot, we're
5    going to have this program, and so on, around a clock of the TV
6    schedule.  Like, in my generation, you know, we got TV Guide in
7    the mail, and you would open it and it would have a chart that
8    would say at 9 a.m. each of these channels is showing this
9    program.
10          So that kind of programming is what would be described
11   as a linear network, is that right?
12          THE WITNESS:  That's the way I would describe it.
13          THE COURT:  That's very helpful.
14   BY MR. HAFENBRACK:
15   Q.  Picking up on your Honor's question, with respect to
16   entertainment programming, consumers now can time shift that
17   and watch it on demand anytime they want, right?
18   A.  They can actually take any program they want and time shift
19   it, even a sports program.  But we provide, in our two hours of
20   Prime Time for Fox, a linear feed from 8 p.m. to 10 p.m. to
21   consumers in America.  If they decide to record and time shift
22   it, that's entirely up to them.
23   Q.  But a lot of the power of watching live sports is watching
24   the game as it occurs in real time, wouldn't you agree?
25   A.  I would agree with that.

O87HFub3                         Nallen - Direct

1    Q.  Now, Mr. Nallen, Fox's networks are available exclusively

2    through traditional and virtual MVPDs, correct?

3    A.  That is correct.

4    Q.  A customer cannot get Fox's networks through any SVOD

5    service, correct?

6    A.  That is correct.

7    Q.  Let's take a look at PX 81.  You should have a binder there

8    in front of you, Mr. Nallen.  We'll also put it on the screen

9    to try to make it easier for you.

10         THE COURT:  And, Mr. Nallen, some of those channels

11   continue to be broadcast over the air also.  Like if you have

12   an antenna, you can pick them up if you're in the right

13   geographic area?

14         THE WITNESS:  Only one of our channels is that way,

15   which is the Fox Network, and it's broadcast onto local

16   stations in each of the markets across the U.S., available

17   either over the air through an antenna or through a

18   distributor.

19         THE COURT:  So in New York I think that's Channel 5?

20         THE WITNESS:  That's correct.

21         THE COURT:  Is your local Fox affiliate?

22         THE WITNESS:  That's correct.

23         THE COURT:  So that Fox Broadcast channel, you can pay

24   for it through a cable subscription or through a digital MVPD

25   or you can, if you have the right equipment and you're in the

O87HFub3                          Nallen - Direct

1    right place geographically, you could get that channel for free

2    over the airwaves, right?

3              THE WITNESS:  Exactly right.

4              THE COURT:  But that wouldn't apply to Fox News, Fox

5    Sports, some of these other specialized channels?

6              THE WITNESS:  That is correct.

7              THE COURT:  All right.  Thank you.

8              Go ahead, Mr. Hafenbrack.

9              MR. HAFENBRACK:  Thank you.

10   BY MR. HAFENBRACK:

11   Q.  If you take a look at PX 81, Mr. Nallen, you can see a

12   couple of your documents like this, but the "from" is cut off

13   at the top.  We discussed this document in your email, which I

14   can represent this came from your email file.

15             You're familiar with this document, correct?

16   A.  I am.

17   Q.  And if you go to the second page of the exhibit, ends in

18   Bates 946, the top there, it says, "Fox MMM" and it has a date

19   of July 26, 2023.  Do you see that?

20   A.  I do.

21   Q.  And MMM is monthly management meeting, is that right?

22   A.  That is correct.

23   Q.  And that's a meeting that's attended by a number of leaders

24   of Fox's operating units, is that right?

25   A.  That is correct.

O87HFub3                        Nallen - Direct

1   Q.  Including you, correct?

2   A.  That's correct.

3   Q.  The CEO, correct?

4   A.  Correct.

5   Q.  The CFO, Mr. Tomsic, correct?

6   A.  That's correct.

7   Q.  And if you look at the next page of this exhibit, which

8   we'll put up on the screen for you, page 3, you see there's a

9   CEO report dated July 2023?

10  A.  I see that.

11  Q.  And that's a report that's prepared for CEO Lachlan

12  Murdoch?

13  A.  That is correct.

14  Q.  Let's take a look at page 7.  I want to direct your

15  attention, Mr. Nallen, to the operating highlights in the top

16  left, and we'll try to highlight it on the screen so we can

17  make crystal clear what I'm talking about.

18          The first sentence says:  "FY23 ended as the most

19  viewed in the history of Fox Sports with approximately

20  450 billion minutes of sports content consumption across all

21  networks."

22          Do you see that?

23  A.  I do.

24  Q.  And fiscal year 2023, did that end June 30, 2023?

25  A.  It did.

O87HFub3                         Nallen - Direct

1    Q.  And that's a one-year period up to that point?

2    A.  Correct.

3    Q.  And it's an accurate statement that fiscal year 2023 was

4    the most viewed in the history of Fox Sports, correct?

5    A.  I have no reason to doubt it.

6    Q.  Thank you.

7            I'll direct your attention to the third sentence in

8    this paragraph where it says:  FY23 Fox Sports linear content

9    —— let me try that again, your Honor.

10           "FY23 Fox Sports linear network content showed growth

11   in consumption," and then it lists Fox's sports networks.

12           Do you see that?

13   A.  Yes.

14   Q.  And Fox's viewership was up across the board in fiscal year

15   2023 on all of Fox's linear networks, correct?

16   A.  Correct.

17   Q.  And that's despite the cord-cutting that's happened years

18   before that, true?

19   A.  True.

20   Q.  You see in the next paragraph it says "Highlights of the

21   year," and it says the most-watched TV show of all time was

22   Super Bowl 57?

23   A.  Yes, I see that.

24   Q.  Is that an accurate fact?

25   A.  I have no reason to doubt it.

O87HFub3                        Nallen - Direct

1    Q.  OK.  You could put that one aside, Mr. Nallen.

2            In 2023, more than 95 of the top 100 broadcasts in the

3    United States were live sports, correct?

4    A.  I have no reason to doubt that.

5    Q.  And you're aware that's true, right?

6    A.  Again, I have no reason to doubt it.

7    Q.  And, Mr. Nallen, among nonsports events, the only two

8    events that, in your view, can rival an NFL game are

9    presidential election night and presidential debates.  Is that

10   accurate?

11   A.  That's what I feel.

12   Q.  And those are events that occur every four years, including

13   this year, right?

14   A.  Correct.

15   Q.  And the presidential events, they can rival an NFL game

16   based on cumulative viewership over a number of different

17   networks, correct?

18   A.  That's correct.

19   Q.  Where an NFL game is just on Fox, right?

20   A.  Our NFL games are just on Fox.

21   Q.  Mr. Nallen, live sports have dominated the top end of the

22   TV marketplace for many years, but never more so than in 2023,

23   correct?

24   A.  Can you ask that again, counselor.

25   Q.  Sure.  Absolutely.

1          Live sports have dominated the top end of the TV

2    marketplace for many years, but never more so than in 2023?

3    A.  I would agree with that.

4    Q.  Let's pull up PX 413, please.

5          You see, Mr. Nallen, there's an email here from

6    Gabrielle Brown to you?

7    A.  I see that.

8    Q.  It's dated November 30, 2023, is that correct?

9    A.  Correct.

10   Q.  And is Ms. Brown the head of Fox's investor relations?

11   A.  She is.

12   Q.  And here you can see she's preparing remarks, a Q&A, for a

13   conference with investors, is that right?

14   A.  That's right.

15   Q.  You would agree it's important for Fox to prepare accurate

16   information when it's speaking to the markets?

17   A.  Absolutely.

18          THE COURT:  Mr. Nallen, the subject is UBS Q&A.  Was

19   that a Q&A in particular for analysts at UBS?

20          THE WITNESS:  It was a conference that UBS was

21   sponsoring, and their analysts would be asking the questions.

22   So preparation for that.

23          THE COURT:  Their analysts would be sort of moderating

24   the panel, as lawyers would call it, I think, but the audience

25   for this conversation would be more than just analysts at UBS?

O87HFub3                        Nallen - Direct

1          THE WITNESS:  Oh, yes, very much so.  And it would be

2   been webcast as well, so it would have been available to

3   anyone.

4          THE COURT:  So even individual investors could listen

5   in, not only analysts or investors at major financial

6   institutions?

7          THE WITNESS:  That's correct.

8          THE COURT:  Go ahead, Mr. Hafenbrack.

9          MR. HAFENBRACK:  Thank you, your Honor.

10  BY MR. HAFENBRACK:

11  Q.  If you go to the second page of this exhibit, Mr. Nallen,

12  there's a section in the bottom half of the page that's about

13  TV affiliates.  Do you see that?

14  A.  I do.

15  Q.  And this is talking about the migration of content onto

16  direct-to-consumer services.  Do you see that?

17  A.  I do.

18  Q.  DTC means direct to consumer?

19  A.  That's correct.

20  Q.  I'd like to direct your attention to the fourth bullet

21  point, and I'm going to read that bullet point and ask you a

22  couple of questions about it.  I'm going to take it in pieces.

23          The first half of this sentence before the comma says:

24  "We have the technical infrastructure (and an increasing

25  portfolio of digital rights) in place to pivot if and when

O87HFub3                        Nallen - Direct

1    needed."

2              Do you see that?

3    A.   I do.

4    Q.   That's talking about Fox's ability to pivot to a

5    direct-to-consumer service if it wanted to, correct?

6    A.   Correct.

7    Q.   And you agree that Fox has the infrastructure and the

8    portfolio of rights to do that if it wants it, correct?

9    A.   Not from an infrastructure standpoint, not immediately, but

10   in a short period of time, we would be able to launch a D to C

11   service.

12   Q.   Thank you.

13             The second half of that sentence says:  "But pay TV is

14   generating more revenue for us than ever before."

15             Let's pause there.  That's an accurate statement,

16   correct?

17   A.   It is.

18   Q.   The second half of that portion of the sentence says:  "And

19   top tier sports consumption on linear TV is as strong as ever."

20             Do you see that?

21   A.   I do.

22   Q.   Also accurate, correct?

23   A.   Also accurate.

24   Q.   So growth in SVODs, notwithstanding top tier sports

25   consumption on linear TV, as strong as ever in 2023, correct?

O87HFub3                          Nallen - Direct

1   A.  Correct.

2   Q.  And you see the bullet point below, it says:  "The

3   Michigan-Ohio State matchup was the most-watched regular season

4   college football game in the history of Fox," correct?

5   A.  I see that, yes.

6   Q.  And no reason to doubt that's accurate, right?

7   A.  No reason to doubt that.

8   Q.  It's the most-watched regular season college football game

9   on any network anywhere in the United States since 2011, is

10  that right?

11  A.  I have no reason to doubt that.

12  Q.  Let's take a look at page 3, and there's the —— at the

13  bottom of the page, there's a section there talking about

14  Charter's renewal with Disney.  You see that?

15  A.  I do now, yes.  Thank you.

16  Q.  And the second bullet says:  "We think that the bundle

17  should deliver real value for consumers.  That includes cutting

18  off the expensive long tail networks that don't drive scale

19  viewership."

20          Do you see that?

21  A.  I do.

22  Q.  And you agree with that, correct?

23  A.  I agree that the core bundle is the best consumer

24  proposition.

25  Q.  And consumers would get more value from the bundle if they

O87HFub3                    Nallen - Direct

1  didn't have to pay for expensive long tail networks that they

2  do not watch, correct?

3  A.  I guess, just to respond, all of the networks are watched.

4  So it's just a question of the concentration of viewing of

5  those networks.  So even a small network has viewership.

6  Q.  But you would agree that there are many networks that

7  aren't delivering sufficient value for the price those

8  consumers are paying for those networks, yes?

9  A.  Not necessarily, because the price that the distributor is

10 paying for those networks is commensurate with the viewing that

11 those networks are getting.

12 Q.  Let's take a look at page 3 —— I'm sorry, we're on page 3.

13 We're going to look at page 4.

14       And you see item No. 4 there, there's a discussion of

15 a potential sports bundle in the U.S.?

16 A.  I see that.

17 Q.  And then down at the last bullet point, it says:  "If a

18 sports bundle was created, we would bring a tremendous amount

19 of value."

20       Do you see that?

21 A.  I do.

22 Q.  And you agree with that, correct?

23 A.  Yes, I do.

24 Q.  And then the first sub-bullet says:  "It's hard to envision

25 a sports bundle that gains scale without our premium content."

1                    Do you see that?

2    A.  I do.

3    Q.  And that's referring to Fox's premium content?

4    A.  That's correct.

5    Q.  And you agree with that statement as well, correct?

6    A.  Yes, I do.

7    Q.  You can put that one aside.

8             Now, Mr. Nallen, when Fox licenses its networks to

9    MVPDs, Fox has not licensed its sports channels separately from

10   its nonsports channels, correct?

11   A.  That's correct.

12   Q.  Fox has never historically unbundled its channels, correct?

13   A.  That is correct.

14   Q.  And Raptor will be the first time that Fox licenses its

15   sports channels without its nonsports channels, correct?

16   A.  That is correct.

17   Q.  Raptor is a brand new product in the market, correct?

18   A.  Correct.

19   Q.  And it's a brand-new product that Fox's distribution

20   partners cannot offer under their existing contracts with Fox,

21   isn't that true?

22   A.  Well, it's a brand —— to your point, it's a brand-new

23   product in the market being offered to a segment of the market

24   that the MVPDs do not access right now.

25   Q.  Appreciate that your answer —— appreciate that, Mr. Nallen.

1    Let me ask again, just to make sure I'm getting a clean answer.

2          In Raptor is a brand-new product that Fox's

3    distribution partners cannot offer under their existing

4    contracts, correct?

5    A.   Correct.

6    Q.   We talked about DTC SVODs earlier.  Live pay TV providers,

7    meaning MVPDs and virtual MVPDs, have a more complete sports

8    offering than any direct-to-consumer product could offer,

9    correct?

10   A.   Yes, that's right.

11   Q.   No one company has enough to satisfy a sports fan with a

12   direct-to-consumer offering, correct?

13   A.   That's correct.

14   Q.   And that's especially true if you're a sports fan and you

15   want to watch multiple different leagues and types of sports,

16   correct?

17   A.   Could you ask it one more time, counselor.

18   Q.   Sure.  Absolutely.

19          And that's especially true if you're a sports fan and

20   you want to watch multiple different leagues and types of

21   sports, correct?

22   A.   Yes.  Even pay TV today cannot offer the sports fan all the

23   sports that a sports fan may want to watch, given that some of

24   the tech companies now own rights outside of pay TV.

25   Q.   But as ——

O87HFub3                          Nallen - Direct

1          THE COURT:  I'm sorry, Mr. Hafenbrack.  Can I just ask
2     a follow-up question.
3          So again setting aside the sports fan who may only
4     care about one thing, if you're the type of sports fan that
5     cares about more than one thing —— if I only like golf, I can
6     pretty much get all the golf I want maybe from one place, but
7     if I want a variety of things, or even like all the Falcons
8     games or something, right now there's no one product I can buy
9     that necessarily has everything I might want.  Is that what
10    you're saying, Mr. Nallen?
11         THE WITNESS:  Yes, because we license rights to the
12    pay TV operators like other broadcasters do.  But outside of
13    those rights entirely, outside of the pay TV bundle entirely,
14    companies like Amazon have Thursday night football.  Companies
15    like Netflix now have NFL football.  Apple has baseball and
16    soccer.  So if you were the kind of fan you described, you
17    would also have to license those products in order to have a
18    complete view of sports in the United States.
19         THE COURT:  And those SVOD distributors that you've
20    just described that now have some live sports, do they have the
21    exclusive right to those live sports?  So I forget, I'm sorry,
22    which distributor you said has the Thursday night NFL games.
23    Do they have the exclusive rights to those Thursday NFL games?
24         THE WITNESS:  Yes, you can only get it on Amazon.
25         THE COURT:  Thank you.

O87HFub3                              Nallen - Direct

1          Go ahead, Mr. Hafenbrack.

2          MR. HAFENBRACK:  Thank you, your Honor.

3   BY MR. HAFENBRACK:

4   Q.  Now, Mr. Nallen, Fox would not have entered into Raptor if

5   it wasn't going to be profitable for Fox to do that, correct?

6   A.  I just didn't hear you, counselor.

7   Q.  Sorry about that.

8          Fox would not have entered into Raptor if it wasn't

9   profitable for Fox to do that, correct?

10  A.  Or over the long term.  We're making an investment in the

11  Raptor Venu sports platform because, over the long term, it

12  will be a profitable enterprise for Fox.  That is our estimate

13  currently.

14  Q.  Fox is a for-profit business, correct?

15  A.  Yes.

16  Q.  And it's a sophisticated one, correct?

17  A.  Yes, I would say that.

18  Q.  And with Raptor, Fox projects that that joint venture is

19  going to make the company $1 billion on net between now and

20  2029 before you project Raptor itself ever turns a profit,

21  correct?

22  A.  No, at that point in time Raptor will have turned a profit.

23  Q.  Sir, Fox's bet of a billion —— strike that.

24          Sir, Fox is a billion dollars better off on net

25  between now and 2029 before Raptor itself becomes profitable,

O87HFub3                          Nallen - Direct

1    correct?

2    A.    I thought my recollection is by 2029 the Raptor platform is

3    profitable, but even with that, whatever the Raptor profitable

4    — whatever, sorry, the Raptor platform economics are, the

5    billion dollars is our estimate of Fox's cumulative profits

6    from the platform over that period of time.

7    Q.    A billion dollars cumulative profits between now and 2029,

8    correct?

9    A.    Correct.

10   Q.    And then in 2029, you project Raptor itself will start to

11   turn a profit, correct?

12   A.    Yes, although I thought '29 was a profitable year.

13   Q.    And at that point, say, beginning in 2029, as you say, Fox

14   will get one-third of the profits from Raptor on top of the net

15   benefit from its affiliate fees, correct?

16   A.    That's right, having funded one-third of the investment up

17   until that point.

18   Q.    And Fox and all of the JV partners are going to invest

19   hundreds of millions of dollars into Raptor, isn't that true?

20   A.    That is true.

21   Q.    And the analysis that Fox will become profitable in 2029 is

22   based on an assumption of 5 million subscribers, correct?

23   A.    5 million by 2029.

24   Q.    Building up to 5 million — achieving 5 million by 2029,

25   correct?

O87HFub3                          Nallen - Direct

1    A.  Correct.

2    Q.  And if Fox has 15 million subscribers instead of 5 million,

3    it will be profitable sooner, right?

4    A.  If Raptor had ——

5    Q.  Yes.

6    A.  —— 15 million?

7    Q.  Yes, sir.

8    A.  I actually don't know the answer to that.

9    Q.  Isn't it sort of basic economics if you have double or

10   triple the subscribers?

11   A.  It would be a massive investment to get 15 million

12   subscribers.  I don't know the ends and out.

13            THE COURT:  I'll just reminding you —— not you,

14   Mr. Nallen.  I'm reminding, Mr. Hafenbrack; I'm telling you for

15   the first time.  Two people cannot talk at the same time or

16   it's very difficult to get an accurate transcript.  So you just

17   want to make sure that you're sure Mr. Hafenbrack is finished.

18   Even if you know, as I can tell you do, where he's going, just

19   wait for him to finish, and he will do the same and make sure

20   you're done with your answer so that we don't have crosstalk.

21            THE WITNESS:  Understood.

22            THE COURT:  Go ahead, Mr. Hafenbrack.

23            MR. HAFENBRACK:  Thank you, your Honor.

24   BY MR. HAFENBRACK:

25   Q.  Mr. Nallen, on Raptor, Fox will keep 100 percent of the

O87HFub3                          Nallen - Direct

1    revenues from the ad sales on its networks?

2    A.  Correct, just like it does on MVPDs.

3    Q.  Whereas with ad sales through an MVPD, Raptor shares some

4    portion of the ad sales with the MVPD, correct?

5         THE COURT:  I'm sorry, Mr. Hafenbrack.  I think you

6    mean Fox.  You said "Raptor shares," and I think you mean Fox

7    shares.

8         MR. HAFENBRACK:  I do.  Let me try again, your Honor.

9    Q.  Whereas with ad sales through a third-party MVPD, Fox

10   shares some portion of the ad revenue with the MVPD, correct?

11   A.  That's correct, very, very small amount.

12   Q.  Two minutes per hour, is that right?

13   A.  Two minutes per hour.

14   Q.  Does it work out to roughly 15 percent?

15   A.  That would be the math, yes.

16   Q.  Let's take a look at PX 79.

17        You see, Mr. Nallen, this is an email from the CFO,

18   Mr. Tomsic, to you, correct?

19   A.  Correct.

20   Q.  Dated August 24, 2023, correct?

21   A.  Correct.

22   Q.  And he attaches a slide deck talking about project Raptor

23   ownership scenarios, right?

24   A.  I don't see the attachment.

25   Q.  Oh.  If you go to the next page, Mr. Nallen, I think you'll

O87HFub3                          Nallen - Direct

1  see the sort of first —— we'll put it on the screen.  We'll

2  walk through on the screen for you as well to make it easier.

3          Right now we've got up the cover of the slide deck.

4  You see there it's entitled "Project Raptor JV Ownership

5  Considerations"?

6  A.  Yes, I see that.

7  Q.  And you're familiar with this document, correct?

8  A.  I am.

9  Q.  Let's go to page 3, please.

10          And you see on the right-hand column this document was

11  considering two sort of alternative scenarios for the Raptor

12  JV, is that right?

13  A.  Can you remove the —— yes.  I think it was considering two

14  alternatives, but not necessarily for the Raptor JV.  At this

15  point just two alternatives.

16  Q.  OK.  And one of the alternatives was an exclusive Raptor

17  where Fox would only license unbundled sports channels to

18  Raptor, correct?

19  A.  Correct.

20  Q.  And then the other scenario was a multiparty licensing

21  scenario where Fox could license unbundled sports to Raptor and

22  also to third parties, right?

23  A.  Correct.

24  Q.  And let's take a look at page 3 —— sorry, I think page 5.

25  Yeah, page 5.

1          Here you see we've got the two columns for the

2    exclusive on the left and on the nonexclusive on the right,

3    correct?

4    A.   Correct.

5    Q.   And if I could direct your attention to the third row, it

6    says "Raptor Subscribers."  Do you see that?

7    A.   Yes.

8    Q.   And here the projection was, in the exclusive scenario,

9    15.6 million subscribers, and the nonexclusive scenario,

10   14.6 million subscribers, correct?

11   A.   At that time, yes.

12   Q.   And Fox didn't pick those numbers out of thin air, correct?

13   A.   Not at that time, no.

14   Q.   Let's go to page 8, please, of the PDF.

15          You see here we've got a P & L with a side-by-side of

16   the two scenarios we've been discussing?

17   A.   I see that.

18   Q.   And I want to ask you about the ending subscribers line.

19   And do you see the subscribers here are ramping up over time,

20   and they match the 15.6 million and 14.6 million projections

21   from the prior slide, correct?

22   A.   I see that, yes.

23   Q.   And you have no reason to doubt that those were Fox's

24   projections at the time, correct?

25   A.   I have no reason to doubt it.

O87HFub3                    Nallen - Direct

1    Q.  Do you see there's a comment bubble there that says

2    "Initial conversion of users from ESPN+"?

3    A.  Yes.

4    Q.  And you understand that ESPN+ will be one of the

5    applications available through Raptor?

6    A.  Yes.  At this point in time, it was just Disney and —— and

7    Fox.

8    Q.  OK.  Right.

9         Raptor will include ESPN+ and the 14 linear networks,

10   14 sports linear networks owned by Fox, Disney, and Warner

11   Bros., correct?

12   A.  That's correct.

13   Q.  And you're familiar that ESPN+ has grown to 25 million

14   subscribers in just seven years, correct?

15   A.  I didn't know that number.

16        THE COURT:  Mr. Hafenbrack, we're getting close to

17   when we need to break for lunch to stay on track for —— I had

18   told DirecTV's counsel to be here at 2:00.  When you're at a

19   natural breaking point in the next few minutes, just let me

20   know, and we'll break for lunch.

21        MR. HAFENBRACK:  Your Honor, I've actually just

22   reached one.  I'd say let's take the break now.

23        THE COURT:  Perfect.

24        Thank you, Mr. Nallen.  You'll return after lunch.

25        We'll break now for lunch.  All counsel should be here

O87HFub3                         Nallen - Direct

1   who are addressing the Thun-related motion at 2 o'clock.

2            And, Mr. Nallen, I expect we'll resume with you at

3   maybe 2:10.  Just consult with your counsel, and they will tell

4   you when to be available.

5            Thank you, everyone.  Enjoy your lunch.

6            MR. HAFENBRACK:  Your Honor, I'm sorry.  Mr. Hansen

7   just reminded me ——

8            THE COURT:  I was just going to do that.  Thank you.

9   I thought of it at the same time, Mr. Hafenbrack.

10           Because even though you're on direct, Mr. Nallen,

11  you're not hostile —— you seem like a perfectly nice gentleman

12  —— but you're what lawyers would call a hostile witness.  That

13  means that, during the lunch break, you cannot speak to your

14  counsel about the content of your testimony.  You can talk to

15  them about anything else you want, just not the subject matter

16  of your testimony.

17           THE WITNESS:  Understood.

18           THE COURT:  All right.  Thank you all.  Have a good

19  lunch.

20           (Lunch recess)

21

22

23

24

25

O872Fub4

1          A F T E R N O O N   S E S S I O N

2                      2:05 p.m.

3          THE COURT:  You can be seated.

4          So, first, Mr. Levine, are you here?

5          MR. LEVINE:  Yes, your Honor.

6          THE COURT:  Okay.  Great.  I will let Ms. Hernández

7   begin, since it's Disney's motion.

8          You can come to the podium, Ms. Hernández, but before

9   you begin, just to kind of, I guess, level set on my own review

10  of the record and narrow the issues that I think are relevant

11  to discuss, so on July 2, 2024, we had a conference in this

12  case in which I ruled on a dispute between the parties related

13  to Mr. Thun, and by "parties to that dispute," I mean between

14  the Disney defendants and DirecTV as relates to Mr. Thun.

15         My ruling at that time was to limit discovery due to a

16  combination of delay and burdensomeness to DirecTV producing

17  the carriage agreements that it had with other programmers that

18  were responsive to request one in Disney's request.  That

19  ruling was in the context of anticipating that the defendants

20  would seek to depose Mr. Thun, which was planned at that time.

21         Subsequent to that ruling and that conference, my

22  understanding is that Disney agreed to forego cross-examining

23  Thun on his first declaration, did not seek the withdrawal of

24  that declaration as a condition of foregoing his deposition,

25  and it said, asked for and received 11 carriage agreements from

O872Fub4

1    DirecTV in exchange for Disney's agreement to not depose

2    Mr. Thun and DirecTV's representation that Mr. Thun would not

3    be a testifying witness at the PI hearing.

4            So I guess my first question for you, Ms. Hernández,

5    is have I accurately summarized the course of events with

6    respect to DirecTV and Mr. Thun and Disney?

7            MS. HERNÁNDEZ:  Yes.

8            THE COURT:  So my first question for you is why, in

9    Disney's view, given that Disney has chosen to forego examining

10   Mr. Thun on his first declaration, why is the second

11   declaration so different from the first that Disney takes a

12   different position about their need to cross-examine Mr. Thun?

13           MS. HERNÁNDEZ:  Yes, your Honor.

14           As you may remember, when we were here for the motion

15   to compel, even Mr. Levine made the representation that

16   Mr. Thun's first declaration was a short six-paragraph document

17   that just had generalized concerns.  I didn't need documents

18   because it didn't really say anything.  I still fought for the

19   documents, and I said I need the basis of what those

20   generalized concerns are.

21           We negotiated and, at the end, to avoid a deposition,

22   Mr. Thun said he would not provide testimony at the PI.  We

23   thought at least with the documents or -- and the declaration

24   didn't really say much.

25           The current declaration is more thorough, expanded,

O872Fub4

1    misleading, and speculative.  And I don't have the basis to

2    challenge the things that are said in there, right?

3         THE COURT:  Let me ask you about that because, based

4    on my read of Mr. Thun's second declaration, nearly all of it

5    relates to specific factual assertions about interactions

6    between DirecTV and Disney.  The facts, which presumably are in

7    the possession of Disney and its employees, and so it is not as

8    if -- and I'm not saying you don't have reason to complain.

9    I'm only saying that it is not the kind of situation where a

10   witness that no one has ever heard of comes up late in the day

11   with factual assertions that cannot be tested in any way by the

12   parties, right?  So am I correct in my reading——you will tell

13   me if I am wrong——that with maybe a word here and there, but

14   overwhelmingly the factual assertions in the second Thun

15   declaration relate to objective facts and the interaction

16   between DirecTV and Disney?

17        MS. HERNÁNDEZ:  I would say that there are some

18   objective facts.  I think some of them are not objective.  They

19   are subjective.  I will give you an example.  He claims that he

20   is not -- that DirecTV is not able to get a skinny package

21   because of our penetration requirements.  And so if we actually

22   remove penetration requirements, they would be able to provide

23   a skinny offering.  They have agreements with nonsports

24   networks that require the same 85 to 90 penetration

25   requirement.  So even if we gave them a sports-only bundle they

O872Fub4

1  would still have to add from those nonsports networks that are

2  requiring penetration, but he doesn't say that part in his

3  declaration.  He only says that if we remove penetration rates

4  and all the tiering and bundling, they would be able to offer a

5  skinny bundle.

6          THE COURT:  Okay.  Is Disney going to call witnesses

7  in this hearing who will challenge the factual narrative in

8  Mr. Thun's second declaration?

9          MS. HERNÁNDEZ:  Yes.

10         THE COURT:  Okay.  And will they say that some of the

11 things he says are not true?

12         MS. HERNÁNDEZ:  Yes.

13         THE COURT:  All right.  So Ms. Hernández, is there

14 anything else about this situation that you want to bring to my

15 attention before I hear from Mr. Levine?

16         MS. HERNÁNDEZ:  No, your Honor.  Thank you.

17         THE COURT:  Mr. Levine, I will hear from you.  And

18 then if Fubo wants to weigh in, they can.

19         MR. LEVINE:  Thank you.  Good afternoon, your Honor.

20 Jared Levine, from Crowell & Moring, on behalf of nonparty

21 DirecTV.

22         First of all, thank you for accommodating our schedule

23 today, making time for this motion.

24         As you know, our opposition letter addresses some

25 important confidential background issues that we can't get into

O872Fub4

1    in open court.  We think the letter contains --

2              THE COURT:  Right.  And I think, you know,

3    Ms. Hernández was careful and I have been careful in my

4    questioning not to elicit the sensitive content, but only the

5    topics and subject matter.  And so I think, you know, unless

6    you tell me differently, I think it is possible for us to have

7    this conversation in open court so long as everyone is careful

8    not to get into the specific terms that are sensitive.

9              MR. LEVINE:  I agree, your Honor.  I don't think it is

10    an issue.  I just wanted to note that we are not going to talk

11    about those things.

12              We do think our letter contains all of the information

13    the Court needs to resolve the decision, but we wanted to

14    emphasize a few key facts and answer any questions the Court

15    may have.

16              Now, in their July 25 opposition, the defendants tried

17    to advance their case by what we would say is mischaracterizing

18    certain communications between DirecTV and Disney.

19    Specifically, Disney has now represented to the Court that "it

20    does not require distributors to license its general

21    entertainment and family networks to be able to license its

22    networks with live sports content."

23              Your Honor, as to DirecTV, that statement is false,

24    full stop.  Defendants have mischaracterized communications

25    with DirecTV, and we felt compelled to correct the record and

O872Fub4

1    to prevent the Court from being misled about what could be an

2    important fact in its resolution of this case.

3            Now, the defendants have tried to conjure up a story

4    of bad faith and prejudice to support their motion to exclude.

5    We understand why they don't want this declaration in evidence,

6    because it does rip out up a narrative in their case.  But they

7    have come nowhere close to providing the type of facts or

8    arguments that would warrant the drastic remedy of preclusion.

9            With respect to bad faith, your Honor has the relevant

10   correspondence among counsel that was attached to defendants'

11   motion.  We explained in our letter to the Court our

12   considerations about deposition and live testimony were driven

13   by factual circumstances that we are not going to discuss

14   today, but the simple fact is that we reached an agreement with

15   defendants' counsel to forego a deposition in exchange for two

16   things——confirming that Mr. Thun would not testify at the

17   trial, which he is not, and producing documents that we

18   believed went beyond the scope of what we were ordered to

19   produce.

20           To be clear --

21           THE COURT:  Can I just ask you a logistical question.

22   If I were to order Mr. Thun to appear in this hearing to be

23   cross-examined, would that be possible, again, to be

24   cross-examined solely on the scope of his declaration, would

25   that be possible?  Like, is he in Tahiti watching the Olympic

O872Fub4

1  surfing or is he able physically to appear——What is today?

2  Wednesday——on Thursday or Friday of this week or Monday of next

3  week?

4          MR. LEVINE:  I'm actually not sure, your Honor.  I

5  would have to check with the client and get back to you.

6          THE COURT:  I would ask you to do that and let

7  Ms. Ghotbi know if that is logistically possible.

8          Okay.  Continue.

9          MR. LEVINE:  So as to prejudice, your Honor, the

10  defendants are unable to identify any meaningful prejudice

11  because there is none.  Mr. Thun's second declaration, as your

12  Honor noted, refers to facts about the communications between

13  Disney and DirecTV.  All those communications are in

14  defendants' possession.  Your Honor will ultimately see those

15  communications.  We believe your Honor will see that the

16  communications do not support the proposition that defendants

17  have cited them for.  But, you know, defendants are well

18  represented in this case.  We are positive that their counsel

19  can make any of the arguments that they see fit based on those

20  documents, and the defendants will also be offering testimony

21  from a witness or witnesses with personal knowledge of the

22  communications who will have ample opportunity to provide their

23  perspective and answer any questions that the Court may have.

24          As to the issue of penetration requirements with other

25  providers, that was the basis for us providing the 11 carriage

O872Fub4

1    agreements in addition to other documents that reflect

2    penetration requirements across more or less all of DirecTV's

3    programmers.  We don't see that being an issue here.  Your

4    Honor, DirecTV strongly supports Fubo's requested relief in

5    this case to prevent an anticompetitive joint venture that will

6    harm DirecTV, other industry participants and consumers.  We

7    are asking the Court to deny defendants' motion so that it can

8    continue to consider all of the relevant evidence in reaching

9    its determination.

10           THE COURT:  Okay.  Thank you, Mr. Levine.  Appreciate

11    it.  Again, if you could let Ms. Ghotbi know as soon as

12    possible about Mr. Thun's availability, I'm not saying I am

13    going to do that, but it just would be relevant information to

14    me.

15           And before we hear from Fubo, just, Ms. Hernández, to

16    follow up on something Mr. Levine said, I confess I was also

17    surprised by some of the factual assertions in the opposition

18    brief when I received it, and I might well have had a

19    misimpression.  I cast no aspersions.  But my understanding of

20    the factual disputes in this case prior to receiving the

21    defendants' briefing a couple of weeks ago was not that the

22    defendants were going to say, oh, we absolutely don't force

23    bundling, no one's ever asked for this unbundled content,

24    and -- just hold on, Mr. Earnhardt.  I'm going to give you a

25    chance.

O872Fub4

```
1          So my sense of the factual dispute prior to getting
2     the defendants' brief is that, well, yes, we do press bundling
3     requirements and that's capitalism, we control extremely
4     valuable content, some of the most valuable content in the
5     world, and we are entitled to sell it on any terms that we
6     think are appropriate so long as they are lawful, and we
7     believe they are lawful.  And, yeah, we absolutely do negotiate
8     agreements where we settle on an acceptable price.  And part of
9     getting to a price that distributors want is that we require
10    bundling, if that's the price they want to pay, and that's
11    normal sophisticated parties negotiate with each other and
12    that's where it comes out and that's the negotiating that we do
13    and, yeah, we absolutely do require it, and that's capitalism
14    because we are entitled to extract the most value from our
15    valuable product that we can, and it's not unlawful.  And that
16    the dispute was really around, first of all, the lawfulness of
17    that conduct, which I think we have all agreed the lawfulness
18    in the sense of the claim in Fubo's complaint that that conduct
19    is per se illegal, tying, is not something we are going to
20    decide in this hearing because it is not -- it doesn't meet the
21    standards for PI in terms of emergency.  It's existed for a
22    long time.  Obviously the fact of bundling is very relevant to
23    the factual context of this case in which the Court has to
24    decide whether the proposed JV violates the antitrust laws and
25    that decision is being made in a factual context of how the
```

O872Fub4

1    industry works and how the defendants have conducted their

2    business.

3              So all of which is to say that I also had some degree

4    of surprise by many of the factual assertions in the

5    defendants' opposition brief, which I think it's clear from

6    Mr. Earnhardt's opening, the first sentence of his opening at

7    this hearing, that in fact it is the defendants' view that, oh,

8    no, there is tremendous factual dispute about our business

9    practices related to what we have generally been referring to

10   as bundling.

11             So I am just giving you sort of fair advice that the

12   position of Mr. Levine and Fubo's counsel that, like, well, we

13   didn't expect them to say this in opposition brief strikes me

14   at least as intuitively reasonable.  And so it is entirely

15   possible that I had a total misunderstanding of what the

16   disputes were in this case until receiving the opposition

17   briefing and reply briefing, but I just put that out as to like

18   why is that wrong?

19             And Mr. Earnhardt, I know you want to speak, so go

20   ahead.

21             MR. EARNHARDT:  Thank you, your Honor.

22             First of all, I completely agree with what you said

23   about the law and what you said about the focus of this

24   hearing.  100 percent in agreement.

25             Your surprise about the nuances related to how our

O872Fub4

1    businesses operate stem from the fact that this is the first

2    time you have heard from us about the facts.  Because they

3    filed a complaint and we moved to dismiss it because it failed

4    on the law, and so we focused on the law.

5           I don't want to say it in open court, but your summary

6    of how the facts operate are not exactly correct and you

7    haven't heard those yet.  It's more nuanced.

8           Our position is we have two airtight defenses.  They

9    are wrong on the law and they are wrong on the facts.  Even if

10    they are right on the facts, they lose.  But we need to make

11    both arguments.

12           And the reason the Thun declaration issue is important

13    is cross-examination is important to credibility, and the Court

14    is going to have to make credibility determinations after you

15    hear all the evidence as to who is accurately describing the

16    nuanced practices that we believe we will show to you, and that

17    is the issue.

18           And it is also the truth that it is difficult, if not

19    impossible, to conduct an effective cross-examination without a

20    deposition.

21           THE COURT:  Well, you have the wrong audience for

22    that, Mr. Earnhardt, because criminal lawyers all around the

23    country are every day cross-examining witnesses they have never

24    met before.  So I don't have a lot of sympathy for that.

25           MR. EARNHARDT:  I understand that position.  In this

O872Fub4

1    case, everyone else is who going to be cross-examined,

2    including all of our witnesses, sat for a seven-hour

3    deposition.  And they are going to be able to use, in

4    cross-examining those witnesses, whatever admissions and facts

5    and understandings they received.

6         So what I am saying is, in the context of this case,

7    civil litigation -- and I have the utmost respect for all

8    criminal lawyers.  I don't know how they do it.  It's amazing,

9    and I understand they do it.  But in this context, a level

10   playing field means you need a deposition before you

11   cross-examine a witness.

12        So, to summarize, we feel sandbagged.  If we would

13   have known that these issues on which I am telling you there

14   are going to be factual disputes not that are dispositive, only

15   dispositive, there are two dispositive ways to win, but that

16   are relevant to one way to win, which is that they are wrong on

17   the facts and there is going to have to be cross -- if we knew

18   that those facts were going to be put in dispute, we would have

19   deposed the gentleman, we would have asked him to come to

20   trial, and we would have cross-examined him.  We were told that

21   wasn't going to happen, and we made a deal.  We have kept our

22   end of the deal.  We didn't depose him.  They haven't kept

23   theirs.  And so we think that whatever it adds to the record,

24   it doesn't -- it doesn't outweigh the prejudice we have

25   suffered from not being able to do that.

O872Fub4

1          THE COURT:  And based on our current progress,
2  Mr. Earnhardt, when do you expect the Disney witnesses who have
3  the relevant information that's in the Thun second declaration
4  will testify?
5          MR. EARNHARDT:  I expect, given how things are
6  going -- it's going to be Justin Connolly, whenever he
7  testifies is when it will be.  We are pretty far behind, so now
8  I am thinking it may be -- it's not -- I understand, but I
9  think it will probably be Friday.
10          THE COURT:  Okay.
11          MS. HERNÁNDEZ:  Your Honor, may I?
12          THE COURT:  Sure.
13          MS. HERNÁNDEZ:  So Justin Connolly will be able to
14  talk about DirecTV and the Disney deals, but the point I made
15  about them having other agreements with networks, nonsports
16  networks and those penetration requirements are things that we
17  can't cede.  So without us being able to cross-examine them, we
18  can't make that argument.
19          THE COURT:  No, I do understand that point.  Thank
20  you, Ms. Hernández.
21          Mr. Hafenbrack.
22          MR. HAFENBRACK:  We, too, have been taken aback by the
23  factual representations that have been made by Disney in this
24  case through their July 25 letter opposition brief, rather,
25  presented at the most charitable a very misleading picture of

O872Fub4

1    their bundling practices.  And I think your Honor has already

2    heard from witness after witness that there can be no dispute

3    that these defendants force bundling and that they force

4    distributors to swallow nonsports channels as a condition of

5    getting sports channels.  This declaration was filed in

6    response to an issue that Disney and the defendants have

7    injected into this case through their arguments, and therefore

8    there is no sandbagging.  This was merely responding to an

9    argument that Disney has raised in the first instance late in

10   the game, including in its July 25 opposition brief.

11           A couple other points I would make, your Honor.

12           The first is there is no dispute this Court can

13   consider declarations on a preliminary injunction motion.  The

14   defendants' own brief say that.  As a legal matter, there is

15   not a Rule 26 issue, like their motion letter brief says,

16   because there is no disclosure requirement and there is simply

17   no prejudice here.

18           Mr. Connolly is going to take the stand.  He can say

19   whatever he wants.  We will cross-examine him.  The Court has

20   already afforded the parties additional post-trial briefing

21   that can address this issue.

22           And the declaration of Mr. Thun, at bottom, was filed

23   in response to an argument made by Disney to correct the

24   record.  And this Court should have the benefit of a full

25   factual record from all industry participants when it is

O872Fub4

1    deciding this important motion.

2            Thank you for your time, your Honor.

3            THE COURT:  All right.  So I think before I make a

4    decision about what to do I want to have all the facts about

5    what the options are.  So we will wait to hear from Mr. Levine

6    after he speaks to his client, and then I will make a decision

7    as soon as I can after that.  Okay.  Thank you all very much.

8    Appreciate it.

9            And with that, we need Mr. Nallen back, is that

10   correct?

11           MR. HAFENBRACK:  Yes, your Honor.

12           A housekeeping matter.  Can I raise that now or should

13   I wait until the witness is back in the box?

14           THE COURT:  No, it's fine as a housekeeping.  You

15   touched on this, Mr. Hafenbrack, but I've been meaning to

16   circle back with the parties about the proposal that I

17   discussed with you on Monday afternoon.

18           I take it from your comment, Mr. Hafenbrack——and I see

19   Mr. Earnhardt standing——that all parties are in agreement that

20   of the options presented, the option of a ten-page supplemental

21   submission that addresses the things that have occurred since

22   the briefing is the option that the parties are electing.

23           MR. HAFENBRACK:  I'm not sure I've had a chance to

24   speak with Mr. Earnhardt about that.

25           Your Honor, I would say a couple things about timing

O872Fub4                         Nallen - Direct

1  generally first.  So today, after Mr. Nallen goes down, we have

2  Gary Schanman, who is a senior executive at DISH.  He needs to

3  be up and down today.  Mr. Pitaro is the chairman of ESPN.  I

4  understand he also needs to go today.  I think we are going to

5  be sort of pressing the limits of 5 p.m. with those witnesses.

6  So we are running a little behind schedule.

7          I do think on your question Fubo -- certainly Fubo's

8  preference is to do the ten-page briefing.

9          THE COURT:  Given the constraints on witness

10 scheduling, we can deal with our housekeeping things later.

11 Let's get Mr. Nallen back on the stand.

12          MR. HAFENBRACK:  Thank you, your Honor.

13          THE COURT:  Mr. Nallen, come right back to where you

14 were, and I will just remind you, sir, that you are still under

15 oath.

16          Okay, Mr. Hafenbrack, you can continue.

17          MR. HAFENBRACK:  Thank you.

18 DIRECT EXAMINATION (continued)

19 BY MR. HAFENBRACK:

20 Q.  Welcome back, Mr. Nallen.

21 A.  Thank you.

22 Q.  Fox -- the defendants in this case have commissioned

23 several research studies that have evaluated consumer demand

24 for some combination of a skinny bundle between the defendants'

25 linear networks, is that right?

O872Fub4                         Nallen - Direct

1    A.  Over the last year, several of those have been prepared.

2    Q.  There have been a couple studies looking at a Fox-ESPN

3    skinny bundle, correct?

4    A.  Correct.

5    Q.  And there has been a study looking at a Warner Bros.

6    Discover-Fox skinny bundle, is that correct?

7    A.  That's correct.

8    Q.  One of those studies was commissioned by Fox, correct?

9    A.  I'm not -- to be honest, I'm not sure.

10   Q.  Are you familiar with a research study that was

11   commissioned by Fox that projected 18 to 24 million subscribers

12   for a Fox-ESPN skinny sports bundle?

13   A.  No, I'm not.

14   Q.  Okay.  Let's put up JX 14, please.

15           You see, Mr. Nallen, there is an e-mail to you from

16   Justin Lancer?

17   A.  I see that.

18           MR. HAFENBRACK:  Your Honor, we designated some

19   testimony from Mr. Lancer.  He was one of the deposition

20   witnesses.

21   Q.  But Mr. Nallen, who is Mr. Lancer?

22   A.  He is one of the executives in our business development

23   function.

24   Q.  And he was one of the folks at Fox who was very involved in

25   negotiating Raptor, correct?

O872Fub4                           Nallen - Direct

1   A.  He was active in it, not necessarily in negotiating.

2   Q.  Okay.  And you see here he is requesting approval to

3   execute the nonbinding term sheet for Raptor?

4   A.  I see that.

5   Q.  And you approved it, correct?

6   A.  I did.

7   Q.  Let's go to page 15.

8          You see here that this is a slide summarizing the

9   third-party research that was conducted by the parties,

10  correct?

11  A.  Correct.

12  Q.  And you see on the left it says "research commissioned by

13  Fox"?

14  A.  I see that.

15  Q.  And you see the long-term subscribers is 18 to 24 million?

16  A.  I see that.

17  Q.  And you are aware this was a large study with more than

18  3,000 surveyed participants, correct?

19  A.  I wasn't aware of that.

20  Q.  Okay.

21         And if you look on the right, there is a study there

22  research led by WBD?  Do you see that?

23  A.  I see that.

24  Q.  You see they project 15 to 28 million subscribers?

25  A.  I see that.

O872Fub4                        Nallen - Direct

1   Q.  And in the chart below, did you see there is a little

2   bullet there that says "key takeaways"?

3   A.  Yes, I see that.

4   Q.  And it says, "Tested both sports and news plus sports

5   offerings.  News had a very limited impact on subscriber count

6   with incremental content costs."  Do you see that?

7   A.  I do.

8   Q.  And it's correct that the defendants tested certain

9   formulations of a skinny bundle that included Fox News,

10  correct?

11  A.  I'm not aware of the testing in this situation.

12  Q.  Are you aware that the testing of skinny bundles that

13  included sports plus Fox News showed that adding Fox News

14  didn't really move the needle?

15  A.  I'm not aware of that.

16  Q.  Okay.

17          You can put that one aside.

18          Now, Mr. Nallen, Fox's CEO, Mr. Murdoch, has publicly

19  said that Raptor is likely to attract around 5 million

20  subscribers by 2029, correct?

21  A.  Correct.

22  Q.  And you told Mr. Murdoch that you thought Raptor was a

23  groundbreaking initiative that would exceed 5 to 6 million

24  subscribers, correct?

25  A.  I said that at one point.  I do not believe that now.

O872Fub4                      Nallen - Direct

1  Q.  That was your view as of December 2023, correct?

2  A.  2023, yes.

3  Q.  And that's no longer your view, correct?

4  A.  It's no longer my view.

5  Q.  And between December 2023 and today, you changed your mind

6  on how many subscribers Raptor will attract based on "peer

7  judgment."  Correct?

8  A.  That's correct.

9  Q.  No additional data analysis --

10  A.  That's correct.

11  Q.  -- between -- thank you, Mr. Nallen.  Let me finish my

12  question.

13          No additional data analysis between December 2023 and

14  today, correct?

15  A.  That's correct.

16  Q.  Fox has a licensing agreement with my client, Fubo, is that

17  right?

18  A.  That's correct.

19  Q.  And Fox's current licensing deal with Fubo prevents Fubo

20  from selling to consumers a sports-only package that includes

21  just Fox's sports channels, is that correct?

22  A.  That's correct.

23  Q.  And that is true with respect not only to Fubo but with all

24  of Fox's current distribution partners, correct?

25  A.  That's correct.

O872Fub4                    Nallen - Direct

1   Q.  No distributor in the market today——traditional MVPD or

2   virtual MVPD——has the right or the ability to sell consumers a

3   package that includes only Fox's sports channels, correct?

4   A.  Not currently.

5   Q.  And when Fubo's contract with Fox is up late next year, you

6   cannot say whether Fox will give Fubo the ability to offer

7   Fox's sports channels separately from Fox nonsports channels,

8   correct?

9   A.  That's correct.

10  Q.  Not willing to commit to that today?

11  A.  No.  I think an extension or a renegotiation of the

12  carriage agreement upon expiration will include a number of

13  factors.  It may include sports only, but that I would -- it

14  would be hypothetical for me to guess.

15  Q.  You can't commit to it today, right, sir?

16  A.  It would be hypothetical for me to guess.

17  Q.  And you can't say -- you can't commit to whether Fox would

18  be willing to license to Fubo on the same terms -- on the same

19  terms that Fox licenses to Raptor, correct?

20  A.  Correct.

21  Q.  Now, Mr. Nallen, Fox is not charging Raptor a premium for

22  the carriage fees it receives for Fox Sports networks, correct?

23  A.  Premium versus?

24  Q.  Premium versus its market rates, sir.

25  A.  That's correct.

O872Fub4                          Nallen - Direct

1    Q.  You are not charging Raptor extra for the privilege of

2    unbundling the sports networks from the nonsports networks,

3    correct?

4    A.  That's correct.

5    Q.  Same rate, right?

6    A.  Same average rate.

7    Q.  Raptor is the first time that the JV owners——Disney, Fox,

8    and Warner Bros.——are unbundling their channels by offering

9    only the sports-centric channel in the television package?

10   A.  I can't speak for the other partners, but I can say that

11   that is correct for Fox.

12   Q.  And that's your understanding of all of the partners,

13   correct?

14   A.  I can't speak for the other partners.

15   Q.  Let's take a look at PX 24, and this, even though your

16   "from" is cut off, this is an e-mail you sent and you remember

17   this e-mail, correct?

18   A.  Yes.

19   Q.  And this is an e-mail you sent on November 14, 2023,

20   correct?

21   A.  That's correct.

22   Q.  And I would like to direct your attention to the final

23   sentence in the second paragraph where you wrote, "Notably,

24   through this offering, the content owners are unbundling their

25   channels by offering only the sports-centric channels in the

O872Fub4                          Nallen - Direct

1    product."  Is that correct, sir?

2    A.  That's correct.

3    Q.  And the content owners here are Fox, Disney, Warner Bros.,

4    correct?

5    A.  That's correct.

6    Q.  And they can only unbundled their channels if they were

7    bundled in the first place, correct?

8    A.  Correct.

9    Q.  Fox's premium sports content positions it to be a crucial

10   partner in any and every skinny sports bundle, correct?

11   A.  I believe that's correct.

12   Q.  When Fox was negotiating Raptor with Disney and Warner

13   Bros., one of the topics that was negotiated was a noncompete

14   provision between the JV parties, is that correct, sir?

15   A.  That is correct.

16   Q.  And you didn't want to see Disney or Warner Bros. joining

17   Raptor-like offerings after the parties launched Raptor, is

18   that correct?

19   A.  Or ourselves.

20   Q.  Or Fox, correct?

21   A.  Any of the parties to join a Raptor-like offering.

22   Q.  You didn't want to see either --

23           THE COURT:  Mr. Hafenbrack, you have to stay at the

24   microphone.

25   BY MR. HAFENBRACK:

O872Fub4                    Nallen - Direct

1  Q.  You didn't want to see want to see any, Fox, Disney or

2  Warner Bros., joining a Raptor-like offering after the --

3  A.  For a limited period of time.

4  Q.  What was the limited period of time you had in mind?

5  A.  Three years.

6  Q.  Let's pull up 286, and let's not blow up right now, if you

7  don't mind, so Mr. Nallen can see the full e-mail.

8          These were e-mails you sent and received in

9  January 2024, correct?

10  A.  That's correct.

11  Q.  And e-mails involving, among other people, Jimmy Pitaro who

12  is the CEO or chairman of ESPN --

13  A.  That's right.

14  Q.  -- and Bruce Campbell is senior -- one of the senior

15  executives at Warner Bros., correct?

16  A.  Correct.

17  Q.  And you, Mr. Pitaro, and Mr. Campbell were the chief

18  negotiators of the JV, is that right?

19  A.  That's correct.

20  Q.  And the subject line below says, "Please read.  Project

21  Raptor Remaining Open Term Sheet Issues."  Do you see that?

22  A.  I do.

23  Q.  And the second e-mail is an e-mail written by you addressed

24  to Mr. Pitaro, and Mr. Campbell, is that correct?

25  A.  That's correct.

O872Fub4                              Nallen - Direct

1   Q.  And you wrote that you were flagging your thoughts on some

2   open issues that had been described by Mr. Lancer in the e-mail

3   below, is that right?

4   A.  That's correct.

5   Q.  And you wrote, "Hopefully the three of us" -- when you said

6   "the three of us," you are referring to you, Mr. Pitaro, and

7   Mr. Campbell, is that right?

8   A.  That's correct.

9   Q.  "Hopefully, the three of us can iterate this over the next

10  couple of days to make the call conclusive."  Do you see that?

11  A.  I do.

12  Q.  And you were talking about a call with respect to the

13  remaining open issues for Raptor, right?

14  A.  On the term sheet for Raptor.

15  Q.  And "conclusive" meaning you wanted to reach an agreement

16  on the open issues, correct?

17  A.  Conclusions on it.

18  Q.  And conclusive meaning to reach an agreement on those open

19  issues, correct?

20  A.  I wanted to get conclusions to finality on the term sheet.

21  Q.  I just want to make sure I am getting -- I am understanding

22  you correctly.  Are you drawing a distinction between

23  conclusions and agreement?

24  A.  I'm not.

25  Q.  Let me try one more time, Mr. Nallen.  And "conclusive"

O872Fub4                        Nallen - Direct

1    meaning to reach an agreement on these open issues, correct,

2    sir?

3    A.  Correct.

4    Q.  And you added your comments in yellow highlighted text in

5    line with Mr. Lancer's e-mail.

6            You can flip to the next page.  You can see it more

7    clearly.

8            Is that correct?

9    A.  That's correct.

10   Q.  Let's go to the noncompete section, and your comments are

11   the ones in yellow highlighting, is that right?

12   A.  That's correct.

13   Q.  And you wrote, "The issue for me here is that I wouldn't

14   want to see that, after the Raptor announcement, we have all

15   immediately become free agents and individually join

16   Raptor-like offerings, even if we were not owners in those

17   platforms.  So an approach could be to limit such commercial

18   arrangements for four years on any other multi-branded, DMVPD

19   sports service."  Do you see that?

20   A.  I do.

21   Q.  And that's what you wrote in January of 2024, is that

22   correct?

23   A.  That's correct.

24   Q.  And what did you mean by multi-branded DMVPD sports

25   service?

O872Fub4                         Nallen - Direct

1   A.  In my case, it was a Raptor-like offering.

2   Q.  Okay.  A skinny sports bundle?

3   A.  If that's how you describe a Raptor-like offering, then

4   yes.

5   Q.  Is that how you describe a Raptor-like offering?

6   A.  No I describe it as a sports bundle, not necessarily a

7   skinny one.

8   Q.  Okay.  Fair enough.

9           Let's pull up PX 52.

10          And Mr. Nallen, this is an e-mail that you sent to

11  your team at Fox on January 31, 2024, is that correct?

12  A.  That's correct.

13  Q.  And it was six days after the last e-mail we just saw?

14  A.  That's correct.

15  Q.  And in the intervening six days, you had your phone call

16  with Mr. Pitaro and Mr. Campbell, is that correct?

17  A.  That is correct.

18  Q.  And in this e-mail, you were relaying to your team at Fox

19  the conclusions from your call with Mr. Pitaro and

20  Mr. Campbell, is that correct?

21  A.  That's correct.

22  Q.  Let's go down to no. 4.  And you wrote, "Each party is free

23  to bundle their Flagship DTC with anyone at any time.  Partners

24  cannot join a Raptor-like offering for X years—either

25  commercially or as an equity owner."  Do you see that?

O872Fub4                              Nallen - Direct

1    A.  I do.

2    Q.  And I believe you testified earlier X years was three

3    years?

4    A.  That's correct.  It became three years.

5    Q.  And those are your words, correct?

6    A.  They are my words.

7    Q.  And you were relaying the conclusions from your call with

8    Mr. Pitaro and Mr. Campbell, right?

9    A.  That's correct.

10   Q.  Let's pull up 53.  Another e-mail, e-mails that you sent

11   and received on February 1, 2024, correct?

12   A.  Correct.

13   Q.  A day after the last exhibit we just looked at, correct?

14   A.  That is correct.

15   Q.  And Mr. Lancer writes to you to clarify some open issues

16   regarding the Raptor term sheet, is that correct?

17   A.  That's correct.

18   Q.  And you respond to him again with your answers in

19   highlighted text, correct?

20   A.  Can I see the rest of the e-mail?

21   Q.  Yes, sir.  Let's unblow it up.  Can we see that?

22            THE COURT:  Mr. Nallen has this in his binder.

23   Q.  I'm sorry, Mr. Nallen it's PX 53 in your binder, and take

24   all the time you need.

25            THE COURT:  That way you can see all of the bold text.

O872Fub4                         Nallen - Direct

1   A.  Yes, I see that.

2   Q.  And sir, just to clarify, you put your responses to

3   Mr. Nallen and its off set by highlighted text, is that right?

4   A.  You mean Mr. Lancer.

5   Q.  Mr. Lancer.  That's what I meant to say.  Thank you for

6   that.

7           And if you looked down at the noncompete section, no.

8   4, do you see there is a section there entitled "Noncompete"?

9   A.  Yes.

10  Q.  And is Mr. Lancer writes, "Disney will continue to push

11  that this noncompete only applies to a DMVPD and avoid a

12  broader definition including a DTC streaming service.  Are we

13  okay with that?"  Do you see that?

14  A.  I do.

15  Q.  And your response to Mr. Lancer is, "We said we would all

16  stay clear of a Raptor-like platform."  Is that correct?

17  A.  That's correct.

18  Q.  And you were relaying to your team at Fox the conclusions

19  from your phone call with Mr. Pitaro and Mr. Campbell, correct?

20  A.  Which were that we were all permitted to run our own

21  flagship D to C platform and sell our channels however we

22  wanted, but we would stay clear for a three-year period of a

23  Raptor-like platform.

24  Q.  You, Mr. Pitaro, and Mr. Campbell agreed on a phone call in

25  late January 2024 that you would all stay clear of a

O872Fub4                          Nallen - Direct

1   Raptor-like platform, isn't that true, sir?

2   A.  That's true.

3   Q.  You can put that one aside.

4          Mr. Nallen, the JV parties——Disney, Fox, Warner

5   Bros.——have no incentive to compete against a platform, the

6   Raptor platform that they are each putting hundreds of millions

7   of dollars into.  Isn't that true?

8   A.  Can you restate or ask the question again.

9   Q.  Sure, absolutely.

10          The JV parties, meaning Disney, Fox, Warner Bros.,

11  have no incentive to compete against a platform, the Raptor

12  platform, that they are each putting hundreds of millions of

13  dollars into, correct?

14  A.  No, I don't think that's the case.  ESPN has already

15  announced that they are going to launch a D to C product in the

16  market which will be a competitor to Raptor.  We are not

17  prohibited nor is Warner Bros. to put its own products into the

18  market, which will also be a competitor to the Raptor product.

19  Q.  Let's take a look at PX 15.  And this these are e-mails

20  between you and Mr. Lancer, correct?

21  A.  Correct.

22  Q.  And Steve Tomsic, the CFO of Fox, is copied as well,

23  correct?

24  A.  He is, yes.

25  Q.  And Mr. Lancer poses a concern to you.  Do you see that?

O872Fub4                          Nallen - Direct

```
 1  A.  Yes, I do.
 2  Q.  And one of his concerns is the ability of the members to
 3  compete against Raptor with their own flagships or bundles of
 4  their flagship services with third parties.  Do you see that,
 5  sir?
 6  A.  I do.
 7  Q.  And your response to Mr. Lancer at the top of the page
 8  says, "Don't know why they would really want to compete with a
 9  platform they are putting $300 million each into."  Do you see
10  that?
11  A.  I do.
12  Q.  And you wrote that, correct?
13  A.  Yes.
14  Q.  "Don't overthink that one."  You wrote this, too?
15  A.  I did.
16  Q.  And those were your true beliefs at the time you wrote
17  them, correct?
18  A.  I think, to put it in context, this was a January 4, very
19  early in the term sheet process.  By "don't overthink this
20  one," I had already reached the conclusion that the Raptor
21  product would be the only product that we would participate in
22  and that we would allow someone else to compete in a
23  Raptor-like product.  So my "don't overthink this one" was more
24  an admonition to him of this is an issue that you don't have to
25  deal with.
```

O872Fub4                    Nallen - Cross

1    Q.  It's common sense, isn't it, sir, that these companies

2    won't want to compete with the platform they are each putting

3    $300 million into?

4    A.  I don't think that's the case.  ESPN has already announced

5    that they are putting a competitive product into the market in

6    one year.

7    Q.  Am I correct that Fox has no plans to license its sports

8    channels on an unbundled basis to a Raptor-like platform?

9    A.  Beyond Raptor, that's correct.

10            MR. HAFENBRACK:  No further questions, your Honor.

11            THE COURT:  Mr. Levander.

12            MR. LEVANDER:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. LEVANDER:

15   Q.  Good afternoon, Mr. Nallen.

16   A.  Good afternoon.

17   Q.  Let's just start where we just finished.  When you wrote

18   "raptor-like product," you are talking about a JV of

19   multi-programmers in one entity, right, sir?

20   A.  That is correct.

21   Q.  You are not talking about Fox or Disney or Warner Bros.

22   choosing to sell a DTC product that would compete with Raptor

23   but on their own?

24   A.  No.  Each party is free to do that.

25   Q.  Now, based on your experience -- withdrawn.

O872Fub4                              Nallen - Cross

1          You have been in Fox or a Fox affiliate company for

2     about 30 years?

3     A.   Correct.

4     Q.   Based on your experience, could you describe the current

5     state of affairs in the pay TV ecosystem?

6     A.   I would suggest, first, it's challenged; second, that it is

7     quite dynamic right now; and that it's competitive.  By those,

8     I mean our business is suffering from a significant decline of

9     pay TV subs, which is our -- 50 percent of the revenue of our

10    company.  So increasingly there is a market outside of pay TV

11    that we are not accessing.  And the dynamism is many other

12    companies have put product into the market to access those

13    customers.  We just don't have that.

14         And on a competitive side, it is, I would argue, that

15    our content costs and our content rights are highly competitive

16    now because we are not competing with traditional competitors

17    any more.  Tech companies, the ones I described earlier in

18    response to a question, are increasingly active in the sports

19    content rights market.

20    Q.   Those would be people like Amazon, Netflix, and so on?

21    A.   Yes.  Including just last week Amazon announcing that they

22    have acquired the NBA rights.

23    Q.   Now, you acknowledged in response to a question that Fox is

24    currently not considering launching its own DTC product, right?

25    A.   That's correct.

O872Fub4                     Nallen - Cross

1   Q.  Why is that?

2   A.  Because our largest source of revenue, as I said, 50

3   percent of the revenue is the pay TV bundle, and for us it

4   still represents a very significant part of our business, it is

5   traditionally the product that is most important to us, and it

6   includes—I haven't commented on this earlier—all of our

7   product.  Pay TV bundle includes not only the Fox Sports

8   product, but the Fox News product as well.

9   Q.  And is there any ban or written policy or policy written in

10  stone that Fox will never offer a DTC product?

11  A.  No.  In fact, I could see a point, given the way -- we were

12  losing 5 million subscribers a year out of the pay TV system

13  into the nonpay system.  So there comes a point in time where

14  we need to put a product in to respond to that market.

15  Q.  What is Fox's purpose in joining the JV?

16  A.  Once again, please?

17  Q.  What is Fox's purpose in joining the JV.

18  A.  To access a market that we currently don't access, that is,

19  those subscribe -- those customers, potential customers, that

20  are outside of the pay TV environment.

21  Q.  Those customers sometimes referred to as cord-cutters and

22  cord-nevers?

23  A.  Yes.

24          THE COURT:  Can I ask you, Mr. Nallen, those customers

25  who currently are outside the pay TV system, do you know where

O872Fub4                        Nallen - Cross

1  are those customers who want to watch sports getting their live

2  sports?

3          THE WITNESS:  Some are getting it over the air, to

4  your earlier point.  Others are getting some of their sports

5  from other providers like Peacock and Paramount+.  These are

6  over the air that have sports.  So they are subscribing to

7  nonpay products to get some of their sports.

8          THE COURT:  Well, they have to pay for Peacock --

9          THE WITNESS:  Sorry, nonpay TV, traditional pay TV.

10         THE COURT:  I think you said earlier that only Fox

11 network is available for free as a broadcast channel and Fox's

12 other channels——Fox Sports, Fox News, some of those things——are

13 only through pay TV, various kinds of MVPDs.

14         THE WITNESS:  That's correct.

15         THE COURT:  Okay.  Go ahead, Mr. Levander.

16         MR. LEVANDER:  Thank you.

17 BY MR. LEVANDER:

18 Q.  And some of the people outside of the pay TV system, do

19 they get their spots being part of the, quote, barstool

20 community?

21 A.  Yes, they would.  They would view their sports in a

22 communal environment, in various venues, and not to use Venu,

23 sorry.

24         THE COURT:  They are going to bar, to a friend's

25 house, something.

O872Fub4                         Nallen - Cross

1        THE WITNESS:  But we are being compensated for that

2    because to go into that bar or restaurant, they pay a fee back

3    to, let's say, DirecTV, which in turn pays a fee to us.

4    Q.  Now --

5        THE COURT:  I'm sorry, Mr. Levander.  I just have one

6    more question.

7        Do you know, Mr. Nallen -- I know you don't work for a

8    distributor, but in the bar example, my understanding is a bar

9    owner who has a commercial DirecTV or DISH or whatever

10   subscription, in other words, where they intend to show the

11   material to a commercial audience, as opposed to, like, me

12   having friends over in my home, do they pay more for the

13   service?

14       THE WITNESS:  Yes, they pay more than you would at

15   your home.  So, they don't count as a home.  They count as a

16   commercial establishment, and there is a multiple of what a

17   single subscriber would pay by the commercial establishment.

18       THE COURT:  Okay.  All right.  Thank you.  Go ahead

19   Mr. Levander.

20   BY MR. LEVANDER:

21   Q.  Based on your experience, Mr. Nallen, what do you

22   understand the phrase cord-cutter to refer to?

23   A.  A consumer who has completely left the pay TV system, who

24   was previously a pay TV subscriber and is no longer a pay TV

25   subscriber.

O872Fub4                    Nallen - Cross

1    Q.  And would that include somebody who was formerly a vMVPD

2    subscriber who is no longer in the pay TV system?

3    A.  Yes.  If they left traditional MVPD or left the vMVPD, we

4    refer to them as cord-cutters.

5    Q.  And that would be satellite, cable, or over the top.

6    A.  That's correct.

7    Q.  And a cord-never is somebody who never signed up for any of

8    those pay TV services?

9    A.  They have never had a pay TV service.

10   Q.  And is the phrase "cord-cutter" something that has been

11   around for many years?

12   A.  Yes.

13   Q.  And --

14        THE COURT:  I'm sorry, Mr. Levander.

15        Mr. Nallen, have you ever heard people use the phrase

16   "cord-cutter" to refer only to customers who have dropped a

17   physical or traditional MVPD service, like cable or satellite,

18   to go to a fully broadband provision of television content,

19   which could include virtual MVPDs, like YouTube TV.

20        THE WITNESS:  No.  So I don't treat them that way.

21   It's regardless of the distribution mechanism for that

22   subscriber, whether they had traditional or virtual.  A

23   cord-cutter is one that has completely left that system.

24        THE COURT:  Okay.  All right.  Thank you.  Go ahead,

25   Mr. Levander.

O872Fub4                          Nallen - Cross

1    BY MR. LEVANDER:

2    Q.  And just to be clear, if somebody had Charter and they are

3    now a Fubo subscriber, you wouldn't consider them a

4    cord-cutter, right?

5    A.  No, they are still a pay TV subscriber.

6    Q.  And the people that you deal with that are experienced in

7    your industry wouldn't call that person a cord-cutter, right?

8    A.  That's correct.

9    Q.  Now, is this JV a merger?

10   A.  No, it's a partnership with these three companies and,

11   quite honestly, we've got great experience in partnerships with

12   other media companies.

13   Q.  And who will manage the Venu JV?

14   A.  There is an independent team led by Peter Distad is the

15   CEO.

16   Q.  Who sets the subscriber prices for the JV?

17   A.  The independent management team.

18   Q.  Does the JV agreement preclude any of the members from

19   pursuing their own DTC products?

20   A.  No.

21   Q.  Have any -- and I think you have actually referenced the

22   fact that ESPN has recently announced it is pursuing its own

23   independent DTC product, right?

24   A.  That's correct.

25   Q.  Does a JV agreement preclude any of the members from

O872Fub4                         Nallen - Cross

1   unbundling any of their channels, including sports channels,

2   and licensing those unbundled channels to any MVPD or vMVDP?

3   A.  No.

4   Q.  Does the JV agreement limit any member from independently

5   bidding on sports leagues content?

6   A.  No.

7   Q.  Do you expect the JV to in any way lessen or inhibit such

8   independent competitive activity?

9   A.  No.  If anything, competition will increase.

10  Q.  And I think you already alluded to this, but can you think

11  of a recent example where at least two of the JV members were

12  bidding against each other for sports content?

13  A.  The most recent NBA renewal, both ESPN and Warner Bros.

14  were bidding for packages.  ESPN was successful and, by press

15  accounts, Warner Bros. has not been.

16  Q.  And you, I think, answered this question when being asked

17  on direct, but the only limit that you understand exists under

18  the JV document is a limited three-year noncompete among the

19  three members from participating in another joint venture

20  product like Raptor or Venu?

21  A.  That's correct.

22  Q.  Now, you were shown PX 15.  I think you were shown PX 15.

23  Yes, you were shown PX 15, which is the "I don't know why they

24  would want to really compete with a platform they are putting

25  $300 million each into.  Don't overthink this one."  Do you

1  remember that?

2  A.  Yes, I do.

3  Q.  And this was on January 4, 2024, right?

4  A.  Yes.

5  Q.  The 300 million has increased for each of the members at

6  this point?

7  A.  Yes, it's approximately 400 million now.

8  Q.  And were you talking about competition other than competing

9  in another Raptor JV type platform?

10  A.  No, not -- at this point in time, while Mr. Lancer was

11  commenting about limiting to flagships or bundle the other

12  flagships, my reference to him about "don't overthink this one"

13  is because I knew where we were headed to a Raptor -- no

14  competition in a Raptor-like environment.

15  Q.  Besides the written noncompete which is limited to three

16  years and Raptor JV-like structures, are there any other

17  understandings, agreements, written or oral, between the

18  members about noncompetition?

19  A.  Absolutely not.

20  Q.  Now, in any of the discussions that you have had or heard

21  about the JV, did anybody ever discuss or suggest that the

22  purpose of the JV was to harm Fubo or cannibalize its

23  subscribers?

24  A.  No.  And quite frankly, from a Fox perspective, it's

25  counterintuitive.  Any subscriber that leaves pay TV that goes

O872Fub4                        Nallen - Cross

1    to Venu is an economic loss to us.

2    Q.  Did you ever hear anybody suggest or say that any of the

3    members would seek to terminate their carriage agreements early

4    because of the JV?

5    A.  No.

6    Q.  Did you ever hear anyone suggest or say that any of the

7    members would be unwilling to extend or enter into a new

8    carriage agreement with Fubo because of the JV?

9    A.  No.

10   Q.  Is it in Fox's interest for the JV to reduce or cannibalize

11   Fubo subscribers or any other vMVPD or MVPD with whom Fox has

12   an arrangement?

13   A.  No.  As I just referred to, for every sub that leaves the

14   pay TV system and goes to Venu, it's a detriment to us at Fox.

15                (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    Q.  Now, is it fair to say that a Fubo subscriber is more

2    valuable to Fox than a Fubo subscriber who leaves Fubo and goes

3    to Venu?

4    A.  Yes, that's correct.

5    Q.  Now, you were shown Exhibit 79, which was an August 2023

6    document looking at a two-way JV between Disney and Fox.

7    A.  Yes, I see that.

8    Q.  You were shown a number from Mr. Hafenbrack of about 14 or

9    15 million subscribers, right, sir?

10   A.  Yes, on page 3.

11   Q.  And that was a projection based on a very different JV at

12   $22 a subscriber, right, sir?

13   A.  That's correct.

14   Q.  And when you considered approving the JV, did you rely on

15   those numbers?

16   A.  No, not at all.

17   Q.  Did you think those numbers were unrealistic?

18   A.  They were irrelevant.  By the time that we approved the

19   joint venture, we had a completely different set of facts from

20   this.

21   Q.  And you had an understanding it was no longer going to be

22   at $22 a subscriber, right, sir?

23   A.  Yes, the range was to be between 40 and $50.

24            THE COURT:  Mr. Levander, can I just ask a question.

25            Mr. Nallen, you said a couple answers ago that Fox

1    would lose money if current Fubo or DISH, or whatever,

2    subscribers left that service to instead subscribe to Venu.

3    That was your testimony?

4              THE WITNESS:  That's right.

5              THE COURT:  Are you aware of documents or research

6    created by members of the JV that estimate what percentage of

7    Venu subscribers would be people dropping their current service

8    to subscribe to Venu instead?

9              THE WITNESS:  I've seen various ranges, your Honor.

10             THE COURT:  So what steps, if any, is Fox taking to

11   try to make sure that current Fox viewers who are getting their

12   Fox content through Fubo or MVPDs, what steps, if any, are you

13   taking to try to ensure that those people stay with their

14   current subscription and don't subscribe to Venu?

15             THE WITNESS:  So we have a marketing commitment with

16   Venu of $15 million per year.  Each of the partners do.  Our

17   marketing commitment will be dedicated toward digital marketing

18   and not linear marketing, but the difference I'll draw is we

19   will use the assets of FoxNews.com, FoxSports.com and a very

20   large digital business advertising video-on-demand business

21   called Tubi to direct advertising.  So we will not put

22   advertising on the linear channels because such advertising

23   would draw potentially subscribers from pay to Venu.

24             THE COURT:  Right.  But I would imagine, you, the

25   expert in this industry, not me ── do you think that there are

1    high walls between people who have a pay TV subscription and

2    people who might also visit FoxSports.com or some of the other

3    websites you described?

4              THE WITNESS:  High walls meaning?  Sorry.

5              THE COURT:  Meaning like those are two completely

6    separate groups of consumers.  People who have pay TV

7    subscriptions are not visiting those websites.

8              THE WITNESS:  Certainly —— let me use the last one,

9    Tubi.  Yes, we know that for a fact that 60 percent of the

10   consumers that come to our Tubi platform do not have a pay TV

11   subscription.  So targeting those users through Tubi is an

12   effective marketing tool for bringing them to Venu, not to the

13   detriment of the pay TV business.

14             THE COURT:  OK.  Thank you.

15             Go ahead, Mr. Levander.

16             MR. LEVANDER:  Thank you.

17   BY MR. LEVANDER:

18   Q.  If we could quickly look at JX 14 on the screen.  It's also

19   in your notebook.

20   A.  Yes.  OK.  I see it on the screen.

21   Q.  Yes.  Turning to page 15, that shows that the research that

22   we were talking to earlier was for a product that was at $22 a

23   share, right?

24   A.  $22 to the subscriber.

25   Q.  Subscriber, I'm sorry.

O87HFub5                    Nallen - Cross

1              And the announced JV price is how much, sir?

2    A.  42.99.

3    Q.  And would it be fair to say that those two price points are

4    quite different in your industry?

5    A.  Yes, they are.

6    Q.  Is there any world in which Fox would want Venu, in the

7    current pay TV system, to have 18 to 24 million subscribers?

8    A.  Can you ask that again.

9    Q.  Yeah.

10             Forget the $22 a share.  Let's take the actual Venu

11   goes out.  If it got 18 to 24 million subscribers, where would

12   a lot of those subscribers be coming from?

13   A.  I can't imagine it would get 18 to 24 million because,

14   quite honestly, the target addressable market for Venu is about

15   20 million people who are outside of pay TV.  That would mean

16   we're getting 100 percent of them, which is not at all going to

17   be the case.

18   Q.  And if it actually got that kind of number of subscribers,

19   it would be a lot of people from the pay TV system, right?

20   A.  I would think so.

21   Q.  And that would not be good for Fox, right?

22   A.  No.  And any —— any shift from pay TV to Venu is negative.

23   I would call out in the —— there was a reference earlier to the

24   billion-dollar cumulative profit to Fox.  The reason for that

25   is because we have accessed the market outside of pay TV.  If

O87HFub5                          Nallen - Cross

1    all we did in Venu was move money from pay TV to Venu, that

2    number would be significantly negative.

3              THE COURT:  Mr. Nallen, what happens if —— accepting

4    at face value what you're saying about what the goal is for Fox

5    with the Venu customer, what happens if you're wrong and what

6    actually happens is Venu is cannibalizing people who currently

7    watch Fox products on a pay TV system?  What happens then?

8              THE WITNESS:  Well, we've —— in hindsight, we will

9    have made a bad decision because of the access.  We will then

10   have to take, likely, our Fox News Channel and have a D to C

11   product for that, because it's probably not uncommon, but it

12   would be unusual for news services to bundle like the sports

13   services are in Venu.  So we would have to access customers to

14   attract them to Fox News in a digital environment as opposed to

15   linear.

16   BY MR. LEVANDER:

17   Q.  Mr. Nallen, to your knowledge, has Fubo ever asked Fox for

18   a skinny sports bundle?

19   A.  Not to my knowledge.

20   Q.  Do your various carriage partners typically ask Fox for

21   skinny sports bundles?

22   A.  No.

23   Q.  And why do you think that is, sir?

24   A.  Because in the case of Fox, which we have a very narrow

25   portfolio of channels, the Fox News Channel is an important

1  part of the offering that our pay TV distributors offer to

2  their subscribers.

3  Q.  Mr. Gandler testified in this courtroom that nobody signs

4  up for Fox News.  I think it's more background noise than

5  anything.  Would you agree with Mr. Gandler, sir?

6          THE COURT:  That's not what he said.  He said he

7  doesn't believe any Fubo customer signed up for Fubo because of

8  Fox News.  So that was the testimony, that he doesn't believe a

9  Fubo customer signed up for Fubo in order to get Fox News, and

10 then the rest of Mr. Levander's statement is correct, that Fox

11 News is more background noise for the Fubo customer.  That was

12 Mr. Gandler's view.

13 A.  I can't judge how Fubo accesses its subscribers.

14 Q.  OK.  Can you address the fact of what your understanding is

15 of the desirability and the value of the asset of Fox News to

16 subscribers in the pay TV system generally?

17 A.  Fox News is the No. 1 —— I'm not doing this as an analyst

18 presentation —— but Fox News is the No. 1 channel in America,

19 news channel.  It often beats the broadcast channels.  It is

20 the No. 1 cable channel in America.  It has 60 percent share of

21 the news audience across the country.  So, as a result, it's an

22 important element to the pay TV bundle that is offered on to

23 subscribers.

24          MR. LEVANDER:  I have no further questions at this

25 time, your Honor.

O87HFub5                    Redirect - Nallen

1          THE COURT:  Any other defendants intend to cross

2   Mr. Nallen?

3          MR. EARNHARDT:  No, your Honor.

4          THE COURT:  OK.  Mr. Hafenbrack.

5          MR. HAFENBRACK:  Thank you, your Honor.

6   REDIRECT EXAMINATION

7   BY MR. HAFENBRACK:

8   Q.  Mr. Nallen, you were talking with your counsel and with

9   your Honor about the potential cannibalization effect and how

10  you're hoping to avoid that with Raptor.  Do you recall that?

11  A.  I do.

12  Q.  And you mentioned a $15 million budget that Fox is going to

13  direct towards digital advertising.  Did I understand that

14  correctly?

15  A.  Yes, you did.

16  Q.  And that is Fox's in-kind advertising contribution towards

17  Raptor, correct?

18  A.  That's correct.

19  Q.  Raptor's going to be spending hundreds of millions of

20  dollars on top of that advertising the service more broadly,

21  correct?

22  A.  I'm not aware of the particular budget that they have, but

23  clearly, they will spend more than the in-kind marketing.

24  Q.  Is Raptor going to be spending half a billion dollars a

25  year advertising its service?

1   A.  I'm not aware of that number.

2   Q.  And the digital advertising channels that you're targeting,

3   aren't those the same digital advertising channels where Fubo

4   gets its customers, sir?

5   A.  I don't —— I don't know the answer to that.

6   Q.  And you said —— did I understand you correctly that Fox

7   doesn't intend to advertise Raptor on its linear networks?

8   A.  That's correct.

9   Q.  But Disney and Warner Bros. do, isn't that true, sir?

10  A.  I have no idea.

11  Q.  You identified directing your $15 million in-kind

12  advertising budget towards digital properties.  Anything else

13  that Fox is doing to prevent people from switching from the fat

14  bundle to the skinny bundle once Raptor's launched?

15  A.  No, that's the principal method for us.

16  Q.  And your counsel asked you about the research studies.

17          And if we could pull up JX 14, again, slide 15.

18          Do you see it says $22 is the revenue maximizing

19  price?

20  A.  Sorry.  Which —— where are we?  On the left side?

21  Q.  Yes, sir.

22  A.  I see that.

23  Q.  $22 is the revenue maximizing price, correct?

24  A.  That's what it says.

25  Q.  This study showed tremendous demand, over 15 million

O87HFub5                          Nallen - Recross

1    subscribers, at a much higher price point, isn't that true,

2    sir?

3    A.  I just don't know, sir.

4    Q.  And Fox didn't conduct any different studies than the ones

5    that are depicted on this screen, correct?

6    A.  Not independently.

7            MR. HAFENBRACK:  No further questions, your Honor.

8            THE COURT:  Mr. Levander?

9            MR. LEVANDER:  One question.

10   RECROSS EXAMINATION

11   BY MR. LEVANDER:

12   Q.  Go back to that slide, please.

13           THE COURT:  Put the slide back up, sir, the one that

14   was up.

15           MR. LEVANDER:  JX 14, page 15.

16   Q.  Would you read, sir, at the bottom, key consideration.

17   It's highlighted for you on the screen.

18   A.  Yes, I see that.

19   Q.  Can you read it to —— into the record, please.

20   A.  Oh.  Read it.  Sorry.

21           "Key considerations:  Despite being positioned as a

22   vMVPD (i.e., a skinny cable bundle) we believe most research

23   respondents misinterpreted the Raptor offering as more akin to

24   an SVOD service and anchored their pricing expectations to be

25   in line with these offerings."

1    Q.   And was that one of the reasons why you rejected these

2    studies as being relevant to your decision to join Venu?

3    A.   It would have been among the decisions.

4            THE COURT:  Mr. Nallen, just to clarify for me, as a

5    consumer, am I correct that most SVOD offerings are cheaper on

6    a per-month basis than MVPD offerings?

7            THE WITNESS:  Yes.

8            THE COURT:  Thank you.

9            MR. LEVANDER:  Mr. Hafenbrack, anything else?

10            MR. HAFENBRACK:  Nothing further, your Honor.

11            THE COURT:  You're excused.  Thank you very much.

12            (Witness excused)

13            MR. HAFENBRACK:  Fubo calls Gary Schanman from DISH,

14    your Honor.

15            THE COURT:  Mr. Schanman, you can come forward, all

16    the way forward.  The witness box is to my left.  Just come to

17    the witness box and remain standing, sir, so Ms. Verneus can

18    administer the oath.

19    GARY EARL SCHANMAN,

20         called as a witness by the Plaintiff,

21         having been duly sworn, testified as follows:

22            THE WITNESS:  Gary Earl Schanman, S-c-h-a-n-m-a-n.

23    DIRECT EXAMINATION

24    BY MR. WILKINS:

25    Q.   Good afternoon.  Matthew Wilkins on behalf of Fubo.

O87HFub5                        Schanman - Direct

1          Before beginning the examination, two quick point of

2      order.  For of all, as your Honor knows, Mr. Schanman is a

3      third-party witness.  I'd like to acknowledge at counsel table

4      his counsel, Pantelis Michalopoulos.

5          MR. MICHALOPOULOS:  Hello, your Honor.

6          THE COURT:  Nice to see you, Mr. Michalopoulos.

7          MR. MICHALOPOULOS:  Likewise.

8          MR. WILKINS:  He will policing myself and Mr. McGinley

9      on issues of privilege, confidentiality, etc.

10         I'd also like to acknowledge in the gallery Ms. Hadass

11     Kogan, who is in-house counsel for EchoStar.

12         THE COURT:  My understanding, Mr. Wilkins, for

13     portions of Mr. Schanman's testimony, we expect the need to

14     seal the courtroom for some portions of his testimony, is that

15     correct?

16         MR. WILKINS:  That is correct.  And Mr. McGinley and I

17     coordinated that the sealed portions of my examination will be

18     at the very end and the sealed portions of his will be at the

19     beginning.  So, hopefully, we only have to do that once.

20         MR. MICHALOPOULOS:  If I may note, your Honor, it was

21     an alignment of stars, thanks the framework you set and

22     collaborative discussions with both counsel, we were able to

23     sandwich the nonpublic portion.

24         One nuance is the nonpublic portion is outside

25     attorneys only.  Of course, Ms. Kogan is not an outside

O87HFub5                          Schanman - Direct

1  attorney, but she's EchoStar.

2          THE COURT:  No, correct.  As you have no reason to

3  know this, Mr. Michalopoulos, when we sealed because of Fubo

4  documents, I permitted employees of Fubo who had success to the

5  documents in their ordinary business to remain even though they

6  weren't lawyers.  So we'll continue that.

7          MR. MICHALOPOULOS:  Great.

8          THE COURT:  And I very much appreciate everyone's

9  cooperation in ensuring that we are closing the courtroom for

10  as little time as possible.

11          With that, Mr. Wilkins, you can begin.

12  BY MR. WILKINS:

13  Q.  You've already stated your name for the record,

14  Mr. Schanman.  Would you please tell us what you do for work.

15  A.  I'm the executive vice president and group president for

16  video services for EchoStar Corporation.

17  Q.  What is EchoStar?

18  A.  EchoStar is a multinational company.  We offer wireless

19  services, satellite services, and then in my case I manage our

20  video services which consist of DISH TV satellite service and

21  Sling TV, an over-the-top streaming service.

22  Q.  How long have you worked for EchoStar?

23  A.  Over two years.

24  Q.  What are your responsibilities there?

25  A.  I have full P&L responsibility across the portfolio of DISH

O87HFub5                    Schanman - Direct

1    TV and Sling TV.  That's everything from marketing, sales,

2    product operations, programming, as well as media sales,

3    advertising.

4    Q.  Now, before working at EchoStar, how long have you worked

5    in television industry generally?

6    A.  2001 was when I started.

7    Q.  Can you name some of the other companies and roles that

8    you've held.

9    A.  Cablevision, I was the SVP of video services there; did

10   business development as well.  I worked at Charter

11   Communications, so Charter Spectrum, and I was there for six

12   years.  And I worked at Comcast for a short period of time in

13   the middle, between those companies.

14   Q.  You mentioned DISH TV.  What is DISH TV?

15   A.  DISH TV is a satellite-delivered pay TV service.  It's a

16   multi- —— it's an MVPD traditionally delivered over satellite

17   to equipment that we provide to consumers in the home.

18   Q.  You mentioned Sling TV.  What's Sling TV?

19   A.  Sling TV also delivers mostly live and on-demand content to

20   consumers, but in that case we build applications that live on

21   devices like Roku, Samsung TVs, etc., and consumers subscribe

22   to services that way.  We don't provide any equipment, and the

23   content streams over the broadband connection that they have in

24   their home.

25   Q.  Does Sling have just one package or does it offer multiple

O87HFub5                        Schanman - Direct

1  packages from which consumers can choose?

2  A.  We have a couple packages that we offer.

3  Q.  Like what?

4  A.  We have two base packages, so you have to get one of these

5  packages, Sling Orange and Sling Blue, and we have a number of

6  add-on packages like Sports Extra, a number of other items you

7  could buy on top of those base packages.

8  Q.  How much overlap do the two base packages, Sling Orange and

9  Sling Blue, have?

10 A.  I believe there's about six —— actually, about 20 channels

11 that overlap roughly, 20 to 25 channels that overlap between

12 the two packages.  Orange has 32 channels, and there's about 40

13 channels in Blue.  So there's overlap between the two.

14 Q.  So does each of these packages, Sling Orange and Sling

15 Blue, have some networks that are unique to just those?

16 A.  Yes, yeah.

17 Q.  Let's start with Sling Orange.  How many networks does

18 Orange have that Blue does not?

19 A.  Six.  There's six.

20 Q.  What are those?

21 A.  It's actually the Disney media networks portfolio that's

22 exclusively in Orange.

23 Q.  And that —— sorry.

24 A.  That's Disney Channel, that's ESPN, ESPN2, etc.

25 Q.  So are you familiar with the term "skinny sports bundle"?

O87HFub5                        Schanman - Direct

1   A.  I am.

2   Q.  To you, in your understanding, what is a skinny sports

3   bundle?

4   A.  Skinny sports bundle would be a bundle, a package, that

5   consumers can buy that would have only sports programming in

6   that bundle.

7   Q.  So is Sling Orange a skinny sports bundle?

8   A.  It is not a skinny sports bundle.

9   Q.  And why's that?

10  A.  Because there's news and entertainment channels in there.

11  A & E's in there.  Basically, there's other entertainment

12  channels.  CNN is in there.  So it's not just sports.

13  Q.  I hope you'll forgive me for forgetting the exact number.

14  I think Orange had 30-some-odd networks?

15  A.  32.

16  Q.  32.

17          Of those 32 networks, how many have sports content?

18  A.  Five of them have sports content, I believe.

19  Q.  Do you know which those are?

20  A.  Well, it has ESPN, ESPN2, and then we carry through the

21  service ESPN3, which is more of a streaming version of ESPN

22  content with other content there.  We have in there Warner

23  Bros.  We have —— we have TNT and TBS in there.  And TNT has

24  basketball, NBA and college, and TBS has baseball.

25  Q.  Let's move on to Sling Blue for a second.  How many

O87HFub5                          Schanman - Direct

1   networks does blue have that Orange doesn't?

2   A.  So it has, I think, close to 10 or 11.  I apologize.  I

3   should have studied up on this, but so . . .

4   Q.  What are some of those unique networks that it has?

5   A.  The Blue package has content from Fox and NBC Universal,

6   and that's — are not in Orange.  So it's channels like Bravo,

7   say, from NBC, and on Fox, it has some Fox services in that.

8   Q.  So Blue has —

9   A.  Fox News is in Blue.

10  Q.  So Blue has news and entertainment content as well?

11  A.  Yeah, it's also not a skinny sports bundle.

12  Q.  Let's back up to something a little bit more fundamental.

13  I've been asking about skinny sports bundles.  Are live sports

14  important to EchoStar's pay TV business?

15  A.  Live sports is very important to every provider like ours.

16  The top — I think over 90 of the top 100 broadcasts on a given

17  year are sports-related programming.  And our consumers come

18  in, and many of them want to watch sports.  So it's extremely

19  important to our business.

20  Q.  How do you know that many of your consumers want to watch

21  sports?

22  A.  Because if you just look at the ratings, that's what it

23  appears that they watch, and that's what they come in to

24  consume.

25  Q.  In the context of this lawsuit, you're here testifying, do

1    you have an understanding of what the term "Raptor" means?

2    A.  Yeah.  Yeah, I do.

3    Q.  And what does Raptor mean to you?

4    A.  I just read that it was the internal project name for the

5    joint venture.

6    Q.  Do you have an understanding of what sports content Raptor

7    is going to carry?

8    A.  Yes.  Based on what was published, it looks like it's

9    about, I believe, 14 sports-centric networks or sports-specific

10   networks as well as ESPN+, which is a —— their

11   direct-to-consumer product that Disney offers.

12   Q.  Let's talk about Sling Orange for a minute.

13            How many of those 14 networks that you just mentioned

14   that Raptor will offer will also be on Sling?

15   A.  On Sling Orange?

16   Q.  On Sling Orange.

17   A.  Five of them, the five I mentioned actually.

18   Q.  And do you know what percentage of Orange's most-watched

19   telecasts come from just those five networks?

20   A.  I do, but I'd rather not publicly talk about that, if

21   that's possible.  Maybe there's another way I could communicate

22   that.  But it's a very high percentage, a very high percentage

23   of the top telecasts that we —— that are broadcast are

24   delivered through those five channels.

25   Q.  I think we can save the detail for the sealed portion.

O87HFub5                        Schanman - Direct

1   We'll leave that topic until later.  I'll put that aside.

2            Can a consumer access all 14 of Raptor's linear

3   networks and ESPN+ through Sling, any package?

4   A.  So none of our packages on Sling have —— or DISH TV have

5   access to ESPN+, so that's not possible.  Of the 14 channels

6   that are in the joint venture, you can get that through Sling.

7   You'd have to subscribe to Sling Orange and Sling Blue, which

8   we call Combo, and then you'd have to get the Sports Extra

9   package.

10  Q.  How much would getting that Sling Orange-Blue combo and the

11  sports package cost?

12  A.  Between $70 and $75.  It depends.  In certain markets where

13  we have the local-owned stations, we charge five bucks more.

14  It could be as much as $75.

15  Q.  Do you have an understanding how much Raptor is going to

16  cost?

17  A.  I do.  Based on what's been issued, it looks like it's

18  going to come out at $42.99 at launch.

19  Q.  So how much more would a consumer, a sports fan, have to

20  pay on Sling to get just the same 14 networks that Raptor will

21  offer?

22  A.  So it would be over $30 they'd have to pay to get the same

23  services from us without ESPN+, which we mentioned.

24  Q.  I apologize.  I cut you off.  I'll try not to do that

25  again.

O87HFub5                     Schanman - Direct

1    A.  OK.

2    Q.  The defendants have said that Raptor is targeted only at

3    cord-cutters and cord-nevers.  Do you buy that?

4    A.  No, I don't.

5    Q.  Tell us why.

6    A.  In my 20-plus years of experience in the industry,

7    basically, people come to our services to get sports content.

8    And if they have an opportunity, they're going to — you know,

9    basically half their bill, or even more, they're going to

10   basically go from our services or traditional service to a

11   cheaper option.

12          So — and I don't believe that — yeah, so I don't

13   believe that that's going to happen.  I think it's going to

14   cause massive defections from traditional distributors.

15   Q.  Defendants here have also said that Raptor will have, or

16   they forecast will have, about 5 million subscribers by 2029.

17   Do you buy that?

18   A.  My personal opinion is it will have many more subscribers

19   than that because sports is the — arguably, the last sort of

20   linchpin that's holding the distributor ecosystem together.

21   You know, entertainment content have migrated off; other things

22   have migrated off.  Investment in live TV has declined, and a

23   lot of people would flock to this package, in my view.

24   Q.  Let's talk more about these packages.  You testified that

25   neither Sling Orange nor Sling Blue is a skinny sports bundle.

O87HFub5                        Schanman - Direct

1   Does EchoStar, any of its offerings, does it offer any skinny

2   sports bundles at all?

3   A.   Sorry.  Could you just repeat the question.

4   Q.   I sure can.  Maybe a little slower and more clearly.

5           You testified earlier that neither Sling Orange nor

6   Sling Blue is a skinny sports bundle.  Does EchoStar, in any of

7   its offerings, offer a skinny sports bundle?

8   A.   No.

9   Q.   Would EchoStar like to?

10  A.   We'd love to.  We'd love to have the flexibility to offer a

11  lot of different packages to consumers, whether it's news,

12  sports, etc.  Yeah, we'd love to.

13  Q.   If EchoStar wants to, why doesn't it?

14  A.   Because our contracts don't legally allow us to offer only

15  those select channels to our consumers.

16  Q.   Let's talk at a high level here.  What types of contractual

17  terms are you talking about that prevent EchoStar from offering

18  a skinny sports bundle?

19  A.   So there's a number of contractual obligations that are in

20  deals that we do with programmers.  First one is general

21  bundling of services.  So, for example, if you want to carry a

22  sport network A, you would carry entertainment network B from

23  that company.  So those are requirements in a lot of cases.

24          Then there's penetration requirements.  So if you're

25  going to carry these, you have to distribute it to a certain

1    percentage of your base.

2              And then there's packaging requirements, and they work

3    hand in hand.  So, for example, if you have a penetration

4    requirement that channel A needs to be distributed to

5    82 percent of your subscribers, but it also has to be in these

6    following packages, right, and they need to be bundled

7    together.  So you have to have both of these channels, again,

8    85 percent-plus.  If you were to discontinue this package and

9    launch a new package, you still have to carry it through, etc.

10             The other one is drag rights, which is interesting,

11   which is basically if a similar program —— programmer, sorry,

12   if a similar channel from a different programmer is carried in

13   a certain package in a certain way, then we're forced to carry

14   the other programmer's content in that same package.  So they

15   call it drag rights, across the board.  So there's a number of

16   these types of structures that don't allow us to do what you

17   described, like a skinny sports bundle.

18   Q.  Speaking about the specific defendants here, do all of

19   EchoStar's distribution agreements with the defendants contain

20   some combination of these packaging and minimum penetration and

21   drag requirements you've been talking about?

22   A.  Yeah, they all have different variations, and some have

23   more of one or the other.  Some are tighter than others.  You

24   try to negotiate what you can, but these are common to —— that

25   get negotiated.

1    Q.  You said that EchoStar tries to negotiate these

2    distribution agreements with the defendants and other

3    programmers, is that right?

4    A.  Yes, we do.

5    Q.  So if these requirements prevent EchoStar from offering a

6    skinny sports bundle, which is what EchoStar wants to do, why

7    not just say no to these requirements?

8    A.  These are huge companies that have content that our

9    consumers do need.  We have a lot of respect for these

10   companies in terms of the great content it provides, but not

11   all of it is stuff we want to provide.  So we can't not

12   necessarily offer ESPN or certain channels.  So we just try to

13   work around maybe trying to get a better way to carry it.  But,

14   yeah, we can't just walk away.  We wouldn't have the business.

15   Q.  In your negotiations with large programmers generally, has

16   EchoStar ever asked for the ability to offer a skinny sports

17   bundle?

18   A.  So I'm not sure what my team —— so programming reports in

19   to me.  I'm not sure exactly the wording they used, but I know

20   we are always looking for maximum flexibility.  So we want

21   flexibility over penetration requirements, of the forced

22   bundling we talked about, of different disparate channels, our

23   ability to be able to package it in a flexible way to give

24   content to consumers the way we think they want and to be able

25   to allow us to lower our prices.  So whether it's an

O87HFub5                    Schanman - Direct

1    entertainment-only bundle or it's a sports-only bundle, that's
2    the flexibility that we seek.  So we always try to get
3    flexibility.
4    Q.  And do you ask for that flexibility in every negotiation?
5    A.  We do.  Some things we won't want to carry at all, we ask
6    for that, and we ask for all the other things I mentioned.
7    It's the way we negotiate.  We're trying to get the best
8    combination of content and flexibility that we can.
9    Q.  If EchoStar received from programmers the flexibility that
10   it's been asking for, would EchoStar have the ability to offer
11   a skinny sports bundle?
12   A.  Sure.  Yeah, I mean, if we're able to carry the specific
13   channels or bundles that customers want or even let customers
14   pick it, yeah, of course.
15              MR. WILKINS:  Your Honor, I think we've reached the
16   part where we need to seal the courtroom, so ——
17              THE COURT:  Just for my information, Mr. Wilkins,
18   approximately how much more on direct do you have?
19              MR. WILKINS:  I'm going to estimate maybe five to six
20   minutes.
21              THE COURT:  Do you have an estimate, Mr. McIntyre ——
22   McGinley, I'm sorry.
23              MR. McGINLEY:  That's OK, your Honor.
24              THE COURT:  Too many lawyers.
25              MR. McGINLEY:  I've been called much worse.

O87HFub5                          Schanman - Direct

1              I would say probably —— and Mr. Addis may ask a few

2      questions.  I think, between the two of us, 15 minutes.

3              THE COURT:  OK.  Why don't we press on, and then when

4      we're done, given the need to get to Mr. Pitaro, we'll take a

5      break after Mr. Schanman is finished.

6              Ladies and gentlemen, if you are not a lawyer for one

7      of the parties and you don't work for EchoStar, I'm going to

8      have to ask you to step out temporarily.  We'll take a break

9      after the sealed portion so you'll know when it's —— the

10     courtroom has reopened.  Thank you all.

11             (Continued next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O87HFub5                          Schanman - Direct

1              (Courtroom sealed)

2              MR. McGINLEY:  Your Honor, just to clarify one thing,

3    we allowed —— the parties, as you're aware, allowed EchoStar to

4    designate things outside attorneys' eyes only.  I think that

5    means even the in-house counsel that are not EchoStar counsel

6    have to leave the courtroom for this small portion of the

7    proceedings.

8              THE COURT:  Yes.  Thank you, Mr. McGinley.

9              And I did notice that Fubo's general counsel has left,

10   and that will be the same rule for Disney, Fox, and Warner

11   Bros.  If you are in-house lawyer at Disney, Fox, or Warner

12   Bros., you have to step out for this portion.  So only outside

13   counsel and then if you work at EchoStar, you can stay.

14             Thank you, Mr. McGinley, for clarifying that.

15             With that, can counsel just affirm for the record that

16   once these two gentlemen leave, no unauthorized person is

17   present?

18             MR. WILKINS:  Looks good to Fubo, your Honor.

19             THE COURT:  Ms. Verneus is going to lock the doors.

20             Ms. Verneus, is the live feed off?

21             THE DEPUTY CLERK:  It's off.

22             THE COURT:  You can continue, Mr. Wilkins.

23             MR. WILKINS:  Thank you, your Honor.

24   BY MR. WILKINS:

25   Q.  Mr. Schanman, now that we've sealed the courtroom, let's

O87HFub5                          Schanman - Direct

1    return to that question you didn't want to answer earlier.

2              XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXX

5    XX   XXXXXXXXXXXX

6    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XX   XXXX

8              XXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10             XXXXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13             XXXXXXXXXX  XXX

14             MR. WILKINS:  Apologize if I did not leave the record

15   clear.

16             THE WITNESS:  Yeah, it wasn't clear.

17             MR. WILKINS:  All right.

18             THE COURT:  Raquel, did you get your question

19   answered?

20             (Discussion off the record)

21   BY MR. WILKINS:

22   Q.  Mr. Schanman, did the defendants' penetration, packaging,

23   and drag requirements have practical implications for EchoStar

24   subscribers?

25   A.  They do.

O87HFub5                    Schanman - Direct

1    Q.   Such as?

2    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XX    XXXXXXXXXXXXX

11   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21           XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXX

O87HFub5                         Schanman - Direct

1   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXX

11  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16          XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22  Q.   You have some water up on the stand with you too.

23          THE COURT:   Yes, you can help yourself there,

24  Mr. Schanman.

25  Q.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O87HFub5                    Schanman - Direct

```
 1    XX   XXXXXXXXXXXXXXXXX

 2    XX   XXXXXXXXXXXXXXXX

 3    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 4    XXXXXXXXXXXXXX

 5    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 7    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 8    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 9    XXXXXXX

10    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19    XX   XXXXXXXXXX

20    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22    XXXXXXXXXXXX

23    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25    XXXXXXXXXXXX
```

1   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14          THE COURT:  Let me just ask you, Mr. Schanman, about

15  that point because, as you may have guessed, we spent a lot of

16  time in this hearing talking about the situation of a

17  sports-driven consumer who currently pays for nonsports

18  channels that they don't really want and may or may not watch.

19          So the premise is that they don't want them, they have

20  to take them, and then once they have them and have paid for

21  them, they may or may not watch them.  There's different views

22  about how much they actually watch.  But what I understand you

23  to be saying now is that these industry practices we've been

24  talking about also affect the consumer who doesn't care about

25  sports but wants some of the other channels that you offer but

O87HFub5                              Schanman - Direct

1    currently can't get from your company a product offering that

2    would be cheaper because it doesn't have sports.

3            THE WITNESS:  Correct.  And sports programming is

4    traditionally the most expensive.  So because it's all in the

5    same package, they can't necessarily —— yeah, they can't choose

6    to just get an entertainment package, right?  When we talk

7    about the flexibility, we're talking about not just sports,

8    like a skinny sports bundle.  We're saying what if you just

9    want an entertainment bundle and we don't have those kind of

10   options?  So they're burdened with that cost, and we have to

11   pass that on.  I mean, we can't —— we need to make a profit.

12           THE COURT:  Based on your experience in the industry,

13   as well as specifically EchoStar, if you could offer an

14   entertainment-only package that didn't include live sports,

15   would you be able to offer that product at a substantially

16   lower price?

17           THE WITNESS:  Definitely, without question.

18           THE COURT:  OK.  Go ahead, Mr. Wilkins.

19           MR. WILKINS:  Thank you, your Honor.

20   BY MR. WILKINS:

21   Q.  Mr. Schanman, based on your experience at EchoStar and

22   those other 20 years you spent in the television industry, how,

23   if at all, do you anticipate that Raptor will affect the

24   dynamic of future distribution agreement negotiations with the

25   defendants?

1    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXX

12          XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1      XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9           THE COURT:  Let me ask you a question, Mr. Schanman.

10   In your time at EchoStar or at one of the previous companies

11   you talked about, have you ever been involved in, I guess, what

12   I as a consumer would call a looming blackout situation in

13   which —— we had a few of these in the news in the last couple

14   of years where negotiations between a programmer and a

15   distributor have gotten sort of to the brink where customers

16   are notified:  Just so you know, there's a risk that after

17   February 1, or whatever the date is, if we can't reach

18   agreement, you won't have access to this content?  Have you

19   ever been involved in that kind of situation?

20          THE WITNESS:  Many, many throughout all the companies

21   I named, except Comcast, but yeah.

22          THE COURT:  Can you just describe, as an industry

23   participant, what are the incentives on the programmer and

24   distributor side as that blackout date is looming?

25          XXXXXXXXXXXXX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3           XXXXXXXXXXX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXX

5           XXXXXXXXXXXX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXX

18           XXXXXXXXXXX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXX

24           XXXXXXXXXXXX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O87HFub5                        Schanman - Direct

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13            THE COURT:  And if the JV launches, does the existence

14   of Raptor, in your view, change the incentive structure in a

15   blackout situation for sports content?

16            THE WITNESS:  Yeah, because there's a place for

17   consumers to leave us and go get sports at a fraction of the

18   price.  If you're a sports consumer and we're negotiating with

19   one of these partners, you know, individually, and they have

20   sports content and they say, well, we're just going to take you

21   down, the next day there's advertisements all over their

22   networks saying come here and spend 42.99 for sports.  So it's

23   very easy for them to handle a takedown.

24            Back in the day, we used to have like in 2008 where

25   they would drive people to their website, right, back in the

1    day.  Now you have applications that, in this case, it's going

2    to have all the content and even more than we could even offer

3    at a higher price.  So, yeah, inevitably, we're competing with

4    their service as well, you know, negotiating with the

5    programmer.  That's the way I see it.

6            THE COURT:  All right.  I didn't mean to take over,

7    Mr. Wilkins.  Go ahead.

8            MR. WILKINS:  Your timing was impeccable, your Honor.

9    I actually have no further questions.

10            MR. McGINLEY:  Thank you, your Honor.  Michael

11    McGinley on behalf of Fox.

12    CROSS-EXAMINATION

13    BY MR. McGINLEY:

14    Q.  Mr. Schanman, it's good do see you again.

15    A.  Same.

16    Q.  It's good to see you not on a Saturday morning.

17    A.  Thanks for doing that for me.  I appreciate it.

18    Q.  You may remember you submitted a sworn declaration in

19    support of Fubo's preliminary injunction motion in this case,

20    correct?

21    A.  I did.

22    Q.  As I just alluded to, you remember we had a deposition in

23    this case as well, correct?

24    A.  Yes.

25    Q.  Just for the ease of everyone, we're going to bring you a

O87HFub5                          Schanman - Cross

1  copy of your declaration and a copy of your transcript from the

2  deposition.  We may or may not need to use it, but just so

3  you —

4  A.  No, I appreciate it.

5  Q.  Thank you.

6        THE COURT:  Mr. McGinley, while it's being handed out,

7  if you get to a point in your examination where you believe you

8  are done with material that requires the sealing of the

9  courtroom, you just advise me that we could reopen.  That may

10 not happen at all.  I understand.

11       MR. McGINLEY:  I appreciate that, your Honor.  My

12 expectation is it will happen, so I will let you know, yeah.

13 Q.  So, Mr. Schanman, why don't we go to the declaration,

14 paragraph 15, and this is PX 116.  And this would be on page 2,

15 I believe, paragraph — actually, sorry.  No, just

16 paragraph 15.

17 A.  Page 4?

18 Q.  Correct.

19       This is a topic that I believe you were just speaking

20 about with Mr. Wilkins.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23 XX  XXXX

24 XX  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25 XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

```
 1    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 4    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 5    XXXXXXXXXXXXXXXXXXX

 6    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 7    XX    XXXXXXXX

 8              XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 9    XXXXXXXXXXXXXXXX

10    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11    XX    XXXXXXXXXXX

12              XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21    XX    XXXXXXXXXXX

22              XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24    XXXXXXXX

25    XX    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XX   XXXXX

4    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    Q.   I believe you mentioned this in your earlier testimony, but

9    packaging penetration and bundling requirements are not unique

10   to these defendants.  They're a common industry practice,

11   correct?

12   A.   It's not unique to these defendants, but larger programmers

13   do a better job of limiting those kind of —— those MFN terms ——

14   I'm sorry, the packaging items.  It's just harder to negotiate

15   with bigger companies.

16   Q.   Sure.  You mentioned MFNs, which is interesting.  MFNs are

17   one of the things that distributors ask for during

18   negotiations?

19   A.   Both ask for it.  It's on both sides.

20   Q.   But distributors receive MFNs, correct?

21   A.   Yes, they do.

22   Q.   In your experience, in fact, carriage agreements are quite

23   heavily negotiated, correct?

24   A.   Sure.  Sure, we spend a lot of time on them.

25   Q.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O87HFub5                          Schanman - Cross

1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2   XXXXXXXX

3   XX   XXXXXXXXXXXXX

4   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12  Q.  If we could pull up Schanman transcript page 52, line 20.

13        And, sir ——

14  A.  I'll look on the screen.  Go ahead.

15  Q.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19  XXXXXXXX

20  XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21  Q.  Can we please display Exhibit JX 2.  I believe this is at

22  —— I guess we'll start here, Mr. Schanman.

23        This is an email.  And am I correct you received this

24  email from Mr. Andy LeCuyer?

25  A.  Correct.

O87HFub5                          Schanman - Cross

1    Q.  And let's go to the attachment to this email, which is

2    entitled Programming —— I think it's called Programming Deep

3    Dive, and let's go to page 12, please.

4                XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXX

8    XX   XXXXXXXX

9    XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXX

21   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O87HFub5                           Schanman - Cross

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    Q.  Yeah.  So you're positing a world in which thing —— where

3    every channel could be offered in a completely à la carte

4    fashion, correct?

5    A.  That's how we modeled it, sure.  That if you're not

6    watching something, then in theory the consumer wouldn't pay

7    for it.  So, yes, correct.

8    Q.  Has the market ever functioned in that fashion as far as

9    you're aware?

10   A.  No, but I wish it would.

11   Q.  Sure.   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXX

14   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   Q.  So in March of 2024, after the JV was announced, you spoke

18   to investors on an earnings call, correct?

19   A.  I did.

20   Q.  Could we pull up IMX 20.

21           THE COURT:  Mr. McGinley, do you have exhibits for us?

22           MR. McGINLEY:  I'm sorry, your Honor.  I apologize.

23   We do have them.

24           Although, honestly, this one, Mr. Aimonetti, we may be

25   able to get through this without an exhibit.

O87HFub5                           Schanman - Cross

1              We can give it to your Honor.

2              THE COURT:  I just would again remind counsel that if

3    you're going to be showing exhibits, then I need a copy and the

4    witness needs a copy.  Because the screen is wonderful, and all

5    of you lawyers who have seen these documents many times, it

6    works beautifully and it works great to show the gallery, but

7    it's not enough for the witness or for me.

8              MR. McGINLEY:  I apologize, your Honor.

9              THE COURT:  Thank you.  Keep going.

10             MR. McGINLEY:  We can go to page 4, believe, of this

11   exhibit.

12   Q.  Mr. Schanman, this is you speaking on this investor call?

13   A.  Correct.

14   Q.  On this investor call, you didn't say anything about the JV

15   posing an existential threat of irreparable harm to EchoStar,

16   correct?

17   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XX   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

O87HFub5                        Schanman - Cross

1              XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2       XXXXXX

3              MR. McGINLEY:  Thank you.  We can move into open court

4       at this point.

5              THE COURT:  Terrific.  Thank you, Mr. McGinley.

6              Ms. Verneus, can you unlock the doors to the courtroom

7       and let the folks in the hallway know they can come in if they

8       want.

9              And while Ms. Verneus is doing that, you can continue,

10      Mr. McGinley, just so we're using our time efficiently.

11             MR. McGINLEY:  Sure.

12             (Continued next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O87HFub5                         Schanman - Cross

1              (In open court)

2    BY MR. McGINLEY:

3    Q.  Mr. Schanman, your business, meaning DISH and EchoStar, has

4    been in steady decline for years, hasn't it?

5    A.  Yes, along with a lot of other of our competitors in the

6    MVPD space.

7    Q.  It's a competitive market, correct?

8    A.  It is a competitive market, and it's —— it's becoming

9    increasingly more competitive.

10   Q.  So let's start with the consistent decline in subscribers

11   over the past two years.  You would agree, wouldn't you, that

12   during 2022 and 2023, DISH and Sling together lost

13   approximately 2.2 million subscribers?

14   A.  I don't have the exact, but we've lost —— we lost sizable

15   numbers of subscribers.

16   Q.  Do you have any reason to doubt that it was 2.2 million?

17   A.  Did you give me —— sorry, was that over a couple of years?

18   Q.  Over —— yeah, over two years.

19   A.  Yeah, that makes sense, about a million a year, 975,000 a

20   year, that range.

21   Q.  And all the subscribers left before the JV was announced,

22   correct?

23   A.  Yes.  Most likely because of higher prices.

24   Q.  And now let's talk about the stock price over the past few

25   years.

O87HFub5                        Schanman - Cross

1              And just to clarify for the Court and for the record,

2      before this year, DISH and EchoStar were traded as separate

3      entities, correct?

4      A.   Correct.  At the end of the year, they merged into one

5      entity called EchoStar.

6      Q.   And DISH was the pay TV entity, correct?

7      A.   Yes.

8              MR. McGINLEY:  And we're going to pull up IMX 18, and

9      we have copies for everyone.

10     A.   Can I just qualify one thing, which is DISH Network

11     includes also the wireless business.  So DISH Network was the

12     video services that I represent, and then if you've heard of

13     the brand Boost Mobile, so that's a part of it too.  So when

14     you look at the overall stock, it reflects those businesses.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O872Fub6                    Schanman - Direct

1   BY MR. McGINLEY:

2   Q.  And Mr. Schanman, this chart shows that DISH traded at 45

3   dollars a share in the middle of 2021, is that correct?

4   A.  It looks like it, yes.

5   Q.  And it shows that at the end of 2023, at the time of the

6   merger, the stock price had dropped to around $5 share,

7   correct?

8   A.  It looks like it.

9   Q.  And that was before the JV was announced, correct?

10  A.  Of course.

11  Q.  And we will bring up Exhibit 19, IMX 19, and this is

12  EchoStar's stock price.  And you would agree that EchoStar's

13  stock price declined from approximately $45 in 2019 to around

14  $16 in 2023, correct?

15  A.  Yeah.  This is due to a lot of headwinds in our industry,

16  sure, and it's also tied to wireless and other things, right.

17  It's not just tied to video what drives our price.

18  Q.  And that occurred before the JV was announced, correct?

19  A.  The JV was announced in March of 2024, right?

20  Q.  Right.  So this is our last exhibit.  IMX 21, please.

21          And as Mr. Aimonetti is handing those out, this shows

22  EchoStar's stock price from the date that the JV was announced

23  on February 6 through the present.  And what this shows,

24  Mr. Schanman, is that EchoStar's stock price has actually gone

25  up since the JV was announced, correct?

O872Fub6                        Schanman - Direct

A.   This has nothing to do with our video services business,

which is basically understood that is in decline.  This has to

do with financing.  This has to do with growth of wireless.

This has to do with speculation in the market.  So, but, yes,

you are correct, but I don't think this represents anything

about the success of our video business or the health of our

video business at all.

Q.   At all.  You don't think your stock price reflects anything

about your video business?

A.   I don't believe that an increase in the stock price is

because the industry believes that we are in a strong position

as a video provider.

Q.   Okay.  But your stock price as gone up since the date of

the JV's announcement, correct?

A.   That's technically true.

         MR. McGINLEY:  No further questions, your Honor.

         MR. ADDIS:  Your Honor, I will be showing some

demonstratives, and I would ask to approach the bench and the

witness to hand them out.

         THE COURT:  Great.  And actually, for efficiency, you

can just hand the whole pile to Ms. Ghotbi, and she will give

them to the witness and me so that you can start the

questioning.

         MR. ADDIS:  Sure.  Thank you, your Honor.

O872Fub6                        Schanman - Cross

1  CROSS-EXAMINATION

2  BY MR. ADDIS:

3  Q.  Mr. Schanman, you testified previously about Sling,

4  correct?

5  A.  Yes, I did.

6  Q.  And you manage Sling, right?

7  A.  I do.

8  Q.  And Sling is EchoStar's virtual MVPD, correct?

9  A.  Yeah.  It's our streaming live TV service.

10  Q.  And you testified that Orange and Blue are Sling's basic

11  packages, right?

12  A.  They are our entry core packages, yes.

13  Q.  And I have taken a series of slides──we can put them

14  up──images directly from Sling's website.  And I would just

15  like to walk through some of them and ask you some questions

16  about the channels that each offers.

17  A.  Sure.

18  Q.  So if someone signs up for Sling Orange, they can get the

19  30 plus channels that are reflected on this slide, correct?

20  A.  Correct.

21  Q.  And someone outside of New York City can get Sling Orange

22  for $40 per month, correct?

23  A.  Actually anyone around the country can get Sling for $40 a

24  month.

25  Q.  Sling Orange, correct?

O872Fub6                          Schanman - Cross

1    A.  Sling Orange, yes.

2    Q.  And in fact, you have a promo code for $20 for the first

3    month, right.

4    A.  Right now we are not offering that.  It depends on -- a lot

5    of it depends upon where you come in, what you are interested

6    in, things like that.

7    Q.  Got it.

8            So $40 a month for Sling Orange around the country,

9    right?

10   A.  That's right.  Sometimes it's $10 off, sometimes it's full

11   price.  It depends.

12   Q.  If we can go to the next slide.  And Sling Orange has ESPN,

13   ESPN2, ESPN3, TBS and TNT, which all show live sports content,

14   correct?

15   A.  That's correct.

16   Q.  And those same channels would be on Venu, correct?

17   A.  That's what I have seen in the press.

18   Q.  And in Sling Orange, there are only a total of five Disney

19   channels, isn't that correct?

20   A.  Yup, it looks like it.

21   Q.  And those are ESPN, Disney, Freeform, ESPN2, and ESPN3,

22   right?

23   A.  Yes, it looks like that.

24   Q.  And you are aware that in the marketplace Disney offers

25   over 20 channels in its full bundle, correct?

O872Fub6                         Schanman - Cross

1    A.  It does, and we carry them on DISH TV and different parts

2    of Sling.

3    Q.  And so Sling Orange -- well, let's get back to Sling, but

4    Sling Orange, your basic package, does not carry the full

5    bundle of Disney channels, correct?

6    A.  That's correct, Sling Orange does not.

7    Q.  And if we can go to the next slide.  And every live sports

8    game that is offered on ABC is available on Sling Orange

9    because those games are simulcast on ESPN3, correct?

10   A.  Yeah.  It's a different feed, so it doesn't have all the

11   hosts.  Sometimes it's just like a cold feed, where you just

12   see the -- you know, you just see the cord, things like that.

13   But, yeah, technically the games are on there in a lot of

14   cases.

15   Q.  And in fact you -- not just in a lot of cases, you

16   specifically market that every game on ABC is simulcast on

17   ESPN3, to use Sling's own words, correct?

18   A.  Yes.

19   Q.  And ABC is also on Venu correct?

20   A.  We are not sure exactly to what extent.  We don't know

21   whether it's a national feed or local system, local O & O, but

22   we believe ABC will be available.

23   Q.  On Venu, correct?

24   A.  Yes.

25   Q.  Can we go to the next slide, please.

O872Fub6                          Schanman - Cross

1          Alternatively, if someone signs up for your other

2     basic package, Sling Blue, they can get approximately 40

3     channels or so that are reflected on this slide, is that

4     correct?

5     A.  That's true.

6     Q.  And outside of New York City, Sling Blue costs $40 per

7     month, correct?

8     A.  Correct, and 45 in markets where we have certain owned and

9     operated stations.

10    Q.  Including New York City, correct?

11    A.  Yeah, New York City, yes.

12    Q.  You can turn to the next slide, please.  And Fox Sports 1,

13    FS1, TBS, TNT and truTV, which all show live sports content,

14    are on Sling Blue, correct?

15    A.  That's correct.

16    Q.  And those same channels will be on Venu, correct?

17    A.  According to the press, yes.

18    Q.  And if we could go to the next slide, please, and this is

19    slide 10.6, your Sling Blue package also includes NFL Network

20    and USA, two other channels with live sports content that will

21    not be on Venu, correct?

22    A.  Correct.

23    Q.  And Sling Blue carries only two Disney networks——FX and

24    National Geographic——correct?

25    A.  Right, and that was the legacy deal with Fox when they used

O872Fub6                        Schanman - Cross

1    to own them.

2    Q.  And so, again, the full bundle of Disney's channels are not

3    carried on Sling Blue, correct?

4    A.  That's true.

5    Q.  You can go to the next slide.

6           And you can sign up for both Sling Orange and Sling

7    Blue and get all of the channels that we have already discussed

8    and others, correct?

9    A.  I don't know about others, but you can -- yeah, you can get

10   Orange and Blue.

11   Q.  And the channels that we did not discuss that were

12   displayed on the prior slides are available to those that sign

13   up for both Sling Orange and Sling Blue, correct?

14   A.  Yes.  And it depends because we have a sports extra

15   package.  But if you have Orange, you don't have certain

16   channels in there, right, because of the carriage agreements.

17   But if you get Sling Blue and you get sports extra, you get

18   different channels.  So in some cases you get ACC networks from

19   Disney, in some cases you can't get that.  So it depends.  But

20   if you get Sling Orange and Blue, you can add on other

21   packages, that's correct.

22   Q.  And if you sign up for both Sling Orange and Sling Blue,

23   you get only seven Disney channels in total in that basic

24   package, correct?

25   A.  It's confusing, but, yes, yeah, I believe that's the combo

O872Fub6                        Schanman - Cross

1  that we just went through.

2  Q.  And again, Sling Orange and Sling Blue together are not

3  carrying Disney's channels as a full bundle, correct?

4  A.  Can you just restate the question --

5  Q.  Sure.

6  A.  -- for me.

7  Q.  Again, Sling Orange and Sling Blue together are not

8  carrying the full bundle of Disney's channels, correct?

9  A.  You mean all the channels that Disney makes available --

10  Q.  Yes.

11  A.  -- in negotiation.

12       That's true.

13  Q.  And Disney has over 20 channels that it makes available in

14  negotiations, correct?

15  A.  I believe they do.

16  Q.  And on Sling Orange and Sling Blue together there are only

17  seven, correct?

18  A.  Correct.

19  Q.  And outside of New York City, Sling Orange and Sling Blue

20  together cost $55 per month, correct?

21  A.  That's correct.

22  Q.  If we can go to the next slide.

23       And if you prepay for three months of a Sling package,

24  you can also receive ABC, Fox, CBS, and NBC and get all of your

25  live sports content for a one-time fee of $49, correct?

O872Fub6                        Schanman - Cross

1    A.  Yeah.  We don't really push that, but it's a small

2    percentage of people that try this.  It's something we came up

3    with, but we are discontinuing it.

4    Q.  And it's available on your website as an offer, correct?

5    A.  Yeah.  Sure.  It basically takes your antenna signals and

6    allows to you take advantage of free TV, which obviously

7    broadcast used to be, and you can get that and we try to stitch

8    it into the app a little bit to make it easier for you to get

9    things in one place.

10   Q.  And so that would include all of the live sports content on

11   CBS and NBC which will not be offered on Venu, correct?

12   A.  Yeah.  CBS isn't a part of that and NBC is not a part of

13   that.  Sure.  But we are not providing it.  We are offering a

14   technical solution for you to take your over-the-antenna that

15   you buy in the store.  So we are not providing that to you, but

16   we have a device that they could use.

17   Q.  You are having a device that you can add it to the channels

18   you already have?  Is that what you are saying?

19   A.  Yeah, but it is the same, true, like if you think about a

20   Vizio where you can add the antenna in there, like on LG, if

21   you add an antenna, actually we do this based on a relationship

22   where you can actually get the local feeds into your Sling

23   guide, but it comes through your antenna.

24   Q.  And I think what you are explaining is that ABC, CBS, Fox,

25   and NBC are all available for free with an antenna, right?

O872Fub6

1   A.  Sure.  That's true, for those that can get it, yes, receive

2   signals.

3   Q.  And now, while EchoStar charges $55 per month for Sling

4   Orange and Sling Blue outside of New York City, EchoStar

5   charges a New Yorker $60 per month for Sling Orange and Sling

6   Blue, correct?

7   A.  And that's because we have to pay for those channels that

8   are available for free over the air.  Our deals require us to

9   retransmission.  We have to pay a certain amount, dollars per

10  channel per month to the provider of the channels.

11  Q.  So for Sling Orange and Sling Blue in New York City at $60

12  and outside of New York City $55, correct?

13  A.  That's right.  Because just to cover our costs.

14  Q.  And you don't know what limitations Fubo has in launching a

15  bundle even skinnier than Sling Orange and Sling Blue even

16  apart from defendants' licensing requirements, correct?

17  A.  I have no idea about Fubo's business.  I don't know what

18  they are able or not able to do.

19          MR. ADDIS:  That's all I have at this time.

20          THE COURT:  Anything further.

21          MR. WILKINS:  Nothing further.

22          THE COURT:  Mr. McGinley, you are finished?

23          MR. McGINLEY:  Finished, your Honor.

24          THE COURT:  So we are going to take brief break.

25          You are excused, Mr. Schanman.  Thank you very much.

O872Fub6

1              (Witness excused)

2              THE COURT:  It is 4:15.  We will resume at 4:25.

3              (Recess)

4              THE COURT:  Mr. Shultz.

5              MR. SCHULTZ:  Yes, your Honor.  Fubo calls James

6    Pitaro.

7              THE COURT:  Mr. Pitaro, you can just come up to the

8    witness stand—it's right here to my left—and remain standing

9    when you get there.

10             THE WITNESS:  Okay.

11    JAMES ANTHONY PITARO,

12        called as a witness by the plaintiff,

13        having been duly sworn, testified as follows:

14             THE COURT:  Go ahead, Mr. Shultz.

15             MR. SCHULTZ:  Your Honor, before we proceed, I want to

16    raise a time issue.  I have about maybe a half hour or so,

17    maybe less, of examination, not counting maybe redirect.  I'm

18    not sure how much defense counsel has.  But I wanted to just

19    raise for you, in case you wanted to get out about 5:00.  I

20    know Mr. Pitaro himself has some availability issues tomorrow,

21    so I wanted to put that on the radar.

22             THE COURT:  No.  I think that everyone needs to use

23    best efforts to finish by 5:30 with Mr. Pitaro so we can excuse

24    him.

25             Mr. Earnhardt, you seen unhappy with that.

O872Fub6                         Pitaro - Direct

1          MR. EVEN:  So it's Mr. Even.  Thank you, your Honor.

2     But we have a little more than that, and we were hoping the

3     Court can accommodate, if at all possible, but --

4          THE COURT:  Well, I don't know that we can accommodate

5     you tonight because we have nightly transcripts and the

6     reporters are already working around the clock.  So, you know,

7     I am sure that they can go a little bit past 5:30, but not

8     significantly so.  No one should be under any illusions that we

9     can go much past 5:30.  So that's where we are.  I mean, I'm

10    happy to have you recall Mr. Pitaro in the morning, but I know

11    that presents a problem for him.  So we are all going to do our

12    best.

13         MR. EVEN:  Thank you, your Honor.  I'm not sure

14    Mr. Pitaro is going to be happy about it.  That's why I am

15    trying to do that.

16         THE COURT:  He works for you, not for you, but --

17         MR. EVEN:  It's a little reversed, your Honor.

18         THE COURT:  By "you" I mean The Walt Disney

19    Corporation.

20         Go ahead Mr. Shultz.

21         MR. SCHULTZ:  Thank you, your Honor.

22    DIRECT EXAMINATION

23    BY MR. SCHULTZ:

24    Q.  Mr. Pitaro, just so you know, there is a binder of

25    documents in front of you.  Those contain some exhibits we may

O872Fub6                    Pitaro - Direct

1  look at today.  If you NEED to look at the actual documents,

2  feel free to page through.  They are in order of PX -- what's

3  called a PX number.  You can also see them on the screen in

4  front of you, the portions I will ask you about.  You will find

5  them in your binder if you want to look at the rest of the

6  documents.

7  A.  Okay.  Thank you.

8  Q.  So Mr. Pitaro, you are the chairman of ESPN, correct?

9  A.  Correct.

10 Q.  And as chairman of ESPN, you report to Disney's CEO, Robert

11 Iger, is that correct?

12 A.  Yes.

13 Q.  And you are familiar with the joint venture between Disney

14 Fox and Warner Bros., code named Raptor, is that correct?

15 A.  Yes.

16 Q.  And you are the person at ESPN responsible for ESPN's

17 participation in Raptor, correct?

18 A.  I am one of the people responsible.

19 Q.  Okay.  You would agree, Mr. Pitaro, that as a general

20 matter today live sports are more important than ever to the

21 viability of the live pay TV service?

22 A.  I would say they are incredibly important.

23 Q.  And ESPN has the most valuable sports content in the U.S.,

24 correct?

25 A.  We have the highest gross ratings points from a Nielsen

O872Fub6                        Pitaro - Direct

1  perspective.  If you look across our networks, we have the

2  highest viewership in terms of sports gross ratings points.

3  Q.  ESPN is the number one cable network in the America,

4  correct?

5  A.  That is correct.  I just would clarify when that is stated,

6  I believe that what we are referring to is in the 18 to 49

7  demographic in terms of total data viewership.

8  Q.  ESPN is the only network with all four major sports, is

9  that correct?

10  A.  That's my understanding, yes.

11  Q.  ESPN refers to itself as the number one "must keep"

12  network, correct?

13  A.  I don't know about those -- that exact wording.

14  Q.  Okay.  Let's go to a document.  This is PX 269 in your

15  binder.  We will show it on the screen, just page 3.

16  A.  Sorry.  Can you state the name again?  PX 09?

17  Q.  No, 269.

18  A.  Okay, yes.

19  Q.  And this is a presentation on ESPN, correct?

20  A.  Yes.

21  Q.  Created by ESPN or Disney?

22  A.  Yes.  It was created by ESPN strategy team in partnership

23  with the Disney strategy team, I believe.

24  Q.  Okay.  And this presentation notes that ESPN is the number

25  one "must keep" TV network brand, is that correct?

O872Fub6                          Pitaro - Direct

1   A.  I see that, yes.

2   Q.  And ESPN has locked up live sports programming rights

3   through long-term sports deals, is that correct?

4   A.  Many of our deals are long-term.  We do have some deals

5   that are shorter term.

6   Q.  Okay.  ESPN has a ten-year deal with the NFL that extends

7   through 2031 at the earliest, is that correct?

8   A.  That's correct.

9   Q.  ESPN has a seven-year deal with the NHL that extends

10  through 2027, correct?

11  A.  I think that's correct, yes.

12  Q.  And ESPN just signed an 11-year deal with the NBA that

13  expires after the 2035-36 season, correct?

14  A.  Correct.

15  Q.  Okay. ESPN linear networks are available to consumers

16  exclusively through live pay TV services, correct?

17  A.  Correct.

18  Q.  They are not available on any SVOD service, correct?

19  A.  Correct.

20  Q.  Not available on any à la carte basis over the Internet,

21  correct?

22  A.  Correct.

23  Q.  And ESPN licenses its channels to MVPD as part of bundles

24  that include Disney general entertainment networks, correct?

25  A.  Yes.

O872Fub6                           Pitaro - Direct

1    Q.  These networks include Disney Channel FX, National

2    Geographic, things like that, correct?

3    A.  For the most part, yes.

4    Q.  And today there are no distributors that offer ESPN's

5    channels on a standalone basis without Disney's general

6    entertainment networks, fair?

7    A.  Without some of the Disney entertainment networks.  Is that

8    what you are saying?

9    Q.  Yes.

10   A.  I believe that's accurate.

11   Q.  And the bundle that includes both sports and entertainment,

12   as we have been talking about, that's known as the fat bundle

13   or the big bundle, correct?

14   A.  Yes.

15   Q.  Let's go to PX 245.

16          THE COURT:  Before we leave this document, Mr. Shultz,

17   Mr. Pitaro, can you just turn to page 12.

18          MR. SCHULTZ:  I'm sorry.  I just want to caution the

19   court there may be portions of this confidential or sealed, so

20   I wouldn't display them on the public monitors.

21          THE COURT:  Okay.  Are we going to have a sealed

22   portion in Mr. Pitaro's --

23          MR. SCHULTZ:  I wouldn't hope so.

24          THE COURT:  All right.  Can Disney counsel and Fubo

25   counsel just quickly come to the sidebar, someone from Disney.

O872Fub6                          Pitaro - Direct

1            (At the sidebar)

2            THE COURT:  What I would like to ask him about is this

3    figure on page 12 that -- about the cannibalization prediction

4    in this presentation.  Does Disney have a problem if I ask him

5    about that on the record?

6            MR. EVEN:  No.

7            THE COURT:  That this presentation predicted that.

8            MR. EVEN:  No.

9            (In open court)

10           THE COURT:  So, Mr. Pitaro, can you turn to page 12 of

11   that PX 269, the board presentation that we were looking at

12   before.

13           THE WITNESS:  Yes.  I apologize.  Give me a second.

14           THE COURT:  Sure.

15           THE WITNESS:  Page 12, your Honor?

16           THE COURT:  The page that is Raptor financial summary

17   impact.

18           THE WITNESS:  Yes.

19           THE COURT:  I think you said this whole thing was a

20   presentation to Disney's board, correct?

21           THE WITNESS:  Yes, that is correct.

22           THE COURT:  And do you see the segment on this slide

23   that is called cannibalization?

24           THE WITNESS:  I do.

25           THE COURT:  And the estimate here is estimate Raptor

O872Fub6                        Pitaro - Direct

1    will drive cannibalization 2.7 million linear subscribers and

2    .7 million FDTC subscribers.  Do you see that?

3              THE WITNESS:  I do.

4              THE COURT:  And does that reflect the estimate of how

5    many Raptor subscribers, future Raptor subscribers would drop

6    the current linear pay service that they have to get these

7    channels and become Venu subscribers?

8              THE WITNESS:  I believe that's accurate.  This was --

9    it was prepared by our research team and, yes, I believe that

10   the 2.7 million linear subs, the .7 million flagship subs,

11   those numbers are meant to reflect the estimated

12   cannibalization.  I would -- can I just elaborate on that

13   little bit further?

14             THE COURT:  I understand it's a prediction; no one

15   knows for sure.

16             THE WITNESS:  Okay.  So you read my mind.  That's

17   where I was going.

18             I would also say that this was probably from research

19   done -- the report was in February, so I would guess the

20   research was done end of last year.  Not certain about when it

21   was.  Don't know if these numbers -- the last thing I would say

22   is when we are presenting to the board, we need to be confident

23   in the numbers and we need to be conservative and walk into

24   those presentations with a high degree of confidence that we

25   are going to be able to meet the financial numbers that we put

O872Fub6                            Pitaro - Direct

1    in front of the board.

2              THE COURT:  Yes.  I understand.  That's very helpful,

3    Mr. Pitaro.  Thank you.

4              THE WITNESS:  Thank you.

5              THE COURT:  Go ahead, Mr. Schultz.

6              MR. SCHULTZ:  Thank you, your Honor.

7    BY MR. SCHULTZ:

8    Q.  I want to actually address that same issue quickly.  Let's

9    go to PX 253.

10   A.  Just to confirm, you said 253?

11   Q.  Let me just double check that, actually.  Yeah, 253,

12   please.

13   A.  Okay, yes.

14   Q.  Doesn't Disney -- so this is a January 10, 2024 e-mail from

15   Justin Warbrooke to yourself, correct?

16   A.  Yes.

17   Q.  And Mr. Warbrooke is another Disney executive who is, along

18   with you, responsible for Disney's participation in Raptor,

19   correct?

20   A.  Correct.

21   Q.  Okay.  And he is sending you a document, presentation about

22   Raptor at this point, correct?

23   A.  Yes.

24   Q.  And this presentation predicts that Raptor will cannibalize

25   67 percent of pay TV subscribers or that two-thirds of Raptor

O872Fub6                        Pitaro - Direct

1   subscribers -- strike that.

2           The presentation predicts that two-thirds of Raptor

3   subscribers will be trade-downs from pay TV, correct?

4   A.  Just give me one second, here.

5   Q.  Yes, page 7 the right-hand box there.  ESPN impact.

6   A.  Okay.  You said page 7 of 27?

7   Q.  That should be correct, yes.

8   A.  Yes.  So you are looking at the ESPN linear impact line 27,

9   the 2.7, correct?  That's what you are asking me about.

10  Q.  I'm looking on page 7 of PX 253 on the screen in front of

11  you, Mr. Pitaro.

12          THE COURT:  Also blown up on the screen, Mr. Pitaro,

13  if you want.

14          THE WITNESS:  Oh, I'm sorry.  Okay.

15  Q.  Are you with me?

16  A.  I'm with you now.  67 percent of subs are trade-downs from

17  pay TV.

18  Q.  Yes.

19  A.  I see it.

20  Q.  And that was Disney's projection at the time this

21  presentation was created, correct?

22  A.  Yes.  Again, it's my responsibility as a part of business

23  planning to make sure that the numbers that we put in front of

24  executives at Disney and the board are numbers that we believe

25  that we are going to hit.

1          At the same time, I would say we are going to do

2   everything we can to make sure that this is not cannibalizing,

3   meaning Venu or Raptor is not cannibalizing.  Our mission here

4   and our focus is on speaking to, attracting people, marketing

5   to people that are on the sidelines.  From day one, we have

6   been incredibly clear that this service is about speaking to,

7   attracting sports fans, especially younger sports fans that are

8   very price sensitive, who are on the sidelines right now and

9   getting them off the sidelines, whether they are on sidelines

10  because they have cut the cord or they have never subscribed.

11  Q.  Okay.  So from day one you testified that you have been

12  intending to target cord-nevers and cord-cutters and doing

13  everything you can to do that, correct?

14  A.  Yes.

15  Q.  And despite that stated intent, at this point in

16  January 2024, you told Disney's board and executives that you

17  expected 67 percent of Raptor subscribers to be trade-downs

18  from pay TV, is that correct?

19  A.  That is correct.  My job is to make sure that we are being

20  financially conservative and putting in front of them a plan

21  that we believe we can hit.

22  Q.  This was the most accurate number that you had at this

23  time, correct?

24  A.  It was a forecast.  It was an estimate that our research

25  team put in front of me and other executives and it was what we

O872Fub6                         Pitaro - Direct

1    had at the time.  I do not believe we have done the same

2    exercise since then.

3    Q.  You are not aware of any other forecast you have presented

4    to the board about the number of subscribers from Raptor who

5    would be trade-downs from pay TV, correct?

6    A.  That's correct.

7    Q.  This is the only one you are aware of?

8    A.  Correct.

9    Q.  Okay.  Do you recall getting concerns from sports leagues

10   about the effect that Raptor would have on cannibalization of

11   pay TV subscribers?

12   A.  I recall one league had concerns or one league asked

13   questions.

14   Q.  And which league was that?

15   A.  That was the NFL.

16           MR. SCHULTZ:  Now, I'm not going to display this next

17   publicly.  It's been sealed by the Court.  So please do not put

18   it on the monitor, Mr. Roberts, but this will be P268.

19   A.  I'm sorry.  You said P68?

20   Q.  P268.

21           MR. EARNHARDT:  Your Honor, if I may, just for this

22   document, because it's not a document that Fubo should see, I

23   would just ask that Fubo's counsel remove herself --

24           THE COURT:  Can you just go to the gallery?  Thank

25   you.

O872Fub6                           Pitaro - Direct

1    BY MR. SCHULTZ:

2    Q.  And I would just ask you, Mr. Pitaro, not to expressly

3    reference anything this document, given the sealed nature of

4    it.

5    A.  Thank you.  Understood.

6    Q.  So my just general question to you is this document we are

7    looking at here reflects concerns the NFL expressed to ESPN and

8    Disney regarding cannibalization effects that Raptor would have

9    on existing pay TV participants, correct?

10   A.  Correct.

11   Q.  Let's talk about the size of Raptor.

12   A.  I'm sorry?

13   Q.  I want to talk to you about the expected subscribers to

14   Raptor, the number of total subscribers to Raptor.

15          You are aware that defendants in this case have

16   publicly stated that they expect Raptor to attract 5 million

17   subscribers by 2029, correct?

18   A.  Yes.

19   Q.  And you supported that, the number, correct?

20   A.  The internal research that our strategy team did and

21   presented to me was directionally consistent with that 5

22   million number that you referenced.

23   Q.  Okay.  I want to ask you about that research.  So it is

24   true that Disney performed research in connection with a joint

25   Disney-Fox sports -- skinny sports bundle to test the number of

O872Fub6                         Pitaro - Direct

1    subscribers that would subscribe to that bundle, is that

2    correct?

3    A.   We -- when we made the decision to go ahead and launch

4    our -- make our primary networks available direct to consumer

5    over the top, we started to ask some questions internally about

6    whether there would be enough content that would be interesting

7    to a sports fan, and we concluded that there might be some

8    sports fans that would want more than just ESPN.  So, yes, we

9    started to think about potential partners.

10   Q.   Let's go to document PX 238.

11             MR. ROBERTS:   Is this a public document?

12             MR. SCHULTZ:   This is a public document unless you

13   tell me differently.

14   BY MR. SCHULTZ:

15   Q.   So this is an e-mail between yourself and some other Disney

16   folks about a conversation that you had with Fox regarding a

17   joint ESPN-Fox skinny sports bundle, is that correct?

18   A.   If you could just give me one moment.

19   Q.   Take your time.

20   A.   Yes, that's accurate.

21   Q.   Okay.  And you discussed with Fox the need to perform

22   research into the number of expected subscribers to that joint

23   service, correct?

24   A.   Can you direct me to where that is in this e-mail thread?

25   I don't see that.

O872Fub6                          Pitaro - Direct

1    Q.  Yeah, it's at page 2 of the e-mail.  You write, "We

2    discussed the need to expand" -- you write here, "We discussed

3    the need to do expanded research that looks at this combined

4    offering in terms of expected subs and specific prices.  We've

5    only done it with ESPN standalone, and we agreed to take that

6    on confidentially."  Do you see that?

7    A.  I do, yes.

8    Q.  So ESPN agreed with Fox on the need to perform market

9    research to test the number of subscribers who would be

10   attracted to a joint ESPN and Fox skinny sports bundle,

11   correct?

12   A.  We said we discussed the need to do that research.

13   Q.  And Disney in fact volunteered to take the lead on that

14   research, isn't that correct?

15   A.  I don't recall that.  Is that referenced in this document?

16   Q.  I am just asking you.

17   A.  I don't recall that.  I'm sorry.

18   Q.  You are not aware that Disney retained an outside vendor to

19   conduct market research on a joint ESPN-Fox offering?

20   A.  I'm not familiar with the specifics of how our research

21   team engaged in this research.  I'm not certain it was internal

22   or external or both.

23   Q.  Okay.  But you are aware that research was conducted on a

24   joint ESPN-Fox offering, correct?

25   A.  I was not -- I was not aware of that, no.

O872Fub6                        Pitaro - Direct

1   Q.  All right.  Let's go to PX 261.

2   A.  You said 261?

3   Q.  261, correct.

4   A.  Okay.

5   Q.  The title of this document is "ESPN-Fox Pricing Conjoint."

6   Do you see that?

7   A.  I see that, yes.

8   Q.  If you turn to page 2 of this document, it says, "The study

9   objectives.  Estimate demand and subscription revenue for ESPN

10  Fox bundle."  See that first bullet point there?

11  A.  I see that, yes.

12  Q.  And the study methodology on the right-hand side notes that

13  there were over 3,000 participants in this research study,

14  correct?

15  A.  I see that.  I believe this is the first time I have seen

16  this document.  But I see what you are referring to.

17  Q.  Okay.  So you never reviewed Disney's market research on

18  the number of likely subscribers to a joint ESPN-Fox offering?

19  A.  I don't believe I have seen or reviewed this document.  I

20  am aware of, I believe, the conclusions.

21  Q.  You believe the conclusions of this document?

22  A.  No.  I'm saying I was made aware of the conclusions.  I

23  don't believe I have seen this document.

24  Q.  Okay.  So you were made aware of the conclusion of this

25  document that more than 30 million people will be potential

O872Fub6                        Pitaro - Direct

1    subscribers to this joint ESPN-Fox service?

2    A.  No, I was not aware of that.

3    Q.  Let's go to page 4 of this document.  First bullet point

4    here says, "Across all prices and plan configurations tested,

5    the live sports essential service, which is the joint ESPN-Fox

6    service, generates an average of 18.9 million subscriptions,

7    with a wide range from 4.9 to 32.3 million subscriptions

8    depending on the exact pricing and plan scenario."  Were you

9    aware of this conclusion of this document, Mr. Pitaro?

10   A.  No.

11   Q.  Okay.  Were you aware of the study's conclusions regarding

12   the likely target market for the joint ESPN-Fox sports bundle?

13   A.  Our target market, whether it was when we initially were

14   considering partnering with Fox to license in their networks to

15   our flagship offering or the joint venture, the target market

16   in both cases has been, like I said before, people on the

17   sidelines that are not subscribed to MVPDs or virtual MVPDs.

18   Q.  Let's go to slide 19 of this document.  Were you aware that

19   this market research study concluded that 87 percent of

20   subscribers to the joint ESPN-Fox sports bundle were existing

21   pay TV subscribers?

22           MR. EVEN:  Your Honor, objection, foundation, asked

23   and answered now.

24           THE COURT:  Well, he said he was aware of some of the

25   conclusion of the document and that he hadn't seen it.  So I

1    think, Mr. Shultz, what you are trying to do is figure out

2    which conclusions he was aware of?

3              MR. SCHULTZ:  That's correct, your Honor.

4              THE COURT:  Okay.  So I think we are all on the same

5    page, and there has been sufficient foundation for that.

6              And again, the question, Mr. Pitaro, you have already

7    said you haven't seen this document, and so don't worry about

8    looking at the document now.  And in fact, maybe it would

9    resolve the objection to just -- let's just take the document

10   down.  Don't look at the document.  You've never seen it

11   before.  And just answer Mr. Schanman's questions about whether

12   the fact -- you will just accept -- he is going to not falsely

13   represent what's in the document.  Accepting his question as

14   true, is that a can -- is that something that you are aware of

15   that a study conducted by Disney had concluded X, you know?  Do

16   you understand?

17             THE WITNESS:  Yes, understood.

18             THE COURT:  Do you remember the fact that he asked you

19   about?

20             THE WITNESS:  I do.

21   A.  And what I can say is, I was never made aware of that

22   range.  The only numbers that I have seen you have referenced

23   already, which is directionally in that 5 million subscriber

24   range.

25   Q.  Okay.  And that's at the very bottom of the subscriber

O872Fub6

1   range we just saw on page 4 of this document which projects

2   between 4.9 and 32 million subscribers to the Raptor service or

3   the Raptor predecessor, correct?

4           THE COURT:  Again, Mr. Schanman said he has never seen

5   the document.

6           As between a range of 4.9 to 30 something, 5ish is at

7   the low end of that range, correct?

8           THE WITNESS:  Correct.

9           THE COURT:  Next question.

10  BY MR. SCHULTZ:

11  Q.  My question for you, Mr. Pitaro, is does this make you

12  reconsider any of the projections that you have offered for the

13  Disney-Fox-Warner Bros. joint service?

14  A.  It does not.  I will tell you we are hopeful that we can do

15  much better in terms of that 67 percent number that you

16  mentioned before, and we are hopeful that we can do better than

17  the 4.7 to 5 million range in terms of subscribers.

18  Q.  Okay.  So you are hoping to attract more than the 4.7

19  million subscribers that you had projected, correct?

20  A.  Provided that they are coming to us from the sidelines,

21  because that is when we make more money.  It is much better for

22  our business to attract a sports fan that is currently on the

23  sidelines versus attracting a sports fan that is currently part

24  of the, use your words, big bundle.

25          MR. SCHULTZ:  I will pass the witness at this time.

O872Fub6

1          THE COURT:  Thank you, Mr. Shultz.

2          THE WITNESS:  Thank you.

3          THE COURT:  While we are waiting for your counsel to

4   get up, Mr. Pitaro, do you have a picture in your mind of who

5   this person is that you describe as currently on the sidelines?

6          THE WITNESS:  It's a very good question, your Honor.

7   I do.  Obviously a sports fan and, for the most part, the way

8   we have looked at it is the younger sports fan that is price

9   sensitive.  And our mission is to serve the sports fan, and we

10  believe that there are many millions of sports fans, again,

11  especially younger sports fans, that are not being served right

12  now by the big bundle.

13         THE COURT:  And is it your view as head of ESPN that

14  there are approximately 5 million people who love sports enough

15  that they will pay $43 a month but are currently entirely

16  outside the pay TV ecosystem.

17         THE WITNESS:  I don't -- I don't know the answer to

18  that.  Our forecast over the five-year period is in that range,

19  the 5 million.  However, we do know that some of them are going

20  to come from the MVPD ecosystem.  I can't tell you they are

21  not.  All I can tell you is that we are going to do everything

22  we can to attract people that are not subscribed.  It is not

23  good for our business if they leave the MVPD ecosystem and go

24  to Venu.  That is not a good day for us.

25         THE COURT:  Okay.  Thank you, Mr. Pitaro.

1          THE WITNESS:  Thank you.

2    CROSS-EXAMINATION

3    BY MR. EVEN:

4    Q.  Good afternoon, Mr. Pitaro.  I'm going to start where you

5    just left off.

6          Can you explain to the Court why is it not a good day

7    for ESPN when a subscriber leaves a Fubo or a Comcast and moves

8    to Venu?

9    A.  First off, in Venu we are receiving our market affiliate

10   rates.  We receive our market affiliate rates in the big

11   bundle.  I'm going to continue to use those words, "the big

12   bundle."  When I say the big bundle, I mean MVPD's traditional

13   MVPDs and digital MVPDs.  The big bundle includes other Disney

14   networks and we get paid on a per-subscriber basis, so it is

15   better for The Walt Disney Company to have a customer in the

16   big bundle versus Venu.

17   Q.  Okay.  You were asked all kinds of questions about

18   forecasts and other things about Venu, so let's maybe take a

19   step back for a second and, very quickly, why did you decide to

20   launch Venu?

21   A.  I mentioned before that our mission is to serve the sports

22   fan, anytime, anywhere.  What we have seen is sports fans are

23   leaving the traditional ecosystem and they are moving more and

24   more to streaming platforms.  We need to serve them.  We need

25   to give them more options than what they have today.  And so we

O872Fub6                        Pitaro - Cross

made the decision internally to go ahead and make our primary

channels available direct to consumer.  We refer to that as

flagship direct to consumer.  At the same time, we realized

internally that there may be some sports fans that want more

than just what ESPN has to offer today, and so that's what led

to the existing partnership and the Venu product.

Q.  Okay.  You mentioned cord-cutting and the effect.  What has

been the effect of cord-cutting -- what has been the effect of

cord-cutting on your ability to reach subscribers.

A.  It's a challenge.  Cord-cutting, what we have seen over the

past few years, is 7 to 8 percent declines, and it's a

challenge for our business.  You know, we are very focused on

reaching those sports fans, and when they are cutting a cord,

it of course hits us financially, and that has an impact on our

ability to acquire rights, sports rights.  It's all

interconnected.

Q.  And you say that it affects your affiliate revenue.  What

are the sources other than affiliate revenues that -- by which

ESPN makes money?

A.  There is advertising revenue.  There is direct to consumer

revenue.  So we have a direct to consumer product in the market

right now called ESPN+.  ESPN+ is a complementary product to

ESPN's primary channels.  It is additive.  It is not

cannibalistic.  But there is revenue associated with that

direct to consumer offering.  Then we have another component of

O872Fub6                        Pitaro - Cross

1    Pay-Per-View revenue.

2              (Continued on next page)

O87HFub7                        Pitaro - Cross

1    Q.  What portion of ESPN's revenue comes from affiliate fees as

2    opposed to other sources?

3    A.  About 60 percent.

4    Q.  You became the head of ESPN in 2018, right?

5    A.  Correct.

6    Q.  How has the competitive environment ESPN is operating in

7    changed since 2018?

8    A.  It's changed significantly, and it's gotten a lot more

9    competitive.

10    Q.  How has ─── in what way has it become more competitive?

11    A.  Well, first off, there are streaming platforms that are

12    very appealing to sports fans, including younger sports fans.

13    And on top of that, because you have streaming platforms that

14    are now offering sports, they're bidding on sports rights and

15    driving the costs up.  So it is somewhat of a perfect storm

16    here where you have cord-cutting, fewer people engaged in that

17    traditional ecosystem and moving to and consuming sports

18    content on streaming platforms, and at the same time we see our

19    rights costs going up.

20    Q.  So you're talking about bidding and new entrants into

21    bidding.  Can you name some of the companies that have started

22    bidding for sports rights against ESPN?

23    A.  Yes.  So Google and YouTube acquired NFL Sunday Ticket.

24    Amazon acquired Thursday Night Football and recently acquired

25    rights from the NBA.  You have Netflix that acquired rights to

1    the WWE and also recently acquired two NFL Christmas Day games.

2    And then you have Apple that acquired exclusive rights to Major

3    League Soccer.

4    Q.  Now, there's been some —— the Court has heard some talk

5    about how big the defendants are.  How do these companies that

6    you compete against in terms of own rights, how large are they

7    compared to ESPN or even the Disney company as a whole?

8    A.  Much larger.  Much large in terms of market cap.

9    Q.  If you turn to JX 044 in your binder, do you see that?

10   A.  I do, yes.

11            MR. EVEN:  Your Honor, I believe this has already been

12   admitted.

13   Q.  What is this document?

14   A.  This is a presentation connected to our taking our primary

15   channels direct to the consumer, which was referred to

16   internally as Flagship.

17            MR. EVEN:  So we need to shut down the screens, if we

18   may, and turn to slide 3 of this.

19            THE COURT:  Turn off the public screen, Mr. Even?

20            MR. EVEN:  Yes, please turn off the public screen.

21   A.  OK.  I'm there.

22   Q.  Can you see this is a slide talking about overview MVPD

23   subscriber trend?

24   A.  I do.

25   Q.  And what does this chart show?

O87HFub7                              Pitaro - Cross

1   A.  It's showing pay TV subscriber attrition over a period of

2   time.

3   Q.  Do you see on the right something that says MCHH FY19-23,

4   sorry?

5   A.  I do.

6   Q.  What is MCHH?

7   A.  That stands for multichannel household.

8   Q.  And what is included in multichannel household?

9   A.  It's pay TV, so it's —— it is people who are accessing pay

10  television through either an MVPD, or multichannel video

11  programming distributor, or a virtual or digital MVPD.

12  Q.  What does this slide show us about what happened to

13  subscribership between 2019 and 2023?

14  A.  It shows that it is declining from 89 million households to

15  70 million households.

16  Q.  What is the forecast for MVPD subscribership after 2023 and

17  into the future?

18  A.  Continued declines and I believe accelerated declines.

19  Q.  Now, this is missing the first parts between 2019 and 2023

20  for ESPN.  What happened to ESPN subscribership between the

21  time you started in 2018 or from 2019 to 2023?

22  A.  The declines were significant and very similar to the

23  declines that you are seeing for the multichannel household

24  universe in general.

25  Q.  Now, you see that up at the bottom this slide says that:

1    "We expect FY23 will be the first year where rate increases

2    will not be enough to offset sub losses."  Do you see that?

3    A.  I do.

4    Q.  Can you explain this?

5    A.  What we're saying there is we believed at the time that

6    fiscal '23 would be the first year where affiliate revenue for

7    ESPN would decline.  In other words, it would be the first year

8    in our history where affiliate rate increases would not be

9    enough to offset subscriber declines.  Therefore, affiliate

10   revenue would decline.

11   Q.  Now, there's a claim here in this case that by and large

12   it's known sports fans that tend to cut the cord, whereas

13   sports fans overwhelmingly still subscribe to MVPD services.

14   Do you agree with that?

15   A.  I do not.

16   Q.  Why not?

17   A.  Our research team has reported that there are directionally

18   about 60 million non-pay TV households today.  Out of that

19   60 million, they reported that over 20 million are sports fans.

20   Q.  And do you have an understanding of the kind of sports fans

21   that have cut the cord to date?

22   A.  I believe that there are casual sports fans, there are

23   hard-core sports fans that are price sensitive that have cut

24   the cord.

25   Q.  How does this notion on this slide that we just talked

1    about, the cord-cutting and the fact that you can't cover rate

2    increases — sorry, that you can't offset sub losses with rate

3    increases, how does that relate to the perfect storm that you

4    were talking about earlier?

5    A.   It's significant.  It impacts revenue.  As I said before,

6    about 60 percent of our revenue is affiliate.  If that revenue

7    is declining, it impacts every area of our business, including

8    our ability to be competitive in the marketplace and acquire

9    sports rights as we move forward.

10   Q.   What has happened to the price of sports rights over time?

11   A.   Going up significantly.

12   Q.   So let's talk about one specific example, your recent NBA

13   deal.

14          How much does the current deal cost more than the

15   prior deal you had with the NBA?

16   A.   I'm sorry.  When you say "current deal," meaning the one we

17   just closed?

18   Q.   Right, the renewal.

19   A.   That deal starts season after next.  The average annual

20   value of that deal is $2.62 billion.  The current deal, the

21   deal that covers this season and next season — I'm sorry, the

22   deal that covers this coming season, the average annual value

23   is 1.5 billion.

24   Q.   Now, you said that this deck was about launching something

25   called Flagship, correct?

1    A.  Correct.

2    Q.  What is Flagship?

3    A.  Flagship is our internal name for ESPN taking and making

4    its primary channels available direct to consumer, over the

5    top, on an à la carte basis.

6    Q.  Have other programmers gone over the top already?

7    A.  CBS has launched Paramount+ —— or CBS has Paramount+.  That

8    includes sports programming.  NBC includes sports programming

9    on Peacock.  Those are two examples.

10   Q.  And why is it that ESPN still has not launched direct to

11   consumer to date?

12   A.  We've been hyperfocused on protecting the traditional MVPD

13   ecosystem, both MVPDs and digital MVPDs, but we've obviously

14   not been successful.

15   Q.  If you turn to slide 5 of JX 044, what is this slide

16   reporting on?

17   A.  It's reporting on the —— one of the biggest issues in the

18   sports industry today, which is the fragmentation.

19   Q.  So what do you mean by fragmentation?

20   A.  I mean that there are oftentimes many partners, many

21   programmers, that have the rights to a specific league's

22   content.

23   Q.  And why is that a problem?

24   A.  I'm a huge sports fan, and discovering where my games are

25   on is part one of the problem, and then part two is the need

O87HFub7                        Pitaro - Cross

1  for several different providers to get access to all of my

2  games.

3  Q.  How does consumer frustration with fragmentation factor

4  into your planning of Flagship?

5  A.  It was very important.  Like I said, the strategy around

6  Flagship was to follow the sports fan.  However, we also

7  realized that ESPN might not have enough for every sports fan,

8  and so we took a step back and said, in addition to Flagship,

9  direct to consumer, is there something else that we could be

10 doing to serve the sports fan and give the sports fan another

11 option?

12 Q.  And what other option did you come up with?

13 A.  Partnering with Fox and Warner Bros. Discovery on a product

14 that we've named Venu that will be offered at a higher price

15 point than Flagship with more content.

16 Q.  If you may turn to DX 191 in your binder.  Do you have it?

17 A.  I can't —— I'm just going to use the screen here.  That's

18 OK.  I'm good.

19 Q.  Do you recognize this email chain as an email chain between

20 Ms. Aguiar and yourself and others?

21 A.  I do.

22 Q.  And what was this email chain about?

23 A.  It was in connection with a discussion around potentially

24 partnering with Fox.

25        MR. EVEN:  Your Honor, we'll move to admit.

O87HFub7                      Pitaro - Cross

1           THE COURT:  If you use the exhibit, it's admitted.

2           MR. EVEN:  Thank you.

3  Q.  If you turn to page 2 of this exhibit, and you see there

4  there's something that talks about opportunity, and it says:

5  "Opportunity exists for us to partner to create content

6  offering that's superserves sports fans given our portfolios."

7           Do you see that?

8  A.  I do.

9  Q.  Then it says:  "Hybrid approach:  Favoring parallel paths

10 where we would continue to participate in larger traditional

11 MVPD bundles and potentially work with them on distributing

12 this offering as well."

13          Do you see that?

14 A.  Correct.

15 Q.  What did you mean by parallel —— working in parallel and

16 then potentially offering something similar to them?

17 A.  The MVPD big bundle, including the digital MVPD offerings,

18 has been and will continue to be very important to us.  So when

19 we say "parallel paths," what we're referring to is Flagship,

20 Venu, and the digital and traditional MVPDs.  We're looking

21 across the continuum, across the spectrum, and making sure that

22 ESPN is available everywhere, across price points and across

23 differing degrees of content.

24          THE COURT:  What about this last part, Mr. Pitaro, the

25 last part of the highlighted part, "potentially work with them

O87HFub7                        Pitaro - Cross

1    on distributing this offering as well," meaning at this time

2    what was contemplated was a Disney-Fox joint venture.  What

3    happened to that as a possibility that, in addition to

4    launching the JV as a standalone project, understanding at the

5    time this did not include Warner Bros., but also as part of

6    that making that same what we've been calling the skinny sports

7    bundle, I think, available to your existing customers at MVPDs?

8              THE WITNESS:  Still very much the case.

9              THE COURT:  Is it your intention to make Venu

10   available as a standalone offering to MVPDs?

11             THE WITNESS:  It is my intention to work with the

12   affiliate team and listen to any proposals, but we want to be

13   everywhere.  So the example that you just gave me is good for

14   ESPN business.  If ESPN is available in that area between

15   Flagship, meaning ESPN standalone and the bundle, if we're

16   available in Venu, that's great, but we want to be available

17   everywhere.  Like, that is our mission, serve the sports fan

18   anywhere.

19             And so as long as it makes business sense for us, we

20   want to be there.  So our —— my understanding is our affiliate

21   sales and marketing team is very interested in what you just

22   described.

23             THE COURT:  Does ESPN negotiate separately with MVPDs,

24   whether physical or digital, or is access to ESPN negotiated by

25   a team that represents all the Disney properties?

1               THE WITNESS:  It's the latter.

2               THE COURT:  All right.  Thank you.

3               THE WITNESS:  Thank you.

4     BY MR. EVEN:

5     Q.  If you go to DX 210 in your binder, and I want to direct

6     your attention to page 2, first email in this thread, the

7     bottom of the document on September 21, '23.  Do you see this?

8     A.  Yes.

9     Q.  And if you go several lines down, it says:  "Co-ownership

10    at one one-third, one-third, one-third, not meant to generate

11    profit."

12              Do you see that?

13    A.  I do.

14    Q.  What is meant by "not meant to generate profit"?

15    A.  The JV's profit was not the motivation here.  As I

16    referenced earlier, what — what motivated us was this idea of

17    creating another solution, another option, for the sports fan,

18    the price-sensitive sports fan, and at the same time making

19    sure that we are receiving fair market value from that

20    offering.  In this case, that meant making sure that we

21    received our fair market affiliate rates.

22    Q.  So why would —

23              THE COURT:  I'm sorry, sir.  Let me just ask about

24    that.

25              Mr. Pitaro, Disney's a publicly traded for-profit

O87HFub7                          Pitaro - Cross

1    company, right?

2              THE WITNESS:  Correct.

3              THE COURT:  And it has a fiduciary duty to its

4    shareholders to try to make as much money as possible, correct?

5              THE WITNESS:  Right.

6              THE COURT:  What is the business case for entering

7    into a transaction that you don't expect to generate any

8    profit?

9              THE WITNESS:  The business case was around the

10   payments that we will get from Venu, from the JV, to carry our

11   networks.

12             THE COURT:  OK.  So just to make sure I understand,

13   because business is not —— you have to talk very simply for me.

14   This line, "not meant to generate profit," meaning that the

15   intent is that your ownership of Venu is not generating a

16   profit, but the business case is to generate revenue,

17   presumably with some profit, from having your content pushed

18   out through Venu?

19             THE WITNESS:  Exactly right.

20             THE COURT:  OK.  I understand now.  Thank you.

21             Go ahead.

22             MR. EVEN:  Just one second, your Honor.  I need to

23   strike like two pages.

24             THE COURT:  Excellent.  I'm sure Mr. Pitaro is equally

25   happy.

1    BY MR. EVEN:

2    Q.  So, Mr. Pitaro, let's talk for a second about how the JV

3    will operate.

4            If you turn to JX 045 in your binder, what is this

5    document?

6    A.  This is the binding term sheet in connection with the joint

7    venture with Fox and Warner Bros. Discovery.

8    Q.  Very briefly on that, who controls the day-to-day

9    operations of the JV?

10   A.  The CEO, Pete Distad, and his executive leadership team.

11   Q.  Who set the price for Venu?

12   A.  The CEO, Pete Distad, and his team.

13   Q.  How does —— strike that.

14           Will Venu affect in any way Disney's plans to launch

15   Flagship?

16   A.  No.

17   Q.  Is Disney allowed to launch Flagship under the term sheet?

18   A.  Yes.

19   Q.  Is Disney going to change how it plans to price Flagship

20   because of Venu?

21   A.  No.

22   Q.  Does Disney have a general range in mind for the pricing of

23   Flagship?

24   A.  Yes.

25   Q.  Has that range changed now that Venu is going to launch?

O87HFub7                        Pitaro - Cross

1    A.  No.

2    Q.  Will Venu change how ESPN is licensed to other

3    distributors?

4    A.  No.

5    Q.  Do you understand the JV has a noncompete?

6    A.  Yes.

7    Q.  So I want to direct your attention to page 17 of this

8    document, which is the noncompete.

9           And what is your understanding of this noncompete

10   provision?

11   A.  Very limited and limited specifically to one instance or

12   one topic, which is the parties' inability to invest in another

13   sports skinny bundle during a three-year period.

14   Q.  And what is the concern, as you understand it, that

15   animated this noncompete?  What is it that, for instance, at

16   Fox or Warner Bros. was concerned that Disney might do?

17   A.  Let me be very clear.  We did not want any kind of

18   noncompete.  This is a compromise and, again, limited to that

19   one instance that I just mentioned.

20   Q.  So let me clarify that.

21          First of all, who's the "we" that did not want any

22   noncompete?

23   A.  Sorry.  I meant ESPN and The Walt Disney Company.

24   Q.  OK.  And this is a compromise that you reached with the

25   other parties?

O87HFub7                    Pitaro - Cross

1    A.  Correct.

2    Q.  Now, as part of that, as part of that compromise, what is

3    it that was the concern that animated and eventually you agreed

4    to in the term sheet that Disney might do what?

5    A.  That Disney might make an investment in a similar product,

6    a sports skinny bundle, with another ── or other enterprises.

7    Q.  What kind of other enterprises?

8    A.  For example, NBC and/or CBS.

9    Q.  So, in other words, you can't initiate or invest in another

10   JV?

11   A.  In another sports skinny bundle-focused JV, yes.

12   Q.  Got it.

13           Is there anything here that prevents you from

14   licensing on a ── rights to a skinny bundle from The Walt

15   Disney Company to anyone?

16   A.  Absolutely not.  We were incredibly clear on that.

17   Q.  If NBC or CBS launched their own sports-focused enterprise

18   or even a JV between the two of them and would want ESPN to

19   license into that JV, would ESPN be willing to negotiate that?

20   A.  Yes.

21   Q.  Why is that?

22   A.  Because it makes good sense for us.  Again, we want to be

23   everywhere, and if ── if the business terms made sense for us,

24   we would go ahead and do that.  And again, we were very clear

25   with Fox and Warner Bros. Discovery that this was a

O87HFub7                         Pitaro - Cross

1  nonnegotiable for us.

2  Q.  Is there anything in here that you think prevents

3  Mr. Connolly, who we'll hear from, or anyone from Disney going

4  out and trying to license skinnier bundles of Disney

5  sports-focused or other programming to distributors?

6  A.  No.

7  Q.  Is there any agreement —— verbal agreement, an agreement by

8  handshake, a gentlemen's agreement, a gentlemen's understanding

9  —— anything like that that's not memorialized in this term

10  sheet about noncompetition between these companies?

11  A.  No.

12        THE COURT:  Mr. Pitaro, during the time that you've

13  been the head of ESPN, has ESPN ever been provided to any MVPD

14  without Disney's entertainment channels?

15        THE WITNESS:  Not to my knowledge.

16        MR. SCHULTZ:  I'm sorry to interrupt.  It's 5:30.

17        THE COURT:  It's 5:26.

18        MR. SCHULTZ:  I'm sorry.  My clock is a little fast.

19        THE COURT:  How are we doing?

20        MR. EVEN:  I'm getting close, your Honor.  I'll try to

21  finish by 5:30, maybe a couple minutes late.

22        THE COURT:  OK.

23        MR. SCHULTZ:  I have about three minutes redirect, if

24  that's OK with the Court.

25        THE COURT:  I understand.

O87HFub7                        Pitaro - Cross

1    BY MR. EVEN:

2    Q.  Mr. Pitaro, will Disney, Fox, and Warner Bros. be sharing

3    competitively sensitive information through the JV?

4    A.  No.

5    Q.  How do you know that?

6    A.  Because it's specifically memorialized in the term sheet.

7    We have a firewall policy, and we have a provision that

8    specifically covers data sharing.

9    Q.  If you go to DX 070, is that the firewall policy for Venu?

10   A.  Yes.

11   Q.  Will Venu negotiate with any sports rights holders?

12   A.  No.

13   Q.  How will Venu get its sports content?

14   A.  By licensing the networks that include sports content.

15   Q.  Will Venu impact how Disney approaches its negotiations

16   with sports rights?

17   A.  No.

18   Q.  Now, we've seen the 67 percent and the 4.8 million

19   subscribers numbers that you received back in November, I

20   think, of 2023.  You remember seeing that?

21   A.  Yes.

22   Q.  Are you content with those numbers?

23   A.  No.

24   Q.  Are you going to try and make better on these numbers?

25   A.  We absolutely are.

1    Q.  What is your plan to try and beat these numbers?

2    A.  Look, we're going to do everything we can to minimize

3    cord-cutting.  We're going to do everything we can on the

4    marketing side to attract people that are on the sidelines

5    through digital, through social, our dot com, our app,

6    attracting people that are not currently subscribed to the MVPD

7    ecosystem.

8    Q.  Now, would it still be —— would it still make business

9    sense for Disney to move forward with the 4.8 million and

10   67 percent numbers that you relied on?

11   A.  Yes, because you're getting —— you're getting incremental

12   subscribers.

13   Q.  What does that mean to Disney that you're getting 1.5 or

14   1.6 million incremental subscribers under these numbers?

15   A.  It's significant.  We get paid on a per-subscriber basis.

16   Q.  If you go to JX 46 —— and this is again not for the public.

17   This is —— you see this is the five-year plan for ESPN?

18   A.  Yes.  Sorry.  Yes.

19   Q.  Is this a document that is routinely produced for ESPN

20   every year?

21   A.  Yes.

22           MR. EVEN:  If we can take it off the public screen and

23   move to slide 7.

24   Q.  Do you see a slide that's entitled "Increasing Distribution

25   Across the Spectrum to Serve Sports Fans"?

O87HFub7                           Pitaro - Cross

1    A.  Yes.

2    Q.  What are you showing on this slide as part of the five-year

3    plan?

4    A.  We're showing a couple of things.  First off, it's

5    suggesting industry headwinds, cord-cutting for the most part,

6    and number two, our desire to create more options for the

7    sports fan.

8    Q.  So we see multiple options here.  One of them is Flagship

9    that we see that you mentioned.  How is the launch of Flagship

10   direct to consumer going to affect the number of people on Venu

11   and vice versa?

12   A.  Flagship and —— will impact Venu and Venu will impact

13   Flagship.  We're looking at the totality of households or

14   sports fans subscribing to ESPN.  That is how we'll judge our

15   success.  This is just showing the spectrum, the continuum, as

16   we provide —— create and provide options, as I said before,

17   across price points and across content levels.

18   Q.  What does this chart show us about your going-forward

19   relationship with pay TV?

20   A.  You see here on the right it is still very much a priority.

21   The big bundle, the MVPD, digital MVPD universe is very much

22   priority.  But it will continue to decline.  That is our

23   forecast.  And so we have to address that, and we have to

24   provide services for sports fans that are not getting served

25   today by or in the future by the big bundle.

O87HFub7                          Pitaro - Cross

1          THE COURT:  Mr. Pitaro, this chart only contemplates,

2     as far as I can see — you'll correct me if I'm wrong — a big

3     bundle continuing relationship with the various MVPDs.  None of

4     the options on here are a relationship that ESPN or The Walt

5     Disney Company might have with MVPDs that would involve

6     something other than the big bundle.  That's not reflected on

7     here, right?

8          THE WITNESS:  Well, the first — if you go from left

9     to right, the first four columns are not the big bundle.

10          THE COURT:  Right.  But they're also not relationships

11     between ESPN or Disney and MVPDs, right?

12          THE WITNESS:  Correct.

13          THE COURT:  So we've got Disney+ as SVOD-type service,

14     but that also has ESPN, ESPN+.  Then we've got the planned

15     Flagship ESPN, then we have Venu, and then the only option, at

16     least that's on this slide that's about how ESPN — ESPN's

17     ongoing relationship with MVPDs is in this last column, this —

18     like this is our big bundle relationship with MVPDs.

19          THE WITNESS:  The only exception I would say, or the

20     only thing I'd point out, is we do consider Venu a digital

21     MVPD.  It's got its own management team.  It's — it will be

22     streaming our linear networks across ESPN, Fox, and Warner

23     Bros. Discovery.

24          THE COURT:  Right.  But that's a new place.  It's not

25     the existing relationships you have with MVPDs?

1          THE WITNESS:  Correct.

2          THE COURT:  OK.  Thank you.

3   BY MR. EVEN:

4   Q.  Mr. Pitaro, last question.  From your experience, how

5   simple it is to have entered — enter into and get a

6   distributor to launch a skinny bundle such that you can plan it

7   as part of your five-year plan?

8   A.  One more time.  I'm sorry.

9   Q.  How difficult or simple it is to actually enter into a

10  relationship with a distributor who can amass the —

11  A.  Yeah.

12  Q.  — skinny rights to launch a skinny bundle?

13  A.  I believe it's quite complicated because existing MVPDs and

14  digital MVPDs have very specific contracts with programmers

15  that would prohibit them today from launching or offering a

16  Venu-like sports skinny bundle service.  Said another way, they

17  would need, I believe, to renegotiate their existing contracts,

18  which, from our perspective, would take years.

19  Q.  Who would be best placed to explain these difficulties

20  from —

21  A.  Sorry.  Justin Connolly, our head of affiliate sales.

22          MR. EVEN:  Thank you.  No further questions.

23          THE COURT:  Mr. Schultz, bringing it home.

24          MR. SCHULTZ:  Be very quick.

25  REDIRECT EXAMINATION

O87HFub7                          Pitaro - Redirect

1    BY MR. SCHULTZ:

2    Q.  Let's stay on JX 46, the same page there.  It's page 7 of

3    JX 46, please.

4           We've been talking about this spectrum here on this

5    slide, Mr. Pitaro, and you've referred to the gap between DTC

6    products and SVODs, on the one hand, and the big bundle, on the

7    other hand, as an ocean of opportunity.  Do you recall that?

8    A.  I believe so, yes.

9    Q.  And that ocean is occupied or will be occupied by Raptor in

10   the skinny sports bundle, correct?

11   A.  It will be occupied by several products, but, yes, Venu

12   will be one of them.

13   Q.  You're not aware of any other skinny sports bundle in the

14   U.S. beside Raptor, correct?

15   A.  The opportunity is somewhere between Flag —— ESPN Flagship

16   standalone and the bundle.  My understanding is that there are

17   today existing virtual MVPD products in that space.  In terms

18   of sports-only products, I do not believe that there are any

19   today.

20   Q.  Raptor will be the only one, correct?

21   A.  When it launches, I believe that's accurate.

22   Q.  Let's go back to JX 45, which was also shown to you by

23   defense counsel.  This again is the term sheet for Raptor.  I

24   want to go to page 5 and follow up on questions Judge Garnett

25   asked you, the Court asked you.

O87HFub7                        Pitaro - Redirect

1          I think you testified earlier that ESPN would be happy

2     to license —— or Disney would be happy to license the Raptor

3     platform to MVPDs.  Do you recall that?

4     A.  On the right terms.

5     Q.  The right terms?

6     A.  We would be open to that.

7     Q.  OK.  I want to direct you to page 5, the box at the bottom

8     here.  It's called "Methods of Distribution."  Said paragraph

9     says:

10          "The JV platform," which is Raptor, "shall not be

11    licensed to or distributed by any current or former distributor

12    of any JV network (e.g., MVPDs or vMVPDs) including affiliated

13    entities, provided that the members may unanimously agree on

14    specific terms for bundling and/or resale by MVPD-affiliated

15    platform, mobile, and/or broadband services."

16          Did I read that correctly?

17    A.  I see that, yes.

18    Q.  This provision of the term sheet restricts Disney and ESPN

19    from licensing Raptor to any MVPD without the unanimous consent

20    of Fox Warner Bros., correct?

21    A.  It is meant to reference the JV platform.  Platform is a

22    defined term with a capital "P."  That cannot be licensed per

23    this section.  What I was referring to is the licensing of our

24    networks that are included in Raptor or Venu.

25    Q.  Certainly, you could not license Raptor itself to any MVPD,

O87HFub7                        Pitaro - Redirect

1    correct, without the consent of Fox and Warner Bros.?

2    A.   The Raptor platform.

3    Q.   Right.

4    A.   That is what this is referencing.

5              MR. SCHULTZ:  No further questions.  Thank you.

6              MR. EVEN:  Nothing, your Honor.  Thank you.

7              THE COURT:  Thank you so much, Mr. Pitaro.

8              If Raquel will indulge me for a couple minutes, we'll

9    talk to the lawyers.  We'll have a bit of a reality check with

10   the lawyers.  Just leave that there, Mr. Pitaro, you're

11   excused.

12             (Witness excused)

13             THE COURT:  So by my calculations and the parties'

14   estimates, you have —— if I've done the math correctly, you

15   predict 12 hours and 40 minutes of testimony remaining.  If

16   everyone actually sticks with those estimates, which you will

17   be doing going forward, we can finish all testimony in the next

18   two days, so which we will do.  We will conclude the testimony

19   at the end of the day on Friday.

20             I have not been overly policing you on time or on

21   repetitive questioning or my personal views, if any, about

22   whether questioning is useful or not, but we scheduled this

23   hearing based on your own estimates of how much time you would

24   need for the witnesses.  And as you all know, we have been

25   running way over that.  So going forward, in order to finish by

O87HFub7                          Pitaro - Redirect

1   Friday, you have to stay at least within the universe of the

2   estimates that you've given me and each other for how much time

3   you expect the witnesses to take.  That's not only for my

4   convenience, it's also for the fact that we have witnesses here

5   who, as far as I understand it, have quite demanding day jobs,

6   and it's for their convenience as well as my convenience and

7   the ability of lawyers to prepare.

8           So just as an act of grace, we will have the closing

9   arguments on Monday morning.  So we'll finish the testimony by

10  the end of the day Friday.  There will be no more testimony.

11  You'll have the weekend to prepare.  I think, actually, that

12  probably will hopefully sharpen the presentations, which will

13  be helpful to the parties and to me.  We'll do that Monday

14  morning.

15          The ten-page post-submissions, which is my

16  understanding I think everyone wants that option, will still be

17  due by midnight on Monday.  So no change on that.  And that

18  really is to enable me to meet the need for clarity of both

19  sides about what the status is of the PI as soon as possible

20  after the hearing is over.

21          So any questions or any other issues that either side

22  wants to raise?

23          Mr. Earnhardt?

24          MR. EARNHARDT:  Nothing here, your Honor.  Thank you.

25          THE COURT:  Mr. Levander?

O87HFub7                          Pitaro - Redirect

1                MR. LEVANDER:  When you say Monday morning, I assume

2      it's 9:30 as well?

3                THE COURT:  Yes, yes.  Again, you each have —— each

4      side has 90 minutes.  If we start at 9:30 on Monday with a

5      morning break, we can finish by lunchtime.  OK.

6                MR. EARNHARDT:  Thank you, your Honor.

7                MR. LEVANDER:  Thank you.

8                THE COURT:  Mr. Schultz, anything further?

9                MR. SCHULTZ:  Nothing further, your Honor.  Thank you.

10               THE COURT:  Thank you all very much.  I'll see you

11     tomorrow morning at 9:30.

12               We're adjourned.

13               (Adjourned to August 8, 2024, at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         INDEX OF EXAMINATION

2      Examination  of:                             Page

3      TODD MATHERS

4      Cross By Mr. Ryan . . . . . . . . . . . . . 253

5      Redirect By Mr. Gideon . . . . . . . . . . . 272

6       BENJAMIN GRAD

7      Direct By Mr. Block  . . . . . . . . . . . . 281

8      Cross By Mr. Tsekerides  . . . . . . . . . . 292

9      Cross By Mr. Earnhardt . . . . . . . . . . . 311

10     Cross By Mr. Earnhardt . . . . . . . . . . . 316

11     Cross By Mr. Bizar . . . . . . . . . . . . . 318

12     Redirect By Mr. Block  . . . . . . . . . . . 320

13     Recross By Mr. Tsekerides  . . . . . . . . . 321

14     SALVATORE PETER MARCHESANO

15     Direct By Ms. Tondrowski . . . . . . . . . . 323

16     Cross By Mr. Ryan  . . . . . . . . . . . . . 336

17     JOHN NALLEN

18     Direct By Mr. Hafenbrack . . . . . . . . . . 347

19     Direct By Mr. Hafenbrack . . . . . . . . . . 389

20     Cross By Mr. Levander  . . . . . . . . . . . 405

21     Redirect By Mr. Hafenbrack . . . . . . . . . 421

22     Recross By Mr. Levander  . . . . . . . . . . 423

23     GARY EARL SCHANMAN

24     Direct By Mr. Wilkins  . . . . . . . . . . . 424

25     Cross By Mr. McGinley  . . . . . . . . . . . 450
```

Cross By Mr. Addis . . . . . . . . . . . . . 463

 JAMES ANTHONY PITARO

Direct By Mr. Schultz  . . . . . . . . . . . 472

Cross By Mr. Even  . . . . . . . . . . . . . 491

Redirect By Mr. Schultz  . . . . . . . . . . 514